RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com

Proposed Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| In re: | ) Case No.: 1:24-bk-10646-MB |
|---|---|
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | ) <br> ) Chapter 11 <br> ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S EMERGENCY MOTION** <br> ) **FOR ENTRY OF AN INTERIM** <br> ) **ORDER: (I) AUTHORIZING THE** <br> ) **DEBTOR TO USE CASH** <br> ) **COLLATERAL (II) GRANTING** <br> ) **ADEQUATE PROTECTION; (III)** <br> ) **SCHEDULING A FINAL HEARING;** <br> ) **AND (IV) GRANTING RELATED** <br> ) **RELIEF; MEMORANDUM OF** <br> ) **POINTS AND AUTHORITIES** <br> ) <br> ) [Omnibus Declaration of Sankaet Pathak in <br> ) Support Hereof Filed Concurrently <br> ) Herewith] <br> ) <br> ) Date:    April 24, 2024 <br> ) Time:    2:00 p.m. <br> ) Place:   Courtroom 303 <br> )            21041 Burbank Boulevard <br> )            Woodland Hills, CA 91367 <br> ) |

1

**Table of Contents**

**BRIEF BACKGROUND INFORMATION** ................................................................. 3

**REQUEST TO USE CASH COLLATERAL** ............................................................. 7

**MEMORANDUM OF POINTS AND AUTHORITIES** ........................................ 12

**I. STATEMENT OF FACTS** ..................................................................................... 12

     **A.**     **CASE BACKGROUND** ................................................................. 12

     **B.**     **PRE-PETITION FINANCING ARRANGEMENTS** ........................ 18

     **C.**     **THE NEED FOR USE OF CASH COLLATERAL** ........................... 20

**II. THE DEBTOR MUST BE AUTHORIZED TO USE CASH COLLATERAL** ....................................................................................................... 25

     **A.**     **THE DEBTOR MUST BE AUTHORIZED TO USE CASH COLLATERAL TO OPERATE, MAINTAIN AND PRESERVE ITS ASSETS IN ACCORDANCE WITH THE APPROVED BUDGET.** ........................................ 25

     **B.**     **THE SECURED CREDITORS ARE ADEQUATELY PROTECTED BY AN EQUITY CUSHION, THE CONTINUED OPERATION OF THE DEBTOR'S BUSINESS AND OTHER FORMS OF ADEQUATE PROTECTION.** .............................................................. 26

**III. THE DEBTOR MUST BE AUTHORIZED TO HONOR PRE-PETITION OBLIGATIONS TO ITS CUSTOMERS AND PARTNER FINANCIAL INSTITUTIONS** ........................................ 29

**IV. PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE MOTION HAVE BEEN SATISFIED** ................................. 31

**IV. THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE** ................................................................................. 32

**V. CONCLUSION** ................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Burchinal v. Central Washington Bank (In re Adams Apple, Inc.)*,
    829 F.2d 1484 (9th Cir. 1987)................................................................30

*Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.)*,
    37 B.R. 334 (W.D. Mo.), *appeal dismissed*, 738 F.2d 445 (8th Cir.
    1984) ....................................................................................................31

*In re Dynaco Corporation*,
    162 B.R. 389 (Bankr. D.N.H. 1993) ..............................................27, 29

*In re Equalnet Commc'ns*,
    258 B.R. 368 (Bankr. S.D. Tex. 2000) ...................................................31

*In re Immenhausen Corp.*,
    164 B.R. 347 (Bankr. M.D. Fla. 1994) ...................................................29

*In re McCombs Properties VI, Ltd.*,
    88 B.R. 261 (Bankr. C.D. Cal. l988).......................................................28

*In re Mellor*,
    734 F.2d 1396 (9th Cir. 1984).................................................................27

*In re Newark Airport/Hotel Ltd. Partnership*,
    156 B.R. 444 (Bankr. D.N.J. 1993) .........................................................29

*In re O'Connor*,
    808 F.2d 1393 (10th Cir. 1987)........................................................28, 29

*In re Oak Glen R-Vee*,
    8 B.R. 213 (Bankr. C.D. Cal. 1981) ........................................................26

*Matter of Pursuit Athletic Footwear, Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) ........................................................29

*In re Stein*,
    19 B.R. 458. (Bankr. E.D. Pa. 1982)........................................................28

*In re Structurelite Plastics Corp.*,
    86 B.R. 922 (Bankr. S.D. Ohio 1988).......................................................31

*In re Triplett*,
   87 B.R. 25 (Bankr. W.D.Tex. 1988) ........................................................................ 28

*In re Tucson Industrial Partners*,
   129 B.R. 614 (9th Cir. BAP 1991) ........................................................................ 26

*United Savings Association v. Timbers of Inwood Forest Associates*,
   108 S.Ct. 626 (1988) ........................................................................................... 28

*In re Woodside Group, LLC*,
   Case No. 08-20682 (Bankr. C.D. Cal. Aug. 27, 2008) [Docket No. 18] ................... 31

**Federal Statutes**

11 U.S.C.
   § 105(a) ................................................................................................................ 1
   § 363(a) ............................................................................................. 1, 21, 22, 26
   § 363(c)(1) ......................................................................................................... 26
   § 363(c)(2)(A) and (B) ....................................................................................... 26
   § 1108 ................................................................................................................ 30

Bankruptcy Code Chapter 5 ................................................................................ 2, 24

Pursuant to Local Bankruptcy Rules 2081-1 and 9075-1, 11 U.S.C. §§ 105(a), 361, 363, 549, and 1108 and Rule 6003 of the Federal Rules of Bankruptcy Procedure, Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor"), hereby files this motion (the "Motion"), on an emergency basis, for the entry of an interim order ("Interim Order") in substantially the form attached as **Exhibit 1** to the Omnibus Declaration of Sankaet Pathak filed in support of the Debtor's first day motions filed concurrently herewith[1] ("Omnibus Declaration"), and for the entry of a final order ("Final Order" and with the Interim Order, the "Orders") following a final hearing, which provide for, among other things:

(a)    authorization for the Debtor's use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), in accordance with the Debtor's 18-week cash flow forecast ("Budget") which sets forth all projected cash receipts and cash disbursements following the Petition Date including the honoring of certain pre-petition obligations to customers and banking and financial service providers ("Partner Financial Institutions") in the ordinary course of its business, subject to the "Permitted Variance" (as defined below), attached as **Exhibit 2** to the Omnibus Declaration, and all future budgets, and in accordance with the terms and conditions set forth in the Orders, as applicable;

(b)    in addition to all the existing security interests and liens previously granted to Silicon Valley Bank, as predecessor to First Citizens Bank & Trust Company ("SVB"), and TriplePoint Capital LLC ("TriplePoint" and with SVB, collectively, the "Secured Creditors"), as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the prepetition collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Secured Creditors to permit the Debtor's use of the cash collateral as provided for in this Interim Order, the Secured Creditors are hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

---

[1] The form of the Interim Order was negotiated with, and the Debtor believes has been agreed to by, the Secured Creditors (as defined below).

