RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

In re:

SYNAPSE FINANCIAL TECHNOLOGIES, INC.,

       Chapter 11 Debtor in Possession

Case No.:

Chapter 11

**DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; (C) WAIVING THE 14-DAY STAY PERIODS OF BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF**

**[Omnibus Declaration of Sankaet Pathak Filed Concurrently Herewith]**

Date: TBD

Time: TBD

Place: Courtroom 303

      21041 Burbank Blvd.

      Woodland Hills, CA 91367

    **TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, THE DEBTOR'S**

**SECURED CREDITORS SILICON VALLEY BANK AND TRIPLE POINT CAPITAL LLC, THE DEBTOR'S TWENTY LARGEST GENERAL UNSECURED CREDITORS, AND ALL PARTIES WHO HAVE REQUESTED SPECIAL NOTICE IN THIS CASE:**

Synapse Financial Technologies, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), hereby moves, by way of this Motion (the "Motion") for entry of the Order (the "Sale Order"), in substantially the form attached as **Exhibit 8**[1] to the Declaration of Sankaet Pathak in Support of First Day Motions ("Pathak Declaration") filed concurrently herewith, approving, among other things, the Debtor's sale of substantially all of its assets free and clear of all liens, claims, encumbrances and other interests (except for assumed obligations) to TabaPay Holdings, LLC, a Delaware limited liability company ("Buyer"), in accordance with the terms of the Asset Purchase Agreement (the "APA") between the Debtor and Buyer, or to an alternative bidder deemed by the Court to be the winning bidder at the Auction in accordance with the Bidding Procedures Order.  **The Debtor has requested in its motion for entry of the Bidding Procedures Order filed concurrently herewith that the Court set a hearing date on this Motion on April 29, 2024 (so that the Debtor may close a sale of its assets by April 30, 2024)**.  **This Motion will not be heard on April 24, 2024.**

By way of this Motion, the Debtor is also seeking the Court's approval of the Debtor's assumption and assignment to Buyer (or an alternative buyer) of those unexpired leases and executory contracts, respectively, that Buyer wishes to assume.  The Debtor will file and serve on contracting counterparties in accordance with the Bidding Procedures Order that certain *Notice Of: (1) Assumption And Assignment Of Executory Contracts And Unexpired Leases; (2) Establishment Of Cure Amounts In Connection Therewith; (3) Procedures And Deadlines Regarding Oppositions To Assumption And Assignment, And Cure Amounts; And (4) Hearing Thereon* (the "Assumption/Assignment Notice") setting forth a schedule of all of the Debtor's known executory contracts and unexpired leases (the "Contracts and Leases Schedule"), along

---

[1] The form of Sale Order remains subject to the review and comments of the Debtor's secured creditors.

with the Debtor's belief as to all outstanding cure amounts owing by the Debtor to the other parties to those executory contracts and unexpired leases (the "Cure Amount").

By way of this Motion, the Debtor is seeking the Court's authority to assume and assign to Buyer (or an alternative buyer) all of the Debtor's executory contracts and unexpired leases that Buyer or an alternative buyer wants to have assigned to it and to fix the required Cure Amounts that would need to be paid to the other parties to the executory contracts and unexpired leases to enable compliance with the provisions of Section 365(b) and (f) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule unless the other parties to the executory contracts and unexpired leases file a timely objection to the Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule. By way of this Motion, the Debtor is also seeking a determination by the Court that none of the other parties to the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtor so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b) and (f) of the Bankruptcy Code.

### Background Information and Need for Emergency Relief

This case was commenced on April 22, 2024 (the "Petition Date") by the Debtor's filing of a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a technology company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users) through certain banking and financial service providers ("Partner Financial Institutions").

The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (Baas) platform for fintechs and Partner Financial Institutions which have agreements with the Debtor to efficiently interface each other to allow for transactions (*i.e.,* the buy and sell) of their financial products and services to the fintechs' end users.

Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Spring of 2022, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital.  The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and sought to engage Jefferies LLC to assist the Debtor with conducting a marketing process for its sale as a going concern, which the Debtor conducted over a number of months prior to the Petition Date.  The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Buyer.

Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations, due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

On April 19, 2024, the Debtor and Buyer executed the APA pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure obligations associated with the assumed leases and contracts. The sale to Buyer is subject to an expedited overbid process though the Debtor does not anticipate that there will be any overbids given the extensive marketing and sale process already conducted which has not generated any better offers due to the complexity of the Debtor's business.

The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000 Purchase Price will be paid; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA[2] and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than the May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

The obligation of Buyer to consummate its purchase of the Purchased Assets from Seller at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, at or prior to the applicable closing, of a number of conditions precedent (all as set forth in Article VIII of the APA), including the following with respect to the Initial Closing:

1. The representations and warranties of the Debtor in the APA shall be true and correct in all material respects, as set forth in the APA;

2. The Debtor shall have performed and complied, in all material respects, with all of the covenants required by the APA to have been performed or complied with by the Debtor prior to the Initial Closing;

---

[2] The Debtor understands that such "change of ownership or control" can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

3. Since the date of the APA, there shall not have occurred any Material Adverse Effect;

4. Evidence of the receipt of any third-party consents required under the APA;

5. Entry of the Sale Order which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure;

6. Entry into a Broker-Dealer Services Agreement in a form reasonably acceptable to Buyer and the Debtor;

7. Entry into an Intercompany Services Agreement in a form reasonably acceptable to Buyer and the Debtor;

8. The completion of an audit of the State Lender Licensing Subsidiary;

9. The Debtor shall have provided Buyer with written evidence satisfactory to Buyer in its reasonable discretion (except to the extent a different standard of approval is set forth in Section 8.1(e) of the APA), of each of the following:

    a. <u>Funding of End-User Demand Deposit Accounts</u>. All banking institutions shall have fully funded all account balances of all End-User demand deposit accounts of all Transferred Customers to the extent maintained by or on behalf of, or otherwise affiliated with or related to, any such banking institution to Buyer's satisfaction in its sole and exclusive discretion.

