RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com

Proposed Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No.: 1:24-bk-10646-MB |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 |
| Debtor and Debtor in Possession. | **DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF COMPROMISE OF CONTROVERSY WITH EVOLVE BANK & TRUST PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | [Omnibus Declaration of Sankaet Pathak and Declaration of Tracey Guerin in Support Hereof Filed Concurrently Herewith] |
| | Date:     April 24, 2024<br>Time:     2:00 p.m.<br>Place:    Courtroom 303<br>              21041 Burbank Boulevard<br>              Woodland Hills, CA 91367 |

Pursuant to Local Bankruptcy Rules 2081-1 and 9075-1, 11 U.S.C. §§ 105(a) and 1108 and Rule 9019 of the Federal Rules of Bankruptcy Procedure, Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor"), hereby files this motion (the "Motion"), on an emergency basis, for approval of the "*Settlement Agreement and Release*" ("Settlement Agreement") between the

Debtor and Evolve Bank & Trust ("Evolve"), a true and correct copy of which is attached as **Exhibit 1** to the Declaration of Tracey Guerin filed concurrently herewith. The full bases for the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

### BRIEF BACKGROUND INFORMATION

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date"). The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was founded by Sankaet Pathak as "Synapse Payments LLC" in 2014 and changed its name, pursuant to its conversion to a corporation, to "Synapse Financial Technologies, Inc." in 2016. The Debtor is a technology and software company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as "End Users" to avoid confusing them with the fintechs which are the Debtor's only customers) through the Debtor's relationships with bank partners and other financial service providers (referred to as "Partner Financial Institutions").

The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (BaaS) platform to allow for the provision of Partner Financial Institutions financial products (*e.g.,* bank accounts, card products, cash management accounts and related services, and loan products) to the customers of the fintechs (*i.e.,* the End Users). The Debtor, a non-bank, has in place certain agreements with Partner Financial Institutions to enable the provision of financial products through the Debtor's software and technology services. The fintechs provide the user interface in which End Users access the products of the Partner Financial Institution through the Debtor's software.

Evolve, who is a party to the Settlement Agreement, was one of the first Partner Financial Institutions who the Debtor contracted with in 2017 and the main banking partner whose banking products and services have been offered to fintechs and End Users through the Debtor services.

*By example* of the Debtor and Evolve (or other Partner Financial Institution) offering, an individual or a company business customer (*i.e.,* the End Users) interested in obtaining various financial services such as opening a bank account will first sign up with a fintech which has contracted for the Debtor's services. Through the fintech's application, the End User signs up for the specific banking products by first signing up for a user account through the fintech's application and agreeing to the fintech's terms and conditions (as well as those of the Debtor). Then, through the fintech's application, the End User can choose from banking products offered by the Partner Financial Institutions (*e.g.,* deposit account agreement, card agreement, or the like). End Users are customers of the fintechs and the Partner Financial Institutions, not the Debtor. The Debtor is not in the flow of funds and does not receive funds from the End Users. The Partner Financial Institutions access information about the End Users through the Debtor's software and technology services. The "network" between the fintech and the Partner Financial Institutions is created through the Debtor's technology and software which then allows for the fintechs, Partner Financial Institutions and the End Users to communicate through their systems and programs to make transactions (for such things as deposits, withdrawals, cards transactions, ACH and wire payments, etc.), for disputing transactions, monitoring and reporting, and the like. The Debtor also provides program records and deposit ledger services to Partner Financial Institutions, based upon the terms as provided in the relevant agreements.

In addition to providing access to its proprietary technology and a platform that allows for the fintechs to offer banking products and services of the Partner Financial Institutions to the End Users, the Debtor also provides related services to the banks and the fintechs, such as, for example, compliance check services (*e.g.*, ensuring that the End Users are authorized to open accounts), and handles End-User disputes and customer service. As of January 2024, the Debtor had service contracts with over 20 Partner Financial Institutions (either directly or indirectly for sweep networks) and 100 fintechs, and approximately 10 million End Users through its technology platform. A substantial number of these fintechs and End Users received Evolve's banking products and services. As of the Petition Date, the Debtor engaged approximately 89 employees

and contractors in the United States. The Debtor also engages approximately 19 personnel outside of the United States, but these personnel are engaged through a third-party employer service.

Confronted with the material financial and operational challenges which are further described in the Memorandum of Points and Authorities annexed hereto, the Debtor determined that it needed to explore investment, restructuring and other options, and, in that regard, the Debtor engaged William Blair as its investment bankers to solicit proposals for infusion of capital (which offer was ultimately rejected). In the Fall of 2023, the Debtor also explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Marketing by William Blair produced several proposals, including an initial offer from the Buyer (as defined below), however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did by seeking to engage Jefferies LLC ("Jefferies").

On April 19, 2024, the Debtor signed an Asset Purchase Agreement ("APA") with Tabapay or its designee ("Buyer" or "Tabapay") which has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to its two (2) wholly-owned subsidiaries (defined and described in the Memorandum of Points and Authorities as "S Brokerage" and "S Credit") for the cash purchase price of $9,700,000 ("Cash Purchase Price"), plus other consideration as described in the APA, including the Buyer's agreement to pay for all cure obligations associated with the assumed leases and contracts. Contemporaneously with the filing of this Motion, the Debtor has filed its motion for approval of the sale of the Debtor's assets to Tabapay ("Sale Motion").

