1  RON BENDER (SBN 143364)
   MONICA Y. KIM (SBN 180139)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
4  Los Angeles, California 90034
   Telephone: (310) 229-1234
5  Facsimile: (310) 229-1244
   Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
6

7  Proposed Attorneys for Debtor and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
                 CENTRAL DISTRICT OF CALIFORNIA
9               SAN FERNANDO VALLEY DIVISION

10 In re:                                      ) Case No.: 1:24-bk-10646-MB
                                               )
11 SYNAPSE FINANCIAL TECHNOLOGIES,             ) Chapter 11
   INC.,                                       )
12                                             ) **DECLARATION OF TRACEY**
                                               ) **GUERIN IN SUPPORT OF ALL OF**
13         Debtor and Debtor in Possession.    ) **THE DEBTOR'S MOTION TO**
                                               ) **APPROVE SETTLEMENT WITH**
14                                             ) **EVOLVE BANK & TRUST PURSUANT**
                                               ) **TO RULE 9019 OF THE FEDERAL**
15                                             ) **RULES OF BANKRUPTCY**
                                               ) **PROCEDURE**
16                                             )
                                               ) Date:    April 24, 2024
17                                             ) Time:    2:00 p.m.
                                               ) Place:   Courtroom
18                                             )          21041 Burbank Boulevard
                                               )          Woodland Hills, CA 91367
19                                             )
                                               )
20                                             )
                                               )
21                                             )
                                               )
22                                             )
                                               )
23 _____ )

24      I, Tracey Guerin, hereby declare as follows:

25      1.      I have personal knowledge of the facts set forth below and, if called to testify,

26 would and could competently testify thereto.

27

28

                                    1

2.      Since June 2022, I have served as the General Counsel of Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor"). From June 14, 2018 until June 2022, I served as Associate General Counsel of Debtor.

3.      In my capacity as the General Counsel of the Debtor, I have access to the Debtor's books and records and am familiar with the organization, operations and financial condition of the Debtor.  Any records and documents referred to in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own review and knowledge of the Debtor's books and records.

4.      I make this declaration in support of the Debtor's emergency motion (the "9019 Motion"), for approval of the "*Settlement Agreement and Release*" ("Settlement Agreement") between the Debtor and Evolve Bank & Trust ("Evolve"), a true and correct copy of which is attached hereto as **Exhibit 1**.

5.      Unless otherwise stated with specificity or implied by context, capitalized defined terms used in this declaration have the same meanings as attributed to them in the 9019 Motion.

6.      Filed concurrently herewith in support of the emergency first day motion is the Declaration of Sankaet Pathak (the "Pathak Declaration"), the Founder and Chief Executive Officer of the Debtor.  The General Background regarding the Debtor and the events leading up to Debtor's commencement of its Chapter 11 Bankruptcy Case are set forth in the Pathak Declaration, incorporated herein by this reference, and will not be repeated herein.

## GENERAL NATURE OF DISPUTES WITH EVOLVE

7.      Since 2017, Evolve is and has been one of the Debtor's main banking partners, and, in this capacity, desired to establish one or more Programs with the Debtor under which Evolve would offer its Bank Services to End Users.  In furtherance of this, Evolve and the

Debtor executed the Master Bank Services Agreement ("MBSA") on September 23, 2022, and the predecessor Bank Services Agreement on April 18, 2017 (collectively, as amended, the "Agreements").

8.      Pursuant to the Agreements, Evolve provided the Bank Services to End Users and the Debtor (known as the "Program Manager" in the MBSA) provided Program Manager services and technology services to enable the provision of Evolve's Bank Services to End Users.

9.      Given the complexities of BaaS, the parties continued to learn and improve on the important cornerstones needed to make a successful Program.

10.     As competition in the BaaS industry rose and became more lucrative, the Debtor contends that Evolve sought to cut the Debtor out from the revenue structure between it and the fintechs.  Evolve denies this contention.

11.     In any case, and independent of Debtor's relationship with Evolve, Debtor sought to expand its bank partnerships and reduce dependencies on bank partners. Furthermore, as competition in the BaaS industry increased, Debtor prepared for increased regulatory scrutiny over bank fintech programs. Therefore, in 2019 and 2020, Debtor to pivot to a new strategy in which it brought its own regulated financial services in house with its subsidiary broker dealer and lending entity.

