RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No.: 1:24-bk-10646-MB |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 Case |
| Chapter 11 Debtor in Possession | **DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING BIDDING PROCEDURES WITH RESPECT TO THE TRANSFER AND SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING BIDDING PROTECTIONS FOR THE STALKING HORSE BIDDER, (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICES RELATED TO THE AUCTION AND SALE, (E) SCHEDULING THE SALE HEARING, AND (F) GRANTING RELATED RELIEF** |
| | Date:   April 24, 2024<br>Time:   2:00 p.m.<br>Place:   Courtroom 303<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

# TABLE OF CONTENTS

I. STATEMENT OF JURISDICTION AND VENUE...................................................................14

II. STATEMENT OF FACTS .................................................................................................14

      A.      The Debtor's Background and Chapter 11 Filing. ..............................................14

      B.      The Asset Sale Process And Asset Purchase Agreement with Buyer. ..................15

III. THE PROPOSED BIDDING PROCEDURES AND BIDDING PROTECTIONS ...............18

IV. PROPOSED SALE NOTICE AND ASSIGNMENT NOTICE............................................28

      *A.*      *Proposed Sale Notice.* ......................................................................................28

      *B.*      *Proposed Assignment Notice.* ..........................................................................29

V. DISCUSSION ...................................................................................................................31

      A.      The Court Should Approve The Bidding Procedures............................................31

      B.      The Court Should Approve the Bid Protection Including Break-Up Fee,
              Expense Reimbursement, and Repayment of Service Fees as
              Reasonable.........................................................................................................33

      C.      The Notices in Connection with the Auction Sale and Hearing, and
              Assignment of Contracts Are Reasonable and Should be Approved. ...................36

VI. CONCLUSION ................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 310 Associates*,
346 F.3d 31 (2d Cir. 2003) ................................................................................. 34

*In re 995 Fifth Ave. Assoc., L.P.*,
96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................................ 33, 34

*In re Atlanta Packaging Products, Inc.*,
99 B.R. 124 (Bankr. N.D. Ga. 1988) ................................................................... 32

*Bennett v. Williams*,
892 F.2d 822 (9th Cir.1989) ............................................................................... 34

*In re Consolidated Auto Recyclers, Inc.*,
123 B.R. 130 (Bankr.D.Me. 1991) ...................................................................... 34

*Cottle v. Storer Communication Inc.*,
849 F.2d 570 (11th Cir. 1988) ............................................................................ 34

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990) ................................................................. 32

*In re Financial News Network, Inc.*,
126 B.R. 152 (Bankr. S.D.N.Y. 1991) ................................................................. 32

*In re Girard Medical Center*,
1990 WL 56486 (Bankr.E.D.Pa. 1990) ............................................................... 34

*In re Integrated Resources, Inc.*,
147 B.R. 650 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3
F.3d 49 (2d Cir. 1993) ........................................................... 33, 34, 35, 36

*In re JW Res., Inc.*,
536 B.R. 193 (Bankr. E.D. Ky. 2015) ................................................................. 34

*In re Wheeling-Pittsburgh Steel Corp.*,
72 B.R. 845 (Bankr.W.D.Pa. 1987) .................................................................... 34

**Federal Statutes**

11 U.S.C.
§§ 101 *et seq.* Chapter 11 ....................................................................... *passim*
§ 503 .................................................................................................................. 23

§ 101(31) ................................................................................... 21
§ 105(a) ..................................................................................... 31
§§ 105(a), 361, 363, 365, 503 and 507 .................................... 2
§ 363(b)(1) ............................................................................... 31
§§ 363(b), (f) and (m) and §§ 365(b) and (f) ................... 10, 16
§ 363(m) ..................................................................................... 5
§ 365 ........................................................................................ 29
§§ 365(b) and (f) ..................................................................... 30
§§ 1107 and 1108 ............................................................... 3, 15

28 U.S.C.

§§ 157 and 1334 ...................................................................... 14
§ 157(b) (2) (A), (M) and (O) ................................................ 14
§§ 1408 and 1409 .................................................................... 14

**Other Authorities**

Bankr. R. 6004(f) ........................................................................... 31

Bankruptcy Rule 6004 ................................................................... 31

Bankruptcy Rules 2002 and 6004 ................................................. 31

Federal Bankruptcy Rules Rules 6004(h) and 6006(d) ........... 21, 24

Federal Rules of Bankruptcy Procedure Rule 2002 ...................... 28

Federal Rules of Bankruptcy Procedure Rules 2002, 6003, 6004, 6006, 9006,
    9007 and 9014 ........................................................................... 2

Federal Rules of Bankruptcy Procedure Rules 2002(a)(2), 6003, 6004 (a), (b), (c),
    (e), (f) and (h), 6006(a) and (c), 9006, 9007 and 9014 ............. 14

Federal Rules of Bankruptcy Procedure Rule 6004(h) ..................... 5

Local Bankruptcy Rule 6004-1 ...................................................... 31

Local Bankruptcy Rule 6004-1(b)(2) ............................................ 31

Local Bankruptcy Rules 6004-1, 9013-1 and 9075-1 .................... 14

Local Bankruptcy Rules 6004-1(b), 9013-1 and 9075-1 ................. 2

Pursuant to Sections 105(a), 361, 363, 365, 503 and 507 of the Bankruptcy Code, and Rules 2002, 6003, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Federal Bankruptcy Rules"), Local Bankruptcy Rules 6004-1(b), 9013-1 and 9075-1 (together with the Federal Bankruptcy Rules, the "Bankruptcy Rules"), and other applicable sections of the Bankruptcy Code and Bankruptcy Rules, Synapse Financial Technologies, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), hereby moves, by way of this Emergency Motion (the "Motion") for entry of the Order (the "Bidding Procedures Order"), in substantially the form attached as **Exhibit 5** to the Omnibus Declaration of Sankaet Pathak in Support of First Day Motions ("Pathak Declaration") filed concurrently herewith, which, among other things, provides for:

1.      Approval of the auction sale format and Bidding Procedures in the form attached to the Bidding Procedures Order;

2.      Approval of the Debtor's proposed form of auction and sale hearing notice to be provided to creditors of the Debtor and its non-debtor subsidiaries, prospective overbidders and other parties in interest in the form attached as **Exhibit 6** to the Pathak Declaration;

3.      Approval of the Debtor's proposed form of notice and procedures regarding the assumption and assignment of executory contracts and unexpired leases, establishment of cure amounts, and objections to be provided to all non-debtor parties (including non-debtor subsidiaries if applicable) to such contracts and leases in the form attached as **Exhibit 7** to the Pathak Declaration;

4.      Approval of the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same asset purchase agreement as the Asset Purchase Agreement dated April 19, 2024 (the "APA") by and between the Debtor and Buyer, a copy of which is attached as **Exhibit 9** to the Pathak Declaration, or to submit a redlined version of the APA which indicates the prospective overbidder's changes to the APA (an asset purchase agreement submitted by a prospective overbidder in accordance with the Bid Procedures is referred to herein as an "Alternative APA");

5.      Approval of Buyer as the stalking horse bidder ("Stalking Horse Bidder") and

approval of bid protections for the Stalking Horse Bidder; and

6.      The scheduling of a Court hearing to consider approval of the sale of substantially all of the Debtor's assets (the "Purchased Assets") to Buyer, or the successful overbidder, pursuant to the terms and conditions of the APA between the Debtor and Buyer or the Alternative APA, as the case may be, and the Bidding Procedures.

### Background Information and Need for Emergency Relief

This case was commenced April 22, 2024 (the "Petition Date") by the Debtor's filing of a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a technology company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users) through certain banking and financial service providers ("Partner Financial Institutions").