1

(i)    continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, contract claims, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), any other choses in action, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtor, by settlement or otherwise, in respect of claims or causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "Adequate Protection Collateral"); provided, that Adequate Protection Collateral shall also include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral; and

(ii)    allowed superpriority administrative expense claims in the Debtor's bankruptcy case and any successor cases (the "Adequate Protection Superpriority

2

Claim") with priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(c)    authorizing the Debtor to honor certain pre-petition obligations to customers which are due in the ordinary course of business, as reflected in the Budget, subject to the Permitted Variance;

(d)    instructing and ordering all banks holding or in possession of the Debtor's funds to immediately release such funds to the Debtor to enable the Debtor to transfer and deposit such funds into its debtor in possession bank accounts at SVB irrespective of any pre-petition agreements, including, without limitation, any deposit account control agreements[2];

(e)    pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order;

(f)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(g)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

## BRIEF BACKGROUND INFORMATION

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date").  The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

[2] Concurrently herewith, the Debtor has also filed an emergency motion seeking relief with respect to their pre-petition cash management system.

3

The Debtor was founded by Sankaet Pathak as "Synapse Payments LLC" in 2014 and changed its name, pursuant to its conversion to a corporation, to "Synapse Financial Technologies, Inc." in 2016. The Debtor is a technology and software company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as "End Users" to avoid confusing them with the fintechs which are the Debtor's only customers) through the Debtor's relationships with bank partners and other financial service providers (referred to as "Partner Financial Institutions").

The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (BaaS) platform to allow for the provision of Partner Financial Institutions financial products (*e.g.,* bank accounts, card products, cash management accounts and related services, and loan products) to the customers of the fintechs (*i.e.,* the End Users). The Debtor, a non-bank, has in place certain agreements with Partner Financial Institutions to enable the provision of financial products through the Debtor's software and technology services. The fintechs provide the user interface in which End Users access the products of the Partner Financial Institution through the Debtor's software.

*By example* of the Debtor and a Partner Financial Institution offering, an individual or a company business customer (*i.e.,* the End Users) interested in obtaining various financial services such as opening a bank account will first sign up with a fintech which has contracted for the Debtor's services. Through the fintech's application, the End User signs up for the specific financial products by first signing up for a user account through the fintech's application and agreeing to the fintech's terms and conditions (as well as those of the Debtor). Then, through the fintech's application, the End User can choose from banking products offered by the Partner Financial Institutions (*e.g.,* deposit account agreement, card agreement, or the like). End Users are customers of the fintechs and the Partner Financial Institutions, not the Debtor. The Debtor is not in the flow of funds and does not receive funds from the End Users.

4

The Partner Financial Institutions access information about the End Users through the Debtor's software and technology services. The "network" between the fintech and the Partner Financial Institutions is created through the Debtor's technology and software which then allows for the fintechs, Partner Financial Institutions and the End Users to communicate through their systems and programs to make transactions (for such things as deposits, withdrawals, cards transactions, ACH and wire payments, etc.), for disputing transactions, monitoring and reporting, and the like.

In addition to providing access to its proprietary technology and a platform that allows for the fintechs to offer banking products and services of the Partner Financial Institutions to the End Users, the Debtor also provides related services to the banks and the fintechs, such as, for example, compliance check services (*e.g.*, ensuring that the End Users are authorized to open accounts), and handles End-User disputes and customer service. As of January 2024, the Debtor had service contracts with over 20 Partner Financial Institutions (either directly or indirectly for sweep networks) and 100 fintechs, and approximately 10 million End Users through its technology platform. As of the Petition Date, the Debtor engaged approximately 89 employees and contractors in the United States. The Debtor also engages approximately 19 personnel outside of the United States, but these personnel are engaged through a third-party employer service.

Confronted with the material financial and operational challenges which are further described in the Memorandum of Points and Authorities annexed hereto, the Debtor determined that it needed to explore investment, restructuring and other options, and, in that regard, the Debtor engaged William Blair as its investment bankers to solicit proposals for infusion of capital (which offer was ultimately rejected). In the Fall of 2023, the Debtor also explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Marketing by William Blair produced several proposals, including an initial offer from the Buyer (as defined below),

however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did so by seeking to engage Jefferies LLC ("Jefferies").

On April 19, 2024, the Debtor signed an Asset Purchase Agreement ("APA") with Tabapay or its designee ("Buyer" or "Tabapay") which has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to its two (2) wholly-owned subsidiaries (defined and described in the Memorandum of Points and Authorities as "S Brokerage" and "S Credit") for the cash purchase price of $9,700,000 ("Cash Purchase Price"), plus other consideration as described in the APA, including the Buyer's agreement to pay for all cure obligations associated with the assumed leases and contracts. Contemporaneously with the filing of this Motion, the Debtor has filed its motion for approval of the sale of the Debtor's assets to Tabapay ("Sale Motion").

The APA contemplates a three-tiered closing process with (i) the Initial Closing to occur for the transfer of all of the "Purchased Assets" other than the Debtor's equity interests in S Brokerage and S Lending, (ii) a second closing to occur as soon as the "change of ownership or control" can be made with respect to S Brokerage pursuant to the procedures governed by FINRA[3], and (iii) a third and final closing to occur as soon as the licenses designated by Tabapay as to S Lending are transferred to Tabapay. The "Outside Closing Date" for the Initial Closing is April 30, 2024.

Although the details of the provisions of the APA are set forth more fully in the Sale Motion, among other things, the APA contains numerous covenants, including the requirement that the Debtor conduct its business in the ordinary course of business until the final closing, which includes, without limitation, the timely honoring and payment of its Customer/Bank Obligations. It is also a condition to closing that the Court approve the Debtor's settlement agreement with the Debtor's banking partner, Evolve Bank & Trust ("Evolve"), and concurrently herewith, the Debtor has filed its emergency motion pursuant to Rule 9019 of the

---

[3] The Debtor is advised that the "change of ownership or control" of S Brokerage can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

Federal Rules of Bankruptcy Procedure for the Court's approval of such settlement agreement ("Evolve Settlement Motion").

The Debtor has concluded that it is in the best interests of its creditors to sell its assets to Tabapay pursuant to Section 363(f) of the Bankruptcy Code, and requires the protections and the benefits afforded to it by the Chapter 11 bankruptcy process in order to consummate a sale and to orderly wind down its remaining affairs.