    b. <u>Program Reconciliation</u>. Except to the extent expressly addressed by Section 8.1(e)(11)(iii) or Section 8.1(e)(11)(iv) of the APA, as applicable, all account balances involving Transferred Customers and any related demand deposit accounts, savings accounts, reserve accounts, FBO accounts, or accounts similar to any of the foregoing at any bank, lender or other institutions are reconciled with the Debtor's ledger records, in each case, in form and substance and with results satisfactory to Buyer in its sole and exclusive discretion (a "<u>Program Reconciliation</u>") as of the Initial Closing Date.

c. <u>Reconciliation of Programs Involving Transferred Customers</u>. All account balances held by or at the Broker-Dealer Subsidiary with respect to Transferred Customers, including in brokerage, sweep, and cash management accounts of such Transferred Customers, shall be reconciled in full with the Debtor's ledger records as of the Initial Closing Date.

d. <u>Reconciliation of Lending Programs Involving Transferred Customers</u>. The Debtor shall produce records demonstrating that, in Buyer's reasonable discretion, the State Lender Licensing Subsidiary holds, controls or has rights to reserve account balances of End-Users or Transferred Customers that are at least equal to the total balance of loans issued and outstanding by the State Lender Licensing Subsidiary (defined as a "<u>Lending Program Reconciliation</u>") as of the Initial Closing Date.

e. <u>Audit</u>. Buyer shall have the right to conduct and complete an audit, or shall have the right to engage a third-party audit firm to conduct and complete an audit, at Buyer's sole cost and expense, in respect of the satisfaction of any of the conditions set forth in Section 8.1(e)(11)(ii)-(iv) (inclusive) of the APA, and the Debtor shall use its reasonable best efforts to cooperate, and to cause each of its Affiliates to cooperate, with any such audit (including, without limitation, by providing data relating to the satisfaction of any of the conditions set forth in <u>Section 8.1(e)(11)(ii)-(iv)</u> (inclusive) of the APA in any manner as Buyer or its third-party audit firm may reasonably request). In the event that Buyer elects to undertake an audit of the satisfaction of any of the conditions set forth in Section 8.1(e)(11)(ii)-(iv) (inclusive) of the APA, then, as an express condition precedent to Buyer's obligation to consummate the Initial Closing, the audit shall have been completed and the results of the audit shall be satisfactory to Buyer in its reasonable discretion; <u>provided</u>, that, solely with respect to the condition precedent set forth in Section 8.1(e)(11)(iii) of the APA, such audit shall not have demonstrated any

material inaccuracies in the completion of the Program Reconciliation contemplated by Section 8.11(e)(iii) of the APA. Buyer shall have twenty (20) days from the date of the APA to complete any audit pursuant to Section 8.1(e)(11)(v) of the APA; provided, that the period of time in which Buyer shall be required to complete any such audit shall be tolled (and shall not run) for so long as Seller or any of its Subsidiaries is in breach of any of its obligations pursuant to Section 8.1(e)(11)(v) of the APA.

f.   Repayment of the Senior Lender Indebtedness and TriplePoint Indebtedness. Buyer, the Debtor and the Senior Lender (Silicon Valley Bank) shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of the Debtor and its Subsidiaries securing obligations under the Indebtedness arising under the Senior Lender Loan Agreement and the other Senior Lender Loan Documents as of the Initial Closing (such Indebtedness, the "Senior Lender Indebtedness"), each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, the Senior Lender shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the Senior Lender Indebtedness such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this Section 8.1(e)(13), the Senior Lender Indebtedness shall be repaid in full and all Senior Lender Loan Documents shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.

g. Buyer, Seller and TriplePoint Capital (together with each of its Affiliates, "<u>TriplePoint</u>") shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of Seller and its Subsidiaries securing obligations under the Indebtedness arising under the TriplePoint Loan Agreement and the other TriplePoint Loan Documents as of the Initial Closing at the agreed upon payoff amount of $7,199,624.29 (defined in the APA as the "<u>TriplePoint Indebtedness</u>")[3] each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, TriplePoint shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the TriplePoint Indebtedness, such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this <u>Section 8.1(e)(13)</u>, the TriplePoint Indebtedness shall be repaid in full and all TriplePoint Loan Documents shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.

h. <u>PCI-DSS Audit</u>. The Debtor shall have provided Buyer with: (i) its most recent final Report on Compliance, which is in progress as of the date hereof, based on a full audit of Seller's security controls for its applicable systems and environments conducted by a Qualified Security Assessor (as designated by the Payment Card Industry (PCI) Security Standards Council (SSC)) and reflected on its website) which Report must show no matters requiring remediation; (ii) evidence that the Report on Compliance was accepted by

---

[3] TriplePoint's agreement to accept a discounted payoff amount is expressly contingent upon payment on or before May 6, 2024.

Seller and transmitted to the applicable payment card networks; and (iii) an Attestation of Compliance by the Debtor with respect to the matters covered in such Report on Compliance. The Report on Compliance and the Attestation of Compliance shall address all Seller systems that are in scope for the Debtor's PCI DSS compliance obligations, including, without limitation, Seller's card processing systems, cardholder environments, tokenization and card data storage systems and environments and any other system or environment maintained by or on behalf of the Debtor, any Subsidiary or any third party that transmits, stores or processes any cardholder data received by the Debtor or any Subsidiary for purposes of facilitating payment card processing.

i.  Evolve Assignment. Buyer and Evolve Bank & Trust ("Evolve") shall have executed and delivered a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the Transactions contemplated by the APA (including, without limitation, the assignment of the Evolve Agreement and the assignment, amendment or termination of that certain letter agreement, dated October 1, 2023, between the Debtor and Evolve).

j.  Approval of Settlement Agreement with Evolve. The Bankruptcy Court shall have unconditionally approved in all respects the Debtor's settlement agreement and release with Evolve (the "Evolve Settlement").