The APA contemplates a three-tiered closing process with (i) the Initial Closing to occur for the transfer of all of the "Purchased Assets" other than the Debtor's equity interests in S Brokerage and S Lending, (ii) a second closing to occur as soon as the "change of ownership or control" can be made with respect to S Brokerage pursuant to the procedures governed by

4

FINRA[1], and (iii) a third and final closing to occur as soon as the licenses designated by Tabapay as to S Lending are transferred to Tabapay. The "Outside Closing Date" for the Initial Closing is April 30, 2024.

Although the details of the provisions of the APA are set forth more fully in the Sale Motion, among other things, the APA contains numerous covenants and conditions to closing. One of the express conditions to closing is that the Court approve the Debtor's Settlement Agreement with Evolve.

Evolve is and has been a banking partner of the Debtor since 2017. More specifically, the parties executed a Master Bank Services Agreement on September 23, 2022, and the predecessor Bank Services Agreement on April 18, 2017 (together, as amended, the "Agreements"). Pursuant to the Agreements, the parties established Programs under which Evolve offers Bank Services to End Users and Synapse services and supports such Programs as "Program Manager".

As part of the Bank Services provided pursuant to the Agreements, End User Deposits are held in omnibus custodial accounts owned by Evolve, in which Evolve pools the funds held by all End Users, for their benefit (or in case of a Platform, for the benefit of a Platform's End Users), if any (the "FBO Accounts");

The parties each have alleged claims against the other relating to the funding and reconciliation of the FBO Accounts (the "FBO Account Claims").

In addition, the parties each have alleged claims against the other relating to the funding of the Program Manager Reserve Account (the "Reserve Balance Claims"), including Evolve's funding, withdrawal and use of funds totaling $43,225,506.73 in, to and from the Reserve Account ("Reserve Funds"). In addition, separate from the Reserve Balance Claims and the unrelated to the Reserve Funds, the Debtor has alleged a claim against Evolve relating to Evolve's underpayment of fees or compensation on End User Balances in FBO Accounts due and owing to Synapse under the Agreements for the years 2022 to date (the "Underpayment Claim").

Under the APA, express conditions to the closing include, among other things: (i) Evolve

---

[1] The Debtor is advised that the "change of ownership or control" of S Brokerage can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

to ensure that all account balances of End-Users in FBO Accounts are fully funded to the Buyer's satisfaction ("Taba Funding Condition")[2], (ii) Evolve to execute and deliver a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the transactions contemplated by the APA subject to only Court approval; and (iii) the Court's approval of the Settlement Agreement between Evolve and the Debtor. In short, the Debtor cannot close by the Initial Closing date of April 30, 2024 (at which point the balance of the entire cash purchase price of $9.7 million is to be paid) unless the Court immediately approves the Settlement Agreement.

The salient terms of the Settlement Agreement are that Evolve will pay the estate the sum of $2 million, and the parties will provide mutual general releases of claims against each other, on the terms set forth in the Settlement Agreement. The Debtor submits that the terms of the Settlement Agreement are fair, comports with the *A & C Properties* standards set forth in the Memorandum of Points and Authorities annexed hereto, and is in the best interests of the Debtor's estate and creditors. Accordingly, the Debtor requests that the Court immediately enter an order approving the Motion and waiving the fourteen (14) day period for any appeal from such order.

The relief sought in this Motion is based upon the Motion, the annexed Memorandum of Points and Authorities, the Omnibus Declaration filed concurrently herewith and all Exhibits attached thereto, the statements, arguments and representations of counsel to be made at the hearing(s) on the Motion, and any other evidence properly presented to the Court at or prior to the hearing(s) on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor has served a copy of this Motion and all supportive papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, all of the Secured Creditors and their counsel (if any), all creditors of the Debtor, and parties requesting special notice via overnight mail.

---

[2] Under the APA, Evolve is required to ensure the FBO Accounts are fully funded as this is a critical component to the Buyer's ongoing operation of the assets and business that it is acquiring.

**WHEREFORE**, the Debtor respectfully requests that this Court:

(1)    Grant the relief requested in the Motion on an emergency basis;

(2)    Authorize the Debtor to enter into the Settlement Agreement;

(3)    Approve the terms of the Settlement Agreement, a copy of which is attached to the Omnibus Declaration as **Exhibit 3**;

(4)    Waive the fourteen (14) day period for any appeal from such order;

(5)    Authorize the Debtor to execute any documents or take any actions reasonably necessary to effectuate the terms of the Settlement Agreement; and

(6)    Grant such other relief as the Court may deem just and necessary.

Dated:  April 22, 2024                          SYNAPSE FINANCIAL TECHNOLOGIES, INC.