12.     The Debtor contends that there have been difficulties in the Evolve/Debtor partnership that resulted in contractual disputes between the Debtor and Evolve over liability for potential damages.  And, although the parties implemented technical updates, and conducted reviews and testing with Evolve's Operations Team to develop and implement additional monitoring processes, these updates and processes did not necessarily resolve any prior contractual disputes.

13.     Substantial disputes developed between the Debtor and Evolve, ultimately resulting in what Debtor contends were Evolve's multiple breaches of the MBSA, including, but not limited to, Evolve allegedly: (a) diverting substantial sums for fees and compensation owed to Debtor  to the Program Manager Reserve Account without proper right or justification; (b)

inflating the amount of the Program Manager Reserve Account Requirement to the sum of $50,000,000 without regard to the formula set forth in the MBSA; (c) improperly debiting payment for Evolve's alleged fees owing to itself or others; (d) withholding from the Debtor the transaction-level data necessary to perform an accounting and failing to participate in reconciliation efforts necessary to rectify issues identified by Synapse; (e) payment processing issues and lack of responsiveness and remediation; and (f) failing to cure ongoing administrative deficiencies that interfere with and impair the Debtor's day-to-day business operations (collectively items (a) through (f) are referred to as "Evolve's Alleged MBSA Breaches"), all of which Debtor contends have caused Debtor to sustain damages.

14. Evolve disputes that it engaged in any of the MBSA Breaches and contends both that it provided Debtor with all transaction-level data necessary for Debtor's obligations under the MBSA, and that Debtor allegedly engaged in unremediated breaches of Debtor's obligations under the MBSA as Program Manager, including related to account for certain transactions, maintain ledgers supporting the End User and fintech accounts, fund the FBO Account to equal supporting ledgers on a daily basis, and satisfy its reserve requirement, all of which Evolve contends have caused Evolve to sustain substantial damages ("Debtor's Alleged MBSA Breaches"). Debtor disputes that it engaged in the Debtor's Alleged MBSA Breaches and maintains that to the extent any losses exist, they are Evolve's responsibility due to Evolve's Alleged MBSA Breaches.

15. There were also accounting disputes between the parties. More specifically, the MBSA provides an obligation for Evolve to pay Debtor a certain percentage on Deposits in FBO Accounts. The Debtor alleges that Evolve failed to pay the Debtor the amount due and owing for such fees and compensation and failed to, *inter alia*, apply such percentage owed on all FBO Accounts, resulting in a significant underpayment to Debtor (the "Underpayment Claim"). Evolve denies such allegations and contends that Debtor failed to properly dispute such underpayment on a timely basis, resulting in waiver.

16. As part of the Bank Services provided pursuant to the Agreements, End User Deposits are held in omnibus custodial accounts owned by Evolve, in which Evolve pools the

1   funds held by all End Users, for their benefit (or in case of a Platform, for the benefit of a

2   Platform's End Users), if any (the "<u>FBO Accounts</u>").  Both the Debtor and Evolve contend that

3   they have claims against the other relating to the funding and reconciliation of the FBO

4   Accounts  (the "<u>FBO Account Claims</u>").

5   **<u>TERMS OF SETTLEMENT AND BENEFIT TO ESTATE</u>**

6   17.    In an effort to resolve these aforementioned claims, I have been talking

7   extensively with representatives of Evolve for over eight months about the FBO Account

8   Claims, Evolve's Alleged MBSA Breaches, Debtor's Alleged MBSA Breaches, and Debtor's

9   Underpayment Claim.  For quite some time, the Parties were at an impasse.

10   18.    The Debtor believes that the estate's various claims against Evolve have merit,

11   and that there is a strong probability that its position as to these claims can ultimately be

12   successful. In the Debtor's view, the success of the estate's FBO Account Claims (and therefore

13   certain claims related to the Reserve Account and Reserve Funds) boil down to expert witness

14   being able to independently reconcile the massive amounts of transactional data tied to the FBO

15   Accounts for the years 2017 to date, which admittedly is not an easy or small task. To the extent

16   that such independent audit were to be performed, the Debtor believes that it would be

17   successful in proving up its position. However, gathering, analyzing and presenting all of the

18   necessary transactional information and data for trial purposes would require vast amounts of

19   financial resources, time, and manpower – all of which the Debtor does not have.