The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (Baas) platform for fintechs and Partner Financial Institutions which have agreements with the Debtor to efficiently interface each other to allow for transactions (*i.e.,* the buy and sell) of their financial products and services to the fintechs' end users. Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Fall of 2023, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital or the sale of the Debtor as a going concern. The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and sought to engage Jefferies LLC to assist the Debtor with conducting a marketing process, which the Debtor conducted over a number of months prior to the Petition Date. The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Buyer.

Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations, due diligence activities and the preparation of transaction documents including the APA. The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

On April 19, 2024, the Debtor and Buyer executed the APA pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure obligations associated with the assumed leases and contracts. The sale to Buyer is subject to an expedited overbid process though the Debtor does not anticipate that there will be any overbids given the extensive marketing and sale process already conducted which has not generated any better offers.

The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000 Purchase Price will be paid; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA[1] and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than the May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing

---

[1] The Debtor understands that such "change of ownership or control" can occur within approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

4

conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

The obligation of Buyer to consummate its purchase of the Purchased Assets from Seller at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, at or prior to the applicable closing, of a number of conditions precedent (all as set forth in Article VIII of the APA), including the following with respect to the Initial Closing:

1. The representations and warranties of the Debtor in the APA shall be true and correct in all material respects, as set forth in the APA;

2. The Debtor shall have performed and complied, in all material respects, with all of the covenants required by the APA to have been performed or complied with by the Debtor prior to the Initial Closing;

3. Since the date of the APA, there shall not have occurred any Material Adverse Effect;

4. Evidence of the receipt of any third-party consents required under the APA;

5. Entry of the Sale Order which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure;

6. Entry into a Broker-Deal Services Agreement in a form reasonably acceptable to Buyer and the Debtor;

7. Entry into an Intercompany Services Agreement in a form reasonably acceptable to Buyer and the Debtor;

8. The completion of an audit of the State Lender Licensing Subsidiary;

9. The Debtor shall have provided Buyer with written evidence satisfactory to Buyer in its reasonable discretion (except to the extent a different standard approval is set forth in Section 8.1(e) of the APA), of each of the following:

a. <u>Funding of End-User Demand Deposit Accounts</u>. All banking institutions shall have fully funded all account balances of all End-User demand deposit accounts of all Transferred Customers to the extent maintained by or on behalf of, or otherwise affiliated with or related to, any such banking institution to Buyer's satisfaction in its sole and exclusive discretion.

b. <u>Program Reconciliation</u>. Except to the extent expressly addressed by Section 8.1(e)(11)(iii) or Section 8.1(e)(11)(iv) of the APA, as applicable, all account balances involving Transferred Customers and any related demand deposit accounts, savings accounts, reserve accounts, FBO accounts, or accounts similar to any of the foregoing at any bank, lender or other institutions are reconciled with the Debtor's ledger records, in each case, in form and substance and with results satisfactory to Buyer in its sole and exclusive discretion (a "<u>Program Reconciliation</u>") as of the Initial Closing Date.

c. <u>Reconciliation of Programs Involving Transferred Customers</u>. All account balances held by or at the Broker-Dealer Subsidiary with respect to Transferred Customers, including in brokerage, sweep, and cash management accounts of such Transferred Customers, shall be reconciled in full with the Debtor's ledger records as of the Initial Closing Date.

d. <u>Reconciliation of Lending Programs Involving Transferred Customers</u>. The Debtor shall produce records demonstrating that, in Buyer's reasonable discretion, the State Lender Licensing Subsidiary holds, controls or has rights to reserve account balances of End-Users or Transferred Customers that are at least equal to the total balance of loans issued and outstanding by the State Lender Licensing Subsidiary (defined as a "**Lending Program Reconciliation**") as of the Initial Closing Date.

e. <u>Audit</u>. Buyer shall have the right to conduct and complete an audit, or shall have the right to engage a third-party audit firm to conduct and complete an audit, at Buyer's sole cost and expense, in respect of the satisfaction of any of the

conditions set forth in Section 8.1(e)(11)(ii)-(iv) (inclusive) of the APA, and the Debtor shall use its reasonable best efforts to cooperate, and to cause each of its Affiliates to cooperate, with any such audit (including, without limitation, by providing data relating to the satisfaction of any of the conditions set forth in Section 8.1(e)(11)(ii)-(iv) (inclusive) of the APA in any manner as Buyer or its third-party audit firm may reasonably request). In the event that Buyer elects to undertake an audit of the satisfaction of any of the conditions set forth in Section 8.1(e)(11)(ii)-(iv) (inclusive) of the APA, then, as an express condition precedent to Buyer's obligation to consummate the Initial Closing, the audit shall have been completed and the results of the audit shall be satisfactory to Buyer in its reasonable discretion; provided, that, solely with respect to the condition precedent set forth in Section 8.1(e)(11)(iii) of the APA, such audit shall not have demonstrated any material inaccuracies in the completion of the Program Reconciliation contemplated by Section 8.11(e)(iii) of the APA. Buyer shall have twenty (20) days from the date of the APA to complete any audit pursuant to Section 8.1(e)(11)(v) of the APA; provided, that the period of time in which Buyer shall be required to complete any such audit shall be tolled (and shall not run) for so long as Seller or any of its Subsidiaries is in breach of any of its obligations pursuant to Section 8.1(e)(11)(v) of the APA.

10. Repayment of the Senior Lender Indebtedness and TriplePoint Indebtedness. Buyer, the Debtor and the Senior Lender (Silicon Valley Bank) shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of the Debtor and its Subsidiaries securing obligations under the Indebtedness arising under the Senior Lender Loan Agreement and the other Senior Lender Loan Documents as of the Initial Closing (such Indebtedness, the "Senior

7

Lender Indebtedness"), each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, the Senior Lender shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the Senior Lender Indebtedness such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this Section 8.1(e)(13), the Senior Lender Indebtedness shall be repaid in full and all Senior Lender Loan Documents shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.

Buyer, Seller and TriplePoint Capital (together with each of its Affiliates, "TriplePoint") shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of Seller and its Subsidiaries securing obligations under the Indebtedness arising under the TriplePoint Loan Agreement and the other TriplePoint Loan Documents as of the Initial Closing at the agreed upon payoff amount of $7,199,624.29 (defined in the APA as the "TriplePoint Indebtedness")[2] each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, TriplePoint shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the TriplePoint Indebtedness, such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this Section 8.1(e)(13), the TriplePoint Indebtedness shall be repaid in full and all TriplePoint Loan Documents

---

[2] TriplePoint's agreement to accept a discounted payoff amount is expressly contingent upon payment or before May 6, 2024.

shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.

11. <u>PCI-DSS Audit</u>. The Debtor shall have provided Buyer with: (i) its most recent final Report on Compliance, which is in progress as of the date hereof, based on a full audit of Seller's security controls for its applicable systems and environments conducted by a Qualified Security Assessor (as designated by the Payment Card Industry (PCI) Security Standards Council (SSC)) and reflected on its website) which Report must show no matters requiring remediation; (ii) evidence that the Report on Compliance was accepted by Seller and transmitted to the applicable payment card networks; and (iii) an Attestation of Compliance by the Debtor with respect to the matters covered in such Report on Compliance. The Report on Compliance and the Attestation of Compliance shall address all Seller systems that are in scope for the Debtor's PCI DSS compliance obligations, including, without limitation, Seller's card processing systems, cardholder environments, tokenization and card data storage systems and environments and any other system or environment maintained by or on behalf of the Debtor, any Subsidiary or any third party that transmits, stores or processes any cardholder data received by the Debtor or any Subsidiary for purposes of facilitating payment card processing.