### REQUEST TO USE CASH COLLATERAL

The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its subsidiaries, which, as evidenced by the APA, will be sold for total consideration value of no less than $9.7 million. In addition, as further described in the Evolve Settlement Motion, the Debtor has reached a settlement agreement with Evolve, which has agreed to pay $2 million to the estate, and the estate also has significant causes of action against a former fintech customer (known as Mercury Technologies, Inc.) from which the Debtor expects that it will recover substantial funds; these recoveries are expected to serve as the primary sources of recovery for unsecured creditors in this case.

The Debtor is a party to two (2) pre-petition financing arrangements with (i) SVB, and (ii) TriplePoint. Both of these Secured Creditors assert liens and security interests upon substantially all of the Debtor's assets including the Debtor's cash. As of the Outside Closing Date of April 30, 2024, SVB will be owed approximately $1.5 million, and TriplePoint will be owed $7,199,624.29.[4]

---

[4] TriplePoint has agreed to accept this discounted amount in full and final satisfaction of the Debtor's obligations to TriplePoint if payment is made by May 6, 2024. Pursuant to that certain Subordination Agreement dated July 29, 2022 between SVB and TriplePoint, TriplePoint's rights to payment and performance of the Debtor's obligations to TriplePoint, and all liens and security interests securing such obligations are subordinated to SVB's right to full payment and performance of the "Senior Debt" (generally defined as all obligations owed to SVB under the SVB Loan Documents up to the "Senior Debt Cap" and all liens and security interests securing the "Senior Debt"). The "Senior Debt Cap" is defined to include (a)(i) with respect to the aggregate principal amount of all indebtedness under the SVB Loan Documents, $6,000,000, plus (ii) with respect to "Bank Services," $250,000; plus (b) any interest, fees, charges, costs and any reimbursement obligations payable pursuant to the SVB Loan Documents. Except as authorized under the Subordination Agreement, TriplePoint agreed to not ask, demand, sue for, take or receive any monies until the Senior Debt up to the Senior Debt Cap shall have been fully paid in cash and all commitments to extend credit under the SVB Loan Documents have been terminated. The Subordination

By the Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral to pay all of their projected expenses set forth in the Budget which includes certain pre-petition obligations to the Debtor's customers incurred in the ordinary course of its business. The Debtor shall not permit the percentage variance with respect to (a) projected receipts in each then-current Budget to exceed (i) 12.5% on an individual basis of actual receipts for a specific line item and (ii) 10% on an aggregate basis of total actual receipts, in each case, on a cumulative four-week rolling basis, and (b) projected disbursements in each then-current Budget to exceed (i) 12.5% on an individual basis of actual disbursements for a specific line item and (ii) 10% on an aggregate basis of total actual disbursements The Debtor further seeks Court authority to deviate from the Budget, without the need for any further Court order, by an allowed cumulative variance of up to 15% of the Budget, with any unused amounts from the Budget for any given week or month to carry over to the following weeks' and/or months' expenditures) ("Permitted Variance").

As adequate protection for the Debtor's use of cash collateral, the Debtor proposes to provide to the Secured Creditors the Adequate Protection Obligations. As further discussed in the Memorandum of Points and Authorities annexed hereto, the Secured Creditors are further adequately protected by the ongoing operations of the Debtor's business, which must continue to operate in the ordinary course of business in order for the Debtor to be able to consummate a sale of its business and related assets to the Buyer, and an equity cushion of approximately 35% afforded by the value of the Debtor's assets, as evidenced, in part, by the Debtor's cash on hand as of the Petition Date and the total value of the consideration offered by the Buyer, which secures the claims of the Secured Creditors. More specifically, the Secured Creditors will be owed collectively approximately $8.7 million (as of April 30, 2024) and are secured by substantially all of the Debtor's assets which have a value of no less than approximately $11.7 million consisting just of the Debtor's cash on hand (approximately $2 million as of the Petition

---

Agreement also confirms that the liens and security interests of TriplePoint in the Debtor's property are junior and subordinated to the liens and security interests securing the Senior Debt.

Date) and the total consideration value offered by the Buyer ($9.7 million). Moreover, at the Initial Closing, which is to occur by not later than April 30, 2024, all of the Debtor's indebtedness owed to the Secured Creditors will be paid and satisfied.

As of January 2024, the Debtor serviced approximately 10 million users through its technology platform, and based on the specific contractual terms with the fintechs as well as the specific banking or financial products or services subscribed by the End Users, may owe interest, deposit revenue (rebate), interchange fees, and other payments to the fintechs in the ordinary course of business. These obligations are generally set up to be paid automatically, and up to 30 days in arrears. As a result, as of the Petition Date, the Debtor has accrued pre-petition obligations to its fintech customers which are set forth in the Budget (described as "Outgoing Customer Rebate") which are payable during the approximately first 4 weeks of this case. The importance of the timely payment of these obligations to its fintech customers (such as interest which could ultimately be paid to the End Users) cannot be understated as they are critical and essential to the Debtor's business, which, if not paid, will decimate the going concern value of its business and jeopardize its relationships with, and increase litigation exposure from, its customers. Moreover, the APA with the Buyer includes a covenant that the Debtor conduct its business in the ordinary course of business through the closing dates of the sale. If the Debtor is not authorized to honor its pre-petition obligations to its customers, the Debtor will not only be in breach of its APA with the Buyer, but its ability to continue in business, successfully sell, and maximize value for creditors will be jeopardized. Therefore, as part of this Motion, the Debtor also requests authority to honor its pre-petition obligations to its customers, as reflected in the Budget and subject to the Permitted Variance, in the ordinary course of business and in the same manner as the Debtor had paid such customers pre-petition.

Pursuant to Bankruptcy Rule 4001, while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing.  The Debtor must have access and use of its cash to avoid immediate and irreparable

harm to its customers, and its bankruptcy estate. Without immediate access to and use of cash collateral, the Debtor will be unable to purchase critical services, pay its employees, customers, or otherwise maintain its business in accordance with applicable laws and regulations that govern its business and preserve the going concern value of its business until its assets can be sold. Therefore, the Debtor must be able to use their cash collateral to pay the expenses set forth in the Budget pending a final hearing.

The relief sought in this Motion is based upon the Motion, the annexed Memorandum of Points and Authorities, the Omnibus Declaration and the Declaration of Monica Y. Kim filed concurrently herewith and all Exhibits attached thereto, the statements, arguments and representations of counsel to be made at the hearing(s) on the Motion, and any other evidence properly presented to the Court at or prior to the hearing(s) on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor has served a copy of this Motion and all supportive papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, all of the Secured Creditors and their counsel (if any), the 20 largest unsecured creditors of the Debtor, and parties requesting special notice via overnight mail.