The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its two subsidiaries, which, as evidenced by the APA, will be sold (not including cash) for a cash payment of $9,700,000 and other consideration.  In addition, the Debtor may have causes of action against third parties from which the Debtor believes that it may recover additional funds.

The Court should approve an expedited sale of the Debtor's assets for the following reasons:

1. Pre-petition, since approximately the Fall 2023, the Debtor has engaged in a marketing process designed to raise capital and/or identify a strategic partner/transaction to support the Debtor's business as a going concern.

2. The Debtor identified Buyer, Buyer has made the highest and best offer for the purchase of the Debtor's assets, and the Debtor and Buyer engaged in significant negotiations pre-petition culminating in the negotiation and execution of the APA.

3. A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code.  The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids.  However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures approved by the Court.

4. The agreed upon fixed payoff amount of $7,199,624.29 to TriplePoint is expressly conditioned on such payment occurring by no later than May 6, 2024.  Absent such agreement, TriplePoint's payoff amount could be significantly more as a result of additional accrued interest and the inclusion of additional attorneys' fees and costs.

5. To maximize recoveries to creditors in this case by minimizing cash usage and losses pending the closing of a sale, and given the marketing process which commenced well in advance of the filing of this case, the Debtor submits expedited approval of this Motion is appropriate.  The Debtor's motion for authority to use cash collateral and budget describe the Debtor's current cash position and proposed cash usage during the following approximate two-three weeks.  A sale closing (the Initial Closing) by no later than April 30, 2024 would result in the payment of all of the Debtor's allowed secured debt in full with additional cash remaining in the estate for the benefit of creditors and the sooner the Debtor is able to close its sale of its assets, the more cash the Debtor believes it will have at closing.  Given the Debtor's

projected weekly cash usage and losses, extending the sale process would increase costs to this estate without materially enhancing any potential for additional benefits from an extended sale process or closing date.  The Debtor has determined in its business judgment that a sale process that extends beyond April 30, 2024 is highly unlikely to result in any net benefit to the estate all things considered, including, without limitation as a result of the incurrence of additional operating expenses.  The Debtor does not expect there to be any higher or better offer for the Debtor's assets, or any alternative offer at all, given that the Debtor already conducted a marketing and sale process, identified the highest and best bid, heavily negotiated with Buyer over the course of many months during which time both the Debtor and Buyer invested significant time and resources in reaching a mutually acceptable APA and sale terms, with any alternative buyer having the ability during all of that time to engage the Debtor in an alternative, higher and better, transaction.

The Debtor believes that in order to avoid irreparable harm to the estate and creditors it is essential to immediately consider the relief requested in this Motion and grant the Motion so that the initial closing may occur as soon as possible and in any event by April 30, 2024.

Buyer was only willing to proceed with its purchase of the Purchased Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but Buyer has agreed that the Debtor can and should continue to make its assets available to alternative buyers (however unlikely that would be at this point in the process) to ensure that the highest and best offer is made for the Debtor's assets/business.  The Debtor believes that the highest and best offer, and, indeed, the only real offer, is Buyer's offer.  Nevertheless, the Debtor has requested Court approval of Bidding Procedures providing for an opportunity for overbids.

However, for the reasons described above, the timing of the sale process is critical, and buyer has conditioned its offer on the Debtor obtaining an entered order of the Court by April 29, 2024 approving the sale by the Debtor to Buyer or a bidder with a higher and better offer.

The proposed sale will allow for the payment in full of the Debtor's secured debt obligations and provide for additional recovery to the estate, and coupled with the Debtor's cash

on hand and recoveries from any claims and causes of action of the Debtor against third parties, will provide unencumbered funds for the benefit and administration of the estate. The sooner a sale closes and the Debtor's operating expenses are eliminated, the more cash will be available for the benefit of the estate after paying secured debt.

**WHEREFORE**, the Debtor respectfully requests that this Court:

1. Grant this Motion;

2. Immediately enter an order granting this Motion;

3. Find that notice of this Motion, the relief requested therein, and the assumption and assignment of and establishment of Cure Amounts for, the executory contracts and unexpired leases to be assumed and assigned, was proper, timely, adequate, appropriate and sufficient and that no other or further notice of this Motion, the hearing on this Motion, or the assumption and assignment of such executory contracts and unexpired leases is or shall be required;

4. Find good, sufficient, and sound business purposes and justification and compelling circumstances for the Debtor's sale of the Purchased Assets and assumption and assignment of the contracts/leases to Buyer or an alternative winning bidder prior to, and outside of, a plan of reorganization;

5. Find that the APA with Buyer or an alternative buyer was negotiated, proposed and entered into without collusion, in good faith, and from arm's-length bargaining positions and that Buyer is acting as a good faith purchaser and is, accordingly, entitled to the protections set forth in section 363(m) of the Bankruptcy Code;

6. Find the consideration provided by Buyer or an alternative buyer for the Purchased Assets: (i) to be fair and reasonable, (ii) to be the highest or otherwise best offer for the Purchased Assets that was received by the Debtor in accordance with the Bidding Procedures Order, (iii) provides a greater recovery for the Debtor's estate than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the circumstances of this case, and find that prospective buyers were

provided an adequate opportunity to participate in the sale process and to submit a higher or otherwise better bid;

7.     Find that one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied for selling the Purchased Assets free and clear of all lien, claims encumbrances and other interests, including any claims pertaining to the Evolve Settlement and the transfers and transactions contemplated therein;

8.     find that approval of the APA and the consummation of the Debtor's sale of the Purchased Assets and the Debtor's assumption and assignment of the contracts and leases to Buyer are in the best interests of the Debtor's estate;

9.     authorize the Debtor to sell the Purchased Assets to Buyer or an alternative winning bidder free and clear of all liens, claims encumbrances and other interests with all liens existing against the Purchased Assets at the time of the closing to attach to the net sale proceeds in the same order of priority, and with the same validity, force and effect, as such liens had against the Purchased Assets immediately before the closing, subject to any rights, claims and defenses of the Debtor and their its bankruptcy estate;

10.     determine that (i) with the payment of the Cure Amounts, the Debtor and Buyer (or an alternative buyer), as applicable, have cured, or have provided adequate assurance of cure, of any default existing or occurring prior to the closing under any of the assumed and assigned contracts and leases, and the winning bidder or winning backup bidder, as the case may be, has provided adequate assurance of its future performance of and under the assumed and assigned contracts and leases, (ii) the provisions of Section 365(b)(1)(A) and (f) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule have been satisfied unless the other parties to the executory contracts and unexpired leases file a timely objection to this Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule, and (iii) none of the other parties to the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtor so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code.