By: _____*/s/ Monica Y. Kim*_____
RON BENDER
MONICA Y. KIM
KRIKOR J. MESHEFIJIAN
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
Proposed Attorneys for Debtor and Debtor in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.    CASE BACKGROUND

1.    The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date"). The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor was founded by Sankaet Pathak as "Synapse Payments LLC" in 2014 and changed its name, pursuant to its conversion to a corporation, to "Synapse Financial Technologies, Inc." in 2016. The Debtor is a technology and software company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers  (referred to as "End Users" to avoid confusing them with the fintechs which are the Debtor's only customers) through the Debtor's relationships with bank partners and other financial service providers (referred to as "Partner Financial Institutions").

3.    The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (BaaS) platform to allow for the provision of Partner Financial Institutions financial products (*e.g.,* bank accounts, card products, cash management accounts and related services, and loan products) to the customers of the fintechs (*i.e.,* the End Users). The Debtor, a non-bank, has in place certain agreements with Partner Financial Institutions to enable the provision of financial products through the Debtor's software and technology services. The fintechs provide the user interface in which End Users access the products of the Partner Financial Institution through the Debtor's software.

4.    *By example,* an individual or a company business customer (*i.e.,* the End Users) interested in obtaining various financial services such as opening a bank account will first sign up with a fintech which has contracted for the Debtor's services. Through the fintech's application,

the End User signs up for the specific banking products by first signing up for a user account through the fintech's application and agreeing to the fintech's terms and conditions (as well as those of the Debtor). Then, through the fintech's application, the End User can choose from banking products offered by the Partner Financial Institutions (*e.g.,* deposit account agreement, card agreement, or the like). End Users are customers of the fintechs and the Partner Financial Institutions, not the Debtor. The Debtor is not in the flow of funds and does not receive funds from the End Users. The Partner Financial Institutions access information about the End Users through the Debtor's software and technology services. The "network" between the fintech and the Partner Financial Institutions is created through the Debtor's technology and software which then allows for the fintechs, Partner Financial Institutions and the End Users to communicate through their systems and programs to make transactions (for such things as deposits, withdrawals, cards transactions, ACH and wire payments, etc.), for disputing transactions, monitoring and reporting, and the like. Debtor also provides program records and deposit ledger services to Partner Financial Institutions based upon the terms of the relevant agreements.

5.      In addition to providing access to its proprietary technology and a platform that allows for the fintechs to offer banking products and services of the Partner Financial Institutions to the End Users, the Debtor also provides related services to the banks and the fintechs, such as, for example, compliance check services (*e.g.*, ensuring that the End Users are authorized to open accounts), and handles End-User disputes and customer service. As of January 2024, the Debtor had service contracts with over 20 Partner Financial Institutions (either directly or indirectly for sweep networks) and 100 fintechs, and approximately 10 million End Users through its technology platform. As of the Petition Date, the Debtor engaged approximately 89 employees and contractors in the United States. The Debtor also engages approximately 19 personnel outside of the United States, but these personnel are engaged through a third-party employer service.

6.      In the ordinary course of its business, and based on the specific banking or financial products or services received by the approximately 10 million End Users, the Debtor may owe deposit revenue (rebates), interest, interchange fees, and other payments to the fintechs based on the terms and conditions of the Debtor's contracts with the fintechs. These obligations are

9

generally set up to be paid automatically, and up to 30 days in arrears (collectively, the "<u>Customer/Bank Obligations</u>"). The importance of the timely payment of these obligations to its fintech customers (such as interest which is ultimately paid to the End Users) cannot be understated as they are critical and essential to the Debtor's business, which, if not paid, will decimate the going concern value of its business and jeopardize the Debtor's relationships with, and increase litigation exposure from, its customers.

7.    The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("<u>S Credit</u>"), and (ii) Synapse Brokerage LLC ("<u>S Brokerage</u>"). S Brokerage is a registered broker-dealer and a member of FINRA Financial Industry Regulatory Authority (a government-authorized not-for-profit organization that oversees U.S. broker-dealers), and SIPC (Securities Investor Protection Corporation, a non-profit that works to restore investors' cash and securities when their brokerage firm fails).

8.    The Debtor purchased S Brokerage around 2020, however, it only began onboarding End Users and becoming operational only recently. Generally, S. Brokerage offers, directly to End Users, cash management products and related services through the Debtor's relationships with fintechs and network of program banks which enables End Users to spread their risk across banks. S. Brokerage's cash management program enables End Users' funds to be placed across a number of program banks to receive potential increased FDIC deposit insurance of such funds. More specifically, given that the standard insurance amount through the FDIC is, subject to its rules, $250,000 per depositor, per bank, S. Brokerage allows for End Users, through its sweep and other programs, to diversify deposit amounts higher than $250,000 across more than one bank, also using the platforms offered by the Debtor and the network of banks that the Debtor has agreements in place with. The terms of the business arrangement between the Debtor and S. Brokerage are set forth in the parties' *Amended and Restated Intercompany Service and Expense Sharing Agreement*. S. Brokerage does not directly have any employees. Rather, the Debtor provides administrative support and services to S. Brokerage such as technology, transaction processing, record keeping, sales, legal and other back-office services, for which S. Brokerage

pays a monthly service fee to the Debtor. S Brokerage has not filed any Chapter 11 bankruptcy case.