20   19.    In addition to the aforementioned claims, the Debtor also has a claim against

21   Evolve relating to Evolve's underpayment of fees or compensation on End User Balances in

22   FBO Accounts due and owing to Synapse under the Agreements for the years 2022 to date (the

23   "<u>Underpayment Claim</u>").  Evolve denies such allegations and contends that Debtor failed to

24   properly dispute such underpayment on a timely basis, resulting in waiver.

25   20.    The salient terms of the Settlement Agreement are that Evolve Salient Terms of

26   the Settlement Agreement:

27      a.   <u>FBO Account Funding</u>. As a condition precedent to the Releases provided in
            Section 2 of this Agreement, no later than April 24, 2024 ("Funding Date")
28          (unless the Funding Date is extended by mutual agreement of Synapse and

Evolve, in their sole and absolute discretion), Evolve shall fund the FBO Accounts, shall ensure that all account balances of End-Users in FBO Accounts are fully funded, and shall provide reasonable evidence to Synapse of same ("Evolve Funding").  The Parties agree that Evolve is not obligated to fund any End User account balances maintained at other financial institutions. From the Execution Date until the close of the Taba Acquisition, (i) Synapse agrees to timely and comprehensively respond to reasonable information requests from Evolve related to current and historical End User account balances, End User transactions, and funding of the FBO Accounts and (ii) Evolve agrees to timely and comprehensively respond to reasonable information requests from Synapse to assist with completion of the Taba Funding Condition.

b.  <u>Settlement Payment</u>. Evolve shall pay to Synapse a cash payment of $2,000,000.00 (the "Settlement Payment"), in exchange for the Synapse Release provided in Section 2.  Such Settlement Payment shall be due on the later of the Effective Date or the Funding Date. For clarity, the Settlement Payment is not owed if the Evolve Funding shall not have been satisfied as set forth in Section 1(a) above, and the Releases set forth in Section 2 above shall not become effective.  Such payment shall be made by wire transfer of immediately available funds as instructed by Synapse.

c.  <u>Releases</u>: The Parties to exchange mutual releases.

21.    The Settlement Agreement was entered into in good faith and was negotiated at arm's length. The settlement of $2 million is a substantial recovery for this estate and for creditors.

22.    The Settlement Agreement, if approved, preserves and protects the concurrent sale with TabaPay and is required in order to satisfy the express conditions to the closing  which includes, among other things: (i) Evolve to ensure that all account balances of End-Users in FBO Accounts are fully funded to the Buyer's satisfaction ("<u>Taba Funding Condition</u>")[1], (ii) Evolve to execute and deliver a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the transactions contemplated by the APA; and (iii) the Court's approval of the Settlement Agreement between Evolve and the Debtor.

---

[1] Under the APA, Evolve is required to ensure the FBO Accounts are fully funded as this is a critical component to the Buyer's ongoing operation of the assets and business that it is acquiring.

23.     In short, the Debtor cannot satisfy the Taba Funding Condition and cannot close by the Initial Closing date of April 30, 2024 (at which point the balance of the entire cash purchase price of $9.7 million is to be paid) unless the Court immediately approves the Settlement Agreement.

24.     The Settlement Agreement also avoids the costs and risks associated with litigation if the parties are unable to arrive at an equitable resolution, to receive funds which could be made available for creditors, and to protect the fintechs and the End Users.

25.     Relatedly, the Debtor also has concerns about the difficulty of collection from Evolve even if it were to obtain a judgment against Evolve as to the various claims because it is likely that Evolve will appeal any judgment which would delay collection.

26.     Absent the settlement and the sale, the Debtor will have no choice but to shut down and liquidate, a scenario in which there will be no recovery to general unsecured creditors and which would result in a detriment to fintechs and End Users. However, with the settlement and sale, all of the secured creditors will be paid, and the proceeds from the Evolve settlement will serve as a source for recovery to other creditors.

27.     In reaching this settlement, the Debtor evaluated the potential strengths and weaknesses of the estate's positions in a future lawsuit with Evolve, and negotiated the Settlement Agreement in an effort to maximize the return to creditors. The Settlement Agreement was entered into in good faith and was negotiated at arm's length. The settlement of $2 million is a substantial recovery for this estate and for creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of April 2024 at ___Orinda___, California.