<u>Evolve Assignment</u>. Buyer and Evolve Bank & Trust ("<u>Evolve</u>") shall have executed and delivered a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the Transactions contemplated by the APA (including, without limitation, the assignment of the Evolve Agreement and the assignment, amendment or termination of that certain letter agreement, dated October 1, 2023, between the Debtor and Evolve).

<u>Approval of Settlement Agreement with Evolve</u>. The Bankruptcy Court shall have unconditionally approved in all respects the Debtor's settlement agreement and release with Evolve (the "<u>Evolve Settlement</u>").

9

The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its two subsidiaries, which, as evidenced by the APA, will be sold (not including cash) for a cash payment of $9,700,000 and other consideration. In addition, the Debtor may have causes of action against third parties from which the Debtor believes that it may recover additional funds.

The timing of the chapter 11 filing is based on the need to proceed with a prompt sale of the Debtor's assets for the highest or otherwise best consideration to maximize recoveries for creditors. An emergency hearing on the Motion is necessary and appropriate for the following reasons:

1. Pre-petition, the Debtor engaged in a marketing process designed to raise capital and/or identify a strategic partner/transaction to support the Debtor's business as a going concern.

2. The Debtor identified Buyer, Buyer has made the highest and best offer for the purchase of the Debtor's assets, and the Debtor and Buyer engaged in significant negotiations pre-petition culminating in the negotiation and execution of the APA.

3. A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code. The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids. However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures proposed herein. The Debtor proposes a bid deadline of April 28, 2024, an auction and sale hearing on April 29, 2024, entry of a sale order on April 29, 2024, and a closing of no later than April 30, 2024.

4. The agreed upon fixed payoff amount of $7,199,624.29 to TriplePoint is conditioned on such payment occurring by no later than May 6, 2024. Absent such agreement, TriplePoint's payoff amount could be significantly more as a result of additional accrued interest and the inclusion of additional attorneys' fees and costs.

5.  To maximize recoveries to creditors in this case by minimizing cash usage and losses pending the closing of a sale, and given the marketing process which commenced well in advance of the filing of this case, an emergency hearing on the Motion is necessary in order for the Debtor to obtain immediate Court approval of and immediately publicize to prospective overbidders the terms and conditions under which they may submit overbids and participate in the auction process. The Debtor's concurrently filed motion for authority to use cash collateral and budget describe the Debtor's current cash position and proposed cash usage during the following approximate two-three weeks. A sale closing (the Initial Closing) by no later than April 30, 2024 would result in the payment of all of the Debtor's allowed secured debt in full with additional cash remaining in the estate for the benefit of creditors, and the sooner the Debtor is able to close its sale of its assets, the more cash the Debtor believes it will have at closing. Given the Debtor's projected weekly cash usage and losses, extending the sale process would increase costs to this estate without materially enhancing any potential for additional benefits from an extended sale process or closing date. The Debtor has determined in its business judgment that a sale process that extends beyond April 30, 2024 is highly unlikely to result in any net benefit to the estate all things considered, including, without limitation as a result of the incurrence of additional operating expenses. The Debtor does not expect there to be any higher or better offer for the Debtor's assets, or any alternative offer at all, given that the Debtor already conducted a marketing and sale process, identified the highest and best bid, heavily negotiated with Buyer over the course of many months during which time both the Debtor and Buyer invested significant time and resources in reaching a mutually acceptable APA and sale terms, with any alternative buyer having the ability during all of that time to engage the Debtor in an alternative, higher and better, transaction.

The Debtor believes that in order to avoid irreparable harm to the estate and creditors it is essential to immediately consider the relief requested in this Motion so that an order establishing Bidding Procedures and bid protections may be entered as soon as possible but in no event later

than April 24, 2024 and to set a hearing on the proposed sale on April 29, 2024, with an outside initial closing date (for substantially all assets except the equity in the two subsidiaries) of April 30, 2024, provided, however, that it is the Debtor's intention and desire to close the sale as soon as possible, in order to preserve as much cash as possible for the benefit of the estate. **Accordingly, the Debtor requests that the Court hold a hearing on this Motion on April 23, 2024, or, at the latest, April 24, 2024.**

### The Required Prompt Sale Process and Bid Procedures

Buyer was only willing to proceed with its purchase of the Purchased Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but Buyer has agreed that the Debtor can and should continue to make its assets available to alternative buyers (however unlikely that would be at this point in the process) to ensure that the highest and best offer is made for the Debtor's assets/business. The Debtor believes that the highest and best offer, and, indeed, the only real offer, is Buyer's offer.

The timing of the sale process is critical. Buyer has conditioned its offer on the Debtor obtaining an entered Bidding Procedures Order by April 24, 2024, and the Debtor obtaining an entered order of the Court by April 29, 2024 approving the sale by the Debtor to Buyer or a bidder with a higher and better offer.

The Debtor believes that Buyer is uniquely situated in regard to the Debtor's assets, that the prospects for any overbid to Buyer's offer are remote, and that the consideration offered by Buyer is very likely to be the highest and best offer. The Debtor has therefore concluded that the foregoing overbid procedures and protections for Buyer are reasonable and in the best interest of the estate and creditors in connection with this case, and given the potential irreparable harm to the estate and creditors if the sale cannot be promptly completed.

**WHEREFORE**, the Debtor respectfully requests that this Court:

1.    Enter an order substantially in the form of the Bidding Procedures Order attached as **Exhibit 5** to the Pathak Declaration:

      a.    Approving the auction sale format and Bidding Procedures in the form attached to the Bidding Procedures Order;

b. Approving the Debtor's proposed form of auction and sale hearing notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached as **Exhibit 6** to the Pathak Declaration

c. Approving the Debtor's proposed form of notice and procedures regarding the assumption and assignment of executory contracts and unexpired leases, establishment of cure amounts, and objections in the form attached as **Exhibit 7** to the Pathak Declaration;

d. Approving the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of APA by and between the Debtor and Buyer, a copy of which is attached as **Exhibit 9** to the Pathak Declaration, or to submit a redlined version of the APA which indicates the prospective overbidder's changes to the APA, i.e., an Alternative APA; and

e. Approving Buyer as the Stalking Horse Bidder and the bid protections for the Stalking Horse Bidder;

2. Scheduling a Court hearing to consider approval of the sale of the Purchased Assets to Buyer, or successful overbidder, pursuant to the terms and conditions of the APA between the Debtor and Buyer or Alternative APA, as the case may be, and the Bidding Procedures; and

3. Granting such other and further relief as he Court deems just and proper.

Dated: April 22, 2024

                    LEVENE, NEALE, BENDER, YOO
                     & GOLUBCHIK L.L.P.


                     By:＿＿*/s/ Krikor J. Meshefejian*＿＿＿
                         RON BENDER
                         MONICA Y. KIM
                         KRIKOR J. MESHEFEJIAN
                         Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Bidding Procedures Motion are (i) Sections 105(a), 361, 363(b), (f) and (m), 365(b) and (f), 503 and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rules 2002(a)(2), 6003, 6004 (a), (b), (c), (e), (f) and (h), 6006(a) and (c), 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Rules 6004-1, 9013-1 and 9075-1.

### II.    STATEMENT OF FACTS[3]

#### A.    The Debtor's Background and Chapter 11 Filing.

1.    The Debtor is a technology company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth.  The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users) through certain banking and financial service providers.

2.    The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("S Credit"), and (ii) Synapse Brokerage LLC ("S Brokerage").  S Brokerage is a registered broker-dealer and a member of FINRA (Financial Industry Regulatory Authority, a government-authorized not-for-profit organization that oversees U.S. broker-dealers), and SIPC (Securities Investor Protection Corporation, a non-profit that works to restore investors' cash and securities when their brokerage firm fails).