**WHEREFORE**, the Debtor respectfully requests that this Court:

(1)     grant the relief requested in the Motion on an interim basis;

(2)     enter the proposed form of the Interim Order attached as **<u>Exhibit 1</u>** to the Omnibus Declaration filed concurrently herewith;

(3)     authorize the Debtor to honor its pre-petition obligations to its customers, in accordance with the Budget subject to the Permitted Variance;

(4)     waive any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

(5)     schedule the Final Hearing on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(6)      grant such further relief as the Court deems just and proper.

Dated:  April 22, 2024                    SYNAPSE FINANCIAL TECHNOLOGIES, INC.

By: _____/s/ Monica Y. Kim_____
    RON BENDER
    MONICA Y. KIM
    KRIKOR J. MESHEFIJIAN
    LEVENE, NEALE, BENDER, YOO & GOLUBCHIK
    L.L.P.
    Proposed Attorneys for Debtor and Debtor in
    Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.    CASE BACKGROUND**

1.     The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date"). The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.     The Debtor was founded by Sankaet Pathak as "Synapse Payments LLC" in 2014 and changed its name, pursuant to its conversion to a corporation, to "Synapse Financial Technologies, Inc." in 2016. The Debtor is a technology and software company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers  (referred to as "End Users" to avoid confusing them with the fintechs which are the Debtor's only customers) through the Debtor's relationships with bank partners and other financial service providers (referred to as "Partner Financial Institutions").

3.     The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (BaaS) platform to allow for the provision of Partner Financial Institutions financial products (*e.g.,* bank accounts, card products, cash management accounts and related services, and loan products) to the customers of the fintechs (*i.e.,* the End Users). The Debtor, a non-bank, has in place certain agreements with Partner Financial Institutions to enable the provision of financial products through the Debtor's software and technology services. The fintechs provide the user interface in which End Users access the products of the Partner Financial Institution through the Debtor's software.

4.     *By example,* an individual or a company business customer (*i.e.,* the End Users) interested in obtaining various financial services such as opening a bank account will first sign

up with a fintech which has contracted for the Debtor's services. Through the fintech's application, the End User signs up for the specific banking products by first signing up for a user account through the fintech's application and agreeing to the fintech's terms and conditions (as well as those of the Debtor). Then, through the fintech's application, the End User can choose from financial products offered by the Partner Financial Institutions (*e.g.,* deposit account agreement, card agreement, or the like). End Users are customers of the fintechs and the Partner Financial Institutions, not the Debtor. The Debtor is not in the flow of funds and does not receive funds from the End Users. The Partner Financial Institutions access information about the End Users through the Debtor's software and technology services. The "network" between the fintech and the Partner Financial Institutions is created through the Debtor's technology and software which then allows for the fintechs, Partner Financial Institutions and the End Users to communicate through their systems and programs to make transactions (for such things as deposits, withdrawals, cards transactions, ACH and wire payments, etc.), for disputing transactions, monitoring and reporting, and the like.

5.     In addition to providing access to its proprietary technology and a platform that allows for the fintechs to offer banking products and services of the Partner Financial Institutions to the End Users, the Debtor also provides related services to the banks and the fintechs, such as, for example, compliance check services (*e.g.*, ensuring that the End Users are authorized to open accounts), and handles End-User disputes and customer service. As of January 2024, the Debtor had service contracts with over 20 Partner Financial Institutions (either directly or indirectly for sweep networks) and 100 fintechs, and approximately 10 million End Users through its technology platform. As of the Petition Date, the Debtor engaged approximately 89 employees and contractors in the United States. The Debtor also engages approximately 19 personnel outside of the United States, but these personnel are engaged through a third-party employer service.

6.     In the ordinary course of its business, and based on the specific banking or financial products or services received by the approximately 10 million End Users, the Debtor may owe deposit revenue (rebates), interest, interchange fees, and other payments to the fintechs

based on the terms and conditions of the Debtor's contracts with the fintechs. These obligations are generally set up to be paid automatically, and up to 30 days in arrears (collectively, the "Customer/Bank Obligations"). The importance of the timely payment of these obligations to its fintechs customers (such as interest which is ultimately paid to the End Users) cannot be understated as they are critical and essential to the Debtor's business, which, if not paid, will decimate the going concern value of its business and jeopardize the Debtor's relationships with, and increase litigation exposure from, its customers.

7.     The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("S Credit"), and (ii) Synapse Brokerage LLC ("S Brokerage"). S Brokerage is a registered broker-dealer and a member of FINRA Financial Industry Regulatory Authority (a government-authorized not-for-profit organization that oversees U.S. broker-dealers), and SIPC (Securities Investor Protection Corporation, a non-profit that works to restore investors' cash and securities when their brokerage firm fails).

8.     The Debtor purchased S Brokerage around 2020, however, it only began onboarding End Users and becoming operational only recently. Generally, S. Brokerage offers, directly to End Users, cash management products and related services through the Debtor's relationships with fintechs and network of program banks which enables End Users to spread their risk across banks. S. Brokerage's cash management program enables End Users' funds to be placed across a number of program banks to receive potential increased FDIC deposit insurance of such funds. More specifically, given that the standard insurance amount through the FDIC is, subject to its rules, $250,000 per depositor, per bank, S. Brokerage allows for End Users, through its sweep and other programs, to diversify deposit amounts higher than $250,000 across more than one bank, also using the platforms offered by the Debtor and the network of banks that the Debtor has agreements in place with. The terms of the business arrangement between the Debtor and S. Brokerage are set forth in the parties' *Amended and Restated Intercompany Service and Expense Sharing Agreement*. S. Brokerage does not directly have any employees. Rather, the Debtor provides administrative support and services to S. Brokerage such as technology, transaction processing, record keeping, sales, legal and other back-office

services, for which S. Brokerage pays a monthly service fee to the Debtor. S Brokerage has not filed any Chapter 11 bankruptcy case.

9.      S. Credit was established by the Debtor around 2019 and holds state lending licenses in order to offer loan products to End Users through the Debtor's relationships with fintechs. S. Credit provides loan products to End Users of the fintechs that the Debtors have agreements in place with. The loans are typically guaranteed with restricted cash and/or reserves for the full amount of the loans; thus, there is very little to no financial risk to the loan products offered to S. Credit. The terms of the business arrangement between the Debtor and S. Credit are set forth in the parties' *Intercompany Service and Expense Sharing Agreement*. S. Credit does not have any employees. Rather, the Debtor provides administrative support and services to S. Credit such as technology, transaction processing, record keeping, sales, legal and other back-office services, for which S. Brokerage pays a monthly service fee to the Debtor. S Credit not filed any Chapter 11 bankruptcy case.