11.     Determine that the Debtor's assumption and assignment to Buyer or alternative winning bidder, is approved, and the requirements for assumption and assignment are deemed satisfied and that the Debtor is authorized in accordance with 11 U.S.C. §§ 105(a) and 365;

12.     Waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

13.     Grant such other and further relief as the Court deems just and proper under the circumstances of this case.

Dated: April 22, 2024

LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.


By:   */s/ Krikor J. Meshefejian*
RON BENDER
MONICA Y. KIM
KRIKOR J. MESHEFEJIAN
Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M), (N) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Motion are (i) Sections 105(a), 363(b), (f), (k), (l) and (m), and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Rules 6004-1, 9006-1, 9013-1, 9014-1 and 9075-1.

### II.    STATEMENT OF FACTS[4]

**A.    The Debtor's Background and Chapter 11 Filing.**

1.    The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users) through certain banking and financial service providers.

2.    The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("S Credit"), and (ii) Synapse Brokerage LLC ("S Brokerage").  S Brokerage is a registered broker-dealer and a member of FINRA (Financial Industry Regulatory Authority, a government-authorized not-for-profit organization that oversees U.S. broker-dealers), and SIPC (Securities Investor Protection Corporation, a non-profit that works to restore investors' cash and securities when their brokerage firm fails).

3.    The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date") with the goal of selling substantially all of its assets (the "Purchased Assets") to the highest and best bidder. The Debtor

---

[4] To avoid repetition, the Debtor incorporates herein by this reference the *Declaration of Sankaet Pathak In Support Of Debtor's First Day Motions* in support of the facts set forth herein.

is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Primary Assets and Secured Loans.**

4.    The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2.1 million) and its proprietary technology platform, customer agreements, and equity interests in its subsidiaries, which will be sold for total consideration value of no less than $9.7 million. In addition, subject to Bankruptcy Court approval, the Debtor has reached a settlement agreement (the "Evolve Settlement") with its current banking partner, known as Evolve Bank & Trust ("Evolve"), and the Debtor has substantial causes of action against Mercury and possibly other third parties from which the Debtor expects that it will recover substantial funds. These recoveries are expected to serve as the primary sources of recovery for unsecured creditors in this case.

5.    The Debtor is a party to two (2) pre-petition financing arrangements with (i) Silicon Valley Bank, as predecessor to First Citizens Bank & Trust Company ("SVB"), and (ii) TriplePoint Capital LLC ("TriplePoint").

6.    Pursuant to a Loan and Security Agreement dated February 19, 2021 between SVB, on the one hand, and the Debtor and S Credit (collectively, the "SVB Borrowers"), on the other hand, and related agreements (collectively, the "SVB Loan Documents"), SVB agreed to make advances in two (2) tranches (Tranche A and Tranche B), with Tranche A not to exceed principal amount of $4 million, and Tranche B not to exceed principal amount of $2 million. All advances are to be re-paid "interest only" through January 31, 2022, and beginning February 1, 2022, the advances were to be repaid in 36 equal monthly installments of principal plus accrued but unpaid interest.  The Debtor estimates that SVB will be owed approximately $1.5 million as of April 30, 2024, the Outside Closing Date for the initial closing on the sale with the Buyer. The SVB Loan Documents grant to SVB a security interest and lien upon all personal property of the Debtor, *other than intellectual property[5]*, to secure its obligations, and SVB recorded a UCC

---

[5] The Collateral of SVB does not include Intellectual Property, however, all Accounts and proceeds of Intellectual Property are purported to be included. The SVB Loan Documents'

financing statement on February 19, 2021 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

7.    **TriplePoint**. Pursuant to a Plain English Growth Capital Loan and Security Agreement dated July 29, 2022 between certain designated "lenders" (identified as TPVG, TPVL and TPC)  and TriplePoint, as Collateral Agent, on the one hand, and the Debtor, on the other hand, and related agreements (collectively, the "TriplePoint Loan Documents"), TriplePoint agreed to make three (3) facilities available to the Debtor with Part 1 in the principal amount of $9 million, Part 2 in the principal amount of $6 million (upon satisfaction of certain milestones and the signing of warrant agreements), and Part 3 in the principal amount of $5 million (upon satisfaction of certain milestones).  Pursuant to an agreement with TriplePoint, the sum of $7,199,624.29 is needed to fully and finally satisfy TriplePoint's secured debt as of May 6, 2024, shortly after the Outside Closing Date for the initial closing on the sale with the Buyer.[6]  The TriplePoint Loan Documents grant to TriplePoint a security interest and lien upon all personal property of the Debtor to secure its obligations, and, as illustrated below, TriplePoint recorded a UCC financing statement on July 29, 2022 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

8.    **Unsecured Debt.**  As of the Petition Date, the Debtor had approximately $4.85 million of unsecured debt.  The Debtor estimates that rejection of any executory contracts and unexpired leases which are not assumed and assigned to the Buyer will increase the total amount of unsecured debt against the estate, including potentially approximately $1.7 million of rejection damages claims in connection with the rejection of pre-petition retention agreement between the

---

definition of "Collateral" states that, "[i]f judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property." The Debtor's sole Intellectual Property asset is a registered trademark. The Debtor does not have any copyright or patent related assets.

[6] TriplePoint's agreement to accept a discounted payoff amount is expressly contingent upon payment or before May 6, 2024.