9.      S. Credit was established by the Debtor around 2020 and holds state lending licenses in order to offer loan products to End Users through the Debtor's relationships with fintechs. S. Credit provides a few loan products in low amounts to End Users of the fintechs that the Debtors have agreements in place with. The loans are typically guaranteed with restricted cash and/or reserves for the full amount of the loans; thus, there is very little to no financial risk to the loan products offered to S. Credit. The terms of the business arrangement between the Debtor and S. Credit are set forth in the parties' *Intercompany Service and Expense Sharing Agreement*. S. Credit does not have any employees. Rather, the Debtor provides administrative support and services to S. Credit such as technology, transaction processing, record keeping, sales, legal and other back-office services, for which S. Brokerage pays a monthly service fee to the Debtor. S Credit not filed any Chapter 11 bankruptcy case.

10.     In recent years, the BaaS industry which Synapse helped pioneer has come under increased scrutiny from state and federal financial regulators, who have raised their expectations of banks and financial institutions who partner with non-bank providers. In many cases, these state and federal regulators have required banks to reduce the number of deposits they receive from BaaS/fintechs and to implement increased scrutiny over new fintech programs. At the same time, federal funds rates were continuing to increase, leading to increased revenue to the Debtor (a large portion of which it passed through to fintech customers). However, fintech valuations were plummeting and venture capital funding was scarce.

11.     The Debtor had long forecasted difficulties on the horizon for the BaaS industry; thus, it planned to pivot to a different approach which included the diversification of its Partner Financial Institutions and expansion to include in-house regulated products through S. Brokerage and S. Credit. The Debtor also engaged in negotiations for the purchase of a bank. However, this pivot required substantial investment and capital. Therefore, the Debtor sought capital infusion and received a term sheet for a $100 million capital infusion, which was vetoed by certain investor directors.

12.    Thereafter, one of the Debtor's largest fintech customers, Mercury Technologies, Inc. ("Mercury"), notified the Debtor that it would not renew its agreement with the Debtor and instead form a direct relationship with bank partners to cut the Debtor out of the revenue stream. Concurrently with this notification, Mercury transferred over $3 billion in End User funds, without the Debtor's participation, to its direct bank relationship. Mercury's transfer, which Synapse alleges was not properly conducted, resulted in damages to Synapse and its Program. Subsequently, Mercury filed a lawsuit against the Debtor alleging that it is owed approximately $30 million for a 2022 dispute based on an interpretation of the parties' agreement as to the rate that it is to pay the Debtor which is inconsistent with the actual language of the parties' agreement. The Debtor is aggressively defending the lawsuit, and has substantial counter-claims against Mercury in an amount in excess of $36 million which it intends to actively pursue during this case.

13.    In the Fall of 2023, the Debtor explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Previous marketing of the Debtor by William Blair had produced several proposals, including an initial offer from the Buyer (as defined below), however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did so by seeking to engage Jefferies LLC ("Jefferies").

14.    On April 12, 2024, the Debtor signed an Asset Purchase Agreement ("APA") with Tabapay or its designee ("Buyer" or "Tabapay") which has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to its two (2) wholly owned subsidiaries, S Brokerage and S Credit, for the cash purchase price of $9,700,000 ("Cash Purchase Price"), plus other consideration as described in the APA, including the Buyer's agreement to pay for all cure obligations associated with the assumed leases and contracts. Contemporaneously with the filing of this Motion, the Debtor has filed its motion for approval of the sale of the Debtor's assets to Tabapay ("Sale Motion").

15.     The APA contemplates a three-tiered closing process, with (i) the Initial Closing to occur for the transfer of all of the "Purchased Assets" other than the Debtor's equity interests in S Brokerage and S Lending, (ii) a second closing to occur as soon as the "change of ownership or control" can be made with respect to S Brokerage pursuant to the procedures governed by FINRA, and (iii) a third and final closing to occur as soon as the licenses designated by Tabapay as to S Lending are transferred to Tabapay. The "Outside Closing Date" for the Initial Closing is April 30, 2024.

16.     Although the details of the provisions of the APA are set forth more fully in the Sale Motion, among other things, the APA contains numerous covenants and conditions to closing. One of the express conditions to closing that the Court approve the Debtor's "*Settlement Agreement and Release*" (the "Settlement Agreement") with the Debtor's banking partner, Evolve Bank & Trust ("Evolve") which was entered on April 19, 2024.

### A.     GENERAL NATURE OF DISPUTES WITH EVOLVE

17.     Since 2017, Evolve is and has been one of the Debtor's main banking partners, and, in this capacity, desired to establish one or more Programs with the Debtor under which Evolve would offer its Bank Services to End Users.  In furtherance of this, Evolve and the Debtor executed the Master Bank Services Agreement ("MBSA") on September 23, 2022, and the predecessor Bank Services Agreement on April 18, 2017 (collectively, as amended, the "Agreements").  Pursuant to the Agreements, Evolve engaged in providing the Bank Services to End Users and the Debtor (known as the "Program Manager" in the MBSA) provided Program Manager services and technology services to enable the provision of Evolve's Bank Services to End Users. Given the complexities of BaaS, the parties continued to learn and improve on the important cornerstones needed to make a successful Program. As competition in the BaaS industry rose and became more lucrative, the Debtor contends that Evolve sought to cut the Debtor out from the revenue structure between it and the fintechs.  Evolve denies this contention. Simultaneously, regulation in the BaaS industry became more prominent, leading the Debtor to pivot to a new strategy in which it brought its own regulated financial services in house with its subsidiary broker dealer and lending entity.