_____
TRACEY GUERIN

7

# EXHIBIT "1"

**Confidential Settlement Communication – FRE 408**

## SETTLEMENT AGREEMENT AND RELEASE

This **Settlement Agreement and Release** ("Settlement Agreement") is entered into as of the last date of execution set forth below ("Execution Date"), by and between Evolve Bank & Trust ("Evolve" or "Bank") and Synapse Financial Technologies, Inc., on behalf of itself and its subsidiaries ("Synapse" or "Program Manager") (collectively, as the "Parties"). Terms not otherwise defined herein shall have the meaning provided in the Parties' Agreement, defined below.

**WHEREAS**, the Parties executed the Master Bank Services Agreement on September 23, 2022, and the predecessor Bank Services Agreement on April 18, 2017 (together, as amended, the "Agreements");

**WHEREAS**, pursuant to the Agreements, the Parties established Programs under which Evolve offers Bank Services to End Users and Synapse services and supports such Programs;

**WHEREAS**, as part of the Bank Services provided pursuant to the Agreements, End User Deposits are held in omnibus custodial accounts owned by Evolve, in which Evolve pools the funds held by all End Users, for their benefit (or in case of a Platform, for the benefit of a Platform's End Users) (the "FBO Accounts");

**WHEREAS**, the Parties each have claims against the other relating to the funding and reconciliation of the FBO Accounts (the "FBO Account Claims");

**WHEREAS**, the Parties each have claims against the other relating to the funding of the Program Manager Reserve Account (the "Reserve Balance Claims"), including Evolve's funding, withdrawal and use of funds totaling $43,225,506.73 in, to and from the Reserve Account ("Reserve Funds").

**WHEREAS**, separate from the Reserve Balance Claims and unrelated to the Reserve Funds, Synapse has a claim against Evolve relating to Evolve's underpayment of fees or compensation on End User Balances in the FBO Accounts due and owing to Synapse under the Agreements for the years 2022 to date (the "Underpayment Claim");

**WHEREAS**, Synapse intends to enter into a transaction in which TabaPay Holdings LLC or its designated affiliate ("Taba") seeks to acquire certain assets of Synapse (the "Taba Acquisition"), including certain rights related to the FBO Accounts. An express condition of the Taba Acquisition requires, *inter alia*, the Parties, to ensure that all account balances of End-Users in FBO Accounts are fully funded to Taba's satisfaction ("Taba Funding Condition");

**WHEREAS**, as part of the Taba Acquisition, Synapse will file a Chapter 11 bankruptcy case (the "Bankruptcy Case") and seek the Bankruptcy Court's approval of the Taba Acquisition pursuant to 11 USC §363 (the "Sale Motion");

**Confidential Settlement Communication – FRE 408**

**WHEREAS,** concurrently with the Sale Motion, Synapse will seek Bankruptcy Court approval for this Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion"), the approval of which by the Bankruptcy Court is a condition to the consummation of this Settlement Agreement and the Taba Acquisition;

**WHEREAS**, the effective date of this Settlement Agreement shall be upon entry of a Bankruptcy Court Order approving the 9019 Motion (the "9019 Order") in the Bankruptcy Case (the "Effective Date") and the Parties waive the fourteen (14) day period for any appeal from such 9019 Order as provided in Federal Rule of Bankruptcy Procedure 8002, and the Bankruptcy Court approves such waiver as part of the 9019 Order;

**NOW, THEREFORE**, in consideration of the promises and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged after consultation with counsel, the Parties hereby agree as follows:

## <u>TERMS OF RELEASE</u>

1.  <u>**Settlement Payment and Funding Requirements:**</u>

    a.  <u>FBO Account Funding</u>. As a condition precedent to the Releases provided in Section 2 of this Agreement, no later than April 24, 2024 ("Funding Date") (unless the Funding Date is extended by mutual agreement of Synapse and Evolve, in their sole and absolute discretion), Evolve shall fund the FBO Accounts, shall ensure that all account balances of End-Users in FBO Accounts are fully funded, and shall provide reasonable evidence to Synapse of same ("Evolve Funding"). The Parties agree that Evolve is not obligated to fund any End User account balances maintained at other financial institutions. From the Execution Date until the close of the Taba Acquisition, (i) Synapse agrees to timely and comprehensively respond to reasonable information requests from Evolve related to current and historical End User account balances, End User transactions, and funding of the FBO Accounts and (ii) Evolve agrees to timely and comprehensively respond to reasonable information requests from Synapse to assist with completion of the Taba Funding Condition.

    b.  <u>Settlement Payment</u>. Evolve shall pay to Synapse a cash payment of $2,000,000.00 (the "Settlement Payment"), in exchange for the Synapse Release provided in Section 2. Such Settlement Payment shall be due on the later of the Effective Date or the Funding Date. For clarity, the Settlement Payment is not owed if the Evolve Funding shall not have been satisfied as set forth in Section 1(a) above, and the Releases set forth in Section 2 above shall not become effective. Such payment shall be made by wire transfer of immediately available funds as instructed by Synapse.