3.    The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date") with the goal of selling substantially all of its assets (the "Purchased Assets") to the highest and best bidder.  The Debtor

---

[3] To avoid repetition, the Debtor incorporates herein by this reference the *Declaration of Sankaet Pathak In Support Of Debtor's First Day Motions* filed concurrently herewith, in support of the facts set forth herein.

is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its two subsidiaries, which, as evidenced by the APA, will be sold (not including cash) for a cash payment of $9,700,000 and other consideration.  In addition, the Debtor may have causes of action against third parties from which the Debtor believes that it may recover additional funds.

**B.     The Asset Sale Process And Asset Purchase Agreement with Buyer.**

5.     Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Spring of 2022, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital.  The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and sought to engage Jefferies LLC to assist the Debtor with conducting a marketing process for the sale of the Debtor as a going concern.  The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Tabapay/its designee ("Buyer" and the "Stalking Horse Bidder").  Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

6.     On April 19, 2024, the Debtor and Buyer executed the APA pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure obligations associated with the assumed leases and contracts. The sale to Buyer is

subject to an expedited overbid process though the Debtor does not anticipate that there will be any overbids given the extensive marketing and sale process already conducted which has not generated any better offers.

7.    The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000.00 Purchase Price will be paid in cash; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA[4] and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

8.    A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code.  A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code.  The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids.  However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures proposed herein.  The Debtor proposes

---

[4] The Debtor understands that such "change of ownership or control" can occur within approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

a bid deadline of April 28, 2024, an auction and sale hearing on April 29, 2024, the entry of a sale order by no later than April 29, 2024, and a closing by no later than April 30, 2024.

9. To maximize recoveries to creditors in this case by minimizing cash usage and losses pending the closing of a sale, and given the marketing process which commenced well in advance of the filing of this case, an emergency hearing on the Motion is necessary in order for the Debtor to obtain immediate Court approval of and immediately publicize to prospective overbidders the terms and conditions under which they may submit overbids and participate in the auction process. The Debtor's concurrently filed motion for authority to use cash collateral and budget describe the Debtor's current cash position and proposed cash usage during the following approximate two-three weeks. A sale closing (the Initial Closing) by no later than April 30, 2024 would result in the payment of all of the Debtor's allowed secured debt in full with additional cash remaining in the estate for the benefit of creditors, and the sooner the Debtor is able to close its sale of its assets, the more cash the Debtor believes it will have at closing. Given the Debtor's projected weekly cash usage and losses, extending the sale process would increase costs to this estate without materially enhancing any potential for additional benefits from an extended sale process or closing date. The Debtor has determined in its business judgment that a sale process that extends beyond April 30, 2024 is highly unlikely to result in any net benefit to the estate all things considered, including, without limitation as a result of the incurrence of additional operating expenses. The Debtor does not expect there to be any higher or better offer for the Debtor's assets, or any alternative offer at all, given that the Debtor already conducted a marketing and sale process, identified the highest and best bid, heavily negotiated with Buyer over the course of many months during which time both the Debtor and Buyer invested significant time and resources in reaching a mutually acceptable APA and sale terms, with any alternative buyer having the ability during all of that time to engage the Debtor in an alternative, higher and better, transaction.

10. The Debtor believes that in order to avoid irreparable harm to the estate and creditors it is essential to immediately consider the relief requested in this Motion so that an order establishing Bidding Procedures and bid protections may be entered by April 24, 2024 and to set a hearing on the proposed sale on April 29, 2024, with an outside initial closing date (for

substantially all assets except the equity in the two subsidiaries) of April 30, 2024, provided, however that it is the Debtor's intention and desire to close the sale as soon as possible, in order to preserve as much cash as possible for the benefit of the estate.  **Accordingly, the Debtor requests that the Court schedule a hearing on this Motion on April 22, 2024, or at the latest, on April 23, 2024**.

11.    Buyer was only willing to proceed with its purchase of the Purchased Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but Buyer has agreed that the Debtor can and should market Buyer's offer for overbid to ensure that the highest and best offer is made for the Debtor's assets/business in the unlikely event that there is an alternative buyer available.

12.    The timing of the sale process is critical.  Buyer has conditioned its offer on the Debtor obtaining an entered Bidding Procedures Order by April 24, 2024, and the Debtor obtaining an entered order of the Court by April 29, 2024 approving the sale by the Debtor to Buyer or a bidder with a higher and better offer.

13.    The Debtor believes that Buyer is uniquely situated in regard to the Debtor's assets, that the prospects for any overbid to Buyer's offer are remote, and that the consideration offered by Buyer is very likely to be the highest and best offer.  The Debtor has therefore concluded that the foregoing overbid procedures and protections for Buyer are reasonable and in the best interest of the estate and creditors in connection with this case, and given the potential irreparable harm to the estate and creditors if the sale cannot be promptly completed.

## III.    THE PROPOSED BIDDING PROCEDURES AND BIDDING PROTECTIONS

The proposed Bidding Procedures and bid protections which the Debtor negotiated with the Stalking Horse Bidder and which the Debtor is requesting the Court to approve are attached to the proposed Bidding Procedures Order which is attached as **Exhibit 5** to the Pathak Declaration. Below is a summary of the key provisions of the Bidding Procedures:

### Stalking Horse Bidder

The Debtor is requesting the Court to approve Buyer as the Stalking Horse Bidder in the Auction (if any) for the Purchased Assets and to receive in the event that Buyer is not the winning

bidder at the Auction and subject to the APA, the Expense Reimbursement (as defined in the APA) subject to a cap of $400,000 plus the Break-Up Fee of $400,000 (equal to approximately 4% of the Purchase Price) with the Expense Reimbursement and Break-Up Fee collectively defined here as the "Stalking Horse Bidder Fee".

### Due Diligence Access/Participation Requirements

To participate in the Auction process as an overbidder, a person or entity interested in purchasing the Purchased Assets (a "Potential Overbidder") must deliver or have previously delivered to the Debtor all of the following documents (the "Participation Requirements"): (1) an executed non-disclosure agreement with the form to be obtained from the Debtor; (2) a statement demonstrating a bona fide interest in purchasing the Purchased Assets; and (3) one of the following: (i) written evidence of readily available funds equal to the Potential Overbidder's initial bid and any increase the Potential Overbidder desires to have authority to bid to, with the Debtor to keep such information completely confidential, (ii) a firm commitment for financing sufficient for the Potential Overbidder to timely consummate its purchase of the Purchased Assets, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Overbidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtor to make a reasonable determination as to the Potential Overbidder's financial and other capabilities to timely consummate its purchase of the Purchased Assets.

Any Potential Overbidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of these Bidding Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, direct communication with the Debtor's management as the Potential Overbidder desires and the Debtor determines to be appropriate under the circumstances and subject to the availability of such management.  For the avoidance of doubt, the Stalking Horse Bidder is deemed to have met the Participation Requirements.

### Bid Deadline for Prospective Overbidders

The deadline for all Potential Overbidders to submit their initial bid for the Purchased Assets

is proposed to be **April 28, 2024, at 5:00 p.m. (prevailing Pacific time)** (the "Prospective Overbidder Bid Deadline" or "Bid Deadline").

### Bid Requirements

The Debtor proposes that to be eligible to participate in the Auction, each bid and each Potential Overbidder submitting a bid (each, an "Overbidder") must be determined by the Debtor (following consultation with the Consultation Parties[5]) to have satisfied a number of conditions as specifically set forth in the Bidding Procedures, including, without limitation all of the conditions listed below (collectively, the "Bid Requirements"):

***Terms***.    A bid must be accompanied by an executed Asset Purchase Agreement, as modified by the Overbidder (the "Alternative APA"), along with an electronic mark-up showing all changes to the APA.    The form APA in Word format can be obtained by any Potential Overbidder from the undersigned Debtor's counsel ("LNBYG").    The Alternative APA must include binding, executed transaction documents, signed by an authorized representative of the Overbidder, and shall be on substantially the same terms as the APA.