10.     In recent years, the BaaS industry which Synapse helped pioneer has come under increased scrutiny from state and federal financial regulators, who have raised their expectations of banks and financial institutions who partner with non-bank providers. In many cases, these state and federal regulators have required banks to reduce the number of deposits they receive from BaaS/fintechs and to implement increased scrutiny over new fintech programs. At the same time, federal funds rates were continuing to increase, leading to increased revenue to the Debtor (a large portion of which it passed through to fintech customers). However, fintech valuations were plummeting and venture capital funding was scarce.

11.     The Debtor had long forecasted difficulties on the horizon for the BaaS industry; thus, it planned to pivot to a different approach which included the diversification of its Partner Financial Institutions and expansion to include in-house regulated products through S. Brokerage and S. Credit. The Debtor also engaged in negotiations for the purchase of a bank. However, this pivot required substantial investment and capital. Therefore, the Debtor sought capital infusion and received a term sheet for a $100 million capital infusion, which was approved by the Debtor's board of directors, but vetoed by certain investor directors.

15

12.     Thereafter, one of the Debtor's largest fintech customers, Mercury Technologies, Inc. ("Mercury"), notified the Debtor that it would not renew its agreement with the Debtor and instead form a direct relationship Debtor's bank partner to cut the Debtor out of the revenue stream. Concurrently with this notification, Mercury transferred over $3 billion in End User funds without the Debtor's participation to its direct bank relationship. Mercury's transfer, which the Debtor alleges was not properly conducted, resulted in damages to the Debtor and its Program. Subsequently, Mercury filed a lawsuit against the Debtor alleging that it is owed approximately $30 million for a 2022 dispute based on an interpretation of the parties' agreement as to the rate that it is to pay the Debtor which is inconsistent with the actual language of the parties' agreement. The Debtor is aggressively defending the lawsuit, and has substantial counter-claims against Mercury in an amount in excess of $36 million which it intends to actively pursue during this case.

13.     In the Fall of 2023, the Debtor explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Previous marketing of the Debtor by William Blair had produced several proposals, including an initial offer from the Buyer (as defined below), however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did so by seeking to engage Jefferies LLC ("Jefferies") which ultimately was not achieved.

14.     On April 19, 2024, the Debtor signed an Asset Purchase Agreement ("APA") with Tabapay or its designee ("Buyer" or "Tabapay") which has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to its two (2) wholly owned subsidiaries, S Brokerage and S Credit, for the cash purchase price of $9,700,000 ("Cash Purchase Price"), plus other consideration as described in the APA, including the Buyer's agreement to pay for all cure obligations associated with the assumed leases and contracts. Contemporaneously with the filing of this Motion, the Debtor has filed its motion for approval of the sale of the Debtor's assets to Tabapay ("Sale Motion").

16

15.    The APA contemplates a three-tiered closing process, with (i) the Initial Closing to occur for the transfer of all of the "Purchased Assets" other than the Debtor's equity interests in S Brokerage and S Lending, (ii) a second closing to occur as soon as the "change of ownership or control" can be made with respect to S Brokerage pursuant to the procedures governed by FINRA[5], and (iii) a third and final closing to occur as soon as the licenses designated by Tabapay as to S Lending are transferred to Tabapay. The "Outside Closing Date" for the Initial Closing is April 30, 2024.

16.    Although the details of the provisions of the APA are set forth more fully in the Sale Motion, among other things, the APA contains numerous covenants, including the requirement that the Debtor conduct its business in the ordinary course of business until the final closing, which includes, without limitation, the timely honoring and payment of its Customer/Bank Obligations. It is also a condition to closing that the Court approve the Debtor's settlement agreement with the Debtor's banking partner, Evolve Bank & Trust ("Evolve"), and concurrently herewith, the Debtor has filed its emergency motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for the Court's approval of such settlement agreement ("Evolve Settlement Motion").

17.    The Debtor has concluded that it is in the best interests of its creditors to sell its assets to Tabapay pursuant to Section 363(f) of the Bankruptcy Code, and requires the protections and the benefits afforded to it by the Chapter 11 bankruptcy process in order to consummate a sale and to orderly wind down its remaining affairs.

18.    The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its subsidiaries, which, as evidenced by the APA, will be sold for total cash consideration of $9.7 million. In addition, the Debtor has reached a settlement agreement with Evolve which has agreed to pay $2 million to the estate, and has substantial causes of action against Mercury Technologies, Inc. and possibly other third parties from which

---

[5] The Debtor is advised that the "change of ownership or control" of S Brokerage can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

the Debtor expects that it will recover substantial funds. These recoveries are expected to serve as the primary sources of recovery for unsecured creditors in this case.

**B.     PRE-PETITION FINANCING ARRANGEMENTS**

19.     The Debtor is a party to two (2) pre-petition financing arrangements with (i) Silicon Valley Bank, as predecessor to First Citizens Bank & Trust Company ("SVB"), and (ii) TriplePoint Capital LLC ("TriplePoint").

20.     **SVB**. Pursuant to a Loan and Security Agreement dated February 19, 2021 between SVB, on the one hand, and the Debtor and S Credit (collectively, the "SVB Borrowers"), on the other hand, and related agreements (collectively, the "SVB Loan Documents"), SVB agreed to make advances in two (2) tranches (Tranche A and Tranche B), with Tranche A not to exceed principal amount of $4 million, and Tranche B not to exceed principal amount of $2 million. All advances are to be re-paid "interest only" through January 31, 2022, and beginning February 1, 2022, the advances were to be repaid in 36 equal monthly installments of principal plus accrued but unpaid interest. The Debtor estimates that SVB will be owed approximately $1.5 million as of April 30, 2024, the Outside Closing Date for the initial closing on the sale with the Buyer.

21.     The SVB Loan Documents grant to SVB a security interest and lien upon all personal property of the Debtor, *other than intellectual property*[6], to secure its obligations, and, as illustrated below, SVB recorded a UCC financing statement on February 19, 2021 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

22.     **TriplePoint**. Pursuant to a Plain English Growth Capital Loan and Security Agreement dated July 29, 2022 between certain designated "lenders" (identified as TPVG, TPVL and TPC) and TriplePoint, as Collateral Agent, on the one hand, and the Debtor, on the

---

[6] The Collateral of SVB does not include Intellectual Property, however, all Accounts and proceeds of Intellectual Property are purported to be included. The SVB Loan Documents' definition of "Collateral" states that, "[i]f judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property." The Debtor's sole Intellectual Property asset is a registered trademark. The Debtor does not have any copyright or patent related assets.

other hand, and related agreements (collectively, the "TriplePoint Loan Documents"), TriplePoint agreed to make three (3) facilities available to the Debtor with Part 1 in the principal amount of $9 million, Part 2 in the principal amount of $6 million (upon satisfaction of certain milestones and the signing of warrant agreements), and Part 3 in the principal amount of $5 million (upon satisfaction of certain milestones).  Pursuant to an agreement with TriplePoint, TriplePoint has agreed to accept the discounted  sum of $7,199,624.29 to fully and finally satisfy TriplePoint's secured debt if payment is made by May 6, 2024.