Debtor and its employees providing for, among other things, certain bonuses.  To the extent the Buyer does not designate such agreements for assumption and assignment, such agreements, along with virtually all other agreements that are not assumed and assigned to the Buyer, will be rejected by the Debtor pursuant to separate motion, and counterparties may assert rejection damages claims in connection therewith.

**C.    The Asset Sale Process And Asset Purchase Agreement with Buyer.**

9.    Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Spring of 2022, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital.  The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and sought to engage Jefferies LLC to assist the Debtor with conducting a marketing process for its sale as a going concern, which the Debtor conducted over a number of months prior to the Petition Date.  The Debtor received three (3) preliminary offers for the purchase of the Debtor's assets, one of which was made by Tabapay/its designee ("Buyer" and the "Stalking Horse Bidder").  Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

10.    On April 19, 2024, the Debtor and Buyer executed the APA pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure obligations associated with the assumed leases and contracts. The sale to Buyer is subject to an expedited overbid process though the Debtor does not anticipate that there

will be any overbids given the extensive marketing and sale process already conducted which has not generated any better offers due to the complexity of the Debtor's business.

11.    The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000.00 Purchase Price will be paid in cash; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA[7] and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

12.    Other salient terms of the APA include[8]:

- The Purchased Assets do not include cash and cash equivalents or avoidance actions and certain other claims and causes of action, among other Excluded Assets.

---

[7] The Debtor understands that such "change of ownership or control" can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

[8] Capitalized terms in this paragraph have the same meaning ascribed to such terms in the APA. To the extent there is a discrepancy between the summary of APA terms herein and the APA, the APA shall govern.

- Buyer will assume and pay when due all Cure Costs owned to counter-parties to Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases.

- The Purchase Price shall be used to pay the allowed/agreed upon secured claim of SVB and the TriplePoint Indebtedness in the agreed upon fixed payoff amount of $7,199,624.29,[9] and any remaining balance of the Purchase Price shall be used by the Debtor as approved by the Bankruptcy Court.

- The sale of the Purchased Assets is on an "As Is, Where Is" and "With All Faults" basis.

- The obligation of Buyer to consummate its purchase of the Purchased Assets at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, at or prior to the Initial Closing, the BD Closing or Final Closing as applicable, of a number of conditions precedent (some of which are described above with respect to the Initial Closing), set forth in Section 8.1 of the APA (in the case of the Initial Closing), Section 8.2 (in the case of the BD Closing), and Section 8.3 (in the case of the Final Closing).

- The APA may be terminated at any time prior to the Initial Closing Date by written notice by the terminating Party to the other Party only as set forth in Article XI.1 of the APA.

- The obligations of the parties to effect the BD Closing under the APA may be terminated at any time following the Initial Closing Date but prior to the BD Closing Date, without any change to the Initial Closing or the assumption of the Assumed Obligations assumed as of the Initial Closing only as set forth in Article XI.2 of the APA.

---

[9] TriplePoint's agreement to accept a discounted payoff amount is expressly contingent upon payment on or before May 6, 2024.

- The obligations of the parties to effect the Final Closing under the APA may be terminated at any time following the Initial Closing Date by prior to the Final Closing Date, without any change to the Initial Closing, the BD Closing or the assumption of the Assumed Obligations as of the Initial Closing or the BD Closing only as set forth in Article XI.3 of the APA.

13.    The Debtor understands Buyer intends to hire employees of the Debtor, including, without limitation, insiders and officers of the Debtor, and Buyer has engaged in discussions and negotiations with employees of the Debtor, including, without limitation, insiders and officers of the Debtor.

14.    A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code (the "Sale Order").  Buyer has required that the Sale Order explicitly provide that the sale of the Purchased Assets to Buyer is free and clear of any and all claims or potential claims related to Evolve Settlement and any and all related funds transfers or other transactions provided for in the Evolve Settlement.

15.    The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids.  However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures proposed by the Debtor as and to the extent approved by the Court.

16.    To maximize recoveries to creditors in this case by minimizing cash usage and losses pending the closing of a sale, and given the marketing process which commenced well in advance of the filing of this case, expedited approval of a sale is necessary.  The Debtor's motion for authority to use cash collateral and budget describe the Debtor's current cash position and proposed cash usage during the following approximate two-three weeks.  A sale closing (the Initial Closing) by no later than April 30, 2024 would result in the payment of all of the Debtor's allowed secured debt in full with additional cash remaining in the estate for the benefit of creditors, and the sooner the Debtor is able to close its sale of its assets, the more cash the Debtor believes it will have at closing.  Given the Debtor's projected weekly cash usage and losses,

extending the sale process would increase costs to this estate without materially enhancing any potential for additional benefits from an extended sale process or closing date. The Debtor has determined in its business judgment that a sale process that extends beyond April 30, 2024 is highly unlikely to result in any net benefit to the estate all things considered, including, without limitation as a result of the incurrence of additional operating expenses. The Debtor does not expect there to be any higher or better offer for the Debtor's assets, or any alternative offer at all, given that the Debtor already conducted a marketing and sale process, identified the highest and best bid, heavily negotiated with Buyer over the course of many months during which time both the Debtor and Buyer invested significant time and resources in reaching a mutually acceptable APA and sale terms, with any alternative buyer having the ability during all of that time to engage the Debtor in an alternative, higher and better, transaction.

17. Buyer was only willing to proceed with its purchase of the Purchased Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but Buyer has agreed that the Debtor can and should market Buyer's offer for overbid to ensure that the highest and best offer is made for the Debtor's assets/business in the unlikely event that there is an alternative buyer available.

18. The timing of the sale process is critical, and buyer has conditioned its offer on the Debtor obtaining an entered order of the Court by April 29, 2024 approving the sale by the Debtor to Buyer or a bidder with a higher and better offer.

19. The proposed sale will allow for the payment in full of the Debtor's secured debt obligations and provide for additional recovery to the estate, and coupled with the Debtor's cash on hand and recoveries from any claims and causes of action of the Debtor against third parties, will provide unencumbered funds for the benefit and administration of the estate. The sooner a sale closes and the Debtor's operating expenses are eliminated, the more cash will be available for the benefit of the estate after paying secured debt.