18.     The Debtor contends that there have been difficulties in the Evolve/Debtor partnership that resulted in contractual disputes between the Debtor and Evolve over liability for potential damages.  The parties implemented technical updates, and conducted reviews and testing with Evolve's Operations Team to develop and implement additional monitoring processes, but that these updates and processes did not necessarily resolve any prior contractual disputes.

19.     Substantial disputes developed between the Debtor and Evolve, ultimately resulting in what Debtor contends were Evolve's multiple breaches of the MBSA, including, but not limited to, relating to Evolve allegedly: (a) diverting substantial sums for fees and compensation owed to Debtor to the Program Manager Reserve Account; (b) increasing the amount of the Program Manager Reserve Account Requirement to the sum of $50,000,000 without regard to the formula set forth in the MBSA; (c) debiting funds for payment of fees Evolve alleged were owing to itself and others; (d) withholding from the Debtor the transaction-level data necessary to perform an accounting and failing to participate in reconciliation efforts necessary to rectify  issues identified by Synapse; (e)  payment processing issues and lack of responsiveness and remediation; and (f) failing to cure ongoing administrative deficiencies that interfere with and impair the Debtor's day-to-day business operations (collectively items (a) through (f) are  referred to as "Evolve's Alleged MBSA Breaches"), all of which Debtor contends have caused Debtor to sustain damages.  Evolve disputes that it engaged in any of the MBSA Breaches, believes its actions in each case were appropriate and contractually authorized, and contends both that it provided Debtor with sufficient transaction-level data necessary for Debtor's obligations under the MBSA, and that Debtor allegedly engaged in unremediated breaches of Debtor's obligations under the MBSA as Program Manager, including related to transaction accounting, maintaining ledgers supporting the End User and fintech accounts, funding the FBO Account, and satisfying its reserve requirement, all of which Evolve contends have caused Evolve to sustain substantial damages ("Debtor's Alleged MBSA Breaches").  Debtor disputes that it engaged in the Debtor's Alleged MBSA Breaches and maintains that to the extent any losses exist, they are Evolve's responsibility due to Evolve's Alleged MBSA Breaches.

20.     There were also accounting disputes between the parties. More specifically, the MBSA provides an obligation for Evolve to pay Debtor a certain percentage on Deposits in FBO Accounts. The Debtor alleges that Evolve failed to pay the Debtor the amount due and owing for such fees and compensation and failed to, inter alia, apply such percentage owed on all FBO Accounts, resulting in a significant underpayment to Debtor (the "Underpayment Claim"). Evolve both denies that it underpaid Debtor and contends that Debtor failed to properly dispute such underpayment on a timely basis, resulting in waiver.

21.     Between August 2023 and April 18, 2024, the Debtor and Evolve engaged in multiple on-going oral and written communications regarding the nature of Evolve's Alleged MBSA Breaches and Debtor's Alleged MBSA Breaches. Ultimately, the parties reached an impasse. The Debtor has been in negotiations with TabaPay Holdings LLC or its designated affiliate to acquire certain assets of the Debtor, including certain rights related to the FBO Accounts. As a result of these negotiations with Tabapay, Evolve has continued to maintain the Program in order to facilitate the Tabapay sale and continuing of the Program with Tabapay.

**B.      THE SETTLEMENT AGREEMENT WITH EVOLVE**

22.     Pre-petition, the Debtor and Evolve engaged in significant efforts to resolve their various disputes and disagreements. The Buyer also requires as an express condition to the Initial Closing, among other things: (i) Evolve to ensure that all account balances of End-Users in FBO Accounts are fully funded to Taba's satisfaction ("Taba Funding Condition"), (ii) Evolve to execute and deliver a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the transactions contemplated by the APA; and (iii) the Court's approval of the Settlement Agreement between Evolve and the Debtor. In short, the Debtor cannot meet the Initial Closing date of April 30, 2024 (at which point the balance of the entire cash purchase price of $9.7 million is to be paid) unless the Court immediately approves the Settlement Agreement.

23.     In order to resolve its disputes with Evolve while preserving its sale with the Buyer, the Debtor and Evolve reached the Settlement Agreement, a true and correct copy of the

Settlement Agreement is attached to the Omnibus Declaration as **Exhibit 3**. The salient terms of the Settlement Agreement are as follows (all capitalized terms used below shall refer to the definitions given in the Settlement Agreement):

1. **Settlement Payment and Funding Requirements:**

   a. <u>FBO Account Funding</u>. As a condition precedent to the Releases provided in Section 2 of this Agreement, no later than April 24, 2024 ("Funding Date")(unless the Funding Date is extended by mutual agreement of Synapse and Evolve, in their sole and absolute discretion), Evolve shall fund the FBO Accounts, shall ensure that all account balances of End-Users in FBO Accounts are fully funded, and shall provide reasonable evidence to Synapse of same ("Evolve Funding"). The Parties agree that Evolve is not obligated to fund any End User account balances maintained at other financial institutions. From the Execution Date until the close of the Taba Acquisition, (i) Synapse agrees to timely and comprehensively respond to reasonable information requests from Evolve related to current and historical End User account balances, End User transactions, and funding of the FBO Accounts and (ii) Evolve agrees to timely and comprehensively respond to reasonable information requests from Synapse to assist with completion of the Taba Funding Condition.