**Confidential Settlement Communication – FRE 408**

2.   **Releases:**

a.   <u>Evolve Release</u>. On the later of the Funding Date or the Effective Date, Evolve, on its own behalf and on behalf of its affiliates, subsidiaries, heirs, agents, and assigns (together, the "Evolve Releasors"), will release and forever discharge Synapse and its subsidiaries, affiliates, shareholders, members, officers, directors, employees, insurers, representatives, predecessors, successors, agents, and assigns and any of them (together, the "Evolve Releasees") of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Evolve has or had as of the Execution Date against the Evolve Releasees, including, but not limited to, the FBO Account Claims and the Reserve Account Claims. Evolve further agrees that, unless required by law, it shall not file or cause to be filed any claims, complaints, affidavits, arbitrations, or proceedings with any federal, state, or local law enforcement, regulatory or administrative commission, agency, board, or person, whether public or private, regarding any alleged acts, failures to act, omissions, facts, events, transactions, occurrences, or other matters that relate to or arise from this Release. For the sake of clarity, the Evolve Release shall result in the release and discharge of Evolve Releasees of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Evolve has or had against Evolve Releasees as of the Execution Date. Evolve acknowledges and agrees that, as of the Execution Date, it has not filed or caused to be filed any claims, complaints, affidavits, arbitrations, or proceedings against the Evolve Releasees.

b.   <u>Synapse Release</u>. On the later of the Funding Date or the Effective Date, Synapse, on its own behalf and on behalf of its affiliates, subsidiaries, heirs, agents, and assigns (together, the "Synapse Releasors"), will release and forever discharge Evolve and its subsidiaries, affiliates, shareholders, members, officers, directors, employees, insurers, representatives, predecessors, successors, agents, and assigns and any of them (together, the "Synapse Releasees") of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, whether known or unknown, which Synapse has or had as of the Execution Date against Synapse Releasees, including, but not limited to, the FBO Account Claims, the Reserve Account Claims, and the Underpayment Claim. Synapse further agrees that, unless required by law, it shall not file or cause to be filed any claims, complaints, affidavits, arbitrations, or proceedings with any federal, state, or local law enforcement, regulatory or administrative commission, agency, board, or person, whether public or private, regarding any acts, failures to alleged acts, omissions, facts, events, transactions, occurrences,

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

DocuSign Envelope ID: 4C9E8BA1-EE71-478F-AF8B-2B5348235AB3

**Confidential Settlement Communication – FRE 408**

or other matters which relate to or arise from this Release. For the sake of clarity, the Synapse Release shall result in the release and discharge of Synapse Releasees of any and all claims, causes of actions, suits, obligations, debts, demands, liabilities, damages, losses, costs, expenses, and attorney's fees of any nature whatsoever, including any claims arising under Chapter 5 of the Bankruptcy Code, whether known or unknown, which Synapse has or had against Evolve as of the Execution Date. Synapse acknowledges and agrees that, as of the Execution Date, it has not filed or caused to be filed any claims, complaints, affidavits, arbitrations, or proceedings against the Synapse Releasees.

3.     **Recitals**.  The foregoing recital paragraphs are incorporated herein by this reference.

4.     **No Actions During Bankruptcy Case.** The Parties agree not to pursue any Claims that are the subject of the releases in Section 2 while the 9019 Motion is pending.

5.     **Taba Letter Agreement**.  Evolve agrees that to the extent requested by Taba pursuant to the Taba Acquisition, it will (i) not unreasonably withhold written consent to Synapse's assignment or transfer of any interest under the Agreements to Taba and (ii) not unreasonably withhold written consent to the Taba Acquisition.