***Minimum Overbid***.    The proposed purchase price to be paid for the Purchased Assets must (i) be in an amount at least $100,000 more than the Cash Purchase Price contained in Buyer's APA, plus (ii) provide for the assumption and/or payment in cash at closing of the Assumed Indebtedness, plus (iii) include the amount of the Stalking Horse Bidder Fee (the "Minimum Overbid").    Without limiting the generality of the foregoing, a bid (i) may not contain representation or warranties, conditions precedent, covenants, or termination rights materially more onerous to the Debtor in the aggregate than are set forth in Buyer's APA, as determined by the Debtor (following consultation with the Consultation Parties), (ii) may not be conditioned upon obtaining financing, or any internal, regulatory, or other third party approvals more onerous than are set forth in Buyer's APA, or on the outcome or review of due diligence, (iii) may not provide for a closing date/closing dates that will be later than those set forth in Buyer's APA, unless both the Debtor (following consultation with the Consultation Parties) and the winning bidder jointly agree to extend the sale

---

[5] As defined in the Bidding Procedures.

closing date(s) at their sole and absolute discretion, and (iv) may not be conditioned upon the Bankruptcy Court order approving the sale becoming a "final order" and must instead agree that the sale may be consummated immediately upon entry pursuant to Rules 6004(h) and 6006(d) of the Federal Bankruptcy Rules.

*Irrevocable*.  A bid must state that such offer is binding and irrevocable until the conclusion of the Sale Hearing (defined below) and such bid must continue to remain binding and irrevocable through the sale closing if the bid or any other higher bid submitted at the Auction is accepted by the Debtor at the Auction as the Winning Bid (defined below) or the Winning Back-Up Bid (defined below) and approved by the Bankruptcy Court at the Sale Hearing.

*Identity of Bidder*.  A bid must fully disclose the following information (collectively. "Identifying Information"): (A) each entity or person that will be bidding for or purchasing the Purchased Assets; (B) all material equity holders (i.e., parties that own at least 10% of the equity of the Overbidder) in the case of an Overbidder that is an entity; (C) any entity that will be financing or otherwise participating in connection with such bid and the complete terms of any such financing or participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid; (D) any connection with or participation by any "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtor or any relative or any affiliate of any "insider" of the Debtor; and (E) any connection with or participation by any current creditor or equity holder of the Debtor or the Stalking Horse Bidder.  A bid must also fully disclose, to the extent such bid includes the acquisition of the equity of S Credit and/or S Brokerage, any provisions in such bid for any internal, regulatory, or other third-party approvals that may be required for a change in control of such subsidiary or subsidiaries (collectively, "Third Party Approvals").

*Contact Information*.  A bid must include the names and contact information (including phone numbers and email addresses) of all authorized representatives of the Overbidder

who will be available to answer questions regarding the bid, including advisors and related parties.

***Deposit***.  A bid must include a good-faith deposit in immediately available funds equal to the sum of: (i) the Stalking Horse Bidder Fee (defined above) and (ii) ten percent (10%) of the cash portion of the purchase price in the Alternative APA, (the sum of (i) and (ii), the "Deposit").  If an Overbidder elects to increase the amount of its bid at the Auction, neither the Overbidder nor the Stalking Horse Bidder will be required to increase the amount of its Deposit.  If a bid is determined to be the Winning Bid at the Auction and the Overbidder who submitted such bid fails to timely close the sale after approval by the Bankruptcy Court at the Sale Hearing, the Deposit shall become non-refundable and be forfeited to the Debtor.  The same shall apply to the Stalking Horse Bidder (subject to the provisions in the APA for the forfeiture of the "Deposit" as defined therein), if determined to be the Winning Back-Up Bidder, and any other Winning Back-Up Bidder in the event (a) the Winning Bidder fails to timely close the Sale, (b) the Winning Back-Up Bidder is notified in writing that it is now the Winning Bidder, and (c) the Winning Back-Up Bidder fails to close its purchase by the outside closing date set forth in the applicable Asset Purchase Agreement unless such Winning Back-Up Bidder and the Debtor jointly agree to extend the applicable sale closing date.  All Deposits of all Qualified Bidders shall be held in an account maintained by LNBYG and shall be returned (other than with respect to the Winning Bidder and the Winning Back-Up Bidder) promptly after the conclusion of the Auction, subject to the return conditions set forth in the applicable Asset Purchase Agreements submitted with such bids.

***Financing Sources***.  A bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed sale with appropriate contact information for such financing sources, with the Debtor (following consultation with the Consultation Parties) to determine whether such evidence of financing satisfies these Bidding Procedures and enables the Overbidder to participate in

the Auction, with such determination to be in the Debtor's sole and absolute discretion and reasonably acceptable to each of the Consultation Parties.

**_Designation of Assigned Contracts and Leases._**  Subject to the ability of the Debtor to obtain an order of the Bankruptcy Court approving of the Debtor's assumption and assignment of any executory contract or unexpired lease to the Winning Bidder, a bid must include an initial list of all of the Debtor's executory contracts and unexpired leases with respect to which the Overbidder seeks assumption and assignment from the Debtor (including without limitation any Debtor contracts or leases to which the Debtor's non-debtor subsidiaries are also parties).

**_Designation of Assumed Liabilities_**.  A bid must identify all liabilities that the Overbidder proposes to assume.

**_No Breakup Fee_**. A bid must not request or entitle the Overbidder to receive any fee analogous to the Stalking Horse Bidder Fee, any termination fee, transaction or breakup fee, expense reimbursement or similar fee or payment. For the avoidance of doubt, by submitting a bid, the Overbidder agrees that it shall not be entitled to any such fee and waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or its participation in the Auction.

### Qualified Bidders and Bids

The Debtor proposes that Potential Overbidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "Qualified Bidders," and bids that meet all of the Bid Requirements described above will be deemed "Qualified Bids," in each case, only if the Debtor (following consultation with the Consultation Parties) concludes in the exercise of its business judgment, that such bid would be consummated if selected as the Winning Bid; provided, however, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction, the Debtor (following consultation with the Consultation Parties) shall have the right, in their sole and absolute discretion, to disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or otherwise participate in the Auction.  For the avoidance of doubt, the

Stalking Horse Bidder is a Qualified Bidder, the Stalking Horse Bidder's bid, as set forth in the APA, is a Qualified Bid, and each bid received from the Stalking Horse Bidder at the Auction that complies with the Bidding Procedures shall be a Qualified Bid.

### Notice of Qualified Bids

As soon as practicable following the Bid Deadline, the Debtor (following consultation with the Consultation Parties) shall identify to all Qualified Bidders: (a) each and every bid that the Debtor considers to be a Qualified Bid and (b) if more than one Qualified Bid has been timely received, the Qualified Bid that will constitute the "Initial Bid" at the Auction (which must equal at least the Minimum Overbid), and the bidding order in which the Auction will be conducted.

### No Auction if Only One Qualified Bid

If, by the Bid Deadline, the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the Debtor (following consultation with the Consultation Parties) shall not conduct an Auction and the Stalking Horse Bidder will be deemed the Winning Bidder and its bid the Winning Bid. If this occurs, the Debtor shall proceed to request at the Sale Hearing that the Court approve the transfer and sale of the Purchased Assets to the Stalking Horse Bidder in accordance with Buyer's APA and request that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) and 6006(d) of the Federal Bankruptcy Rules.

### Auction

If by the Bid Deadline, more than one Qualified Bid has been received by the Debtor, the Debtor will conduct the Auction with all Qualified Bidders. The Auction will be held concurrently with the Sale Hearing at the Bankruptcy Court.