23.    The TriplePoint Loan Documents grant to TriplePoint a security interest and lien upon all personal property of the Debtor to secure its obligations, and, as illustrated below, TriplePoint recorded a UCC financing statement on July 29, 2022 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

24.    There are also Deposit Account Control Agreements ("DACAs") between TriplePoint and three (3) banking companies: (i) SVB, (ii) Evolve, and (iii) Independent Bank seeking to perfect the Debtor's cash that are maintained in accounts at these banking institutions.

25.    **Subordination Agreement between SVB and TriplePoint**. Pursuant to that certain Subordination Agreement dated July 29, 2022 between SVB and TriplePoint, TriplePoint's rights to payment and performance of the Debtor's obligations to TriplePoint, and all liens and security interests securing such obligations are subordinated to SVB's right to full payment and performance of the "Senior Debt" (generally defined as all obligations owed to SVB under the SVB Loan Documents up to the "Senior Debt Cap" and all liens and security interests securing the "Senior Debt"). The "Senior Debt Cap" is defined to include (a)(i) with respect to the aggregate principal amount of all indebtedness under the SVB Loan Documents, $6,000,000, plus (ii) with respect to "Bank Services," $250,000; plus (b) any interest, fees, charges, costs and any reimbursement obligations payable pursuant to the SVB Loan Documents. Except as authorized under the Subordination Agreement, TriplePoint agreed to not ask, demand, sue for, take or receive any monies until the Senior Debt up to the Senior Debt Cap shall have been fully paid in cash and all commitments to extend credit under the SVB

Loan Documents have been terminated. The Subordination Agreement also confirms that the liens and security interests of TriplePoint in the Debtor's property are junior and subordinated to the liens and security interests securing the Senior Debt.

26.    A general summary of all active UCC financing statements recorded against the Debtor in Delaware, the Debtor's state of incorporation, including the names of the creditors, the numbers and dates of the UCC financing statements, and the scope of their collateral ("UCC Analysis") is provided in the Declaration of Monica Y. Kim filed herewith. As set forth therein, a general summary of Ms. Kim's review of all of the active UCC-1 financing statements existing as of January 16, 2024 as to the Debtor is as follows:

| Creditor | Number and Date | Collateral |
|---|---|---|
| First Citizens Bank & Trust Company, as assignee to Silicon Valley Bank | 20211367359 (filed 2/19/21) Full assignment (filed 10/5/2023) | All personal property assets |
| TriplePoint Capital LLC, as Collateral Agent | 20226374367 (filed 7/29/22) | All personal property assets |

27.    The UCC Analysis is being provided for information purposes only, and does not constitute an admission or legal opinion as to the validity, priority, or scope of any liens asserted by any creditor in this case.  As set forth in the UCC Analysis, all of the cash of all of the Debtor, may constitute the cash collateral of SVB and TriplePoint. SVB and TriplePoint shall collectively be referred to herein as the "Secured Creditors".

**C.    THE NEED FOR USE OF CASH COLLATERAL**

28.    Based on the existing liens of the Secured Creditors (which will be collectively owed approximately $8.7 million as of April 30, 2024) upon substantially all of the Debtor's personal property assets and the proceeds therefrom, all of the Debtor's post-petition revenue and income may constitute the "cash collateral" of these parties pursuant to 11 U.S.C. § 363(a).

29.    Attached as **Exhibit 2** to the Omnibus Declaration filed herewith is the Debtor's 18-week cash flow forecast ("Budget") which sets forth all projected cash receipts and cash

disbursements following the Petition Date including the pre-petition Customer/Bank Obligations. The Budget was prepared by Pam Wismer of Ascent CFO Solutions ("Ascent"), who is serving as the Fractional CFO for the Debtor. Pre-petition, the Debtor engaged Ascent to receive the services of an experienced CFO, however, Ascent has advised the Debtor that it's policies and procedures prohibit their personnel (including Ms. Wismer) from providing declarations in connection with legal proceedings. Although the Budget was prepared by Ms. Wismer, it was done so under the supervision and monitoring by Sankaet Pathak, who has verified and confirmed that the information set forth in the Budget is based upon the books and records of the Debtor which are kept in the ordinary course of business, and correct.

30.     As the Budget shows, the use of the Debtor's cash collateral (as such term is defined in 11 U.S.C. § 363(a)) will be sufficient to meet the Debtor's immediate post-petition liquidity needs through April 30, 2024, the Outside Closing Date for the initial closing of the sale to the Buyer, and thereafter in connection with the wind-down of the Debtor's affairs.

31.     The Budget does contain (and the Motion seeks approval to pay) the following pre-petition Customer/Bank Obligations:

- Outgoing customer rebate: The Debtor earns deposit revenue from its Partner Financial Institutions for the services that it provides to such partners, usually based on a percentage of the total deposits placed at such banks through the Debtor's services (such as the federal funds rate less a certain additional basis points or percentage amount). As part of its agreements with its fintechs, the Debtor may have agreed to pass through a certain amount (*i.e.,* provide a rebate) of the deposit revenue that it receives to the fintechs since the fintechs have been responsible for originating the End Users, especially with interest rates recently on the rise and concerns that the fintechs could contract directly with the banks. Nonpayment of these rebates will result in breaches of the contracts with the fintechs as well as a breach under the APA.

32.     The Budget reflects those expenses that the Debtor must pay in order to avoid irreparable harm to its business and to this estate pending a sale of its business and to avoid

21

violating the terms of the APA. The Debtor must be able to continue to provide and acquire services, pay their employees, customers, and maintain and otherwise operate their platforms in a manner that is compliant with all applicable laws and regulations in order to continue to provide financial services and products to its customers which is the fundamental purpose of its business. Thus, the Budget includes critical and necessary expenses such as payroll and healthcare benefits to employees, payables associated with critical services needed from third parties to maintain its financial platforms, license renewals, insurance, Bank/Customer Obligations and other administrative services.

33.    By the Motion, the Debtor seeks to use cash collateral pursuant to the Budget, and the Debtor shall not permit the percentage variance with respect to (a) projected receipts in each then-current Budget to exceed (i) 12.5% on an individual basis of actual receipts for a specific line item and (ii) 10% on an aggregate basis of total actual receipts, in each case, on a cumulative four-week rolling basis, and (b) projected disbursements in each then-current Budget to exceed (i) 12.5% on an individual basis of actual disbursements for a specific line item and (ii) 10% on an aggregate basis of total actual disbursements with authority to deviate from the Budget, without the need for any further Court order or consent of the Secured Creditors (*i.e.,* the "Permitted Variance").