20. In order to provide additional certainty that Buyer's offer constitutes the highest and best offer for the Debtor's assets, the Debtor has proposed bidding and auction procedures

pursuant to which an alternative buyer can still participate in the sale of the Debtor's assets and submit a higher and better offer and participate in an auction.

## III.    DISCUSSION

**A.    The Bankruptcy Court Should Authorize The Debtor To Sell Substantially All Of Its Assets To Buyer Or An Alternative Buyer.**

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification." *See, e.g., In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. at 19-20.

The Debtor submits that its proposed sale of assets pursuant to the terms of the APA and bidding procedures approved by the Court comports with each of these four criteria, and demonstrates that the Debtor's business judgment to proceed with the proposed sale of substantially all of its assets is sound.

**1.    <u>Sound Business Purpose</u>.**

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section 363(b).  *In re Lionel Corp.,* 722 F.2d at 1070.  The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  In *Walter*, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in *In re Lionel Corp.*, *supra*, articulated the standard to be applied under Section 363(b) as follows:

> Whether the proffered business justification is sufficient depends on the case.  As the Second Circuit held in <u>Lionel</u>, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike.  He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In Re Walter*, 83 B.R. at 19-20, *citing In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to the Debtor's proposed sale of the Purchased Assets clearly substantiate the Debtor's business decision that such contemplated sale serves the best interests

of its estate and merits the approval of the Court.

For all of the reasons explained in the Declaration of Sankaet Pathak, the Debtor, confronted with financial and operational challenges, sought capital infusions starting around Spring of 2022, including by engaging an investment banker (which was ultimately unsuccessful). In the Fall of 2023, the Debtor also explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc.as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor.  Marketing by William Blair produced several proposals, however, around December 2023, the Debtor determined that it needed to replace William Blair, and sought to engage Jefferies LLC as the Debtor's investment banker.  The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Buyer.

Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations, due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.  The Debtor continues to lose money and absent a sale in the very near future, the Debtor will eventually run out of money to operate, would lose employees, and ultimately be forced to shut down its business.  The Debtor believes that if there was a shutdown of its business with a resulting liquidation, it would be a disastrous result for creditors.

Based on the foregoing, and given that Buyer has required that the sale occur pursuant to section 363 of the Bankruptcy Code, the Debtor determined in the exercise of its business judgment that the best option available to the Debtor would be to conduct an expedited free and clear asset sale process in a chapter 11 bankruptcy proceeding and consummate that asset sale. The Debtor therefore submits that its proposed sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

**2.      <u>Accurate and Reasonable Notice</u>.**

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors.  The notice should: place all parties on

notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate." *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. *Id.*

In connection with the Debtor's request for Court approval of bidding procedures, the Debtor has requested that the Court approve a form of sale notice (the "Sale Notice") which the Debtor submits complies with all of the requirements of providing notice of this Motion and the proposed sale and which will be served on all creditors and equity interest holders and any other required parties in interest. The Debtor submits that the foregoing will satisfy the requirements of the Bankruptcy Rules 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...
> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c).

### 3.    Fair and Reasonable Price.

In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable. *Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). Several courts have held that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such property is paid. *See In re Karpe*, 84 B.R. at 933; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986); *Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985); *In re Snyder*, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); *In re The Seychelles, Partnership and Genius*

*Corp. v. Banyan Corp.*, 32 B.R. 708 (N.D. Tex. 1983).  However, the Debtor also realizes that "its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilde Horse Enterprises*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold").

The pre-petition marketing process and the terms of the Bidding Procedures are designed to insure that the highest price possible is obtained for the Purchased Assets, bearing in mind that the Debtor believes that the highest and best price is reflected in Buyer's offer and that the Debtor believes it is unlikely that there will be any overbids.  The Debtor submits that the extensive marketing process it conducted pre-petition coupled with the intensive negotiations it conducted with Buyer, resulted in a fair market value offer by Buyer for the Debtor's assets.

### 4.    <u>Good Faith</u>.

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts Dairies*, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith.  *Id.* at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction.  *In re Wilde Horse Enterprises*, 136 B.R. at 842.  With respect to a debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction."  *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

With respect to the buyer's conduct, this Court should consider whether there is any

evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147; *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988).   In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), *citing In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983); *see also In re M Capital Corp.*, 290 B.R. 743 (B.A.P. 9th Cir. 2003).

In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.]   [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

*Filtercorp*, 163 F.3d at 577.

The Ninth Circuit made clear in *Filtercorp* that this standard for determining good faith is applicable even when the buyer is an insider.   The Debtor is not aware of any fraud, collusion or attempt to take unfair advantage of any bidders by Buyer.   Indeed, Buyer agreed that the Debtor's assets should be made available for overbids.   Additionally, the Bid Procedures and APA were intensively negotiated at arm's length in good faith between the Debtor and Buyer. Based on the foregoing, and a declaration to be submitted (or testimony provided) by Buyer or the winning bidder describing its good-faith conduct throughout the sale process, the Debtor submits that the Court should find that Buyer or another winning bidder constitutes a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

**B.**   **Section 363(f) Of The Bankruptcy Code Permits The Debtor's Sale Of The Purchased Assets To Be Free And Clear Of Any And All Liens, Claims, Encumbrances, And Interests.**

The proposed transaction with Buyer, once closed, will result in the payment in full of all secured debt, and thus, SVB and TriplePoint will consent to the sale under section 363(f)(2) and the sale could be approved under section 363(f)(3). The Debtor does not believe that there will be a scenario where SVB and TriplePoint do not consent to the sale of the Purchased Assets in accordance with the terms of the APA. However, with respect to any other parties in interest other than SVB and TriplePoint asserting a lien, claim, interest or encumbrance in the Purchased Assets, the Debtor's discussion below includes an analysis of sections 363(f)(1), (4) and (5).

Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

> The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—
>> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; ...
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>> (4) Such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) of the Bankruptcy Code was drafted in the disjunctive. Thus, a debtor in possession need only meet the provisions of one of the five subsections of section 363(f) in order for a sale of property to be free and clear of any and all liens, claims, interests, or encumbrances of any nature (defined collectively as "Encumbrances") [10]. The Debtor submits that one or more of the tests of Bankruptcy Code section 363(f) are satisfied with respect to the Debtor's proposed sale of the Purchased Assets free and clear of Encumbrances.

---

[10] The Bankruptcy Code does not define the phrase "interest in ... property" for purposes of § 363(f). *See In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 567 B.R. 820, 825 (Bankr. C.D. Cal. 2017). "The Third Circuit has held that the phrase 'interest in ... property' is 'intended to refer to obligations that are connected to, or arise from, the property being sold.' *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000). That conclusion is echoed by *Collier on Bankruptcy*, which observes a trend in caselaw 'in favor of a broader definition [of the phrase] that encompasses other obligations that may flow from ownership of the property.' 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.06[1] (16th ed. 2017)." *Id.*

**1.    The Debtor's Proposed Sale Is Permissible Pursuant To Section 363(f)(1).**

Applicable nonbankruptcy law permits the sale of the Purchased Assets free and clear of such interest. *See e.g., In the Matter of Spanish Peaks Holdings II, LLC,* 872 F.3d 892 (9th Cir. 2017) ("Section 363(f)(1) does not require an actual or anticipated foreclosure sale.  It is satisfied if such a sale would be legally permissible") (holding that, under Montana law, a foreclosure sale to satisfy a mortgage terminates a subsequent lease on the mortgaged property, and, therefore, the sale free and clear of a lease was permitted under section 363(f)(1)).

For example, under California law, a foreclosure sale of a personal property interest would terminate junior interests if conducted pursuant to the lien of a deed of trust, or an execution sale pursuant to a judgment lien. Specifically, a junior lienholder in California could be compelled to accept a money satisfaction upon a senior secured party's disposition of collateral under the default remedies provided in §9617 of California's Uniform Commercial Code.

Based on the foregoing, the Debtor submits that applicable non-bankruptcy law permits the sale of the Property free and clear of Encumbrances.

**2.    The Debtor's Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(2).**

Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if the interest holder consents to the sale.  However, the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in section 363(f)(2) of the Bankruptcy Code, can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  *In re Eliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

As discussed above, the Debtor understands SVB and TriplePoint will consent to the Debtor's sale of the Purchased Assets free and clear of their liens in accordance with the APA. In the event that there any other Encumbrance holders, the Debtor requests that the Bankruptcy Court approve the sale of the Purchased Assets free and clear of all Encumbrances of those parties who do not file a timely objection to the sale, by deeming all such parties to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.

**3.**     **The Debtor's Proposed Sale is Projected to be Permissible Pursuant to 11 U.S.C. Section 363(f)(3).**

Section 363(f)(3) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if such interest is a lien and the price at which the property to be sold is greater than the aggregative value of all liens against the property.  Here, the proposed sale to Buyer will result in a Purchase Price that will exceed SVB's and TriplePoint's agreed upon secured claim amounts.

**4.**     **The Debtor's Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(4).**

Section 363(f)(4) permits a sale free and clear of an interest if such interest is in bona fide dispute.  Here, the Debtor is not seeking Bankruptcy Court approval of the sale under section 363(f)(4) as it pertains to SVB's or TriplePoint's security interest.  However, to the extent any other party in interest asserts an Encumbrance against the Purchased Assets, the Debtor reserves the right to contend that such Encumbrance is in bona fide dispute.

**5.**     **The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(5).**

Section 363(f)(5) of the Bankruptcy Code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5).

The Bankruptcy Appellate Panel for the Ninth Circuit has scrutinized § 363(f)(5) in the context of the sale of real property.  *See Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (9th Cir. B.A.P. 2008) ("*Clear Channel*").  In *Clear Channel*, the senior secured creditor attempted to purchase the debtor's real property by way of a credit bid, free and clear of the interest of a nonconsenting junior lienholder outside of a plan of reorganization.  The Bankruptcy Court approved the sale to the senior lender under § 363(f)(5), finding that § 363(f)(5) permits a sale free and clear of the creditor's interest in property "whenever a claim can be paid with money."  391 B.R. at 42.

In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel found that § 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which (2) the

1    nondebtor could be compelled to accept a money satisfaction of (3) its interest." *Id.* at 41.

2    Taking up these factors in reverse order, the Bankruptcy Appellate Panel concluded that a lien,

3    such as the lien of a secured lender, constitutes an "interest" for purposes of § 363(f)(5).  With

4    respect to the second factor, the Bankruptcy Appellate Panel ruled that § 363(f)(5) refers to

5    those proceedings in which the creditor "could be compelled to take less than the value of the

6    claim secured by the interest." *Id.*  In order to approve a sale free and clear under § 363(f)(5),

7    the Court must "make a finding of the existence of … a mechanism [to address extinguishing

8    the lien or interest without paying such interest in full] and the [debtor in possession] must

9    demonstrate how satisfaction of the lien 'could be compelled.'" *Id.* at 45.  Finally, the

10   Bankruptcy Appellate Panel held that § 363(f)(5) requires that there be, "or that there be the

11   possibility of, some proceeding, either at law or at equity, in which the nondebtor could be

12   forced to accept money in satisfaction of its interest." *Id.*

13        In *In re Jolan, Inc.*, 403 B.R. 866 (Bankr. W.D. Wash. 2009), decided after *Clear*

14   *Channel*, the bankruptcy court held that *Clear Channel* "does not preclude a §363(b) sale free

15   and clear for an amount less than enough to satisfy all liens…." *Id.* at 867.  "The [Bankruptcy

16   Appellate] Panel nowhere addressed non-contractual mechanisms whereby a lienholder might

17   get less than full payment yet lose the lien.  In fairness, the appellees [in *Clear Channel*] did not

18   even argue that there were any qualifying legal or equitable proceedings beyond cramdown

19   under §1129." *Id.* at 869.[11]