   b. <u>Settlement Payment</u>. Evolve shall pay to Synapse a cash payment of $2,000,000.00 (the "Settlement Payment"), in exchange for the Synapse Release provided in Section 2. Such Settlement Payment shall be due on the later of the Effective Date or the Funding Date. For clarity, the Settlement Payment is not owed if the Evolve Funding shall not have been satisfied as set forth in Section 1(a) above, and the Releases set forth in Section 2 above shall not become effective. . Such payment shall be made by wire transfer of immediately available funds as instructed by Synapse.

2. **Releases:**

   a. <u>Evolve Release</u>. On the later of the Funding Date or the Effective Date, Evolve, on its own behalf and on behalf of its affiliates, subsidiaries, heirs, agents, and assigns (together, the "Evolve Releasors"), will release and forever discharge Synapse and its subsidiaries, affiliates, shareholders, members, officers, directors, employees, insurers, representatives, predecessors, successors, agents, and assigns and any of them (together, the "Evolve Releasees") of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Evolve has or had as of the Execution Date against the Evolve Releasees, including, but not limited to, the FBO Account Claims and the Reserve Account Claims. Evolve further agrees that, unless required by law, it shall not file or cause to be filed any claims, complaints, affidavits, arbitrations, or proceedings with any federal, state, or local law enforcement, regulatory or administrative commission, agency, board, or person, whether public or private, regarding any alleged acts, failures to act, omissions, facts, events, transactions, occurrences, or other matters that relate to or arise from this Release. For the sake of clarity, the Evolve Release shall result in the release and

discharge of Evolve Releasees of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Evolve has or had against Evolve Releasees as of the Execution Date. Evolve acknowledges and agrees that, as of the Execution Date, it has not filed or caused to be filed any claims, complaints, affidavits, arbitrations, or proceedings against the Evolve Releasees.

b.  <u>Synapse Release</u>. On the later of the Funding Date or the Effective Date, Synapse, on its own behalf and on behalf of its affiliates, subsidiaries, heirs, agents, and assigns (together, the "Synapse Releasors"), will release and forever discharge Evolve and its subsidiaries, affiliates, shareholders, members, officers, directors, employees, insurers, representatives, predecessors, successors, agents, and assigns and any of them (together, the "Synapse Releasees") of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Synapse has or had as of the Execution Date against Synapse Releasees, including, but not limited to, the FBO Account Claims, the Reserve Account Claims, and the Underpayment Claim. Synapse further agrees that, unless required by law, it shall not file or cause to be filed any claims, complaints, affidavits, arbitrations, or proceedings with any federal, state, or local law enforcement, regulatory or administrative commission, agency, board, or person, whether public or private, regarding any acts, failures to alleged acts, omissions, facts, events, transactions, occurrences, or other matters which relate to or arise from this Release. For the sake of clarity, the Synapse Release shall result in the release and discharge of Synapse Releasees of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, including any claims arising under Chapter 5 of the Bankruptcy Code, whether known or unknown, which Synapse has or had against Evolve as of the Execution Date. Synapse acknowledges and agrees that, as of the Execution Date, it has not filed or caused to be filed any claims, complaints, affidavits, arbitrations, or proceedings against the Synapse Releasees.

24.    The Debtor believes that the estate's various claims against Evolve have merit, and that there is a strong probability that its positions as to these claims can ultimately be successful. In the Debtor's view, the success of the estate's claims related to the FBO Accounts boils down to being able to account for and reconcile a massive amounts of transactional data which admittedly is not an easy or small task, but to the extent that proper accounting and reconciliation can be performed, the Debtor believes that it would be successful in proving up its positions. However, gathering, analyzing and presenting all of the necessary transactional information and data for trial purposes would require vast amounts of financial resources, time, and manpower – all of which the Debtor does not have.

17

25.     Moreover, Evolve has communicated to Debtor that Evolve believes its claims against Debtor have merit, and that there is a strong probability that its position as to these claims would ultimately be successful.  While the Debtor disagrees with Evolve's position, if the Parties were to pursue their respective claims, such litigation would, in any event, be costly, time consuming and uncertain for either party.

26.     The estate lacks sufficient funds to maintain a complex and time-consuming litigation with Evolve, and because the Settlement Agreement is an express condition to the Initial Closing with the Buyer, the settlement with Evolve is necessary in order to preserve the sale with the Buyer. Absent the settlement and the sale, the Debtor will simply shut down and liquidate, a scenario in which there will be no recovery to general unsecured creditors and which would result in a detriment to fintechs and End Users. However, with the settlement and sale, all of the secured creditors will be paid, and the proceeds from the Evolve settlement will serve as a source for recovery to other creditors.

27.     Even if the estate could afford litigation with Evolve, there is no question that ongoing litigation will be inconvenient, time consuming, burdensome and risky as the outcome and collection are not certain. The Settlement Agreement avoids the expense, inconvenience and delay attendant to any litigation and assures that the estate will have more money to pay to its creditors.