6.     **Waiver of Section 1542**.  The Parties recognize, acknowledge, and waive the provisions of, and relinquish any rights and benefits afforded under, Section 1542 of the California Civil Code, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

7.     In waiving the provisions of Section 1542 of the California Civil Code, each Party acknowledges that it may discover facts in addition to or different than those which it now believes to be true with respect to the matters released in this Settlement Agreement, but agree that it has taken that possibility into account in reaching this settlement, and the releases given in this Settlement Agreement shall remain in effect as a full and complete release notwithstanding the discovery or existence of such additional or different facts, as to which each Party expressly assumes the risk.  The Parties also expressly waive and relinquish any rights and benefits afforded under any other statutes or common law principles of similar effect of any other jurisdiction.

8.     **Covenant Not to Sue**.  Except to enforce the express obligations of the Parties under this Settlement Agreement, the Parties hereby irrevocably covenant, to the fullest extent permitted by law, to refrain from, directly or indirectly, asserting any claim or demand, or commencing or causing to be commenced, any action or proceeding of any kind against any of the

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

**Confidential Settlement Communication – FRE 408**

Parties, as applicable, related to the matters released in Section 2 above unless the conditions precedent are not met.

9.     **Representations and Warranties**.    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof:

9.1     **Power and Authority**.  Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Settlement Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Settlement Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

9.2     **No Conflict**.  The execution, delivery and performance by such Party of this Settlement Agreement does not and will not: (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

9.3     **No Consent or Approval**.  No consent or approval is required by any other person or entity in order for each of the Parties respectively to effectuate the transactions contemplated by, and perform their respective obligations under, this Settlement Agreement.

9.4     **Enforceability**.  This Settlement Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally by equitable principles relating to enforceability.

9.5     **No Assignment**.  Such Party owns and has not assigned, transferred or conveyed, in whole or in part, to any other person or entity, any and all rights, claims or causes of action against any other Party that are released by this Settlement Agreement.

9.6     **Investigation**.  Such Party has made such investigation as it deems necessary or desirable of all matters contained in or related to this Settlement Agreement.

9.7     **Knowledge of Terms of Settlement Agreement**.  In entering into this Settlement Agreement, such Party is relying solely upon its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  Such Party is not relying on any representation or statement made by any other Party or any person representing such other Party except for the representations and warranties expressly set forth in this Settlement Agreement.  By signing this Settlement Agreement, such Party hereby confirms and states that (a) it has carefully read this Settlement Agreement, (b) it knows the content of this Settlement Agreement and (c) it has been represented by independent legal counsel in connection with the negotiation of this Settlement Agreement.  The discovery by any Party, subsequent to the Execution Date, of any facts not heretofore known to that Party, or that the facts or law upon which

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

**Confidential Settlement Communication – FRE 408**

any Party relied upon in executing this Settlement Agreement were not as that Party believed it to be, shall not constitute grounds for declaring this Settlement Agreement void, avoidable, or otherwise unenforceable in whole or in part.  This Section 7.7 is intended to preclude any claim by any Party that it was fraudulently induced to enter this Settlement Agreement, or was induced to enter this Settlement Agreement by a mistake of fact or law.

10.    **Confidentiality**.  The Parties acknowledge and agree that the terms and conditions of this Settlement Agreement are confidential and shall not be disclosed except to the extent required by applicable law or in connection with the 9019 Motion and the Sale Motion to be filed in the Bankruptcy Case.  However, the Parties may respond to any inquiry by stating that any dispute has been resolved to their mutual satisfaction. The Parties may disclose the matters subject to this confidentiality provision if compelled by court order, subpoena, or other legal requirement, and in that situation, will take steps to obtain an appropriate protective order to safeguard the confidentiality of the terms of this Settlement Agreement. Further, the Parties may discuss the matters subject to this confidentiality provision with their respective board members, members, attorneys, accountants, financial advisors, tax preparers, service providers, regulators, and other persons who are subject to an independent duty to maintain the confidentiality of such information. Notwithstanding the foregoing, the Parties may disclose the terms of this Settlement Agreement with Taba, provided that Taba agrees to keep such information confidential.

11.    **General Provisions**.

11.1    **Governing Law and Venue; Jurisdiction**.    Any matter concerning the interpretation or enforcement of this Settlement Agreement shall be governed by and construed under the laws of the State of Tennessee, without regard to conflicts-of-law principles that would require the application of any other law.