### Consent to Jurisdiction, No Collusion and Good Faith Bona Fide Offer

All Qualified Bidders shall be deemed to have consented to the exclusive and core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the bidding process, the Auction, the transfer and sale of the Purchased Assets, and any other matter relating to, or contemplated by, Buyer's APA and any Alternative APA. Any and all disputes related to the Auction shall be determined solely by the Bankruptcy Court. Each Qualified

Bidder participating in the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or with any other bidder or prospective bidder; (ii) its bid is a good-faith *bona fide* offer; (iii) it intends to consummate the proposed transaction if selected as the Winning Bidder; and (iv) it acknowledges that, if chosen, it will serve as the Winning Back-Up Bidder.

### Initial Bid at the Auction

The bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted by the Bid Deadline, as determined by the Debtor (following consultation with the Consultation Parties). Each subsequent bid shall be in increments of no less than $100,000 and by figures which are wholly divisible by $100,000. The Debtor will notify all Qualified Bidders and the Consultation Parties in advance of the Auction which bid has been accepted as the Initial Bid at the Auction and the order in which the bidding at the Auction will proceed.

### Conducting the Auction

The Debtor and LNBYG will direct and preside over the Auction. At the start of the Auction, and after each Qualified Bidder acknowledges on the record (i) that it has not engaged in any collusion with respect to the bidding, (ii) that its bid is a good faith bona fide offer, and (iii) that it intends to consummate the proposed transaction if selected as the Winning Bidder or the Winning Back-Up Bidder, the Debtor and LNBYG will identify, confirm and describe the Initial Bid. The bidding will then ensue in the bidding order provided by the Debtor to all Qualified Bidders in advance of the Auction. All bidding after the Initial Bid shall continue in bidding increments of at least $100,000 and by figures that are wholly divisible by $100,000. All bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and all Qualified Bidders will be entitled to be present for all bidding with the understanding that the Identifying Information of each bidder and the material terms of each Qualified Bid (including any Third Party Approvals) will be fully disclosed to all Qualified Bidders before the Auction, and all successive bids made at the Auction will be fully disclosed to all Qualified Bidders. All Qualified Bidders will be permitted to bid at the Auction based on what the Debtor and LNBYG (following consultation with the Consultation Parties), and

subject to the Court's approval at the Sale Hearing, determine to be an appropriate amount of time to respond to each prior submitted bid.

Prior to the Auction, the Debtor will randomly assign to each Qualified Bidder a bidder number, except that the bidder whose bid was accepted as the Initial Bid will be assigned bidder number 1. Once the Initial Bid has been described by the Debtor and LNBYG, the bidding will then pass to bidder number 2. Bidder number 2 will have the option of submitting an overbid to the Initial Bid of at least the sum of (A) the Initial Bid (inclusive of the Stalking Horse Bidder Fee) plus (B) $100,000, or dropping out of the Auction. Once a bidder drops out of the Auction, such bidder will no longer be permitted to participate in the Auction. After bidder number 2 either submits a qualifying overbid or drops out of the Auction, the bidding will then pass to bidder number 3. This process will continue until only two Qualified Bidders are left, in which case the Qualified Bidder who submits the highest and best Qualified Bid will be deemed the Winning Bidder at the Auction, and the Qualified Bidder who submits the second highest and best Qualified Bid will be deemed the Winning Back-Up Bidder at the Auction.

Except as expressly provided in the Bidding Procedures Order or the provisions of these Bidding Procedures, the Debtor (following consultation with the Consultation Parties) shall have the right to conduct the Auction in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtor's bankruptcy estate. The Debtor shall also have the right to deviate from these Bidding Procedures or announce and employ at the Auction other procedural rules without the need for any further order of the Bankruptcy Court if the Debtor reasonably determines, in the exercise of its business judgment and following consultation with the Consultation Parties, that doing so would be in the best interests of the Debtor's bankruptcy estate and is not inconsistent with any of the provisions of the Bankruptcy Code or any previously entered order of the Bankruptcy Court including the Bidding Procedures Order.

The Debtor and LNBYG (following consultation with the Consultation Parties) may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer in terms of both amount and execution risk and (2) reject at any time any bid that is (i) inadequate

or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtor or its bankruptcy estate; provided that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the Auction reasonably expected to result (including after taking into account execution risk) in the highest amount of money being paid to the Debtor for the purchase of the Purchased Assets.

### Selection of the Winning Bid and Winning Back-Up Bid

The Auction shall continue until there is one Qualified Bid that the Debtor determines (following consultation with the Consultation Parties), subject to Bankruptcy Court approval, to be the highest and best bid (the "Winning Bid"), and another Qualified Bid to be the second highest and best bid (the "Winning Back-Up Bid"), at which point the Auction will be deemed concluded. The Debtor will not consider any bids submitted after the conclusion of the Auction.

Subject to the Bankruptcy Court approving the Winning Bid and entering an order approving of the Debtor's free and clear sale of the Purchased Assets to the Winning Bidder in accordance with the APA or Alternative APA, as the case may be, submitted by the Winning Bidder (the "Sale Order"), the Winning Bidder shall be required to close the sale by the outside closing date set forth in such APA or Alternative APA, as applicable (unless the Debtor and the Winning Bidder jointly agree to an extension of this outside Sale closing date which will be in their sole and absolute discretion), or the Winning Bidder will be deemed to have forfeited its Deposit to the Debtor subject to the terms and conditions for such forfeiture set forth in such APA or Alternative APA, as applicable.  Promptly following the closing of the sale to the Winning Bidder, LNBYG shall return the Deposit of the Winning Back-Up Bidder to the Winning Back-Up Bidder.

If the Winning Bidder fails to close the sale of all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage by the outside closing date for such initial closing (as set forth in the APA or Alternative APA, as applicable), unless the Debtor and the Winning Bidder mutually agree in their sole and absolute discretion to extend such closing date, the Debtor shall so notify the Winning Back-Up Bidder.  The Winning Back-Up Bidder will then have ten (10) days following the date of having been notified by the Debtor to close the purchase

of such assets (*i.e.*, all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage). If the Winning Back-Up Bidder fails to close the sale within this time period, unless the Debtor, following consultation with the Consultation Parties, and the Winning Back-Up Bidder mutually agree in their sole and absolute discretion to extend such initial closing date, the Winning Back-Up Bidder will be deemed to have forfeited its Deposit to the Debtor subject to any conditions for such forfeiture in the applicable Asset Purchase Agreement.

### **Sale Hearing**

The Debtor proposes that the hearing for the Bankruptcy Court to approve the outcome of the Auction and the Debtor's sale of the Purchased Assets to the Winning Bidder and to the Winning Back-Up Bidder if the Winning Bidder fails to close (the "Sale Hearing") be held on April 29, 2024, or at such other date and time set by the Bankruptcy Court.

### **IV.    PROPOSED SALE NOTICE AND ASSIGNMENT NOTICE**

Attached as **Exhibit 6** to the Pathak Declaration is the Debtor's proposed form of notice to creditors of the Debtor and its non-debtor subsidiaries, prospective overbidders and other parties in interest ("Proposed Sale Notice"), and attached as **Exhibit 7** to the Pathak Declaration is the Debtor's proposed form of notice to non-debtor counterparties (including non-debtor subsidiaries if applicable) under executory contracts and unexpired leases regarding the possible assumption and assignment thereof ("Proposed Assignment Notice").

### *A.    Proposed Sale Notice.*

Within one (1) business day after the Court's entry of the Bidding Procedures Order, the Debtor will file with the Court and serve the Proposed Sale Notice upon all known creditors and equity holders of the Debtor and its non-debtor subsidiaries and upon all prospective overbidders following Court approval of the Bidding Procedures.