34.    In addition to all the existing security interests and liens previously granted to the Secured Creditors, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the prepetition collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Secured Creditors to permit the Debtor's use of the cash collateral as provided for in this Interim Order, the Secured Creditors are hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

(i)      continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and postpetition tangible and

intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, contract claims, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), any other choses in action, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtor, by settlement or otherwise, in respect of claims or causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "Adequate Protection Collateral"); provided, that Adequate Protection Collateral shall also include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral; and

(ii)     allowed superpriority administrative expense claims in the Debtor's bankruptcy case and any successor cases (the "Adequate Protection Superpriority Claim") with priority over all other administrative expense claims and unsecured claims

23

against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

35.     Attached as **Exhibit 1** to the Omnibus Declaration is the proposed interim order ("Interim Order") granting the Motion. The form of the Interim Order has been negotiated with, and the Debtor believes reflects the agreements of, the Secured Creditors. The Debtor also seeks to include in the Interim Order an instruction and order to all banks holding or in possession of the Debtor's funds to immediately release such funds to the Debtor to enable the Debtor to transfer and deposit such funds into its debtor in possession bank accounts to be established at SVB irrespective of any pre-petition agreements, including, without limitation, any deposit account control agreements.

36.     For all of the reasons set forth herein, the Debtor submits that the immediate granting of all of the relief sought herein is warranted. Use of cash collateral is appropriate under the circumstances. In addition to the Adequate Protection Obligations, the Secured Creditors (which will be collectively owed approximately $8.7 million as of April 30, 2024) are further adequately protected by the ongoing operations of the Debtor's business, and an equity cushion of approximately 35% afforded by the value of the Debtor's assets (which is no less than $11.7 million) which secure the claims of the Secured Creditors as evidenced by the Debtor's cash on hand as of the Petition Date and the Buyer's offer to purchase substantially all of the Debtor's assets. Moreover, at the Initial Closing, which is to occur by not later than April 30, 2024, all of the Debtor's indebtedness owed to the Secured Creditors will be paid and satisfied.

## II.

## THE DEBTOR MUST BE AUTHORIZED TO USE CASH COLLATERAL

**A.     The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Its Assets In Accordance With The Approved Budget.**

The Debtor's use of property of the estate is governed by section 363 of the Bankruptcy Code.  Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)     each entity that has an interest in such cash collateral consents; or
> (B)     the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S. C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely

important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For the reasons discussed herein, the Debtor has no ability to maintain its business operations or to preserve the going-concern value of its assets unless it has the ability to use cash collateral to pay its projected expenses in accordance with the Budget. The Debtor's inability to pay such expenses would cause immediate and irreparable harm to its customers, business, its sale efforts, and its bankruptcy estate. Indeed, the Debtor's inability to pay the expenses set forth in the Budget, which include critical services needed for the maintenance of its platforms for meeting its clients' needs, payroll, insurance, Bank/Customer Obligations and other critical operating expenses, would result in the immediate shutdown of its business, breaches of the APA, and the decimation of the going-concern value and the anticipated sale of its business and assets. The preservation and maintenance of the Debtor's business and assets are of the utmost significance and importance to its ability to consummate a sale and its emergence from this Chapter 11 case.

**B.**     **The Secured Creditors Are Adequately Protected By An Equity Cushion, The Continued Operation Of The Debtor's Business And Other Forms Of Adequate Protection.**

As aforementioned, the Debtor believes that the only parties which may have a valid interest in its cash are SVB and TriplePoint, which will be collectively owed approximately $8.7 million as of April 30, 2024, the Outside Closing Date for the Initial Closing on the sale with the Buyer, and the date by which the Debtor intends to pay these Secured Creditors' claims in full in accordance with their payoff statements and agreements.

Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.

1    1984).  *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs*

2    *Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

3        Here, the Debtor should be authorized to use cash collateral pursuant to section 363(c)(2)

4    of the Bankruptcy Code.  The Debtor submits that the value of the Secured Creditors' interests

5    in cash collateral will be adequately protected by, among other things, an equity cushion as

6    evidenced by the Buyer's offer to purchase substantially all assets of the Debtor for total cash

7    consideration of $9.7 million, and the continued operation and maintenance of the Debtor's

8    business which includes cash on hand of approximately $2 million.

9        Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

10   *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property

11   interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

12   Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

13   *See also, McCombs,* 88 B.R. at 266.  Section 506(a) "limit[s] the secured status of a creditor

14   (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value

15   of the collateral."  *McCombs*, 88 B.R. at 266.  The law is clear that the preservation of the value

16   of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor

17   when a debtor seeks to use cash collateral.  *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).

18   *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  The *Stein* Court determined that the

19   use of cash collateral was necessary to the continued operations of the debtor, and that the

20   creditor's secured position could only be enhanced by the continued operation of the debtor's

21   business.  *See also, In re McCombs*, *supra*, where the court determined that the debtor's use of

22   cash collateral for needed repairs, renovations and operating expenses eliminated the risk of

23   diminution in the creditor's interest in the cash collateral and such use would more likely

24   increase cash collateral.

25       As reflected in the Budget, the payment of the expenses necessary for the Debtor to

26   continue operating its business will adequately protect the Secured Creditors because by doing

27   so, the Debtor will continue to generate revenue and will be able to preserve the going-concern

28   value of its assets while they pursue a sale.  Other courts have determined that a debtor's

continued business operations can constitute the adequate protection of a secured creditor.  *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization.  In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtor's ability to maintain its business operations, continue to provide services and products to its clients, and preserve the value of its assets until it can consummate a sale of its assets, for the benefit of the Debtor's creditors. If the Debtor is not permitted to use cash collateral to maintain its business operations and preserve the going-concern value of its assets, the fintechs will terminate services with the Debtor, and the Debtor will be forced to shut down, which in turn will dramatically and negatively impact the fintechs, the value of the Debtor's assets and the Debtor's ability to close a sale of its assets to the Buyer.  On the other hand, if the Debtor is authorized to use its cash collateral, it will be able to maintain its business operations, ensure services to its customers, and preserve the value of its assets while it pursues a successful sale of such assets which will ultimately allow for the Secured Creditors' claims to be assumed by the Buyer, and provide the basis for a recovery to its other creditors.  Clearly, the use of cash collateral will only enhance the prospect of the

1    Debtor's sale efforts and reorganization.

2         Moreover, there can be no question or dispute that the Secured Creditors are adequately

3    protected by an equity cushion of approximately 35%. The Secured Creditors will be owed

4    collectively approximately $8.7 million, and are secured by substantially all of the Debtor's

5    assets. The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is

6    approximately $2 million) and its proprietary technology platform, customer agreements, and

7    equity interests in its subsidiaries, which, as evidenced by the APA, will be sold for no less than

8    $9.7 million, for a total of approximately $11.7 million. This equates to an equity cushion of

9    approximately 35%.