20        "As in *Clear Channel*, subsection (f)(5) is the only subsection of § 363 which might here

21   permit the trustee's proposed auction if the proceeds do not cover the debts secured by the

22   collateral sold.  But there are legal and equitable proceedings in Washington in which a junior

23   lienholder could be compelled to accept a money satisfaction: a senior secured party's

24   disposition of collateral under the default remedies provided in part VI of Article 9, Secured

25   Transactions of Washington's Uniform Commercial Code, RCW 62A.9A." *Id.*

26

27   [11] *But see Clear Channel*, footnote 21: "*Collier* seems to indicate that UCC §9-320, which
     permits a sale free and clear of a consensual security interest if the collateral is sold in the
28   ordinary course of business of the debtor, might satisfy paragraph (5).  We think, however, that

Other examples provided by the *Jolan* court included: (1) a receiver's sale free and clear of liens under applicable Washington law; (2) the liquidation of a probate estate under applicable Washington law; (3) a personal property tax sale; (4) a federal tax lien sale; and (5) a judicial or nonjudicial foreclosure of real property.

As discussed above in connection with section 363(f)(1), there are legal and equitable proceedings available in California and other jurisdictions that parallel the proceedings discussed by the bankruptcy court in *Jolan*.

Here, all of the factors set forth in *Clear Channel* for a sale free and clear of claimants' interests could be satisfied. Specifically, any party who asserts an "interest" in the Purchased Assets could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. Similarly, any unsecured creditor of the Debtor's estate could undeniably be forced to accept, via court proceedings whereby such creditors could obtain money judgments against the Debtor, money satisfaction of their claims.

Based upon all of the foregoing, all creditors of the Debtor's estates, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest.

**C.**  **The Bankruptcy Court Should Authorize The Debtor To Assume And Assign To Buyer All Of The Assigned Contracts That The Buyer Desires.**

Barring exceptions not herein relevant, sections 365(a) and 1107(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor." A debtor in possession may assume or reject executory contracts for the benefit of the estate. *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2d. Cir. 1996); *In re Central Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996). In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it. *In re Continental Country Club, Inc.*, 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); *see also In re Gucci*, 193 B.R. at 415.

---

such a use is better classified under paragraph (1).

The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice.  *In re Prime Motors Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), *citing Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee.  Pursuant to section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1); *see also In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); *In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993).  Pursuant to section 365(f)(1) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease pursuant to section 365(f)(2) of the Bankruptcy Code notwithstanding any provision in such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of such executory contract or unexpired lease.

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  *In re Embers 86th Street. Inc.*, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

By way of this Motion, the Debtor is also seeking the Court's approval of the Debtor's assumption and assignment to the winning bidder and the winning backup bidder of those unexpired leases and executory contracts, respectively, that the winning bidder and the winning backup bidder, respectively, wish to assume.

The Debtor will file and serve on contracting counterparties that certain *Notice Of: (1) Assumption And Assignment Of Executory Contracts And Unexpired Leases; (2) Establishment*

*Of Cure Amounts In Connection Therewith; (3) Procedures And Deadlines Regarding Oppositions To Assumption And Assignment, And Cure Amounts; And (4) Hearing Thereon* as approved by the Court (the "<u>Assumption/Assignment Notice</u>")[12] setting forth a schedule of all of the Debtors' known executory contracts and unexpired leases (the "<u>Contracts and Leases Schedule</u>"), along with the Debtor's and Buyer's belief as to all outstanding cure amounts owing by the Debtor to the other parties to those executory contracts and unexpired leases (the "<u>Cure Amount</u>").

By way of this Motion, the Debtor are seeking the Court's authority to assume and assign to the winning bidder/winning backup bidder all of the Debtor's executory contracts and unexpired leases that Buyer wants to have assigned to it and to fix the required Cure Amounts that would need to be paid to the other parties to the executory contracts and unexpired leases to enable compliance with the provisions of Section 365(b)(1)(A) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule unless the other parties to the executory contracts and unexpired leases file a timely objection to the Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule. By way of this Motion, the Debtor is also seeking a determination by the Court that none of the other parties to the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtor so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code.

The Debtors submit that none of the other parties to the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtor so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code. The Debtor therefore submits that any party that fails to file a timely objection to this Motion should be deemed to have consented to the Debtor's proposed Cure Amounts and pecuniary loss amounts

---

[12] The Debtor has requested in its motion for approval of bidding procedures that the Court approve the Debtor's proposed form of the Assumption/Assignment Notice.

and be forever barred from challenging the Debtor's proposed Cure Amounts and pecuniary loss amounts.

Those executory contracts and unexpired leases that will not be assumed and assigned to the Buyer at the closing of the sale, will be deemed rejected. The Debtor will file a separate motion and notice with the Court setting forth a list of those contracts and leases that the Debtor seeks to be deemed rejected.

**D.      The Debtor Requests the Court to Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise. Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of a debtor's assumption and assignment of unexpired leases and executory contracts.

For all of the reasons set forth above, the Debtor believes that selling the Purchased Assets in accordance with the timeline provided in the APA is in the best interest of the Debtor's estate. Closing the sale of the Purchased Assets as soon as possible will minimize the need for the Debtor to expend further cash for its business operations. In order to facilitate the most expeditious closing possible, the Debtor requests that the order granting this Motion be effective immediately upon entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.

## IV.      CONCLUSION

Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an order granting this Motion in its entirety and all of the relief requested above in this Motion.

Dated: April 22, 2024

LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.


By:    /s/ Krikor J. Meshefejian
       RON BENDER
       MONICA Y. KIM
       KRIKOR J. MESHEFEJIAN
       Proposed Attorneys for Chapter 11 Debtor
       and Debtor in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; (C) WAIVING THE 14-DAY STAY PERIODS OF BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) *April 22, 2024*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyg.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) *April 22, 2024*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) *April 22, 2024*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON**
**SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 22, 2024 | Lourdes Cruz | */s/ Lourdes Cruz* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423


Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113


Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105


First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117


Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457


FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526


Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111


Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043

Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292

Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104

Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367