28.     The Debtor also has concerns about the difficulty of collection from Evolve even if it were to obtain a judgment against Evolve as to the various claims because it is likely that Evolve will appeal any judgment which would delay collection.

29.     The Debtor negotiated the Settlement Agreement to preserve and protect the sale with the Buyer, to avoid the costs and risks associated with litigation if the parties were unable to arrive at an equitable resolution, to receive funds which could be made available for creditors, and to protect the fintechs and the End Users. The Debtor evaluated the potential strengths and weaknesses of the estate's positions in a future lawsuit with Evolve, and negotiated the Settlement Agreement in an effort to maximize the return to creditors. The Settlement Agreement was entered

into in good faith and was negotiated at arm's length. The settlement of $2 million is a substantial recovery for this estate and for creditors.

30.    The Debtor submits that the terms of the Settlement Agreement are fair, comports with the *A & C Properties* standards set forth below, and is in the best interests of the Debtor's estate and creditors. Accordingly, the Debtor requests that the Court immediately enter an order approving the Motion.

31.    The Debtor believes that the estate's various claims against Evolve have merit, and that there is a strong probability that its positions as to these claims can ultimately be successful. In the Debtor's view, the success of the estate's claims boils down to being able to account for and reconcile the massive amounts of transactional data tied to the FBO Account and the Reserve Fund, which admittedly is not an easy or small task, but to the extent that proper accounting and reconciliation can be performed, the Debtor believes that it would be successful in proving up its positions. However, gathering, analyzing and presenting all of the necessary transactional information and data for trial purposes would require vast amounts of financial resources, time, and manpower – all of which the Debtor does not have.

32.    Moreover, Evolve has communicated to Debtor that Evolve believes its claims against Debtor have merit, and that there is a strong probability that its position as to these claims would ultimately be successful.  While the Debtor disagrees with Evolve's position, if the Parties were to pursue their respective claims, such litigation would, in any event, be costly, time consuming and uncertain for either party.

33.    The estate has no money to fund litigation with Evolve, and because the Settlement Agreement is an express condition to the Initial Closing with the Buyer, the settlement with Evolve is necessary in order to preserve the sale with the Buyer. Absent the settlement and the sale, the Debtor have no choice but to shut down and liquidate, a scenario in which there will be no recovery to general unsecured creditors and which would result in a detriment to fintechs and End Users. However, with the settlement and sale, all of the secured creditors will be paid, and the proceeds from the Evolve settlement will serve as a source for recovery to other creditors.

34.     Even if the estate could afford litigation with Evolve, there is no question that ongoing litigation will be inconvenient, time consuming, burdensome and risky as the outcome and collection are not certain. The Settlement Agreement avoids the expense, inconvenience and delay attendant to any litigation and assures that the estate will have more money to pay to its creditors.

35.     The Debtor also has concerns about the difficulty of collection from Evolve even if it were to obtain a judgment against Evolve as to the various claims because it is likely that Evolve will appeal any judgment which would delay collection.

36.     The Debtor negotiated the Settlement Agreement to preserve and protect the sale with the Buyer, to avoid the costs and risks associated with litigation if the parties were unable to arrive at an equitable resolution, to receive funds which could be made available for creditors, and to protect the fintechs and the End Users. The Debtor evaluated the potential strengths and weaknesses of the estate's positions in a future lawsuit with Evolve, and negotiated the Settlement Agreement in an effort to maximize the return to creditors.  The Settlement Agreement was entered into in good faith and was negotiated at arm's length. The settlement of $2 million is a substantial recovery for this estate and for creditors.

37.     The Debtor submits that the terms of the Settlement Agreement are fair, comports with the *A & C Properties* standards set forth below, and is in the best interests of the Debtor's estate and creditors. Accordingly, the Debtor requests that the Court immediately enter an order approving the Motion.

**III.**

**A.     The Court Can Approve the Settlement Agreement**

The authority granting a debtor in possession the ability to compromise a controversy or agree to a settlement is set forth in Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), which provides in pertinent part that "[o]n motion by the [debtor in possession] and after hearing on notice to creditors . . ., the court may approve a compromise or settlement." The decision of whether a compromise should be accepted or rejected lies within the

sound discretion of the court. *In re Carson*, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987); *In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I. 1986); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); *Knowles v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565 (Bankr. D.Me. 1983).

The Ninth Circuit Court of Appeals has determined that, in considering a proposed compromise, the court must evaluate (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and (iv) the paramount interests of creditors and a deference to their views. *In re A & C Properties*, 764 F.2d 1377, 1381 (9th Cir. 1986). *See also In re Lion Capital Group*, 49 B.R. 163 (Bankr. S.D. N.Y. 1985); *Matter of Marshall*, 33 B.R. 42 (Bankr. D. Conn. 1983).