11.2    **No Admission of Liability**.  It is expressly understood and agreed that entry into this Settlement Agreement does not constitute an admission of liability, fault, wrongdoing, or any fact by any of the Parties; rather, each of the Parties acknowledges and agrees that all claims held by each of them against the other are disputed and subject to dispute.

11.3    **Attorneys' Fees**.  In the event of any dispute between the Parties relating to the interpretation or implementation of this Settlement Agreement, each Party shall bear its own attorneys' fees and costs.

11.4    **Full Satisfaction**.  This Settlement Agreement and the rights and benefits provided thereby, including the Payments, are acknowledged by the Parties to be in full and complete settlement and satisfaction of the claims and causes of actions that are to be released hereby.

11.5    **Integration**.    This Settlement Agreement contains the entire and only understanding among the Parties regarding the subject matter hereof and supersedes any and all prior and/or correspondence oral or written negotiations, agreements, representations and understandings.  The Parties and each of them represent and warrant that no promise, statement or inducement has been made to cause them to execute this Settlement Agreement, other than those expressly set forth in this Settlement Agreement.

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

**Confidential Settlement Communication – FRE 408**

11.6    **Modification**.  This Settlement Agreement may not be modified, except by a writing which expressly refers to this Settlement Agreement and is signed subsequent to the date of this Settlement Agreement by duly authorized representatives of all Parties.  The ability to modify or amend this agreement includes, without limitation, the ability to amend the Funding Date specified in Section 1 of this Settlement Agreement.

11.7    **Survival**.  All representations, warranties, covenants, releases, waivers, agreements and obligations in this Settlement Agreement will survive the execution and delivery of, and the consummation of the transactions contemplated by, this Settlement Agreement.

11.8    **Successors and Assigns**.  This Settlement Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties; provided, however, that this Settlement Agreement shall not be assignable or transferable by any Party without the prior written consent of all of the other Parties hereto, and any assignment or transfer not in compliance with the above shall be null and void.

11.9    **No Third-Party Beneficiaries**.  Except for the Parties, each of the Evolve Releasees and the Synapse Releasees, this Settlement Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give any individual or entity, other than the Parties hereto and their respective successors and permitted assigns, any legal or equitable rights, remedies, or claims hereunder.

11.10    **Counterparts**.  This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Electronic, scanned and facsimile signatures shall be of the same force and effect as if in original ink.

11.11    **Headings**.  The headings and captions used in this Settlement Agreement are for convenience only and shall not be deemed to affect in any way the language of the provisions to which they refer.

11.12    **Interpretation**.  This Settlement Agreement shall be interpreted as if jointly drafted by the Parties, and no provision shall be interpreted against any Party because such provision was drafted by that Party.

11.13    **Severability**.  If any term of this Settlement Agreement is found invalid or unenforceable for any reason, that portion, that term may be severed from the Settlement Agreement and shall not affect the validity of the remainder of the Settlement Agreement.

11.14    **No Waiver**. The delay or failure of a Party to assert a right in this Settlement Agreement or to insist upon compliance with any term or condition of this Settlement Agreement will not constitute a waiver of that right or excuse a similar subsequent failure to perform any term or condition by any other Party. A valid waiver must be executed in writing and signed by the Party granting the waiver.

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

**Confidential Settlement Communication – FRE 408**

 

       **IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement on the respective dates set forth below.

     **PROGRAM MANAGER:**

**SYNAPSE FINANCIAL TECHNOLOGIES, INC.**

**By:** _sankaet pathak_

**Name:** Sankaet Pathak

**Title:** CEO

**Date:** 04 / 19 / 2024

 

**BANK**

**EVOLVE BANK & TRUST**

**By:** _Scot Lenoir_

**Name:** Scot Lenoir

**Title:** Chairman

**Date:** 4/17/2024

 

Doc ID: ae3852e8ad59cafde9446b17cd29cf6f15138948

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **DECLARATION OF TRACEY GUERIN IN SUPPORT OF ALL OF THE DEBTOR'S MOTION TO APPROVE SETTLEMENT WITH EVOLVE BANK & TRUST PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) *__April 22, 2024__*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyg.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) *__April 22, 2024__*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) *__April 22, 2024__*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON**
**SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 22, 2024 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                **F 9013-3.1.PROOF.SERVICE**

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423


Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113


Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105


First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117


Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457


FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526


Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111


Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043


Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292


Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104


Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367