The Debtor submits that the notice, and service thereof, will satisfy the requirements of Rule 2002 of the Federal Rules of Bankruptcy Procedure, and that such notice will constitute proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures (including any Bid Deadline), the Auction, the Sale Hearing, and the deadline to object to any sale. Accordingly, the Debtors request that the Proposed Sale Notice, substantially in the form attached as **Exhibit 6**

to the Pathak Declaration be approved by the Court.

**B.**     ***Proposed Assignment Notice.***

Similarly, within one (1) business days after the Court's entry of the Bidding Procedures Order, the Debtor will file with the Court and serve the Proposed Assignment Notice attached as **Exhibit 7** to the Pathak Declaration on each counterparty (including non-debtor subsidiaries if applicable) to an executory contract or unexpired lease (a "Counterparty") that is proposed for assumption and assignment to the Stalking Horse Bidder, which notice shall: (i) state the cure amounts, if any, that the Debtor and Stalking Horse Bidder believe are necessary to assume such contracts or leases pursuant to Bankruptcy Code section 365 (the "Cure Amount"); (ii) notify the non-debtor Counterparty or Counterparties that such party's or parties' contract or lease may be assumed and assigned to the Winning Bidder; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Court; and (iv) state the deadline by which any non-debtor Counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s).

If the Winning Bid includes (i) a different list of executory contracts and unexpired leases to be assumed and assigned or (ii) different Cure Amount(s) than those listed in the Proposed Assignment Notice that is filed and served as described above (the "Initial Assignment Notice"), then the Debtor will file and serve on the same Counterparties that were served with the Initial Assignment Notice a pleading setting forth the changes to the Initial Assignment Notice (the "Supplemental Assignment Notice"). The Supplemental Assignment Notice will include, to the extent the Winning Bidder is not the Stalking Horse Bidder, a description of the Winning Bidder and a statement as to its ability to pay all required Cure Amounts and perform the Debtor's obligations under such contracts and leases in accordance with section 365 of the Bankruptcy Code.

The Debtor proposes that objections to any matter pertaining to the assumption and assignment of executory contracts or unexpired leases by the Stalking Horse Bidder or Winning Bidder (if different), including without limitation as to adequate assurance of future performance

or payment of applicable Cure Amounts, be filed with the Court no later than (a) April 28, 2024 at 5:00 p.m. (the "Initial Objection Deadline"), with respect to the Initial Assignment Notice, and (b) up until the Sale Hearing (the "Supplemental Objection Deadline"), with respect to the Supplemental Assignment Notice. Any such objections must be served so as to be actually received no later than the Initial Objection Deadline or the Supplemental Objection Deadline (as applicable).

The Debtor proposes that to the extent that any Counterparty or other party in interest does not timely serve an objection to the Initial Assignment Notice or Supplemental Assignment Notice as set forth above, such party shall be deemed to have (i) consented to the assumption and assignment of the applicable contracts or leases to the Winning Bidder; (ii) agreed that the Winning Bidder has provided adequate assurance of future performance within the meaning of sections 365(b) and (f) of the Bankruptcy Code; (iii) consented to the applicable Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

Upon the filing of an objection by a Counterparty or other party in interest to the Initial Assignment Notice or Supplemental Assignment Notice, the Debtor will contact the objecting party and the Winning Bidder to attempt to consensually resolve any timely filed objection. The Debtor will work with the Winning Bidder in good faith in this regard, and the Winning Bidder must consent to any increase in the proposed Cure Amount for the applicable contract or lease. If the Debtor and Winning Bidder are unable to resolve such an objection, such objection will be heard at the Sale Hearing (as may be adjourned by the Court without such objecting party's consent); provided, further, that in the event an objection relates solely to a Cure Amount (a "Cure Objection"), then such objecting party will be deemed to consent to the assumption and assignment of its contract or lease, notwithstanding such objection. In the event the Debtor and the Winning Bidder are unable to resolve a Cure Objection prior to the Sale Hearing, the Winning Bidder may elect not to include the applicable contract or lease in its purchase of the Purchased Assets, subject to any conditions set forth in the APA or Alternative APA (as applicable).

## V.    DISCUSSION

**A.    The Court Should Approve The Bidding Procedures.**

Local Bankruptcy Rule 6004-1 provides, in pertinent part, as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> . . .
>
> (2) <u>Contents of Notice [of a Sale Procedure Motion].</u> The notice must describe the proposed bidding procedures and include a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. …
>
> (3) <u>Service of the Notice and Motion.</u> The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court.
> . . .

Local Bank. R. 6004-1(b).

The Debtors respectfully submit that all of the information required under Local Bankruptcy Rule 6004-1(b)(2) to be provided in a notice of a bidding procedures motion will be included in the Notice of Motion once the Debtor obtains an emergency hearing date from the Court. The Debtor is requesting an emergency hearing on this Bidding Procedures Motion for the reasons set forth above.

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a

sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Bankr. R. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Preapproval of bid procedures and terms facilitates bidding by providing a fair and efficient process, ensuring fair comparability between competing bids, and protecting other bidders who have limited their bids to the announced terms. *See In re Financial News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991).

A corollary to these principles is that a bankruptcy court will evaluate a proposed sale transaction in its totality and will approve the sale if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this principle to a transaction including breakup and overbid provisions in the sale of the debtor's business. In *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions relating to a breakup fee and minimum overbids. In responding to objections to other provisions of the agreement, the court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11. *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,* 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) … [some contractual] provisions may be justified by the need to attract a prospective investor….

114 B.R. at 888.

The Debtor has concluded that the auction and bidding procedures outlined above (and in more detail in the Bidding Procedures) are designed to enable the Debtor's estate to obtain the

32

highest price possible for the Purchased Assets (including after taking into account execution risk) and provide the greatest possible recovery for the Debtor's creditors. The Debtor believes that the sale process conducted by the Debtor was and continues to be thorough and adequate to obtain the highest and best offer for the Purchased Assets, subject to the opportunity for others to participate in accord with the proposed Bidding Procedures.

The Bidding Procedures serve numerous legitimate purposes. The Bidding Procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability or certainty of execution to consummate the transaction; (iii) ensure that the highest possible price is obtained for the Purchased Assets; (iv) afford the broadest notice of the proposed sale as possible under the circumstances; and (v) compensate the Buyer for the Buyer's time, effort, costs and expenses incurred in connection with negotiating the APA, conducting due diligence and setting a "floor" that will pay all secured debt in full while leaving the estate with additional cash for the benefit of all creditors.

**B.**     **The Court Should Approve the Bid Protection Including Break-Up Fee, Expense Reimbursement, and Repayment of Service Fees as Reasonable.**

The proposed Stalking Horse Bidder Fee is reasonable given the amount of the proposed purchase price and the complexity of the transaction. The Debtor is informed that the Stalking Horse Bidder has expended substantial time and resources with respect to the formulation of its offer, negotiations with the Debtor (including with respect to complex inter-company and inter-bank program reconciliations and multiple regulatory and other third-party approvals in connection with the acquisition of the equity of S Credit and S Brokerage), and due diligence with respect to the proposed transaction.

Break-up fees are generally permitted as long as they "enhance" the bidding by promoting an offer and the possibility of higher bids. *See, In re Integrated Resources, Inc.,* 147 B.R. 650, 659-60 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993). Break-up fees may be necessary to convince a stalking horse bidder to enter the bidding by providing some form of compensation for the risks it is undertaking; in assessing the incentive

effect of the break-up fee, a court should determine whether the dollar amount of the fee is so substantial that it has a "chilling effect" on other prospective bidders. Id. at 660; *In re 995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Breakup fees are authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called "stalking horse," whose initial research, due diligence, and subsequent bid may encourage later bidders; the break-up fee compensates the stalking horse for the risk it shoulders in being the first bidder. *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003)

In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." *Cottle v. Storer Communication Inc*., 849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave., supra*, 96 B.R. at 28.