10        The Secured Creditors are further adequately protected by the Adequate Protection

11   Obligations in the collateral proposed to be provided to them (to the same extent, validity and

12   priority as their respective pre-petition liens against the Debtor's assets). Based on all of the

13   foregoing, the Debtor submits that the requirements of Section 363(c)(2) of the Bankruptcy

14   Code have been satisfied and that it should be authorized to use cash collateral in accordance

15   with the terms and conditions set forth in the Orders.

16                                          **III.**

17       **THE DEBTOR MUST BE AUTHORIZED TO HONOR PRE-PETITION**

18       **OBLIGATIONS TO ITS CUSTOMERS AND PARTNER FINANCIAL**

19                                    **INSTITUTIONS**

20        Unless the Court orders otherwise, Bankruptcy Code section 1108 authorizes a debtor in

21   possession  "to operate the debtor's business," and section 363(c) of the Bankruptcy Code

22   authorizes the debtor in possession to "enter into transactions and to " use property of the estate

23   in the ordinary course of business without notice and a hearing. 11 U.S.C. §§ 363(c) and 1108.

24   Bankruptcy Code section 105(a) provides in relevant part: "[t]he Court may issue any order,

25   process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11

26   U.S.C. § 105(a). Courts routinely rely upon Bankruptcy Code sections 105(a) and 363(c) for

27   statutory authority to grant relief such as the relief requested in this Motion. *See, e.g.*, *Burchinal*

28   *v. Central Washington Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987)

(courts have permitted payment of prepetition claims when necessary for rehabilitation); *In re Equalnet Commc'ns,* 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (noting the general proscription of payment of prepetition claims, the court listed examples of exceptions to such rule such as "redemption of prepetition retail coupons in a consumer products case, the honoring of credit card debits, debits and chargebacks in a retail department store case . . . ."; *In re Woodside Group, LLC*, Case No. 08-20682 (Bankr. C.D. Cal. Aug. 27, 2008) [Docket No. 18] (approving stipulation allowing debtors to pay ordinary course providers of goods and services in the ordinary course of business); *In re Structurelite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) (finding payment of prepetition claims justified where otherwise debtor's rehabilitative effort immediately would be aborted).

In addition, Bankruptcy Code section 549(a)(2)(B), which governs most postpetition transfers, provides in part that "the trustee may avoid a transfer of property of the estate (1) made after the commencement of the case and, . . . that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(2)(B). It follows that the Court may authorize certain postpetition payments to satisfy prepetition debts, including the Customer Program obligations. The statute grants the Court, faced with the intricate facts and circumstances of each case, the discretion to ascertain whether a debtor's business judgment to make a postpetition transfer inures to the benefit of the estate in the particular case, and, if so, to authorize the transfer. *See Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.)*, 37 B.R. 334, 336 n.3 (W.D. Mo.), *appeal dismissed*, 738 F.2d 445 (8th Cir. 1984) ("It would appear proposed transfers could be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack under section 549 . . . ").

The Debtor incurs the Bank/Customer Obligations in the ordinary course of its business, and the customers (which are the lifeblood of the Debtor's business) expect the services and benefits that are covered under contracts with the Debtor. The Debtor must honor these obligations in order to close a sale of its business to the Buyer. The ability of the Debtor to successfully sell its assets, reorganize and/or to maximize value for creditors are completely dependent upon the loyalty, confidence, and continued business with its customers. Thus, any

delay in honoring the Bank/Customer Obligations will undoubtedly create immediate and irreparable harm to the Debtor's business.

At a time when customer and banking relationships must be maintained in order to consummate a sale and to successfully reorganize, the Debtor submits that it is entirely necessary, and appropriate for the Court to issue an order pursuant to Bankruptcy Code sections 105(a), 363(c), and 549(a) allowing the Debtor to continue to honor the pre-petition Bank/Customer Obligations under these circumstances.

**IV.**

**<u>PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE MOTION</u>**

**<u>HAVE BEEN SATISFIED</u>**

Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") sets forth the procedural requirements for obtaining authority to use cash collateral.  The Debtor submits that it has complied with these procedural requirements.  First, the Motion must contain a copy of the proposed form of order granting the Motion, which has been done by attaching the proposed Interim Order as **<u>Exhibit 1</u>** to the Omnibus Declaration concurrently filed herewith. Second, the Motion must provide a concise statement of the relief requested, which was done above.  Third, the Motion is required to be served on any entity with an interest in the Debtor's cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs.  Here, the Debtor has served the Motion and all supportive papers upon the Office of the United States Trustee, all of the Secured Creditors and their counsel (if any), the twenty largest unsecured creditors of each of the Debtor (as no committee yet exists), and all parties who have requested special notice via overnight mail.  Accordingly, the Motion complies with the procedural requirements of Bankruptcy Rules 4001 (b)-(d).

In addition, in compliance with Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed Interim Order authorizing the Debtor's use of

31

cash collateral on an interim basis, pending a final hearing, contains certain provisions of findings of fact. Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

## IV.

## **THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**

For the reasons noted in the Motion, the Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtor requires the terms of the Interim Order to become immediately effective to ensure that the Debtor will be able to use its cash collateral to pay such critical and immediate expenses. Based on the foregoing, the Debtor requests that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow the Interim Order to become immediately effective.

## V.

## **CONCLUSION**

Based upon all of the foregoing, the Debtor respectfully requests that the Court:

(1)     grant the relief requested in the Motion on an interim basis;

(2)     enter the proposed form of the Interim Order attached as **Exhibit 1** to the Omnibus Declaration filed concurrently herewith;

(3)     authorize the Debtor to honor its pre-petition obligations to its customers and Partner Financial Institutions, in accordance with the Budget subject to the Permitted Variance;

(4)     waive any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

(5)     schedule the Final Hearing on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

1        (6)    grant such further relief as the Court deems just and proper.

2

Dated:  April 22, 2024                SYNAPSE FINANCIAL TECHNOLOGIES, INC.

3

By:    */s/ Monica Y. Kim*
4                                   RON BENDER

5                                   MONICA Y. KIM
                               KRIKOR J. MESHEFEJIAN
6                                   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK
                               L.L.P.
7                                   Proposed Attorneys for Debtor and Debtor in
                               Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_April 22, 2024_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyg.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) **_April 22, 2024_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_April 22, 2024_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON**
**SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 22, 2024 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423


Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113


Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105


First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117


Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457


FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526


Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111


Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043


Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292


Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104


Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367