A court should not substitute its own judgment for the judgment of the trustee or the debtor in possession. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984). "It is sufficient that, after apprising itself of all facts necessary for an intelligent and objective opinion concerning the claim's validity, the court determines that either (1) the claim has a 'substantial foundation' and is not 'clearly invalid as a matter of law,' or (2) the outcome of the claim's litigation is 'doubtful'." *Matter of Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982). A court, in reviewing a proposed settlement, "is not to decide the numerous questions of law and fact but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), *accord, Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir. 1972). The court should not conduct a "mini-trial" on the merits of the underlying cause of action. *Matter of Walsh Const., Inc.*, 669 F.2d at 1328; *In re Blairu*, 538 F.2d 849 (9th Cir. 1976).

**B.    <u>The Settlement Is Fair and Reasonable</u>**

The Settlement Agreement comports with the *A & C Properties* standards set forth above and is in the best interests of the Debtor's estate and creditors. The four factors, pursuant to *A & C Properties*, to be considered in reaching the aforementioned conclusion, are as follows:

21

1.    <u>The probability of success in the litigation</u>.

The Debtor believes that the estate's various claims against Evolve have merit, and that there is a strong probability that its positions as to these claims can ultimately be successful. In the Debtor's view, the success of the estate's claims boils down to being able to account for and reconcile the massive amounts of transactional data tied to the FBO Account and the Reserve Fund, which admittedly is not an easy or small task, but to the extent that proper accounting and reconciliation can be performed, the Debtor believes that it would be successful in proving up its positions. However, gathering, analyzing and presenting all of the necessary transactional information and data for trial purposes would require vast amounts of financial resources, time, and manpower – all of which the Debtor does not have.  In addition, as noted above, Evolve has communicated to Debtor that it believes it would be successful in proving up its position and is prepared to pursue its own claims against the Debtor if this Settlement Agreement is not approved. However, Debtor disagrees as the outcome of protracted litigation of these highly disputed claims is uncertain.

2.    <u>The difficulties in collection</u>.

The Debtor has concerns about the difficulty of collection from Evolve even if it were to obtain a judgment against Evolve as to the various claims. It is also likely to appeal any judgment favorable to the Debtor, and delay collection.

3.    <u>The complexity of the litigation involved and the expense, inconvenience and delay attendant to it</u>.

This factor weighs strongly in favor of approving the Settlement Agreement. The estate has no money to fund litigation with Evolve, and because the Settlement Agreement is an express condition to the Initial Closing with the Buyer, approval of the settlement is necessary in order to preserve the sale with the Buyer. Absent the settlement and the sale, the Debtor will simply shut down and liquidate, a scenario in which there will be no recovery to general unsecured creditors and which would result in a detriment to fintechs and End Users. However, with the settlement and sale, all of the secured creditors will be paid, and the proceeds from the Evolve settlement will serve as a source for recovery to other creditors.

Even if the estate could afford litigation with Evolve, there is no question that ongoing litigation will be inconvenient, time consuming, burdensome and risky as the successful outcome and collection are not certain. The Settlement Agreement avoids the expense, inconvenience and delay attendant to any litigation and assures that the estate will have more money to pay to its creditors.

The Debtor negotiated the Settlement Agreement to preserve and protect the sale with the Buyer, to avoid the costs and risks associated with litigation if the parties were unable to arrive at an equitable resolution, to receive funds which could be made available for creditors, and to protect the fintechs and the End Users. The Debtor evaluated the potential strengths and weaknesses of the estate's positions in a future lawsuit with Evolve, and negotiated the Settlement Agreement in an effort to maximize the return to creditors.  The Settlement Agreement was entered into in good faith and was negotiated at arm's length. This factor supports granting of the Motion.

4.      The interests of creditors.

Interests of creditors are best served by the approval of the Settlement Agreement. The Settlement Agreement is made with the economic purpose of limiting litigation costs and risks, while ensuring that the estate will have money to pay to creditors. The settlement of $2 million is a substantial recovery for this estate and for creditors. This factor supports approval of the Motion.

**III.**

**CONCLUSION**

For these reasons, the Debtor respectfully requests that the Court enter an order providing for the following relief:

(1)      Grant the relief requested in the Motion on an emergency basis;

(2)      Authorize the Debtor to enter into the Settlement Agreement;

(3)      Approve the terms of the Settlement Agreement, a copy of which is attached to the Omnibus Declaration as **Exhibit 3**;

(4)       Waive the fourteen (14) day period for any appeal from such order;

(5)      Authorize the Debtor to execute any documents or take any actions reasonably necessary to effectuate the terms of the Settlement Agreement; and

1    (6)    Grant such other relief as the Court may deem just and necessary.

2

3    Dated:  April 22, 2024                    SYNAPSE FINANCIAL TECHNOLOGIES, INC.

4                                        By:___/s/ Monica Y. Kim_____
                                             RON BENDER
5                                            MONICA Y. KIM
                                             KRIKOR J. MESHEFEJIAN
6                                            LEVENE, NEALE, BENDER, YOO & GOLUBCHIK
7                                            L.L.P.
                                             Proposed Attorneys for Debtor and Debtor in
8                                            Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF COMPROMISE OF CONTROVERSY WITH EVOLVE BANK & TRUST PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) *April 22, 2024*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyg.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) *April 22, 2024*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) *April 22, 2024*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON**
**SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 22, 2024 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423

Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113

Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105

First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117

Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457

FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526

Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111

Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043

Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292

Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104

Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367