In examining business transactions, the Court employs a deferential "business judgment" rule. *In re JW Res., Inc.,* 536 B.R. 193, 197 (Bankr. E.D. Ky. 2015) (negotiated break-up fees based on the sound business judgment of the debtors). "A debtor-in-possession is accorded great deference as to its business judgments." *In re Girard Medical Center*, 1990 WL 56486, *2 (Bankr.E.D.Pa. 1990). *See also*, *In re Wheeling-Pittsburgh Steel Corp*., 72 B.R. 845, 849 (Bankr.W.D.Pa. 1987) ("courts accord the debtor'' business judgment a great amount of deference").

The Stalking Horse Bidder Fee and all of the other Bidding Procedures are reasonable in the business judgment of the Debtor. "So long as a [debtor in possession] conducts the affairs of the estate by exercising his business judgment in good faith, upon a reasonable basis, and within the scope of his authority under the Code, he may proceed without interference." *In re Consolidated Auto Recyclers, Inc*., 123 B.R. 130, 140 (Bankr.D.Me. 1991). *Cf. Bennett v. Williams,* 892 F.2d 822, 824 (9th Cir.1989) (deference to business management decisions of bankruptcy trustee).

A court will uphold a decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested directors or by other such means. *See In re Integrated Res., Inc*., 147 B.R. at 657 (break-up fee approved by disinterested board); *In re 995 Fifth Ave. Assoc.,* 96 B.R. at 28. In the present case, the Debtor's board reviewed and approved the break-up fee and expense

reimbursement in light of the complexity of the proposed sale transaction, including the multiple regulatory and other third-party approvals required for the sale of the equity in S Credit and S Brokerage and the complex inter-company and inter-bank program reconciliations required to consummate the transaction. None of the board members is related in any way to the Stalking Horse Bidder.

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662.

The Debtor strongly believes that proceeding with an auction sale of the Purchased Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of this estate and will result in the highest price possible being paid for the Purchased Assets.  All of the prospective bidders, including Buyer, would understandably only be willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee.  Without giving such benefits to a stalking horse bidder, there would have been no way for the Debtor to obtain a viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder.  Buyer would never have been willing to serve as the stalking horse bidder without the various protections that are being afforded to Buyer, particularly given the complexity of the transaction (including various inter-company and inter-bank program reconciliations and a three-step closing upon obtaining various regulatory and other third-party approvals with respect to the proposed changes in control of S Credit and S Brokerage).  The Debtor submits that these protections are fair, reasonable and consistent with market practice and unquestionably will result in the Debtor's estate receiving a substantially higher purchase price for the Purchased Assets than would otherwise be the case.

The Bidding Procedures and bid protections are customary, and are reasonably designed to promote an orderly bid process which will permit the making and consideration of overbids by qualified buyers.  The Bidding Procedures, including the Stalking Horse Bidder Fee, were negotiated as part of the Purchase Agreement, and have been found to be reasonable by the Debtor.

The Break-Up Fee of $400,000 (equal to 4% of the Purchase Price) and the Expense Reimbursement with a cap of $400,000, which is well within common break-up fee and expense reimbursement levels, and likely reasonably representative of compensation for the time and effort put into this sale transaction by Buyer. The Expense Reimbursement is based on delivery of a reasonably detailed calculation of actual out-of-pocket costs and expenses.

Accordingly, the Debtor believes that its proposed break-up fee, expense reimbursement and other protections in favor of Buyer satisfy the standards identified in *Integrated Resources* (i.e., serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders"). *Id.* at 662.

The Debtor therefore submits that the proposed bidding procedures and stalking horse bid protections described above and provided for in the Bidding Procedures are in the overwhelming best interests of this estate, are necessary and appropriate to maximize the value paid for the Purchased Assets, and should be approved by the Court as an exercise of the Debtor's sound business judgment.

## C.    The Notices in Connection with the Auction Sale and Hearing, and Assignment of Contracts Are Reasonable and Should be Approved.

The Bidding Procedures Order also calls for the approval of the form of (i) the Proposed Sale Notice and (ii) the form of the Proposed Assignment Notice. The Proposed Sale Notice is reasonably designed to alert parties to the Auction, the Bidding Procedures, the Sale Hearing, and time for objections. The Proposed Assignment Notice and procedure is reasonably designed to facilitate the sale process by advising parties to contracts which may be assumed and assigned of the terms of assignment, including any cure amount, and to allow for objections to the assignment to Buyer, or in the case of a successful overbidder, for objections to the revised proposed assignment and proposed cure amount. In the event no objection is timely made, the non-debtor parties to assumed and assigned contracts will be deemed to have consented to and waived objections to (i) the assumption and assignment; (ii) adequate assurance of future performance; (iii) the proposed cure amount; and (iv) the terms of the Sale Order.

These notices and attendant procedures will provide interested creditors and other parties in interest (including creditors of the Debtor's subsidiaries who might be affected by the proposed Sale) and contract counterparties adequate notice and opportunity to object, as well as notifying parties who may wish to bid.

## VI.    **CONCLUSION**

The Debtor respectfully requests that this Court:

1.    Enter an order substantially in the form of the Bidding Procedures Order attached as **Exhibit 5** to the Pathak Declaration:

    a.    Approving the auction sale format and Bidding Procedures in the form attached to the Bidding Procedures Order;

    b.    Approving the Debtor's proposed form of auction and sale hearing notice to be provided to creditors of the Debtor and its non-debtor subsidiaries, prospective overbidders and other parties in interest in the form attached as **Exhibit 6** to the Pathak Declaration;

    c.    Approving the Debtor's proposed form of notice and procedures regarding the assumption and assignment of executory contracts and unexpired leases, establishment of cure amounts, and objections in the form attached as **Exhibit 7** to the Pathak Declaration;

    d.    Approving the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of APA by and between the Debtor and Buyer, a copy of which is attached as **Exhibit 9** to the Pathak Declaration, or to submit a redlined version of the APA which indicates the prospective overbidder's changes to the APA, i.e., an Alternative APA; and

    e.    Approving Buyer as the Stalking Horse Bidder and the bid protections for the Stalking Horse Bidder;

2.    Scheduling a Court hearing to consider approval of the sale of the Purchased Assets to Buyer, or successful overbidder, pursuant to the terms and conditions of the APA between the

Debtor and Buyer or Alternative APA, as the case may be, and the Bidding Procedures; and

3.       Granting such other and further relief as he Court deems just and proper.

Dated: April 22, 2024                          LEVENE, NEALE, BENDER, YOO
                                                 & GOLUBCHIK L.L.P.


By:   */s/ Krikor J. Meshefejian*
                RON BENDER
                MONICA Y. KIM
                KRIKOR J. MESHEFEJIAN
                Proposed Attorneys for Chapter 11 Debtor
                and Debtor in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING BIDDING PROCEDURES WITH RESPECT TO THE TRANSFER AND SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING BIDDING PROTECTIONS FOR THE STALKING HORSE BIDDER, (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICES RELATED TO THE AUCTION AND SALE, (E) SCHEDULING THE SALE HEARING, AND (F) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ***April 22, 2024***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender     rb@lnbyg.com**
- **Russell Clementson     russell.clementson@usdoj.gov**
- **United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) ***April 22, 2024***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ***April 22, 2024***, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON**
**SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| April 22, 2024 | Lourdes Cruz | */s/ Lourdes Cruz* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423


Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113


Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105


First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117


Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457


FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526


Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111


Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043


Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292


Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104


Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367