1   RON BENDER (SBN 143364)
    MONICA Y. KIM (SBN 180139)
2   KRIKOR J. MESHEFEJIAN (SBN 255030)
    LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3   2818 La Cienega Avenue
4   Los Angeles, California 90034
    Telephone: (310) 229-1234
5   Facsimile: (310) 229-1244
    Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
6

7   Proposed Attorneys for Debtor and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
9               SAN FERNANDO VALLEY DIVISION

10  In re:                              | Case No.: 1:24-bk-10646-MB

11  SYNAPSE FINANCIAL TECHNOLOGIES,     | Chapter 11
    INC.,
12                                      | DECLARATION     OF    SANKAET
                                        | PATHAK IN SUPPORT OF ALL OF
13          Debtor and Debtor in Possession.  | THE     DEBTOR'S     "FIRST-DAY
                                        | MOTIONS"
14
                                        | Date:    April 24, 2024
15                                      | Time:    2:00 p.m.
                                        | Place:   Courtroom 303
16                                      |          21041 Burbank Boulevard
                                        |          Woodland Hills, CA 91367
17

18

19

20      I, Sankaet Pathak, hereby declare as follows:

21      1.     I have personal knowledge of the facts set forth below and, if called to testify,

22  would and could competently testify thereto.

23      2.     I am the Founder and Chief Executive Officer of Synapse Financial

24  Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned,

25  chapter 11 bankruptcy case ("Debtor").

26      3.     In my capacity as the Founder and CEO of the Debtor, I have access to the

27  Debtor's books and records and am familiar with the organization, operations and financial

28  condition of the Debtor.  Any records and documents referred to in this declaration constitute

                                      1

writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own review and knowledge of the Debtor's books and records.

4.      I make this declaration in support of the following emergency first-day motions (each a "Motion" and, collectively, the "Motions"):

    a.      Debtor's Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtor To Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief (the "Cash Collateral Motion");

    b.      Debtor's Emergency Motion For Entry Of An Order: (I) Authorizing The Continued Use Of Its Cash Management System; (II) Authorizing The Maintenance of Certain Pre-Petition Bank Accounts; And (III) Authorizing Banks To Release Administrative Holds And/Or Freezes On the Debtor's Prepetition Accounts (the "Cash Management Motion");

    c.      Debtor's Emergency Motion For Entry of An Order Authorizing Debtor To Honor And/Or Pay Pre-Petition Wages, Salaries, Commissions, and Vacation, Leave And Other Benefits, Reimbursable Expenses, Payroll Taxes And Corkers' Compensation Insurance Costs (the "Payroll Motion");

    d.      Debtor's Emergency Motion For An Order (A) Approving Bidding Procedures With Respect To The Transfer And Sale Of Substantially All Of The Debtor's Assets, (B) Approving Bidding Protections For The Stalking Horse Bidder, (C) Approving Procedures Related To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And Manner Of Notices Related To The Auction And Sale, (E) Scheduling The Sale Hearing, And (F) Granting Related Relief (the "Bidding Procedures Motion"); and

    e.      Debtor's Emergency Motion For An Order (A) Approving Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Interests And Encumbrances; (B) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts; (C) Waiving The 14-Day Stay Periods Of Bankruptcy Rules 6004(h) And 6006(d); And (D) Granting Related Relief (the "Sale Motion").

5.      Unless otherwise stated with specificity or implied by context, capitalized defined terms used in this declaration have the same meanings as attributed to them in the master statement of facts to which this declaration is attached.

**GENERAL BACKGROUND**

6.      The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date"). The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.      The Debtor was founded by me as "Synapse Payments LLC" in 2014 and changed its name, pursuant to its conversion to a corporation, to "Synapse Financial Technologies, Inc." in 2016. The Debtor is a technology and software company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth. The Debtor has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as "End Users" to avoid confusing them with the fintechs which are the Debtor's only customers) through the Debtor's relationships with bank partners and other financial service providers (referred to as "Partner Financial Institutions").

8.      The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Service (BaaS) platform to allow for the provision of Partner Financial Institutions financial products (*e.g.,* bank accounts, card products, cash management accounts and related services, and loan products) to the customers of the fintechs (*i.e.,* the End Users). The Debtor, a non-bank, has in place certain agreements with Partner Financial Institutions to enable the provision of financial products through the Debtor's software and technology services. The fintechs provide the user interface in which End Users access the products of the Partner Financial Institution through the Debtor's software.

9.      *By example,* an individual or a company business customer (*i.e.,* the End Users) interested in obtaining various financial services such as opening a bank account will first sign up with a fintech which has contracted for the Debtor's services. Through the fintech's application, the End User signs up for the specific banking products by first signing up for a user account through the fintech's application and agreeing to the fintech's terms and conditions (as well as those of the Debtor). Then, through the fintech's application, the End User can choose

from financial products offered by the Partner Financial Institutions (*e.g.,* deposit account agreement, card agreement, or the like).  End Users are customers of the fintechs and the Partner Financial Institutions, not the Debtor. The Debtor is not in the flow of funds and does not receive funds from the End Users. The Partner Financial Institutions access information about the End Users through the Debtor's software and technology services. The "network" between the fintech and the Partner Financial Institutions is created through the Debtor's technology and software which then allows for the fintechs, Partner Financial Institutions and the End Users to communicate through their systems and programs to make transactions (for such things as deposits, withdrawals, cards transactions, ACH and wire payments, etc.), for disputing transactions, monitoring and reporting, and the like.

10.    In addition to providing access to its proprietary technology and a platform that allows for the fintechs to offer banking products and services of the Partner Financial Institutions to the End Users, the Debtor also provides related services to the banks and the fintechs, such as, for example, compliance check services (*e.g.*, ensuring that the End Users are authorized to open accounts), and handles End-User disputes and customer service. As of January 2024, the Debtor had service contracts with over 20 Partner Financial Institutions (either directly or indirectly for sweep networks) and 100 fintechs, and approximately 10 million End Users through its technology platform. As of the Petition Date, the Debtor engaged approximately 89 employees and contractors in the United States. The Debtor also engages approximately 19 personnel outside of the United States, but these personnel are engaged through a third-party employer service.

11.    In the ordinary course of its business, and based on the specific banking or financial products or services received by the approximately 10 million End Users, the Debtor may owe deposit revenue (rebates), interest, interchange fees, and other payments to the fintechs based on the terms and conditions of the Debtor's contracts with the fintechs. These obligations are generally set up to be paid automatically, and up to 30 days in arrears (collectively, the "Customer/Bank Obligations"). The importance of the timely payment of these obligations to its fintechs customers (such as interest which is ultimately paid to the End Users) cannot be

4

understated as they are critical and essential to the Debtor's business, which, if not paid, will decimate the going concern value of its business and jeopardize the Debtor's relationships with, and increase litigation exposure from, its customers.

12.     The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("S Credit"), and (ii) Synapse Brokerage LLC ("S Brokerage").  S Brokerage is a registered broker-dealer and a member of FINRA Financial Industry Regulatory Authority (a government-authorized not-for-profit organization that oversees U.S. broker-dealers), and SIPC (Securities Investor Protection Corporation, a non-profit that works to restore investors' cash and securities when their brokerage firm fails).

13.     The Debtor purchased S Brokerage around 2020, however, it only began onboarding End Users and becoming operational only recently. Generally, S. Brokerage offers, directly to End Users, cash management products and related services through the Debtor's relationships with fintechs and network of program banks which enables End Users to spread their risk across banks. S. Brokerage's cash management program enables End Users' funds to be placed across a number of program banks to receive potential increased FDIC deposit insurance of such funds. More specifically, given that the standard insurance amount through the FDIC is, subject to its rules, $250,000 per depositor, per bank, S. Brokerage allows for End Users, through its sweep and other programs, to diversify deposit amounts higher than $250,000 across more than one bank, also using the platforms offered by the Debtor and the network of banks that the Debtor has agreements in place with. The terms of the business arrangement between the Debtor and S. Brokerage are set forth in the parties' *Amended and Restated Intercompany Service and Expense Sharing Agreement*. S. Brokerage does not directly have any employees. Rather, the Debtor provides administrative support and services to S. Brokerage such as technology, transaction processing, record keeping, sales, legal and other back-office services, for which S. Brokerage pays a monthly service fee to the Debtor. S Brokerage has not filed any Chapter 11 bankruptcy case.

14.     S. Credit was established by the Debtor around 2019 and holds state lending licenses in order to offer loan products to End Users through the Debtor's relationships with

5

fintechs. S. Credit provides loan products to End Users of the fintechs that the Debtors have agreements in place with. The loans are typically guaranteed with restricted cash and/or reserves for the full amount of the loans; thus, there is very little to no financial risk to the loan products offered to S. Credit. The terms of the business arrangement between the Debtor and S. Credit are set forth in the parties' *Intercompany Service and Expense Sharing Agreement*. S. Credit does not have any employees. Rather, the Debtor provides administrative support and services to S. Credit such as technology, transaction processing, record keeping, sales, legal and other back-office services, for which S. Brokerage pays a monthly service fee to the Debtor. S Credit not filed any Chapter 11 bankruptcy case.

15.    In recent years, the BaaS industry which Synapse helped pioneer has come under increased scrutiny from state and federal financial regulators, who have raised their expectations of banks and financial institutions who partner with non-bank providers. In many cases, these state and federal regulators have required banks to reduce the number of deposits they receive from BaaS/fintechs and to implement increased scrutiny over new fintech programs. At the same time, federal funds rates were continuing to increase, leading to increased revenue to the Debtor (a large portion of which it passed through to fintech customers). However, fintech valuations were plummeting and venture capital funding was scarce.

16.    The Debtor had long forecasted difficulties on the horizon for the BaaS industry; thus, it has always planned to pivot to a different approach which included the diversification of its Partner Financial Institutions and expansion to include in-house regulated products through S. Brokerage and S. Credit. The Debtor also engaged in negotiations for the purchase of a bank. However, this pivot required substantial investment and capital. Therefore, the Debtor sought capital infusion and received a term sheet for a $100 million capital infusion, which was approved by the Debtor's board of directors, but vetoed by certain investor directors.

17.    Thereafter, one of the Debtor's largest fintech customers, Mercury Technologies, Inc. ("Mercury"), notified the Debtor that it would not renew its agreement with the Debtor and instead form a direct relationship Debtor's bank partner to cut the Debtor out of the revenue stream. Concurrently with this notification, Mercury transferred over $3 billion in End User

funds without the Debtor's participation to its direct bank relationship. Mercury's transfer, which Synapse alleges was not properly conducted, resulted in damages to Synapse and its Program. Subsequently, Mercury filed a lawsuit against the Debtor alleging that it is owed approximately $30 million for a 2022 dispute based on an interpretation of the parties' agreement as to the rate that it is to pay the Debtor which is inconsistent with the actual language of the parties' agreement. The Debtor is aggressively defending the lawsuit, and has substantial counter-claims against Mercury in an amount in excess of $36 million which it intends to actively pursue during this case.

18.    In the Fall of 2023, the Debtor explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Previous marketing of the Debtor by William Blair had produced several proposals, including an initial offer from the Buyer (as defined below), however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did so by seeking to engage Jefferies LLC ("Jefferies").

19.    On April 19, 2024, the Debtor signed an Asset Purchase Agreement ("APA") with Tabapay or its designee ("Buyer" or "Tabapay") which has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to its two (2) wholly owned subsidiaries, S Brokerage and S Credit, for the cash purchase price of $9,700,000 ("Cash Purchase Price"), plus other consideration as described in the APA, including the Buyer's agreement to pay for all cure obligations associated with the assumed leases and contracts.

20.    The APA contemplates a three-tiered closing process, with (i) the Initial Closing to occur for the transfer of all of the "Purchased Assets" other than the Debtor's equity interests in S Brokerage and S Lending, (ii) a second closing to occur as soon as the "change of ownership or control" can be made with respect to S Brokerage pursuant to the procedures

governed by FINRA[1], and (iii) a third and final closing to occur as soon as the licenses designated by Tabapay as to S Lending are transferred to Tabapay. The "Outside Closing Date" for the Initial Closing is <u>April 30, 2024</u>.

21.    Although the details of the provisions of the APA are set forth more fully in the Sale Motion, among other things, the APA contains numerous covenants, including the requirement that the Debtor conduct its business in the ordinary course of business until the final closing, which includes, without limitation, the timely honoring and payment of its Customer/Bank Obligations. It is also a condition to closing that the Court approve the Debtor's settlement agreement with the Debtor's current banking partner, Evolve Bank & Trust ("<u>Evolve</u>").

22.    The Debtor has concluded that it is in the best interests of its creditors to sell its assets to Tabapay pursuant to Section 363(f) of the Bankruptcy Code, and requires the protections and the benefits afforded to it by the Chapter 11 bankruptcy process in order to consummate a sale and to orderly wind down its remaining affairs.

23.    The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and equity interests in its subsidiaries, which, as evidenced by the APA, will be sold for total cash consideration of $9.7 million. In addition, the Debtor has reached a settlement agreement with Evolve which has agreed to pay $2 million to the estate, and has substantial causes of action against Mercury Technologies, Inc. and possibly other third parties from which the Debtor expects that it will recover substantial funds. These recoveries are expected to serve as the primary sources of recovery for unsecured creditors in this case.

---

[1] The Debtor is advised that the "change of ownership or control" of S Brokerage can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

8

**CASH COLLATERAL MOTION**

24.     The Debtor is a party to two (2) pre-petition financing arrangements with (i) Silicon Valley Bank, as predecessor to First Citizens Bank & Trust Company ("SVB"), and (ii) TriplePoint Capital LLC ("TriplePoint").

25.     **SVB**. Pursuant to a Loan and Security Agreement dated February 19, 2021 between SVB, on the one hand, and the Debtor and S Credit (collectively, the "SVB Borrowers"), on the other hand, and related agreements (collectively, the "SVB Loan Documents"), SVB agreed to make advances in two (2) tranches (Tranche A and Tranche B), with Tranche A not to exceed principal amount of $4 million, and Tranche B not to exceed principal amount of $2 million. All advances are to be re-paid "interest only" through January 31, 2022, and beginning February 1, 2022, the advances were to be repaid in 36 equal monthly installments of principal plus accrued but unpaid interest. The Debtor estimates that SVB will be owed approximately $1.5 million as of April 30, 2024, the Outside Closing Date for the initial closing on the sale with the Buyer.

26.     The SVB Loan Documents grant to SVB a security interest and lien upon all personal property of the Debtor, *other than intellectual property[2]*, to secure its obligations, and, as illustrated below, SVB recorded a UCC financing statement on February 19, 2021 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

27.     **TriplePoint**. Pursuant to a Plain English Growth Capital Loan and Security Agreement dated July 29, 2022 between certain designated "lenders" (identified as TPVG, TPVL and TPC) and TriplePoint, as Collateral Agent, on the one hand, and the Debtor, on the

---

[2] The Collateral of SVB does not include Intellectual Property, however, all Accounts and proceeds of Intellectual Property are purported to be included. The SVB Loan Documents' definition of "Collateral" states that, "[i]f judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property." The Debtor's sole Intellectual Property asset is a registered trademark. The Debtor does not have any copyright or patent related assets.

other hand, and related agreements (collectively, the "TriplePoint Loan Documents"), TriplePoint agreed to make three (3) facilities available to the Debtor with Part 1 in the principal amount of $9 million, Part 2 in the principal amount of $6 million (upon satisfaction of certain milestones and the signing of warrant agreements), and Part 3 in the principal amount of $5 million (upon satisfaction of certain milestones).  Pursuant to an agreement with TriplePoint, TriplePoint has agreed to accept the discounted sum of $7,199,624.29 to fully and finally satisfy TriplePoint's secured debt if payment is made by May 6, 2024.

28.     The TriplePoint Loan Documents grant to TriplePoint a security interest and lien upon all personal property of the Debtor to secure its obligations, and, as illustrated below, TriplePoint recorded a UCC financing statement on July 29, 2022 with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

29.     There are also Deposit Account Control Agreements ("DACAs") between TriplePoint and three (3) banking companies: (i) SVB, (ii) Evolve, and (iii) Independent Bank seeking to perfect the Debtor's cash that are maintained in accounts at these banking institutions.

30.     **Subordination Agreement between SVB and TriplePoint**. Pursuant to that certain Subordination Agreement dated July 29, 2022 between SVB and TriplePoint, TriplePoint's rights to payment and performance of the Debtor's obligations to TriplePoint, and all liens and security interests securing such obligations are subordinated to SVB's right to full payment and performance of the "Senior Debt" (generally defined as all obligations owed to SVB under the SVB Loan Documents up to the "Senior Debt Cap" and all liens and security interests securing the "Senior Debt"). The "Senior Debt Cap" is defined to include (a)(i) with respect to the aggregate principal amount of all indebtedness under the SVB Loan Documents, $6,000,000, plus (ii) with respect to "Bank Services," $250,000; plus (b) any interest, fees, charges, costs and any reimbursement obligations payable pursuant to the SVB Loan Documents. Except as authorized under the Subordination Agreement, TriplePoint agreed to not ask, demand, sue for, take or receive any monies until the Senior Debt up to the Senior Debt Cap shall have been fully paid in cash and all commitments to extend credit under the SVB

Loan Documents have been terminated. The Subordination Agreement also confirms that the liens and security interests of TriplePoint in the Debtor's property are junior and subordinated to the liens and security interests securing the Senior Debt.

31.    A general summary of all active UCC financing statements recorded against the Debtor in Delaware, the Debtor's state of incorporation, including the names of the creditors, the numbers and dates of the UCC financing statements, and the scope of their collateral ("UCC Analysis") is provided in the Declaration of Monica Y. Kim filed herewith. As set forth therein, a general summary of Ms. Kim's review of all of the active UCC-1 financing statements existing as of January 16, 2024 as to the Debtor is as follows:

| Creditor | Number and Date | Collateral |
| --- | --- | --- |
| First Citizens Bank & Trust Company, as assignee to Silicon Valley Bank | 20211367359 (filed 2/19/21) Full assignment (filed 10/5/2023) | All personal property assets |
| TriplePoint Capital LLC, as Collateral Agent | 20226374367 (filed 7/29/22) | All personal property assets |

32.    The UCC Analysis is being provided for information purposes only, and does not constitute an admission or legal opinion as to the validity, priority, or scope of any liens asserted by any creditor in this case.  As set forth in the UCC Analysis, all of the cash of all of the Debtor, may constitute the cash collateral of SVB and TriplePoint. SVB and TriplePoint shall collectively be referred to herein as the "Secured Creditors".

33.    Based on the existing liens of the Secured Creditors (which will be collectively owed approximately $8.7 million as of April 30, 2024) upon substantially all of the Debtor's personal property assets and the proceeds therefrom, all of the Debtor's post-petition revenue and income may constitute the "cash collateral" of these parties pursuant to 11 U.S.C. § 363(a).

34.    Attached hereto as **Exhibit 2** is the Debtor's 18-week cash flow forecast ("Budget") which sets forth all projected cash receipts and cash disbursements following the

Petition Date including the pre-petition Customer/Bank Obligations. The Budget was prepared by Pam Wismer of Ascent CFO Solutions ("Ascent"), who is serving as the Fractional CFO for the Debtor. Pre-petition, the Debtor engaged Ascent to receive the services of an experienced CFO, however, Ascent has advised the Debtor that it's policies and procedures prohibit their personnel (including Ms. Wismer) from providing declarations in connection with legal proceedings. Although the Budget was prepared by Ms. Wismer, it was done so under the supervision and monitoring by Sankaet Pathak, who has verified and confirmed that the information set forth in the Budget is based upon the books and records of the Debtor which are kept in the ordinary course of business, and correct.

35.    As the Budget shows, the use of the Debtor's cash collateral (as such term is defined in 11 U.S.C. § 363(a)) will be sufficient to meet the Debtor's immediate post-petition liquidity needs through April 30, 2024, the Outside Closing Date for the initial closing of the sale to the Buyer, and thereafter in connection with the wind-down of the Debtor's affairs.

36.    The Budget does contain (and the Cash Collateral Motion seeks approval to pay) the following pre-petition Customer/Bank Obligations:

- Outgoing customer rebate: The Debtor earns deposit revenue from its Partner Financial Institutions for the services that it provides to such partners, usually based on a percentage of the total deposits placed at banks through the Debtor's services (such as the federal funds rate less a certain additional basis points or percentage amount). As part of its agreements with its fintechs, the Debtor may have agreed to pass through a certain amount (*i.e.,* provide a rebate) of the deposit revenue that it receives to the fintechs since the fintechs have been responsible for originating the End Users, especially with interest rates recently on the rise and concerns that the fintechs could contract directly with the banks. Nonpayment of these rebates will result in breaches of the contracts with the fintechs as well as a breach under the APA.

37.    The Budget reflects those expenses that the Debtor must pay in order to avoid irreparable harm to its business and to this estate pending a sale of its business and to avoid

12

violating the terms of the APA. The Debtor must be able to continue to provide and acquire services, pay their employees, customers, and maintain and otherwise operate their platforms in a manner that is compliant with all applicable laws and regulations in order to continue to provide financial services and products to its customers which is the fundamental purpose of its business. Thus, the Budget includes critical and necessary expenses such as payroll and healthcare benefits to employees, payables associated with critical services needed from third parties to maintain its financial platforms, license renewals, insurance, Bank/Customer Obligations and other administrative services.

38.    By the Cash Collateral Motion, the Debtor seeks to use cash collateral pursuant to the Budget, and the Debtor shall not permit the percentage variance with respect to (a) projected receipts in each then-current Budget to exceed (i) 12.5% on an individual basis of actual receipts for a specific line item and (ii) 10% on an aggregate basis of total actual receipts, in each case, on a cumulative four-week rolling basis, and (b) projected disbursements in each then-current Budget to exceed (i) 12.5% on an individual basis of actual disbursements for a specific line item and (ii) 10% on an aggregate basis of total actual disbursements (the "Permitted Variance").

39.    In addition to all the existing security interests and liens previously granted to the Secured Creditors, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the prepetition collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Secured Creditors to permit the Debtor's use of the cash collateral as provided for in this Interim Order, the Secured Creditors are hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

(i)    continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without

limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, contract claims, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), any other choses in action, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtor, by settlement or otherwise, in respect of claims or causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "Adequate Protection Collateral"); provided, that Adequate Protection Collateral shall also include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral;

(ii)    allowed superpriority administrative expense claims in the Debtor's bankruptcy case and any successor cases (the "Adequate Protection Superpriority Claim") with priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified

14

in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

40.     Attached hereto as **Exhibit 1** is the proposed interim order ("<u>Interim Order</u>") granting the Cash Collateral Motion. The Interim Order was negotiated with, and the Debtor believes has been agreed to by, the Secured Creditors. The Debtor also seeks to include in the Interim Order an instruction and order to all banks holding or in possession of the Debtor's funds to immediately release such funds to the Debtor to enable the Debtor to transfer and deposit such funds into its debtor in possession bank accounts at SVB irrespective of any pre-petition agreements, including, without limitation, any deposit account control agreements.

41.     For all of the reasons set forth herein, the Debtor submits that the immediate granting of all of the relief sought herein is warranted. Use of cash collateral is appropriate under the circumstances. In addition to the Adequate Protection Obligations, the Secured Creditors (which will be collectively owed approximately $8.7 million as of April 30, 2024) are further adequately protected by the ongoing operations of the Debtor's business, and an equity cushion of approximately 35% afforded by the value of the Debtor's assets (which is no less than $11.7 million) which secure the claims of the Secured Creditors as evidenced by the Debtor's cash on hand as of the Petition Date and the Buyer's offer to purchase substantially all of the Debtor's assets. Moreover, at the Initial Closing, which is to occur by not later than April 30, 2024, all of the Debtor's indebtedness owed to the Secured Creditors will be paid and satisfied.

## CASH MANAGEMENT MOTION

42.     As of the Petition Date, the Debtor collected revenue, disbursed funds and managed customer and Partner Financial Institution relationships and programs utilizing a network of bank accounts and other accounts at numerous depositories, as described below.

### The Debtor's Operating Bank Accounts

43.     From the Debtor's perspective, the only accounts that the Debtor would ordinarily be required to close immediately after the Petition Date and replace with "debtor in

possession" accounts at approved depositories are a handful of bank accounts that the Debtor uses to deposit revenue and make disbursements in the ordinary course of business.  These bank accounts are the following:

| Financial Institution | Account Number | Account Description | Proposed Disposition |
|---|---|---|---|
| First Horizon Bank | X33074 | Savings | Close and transfer any funds to a debtor in possession operating account |
| iBank | x60012 | Business Checking – primarily used to fund operating expenses | Keep for a thirty (30) day period of time |
| iBank | X0495 | Small Business Checking – primarily used to fund payroll expenses | Keep for a thirty (30) day period of time |
| Evolve Bank and Trust | X42341 | Savings | Close and transfer any funds into a debtor in possession operating account |
| Silicon Valley Bank | x5986 | Operating Checking | Convert into a debtor in possession account, per the Debtor's agreement with Silicon Valley Bank |
| Silicon Valley Bank | x9909 | Accounts Payable and Payroll Checking | Convert into a debtor in possession account, per the Debtor's agreement with Silicon Valley Bank |
| Silicon Valley Bank | x9886 | Interchange account | Convert into a debtor in possession account, per the Debtor's agreement with Silicon Valley Bank |
| Silicon Valley Bank | x9890 | Billing Collection Checking | Convert into a debtor in possession account, per the Debtor's agreement with Silicon Valley Bank |

44.    The Debtor requests authority to maintain the two iBank accounts for a temporary period of time following the Petition Date in order to minimize disruption to the Debtor's ability to conduct business post-petition, including to ensure that it is able to pay its post-petition payroll obligations.    Immediately after the Petition Date, the Debtor will commence the process of opening new debtor in possession accounts (by converting its Silicon Valley Bank accounts into debtor in possession accounts which I understand Silicon Valley Bank will do) and will ultimately transition operating and disbursement activities to its debtor in possession accounts, into which the Debtor will ultimately deposit revenue and from which the Debtor will ultimately make disbursements.

**Accounts Partner Financial Institutions**

45.    Separate and apart from the above bank accounts, the Debtor also has an interest in, access to, or some control over certain other accounts held at Partner Financial Institutions. The Debtor's provision of services to Partner Financial Institutions are pursuant to agreements between the Debtor (and/or the Debtor's subsidiaries) and the Partner Financial Institutions, including, without limitation, Evolve Bank and Trust ("Evolve"), Lineage Bank ("Lineage"), AMG National Trust Bank ("AMG") and American Bank ("AB").   The Debtor also provides access to other financial services through its wholly-owned subsidiaries.   Cash management services are provided through the Debtor's broker dealer subsidiary, who has indirect agreements with other financial institutions through its sweep network.   In addition, the Debtor provides lending services through its lender subsidiary, which holds state lending licenses.

46.    The Debtor's software, among other things, provides financial technology companies (the Debtor's customers), and ultimately end-users the ability to access financial products offered by the Partner Financial Institutions via a single platform (the Synapse platform) such that the Debtor's customers, and, ultimately, end-users are able to access different financial institutions' products and, in theory, are not susceptible to the success or failure of a single financial institution.

47.     The Debtor generates revenue from these arrangements in the form of fees, interest and other charges, and the Debtor's provision of such services are pursuant to agreements between the Debtor and the Partner Financial Institutions.

48.     Therefore, the Debtor's agreements with Partner Financial Institutions, including its subsidiaries, require or provide for the establishment of certain accounts, including, without limitation reserve accounts, fee and revenue accounts and other accounts in connection with the program services provided by the Debtor to the Partner Financial Institutions, the Debtor's customers (fintechs) and end-users.   These fee and revenue accounts, in particular, include technological integrations with third-party providers and fintechs for the receipt of revenue and payment of fees and costs. Therefore, these accounts are required to be maintained by the Debtor as ancillary and necessary to its provision of services. For example, the Debtor maintains certain deposit accounts at the Partner Financial Institutions which are used to receive fees and compensation from Partner Financial Institutions and other third-parties and to also make payments of certain fees and compensation due and owing to fintechs and/or end users.

49.     In addition, certain accounts required to provide services to fintechs and end users, which are maintained at Partner Financial Institutions, are not owned or controlled by the Debtor and the Debtor has no interest in such accounts; rather, they are controlled by the respective financial institutions at which the accounts are held.   An example of such accounts are omnibus custodial accounts owned by Partner Financial Institutions, in which the Partner Financial Institution pools the funds held by end users, for their benefit (or in the case of a fintech, for the benefit of a fintech's end users) and the funds thereon, are not owned or controlled by the Debtor.

50.     At this time, to the extent the Debtor has any control over or ability to close any such accounts with its Partner Financial Institutions, the Debtor does not intend to close any such accounts, and to the extent Court authority is required to continue to maintain such accounts with its Partner Financial Institutions, the Debtor requests Court authority to do so.  In particular, the Debtor desires to ensure that there is no disruption to end-users' ability to access their funds (which are not funds that belong to the Debtor) and that there is no disruption to the

flow of revenue to the Debtor in connection with interest, fees and charges to which the Debtor is entitled. Additionally, the Debtor is conducting a sale process and has a stalking horse bidder, and the Debtor's maintenance and continued administration of accounts with its Partner Financial Institutions in accordance with the Debtor's agreements with such Partner Financial Institutions may be a critical component of a sale of the Debtor's assets and an important condition of purchase by any buyer, including the Debtor's stalking horse bidder. Indeed, the Debtor's asset purchase agreement with the stalking horse bidder requires the Debtor to, pending approval of the sale, operate and conduct the Debtor's business in the ordinary course, consistent with past practices. Moreover, the asset purchase agreement includes or may include certain bank accounts designated as "Purchased Assets."

51.    As described above, the Debtor will open debtor in possession accounts (the Debtor contemplates opening a debtor in possession operating account and a debtor in possession payroll account) into which revenue received by the Debtor will ultimately be deposited and disbursements made by the Debtor to pay its post-petition expenses and any other expenses approved by the Court will be originated.

52.    The relief requested in the Cash Management Motion will help ensure the Debtor's smooth transition into chapter 11 and avoid any interruption or disruption in the Debtor's ability to provide services to its customers, Partner Financial Institutions and end-users, continue to generate and collect revenue for the benefit of the estate and preserve and maintain operations and activities to help ensure a successful sale process.

## PAYROLL MOTION

53.    As of the Petition Date, the Debtor had approximately 78 employees in the United States. The Debtor also engages approximately 18 personnel outside of the United States, but these personnel are engaged through a third-party employer service. With respect to any prepetition claims proposed to be paid or honored, this Motion pertains only to the Debtor's employees in the United States who are not insiders (the "Employees").

54.    All Employees, including those that provide services to one or both of the Debtor's wholly-owned subsidiaries are employed directly by the Debtor. All Employees are

compensated by the Debtor.  With respect to any post-petition compensation for any insider of the Debtor, the Debtor will file and serve a Notice of Insider Compensation in accordance with applicable rules.

55.     Payments to the Debtor's Employees are primarily on a salaried or hourly basis. The Employees are primarily paid via a payroll service that the Debtor contracts with and utilizes – Rippling People Center Inc. ("Rippling") – which provides employee payroll and human resources services and solutions to the Debtor.  All Employees, including those that provide services to one or both of the Debtor's wholly-owned subsidiaries are employed directly by the Debtor.  All Employees are compensated by the Debtor.  Some Employees participate in certain of the Debtor's benefits programs, which include health, vision, dental, disability and life insurance, a 401k plan pursuant to which the Debtor matches up to 4% of an Employee's contributions, and a flexible healthcare spending plan.  There are approximately 56 - 64 Employees (not including insiders) covered by the Debtor's employee benefit plans.  Six Employees do not participate in benefits, but still receive life and disability insurance benefits. Fourteen Employees are not participating in the Debtor's 401k plan.    The Debtor's employee benefits plans for 2024 are all described in the Benefits Guide attached as **Exhibit 3** to this Declaration.

56.     In the normal course of its relationship with Rippling, the Debtor transfers to Rippling the funds necessary for the payment of Employer Obligations by the payroll date and remits all withheld amounts and payroll taxes.

**The Pre-Petition Payroll Period of March 31, 2024 – April 13, 2024**

57.     The Debtor is generally current with its payroll obligations to Employees, and Employees have been paid their wages current through April 13, 2024, provided, however, that for the payroll period of March 31, 2024 through April 13, 2024, the entirety of which is a pre-petition period (but well within the 180 day period prior to the Petition Date), health insurance and life insurance benefits of the Employees, respectively, totaling $120,540 and $11,118, respectively, may have not been fully funded and such benefits are ordinarily funded approximately one week after the payroll date of April 13, 2024.  As and to the extent not

already funded, the Debtor requests authority to honor such obligations. In order to ensure there is no interruption in the funding of these benefits to Employees, the Debtor requests that the Court hear the Payroll Motion on an emergency basis.

**The Payroll Period of April 14, 2024 – April 27, 2024, only a Portion of Which Constitutes a Pre-petition Period.**

58.     On April 26, 2024, the Debtor will pay Employer Obligations to its Employees for the period from April 14, 2024 through and including April 27, 2024, a portion of which (approximately 5 days) constitutes pre-petition obligations. The Debtor estimates that the total Employer Obligations due to its non-insider employees on April 26, 2024, including all payroll taxes and insurance obligations will be approximately $425,784 (approximately less than half of which is pre-petition), not including the Debtor's contributions to employee benefit plans.

59.     The Debtor estimates that its total contribution to employee insurance benefit plans for the payroll period from April 13, 2024 through and including April 27, 2024 is approximately $131,658, of which approximately $65,829, would be for the prepetition period.

60.     The Debtor estimates that the total amount of 401k match obligations of the Debtor pertaining to the payroll period of April 14, 2024 – April 27, 2024 date is approximately $12,137, of which approximately $6,069 would be for the prepetition period.

61.     Pursuant to the Payroll Motion, the Debtor requests authority to honor these obligations to its Employees.

**Timing of Payroll and Benefits Funding**

62.     Rippling typically obtains the funds from the Debtor to pay the Employer Obligations at least two (2) days prior to disbursements to Employees, and with respect to certain contributions to the Debtor such as for the Debtor's 401k match (up to 4%), Rippling obtains such funds within approximately one week after the payroll pay date. The Debtor therefore requests expedited relief to ensure that it is able to timely fund all of its payroll obligations to the Employees. Additionally, the Debtor requests expedited relief to ensure that its Employees, many of which will be learning of the Debtor's bankruptcy filing now, may be provided assurance that the Debtor has taken immediate action to ensure that the Debtor is able

to honor its Employer Obligations to the Employees and that there will not be disruption to the ordinary course payment of the Employer Obligations.

63.     The source of the funds to be used to pay and/or honor the Employer Obligations will be the Debtor's cash, which constitutes the cash collateral of Silicon Valley Bank and Triple Point Capital.

64.     Attached as **Exhibit 4** to this Declaration is an analysis of the Debtor's anticipated Employer Obligations for the period from April 14, 2024 through and including April 27, 2024 (Exhibit 4a).  Included in **Exhibit 4** is an analysis of the statutorily capped payroll amounts proposed to be paid/honored (Exhibit 4b).

65.     The Debtor has brought the Payroll Motion to (i) minimize the personal financial hardship that all of the Employees will suffer if the Employee Obligations are not immediately paid/honored by the Debtor; (ii) avoid the unnecessary delay in the payment of such priority claims, which delay will negatively impact and interfere with the administration of the Debtor's chapter 11 bankruptcy case; (iii) avoid the unfair and unintended consequences to the Employees of the timing of the Debtor's bankruptcy filing and to ensure that additional claims do not arise against the Debtor as a result of the Debtor's failure to pay the Employer Obligations; and (iv) ensure that there is no disruption to or jeopardization of the Debtor's sale efforts or any diminishment in the value of the Debtor's assets and business as a result of Employee attrition caused by an inability to honor the Employer Obligations.

66.     The Debtor requires the services of the Employees to continue to operate, and would like to ensure that its Employees remain incentivized and willing to work for the Debtor post-petition during the Debtor's expedited sale process.  It is crucial for the Debtor to retain at this time the Employees to operate the business, particularly during this crucial beginning phase of the Debtor's bankruptcy case where additional administrative and other obligations are imposed upon the Debtors, and also in connection with the sale process involving a stalking horse bidder and an executed Asset Purchase Agreement that contains various provisions requiring the continued operation of the Debtor and the avoidance of any material adverse changes to the Debtor's operations. If the Debtor does not continue to pay the Employees their

22

ordinary and earned compensation and continue to honor employee benefits, the Employees may quit.  Without the Employees, the Debtor's business will be severely impaired, if not eviscerated altogether.  Without a functioning business, the Debtor's goal in this case of selling its assets for the highest and best price will be severely harmed.

67.    All of the Employees are current Employees, and are anticipated to continue to work for the Debtor post-petition.

68.    Employees will quit and the Debtor's business will be severely disrupted if the Debtor does not honor the Employer Obligations immediately.  Retention of its Employees is crucial to (i) the Debtor's continued operations without interruptions, (ii) preserve and maximize the value of the Debtors' assets, (iii) ensure compliance with the terms of the Debtor's asset purchase agreement with the proposed stalking horse bidder; and (iv) maximize recoveries for the Debtor's creditors.

69.    The Debtor has an executed stalking horse asset purchase agreement and a proposed sale process and believes that it will be able to conduct a successful sale of its assets within an expedited timeframe, but in order to do so and generate the most money possible, the Debtor requires the continued services of its Employees while the Debtor conducts a sale process.

70.    The Debtor is not requesting authority to pay any pre-petition claims of any insiders.

71.    None of the Employees shall receive more than the applicable statutory limit on account of their pre-petition priority claims.  Furthermore, based on the information currently available and analysis to date, I anticipate that all priority claims will get paid in full in this case such that payment of the Employer Obligations to the employees is simply a matter of timing.

72.    Based on the information currently available and analysis to date, including the Debtor's asset purchase agreement, I do not believe payment of the Employer Obligations will render this bankruptcy estate administratively insolvent.  As indicated in the cash collateral budget addressed in the concurrently filed emergency cash collateral motion, the Debtor has sufficient funds available to pay the Employer Obligations.

73.     A portion of the Employer Obligations constitute payroll taxes, which are required to be withheld from earnings and paid to taxing agencies.  If the Debtor does not remit those amounts, the employees may face legal action, and the Debtor may be burdened by inquiries and disputes concerning the Debtor's failure to submit legally required payments and potentially penalties and interest to the various taxing agencies.

**BIDDING PROCEDURES MOTION**

74.     Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Spring of 2022, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital. The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and engaged Jefferies LLC to assist the Debtor with conducting a marketing process for the sale of the Debtor as a going concern.  The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Tabapay/its designee ("Buyer" and the "Stalking Horse Bidder").  Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

75.     On April 19, 2024, the Debtor and Buyer executed the Asset Purchase Agreement attached as **Exhibit 9** to this Declaration pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure obligations associated with the assumed leases and contracts. The sale to Buyer is subject to an expedited overbid process though I do not anticipate that there will be any overbids given the

extensive marketing and sale process already conducted which has not generated any better offers.

76.     The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000.00 Purchase Price will be paid in cash; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

77.     A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code.  A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code.  The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids.  However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures proposed herein.  The Debtor proposes a bid deadline of April 28, 2024, an auction and sale hearing on April 29, 2024, the entry of a sale order by no later than April 29, 2024, and a closing by no later than April 30, 2024.

25

78.     To maximize recoveries to creditors in this case by minimizing cash usage and losses pending the closing of a sale, and given the marketing process which commenced well in advance of the filing of this case, an emergency hearing on the Bid Procedures Motion is necessary in order for the Debtor to obtain immediate Court approval of and immediately publicize to prospective overbidders the terms and conditions under which they may submit overbids and participate in the auction process.  The Debtor's Cash Collateral Motion and budget describe the Debtor's current cash position and proposed cash usage during the following approximate two-three weeks.  A sale closing (the Initial Closing) by no later than April 30, 2024 would result in the payment of all of the Debtor's allowed secured debt in full with additional cash remaining in the estate for the benefit of creditors.  The sooner the Debtor is able to close its sale of its assets, the more cash the Debtor believes it will have at closing.  Given the Debtor's projected weekly cash usage and losses, extending the sale process would increase costs to this estate without materially enhancing any potential for additional benefits from an extended sale process or closing date.  A sale process that extends beyond April 30, 2024 is highly unlikely to result in any net benefit to the estate all things considered, including, without limitation as a result of the incurrence of additional operating expenses.  I do not expect there to be any higher or better offer for the Debtor's assets, or any alternative offer at all, given that the Debtor already conducted a marketing and sale process, identified the highest and best bid, heavily negotiated with Buyer over the course of many months during which time both the Debtor and Buyer invested significant time and resources in reaching a mutually acceptable APA and sale terms, with any alternative buyer having the ability during all of that time to engage the Debtor in an alternative, higher and better, transaction.

79.     Buyer was only willing to proceed with its purchase of the Purchased Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but Buyer has agreed that the Debtor can and should market Buyer's offer for overbid to ensure that the highest and best offer is made for the Debtor's assets/business in the unlikely event that there is an alternative buyer available.

26

80.     The timing of the sale process is critical.  Buyer has conditioned its offer on the Debtor obtaining an entered Bidding Procedures Order by April 24, 2024, and the Debtor obtaining an entered order of the Court by April 29, 2024 approving the sale by the Debtor to Buyer or a bidder with a higher and better offer.

81.     Buyer is uniquely situated in regard to the Debtor's assets, that the prospects for any overbid to Buyer's offer are remote, and that the consideration offered by Buyer is very likely to be the highest and best offer.

82.     The proposed Bidding Procedures and bid protections which the Debtor negotiated with the Stalking Horse Bidder and which the Debtor is requesting the Court to approve are attached to the proposed Bidding Procedures Order which is attached as **Exhibit 5** to this Declaration.

83.     Attached as **Exhibit 6** to this Declaration is the Debtor's proposed form of notice to creditors of the Debtor and its non-debtor subsidiaries, prospective overbidders and other parties in interest ("Proposed Sale Notice"), and attached as **Exhibit 7** to this Declaration is the Debtor's proposed form of notice to non-debtor counterparties (including non-debtor subsidiaries if applicable) under executory contracts and unexpired leases regarding the possible assumption and assignment thereof ("Proposed Assignment Notice").

84.     The proposed auction and bidding procedures outlined are designed to enable the Debtor's estate to obtain the highest price possible for the Purchased Assets (including after taking into account execution risk) and provide the greatest possible recovery for the Debtor's creditors. The sale process conducted by the Debtor was and continues to be thorough and adequate to obtain the highest and best offer for the Purchased Assets, subject to the opportunity for others to participate in accord with the proposed Bidding Procedures.

85.     The proposed Stalking Horse Bidder Fee is reasonable given the amount of the proposed purchase price and the complexity of the transaction.  I am informed that the Stalking Horse Bidder has expended substantial time and resources with respect to the formulation of its offer, negotiations with the Debtor (including with respect to complex inter-company and inter-bank program reconciliations and multiple regulatory and other third-party approvals in

connection with the acquisition of the equity of S Credit and S Brokerage), and due diligence with respect to the proposed transaction.

86.    I strongly believe that proceeding with an auction sale of the Purchased Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of this estate and will result in the highest price possible being paid for the Purchased Assets.  All of the prospective bidders, including Buyer, would understandably only be willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee.  Without giving such benefits to a stalking horse bidder, there would have been no way for the Debtor to obtain a viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder.  Buyer would never have been willing to serve as the stalking horse bidder without the various protections that are being afforded to Buyer, particularly given the complexity of the transaction (including various inter-company and inter-bank program reconciliations and a three-step closing upon obtaining various regulatory and other third-party approvals with respect to the proposed changes in control of S Credit and S Brokerage).

### **SALE MOTION**

87.    A proposed form of Sale Order is attached as **Exhibit 8** to this Declaration.

88.    Salient terms of the APA (attached as **Exhibit 9** to this Declaration) include:

    a.  The Purchased Assets do not include cash and cash equivalents or avoidance actions and certain other claims and causes of action, among other Excluded Assets.

    b.  Buyer will assume and pay when due all Cure Costs owned to counter-parties to Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases.

    c.  The Purchase Price shall be used to pay the allowed/agreed upon secured claim of SVB and the TriplePoint Indebtedness in the agreed upon fixed payoff amount of $7,199,624.29, and any remaining balance of the Purchase Price shall be used by the Debtor as approved by the Bankruptcy Court.

28

d.  The sale of the Purchased Assets is on an "As Is, Where Is" and "With All Faults" basis.

e.  The obligation of Buyer to consummate its purchase of the Purchased Assets at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, at or prior to the Initial Closing, the BD Closing or Final Closing as applicable, of a number of conditions precedent (some of which are described above with respect to the Initial Closing), set forth in Section 8.1 of the APA (in the case of the Initial Closing), Section 8.2 (in the case of the BD Closing), and Section 8.3 (in the case of the Final Closing).

f.  The APA may be terminated at any time prior to the Initial Closing Date by written notice by the terminating Party to the other Party only as set forth in Article XI.1 of the APA.

g.  The obligations of the parties to effect the BD Closing under the APA may be terminated at any time following the Initial Closing Date but prior to the BD Closing Date, without any change to the Initial Closing or the assumption of the Assumed Obligations assumed as of the Initial Closing only as set forth in Article XI.2 of the APA.

h.  The obligations of the parties to effect the Final Closing under the APA may be terminated at any time following the Initial Closing Date by prior to the Final Closing Date, without any change to the Initial Closing, the BD Closing or the assumption of the Assumed Obligations as of the Initial Closing or the BD Closing only as set forth in Article XI.3 of the APA.

89.  Buyer intends to hire employees of the Debtor, including, without limitation, insiders and officers of the Debtor, and Buyer has engaged in discussions and negotiations with employees of the Debtor, including, without limitation, insiders and officers of the Debtor.

90.  A condition to the proposed sale to Buyer is the entry of an order pursuant to sections 363(b), (f) and (m) and sections 365(b) and (f) of the Bankruptcy Code (the "Sale

29

Order"). Buyer has required that the Sale Order explicitly provide that the sale of the Purchased Assets to Buyer is free and clear of any and all claims or potential claims related to Evolve Settlement and any and all related funds transfers or other transactions provided for in the Evolve Settlement.

91. The proposed sale is subject to overbids but the Debtor does not expect to receive any overbids. However, in the unlikely event that another potential buyer materializes, such a potential buyer will have an opportunity to acquire the Debtor's assets in accordance with the Bidding Procedures proposed by the Debtor as and to the extent approved by the Court.

92. The Debtor, confronted with financial and operational challenges, sought capital infusions starting around Spring of 2022, including by engaging an investment banker (which was ultimately unsuccessful). In the Fall of 2023, the Debtor also explored the sale of the Debtor as a going concern, and engaged Sherwood Partners, Inc.as its financial advisors to assist generally with its financial affairs as well as to evaluate all of its options and began soliciting offers for the sale of the Debtor. Marketing by William Blair produced several proposals, however, around December 2023, the Debtor determined that it needed to replace William Blair, which it did so by engaging Jefferies LLC as the Debtor's investment banker. The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Buyer.

///

///

///

///

///

///

///

///

///

93.    Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations, due diligence activities and the preparation of transaction documents including the APA.  The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.  The Debtor continues to lose money and absent a sale in the very near future, the Debtor will eventually run out of money to operate, would lose employees, and ultimately be forced to shut down its business.  The Debtor believes that if there was a shutdown of its business with a resulting liquidation, it would be a disastrous result for creditors.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21st day of April 2024.

_____
SANKAET PATHAK

# EXHIBIT "1"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com

Proposed Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

In re:

SYNAPSE FINANCIAL TECHNOLOGIES, INC.,

    Debtor and Debtor in Possession.

) Case No.: 1:24-bk-10646-MB
)
) Chapter 11
)
)
) **INTERIM ORDER: (I) AUTHORIZING**
) **THE    DEBTOR    TO    USE    CASH**
) **COLLATERAL    (II)    GRANTING**
) **ADEQUATE    PROTECTION;    (III)**
) **SCHEDULING  A  FINAL  HEARING;**
) **AND    (IV)    GRANTING    RELATED**
) **RELIEF**
)
) Date:    April 24, 2024
) Time:    2:00 p.m.
) Place:    Courtroom 303
)         21041 Burbank Boulevard
)         Woodland Hills, CA 91367
)
)
)
)
)
)
)
)
)

      An interim hearing ("Interim Hearing") was held on April 24, 2024, at 2:00 p.m. before the Honorable Martin R. Barash in Courtroom 303 located at 21041 Burbank Blvd., Woodland Hills, CA 91367, for the Court to consider the motion ("Motion") brought on an emergency basis by Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor"), pursuant to Local Bankruptcy Rules

1

2081-1 and 9075-1, 11 U.S.C. §§ 105(a), 361, 363, 549, and 1108 and Rule 6003 of the Federal Rules of Bankruptcy Procedure, for the entry of an interim order ("Interim Order") and for the entry of a final order ("Final Order" and with the Interim Order, the "Financing Orders") following a final hearing, which provide for, among other things:

(a)      authorization for the Debtor's use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), in accordance with the Debtor's 18-week cash flow forecast ("Budget") which sets forth all projected cash receipts and cash disbursements following the Petition Date including the honoring of certain pre-petition obligations to customers and banking partners in the ordinary course of its business, subject to the Budget Variances (as defined below), attached as **Exhibit 2** to the Omnibus Declaration of Sankaet Pathak filed in support of the Motion, and all future budgets, and in accordance with the terms and conditions set forth in the Financing Orders, as applicable;

(b)      in addition to all the existing security interests and liens previously granted to Silicon Valley Bank, a division of First-Citizens Bank & Trust Company (successor by purchase to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bridge Bank, N.A. (as successor to Silicon Valley Bank)) ("SVB"), and TriplePoint Capital LLC ("TriplePoint" and with SVB, collectively, the "Secured Creditors"), as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the prepetition collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Secured Creditors to permit the Debtor's use of the cash collateral as provided for in this Interim Order, the Secured Creditors are hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

(i)      continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any

2

investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, contract claims, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), any other choses in action, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtor, by settlement or otherwise, in respect of claims or causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "Adequate Protection Collateral"); provided, that Adequate Protection Collateral shall also include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral;

(ii) allowed superpriority administrative expense claims in the Debtor's bankruptcy case and any successor cases (the "Adequate Protection Superpriority Claim") with priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code;

3

(c)    authorizing the Debtor to honor certain pre-petition obligations to customers and banking partners which are due in the ordinary course of business, as reflected in the Budget, subject to the Budget Variances;

(d)    instructing and ordering all banks holding or in possession of the Debtor's funds to immediately release such funds to the Debtor to enable the Debtor to transfer and deposit such funds into its debtor in possession bank accounts at SVB irrespective of any pre-petition agreements, including, without limitation, any deposit account control agreements[1];

(e)    pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order;

(f)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(g)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

The Court having considered the Motion, the Omnibus Declaration of Sankaek Pathak ("Omnibus Declaration"), the Declaration of Monica Y. Kim, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the Interim Hearing; and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtor, its estate and its creditors, and is essential for the preservation of the value of the Debtor's assets; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled

---

[1] Concurrently herewith, the Debtor has also filed an emergency motion seeking relief with respect to their pre-petition cash management system.

1 by the Court; and after due deliberation and consideration, and good and sufficient cause

2 appearing therefor:

3

4    **IT IS FOUND AND DETERMINED THAT:**[3]

5    A.    **Commencement of Chapter 11 Case**.  On April 22, 2024 (the "Petition Date"),

6 the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with this Court.

7 The Debtor is continuing to operate its business as a debtor and debtor in possession under sections

8 1107 and 1108 of the Bankruptcy Code.

9    B.    **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings,

10 pursuant to 28 U.S.C. §§ 157(b) and 1334 and General Order No. 13-05 from the United States

11 District Court for the Central District of California, and over the persons and property affected

12 hereby.  Venue for the Debtor's bankruptcy case and proceedings on the Motion is proper in this

13 District pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core

14 proceeding under 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article

15 III of the United States Constitution.

16    C.    **Notice**.  Notice of the Interim Hearing and the Motion has been provided by the

17 Debtor to (i) the U.S. Trustee for the Central District of California (the "UST"), (ii) the Internal

18 Revenue Service, (iii) the Debtor's twenty (20) largest unsecured creditors (excluding insiders),

19 (iv) counsel to the Secured Creditors, and (v) all other known holders of prepetition liens,

20 encumbrances or security interests against the Debtor's property, and (vi) any party that has

21 requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the

22 Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with

23 section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (d), and the

24 Local Bankruptcy Rules.

25

26 ────────────────

27    [3]    The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

28 the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5

ny-2678585

D.    **Debtor's Stipulations.**    After consultation with its attorneys, and without prejudice to the rights of parties-in-interest as set forth in paragraph 15 herein, the Debtor, on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees as follows:

(i)    **SVB Secured Loan**.  As of the Petition Date, pursuant to that certain *Loan and Security Agreement*, dated as of February 19, 2021 among the Debtor and SVB (as amended, supplemented, or otherwise modified, the "SVB Loan Agreement" and, together with all other agreements, documents and instruments executed and/or delivered in connection therewith, as all of the same have been amended, supplemented, or otherwise modified at any time prior to the Petition Date, the "SVB Loan Documents"), the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, to SVB in the aggregate principal amount of not less than $1,513,472.83 (the "SVB Facility").  All obligations of the Debtor arising under the SVB Loan Agreement or any other SVB Loan Documents, including under the SVB Facility, shall hereinafter be referred to collectively as the "SVB Loan Obligations".

(ii)    **SVB Liens**.  As set forth more fully in the SVB Loan Agreement and the Motion, prior to the Petition Date, to secure the SVB Loan Obligations, the Debtor granted to SVB first priority liens (the "SVB Liens") on substantially all of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, products and proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit (collectively, the "SVB Collateral").

(iii)    **SVB Additional Stipulations**.  The Debtor acknowledges that as of the Petition Date, (a) the SVB Liens on the SVB Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, SVB for fair consideration and reasonably equivalent value, (b) the SVB Liens were senior in priority over any and all other liens on the SVB Collateral, subject only to certain liens senior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), or otherwise permitted by the SVB Loan Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the SVB Liens as of the Petition Date), (c) the SVB Loan Obligations constitute legal, valid,

6

binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the SVB Loan Agreement, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the SVB Liens or SVB Loan Obligations exist, and no portion of the SVB Liens or SVB Loan Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against SVB or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the SVB Facility, (f) the Debtor has waived, discharged, and released any right to challenge any of the SVB Loan Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the SVB Loan Obligations, and (g) the SVB Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(iv)    **TPC Secured Loan.**  As of the Petition Date, pursuant to that certain *Plain English Growth Capital Loan and Security Agreement*, dated on or about July 29, 2022 among Borrower and TriplePoint Capital LLC ("TPC") (as amended, supplemented, or otherwise modified, the "TPC Loan Agreement" and, together with all other agreements, documents and instruments executed and/or delivered in connection therewith, as all of the same have been amended, supplemented, or otherwise modified at any time prior to the Petition Date, the "TPC Loan Documents"), the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, to TPC in the aggregate amount of not less than $6,722,496.81 (the "TPC Facility"). All obligations of the Debtor arising under the TPC Loan Agreement or any other TPC Loan Documents, including under the TPC Facility, shall hereinafter be referred to collectively as the "TPC Loan Obligations".

(v)    **TPC Liens**.  As set forth more fully in the TPC Loan Agreement and the Motion, prior to the Petition Date, to secure the TPC Loan Obligations, the Debtor granted to TPC

first priority liens (the "TPC Liens"), subject to the SVB Liens, on substantially all of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, products and proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit (collectively, the "TPC Collateral").

(vi)    **TPC Additional Stipulations**.  The Debtor acknowledges that as of the Petition Date, (a) the TPC Liens on the TPC Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, TPC for fair consideration and reasonably equivalent value, (b) the TPC Liens were senior in priority over any and all other liens on the TPC Collateral, subject only to the SVB Liens and certain other liens senior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the TPC Loan Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the TPC Liens as of the Petition Date), (c) the TPC Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the TPC Loan Agreement, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the TPC Liens or TPC Loan Obligations exist, and no portion of the TPC Liens or TPC Loan Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of TPC or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the TPC Facility, (f) the Debtor has waived, discharged, and released any right to challenge any of the TPC Loan Obligations, the priority of the Debtor' obligations thereunder, and the validity, extent, and priority of the liens securing the TPC Loan Obligations, and (g) the TPC Loan Obligations

8

1  constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy

2  Code.

3              (vii)      **Subordination Agreement**.  That certain *Subordination Agreement*, dated

4  as of July 29, 2022 between SVB and TPC (as amended, modified, and in effect from time to

5  time, the "Subordination Agreement"), which governs, among other things, the relative priorities

6  of the SVB Liens and the TPC Liens (the "Prepetition Liens") in respect of the SVB Collateral

7  and the TPC Collateral (the "Prepetition Collateral") is binding and enforceable against the Debtor

8  and the Secured Creditors in accordance with its terms, and the Debtor and the Secured Creditors

9  are not entitled to take any action that would be contrary to the provisions thereof.

10  Notwithstanding anything to the contrary contained in this Interim Order, any right that may be

11  exercised, or action taken, by a Prepetition Lender under the terms of this Interim Order shall be

12  expressly subject to the terms of the Subordination Agreement and shall not be taken by the

13  Prepetition Lender if such exercise or action would violate the terms of the Subordination

14  Agreement.

15              (viii)      **No Claims**.  The Debtor has no valid claims (as such term is defined in

16  section 101(5) of the Bankruptcy Code) or causes of action against the Secured Creditors with

17  respect to the SVB Loan Documents or the TPC Loan Documents (together, the "Prepetition Loan

18  Documents"), the SVB Loan Obligations or the TPC Loan Obligations (together, the "Prepetition

19  Loan Obligations"), the SVB Facility or the TPC Facility (together, the "Prepetition Facilities"),

20  the Prepetition Liens, any prior financing transactions, or otherwise, whether arising at law or at

21  equity, including, without limitation, any challenge, recharacterization, subordination, avoidance,

22  or other claims arising under or pursuant to sections 105, 510, 541, or 542 through 553, inclusive,

23  of the Bankruptcy Code.

24              (ix)      **Release**.  The Debtor, for itself and on behalf of its successors, assigns,

25  agents, attorneys, officers, directors, partners, relatives, executors, administrators, shareholders,

26  subsidiaries, other affiliates and representatives (in their representative capacities, the foregoing

27  individuals and entities herein referred to as the "**Releasors**"), hereby stipulates and agree that

28  they forever, unconditionally and irrevocably release, discharge and acquit the Secured Creditors

9

ny-2678585

1  and each of their respective predecessors, successors, assigns, affiliates, subsidiaries, parents,

2  officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and

3  their respective heirs, predecessors, successors, and assigns (collectively, the "Releasees") of and

4  from any and all claims, controversies, disputes, liabilities, obligations, demands, damages,

5  expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and

6  causes of action of any and every kind whatsoever, whether arising in law or otherwise, and

7  whether or not known or matured, arising out of or relating to, as applicable, the Prepetition

8  Facilities, the Prepetition Loan Documents, and/or the transactions contemplated hereunder or

9  thereunder including, without limitation, (x) any so-called "lender liability" or equitable

10  subordination claims or defenses, (y) any and all claims and causes of action arising under the

11  Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity,

12  priority, perfection, or avoidability of the liens or claims of the Secured Creditors.  The Debtor,

13  on behalf of itself and the Releasors, further waive and release any defense, right of counterclaim,

14  right of set-off, or deduction to the payment of the Prepetition Loan Obligations which the Debtor

15  now has or may claim to have, directly or indirectly against the Releasees, arising out of,

16  connected with or relating to any and all acts, omissions, or events occurring prior to the Court

17  entering this Interim Order.  The Debtor acknowledges that it is its intention, on behalf of itself

18  and the Releasors, to effect a general release as provided in California Civil Code § 1542, and the

19  Debtor specifically waives the protections of California Civil Code § 1542, which reads as

20  follows:

21              **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS**

22              **THAT THE CREDITOR OR RELEASING PARTY DOES**

23              **NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER**

24              **FAVOR AT THE TIME OF EXECUTING THE RELEASE**

25              **AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE**

26              **MATERIALLY AFFECTED HIS OR HER SETTLEMENT**

27              **WITH THE DEBTOR OR RELEASED PARTY.**

28

ny-2678585

The Debtor, on behalf of itself and the Releasors, expressly waives and releases any right or benefit which it or they might now or in the future have under California Civil Code § 1542 (or any other laws of similar effect) to the fullest extent that such rights or benefits may be lawfully waived and released.  The Debtor, on behalf of itself and the Releasors, acknowledges that it may hereafter discover facts different from the facts now known or believed by the Debtor and/or the Releasors to be true with respect to the matters covered by this release, and agrees that this release nevertheless will be binding on the Debtor and the Releasors and remain in full force and effect.

(x)    **No Control**.  The Secured Creditors do not control the Debtor or its properties or operations, do not have authority to determine the manner in which any of the Debtor's operations are conducted, and are not control persons or insiders of the Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the Prepetition Facilities, and/or the Prepetition Loan Documents.

(xi)    **Cash Collateral**.  Any and all of the Debtor's cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtor, whether subject to control agreements or otherwise, and any amount generated by the collection of accounts receivable or other disposition of the Prepetition Collateral, and the proceeds of any of the foregoing, whether existing on the Petition Date or thereafter, constitutes the Cash Collateral of the Secured Creditors.

E.    **Need for Use of Cash Collateral**.  An immediate need exists for the Debtor to obtain access to the Cash Collateral in order to continue operations, to fund payroll and operating expenses, and to administer and preserve the value of its estate pending the Final Hearing.  The ability of the Debtor to operate by using Cash Collateral on an interim basis is vital to the preservation and maintenance of the going concern value of the Debtor's estate, to maximize the value of the Debtor's assets for the benefit of their creditors, and to avoid immediate and irreparable harm to the Debtor, its estate, and its creditors.

F.    **Good Cause for Immediate Entry**.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  In particular, the authorization granted herein for the Debtor to continue using Cash Collateral is necessary to avoid

11

immediate and irreparable harm to the Debtor and its estate.  Entry of this Interim Order is in the best interests of the Debtor, its estate, and creditors.  The terms of the Debtor's use of Cash Collateral as set forth in this Interim Order are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

G.    **Arm's-Length Negotiation; Good Faith**.  The Debtor and the Secured Creditors have negotiated the terms and conditions of this Interim Order in good faith and at arm's-length. The terms of the use of the Cash Collateral pursuant to this Interim Order shall be, and hereby are, deemed to have been extended and made, as the case may be, in "good faith" and at arm's-length among the Debtor and the Secured Creditors, and pursuant to sections 105, 361 and 363 of the Bankruptcy Code, the Secured Creditors are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Interim Order, and each is entitled to the protection provided under Bankruptcy Code section 363(m).

H.    **Good Cause**.  The ability of the Debtor to continue to use Cash Collateral is vital to the Debtor, its estate, creditors, and other parties in interest.  The liquidity to be provided through the use of the Cash Collateral will enable the Debtor to continue to operate their business in the ordinary course and preserve the value of its business.  The Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors, as its implementation will, among other things, allow for the sustained operation of the Debtor's existing businesses and further enhance the Debtor's prospects for a successful restructuring.

I.    **Adequate Protection**.  The Secured Creditors are entitled to adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to Bankruptcy Code sections 361 and 363.  Based on the Motion, all evidence submitted in support of the Motion, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral are fair and reasonable, reflect the Debtor's prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided*, that nothing in this Interim Order shall prejudice, limit, or otherwise impair the rights of the Secured Creditors to seek new,

12

different, or additional adequate protection (or the Debtor's rights to object to such new, different, or additional adequate protection).

J.    **Immediate And Irreparable Harm**.  The Court hereby specifically finds, in accordance with Bankruptcy Rule 6003, that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

**NOW, THEREFORE,** based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, all evidence submitted in support of the Motion, and the record created during the Interim Hearing, and with the consent of the Debtor and the Secured Creditors to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED AND DECREED:**

1.    **Motion Granted**.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.    **Authorization to Use Cash Collateral**.  Subject to the terms of this Interim Order, the Debtor is hereby authorized to continue to use Cash Collateral from and after the Petition Date until the earlier to occur of (a) May 6, 2024, and (c) the Termination Date (as defined herein), only for the purposes specifically set forth in the Prepetition Loan Documents and this Interim Order and in strict compliance with the Budget (as defined herein), subject to the "Budget Variances" (as defined in paragraph 7 below) permitted by this Interim Order.  Except as expressly provided herein including paragraphs 10 and 11 below, the Debtor shall be immediately prohibited from using the Cash Collateral from and after the Termination Date.  Notwithstanding anything to the contrary herein, nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business, or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order and in accordance with the Budget (as defined herein).

13

3. **Adequate Protection**. In addition to all the existing security interests and liens previously granted to the Secured Creditors, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the Prepetition Collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Secured Creditors to permit the Debtor's use of the Cash Collateral as provided for in this Interim Order, the Secured Creditors are hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

(i)    continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, contract claims, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), any other choses in action, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtor, by settlement or otherwise, in respect of claims or causes of action to which the Debtor may be entitled to

14

assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "Adequate Protection Collateral"); provided, that Adequate Protection Collateral shall also include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral;

(ii)    allowed superpriority administrative expense claims in the Debtor's bankruptcy case and any successor cases (the "Adequate Protection Superpriority Claim") with priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code;

(iii)    payment of interest on the SVB Loan Obligations at the contractual, non-default rate that would otherwise be applicable under the SVB Loan Documents, which interest shall be payable monthly in cash and otherwise in accordance with the terms of the SVB Loan Documents, and payment of interest on the TPC Loan Obligations at the contractual, non-default rate that would otherwise be payable under the TriplePoint Loan Documents, which interest shall be payable beginning on May 7, 2024 in cash and otherwise in accordance with the terms of TPC Loan Documents solely in the event TriplePoint has not received the sum of $7,199,624,29 on or prior to May 6, 2024; and

(iv)    payment to SVB in cash within five (5) business days of receipt all reasonable and documented legal fees and out-of-pocket expenses incurred in connection with the Chapter 11 Case, whether arising before or after the Petition Date.  Such fees and expenses through the date of entry of the Interim Order shall be paid in cash upon entry of the Interim Order; and

(v)    beginning on May 7, 2024, and solely in the event TriplePoint has not received the sum of $7,199,624,29 on or prior to May 6, 2024, payment to TriplePoint in cash within five (5) business days of receipt all reasonable and documented legal fees and

15

1   out-of-pocket expenses incurred in connection with the Chapter 11 Case, whether arising

2   before or after the Petition Date.  The invoices for SVB's and TriplePoint's fees and

3   expenses shall not be required to comply with any UST guidelines related to the payment

4   of fees and expenses of retained estate professionals, may be in summary form only, and

5   shall not be subject to application or allowance by the Court.

6   4.    **Priority of Adequate Protection Liens**.  The Adequate Protection Liens shall be

7   first priority perfected security interests, liens, and mortgages on all Adequate Protection

8   Collateral to the extent such Adequate Protection Collateral was not subject to valid, perfected,

9   enforceable, and non-avoidable security interests, liens, or mortgages in existence on Petition

10  Date, including the Prepetition Liens (the "Prior Permitted Liens").  The Adequate Protection

11  Liens shall be junior security interests, liens and mortgages on all Adequate Protection Collateral

12  that was subject to a Prior Permitted Lien in existence on the Petition Date; provided, that the

13  Adequate Protection Liens shall be subject only to the Prior Permitted Liens.  Other than as set

14  forth herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any

15  lien or security interest heretofore or hereinafter in the Debtor's bankruptcy case or any successor

16  cases, and shall be valid and enforceable against any trustee appointed in the Debtor's bankruptcy

17  case or any successor cases, or upon the dismissal of the Debtor's bankruptcy case or any

18  successor case.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550

19  of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate

20  pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the

21  Prepetition Liens or the Adequate Protection Liens.

22  5.    **Validity of Adequate Protection Obligations**.    The Adequate Protection

23  Obligations shall constitute valid and binding obligations of the Debtor, enforceable against the

24  Debtor in accordance with the terms thereof.  The Adequate Protection Liens as approved under

25  this Interim Order shall become effective on an interim basis upon entry of this Interim Order and

26  on a final basis upon entry of the Final Order.  No obligation, payment, transfer, or grant of

27  security interest or lien under this Interim Order or the Final Order shall be voided, voidable, or

28  recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject

16

1  to any defense, reduction, setoff, recoupment, or counterclaim.  The Debtor shall not consent to

2  relief from the automatic stay by any person or entity other than the Secured Creditors to proceed

3  against any Adequate Protection Collateral without the express written consent of Secured

4  Creditors.

5      6.    **Postpetition Lien Perfection**.   This Interim Order shall be sufficient and

6  conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens

7  without the necessity of filing or recording any financing statement, deed of trust, mortgage, or

8  other instrument or document which may otherwise be required under the law of any jurisdiction

9  or the taking of any other action (including, for the avoidance of doubt, entering into any deposit

10  account control agreement) to validate or perfect the Adequate Protection Liens or to entitle the

11  Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the

12  Secured Creditors may, in their sole discretion, file such financing statements, mortgages, notices

13  of liens, and other similar documents, and are hereby granted relief from the automatic stay of

14  section 362 of the Bankruptcy Code in order to do so, and all such financing statements,

15  mortgages, notices and other documents shall be deemed to have been filed or recorded at the

16  time and on the date of the commencement of the Debtor's bankruptcy case.  The Debtor shall

17  execute and deliver to the Secured Creditors all such financing statements, mortgages, notices,

18  and other documents as the Secured Creditors may reasonably request to evidence, confirm,

19  validate or perfect, or to ensure the contemplated priority of, the Adequate Protection Liens

20  granted pursuant hereto.  The Secured Creditors, in their sole discretion, may file a photocopy of

21  this Interim Order as a financing statement with any recording officer designated to file or record

22  financing statements or with any registry of deeds or similar office in any jurisdiction in which

23  the Debtor has real or personal property, and in such event, the recording officer shall be

24  authorized to file or record such copy of this Interim Order.  To the extent required, the automatic

25  stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to

26  permit the Debtor to grant the liens and security interests to the Secured Creditors contemplated

27  by this Interim Order.

28

17

ny-2678585

7.    **Budget**.    The budget annexed hereto as **Exhibit A** (as it may be updated periodically in accordance with this Interim Order, the "Budget"), is hereby approved.  Beginning on the second Friday following the Petition Date, and then no later than the Friday of each subsequent calendar week, the Debtor shall deliver to the Secured Creditors an updated, proposed Budget (each, a "Proposed Budget") for the following 13-week period, which shall be in form and substance satisfactory to the Secured Creditors.  A Proposed Budget shall become the new Budget upon approval by the Secured Creditors (which must be in writing, including via email).  If the Secured Creditors reject or fail to approve a Proposed Budget, the prior approved budget shall continue in place and shall govern and the parties shall negotiate in good faith regarding the terms of the Proposed Budget.  The Debtor shall not permit the percentage variance with respect to (a) projected receipts in each then-current Budget to exceed (i) 12.5% on an individual basis of actual receipts for a specific line item and (ii) 10% on an aggregate basis of total actual receipts, in each case, on a cumulative four-week rolling basis, and (b) projected disbursements in each then-current Budget to exceed (i) 12.5% on an individual basis of actual disbursements for a specific line item and (ii) 10% on an aggregate basis of total actual disbursements (collectively, the "Budget Variances"; all references in this Interim Order to "Budget" shall mean the Budget as it is subject to the Budget Variances).  The Debtor shall also deliver with each updated Budget a variance report reflecting on a line item and an aggregate basis, the Debtor's actual unrestricted cash receipts and cash disbursements compared to the Budget for such immediately preceding week and for the period commencing on the Petition Date through and including the end of the week immediately preceding the date of the variance report; and such variance report shall be in form and substance satisfactory to the Secured Creditors and certified as complete and accurate by a responsible officer to the responsible officer's reasonable belief.

8.    **Cash Management**.    The Debtor shall maintain their cash management arrangements in a manner consistent with that described in the motion seeking entry of an order authorizing the Debtor to maintain its existing cash management system, which order shall be in form and substance acceptable to the Secured Creditors, unless directed otherwise by the Court or the UST.

18

9.     **Protection of Secured Creditors' Rights**.  A "Termination Event" means: (i) the Debtor shall violate the terms of this Interim Order, including without limitation, failing to make any adequate protection payment required pursuant to Paragraph 3 above; (ii) (a) the relief granted in this Interim Order has not been approved, on a final basis, on or before the date that is 35 days after the Petition Date, (b) the Debtor has not filed a motion seeking to sell all or substantially all of the Debtor's assets to Tabapay or its designee ("Buyer"), in a form and substance acceptable to the Secured Creditors in all respects within two (2) business days after the Petition Date, or (c) the Court shall not have entered an order, in a form and substance acceptable to the Secured Creditors in all respects, approving the sale to the Buyer by May 6, 2024; (iii) this Interim Order ceasing to be in full force and effect for any reason (except to the extent superseded by the Final Order in form and substance acceptable to the Secured Creditors in their sole and absolute discretion); (iv) Debtor shall file, propose, or support confirmation of a chapter 11 plan that is not reasonably acceptable to SVB; (v) the Debtor shall file, propose, or support any sale process for, or sell, a material portion of their assets without the prior written consent of SVB; (vi) the Debtor investigates, asserts, or prosecutes (x) any claims or causes of action against any of the Secured Creditors arising under or related to the Prepetition Loan Documents, or (y) any Challenge (as defined herein) or raise any defenses to the Prepetition Loan Obligations.

10.     **Additional Rights Upon Termination Event**.  Subject to the provisions of paragraph 11 below, upon the occurrence and during the continuance of a Termination Event, unless such Termination Event is waived by the SVB or unless the Court orders otherwise, SVB may declare (a) all Adequate Protection Obligations and Prepetition Loan Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtor, whereupon all Adequate Protection Obligations and Prepetition Loan Obligations shall be immediately due and payable; and (b) that the Debtor shall have no right to use any Cash Collateral, except (i) towards the satisfaction of the Adequate Protection Obligations and Prepetition Loan Obligations and/or (ii) as otherwise ordered by the Court. Upon the indefeasible repayment in full of the Adequate Protection

Obligations (if any) and the SVB Loan Obligations, TPC shall be permitted to exercise its rights pursuant to subsections (a) and (b) above in accordance with the Subordination Agreement.

11.    **Notice of Termination Event; Exercise of Remedies**.  Five (5) business days after the delivery by a Prepetition Lender to the Debtor and its counsel of a written notice (the "Remedies Notice"), which may be via email or otherwise, of the occurrence of a Termination Event (such date, the "Termination Date"), the Secured Creditors may seek relief from the automatic stay from the Court on an emergency or expedited bases (and the Debtor hereby consent to the emergency and expedited nature of such request) to exercise all rights and remedies available under applicable non-bankruptcy law or the Prepetition Loan Documents with respect to the Adequate Protection Collateral (to the extent of the Adequate Protection Obligations) and the Prepetition Collateral; *provided*, *however*, that within five (5) business days after the delivery of the Remedies Notice, the Debtor may seek authority to use Cash Collateral from the Court on an emergency or expedited bases and the Debtor may use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtor's business subject to the Budget.  Within two (2) business days after the delivery of the Remedies Notice, the Debtor shall provide a line-by-line itemization of the Budget to the Secured Creditors as of the date of the Remedies Notice.

12.    **Modifications of Prepetition Loan Documents**.  The Debtor and the Secured Creditors are hereby authorized to implement, in accordance with the terms of the Prepetition Loan Documents, any modifications to the Prepetition Loan Documents (other than to this Interim Order) that are not materially adverse to the Debtor's estate or creditors without further notice, motion, or application to, order of, or hearing before this Court.  Any material modification or amendment to the Prepetition Loan Documents shall only be permitted pursuant to an order of this Court (which may be sought on an expedited basis), *provided*, *however*, that any forbearance from, or waiver of the following shall not require an order of this Court: (a) a breach by the Debtor of a covenant, representation or any other agreement relating to the use of Cash Collateral or (b) a Termination Event.

13.    **Waiver of Requirement to File Proofs of Claim**.  The Secured Creditors shall not be required to file proofs of claim in the Debtor's bankruptcy case or any successor cases in

order to maintain their respective claims for payment of the obligations under their respective Prepetition Loan Documents.

14.    **Payment of Compensation**.  Nothing herein shall be construed to obligate the Secured Creditors to pay any professional fees or to assure that the Debtor has sufficient funds on hand to pay any professional fees.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtor or shall affect the right of the Secured Creditors to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

15.    **Effect of Stipulations**.

(i)    **Generally**.  The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph D of this Interim Order (collectively, the "Prepetition Lien and Claim Stipulations") are and shall be binding on the Debtor.  In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including any statutory committee, unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Debtor, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (a) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph) challenging the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the date that is sixty (60) days after the date of entry of this Interim Order (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time with the consent of the Debtor and the affected Prepetition Lender (which written consent may be via email), and (b) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  Notwithstanding the foregoing, if a chapter 11 trustee

21

ny-2678585

is appointed or the Debtor's bankruptcy case is converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Debtor's bankruptcy case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause, and (2) if a statutory committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of such committee in such Challenge.

(ii)    **Binding Effect**.    To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Debtor's case, and their successors and assigns, and in any successor cases for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate.    Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (i) above except to the extent that any of such Prepetition Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (i) above, and only as to the parties to such Challenge.    To the extent any such Challenge proceeding is timely and properly commenced, the Secured Creditors shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Loan Documents in defending themselves in any such proceeding as adequate protection.    If any such Challenge is timely commenced and/or sustained, the stipulations contained in Paragraph D shall nonetheless remain binding on the Debtor's estate and all parties

22

in interest, except to the extent that such stipulations were expressly challenged in such Challenge, and only as to the parties to such Challenge.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any statutory committee, standing or authority to pursue any cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges, without prior express Court approval.

16. **Limitation on Charging Expenses Against Collateral**.  Subject to entry of the Final Order, (i) no costs or expenses of administration of the Debtor's case, any successor case or any other future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the Adequate Protection Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity, and (ii) the Debtor (and any successor thereto, including any representatives thereof, including any trustee appointed in these Chapter 11 Cases or any successor cases) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Secured Creditors, the Adequate Protection Collateral or the Prepetition Collateral.  Nothing contained in this Interim Order shall be deemed a consent by the Secured Creditors to any charge, lien, assessment, or claim against, or in respect of, the Adequate Protection Collateral or the Prepetition Collateral under 506(c) of the Bankruptcy Code or otherwise.

17. **Carve-Out**.  Notwithstanding anything to the contrary in this Interim Order, any Prepetition Lien, Adequate Protection Lien, Prepetition Loan Obligations, Adequate Protection Superpriority Claim, or Adequate Protection Obligations are subject and subordinate to a carve out for the payment of the following (the "**Carve-Out**"): (A) all fees required to be paid pursuant to the Clerk of the Court and to the UST under section 1930(a) of title 28 of the United States Code prior to or after delivery by SVB of a Remedies Notice plus interest at the statutory rate, plus (B) all reasonable  and documented fees and expenses of the Debtor's bankruptcy counsel and financial advisors incurred prior to a Termination Event and allowed under section 330 of the Bankruptcy Code, but not to exceed the line item for such fees and expenses in the Budget, plus (C) all reasonable fees and expenses up to $250,000 of counsel to the Debtor or any official

23

committee that are incurred after a Termination Event and allowed under section 330 of the Bankruptcy Code, plus (D) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.

18.    **Limitations on the Use of Prepetition Collateral, Cash Collateral, and Carve-Out**.  The Prepetition Collateral, Cash Collateral, and any Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to the interests of the Secured Creditors, or their rights and remedies under the Prepetition Loan Documents, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor or any official committee of unsecured creditors appointed in the Debtor's case in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Obligations or Adequate Protection Obligations, (ii) for monetary, injunctive or other affirmative relief against the Secured Creditors, or (iii) preventing, hindering, or otherwise delaying the exercise by the Secured Creditors of any rights and remedies under this Interim Order, the Prepetition Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the Secured Creditors upon any of the Prepetition Collateral; (b) so long as the Prepetition Loan Obligations are outstanding, to make any distribution under a plan of reorganization in the Debtor's bankruptcy case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Secured Creditors, except as contemplated by the Budget or approved by the Court; (d) to object to, contest, or interfere with in any way the Secured Creditors' enforcement or realization upon any of the Prepetition Collateral, as applicable, once an Event of Default has occurred; (e) so long as the Prepetition Loan Obligations are outstanding, to use or seek to use any insurance proceeds constituting Prepetition Collateral without the prior written consent of the Secured Creditors; (f) so long as the

Prepetition Loan Obligations are outstanding, to incur indebtedness outside the ordinary course of business without the prior written consent of the Secured Creditors; (g) to object to or challenge in any way the claims, security interests, liens, or other interests (including interests in the Prepetition Collateral) held by or on behalf of the Secured Creditors; (h) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Secured Creditors; (i) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations, the Adequate Protection Obligations, or any other rights or interests of the Secured Creditors; or (j) to prevent (or attempt to prevent), hinder, or otherwise delay the exercise by the Secured Creditors of any rights and remedies granted under this Interim Order; *provided*, that any official committee of unsecured creditors appointed in the Debtor's case may use up to $25,000 (in the aggregate) in connection with the investigation (including discovery proceedings), initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Secured Creditors.

19.    **Payments Free and Clear**.  Any and all payments or proceeds remitted to the Secured Creditors pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including without limitation, subject to the entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.  No payments authorized by this Interim Order shall be subject to recharacterization, avoidance, subordination, or disgorgement.

20.    **No Marshaling / Applications of Proceeds**.  Subject to entry of the Final Order, the Secured Creditors shall not be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the Adequate Protection Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim

Order and the Prepetition Loan Documents notwithstanding any other agreement or provision to the contrary.

21.        **Section 552(b)**.  The Secured Creditors shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Secured Creditors in any respect.

22.        **Limitation of Liability**.  Nothing in this Interim Order or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the Secured Creditors, or any of their successors or predecessors, of any liability for any claims arising from the prepetition or postpetition activities of the Debtor or any affiliate of the Debtor.

23.        **Indemnification**.  The Debtor shall indemnify and hold harmless the Secured Creditors and their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors, and assigns in accordance with the Prepetition Loan Documents, which indemnification is hereby authorized and approved; *provided*, that the Secured Creditors shall not be indemnified with respect to any judgment in favor of the Debtor's estate in any timely and properly commenced Challenge proceeding where such judgment has become a final judgment that is not subject to any further review or appeal.

24.        **Credit Bidding**.  Each Prepetition Lender shall have the unqualified right to credit bid (a) up to the full amount of its Adequate Protection Obligations and Prepetition Loan Obligations in any sale of the Prepetition Collateral (or any part thereof), and (b) any unpaid amounts due and owing to such Prepetition Lender under this Interim Order, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided that* with respect to a credit bid submitted by TPC, TPC's right to credit bid is subject to the indefeasible repayment in full in cash of the SVB Loan Obligations in accordance with the Subordination Agreement.

26

25.     **Monitoring of Collateral**. During normal business hours and after advanced written notice to the Debtor's counsel (email shall suffice), the Secured Creditors, and their representatives, consultants and advisors, shall be given reasonable access to the Debtor's books, records, assets, and properties for purposes of monitoring the Debtor's business and the value of the Adequate Protection Collateral.

26.     **No Third Party Rights**.  This Interim Order does not create any rights for the benefit of any party, creditor, equity holder, or other entity other than the Secured Creditors and the Debtor, and their respective successors and assigns.

27.     **Rights Preserved**.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Secured Creditors' right to seek any other or supplemental relief in respect of the Debtor, including the right to seek new, different, or additional adequate protection, as applicable. Nothing contained in this Interim Order shall be deemed a finding by the Court or an acknowledgement by the Secured Creditors that the adequate protection granted in this Interim Order does in fact adequately protect the Secured Creditors against any diminution in value of the Prepetition Collateral.

28.     **Reversal or Modification on Appeal**.  The reversal or modification on appeal of a grant of priority or a lien under this Interim Order shall not affect the validity of any priority or lien so granted to the Secured Creditors under this Interim Order.

29.     **Binding Nature of Order**.  The provision**s** of this Interim Order shall be binding upon the Debtor and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of the Debtor's estate or with respect to their property).

30.     **Survival of Order**.  Solely with respect to the Secured Creditors, the provisions of this Interim Order and any actions taken pursuant hereto (a) shall survive the entry of any order: (i) confirming any plan of restructuring in the Debtor's case; (ii) converting the Debtor's case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Debtor's bankruptcy case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the

claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until (x) all of the Adequate Protection Obligations are indefeasibly paid or otherwise satisfied in full and discharged in accordance with this Interim Order and (y) the obligations owed to the Secured Creditors are indefeasibly paid or otherwise satisfied in full.  The Adequate Protection Obligations shall not be discharged by the entry of any order confirming any plan in the Debtor's case that does not provide for payment in full of the Adequate Protection Obligations or such other treatment of the Adequate Protection Obligations as may be agreed to by the Secured Creditors.

31.    **Priority of Terms**.  To the extent of any conflict between or among the Motion, the terms of any "first day" orders (including any provisions contained in such orders authorizing the Debtor to make any payments), and this Interim Order, the terms and provisions of this Interim Order (including the provisions hereof relating to the Budget) shall govern.

32.    **Disposition of Collateral**.  The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Adequate Protection Collateral without an order of the Court or the prior written consent of the Secured Creditors (and no such consent shall be implied, from any other action, inaction, or acquiescence by the Secured Creditors or an order of this Court).

33.    **No Waivers or Modification of Interim Order**.  The Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of the Secured Creditors, and no such consent shall be implied by any other action, inaction, or acquiescence of the Secured Creditors.

34.    **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled for May __, 2024 at [--] [--].m. prevailing Pacific time at the United States Bankruptcy Court for the Central District of California.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtor and entered by this Court.  Within two (2) business days following entry of this Interim Order, the Debtor shall serve, by e-mail or United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final

28

ny-2678585

Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed Final Order, on: (i) the parties having been given notice of the Interim Hearing, (ii) any party which has filed prior to such date a request for notices with this Court, (iii) counsel for any statutory committee, if any, (iv) the UST, (v) the Internal Revenue Service, (vi) counsel to the Secured Creditors, and (vii) the Securities and Exchange Commission. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than [--], 2024, which objections shall be served so that the same are received on or before such date by: (i) bankruptcy counsel for the Debtor, (ii) counsel for SVB, Morrison & Foerster LLP, 200 Clarendon St., Boston, MA 02116, Attn: Alexander Rheaume, Esq. and 250 West 55th St., New York, NY 10019, Attn: Benjamin Butterfield, Esq., and Alexander Severance, Esq., (iii) counsel to TPC, McDermott Will & Emery LLP, (A) 2049 Century Park East, Suite 3200, Los Angeles, CA 90067, Attention: Gary B. Rosenbaum (grosenbaum@mwe.com) and (B) One Vanderbilt Avenue, Suite 6700, New York, NY 10017-3852, Attention Darren Azman (dazman@mwe.com), (iv) counsel to any statutory committee, and (v) the U.S. Trustee, Attn: [--], and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than _____, 2024, at 4:00 p.m. prevailing Pacific time. Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a Final Order containing provisions that are inconsistent with, or contrary to any of the terms in this Interim Order; *provided*, that the Secured Creditors shall have the right to terminate the use of Cash Collateral if such Final Order is not acceptable to them. In the event this Court modifies any of the provisions of this Interim Order following such further hearing, such modifications shall not affect the rights and priorities of Secured Creditors pursuant to this Interim Order with respect to the Adequate Protection Collateral, and this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

35. **Nunc Pro Tunc Effect**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable nunc pro tunc to the Petition Date immediately upon execution thereof.

36.      **Waiver of Stay of Effectiveness of the Interim Order**.    Notwithstanding Bankruptcy Rules 6003 and 6004 or any other Bankruptcy Rule, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37.      **Retention of Jurisdiction**.    This Court has and will retain exclusive jurisdiction to enforce this Interim Order and over all matters, including, without limitation, disputes, relating hereto.

# # #

30

ny-2678585

DM_US 203974529-4.082853.0217

# EXHIBIT "2"

**SYNAPSE FINANCIAL TECHNOLOGIES, INC.**

**Cash Collateral Budget** — Post close >>>>>>>>>

| | | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | Proj Week | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/B | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | |
| | W/E | 26-Apr | 3-May | 10-May | 17-May | 24-May | 31-May | 7-Jun | 14-Jun | 21-Jun | 28-Jun | 5-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | |
| | Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 1 to 18 |
| **BEGINNING CASH (SFT)** | | $1,960,000 | $1,277,839 | $3,513,278 | $5,089,893 | $4,071,379 | $4,046,379 | $4,021,379 | $3,996,379 | $3,976,379 | $3,956,379 | $3,936,379 | $3,916,379 | $3,901,379 | $3,886,379 | $3,723,379 | $3,708,379 | $3,693,379 | $3,678,379 | $1,960,000 |
| **INFLOWS** | | | | | | | | | | | | | | | | | | | | |
| SaaS & Per User | | | | | | | | | | | | | | | | | | | | 0 |
| Transaction Pass Through | | 190,000 | | | | | | | | | | | | | | | | | | 190,000 |
| Incoming Interchange | | 100,000 | | | | | | | | | | | | | | | | | | 100,000 |
| Transaction Fees | | 85,000 | | | | | | | | | | | | | | | | | | 85,000 |
| Card Printing & Other Rev | | 15,000 | | | | | | | | | | | | | | | | | | 15,000 |
| Evolve Settlement | | | 2,000,000 | | | | | | | | | | | | | | | | | 2,000,000 |
| Brokerage est cash balance post close | | | | 1,721,615 | | | | | | | | | | | | | | | | 1,721,615 |
| Sale Proceeds | | | 9,700,000 | | | | | | | | | | | | | | | | | 9,700,000 |
| **TOTAL INFLOWS** | | 390,000 | 11,700,000 | 1,721,615 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,811,615 |
| **OUTFLOWS** | | | | | | | | | | | | | | | | | | | | |
| **Payroll and Debt Repayments** | | | | | | | | | | | | | | | | | | | | |
| Payroll, Taxes and Benefits | | -431,004 | -133,201 | | | | | | | | | | | | | | | | | -564,205 |
| Cigna/PLIC/Bridge Immigration | | -120,175 | -11,118 | | | | | | | | | | | | | | | | | -131,293 |
| International Staff | | -22,982 | -111,646 | | | | | | | | | | | | | | | | | -134,628 |
| PTO Liability | | | -165,000 | | | | | | | | | | | | | | | | | -165,000 |
| Payoff Secured Debt - SVB | | | -1,505,472 | | | | | | | | | | | | | | | | | -1,505,472 |
| Payoff Secured Debt - TPC | | | -7,199,624 | | | | | | | | | | | | | | | | | -7,199,624 |
| | | -574,161 | -9,126,061 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -9,700,222 |
| **Cost of Sales** | | | | | | | | | | | | | | | | | | | | |
| AWS | | -248,000 | | | -248,000 | | | | | | | | | | | | | | | -496,000 |
| Mongo (auto draft) | | -30,000 | -30,000 | -30,000 | | | | | | | | | | | | | | | | -90,000 |
| Mastercard Invoices (auto draft - node) | | -90,000 | -90,000 | -90,000 | | | | | | | | | | | | | | | | -270,000 |
| (2) Outgoing Customer Rebate | | | | | -745,514 | | | | | | | | | | | | | | | -745,514 |
| COS vendors - IT | | -25000 | -25000 | | | | | | | | | | | | | | | | | -50,000 |
| COS Cards - required for card income | | -20,000 | -20,000 | | | | | | | | | | | | | | | | | -40,000 |
| COS - Other vendors | | | | | | | | | | | | | | | | | | | | 0 |
| Audits - Compliance | | -40,000 | -31,500 | | | | | | | | | | | | | | | | | -71,500 |
| (1) LNBYG | | | | | | | | | | | | | | | | | | | | 0 |
| 1Q2024 US Trustee Fees | | | | | | | | | | | | | | | -148,000 | | | | | -148,000 |

**SYNAPSE FINANCIAL TECHNOLOGIES, INC.**

| Cash Collateral Budget | | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | Proj | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | Week | |
| | W/B | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | |
| | W/E | 26-Apr | 3-May | 10-May | 17-May | 24-May | 31-May | 7-Jun | 14-Jun | 21-Jun | 28-Jun | 5-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | |
| | Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 1 to 18 |
| **BEGINNING CASH (SFT)** | | $1,960,000 | 1,277,839 | $3,513,278 | $5,089,893 | $4,071,379 | $4,046,379 | $4,021,379 | $3,996,379 | $3,976,379 | $3,956,379 | $3,936,379 | $3,916,379 | $3,901,379 | $3,886,379 | $3,723,379 | $3,708,379 | $3,693,379 | $3,678,379 | $1,960,000 |
| Creditor's Committee Advisors | | | | | | | | | | | | | | | | | | | | 0 |
| Operating Exp | | | | | | | | | | | | | | | | | | | | |
| Insurance | | | -67000 | | | | | | | | | | | | | | | | | -67,000 |
| G&A IT/Compliance | | -17,000 | -17,000 | | | | | | | | | | | | | | | | | -34,000 |
| G&A Legal-normal course | | | | | | | | | | | | | | | | | | | | 0 |
| G&A Finance/legal contractors | | -12000 | -12000 | -25,000 | -25,000 | -25,000 | -25,000 | -25,000 | -20,000 | -20,000 | -20,000 | -20,000 | -15,000 | -15,000 | -15,000 | -15,000 | -15,000 | -15,000 | -15,000 | -334,000 |
| G&A Other vendor payments | | -16,000 | -46,000 | | | | | | | | | | | | | | | | | -62,000 |
| **Total Operations** | | **-498,000** | **-338,500** | **-145,000** | **-1,018,514** | **-25,000** | **-25,000** | **-25,000** | **-20,000** | **-20,000** | **-20,000** | **-20,000** | **-15,000** | **-15,000** | **-163,000** | **-15,000** | **-15,000** | **-15,000** | **-15,000** | **-2,408,014** |
| **TOTAL OUTFLOWS** | | -1,072,161 | -9,464,561 | -145,000 | -1,018,514 | -25,000 | -25,000 | -25,000 | -20,000 | -20,000 | -20,000 | -20,000 | -15,000 | -15,000 | -163,000 | -15,000 | -15,000 | -15,000 | -15,000 | -12,108,236 |
| **NET CHANGE IN CASH** | | -682,161 | 2,235,439 | 1,576,615 | -1,018,514 | -25,000 | -25,000 | -25,000 | -20,000 | -20,000 | -20,000 | -20,000 | -15,000 | -15,000 | -163,000 | -15,000 | -15,000 | -15,000 | -15,000 | 1,703,379 |
| **Non Debtor Cash Transfers** | | | | | | | | | | | | | | | | | | | | 0 |
| **ENDING CASH (SFT)** | | $1,277,839 | $3,513,278 | $5,089,893 | $4,071,379 | $4,046,379 | $4,021,379 | $3,996,379 | $3,976,379 | $3,956,379 | $3,936,379 | $3,916,379 | $3,901,379 | $3,886,379 | $3,723,379 | $3,708,379 | $3,693,379 | $3,678,379 | $3,663,379 | $3,663,379 |
| Brokerage/Credit Cash | | 1,276,615 | 2,021,615 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| Consolidated Cash | | $2,554,454 | $5,534,893 | $5,389,893 | $4,371,379 | $4,346,379 | $4,321,379 | $4,296,379 | $4,276,379 | $4,256,379 | $4,236,379 | $4,216,379 | $4,201,379 | $4,186,379 | $4,023,379 | $4,008,379 | $3,993,379 | $3,978,379 | $3,963,379 | 3,963,379 |

Post close >>>>>>>> (begins at Week No. 3, 6-May)

# EXHIBIT "3"



# Benefits Guide

## January 1, 2024 – December 31, 2024



Benefits Brought to You By

Bennie    BETTER BENEFITS

# Table of Contents

**1**   **Introduction**

**2**   **Eligibility Requirements & Deadlines**

**3**   **Ask Bennie**

**4**   **Your 2024 Benefits**

**5**   **Plan Costs**

**6**   **Benefits Enrollment**

**7**   **Glossary**

**8**   **Required Healthcare Notices**



## Section 1

# Introduction



# Dear Valued Employees,

**This Benefits Program Guide summarizes the Synapse employee benefits program options available for the period of January 1, 2024 through December 31, 2024. Please review the guide carefully so you can choose plans that best fit the needs of you and your family.**

## Open Enrollment:

Open enrollment is your annual opportunity to enroll in health benefits. During this time, you can also transfer to a different plan and add eligible family members.



**You must complete your online enrollment by:**

# 12/11/2023

## New Employees & Newly Eligible Employees:

If you are a new employee or a newly eligible employee, you must actively enroll if you want to receive benefits through any of these plans. You must complete enrollment no later than 30 days after your hire date or the date of your change in eligibility status. After this date, you will not be able to make any changes to your coverage until the next open enrollment.

Sincerely,



**If you have questions or need more information, please contact:**

**People Ops Team**
people@synapsefi.com





**Section 2**

# Eligibility Requirements & Deadlines



 # Initial Eligibility

 ## Who is Eligible for Health Benefits?

Employees who work a minimum of 30 hours per week are eligible for health benefits as described in this booklet.

 ## When Do Benefits Become Effective?

For newly hired or newly-eligible employees, benefits begin on the first of the month following your date of hire.

 ## What are the Enrollment Deadlines?

For newly hired employees or for those who become newly eligible during the plan year, you must enroll no later than 30 days after your date of hire or the date of your change in eligibility status.

 ## Can I Cover my Dependents?

Your legal spouse, domestic partner, and/or legal children are eligible as dependents on the company's benefit plans.

 ## Termination Provisions

If you are no longer employed by Synapse, your benefits end at the end of the month you last worked. For additional information on continuing your coverage under COBRA, please reference your COBRA rights in the notices section of this document.



# Ongoing Eligibility & Maintenance



## Making Changes to Your Health Benefits

Once you make benefit elections during open enrollment, you will not have another opportunity to make a change to your health benefits until the next open enrollment unless you experience a change in status, otherwise known as a "qualifying event."

## What is a Qualifying Event?

- Marriage, Divorce or legal separation
- Birth or adoption of a child
- A change in your or your spouse's employment or insurance status
- A dependent ceasing to meet eligibility requirements
- A change in residence that affects coverage



## Qualifying Event Deadlines

Should you experience a qualifying event and need to make a change in your coverage, you must contact your plan administrator within 30 days of the event and complete the appropriate paperwork. If you fail to notify your HR administrator within 30 days of the event, you will not be able to make a change and will be required to wait until the next open enrollment or another qualifying event, whichever comes first.

## New to Bennie?
Here's what to expect next.

**WATCH VIDEO**



## ABOUT BENNIE

# Better Benefits

## For Everyone.

**Bennie partners with your HR Team to offer a single hub for all employee benefits information as well as an on-demand healthcare concierge.**



**Whenever you have a question about your benefits, the Bennie app is there to help you get the answers you need and resolve any issues.**

In addition to the benefits provided through your company, Bennie's individual marketplace allows you to access personalized benefits that meet your unique needs.



## Download the Bennie App today!



# Benefits Marketplace
For Health & Wellbeing



**Our Mission**

**To provide everyone with access to better benefits and help create a healthier world.**

**Access a Variety of Additional Benefits**

The Bennie Marketplace includes physical, social, financial, and emotional benefits from leading wellness providers. You can enroll with a Bennie marketplace partner at any time! There's no need to involve your HR team as you sign up for these services directly with the vendor. Simply log in to your Bennie App and click on the Marketplace tab to start exploring.













**For Employees**

## Individual Voluntary Benefits

You can choose wellness benefits to suit your specific needs.

- Pet Insurance
- Financial Advice
- Mental Health Support
- Family Planning
- Caregiving Support
- And More





**Section 3**

# Ask Bennie



# Ask Bennie



**A Unified Experience**

## The Complete Package

With Ask Bennie, you can speak with expert Advocates who can help you understand your benefits, find doctors, fix billing mistakes, book appointments, and more.

**Accessible Advocates**

## White Glove Service

Ask Bennie Advocates are experts in healthcare, who work for you–not the insurance company. With Ask Bennie, you can get help with your benefits or healthcare questions at any time.

## The Help You Need, When You Need It

Delivered in a modern experience through the Bennie mobile app.



**Benefits Questions**

Get immediate answers regarding benefits. You will be notified as soon as the Ask Bennie team replies.

**Enrollment Support**

Expert support during your open enrollment process. Bennie can help you compare cost and benefit details, so you can choose the right plan for you and your family.

**Billing Review**

Got a confusing medical bill? The Bennie team can review it for you, ensuring it's accurate.

**Find a Provider**

Find low cost, high quality providers with the touch of a button.  Bennie provides the best matches in your area.



**Section 4**

# Your 2024 Benefits



# Navigating Your Benefits

Here are some helpful tips on how to save money and best navigate your benefits.

## Tips for Saving Money

**1**    Always stay in-network whenever possible

**2**    Take advantage of preventive care – it's free!

**3**    Use urgent care centers and mini-clinics instead of emergency rooms when not a true emergency

**4**    Use telemedicine to save time and money

**5**    Ask about the costs of services & prescriptions  before receiving them

**6**    Use online resources:
FSAstore.com, HSAstore.com, GoodRx.com and more



# Medical

**Member ID Cards**

If you elect benefits, find out when you can expect your member ID cards.


▶ **LEARN MORE**

Your medical and prescription drug coverage is offered through Cigna. Synapse provides comprehensive medical and prescription drug through three plan options. The below is a high-level comparison between the plan options. For full plan details, please refer to the medical plan summaries available for download in Bennie.

To search for providers, visit the Bennie app or https://hcpdirectory.cigna.com/.



## OAP $250 Platinum

| | In-Network | Out-of-network |
|---|---|---|
| **Deductible (Individual/Family)** | $250 / $500 | $1,000 / $2,000 |
| **Coinsurance** | 20% | 50% |
| **Out-of-Pocket Maximum (Individual/Family)** | $3,200 / $6,400 | $6,400 / $12,800 |
| **Preventative Care** | Covered 100% | 50% after deductible |
| **Primary Care** | $15 Copay | 50% after deductible |
| **Specialist** | $30 Copay | 50% after deductible |
| **Telemedicine** | $15 Copay | Not Covered |
| **Urgent Care** | $50 Copay | 50% after deductible |
| **Emergency Room** | $250 Copay | $250 Copay |
| **Inpatient Hospital Admission** | 20% after deductible | 50% after deductible |
| **Outpatient Hospital Services** | 20% after deductible | 50% after deductible |

| **Prescription Drugs** | | |
|---|---|---|
| Preferred Generic | **Pharmacy**: $10 **Mail Order**: $25 | **Pharmacy**: 50% **Mail Order**: Not Covered |
| Preferred Brand | **Pharmacy**: $35 **Mail Order**: $88 | **Pharmacy**: 50% **Mail Order**: Not Covered |
| Non-Preferred Brand | **Pharmacy**: $70 **Mail Order**: $175 | **Pharmacy**: 50% **Mail Order**: Not Covered |
| Specialty | **Pharmacy**: 10% up to $250 | **Pharmacy**: 50% |
| Number of days Supply | **Pharmacy**: 30 Days; **Mail Order**: 90 days | |



# Medical

**Member ID Cards**

If you elect benefits, find out when you can expect your member ID cards.

 **LEARN MORE**

Your medical and prescription drug coverage is offered through Cigna. Synapse provides comprehensive medical and prescription drug through three plan options. The below is a high-level comparison between the plan options. For full plan details, please refer to the medical plan summaries available for download in Bennie.

To search for providers, visit the Bennie app or https://hcpdirectory.cigna.com/.



## OAP $1,000 Bronze

| | In-Network | Out-of-network |
|---|---|---|
| **Deductible (Individual/Family)** | $1,000 / $2,000 | $2,000 / $4,000 |
| **Coinsurance** | 20% | 50% |
| **Out-of-Pocket Maximum (Individual/Family)** | $6,400  / $12,800 | $12,800 / $25,600 |
| **Preventative Care** | Covered 100% | 50% after deductible |
| **Primary Care** | $20 Copay | 50% after deductible |
| **Specialist** | $40 Copay | 50% after deductible |
| **Telemedicine** | $20 Copay | Not Covered |
| **Urgent Care** | $50 Copay | 50% after deductible |
| **Emergency Room** | $250 Copay | $250 Copay |
| **Inpatient Hospital Admission** | 20% after deductible | 50% after deductible |
| **Outpatient Hospital Services** | 20% after deductible | 50% after deductible |

**Prescription Drugs**

| | | |
|---|---|---|
| Preferred Generic | **Pharmacy:** $15 <br> **Mail Order:** $38 | **Pharmacy:** 50% <br> **Mail Order:** Not Covered |
| Preferred Brand | **Pharmacy:** $40 <br> **Mail Order:** $100 | **Pharmacy:** 50% <br> **Mail Order:** Not Covered |
| Non-Preferred Brand | **Pharmacy:** $75 <br> **Mail Order:** $188 | **Pharmacy:** 50% <br> **Mail Order:** Not Covered |
| Specialty | **Pharmacy:** 10% up to $250 | **Pharmacy:** 50% |
| Number of days Supply | Pharmacy: 30 Days; Mail Order: 90 days | |



# Medical

**Member ID Cards**

If you elect benefits, find out when you can expect your member ID cards.


▶ **LEARN MORE**

Your medical and prescription drug coverage is offered through Cigna. Synapse provides comprehensive medical and prescription drug through three plan options. The below is a high-level comparison between the plan options. For full plan details, please refer to the medical plan summaries available for download in Bennie.

To search for providers, visit the Bennie app or https://hcpdirectory.cigna.com/.



## OAP $2,000 Base

| | In-Network | Out-of-network |
|---|---|---|
| **Deductible (Individual/Family)** | $2,000 / $4,000 | $4,000 / $8,000 |
| **Coinsurance** | 30% | 50% |
| **Out-of-Pocket Maximum (Individual/Family)** | $7,000 / $14,000 | $14,000 / $28,000 |
| **Preventative Care** | Covered 100% | 50% after deductible |
| **Primary Care** | $15 Copay | 50% after deductible |
| **Specialist** | $30 Copay | 50% after deductible |
| **Telemedicine** | $15 Copay | Not Covered |
| **Urgent Care** | $50 Copay | 50% after deductible |
| **Emergency Room** | $250 Copay | $250 Copay |
| **Inpatient Hospital Admission** | 30% after deductible | 50% after deductible |
| **Outpatient Hospital Services** | 30% after deductible | 50% after deductible |

**Prescription Drugs**

| | | |
|---|---|---|
| Preferred Generic | **Pharmacy**: $10 **Mail Order**: $25 | **Pharmacy:** 50% **Mail Order**: Not Covered |
| Preferred Brand | **Pharmacy**: $35 **Mail Order**: $88 | **Pharmacy:** 50% **Mail Order**: Not Covered |
| Non-Preferred Brand | **Pharmacy**: $70 **Mail Order**: $175 | **Pharmacy:** 50% **Mail Order**: Not Covered |
| Specialty | **Pharmacy**: 10% up to $250 | **Pharmacy**: 50% |
| Number of days Supply | **Pharmacy**: 30 Days; **Mail Order**: 90 days | |



# Cigna Plan Features

With all three Cigna plan options, you have access to the below partners for mental health and wellbeing solutions.



iPrevail's digital therapeutics platform helps you take control of the stresses of everyday life and challenges.

Finish one level (15 minutes) per week for peak results!

Visit **mycigna.com** to sign-up and to complete a short quiz.

**ginger**

Ginger offers confidential mental  healthcare through text-based  chats, self-guided activities, and  video-based psychiatry, if needed.

30 days of unlimited behavioral health coaching is available, then  costs will be based on your medical plan benefits.

Visit **ginger.com/cigna** for more  information

**happify**™

Happify's science-based games and activities are designed to help you defeat  negative thoughts, increase  mindfulness & confidence,  and more!

Visit **happify.com/cigna** to sign-up and download the app



Talkspace is a digital space for private and convenient mental health support.

Choose a dedicated therapist and/or  prescriber from a recommended list of licensed providers who are available  day and night from the convenience of your device (iOS, Android, and Web).

- Visit **talkspace.com/cigna**
- Complete the QuickMatch™ survey
- Review your best matches and  choose your personal provider



NOCD provides affordable options for treatment through licensed ERP-trained therapists.

Visit **treatmyocd.com** to sign-up and schedule a free call.



# Cigna Plan Features

With all three Cigna plan options, you have access to the below partners for mental health and wellbeing solutions.

- **Healthy Rewards:** Various discounts, including meal delivery services, hearing aids, alternative medicine, yoga, etc.

- **Active and Fit Direct:** Discounted gym membership

- **Online Coaching:** Diet and exercise, management of certain conditions

- **Omada:** 18 week program for participants who are pre-diabetic and qualify for the program for weight loss.

- **RecoveryOne:** Online physical therapy with instructions





# Telemedicine

On demand access to affordable, quality health care – anytime, anywhere.

**Why wait for the care you need now? Cigna, via their partner, MDLive, now offers another alternative to receive care. Visit with a US Board Certified doctor right from your home, office, or on the go for non-emergency medical conditions.**

**Visit the Bennie app or [www.mdliveforcigna.com](http://www.mdliveforcigna.com) to schedule a telemedicine visit today!**



Virtual Care, Anywhere.

## When to Use Telemedicine

- 24/7/365
- If your primary care doctor is not available
- Instead of going to the ER or an urgent care center (for a non-emergency issue)
- To request prescription refills*
- If traveling and in need of medical care

## Common Conditions Treated

- Allergies
- Asthma
- Bronchitis
- Cold & Flu
- Diarrhea
- Ear Infections
- Fever
- Headache
- Infections
- Insect Bites
- Joint Aches
- Rashes
- Sinus Infections
- Skin Infections
- Sore Throat
- And More

**Pediatric Care**

- Cold & Flu
- Constipation
- Ear Infections
- Nausea
- Pink Eye
- And More



# Know Where to Go For Care

**If you're not experiencing an emergency, being informed about where to go for medical care can result in time and cost savings. You have options for getting non-emergency medical attention.**

The below chart can assist you in determining the appropriate type of care for different situations. Opting for In-Network providers for your family's medical needs typically leads to reduced expenses.

### Virtual Visits
$

• *Available 24/7*

• *Access to care for non-emergency medical issues at home and out of the home*

### Doctor's Office
$

• *Hours of operation may vary*

• *Typically the best option for non-emergency care*

• *Doctor-to-patient relationship established and therefore able to treat, based on knowledge of medical history*

### Health Clinic
$

• *Based on the clinic's hours of operation*

• *Usually lower out-of-pocket costs than if you go to urgent care*

• *Convenient to access, low-cost treatment for small medical problems*

### Urgent Care
$$

• *Generally includes evenings, weekends and holidays*

• *Typically used when a doctor's office is closed, and you don't have an emergency*

• *Many have options to check in online or by calling*

### Hospital ER
$$$

• *Open 24/7*

• *If you receive emergency room care from an out-of-network provider, you may have to pay more*

• *Multiple bills for services such as doctors and facility*

### Standalone ER
$$$$

• *Open 24/7*

• *Could be transferred to a hospital ER based on circumstances*

• *Does not include trauma care*

• *Often out-of-network, which means you'd have to pay more out of pocket*

• *All standalone ERs charge a facility fee that urgent care doesn't. You may receive other bills for each doctor you see.*

## Urgent Care Center vs. Standalone ER

**Here are ways to tell if you're at a standalone ER:**

- It looks like an urgent care center but has "Emergency" in its name or on the building.
- It's open 24/7.
- It's not connected to or linked with a hospital.
- You might have similar costs as an ER visit, including copay, coinsurance, and deductible.

# Know Where to Go For Care

| Who provides care? | Virtual Visits | Dr. Office | Health Clinic | Urgent Care | Hospital ER | Standalone ER |
|---|---|---|---|---|---|---|
| | • *Primary Care* <br> • *Pediatric* <br> • *Family* <br> • *Emergency Doctors* | • *Primary Care* | • *Physician Assistant* <br> • *Nurse Practitioner* | • *Internal Medicine* <br> • *Family Practice* <br> • *Pediatric* | • *ER Doctors* <br> • *Internal Medicine* <br> • *Specialists* | • *ER Doctors* |
| Sprains, strains | | ✔ | ✔ | ✔ | • Any life-threatening or disabling conditions | • Most major injuries except for trauma |
| Animal bites | | ✔ | ✔ | ✔ | • Sudden or unexplained loss of consciousness | • May also provide imaging and lab services but do not offer trauma or cardiac services requiring catheterization |
| X-rays | | | | ✔ | • Major injuries | |
| Stitches | | | | ✔ | • Chest pain; numbness in the face, arm or leg; difficulty speaking | • Do not always accept ambulances |
| Mild asthma | ✔ | ✔ | ✔ | ✔ | • Severe shortness of breath | |
| Minor headaches | ✔ | ✔ | ✔ | ✔ | | |
| Back pain | | ✔ | ✔ | ✔ | • High fever with stiff neck, mental confusion or difficulty breathing | |
| Nausea, vomiting, diarrhea | ✔ | ✔ | ✔ | ✔ | • Coughing up or vomiting blood | |
| Minor allergic reactions | ✔ | ✔ | ✔ | ✔ | • Cut or wound that won't stop bleeding | |
| Coughs, sore throat | ✔ | ✔ | ✔ | ✔ | • Possible broken bones | |
| Bumps, cuts, scrapes | ✔ | ✔ | ✔ | ✔ | | |
| Rashes, minor burns | ✔ | ✔ | ✔ | ✔ | | |
| Minor fevers, colds | ✔ | ✔ | ✔ | ✔ | | |
| Ear or sinus pain | ✔ | ✔ | ✔ | ✔ | | |
| Burning with urination | ✔ | ✔ | ✔ | ✔ | | |
| Eye swelling, irritation, redness or pain | ✔ | ✔ | ✔ | ✔ | | |
| Vaccinations | | ✔ | ✔ | ✔ | | |



# Flexible Spending Account (FSA)



## Healthcare FSA

- FSA Contributions are tax-free and funds become available on your effective date.
- Funds expire at the end of the year, so it is useful only if you have predictable expenses
- Can be used on qualifying medical, dental, and vision expenses (deductibles, copays, prescriptions).
- Can roll over up to $640 to your next plan year
- **Maximum annual contribution is $3,200 in 2024**



## Dependent-Care FSA

- FSA Contributions are tax-free and funds accrue with each pay period.
- Funds expire at the end of the year, so it is useful only if you have predictable expenses. The IRS does not permit remaining funds to be carried over into the next plan year.
- Can be used on qualifying dependent care expenses (day care, child care, elder care) for dependent children up to age 13.
- Cannot roll over any funds into the next plan year
- **Maximum annual contribution is $5,000.**

**Note:** You can review your FSA total funds remaining, transactions, and claims by logging into Rippling and going to the Insurance & Benefits tab > select the FSA tab.

For help submitting an FSA claim please visit: https://help.rippling.com/s/article/360056303073

 ## Important to Know!

## FSA Funds expire at the end of the plan year.

It is important to budget carefully so as not to lose access to your contributed tax-free funds. The IRS does not allow contributions to an HSA and a full-purpose FSA in the same tax year.

 

# Dental

Dental Insurance is provided through Principal. Synapse offers a dental plan that provides comprehensive dental care. For full plan details, please refer to the dental plan summaries available for download in Bennie.

To locate a dental provider, visit **https://www.principal.com/find-dentist**.



### Dental PPO & EPO

The dental PPO & EPO options allow you to see a wide range of both in-network and out-of-network dentists and pays a reimbursement percentage based on the type of service you receive. **If you reside in CA, you have access to Principal's EPO network providers, in addition to DPPO network providers. The EPO network can provide additional discounts and savings on routine services.**

|  | EPO Network *(CA only)* | DPPO Network *(CA + all other states)* | |
| --- | --- | --- | --- |
|  | *EPO* | *In-Network* | *Out-Of-Network* |
| **Deductible** | $50 / $150 | $50 / $150 | $50 / $150 |
| **Dental Annual Maximum** | $2,000 | $2,000 | $2,000 |
| **Preventative Care** | 100% Covered | 100% Covered | 100% Covered |
| **Basic Services** | 100% Covered | 100% Covered | 80% Covered |
| **Major Services** | 60% Covered | 60% Covered | 50% Covered |
| **Orthodontic Lifetime Maximum** | $2,000 | $2,000 | $2,000 |
| **Orthodontic Services** *Child(ren) & Adult* | 50% Covered | 50% Covered | 50% Covered |

 ## Important to Know!

**Note:** The in-network and out-of-network reimbursements appear to be the same, but an out-of-network provider may charge higher fees and "balance bill" after insurance payment is calculated, so in general you will save money by staying in-network.

 **Vision**



**Vision Insurance is provided through Principal. Through this plan, you can access the VSP network of providers. For full plan details, please refer to the summaries available for download in Bennie.**

**To locate a vision provider, visit https://www.vsp.com/eye-doctor.**

|  | **In-Network** | **Out-Of-Network** |
|---|---|---|
| **Exams** | $10 copay | Up to $45 reimbursement |
| **Materials** | $25 copay | Up to $100 reimbursement |
| **Frames** | $150 allowance + 20% off amount over allowance | Up to $70 reimbursement |
| **Elective Contacts** | $150 allowance | Up to $105 reimbursement |
| **Frequency** *in months* *(exams, materials, frames, contact lenses)* | 12 / 12 / 24 / 12 | |

 **Important to Know!**

**Note:** **This plan reimburses for some out-of-network costs, but each reimbursement is based on an allowance depending on the type of service you receive.**

 # Group Life and AD&D



**Group Life and AD&D Insurance is provided through Principal. For full plan details, please refer to the plan summaries available for download in Bennie.**

 ## Group Life & Accidental Death and Dismemberment

- If you die, your beneficiary is entitled to receive 1x your annual earnings up to a maximum of $250,000.
- If your death is the result of an accident, the accidental death and dismemberment benefit pays your beneficiary an additional 1x annual earning up to a maximum of $250,000.
- This benefit is offered by Synapse at no cost to you.

 ## Important to Know!

**Make sure your beneficiary information is current.**

You can update it at any time in Rippling.

 **Disability**



**Short-Term and Long-Term Disability Insurance is provided through Principal. For full plan details, please refer to the plan summaries available for download in Bennie.**

## Short-Term Disability

- If you become disabled as the result of an off-the-job accident, sickness, or condition, and remain disabled for over a week, you become eligible to receive short-term disability benefits.
- This benefit pays you 60% of your weekly earnings up to a maximum of $2,309 per week (for up to 12 weeks).
- This benefit is offered by Synapse at no cost to you.

## Long-Term Disability

- If you remain disabled after 90 days on short-term disability, you become eligible to receive long-term disability benefits
- This benefit pays you 60% of your pre-disability monthly earnings, up to a maximum of $10,000 per month.
- This benefit is offered by Synapse at no cost to you.

**Note:** The Long-Term Disability plan includes a pre-existing condition provision. If you have been diagnosed with or treated for a disability within the 3 months immediately prior to enrolling (including pregnancy), you are ineligible to receive benefits for that condition for the first  12 months of enrollment.



# Additional Benefits

÷ one medical

## One Medical Membership

To provide you with more options, Synapse will sponsor a One Medical membership for each employee, if available in your area. Membership for your dependent spouse & children may be purchased through One Medical as well.

## A One Medical membership offers:

- Same and next-day appointments continently located near many of the firm's offices
- Free, 24/7 virtual care via the One Medical mobile app
- More one-on-one time with highly rated health providers

To activate your One Medical membership, visit **www.onemedical.com/myhealth** **and use code SYNPXOM.**

## Register through the app:

Apple Users:
- https://apps.apple.com/us/app/one-medical/id393507802

Android Users:
- https://play.google.com/store/apps/details?id=com.onemedical.android&hl=en_US&gl=US





# Additional Benefits

## 401(K) and Roth 401(K) Retirement

401(k) plans are retirement savings plans designed to allow eligible employees to save and invest before-tax and after-tax (i.e., Roth) dollars for retirement through a voluntary salary contribution. Synapse Fi offers a 401(k) retirement plan through Guideline and as an incentive, provides a company match to help you save. For complete details regarding the plan, including fees and available services refer to the plan document, visit www.guideline.com, call (888) 344-5188, or email support@guideline.com. You can also make changes any time, even outside of Open Enrollment!

## Eligibility & Enrollment

You are eligible to enroll after 90 days of employment, You must opt out to avoid auto enrollment.

| MATCH | VESTING SCHEDULE | AGE | MAX ANNUAL CONTRIBUTION |
|---|---|---|---|
| 4% | Immediate | **Under 50 years of age** | $23,000 |
| | | **50 years of age or older** | $23,000 + $7,500 = $30,500 |



---

## Employee Assistance Program (EAP)

The confidential Employee Assistance Program (EAP) through Magellan Health can help you with things like stress, anxiety, depression, chemical dependency, relationship issues, legal issues, parenting questions, financial counseling, and dependent or elder care resources.

Help is available 24/7, 365 days a year by telephone at (800) 356-7089. Online support is available at www.magellanascend.com. If prompted to log in, enter "Synapse" as the company name. In-person counseling may also be available, depending on the type of help you need. The program allows you and your family/household members up to 3 visit per incident.





# Plan Contacts

| Plan Type | Provider | Phone | Web |
|-----------|----------|-------|-----|
| **Medical PPO** | Cigna | 800-244-6224 | www.mycigna.com |
| **Medical Concierge** | One Medical | 888-663-6331 | www.onemedical.com/mybenefit |
| **Dental PPO** | Principal | 800-877-7195 | www.principal.com |
| **Vision** | Principal VSP | 800-877-7195 | www.vsp.com<br>www.principal.com |
| **Flexible Spending Account** | Rippling | N/A | www.rippling.com |
| **EAP** | Magellan | 800-356-7089<br>800-456-4006 (TTY) | www.magellanascend.com |
| **401K** | Guideline | 888-344-5188 | www.guideline.com |
| **Life/AD&D, STD, LTD** | Principal | 800-245-6609 | www.principal.com |
| **People Team** | People Ops | | people@synapsefi.com |





**Section 5**

# Plan Costs





# Plan Costs

The total amount that you pay for your benefits coverage depends on the plans you choose and how many dependents you cover, with the below per pay period costs being semi-monthly (24/yr).

Synapse covers the full cost of employee only coverage for the Cigna OAP $2,000 Base, Cigna OAP $1,000 Bronze PPO, Principal Dental, Principal Vision, Basic Life/AD&D, STD, and LTD – meaning these benefits are free to you!

| | Total Monthly Premium | Synapse Monthly Cost | Your Monthly Cost | Your Cost Per Pay Period |
|---|---|---|---|---|
| **Cigna OAP $2,000 Base** | | | | |
| **Employee** | $676.72 | $676.72 | $0.00 | **$0.00** |
| **Employee + Spouse** | $1,421.12 | $1,122.68 | $298.44 | **$149.22** |
| **Employee + Child(ren)** | $1,285.78 | $1,.028.62 | $257.16 | **$128.58** |
| **Employee + Family** | $2,030.18 | $1,490.96 | $539.22 | **$269.61** |
| | | | | |
| **Cigna OAP $1,000 Bronze** | | | | |
| **Employee** | $717.23 | $717.23 | $0.00 | **$0.00** |
| **Employee + Spouse** | $1,506.21 | $1,149.09 | $357.12 | **$178.56** |
| **Employee + Child(ren)** | $1,362.75 | $1,070.58 | $292.17 | **$146.09** |
| **Employee + Family** | $2,151.73 | $1,502.55 | $649.18 | **$324.59** |
| | | | | |
| **Cigna OAP $250 Platinum** | | | | |
| **Employee** | $787.51 | $717.58 | $69.93 | **$34.97** |
| **Employee + Spouse** | $1,653.82 | $1,199.02 | $454.80 | **$227.40** |
| **Employee + Child(ren)** | $1,496.31 | $1,111.46 | $384.85 | **$192.43** |
| **Employee + Family** | $2,362.57 | $1,593.08 | $769.49 | **$384.75** |
| | | | | |
| **Principal Dental PPO/EPO** | | | | |
| **Employee** | $45.77 | $45.77 | $0.00 | **$0.00** |
| **Employee + Spouse** | $92.93 | $68.09 | $24.84 | **$12.42** |
| **Employee + Child(ren)** | $123.69 | $85.33 | $38.36 | **$19.18** |
| **Employee + Family** | $180.18 | $89.64 | $90.54 | **$45.27** |
| | | | | |
| **Principal VSP Vision** | | | | |
| **Employee** | $6.82 | $6.82 | $0.00 | **$0.00** |
| **Employee + Spouse** | $13.67 | $10.15 | $3.52 | **$1.76** |
| **Employee + Child(ren)** | $13.34 | $9.98 | $3.36 | **$1.68** |
| **Employee + Family** | $21.50 | $14.08 | $7.42 | **$3.71** |



**Section 6**

# Benefits Enrollment





# Benefits Enrollment

Enroll in your benefits on the Rippling platform.

## ))) RIPPLING

**Login to elect or waive benefits for yourself and any dependents.**

• Rates are displayed at the time of enrollment, so you know exactly how much will be taken out of your paycheck.

• You can also download plan documents for detailed plan information.



# You've made your elections, now what?

## When can I expect my ID Numbers & Physical ID Cards

**WATCH VIDEO**



## Seeing a Provider or Filing a Claim Before Your Enrollment Has Processed

**WATCH VIDEO**



## What Should I Do If I Already Have a Procedure or Visit Scheduled?

**WATCH VIDEO**



**\*\*To prevent loading errors, please close video tabs prior to viewing subsequent videos.**

If you need additional assistance or need more clarification on what to expect after enrollment, feel free to contact our Ask Bennie team:     Askbennie@bennie.com  |  844-905-3157



**Section 7**

# Glossary



 # Glossary of Terms

## Plan Coverage Terms

**In-Network Coverage**
In-network providers have contracted rates they've pre-negotiated with insurance
carriers.  Typically, you will pay less with an in-network provider.

**Out-Of-Network**
Out-of-network providers do not have pre-negotiated rates with your insurance carrier.  You may
pay more for eligible services with an out-of-network provider.

**Primary Copay**
A predetermined rate you will pay every time you see your primary care physician.

**Specialist Copay**
A predetermined rate you will pay every time you see a specialist.

**Deductible**
The amount you will pay before your insurance carrier will pay for eligible expenses.

**Embedded Deductible**
No single individual on a family plan will have to pay a deductible higher than the individual
deductible amount. Once an individual on a family plan has met their individual deductible,
coinsurance and/or copays will apply for continued services (based on the medical plan type).

**Aggregate (Non-Embedded) Deductible**
All family members' out-of-pocket expenses count towards the family deductible until it is met.
Once the family deductible is satisfied, coinsurance and/or copays will apply (based on the
medical plan type) for continued services incurred by all family members.

**Coinsurance**
After your deductible is met, this is the percentage of costs you will pay for covered services.

**Out of Pocket Maximum**
The most you will pay for covered services in a plan year.  Once this maximum is met through
the deductible, copayments, and coinsurance, your health plan pays 100% of the costs of
covered services.  This does not include your payroll contribution.

**Emergency Room**
The amount you pay to receive care for emergency services in a hospital facility.

 # Glossary of Terms

**Urgent Care**
The amount you pay to receive care for emergency services in an independent non-hospital facility.

**Retail Rx Copay**
A predetermined rate you will pay for retail prescriptions.

**Mail Order Copay**
A predetermined rate you will pay for mail order prescriptions.

**Rx Deductible**
The amount you will pay before your insurance carrier will pay for eligible expenses on your prescription.

**Guaranteed Issue**
The benefit amount that the carrier has agree to approve coverage up to without requiring any health questions.

**Evidence of Insurability**
Health questions that carrier will review when determining to approve or decline benefit amounts above the guaranteed issue.

**Balance Billing**
The act of a provider billing a patient for the difference between the total cost of a service and the amount that the insurance carrier has agreed to covered for that service.

 # Glossary of Terms

## Your Medical Insurance Card

**Group**
This is unique to your company and is assigned by the insurance carrier. Healthcare providers and pharmacies use this to verify your coverage.

**ID (Member ID)**
This number is unique to you. Healthcare providers and pharmacies use this to verify your coverage.

**RxBIN**
This is an identifier that insurance carriers use for prescription billing.

**RxPCN**
This is a secondary identifier that insurance carriers use for prescription billing.

## Plan Costs

**Your Contribution**
The amount you contribute per pay period to be enrolled in the plan.

**Employer Contribution**
The amount your employer contributes per pay period toward your enrollment in the plan.



**Section 8**

# Required Healthcare Notices



**Newborns' Act Disclosure**

Group health plans and health insurance issuers generally may not, under Federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, Federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, plans and issuers may not, under Federal law, require that a provider obtain authorization from the plan or the insurance issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

**Special Enrollment Notice**

If you are declining enrollment for yourself or your dependents (including your spouse) because of other health insurance or group health plan coverage, you may be able to enroll yourself and your dependents in this plan if you or your dependents lose eligibility for that other coverage (or if the employer stops contributing toward your or your dependents' other coverage). However, you must request enrollment within 30 days after your or your dependents' other coverage ends (or after the employer stops contributing toward the other coverage).

In addition, if you have a new dependent as a result of marriage, birth, adoption, or placement for adoption, you may be able to enroll yourself and your dependents. However, you must request enrollment within 30 days after the marriage, birth, adoption, or placement for adoption.

To request special enrollment or obtain more information, contact People Ops at **people@synapsefi.com**.

**WHCRA Enrollment Notice**

If you have had or are going to have a mastectomy, you may be entitled to certain benefits under the Women's Health and Cancer Rights Act of 1998 (WHCRA). For individuals receiving mastectomy-related benefits, coverage will be provided in a manner determined in consultation with the attending physician and the patient, for:

• All stages of reconstruction of the breast on which the mastectomy was performed;
• Surgery and reconstruction of the other breast to produce a symmetrical appearance;
• Prostheses; and
• Treatment of physical complications of the mastectomy, including lymphedema.

These benefits will be provided subject to the same copays, deductibles and coinsurance applicable to other medical and surgical benefits provided under this plan.

If you would like more information on WHCRA benefits, contact your HR administrator.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**Michelle's Law Notice**

Federal legislation known as "Michelle's Law" generally extends eligibility for group health benefit plan coverage to a dependent child who is enrolled in an institution of higher education at the beginning of a medically necessary leave of absence if the leave normally would cause the dependent child to lose eligibility for coverage under the plan due to loss of student status. The extension of eligibility protects eligibility of a sick or injured dependent child for up to one year.

The Plan currently permits an employee to continue a child's coverage until the age of 26 if that child is enrolled at an accredited institution of learning on a full-time basis, with full-time defined by the accredited institution's registration and/or attendance policies. Michelle's Law requires the Plan to allow extended eligibility in some cases for a dependent child who would lose eligibility for Plan coverage due to loss of full-time student status.

There are two definitions that are important for purposes of determining whether the Michelle's Law extension of eligibility applies to a particular child:

- Dependent child means a child of a plan participant who is eligible under the terms of a group health benefit plan based on his or her student status and who was enrolled at a post-secondary educational institution immediately before the first day of a medically necessary leave of absence.
- Medically necessary leave of absence means a leave of absence or any other change in enrollment:
    - of a dependent child from a post-secondary educational institution that begins while the child is suffering from a serious illness or injury;
    - which is medically necessary; and
    - which causes the dependent child to lose student status under the terms of the Plan.

For the Michelle's Law extension of eligibility to apply, a dependent child's treating physician must provide written certification of medical necessity (i.e., certification that the dependent child suffers from a serious illness or injury that necessitates the leave of absence or other enrollment change that would otherwise cause loss of eligibility).

If a dependent child qualifies for the Michelle's Law extension of eligibility, the Plan will treat the dependent child as eligible for coverage until the earlier of:

- One year after the first day of the leave of absence; or

- The date that Plan coverage would otherwise terminate (for reasons other than failure to be a full-time student).

A dependent child on a medically necessary leave of absence is entitled to receive the same Plan benefits as other dependent children covered under the Plan. Further, any change to Plan coverage that occurs during the Michelle's Law extension of eligibility will apply to the dependent child to the same extent as it applies to other dependent children covered under the Plan.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**Genetic Information Nondiscrimination Act of 2008**

The Genetic Information Nondiscrimination Act of 2008 ("GINA") protects employees against discrimination based on their genetic information.  Unless otherwise permitted, your Employer may not request or require any genetic information from you or your family members.

"The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services."

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## COBRA General Rights Notice

This notice has important information about your right to COBRA continuation coverage, which is a temporary extension of coverage under the Plan.  This notice explains COBRA continuation coverage, when it may become available to you and your family, and what you need to do to protect your right to get it.  When you become eligible for COBRA, you may also become eligible for other coverage options that may cost less than COBRA continuation coverage.

The right to COBRA continuation coverage was created by a federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).  COBRA continuation coverage can become available to you and other members of your family when group health coverage would otherwise end.  For more information about your rights and obligations under the Plan and under federal law, you should review the Plan's Summary Plan Description or contact the HR Administrator.

**You may have other options available to you when you lose group health coverage.**  For example, you may be eligible to buy an individual plan through the Health Insurance Marketplace.  By enrolling in coverage through the Marketplace, you may qualify for lower costs on your monthly premiums and lower out-of-pocket costs.  Additionally, you may qualify for a 30-day special enrollment period for another group health plan for which you are eligible (such as a spouse's plan), even if that plan generally doesn't accept late enrollees.

## What is COBRA continuation coverage?

COBRA continuation coverage is a continuation of Plan coverage when it would otherwise end because of a life event.  This is also called a "qualifying event."  Specific qualifying events are listed later in this notice.  After a qualifying event, COBRA continuation coverage must be offered to each person who is a "qualified beneficiary."  You, your spouse, and your dependent children could become qualified beneficiaries if coverage under the Plan is lost because of the qualifying event.  Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage.

If you're an employee, you'll become a qualified beneficiary if you lose your coverage under the Plan because of the following qualified life events:

- your hours of employment are reduced, or
- your employment ends for any reason other than your gross misconduct.

If you're the spouse of an employee, you'll become a qualified beneficiary if you lose your coverage under the Plan because of the following qualifying events:

- Your spouse dies;
- Your spouse's hours of employment are reduced;
- Your spouse's employment ends for any reason other than his or her gross misconduct;
- Your spouse becomes entitled to Medicare benefits (under Part A, Part B, or both); or
- You become divorced or legally separated from your spouse.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**COBRA General Rights Notice (Continued)**

Your dependent children will become qualified beneficiaries if they lose coverage under the Plan because of the following qualifying events:

- The parent-employee dies;
- The parent-employee's hours of employment are reduced;
- The parent-employee's employment ends for any reason other than their gross misconduct;
- The parent-employee becomes entitled to Medicare benefits (Part A, Part B, or both);
- The parents become divorced or legally separated; or
- The child stops being eligible for coverage under the Plan as a "dependent child."

If the plan offers retiree health coverage, add the following paragraph: Sometimes, filing a proceeding in bankruptcy under title 11 of the United States Code can be a qualifying event. If a proceeding in bankruptcy is filed with respect to Synapse, and that bankruptcy results in the loss of coverage of any retired employee under the Plan, the retired employee will become a qualified beneficiary. The retired employee's spouse, surviving spouse, and dependent children will also become qualified beneficiaries if bankruptcy results in the loss of their coverage under the Plan.

**When will COBRA coverage become available?**

The Plan will offer COBRA continuation coverage to qualified beneficiaries only after the Plan Administrator has been notified that a qualifying event has occurred. The employer must notify the Plan Administrator of the following qualifying events:

- The end of employment or reduction of hours of employment;
- Death of the employee;
- Add if Plan provides retiree health coverage: Commencement of a proceeding in bankruptcy with respect to the employer; or
- The employee's becoming entitled to Medicare benefits (under Part A, Part B, or both).

For all other qualifying events (divorce or legal separation of the employee and spouse or a dependent child's losing eligibility for coverage as a dependent child), you must notify the Plan Administrator within 60 days after the qualifying event occurs. You must provide this notice to your benefits administrator.

**How is COBRA continuation coverage provided?**

Once the Plan Administrator receives notice that a qualifying event has occurred, COBRA continuation coverage will be offered to each of the qualified beneficiaries. Each qualified beneficiary will have an independent right to elect COBRA continuation coverage. Covered employees may elect COBRA continuation coverage on behalf of their spouses, and parents may elect COBRA continuation coverage on behalf of their children.

COBRA continuation coverage is a temporary continuation of coverage that generally lasts for 18 months due to employment termination or reduction of hours of work. Certain qualifying events, or a second qualifying event during the initial period of coverage, may permit a beneficiary to receive a maximum of 36 months of coverage.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**COBRA General Rights Notice (Continued)**

There are also ways in which this 18-month period of COBRA continuation coverage can be extended:

• Disability extension of 18-month period of COBRA continuation coverage:

    • If you or anyone in your family covered under the Plan is determined by Social Security to be disabled and you notify the Plan Administrator in a timely fashion, you and your entire family may be entitled to get up to an additional 11 months of COBRA continuation coverage, for a maximum of 29 months.  The disability would have to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of COBRA continuation coverage.

• Second qualifying event extension of 18-month period of continuation coverage:

    • If your family experiences another qualifying event during the 18 months of COBRA continuation coverage, the spouse and dependent children in your family can get up to 18 additional months of COBRA continuation coverage, for a maximum of 36 months, if the Plan is properly notified about the second qualifying event.  This extension may be available to the spouse and any dependent children getting COBRA continuation coverage if the employee or former employee dies; becomes entitled to Medicare benefits (under Part A, Part B, or both); gets divorced or legally separated; or if the dependent child stops being eligible under the Plan as a dependent child.  This extension is only available if the second qualifying event would have caused the spouse or dependent child to lose coverage under the Plan had the first qualifying event not occurred.

• Are there other coverage options besides COBRA Continuation Coverage?

    • Yes.  Instead of enrolling in COBRA continuation coverage, there may be other coverage options for you and your family through the Health Insurance Marketplace, Medicare, Medicaid, Children's Health Insurance Program (CHIP) or other group health plan coverage options (such as a spouse's plan) through what is called a "special enrollment period."   Some of these options may cost less than COBRA continuation coverage.   You can learn more about many of these options at www.healthcare.gov.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## COBRA General Rights Notice (Continued)

Can I enroll in Medicare instead of COBRA continuation coverage after my group health plan coverage ends?

In general, if you don't enroll in Medicare Part A or B when you are first eligible because you are still employed, after the Medicare initial enrollment period, you have an 8-month special enrollment period to sign up for Medicare Part A or B, beginning on the earlier of

·     The month after your employment ends; or
·     The month after group health plan coverage based on current employment ends.

If you don't enroll in Medicare and elect COBRA continuation coverage instead, you may have to pay a Part B late enrollment penalty and you may have a gap in coverage if you decide you want Part B later.  If you elect COBRA continuation coverage and later enroll in Medicare Part A or B before the COBRA continuation coverage ends, the Plan may terminate your continuation coverage.  However, if Medicare Part A or B is effective on or before the date of the COBRA election, COBRA coverage may not be discontinued on account of Medicare entitlement, even if you enroll in the other part of Medicare after the date of the election of COBRA coverage.

If you are enrolled in both COBRA continuation coverage and Medicare, Medicare will generally pay first (primary payer) and COBRA continuation coverage will pay second.  Certain plans may pay as if secondary to Medicare, even if you are not enrolled in Medicare.

For more information visit https://www.medicare.gov/medicare-and-you.


If you have questions:

Questions concerning your Plan or your COBRA continuation coverage rights should be addressed to the contact or contacts identified below.  For more information about your rights under the Employee Retirement Income Security Act (ERISA), including COBRA, the Patient Protection and Affordable Care Act, and other laws affecting group health plans, contact the nearest Regional or District Office of the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit www.dol.gov/ebsa.  (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)  For more information about the Marketplace, visit www.HealthCare.gov.

Keep your Plan informed of address changes.

To protect your family's rights, let the Plan Administrator know about any changes in the addresses of family members.  You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

**Plan contact information:**

**Synapse**

people@synapsefi.com

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**Premium Assistance Under Medicaid and the Children's Health Insurance Program (CHIP)**

If you or your children are eligible for Medicaid or CHIP and you're eligible for health coverage from your employer, your state may have a premium assistance program that can help pay for coverage, using funds from their Medicaid or CHIP programs.  If you or your children aren't eligible for Medicaid or CHIP, you won't be eligible for these premium assistance programs but you may be able to buy individual insurance coverage through the Health Insurance Marketplace.  For more information, visit **www.healthcare.gov**.

If you or your dependents are already enrolled in Medicaid or CHIP and you live in a State listed below, contact your State Medicaid or CHIP office to find out if premium assistance is available.

If you or your dependents are NOT currently enrolled in Medicaid or CHIP, and you think you or any of your dependents might be eligible for either of these programs, contact your State Medicaid or CHIP office or dial **1-877-KIDS NOW** or **www.insurekidsnow.gov** to find out how to apply.  If you qualify, ask your state if it has a program that might help you pay the premiums for an employer-sponsored plan.

If you or your dependents are eligible for premium assistance under Medicaid or CHIP, as well as eligible under your employer plan, your employer must allow you to enroll in your employer plan if you aren't already enrolled.  This is called a "special enrollment" opportunity, and **you must request coverage within 60 days of being determined eligible for premium assistance**. If you have questions about enrolling in your employer plan, contact the Department of Labor at **www.askebsa.dol.gov** or call **1-866-444-EBSA (3272)**.

**If you live in one of the following states, you may be eligible for assistance paying your employer health plan premiums.  The following list of states is current as of July 31, 2024.  Contact your State for more information on eligibility.**

**ALABAMA – Medicaid**
Website: http://myalhipp.com/
Phone: 1-855-692-5447

**ALASKA – Medicaid**
The AK Health Insurance Premium Payment Program Website:  http://myakhipp.com/
Phone:  1-866-251-4861
Email:  CustomerService@MyAKHIPP.com
Medicaid Eligibility:  https://health.alaska.gov/dpa/Pages/default.aspx

**ARKANSAS – Medicaid**
Website: http://myarhipp.com/
Phone:  1-855-MyARHIPP (855-692-7447)

**CALIFORNIA – Medicaid**
Website: http://dhcs.ca.gov/hipp
Phone: 916-445-8322
Fax: 916-440-5676
Email: hipp@dhcs.ca.gov

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## COLORADO – Health First Colorado (Colorado's Medicaid Program) & Child Health Plan Plus (CHP+)

Health First Colorado Website:  https://www.healthfirstcolorado.com/
Health First Colorado Member Contact Center Phone:  1-800-221-3943/ State Relay 711
CHP+: https://hcpf.colorado.gov/child-health-plan-plus
CHP+ Customer Service Phone: 1-800-359-1991/ State Relay 711
Health Insurance Buy-In Program (HIBI):  https://www.mycohibi.com/
HIBI Customer Service:  1-855-692-6442

## FLORIDA – Medicaid

Website: https://www.flmedicaidtplrecovery.com/flmedicaidtplrecovery.com/hipp/index.html
Phone: 1-877-357-3268

## GEORGIA – Medicaid

Website: https://medicaid.georgia.gov/health-insurancepremium-payment-program-hipp
Phone: 678-564-1162, Press 1
GA CHIPRA Website: https://medicaid.georgia.gov/programs/third-party-liability/childrens-health-insurance-program-reauthorization-act-2009-chipra
Phone: 678-564-1162, Press 2

## INDIANA – Medicaid

**Healthy Indiana Plan for low-income adults 19-64**
Website: http://www.in.gov/fssa/hip/
Phone: 1-877-438-4479
**All other Medicaid**
Website: https://www.in.gov/medicaid/
Phone 1-800-457-4584

## IOWA – Medicaid and CHIP (Hawki)

Medicaid Website:  https://dhs.iowa.gov/ime/members
Medicaid Phone: 1-800-338-8366
Hawki Website:  http://dhs.iowa.gov/Hawki
Hawki Phone: 1-800-257-8563
HIPP Website: https://dhs.iowa.gov/ime/members/medicaid-a-to-z/hipp
HIPP Phone: 1-888-346-9562

## KANSAS – Medicaid

Website:  https://www.kancare.ks.gov/
Phone:  1-800-792-4884
HIPP Phone: 1-800-967-4660

## KENTUCKY – Medicaid

**Kentucky Integrated Health Insurance Premium Payment Program (KI-HIPP)**
Website:  https://chfs.ky.gov/agencies/dms/member/Pages/kihipp.aspx
Phone: 1-855-459-6328
Email: KIHIPP.PROGRAM@ky.gov
KCHIP Website: https://kidshealth.ky.gov/Pages/index.aspx
KCHIP Phone: 1-877-524-4718
Kentucky Medicaid Website: https://chfs.ky.gov

## LOUISIANA – Medicaid

Website: www.medicaid.la.gov or www.ldh.la.gov/lahipp
Phone: 1-888-342-6207 (Medicaid hotline) or 1-855-618-5488 (LaHIPP)

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## MAINE – Medicaid

Enrollment Website:  https://www.mymaineconnection.gov/benefits/s/?language=en_US
Phone: 1-800-442-6003 TTY: Maine relay 711
**Private Health Insurance Premium**
Website: https://www.maine.gov/dhhs/ofi/applications-forms
Phone: 1-800-977-6740
TTY: Maine relay 711

## MASSACHUSETTS – Medicaid and CHIP

Website: https://www.mass.gov/masshealth/pa
Phone: 1-800-862-4840
TTY: 617-886-8102

## MINNESOTA – Medicaid

Website:  https://mn.gov/dhs/people-we-serve/children-and-families/health-care/health-care-programs/programs-and-services/other-insurance.jsp
Phone: 1-800-657-3739

## MISSOURI – Medicaid

Website: http://www.dss.mo.gov/mhd/participants/pages/hipp.htm
Phone: 573-751-2005

## MONTANA – Medicaid

Website: http://dphhs.mt.gov/MontanaHealthcarePrograms/HIPP
Phone: 1-800-694-3084
Email: HHSHIPPProgram@mt.gov

## NEBRASKA – Medicaid

Website:  http://www.ACCESSNebraska.ne.gov
Phone: 1-855-632-7633
Lincoln: 402-473-7000
Omaha: 402-595-1178

## NEVADA – Medicaid

Website:  http://dhcfp.nv.gov
Phone:  1-800-992-0900

## NEW HAMPSHIRE – Medicaid

Website: https://www.dhhs.nh.gov/programs-services/medicaid/health-insurance-premium-program
Phone: 603-271-5218
Toll free number for the HIPP program: 1-800-852-3345, ext. 5218

## NEW JERSEY – Medicaid and CHIP

Medicaid Website:  http://www.state.nj.us/humanservices/_dmahs/clients/medicaid/
Medicaid Phone: 609-631-2392
CHIP Website: http://www.njfamilycare.org/index.html
CHIP Phone: 1-800-701-0710

## NEW YORK – Medicaid

Website: https://www.health.ny.gov/health_care/medicaid/
Phone: 1-800-541-2831

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

### NORTH CAROLINA – Medicaid
Website:  https://medicaid.ncdhhs.gov/
Phone:  919-855-4100

### NORTH DAKOTA – Medicaid
Website: http://www.nd.gov/dhs/services/medicalserv/medicaid/
Phone: 1-844-854-4825

### OKLAHOMA – Medicaid and CHIP
Website: http://www.insureoklahoma.org
Phone: 1-888-365-3742

### OREGON – Medicaid
Website: http://healthcare.oregon.gov/Pages/index.aspx http://www.oregonhealthcare.gov/index-es.html
Phone: 1-800-699-9075

### PENNSYLVANIA – Medicaid and CHIP
Website: https://www.dhs.pa.gov/providers/Providers/Pages/Medica l/HIPP-Program.aspx
Phone: 1-800-692-7462
CHIP Website: Children's Health Insurance Program (CHIP) (pa.gov)
CHIP Phone: 1-800-986-KIDS (5437)

### RHODE ISLAND – Medicaid and CHIP
Website: http://www.eohhs.ri.gov/
Phone: 1-855-697-4347, or 401-462-0311 (Direct RIte Share Line)

### SOUTH CAROLINA – Medicaid
Website: https://www.scdhhs.gov
Phone: 1-888-549-0820

### SOUTH DAKOTA – Medicaid
Website: http://dss.sd.gov
Phone: 1-888-828-0059

### TEXAS – Medicaid
Website: http://gethipptexas.com/
Phone: 1-800-440-0493

### UTAH – Medicaid and CHIP
Medicaid Website: https://medicaid.utah.gov/
CHIP Website: http://health.utah.gov/chip
Phone: 1-877-543-7669

### VERMONT – Medicaid
Website: Health Insurance Premium Payment (HIPP) Program | Department of Vermont Health Access
Phone: 1-800-250-8427

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

### VIRGINIA – Medicaid and CHIP

Website:  https://www.coverva.org/hipp/
Medicaid/CHIP Phone: 1-800-432-5924

### WASHINGTON – Medicaid

Website: https://www.hca.wa.gov/
Phone:  1-800-562-3022

### WEST VIRGINIA – Medicaid and CHIP

Website:  http://mywvhipp.com/
Medicaid Phone: 304-558-1700
CHIP Toll-free phone: 1-855-MyWVHIPP (1-855-699-8447)

### WISCONSIN – Medicaid and CHIP

Website:  https://www.dhs.wisconsin.gov/badgercareplus/p10095.htm
Phone: 1-800-362-3002

### WYOMING – Medicaid

Website: https://health.wyo.gov/healthcarefin/medicaid/programs-and-eligibility/
Phone: 1-800-251-1269


To see if any other states have added a premium assistance program since January 31, 2024, or for more information on special enrollment rights, contact either:

**U.S. Department of Labor Services**
Employee Benefits Security Administration
www.dol.gov/agencies/ebsa
1-866-444-EBSA (3272)

**U.S. Department of Health and Human Services**
Centers for Medicare & Medicaid Services
www.cms.hhs.gov
1-877-267-2323, Menu Option 4, Ext. 61565

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

# New Health Insurance Marketplace Coverage Options and Your Health Coverage

Form Approved
OMB No. 1210-0149
(Expires 7-31-2023)

## Part A: General Information

When key parts of the health care law take effect in 2014, there will be a new way to buy health insurance: the Health Insurance Marketplace. To assist you as you evaluate options for you and your family, this notice provides some basic information about the new Marketplace and employment-based health coverage offered by your employer.

### What is the Health Insurance Marketplace?

The Marketplace is designed to help you find health insurance that meets your needs and fits your budget. The Marketplace offers "one-stop shopping" to find and compare private health insurance options. You may also be eligible for a new kind of tax credit that lowers your monthly premium right away. Open enrollment for health insurance coverage through the Marketplace begins in October 2013 for coverage starting as early as January 1, 2014.

### Can I Save Money on my Health Insurance Premiums in the Marketplace?

You may qualify to save money and lower your monthly premium, but only if your employer does not offer coverage, or offers coverage that doesn't meet certain standards. The savings on your premium that you're eligible for depends on your household income.

### Does Employer Health Coverage Affect Eligibility for Premium Savings through the Marketplace?

Yes. If you have an offer of health coverage from your employer that meets certain standards, you will not be eligible for a tax credit through the Marketplace and may wish to enroll in your employer's health plan. However, you may be eligible for a tax credit that lowers your monthly premium, or a reduction in certain cost-sharing if your employer does not offer coverage to you at all or does not offer coverage that meets certain standards. If the cost of a plan from your employer that would cover you (and not any other members of your family) is more than 9.5% of your household income for the year, or if the coverage your employer provides does not meet the "minimum value" standard set by the Affordable Care Act, you may be eligible for a tax credit.[1]

**Note:** If you purchase a health plan through the Marketplace instead of accepting health coverage offered by your employer, then you may lose the employer contribution (if any) to the employer-offered coverage. Also, this employer contribution -as well as your employee contribution to employer-offered coverage- is often excluded from income for Federal and State income tax purposes. Your payments for coverage through the Marketplace are made on an after- tax basis.

### How Can I Get More Information?

For more information about your coverage offered by your employer, please check your summary plan description or contact: people@synapsefi.com.

The Marketplace can help you evaluate your coverage options, including your eligibility for coverage through the Marketplace and its cost. Please visit **HealthCare.gov** for more information, including an online application for health insurance coverage and contact information for a Health Insurance Marketplace in your area.

NOTE: You'll get this notice each year. You will also get it before the next period you can join a Medicare drug plan, and if this coverage through the company changes.

You also may request a copy of this notice at any time by contacting people@synapsefi.com.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## Part B: Information about Health Coverage offered by Your Employer

This section contains information about any health coverage offered by your employer. If you decide to complete an application for coverage in the Marketplace, you will be asked to provide this information. This information is numbered to correspond to the Marketplace application.

| 3. Employer name<br>Synapse | 4. Employer Identification Number (EIN)<br>46-5396710 |
|---|---|
| 5. **Employer address**<br>101 2nd St. Suite 525 | 6. Employer phone number |

| 7. City<br>**San Francisco** | 8. State<br>**CA** | 9. ZIP code<br>94105 |
|---|---|---|

| 10. Who can we contact about employee health coverage at this job?<br>Thao Dinh | |
|---|---|
| 11. Phone number (if different from above) | 12. Email address<br>people@synapsefi.com |

### Information about Health Coverage offered by Your Employer

Here is some basic information about health coverage offered by this employer:

**As your employer, we offer a health plan to:**

❑   All employees. Eligible Employees are:

❑   Full time employees working at least 30 hours per week

**With respect to dependents:**

❑   We do offer coverage. Eligible Dependents are:

❑   Spouses, domestic partners, and legal dependent children

**This coverage meets the minimum value standard, and the cost of this coverage to you is intended to be affordable, based on employee wages.**

Even if your employer intends your coverage to be affordable, you may still be eligible for a premium discount through the Marketplace. The Marketplace will use your household income, along with other factors, to determine whether you may be eligible for a premium discount. If, for example, your wages vary from week to week (perhaps you are an hourly employee or you work on a commission basis), if you are newly employed mid-year, or if you have other income losses, you may still qualify for a premium discount.

If you decide to shop for coverage in the Marketplace, www.HealthCare.gov  will guide you through the process. Here's the employer information you'll enter when you visit www.HealthCare.gov to find out if you can get a tax credit to lower your monthly premiums.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

## Important Notice About Your Prescription Drug Coverage and Medicare

Please read this notice carefully and keep it where you can find it. This notice has information about your current prescription drug coverage offered through the Plan and about your options under Medicare's prescription drug coverage. This information can help you decide whether you want to join a Medicare drug plan. If you are considering joining, you should compare your current coverage, including which drugs are covered at what cost, with the coverage and costs of the plans offering Medicare prescription drug coverage in your area. Information about where you can get help to make decisions about your prescription drug coverage is at the end of this notice.

There are two important things you need to know about your current coverage and Medicare's prescription drug coverage:

1.  Medicare prescription drug coverage became available in 2006 to everyone with Medicare. You can get this coverage if you join a Medicare Prescription Drug Plan or join a Medicare Advantage Plan (like an HMO or PPO) that offers prescription drug coverage. All Medicare drug plans provide at least a standard level of coverage set by Medicare. Some plans may also offer more coverage for a higher monthly premium.
2.  The company has determined that the prescription drug coverage offered is, on average for all plan participants, expected to pay out as much as standard Medicare prescription drug coverage pays and is therefore considered Creditable Coverage. Because your existing coverage is Creditable Coverage, you can keep this coverage and not pay a higher premium (a penalty) if you later decide to join a Medicare drug plan.

### When Can You Join A Medicare Drug Plan?
You can join a Medicare drug plan when you first become eligible for Medicare and each year from October 15th to December 7th. However, if you lose your current creditable prescription drug coverage, through no fault of your own, you will also be eligible for a two (2) month Special Enrollment Period (SEP) to join a Medicare drug plan.

### What Happens To Your Current Coverage If You Decide to Join A Medicare Drug Plan?
If you decide to join a Medicare drug plan, your current coverage will not be affected.
If you do decide to join a Medicare drug plan and drop your current coverage, be aware that you and your dependents will be able to get this coverage back.

### When Will You Pay A Higher Premium (Penalty) To Join A Medicare Drug Plan?
You should also know that if you drop or lose your current coverage and don't join a Medicare drug plan within 63 continuous days after your current coverage ends, you may pay a higher premium (a penalty) to join a Medicare drug plan later.

If you go 63 continuous days or longer without creditable prescription drug coverage, your monthly premium may go up by at least 1% of the Medicare base beneficiary premium per month for every month that you did not have that coverage. For example, if you go nineteen months without creditable coverage, your premium may consistently be at least 19% higher than the Medicare base beneficiary premium. You may have to pay this higher premium (a penalty) as long as you have Medicare prescription drug coverage. In addition, you may have to wait until the following October to join.

### For More Information About This Notice Or Your Current Prescription Drug Coverage...
Contact the person listed below for further information.

**NOTE**: You'll get this notice each year. You will also get it before the next period you can join a Medicare drug plan, and if this coverage through the company changes.  You also may request a copy of this notice at any time.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

**For More Information About Your Options Under Medicare Prescription Drug Coverage...**

More detailed information about Medicare plans that offer prescription drug coverage is in the "Medicare & You" handbook. You'll get a copy of the handbook in the mail every year from Medicare. You may also be contacted directly by Medicare drug plans.

For more information about Medicare prescription drug coverage:
- Visit www.medicare.gov.
- Call your State Health Insurance Assistance Program (see the inside back cover of your copy of the "Medicare & You" handbook for their telephone number) for personalized help.
- Call 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

If you have limited income and resources, extra help paying for Medicare prescription drug coverage is available. For information about this extra help, visit Social Security on the web at www.socialsecurity.gov, or call them at 1-800-772-1213 (TTY 1-800-325-0778).

**Remember: Keep this Creditable Coverage notice. If you decide to join one of the Medicare drug plans, you may be required to provide a copy of this notice when you join to show whether or not you have maintained creditable coverage and, therefore, whether or not you are required to pay a higher premium (a penalty).**

**Date: January 2024**
**Synapse**
People@synapsefi.com

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0990. The time required to complete this information collection is estimated to average 8 hours per response initially, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.*

# EXHIBIT "4"

Synapse Financial Technologies, Inc.
Est 4/26 Payroll Obligations
4/14-4/27 Est

| Name | Employee Id | Total Gross Earnings | 401K - company contribution | Dental Deductions - company contribution | Life Deductions - company contribution | Long Term Disability Deductions - company contribution | Medical Deductions - company contribution | Roth 401K - company contribution | Short Term Disability Deductions - company contribution | Vision Deductions - company contribution | Total Deductions - Company Contribution | Total Employer Taxes | Gross Per Day | PR Tax per Day | Ins Per Day | Total Per Day | 410k per Day |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 416 | 7,696.88 | 307.69 | 22.89 | 7.09 | 9.84 | 358.62 | 0.00 | 6.48 | 3.41 | 716.02 | 588.81 | 769.69 | 58.88 | 40.83 | 869.40 | 30.77 |
| | 242 | 4,463.98 | 178.46 | 44.82 | 5.14 | 7.14 | 796.54 | | 4.69 | 7.04 | 1,043.83 | 308.32 | 446.40 | 30.83 | 86.54 | 563.77 | 17.85 |
| | 285 | 2,500.08 | | | 2.30 | 3.20 | | | 2.10 | | 7.60 | 191.25 | 250.01 | 19.13 | 0.76 | 269.89 | 0.00 |
| | 2 | 4,284.83 | 171.34 | 22.89 | 3.99 | 5.48 | 338.36 | 0.00 | 3.61 | 3.41 | 549.08 | 327.79 | 428.48 | 32.78 | 37.77 | 499.04 | 17.13 |
| | 288 | 4,848.75 | | 34.05 | 4.96 | 6.89 | 599.51 | | 4.55 | 5.08 | 655.04 | 342.25 | 484.88 | 34.23 | 65.50 | 584.60 | 0.00 |
| | 8 | 1,587.91 | 63.51 | | 2.30 | 3.18 | 358.62 | | 2.10 | 3.41 | 433.12 | 121.47 | 158.79 | 12.15 | 36.96 | 207.90 | 6.35 |
| | 10 | 1,663.69 | 66.54 | 22.89 | 2.39 | 3.32 | 574.55 | | 2.21 | 5.08 | 676.98 | 113.48 | 166.37 | 11.35 | 61.04 | 238.76 | 6.65 |
| | 156 | 8,274.37 | 330.77 | 34.05 | 7.62 | 10.58 | 599.51 | 0.00 | 6.97 | 5.08 | 994.58 | 614.51 | 827.44 | 61.45 | 66.38 | 955.27 | 33.08 |
| | 9 | 3,505.45 | 140.19 | 22.89 | 3.24 | 4.49 | 358.62 | | 2.98 | 3.41 | 535.82 | 268.17 | 350.55 | 26.82 | 39.56 | 416.93 | 14.02 |
| | 371 | 5,579.64 | 223.08 | | 5.14 | 7.14 | 358.62 | | 4.69 | 3.41 | 624.97 | 420.47 | 557.96 | 42.05 | 40.19 | 640.20 | 22.31 |
| | 405 | 5,856.98 | 233.85 | 44.82 | 6.73 | 9.36 | 796.54 | | 6.16 | 7.04 | 1,104.50 | 414.88 | 585.70 | 41.49 | 87.07 | 714.25 | 23.39 |
| | 12 | 5,233.95 | 209.23 | | 6.03 | 8.37 | 574.55 | | 5.50 | 5.08 | 842.81 | 385.66 | 523.40 | 38.57 | 63.36 | 625.32 | 20.92 |
| | 13 | 1,206.19 | | 34.05 | 1.99 | 2.76 | 574.55 | | 1.82 | 5.08 | 620.25 | 77.53 | 120.62 | 7.75 | 62.03 | 190.40 | 0.00 |
| | 15 | 3,165.99 | | | 3.68 | 5.06 | 535.29 | | 3.33 | 4.99 | 552.35 | 291.25 | 316.60 | 29.13 | 55.24 | 400.96 | 0.00 |
| | 21 | 6,469.71 | 258.46 | 44.82 | 7.44 | 10.34 | 796.54 | | 6.79 | 3.41 | 1,127.80 | 462.04 | 646.97 | 46.20 | 86.93 | 780.11 | 25.85 |
| | 17 | 2,454.58 | | 44.82 | 2.83 | 3.88 | 745.48 | | 2.56 | 7.04 | 806.61 | 163.40 | 245.46 | 16.34 | 80.66 | 342.46 | 0.00 |
| | 404 | 3,542.92 | 141.54 | 22.89 | 4.08 | 5.66 | 358.62 | 0.00 | 3.75 | 3.41 | 539.95 | 269.44 | 354.29 | 26.94 | 39.84 | 421.08 | 14.15 |
| | 428 | 6,004.40 | 240.00 | 44.82 | 6.91 | 9.60 | 796.54 | | 6.30 | 5.08 | 1,109.25 | 426.30 | 600.44 | 42.63 | 86.93 | 730.00 | 24.00 |
| | 122 | 3,697.19 | 73.85 | 34.05 | 4.26 | 5.91 | 358.79 | | 3.89 | 5.08 | 485.83 | 271.11 | 369.72 | 27.11 | 41.20 | 438.03 | 7.39 |
| | 232 | 1,317.22 | 17.60 | 22.89 | 2.13 | 2.94 | 358.62 | | 1.96 | 3.41 | 409.55 | 100.77 | 131.72 | 10.08 | 39.20 | 180.99 | 1.76 |
| | 312 | 10,594.95 | 423.08 | 44.82 | 9.75 | 12.31 | 796.54 | | 8.09 | 7.04 | 1,301.63 | 824.94 | 1,059.50 | 82.49 | 87.86 | 1,229.84 | 42.31 |
| | 267 | 2,155.68 | 86.15 | 42.67 | 2.48 | 3.45 | 555.73 | | 2.28 | 4.99 | 697.75 | 148.59 | 215.57 | 14.86 | 61.16 | 291.59 | 8.62 |
| | 368 | 6,157.91 | 246.15 | 34.05 | 7.09 | 9.84 | 574.55 | | 6.48 | 5.08 | 883.24 | 456.33 | 615.79 | 45.63 | 63.71 | 725.13 | 24.62 |
| | 315 | 5,877.22 | 233.85 | 34.05 | 6.73 | 9.36 | 599.51 | | 6.16 | 5.08 | 894.74 | 430.33 | 587.72 | 43.03 | 66.09 | 696.84 | 23.39 |
| | 33 | 2,409.64 | | | 2.26 | 3.08 | 574.55 | | 2.03 | 5.08 | 587.00 | 170.55 | 240.96 | 17.06 | 58.70 | 316.72 | 0.00 |
| | 32 | 1,080.00 | 43.20 | 22.89 | 1.28 | 1.73 | 358.79 | | 1.16 | 3.41 | 432.46 | 76.76 | 108.00 | 7.68 | 38.93 | 154.60 | 4.32 |
| | 34 | 8,486.56 | 338.46 | 44.82 | 7.80 | 10.83 | | | 7.14 | 7.04 | 416.09 | 645.47 | 848.66 | 64.55 | 7.76 | 920.97 | 33.85 |
| | 155 | 6,700.57 | 267.82 | 44.82 | 7.75 | 10.71 | 796.54 | | 7.04 | 7.04 | 1,141.72 | 479.41 | 670.06 | 47.94 | 87.39 | 805.39 | 26.78 |
| | 334 | 7,117.74 | 283.08 | 44.82 | 8.15 | 11.32 | 796.54 | | 7.46 | 7.04 | 1,158.41 | 532.97 | 711.77 | 53.30 | 87.53 | 852.60 | 28.31 |
| | 170 | 4,533.65 | 181.25 | 34.05 | 5.23 | 7.25 | 574.55 | | 4.76 | 5.08 | 812.17 | 332.08 | 453.37 | 33.21 | 63.09 | 549.67 | 18.13 |
| | 43 | 2,354.40 | 94.15 | 42.67 | 2.75 | 3.77 | 358.62 | | 2.49 | 4.99 | 509.44 | 178.52 | 235.44 | 17.85 | 41.53 | 294.82 | 9.42 |
| | 42 | 2,215.71 | 22.15 | 22.89 | 2.57 | 3.54 | 358.62 | | 2.35 | | 412.12 | 169.50 | 221.57 | 16.95 | 39.00 | 277.52 | 2.22 |
| | 261 | 2,424.88 | 48.46 | 22.89 | 2.48 | 3.45 | 358.79 | | 2.28 | 3.41 | 441.76 | 359.71 | 242.49 | 35.97 | 39.33 | 317.79 | 4.85 |
| | 41 | 2,648.59 | | 22.89 | 2.75 | 3.77 | 358.62 | | 2.49 | 3.41 | 393.93 | 199.43 | 264.86 | 19.94 | 39.39 | 324.20 | 0.00 |
| | 272 | 8,316.27 | 332.31 | | 7.67 | 10.63 | | | 7.00 | | 357.61 | 636.20 | 831.63 | 63.62 | 2.53 | 897.78 | 33.23 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 356 | | 6,158.42 | 246.15 | 44.82 | 7.09 | 9.84 | 796.54 | 0.00 | 6.48 | | 1,110.92 | 438.22 | 615.84 | 43.82 | 86.48 | 746.14 | 24.62 |
| 49 | | 1,363.68 | 54.55 | 22.89 | 1.95 | 2.70 | 338.36 | 0.00 | 1.79 | 3.41 | 425.65 | 99.45 | 136.37 | 9.95 | 37.11 | 183.42 | 5.46 |
| 351 | | 8,010.94 | 320.00 | 22.89 | 9.22 | 12.31 | 358.62 | | 8.09 | | 731.13 | 612.84 | 801.09 | 61.28 | 41.11 | 903.49 | 32.00 |
| 331 | | 3,324.62 | | 22.89 | 3.85 | 5.32 | 338.36 | | 3.50 | 3.41 | 377.33 | 254.34 | 332.46 | 25.43 | 37.73 | 395.63 | 0.00 |
| 119 | | 7,907.27 | 315.39 | 44.82 | 7.26 | 10.09 | 796.54 | | 6.65 | 7.04 | 1,187.79 | 661.52 | 790.73 | 56.15 | 87.24 | 934.12 | 31.54 |
| 172 | | 4,238.94 | 169.48 | 22.89 | 4.34 | 6.03 | 358.62 | | 3.96 | 3.41 | 568.73 | 324.27 | 423.89 | 32.43 | 39.93 | 496.25 | 16.95 |
| 417 | | 8,660.06 | | 34.05 | 8.86 | 12.31 | 599.51 | | 8.09 | 5.08 | 667.90 | 644.02 | 866.01 | 64.40 | 66.79 | 997.20 | 0.00 |
| 113 | | 8,860.42 | 353.85 | 22.89 | 8.15 | 11.32 | 358.79 | | 7.46 | 3.41 | 765.87 | 675.15 | 886.04 | 67.52 | 41.20 | 994.76 | 35.39 |
| 70 | | 6,025.49 | 240.86 | 22.89 | 6.96 | 9.64 | 358.79 | | 6.34 | 3.41 | 648.89 | 630.14 | 602.55 | 63.01 | 40.80 | 706.37 | 24.09 |
| 363 | | 4,675.46 | | 22.89 | 4.79 | 6.65 | 358.79 | | 4.38 | 3.41 | 400.91 | 355.00 | 467.55 | 35.50 | 40.09 | 543.14 | 0.00 |
| 354 | | 6,161.47 | 246.15 | 44.82 | 7.09 | 9.84 | 796.54 | | 6.48 | 7.04 | 1,117.96 | 438.17 | 616.15 | 43.82 | 87.18 | 747.15 | 24.62 |
| 178 | | 4,124.02 | 164.80 | 22.89 | 4.79 | 6.59 | 358.62 | | 4.34 | 3.41 | 565.44 | 439.91 | 412.40 | 43.91 | 40.06 | 496.38 | 16.48 |
| 114 | | 5,957.02 | 237.69 | 42.67 | 5.49 | 7.61 | 555.73 | | 5.01 | 4.99 | 859.19 | 439.39 | 595.70 | 43.94 | 62.15 | 701.79 | 23.77 |
| 75 | | 7,530.93 | 301.08 | 22.89 | 6.96 | 9.64 | 358.62 | | 6.34 | 3.41 | 708.94 | 789.39 | 753.09 | 78.94 | 40.79 | 872.82 | 30.11 |
| 80 | | 6,466.99 | 258.46 | 44.82 | 7.44 | 10.34 | 745.48 | | 6.79 | 7.04 | 1,080.37 | 463.97 | 646.70 | 46.40 | 82.19 | 775.29 | 25.85 |
| 76 | | 7,699.23 | 307.69 | 44.82 | 8.86 | 12.31 | 796.54 | | 8.09 | 7.04 | 1,185.35 | 541.32 | 769.92 | 54.13 | 87.77 | 911.82 | 30.77 |
| 84 | | 7,729.57 | 309.00 | 42.67 | 7.14 | 9.89 | 555.73 | | 6.51 | 4.99 | 935.93 | 557.32 | 772.96 | 55.73 | 62.69 | 891.38 | 30.90 |
| 85 | | 1,356.51 | 54.26 | 22.89 | 1.95 | 2.70 | 358.79 | 0.00 | 1.79 | 3.41 | 445.79 | 99.28 | 135.65 | 9.93 | 39.15 | 184.73 | 5.43 |
| 220 | | 1,543.98 | | 22.89 | 2.22 | 3.06 | 358.62 | | 2.03 | 3.41 | 392.26 | 118.12 | 154.40 | 11.81 | 39.22 | 205.43 | 0.00 |
| 136 | | 7,134.81 | 285.23 | 34.05 | 6.60 | 9.13 | 599.51 | | 6.02 | 5.08 | 945.62 | 526.06 | 713.48 | 52.61 | 66.04 | 832.13 | 28.52 |
| 415 | | 7,702.69 | 307.69 | 22.89 | 8.86 | 12.31 | 358.79 | | 8.09 | 3.41 | 722.04 | 582.44 | 770.27 | 58.24 | 41.44 | 869.95 | 30.77 |
| 87 | | 6,184.10 | 247.20 | 22.89 | 7.14 | 9.89 | 358.79 | | 6.51 | 3.41 | 655.83 | 470.41 | 618.41 | 47.04 | 40.86 | 706.31 | 24.72 |
| 90 | | 10,396.14 | 415.39 | 22.89 | 9.57 | 12.31 | 358.62 | | 8.09 | 3.41 | 830.28 | 795.30 | 1,039.61 | 79.53 | 41.49 | 1,160.63 | 41.54 |
| 235 | | 3,695.49 | | 34.05 | 4.26 | 5.91 | 561.34 | | 3.89 | 5.08 | 614.53 | 268.61 | 369.55 | 26.86 | 61.45 | 457.86 | 0.00 |
| 89 | | 3,078.03 | 123.08 | 34.05 | 3.54 | 4.92 | 358.62 | | 3.26 | 3.41 | 530.88 | 234.52 | 307.80 | 23.45 | 40.78 | 372.04 | 12.31 |
| 445 | | 2,500.00 | | | | | | | | | 0.00 | 0.00 | 250.00 | 0.00 | 0.00 | 250.00 | 0.00 |
| 127 | | 6,875.30 | 274.62 | | 6.34 | 8.79 | | | 5.78 | | 295.53 | 525.96 | 687.53 | 52.60 | 2.09 | 742.22 | 27.46 |
| 93 | | 3,461.54 | 138.46 | | | | | 0.00 | | | 138.46 | 264.81 | 346.15 | 26.48 | 0.00 | 372.64 | 13.85 |
| 202 | | 1,380.48 | 55.22 | 34.05 | 1.99 | 2.76 | 561.34 | 0.00 | 1.82 | 5.08 | 662.26 | 93.11 | 138.05 | 9.31 | 60.70 | 208.06 | 5.52 |
| 338 | | 5,818.53 | 232.62 | 22.89 | 5.98 | 8.27 | 358.79 | | 5.46 | 3.41 | 637.42 | 442.44 | 581.85 | 44.24 | 40.48 | 666.58 | 23.26 |
| 335 | | 8,010.94 | | 44.82 | 9.22 | 12.31 | 796.54 | | 8.09 | 7.04 | 878.02 | 574.87 | 801.09 | 57.49 | 87.80 | 946.38 | 0.00 |
| 102 | | 8,139.71 | 325.38 | 22.89 | 8.33 | 11.57 | 358.62 | | 7.60 | 3.41 | 737.80 | 657.70 | 813.97 | 65.77 | 41.24 | 920.98 | 32.54 |
| 248 | | 5,541.68 | 221.54 | 22.89 | 5.67 | 7.88 | 358.62 | 0.00 | 5.18 | 3.41 | 625.19 | 580.90 | 554.17 | 58.09 | 40.37 | 652.62 | 22.15 |
| 135 | | 4,161.06 | 166.39 | 22.89 | 3.85 | 5.33 | 338.36 | | 3.50 | 3.41 | 543.73 | 621.90 | 416.11 | 62.20 | 37.73 | 516.04 | 16.64 |
| 105 | | 8,274.37 | 330.77 | 44.82 | 7.62 | 10.58 | 796.54 | | 6.97 | 3.41 | 1,200.71 | 589.89 | 827.44 | 58.99 | 86.99 | 973.42 | 33.08 |
| 152 | | 4,444.75 | 177.69 | 22.89 | 5.14 | 7.11 | 358.79 | | 4.69 | 3.41 | 579.72 | 337.35 | 444.48 | 33.74 | 40.20 | 518.41 | 17.77 |
| | | 361,023.12 | 12,136.91 | 2,017.15 | 375.51 | 517.44 | 33,371.28 | 0.00 | 340.72 | 291.34 | 49,050.35 | 27,847.05 | 36,102.31 | 2,784.71 | 3,691.34 | 42,578.36 | 1,213.69 |

Synapse Financial Technologies, Inc.
Est 4/26 Payroll Obligations
4/14-4/27

| Employee Id | Total est Gross Earnings (excl insiders) | Est Wages pre-petiton (50%) | PTO (180 days) | Total Wages/ PTO | Capped | | Total Employer Taxes | Est taxes for pre-petition wages | Total Pre-petition wages/PTO /taxes | Capped |
|---|---|---|---|---|---|---|---|---|---|---|
| 416 | 7,697 | 3,848 | 5,586 | 9,434 | 9,434 | | 589 | 294.405 | 9,729 | 9,729 |
| 242 | 4,464 | 2,232 | 821 | 3,053 | 3,053 | | 308 | 154.16 | 3,207 | 3,207 |
| 285 | 2,500 | 1,250 | 135 | 1,385 | 1,385 | | 191 | 95.625 | 1,481 | 1,481 |
| 2 | 4,285 | 2,142 | 823 | 2,965 | 2,965 | | 328 | 163.895 | 3,129 | 3,129 |
| 288 | 4,849 | 2,424 | 3,093 | 5,517 | 5,517 | | 342 | 171.125 | 5,689 | 5,689 |
| 8 | 1,588 | 794 | 124 | 918 | 918 | | 121 | 60.735 | 979 | 979 |
| 10 | 1,664 | 832 | 204 | 1,036 | 1,036 | | 113 | 56.74 | 1,093 | 1,093 |
| 156 | 8,274 | 4,137 | 639 | 4,776 | 4,776 | | 615 | 307.255 | 5,083 | 5,083 |
| 9 | 3,505 | 1,753 | 2,049 | 3,802 | 3,802 | | 268 | 134.085 | 3,936 | 3,936 |
| 371 | 5,580 | 2,790 | 386 | 3,176 | 3,176 | | 420 | 210.235 | 3,386 | 3,386 |
| 405 | 5,857 | 2,928 | 720 | 3,648 | 3,648 | | 415 | 207.44 | 3,856 | 3,856 |
| 12 | 5,234 | 2,617 | 1,213 | 3,830 | 3,830 | | 386 | 192.83 | 4,023 | 4,023 |
| 13 | 1,206 | 603 | 187 | 790 | 790 | | 78 | 38.765 | 829 | 829 |
| 15 | 3,166 | 1,583 | 1,723 | 3,306 | 3,306 | | 291 | 145.625 | 3,452 | 3,452 |
| 21 | 6,470 | 3,235 | 931 | 4,166 | 4,166 | | 462 | 231.02 | 4,397 | 4,397 |
| 17 | 2,455 | 1,227 | 1,694 | 2,921 | 2,921 | | 163 | 81.7 | 3,003 | 3,003 |
| 404 | 3,543 | 1,771 | 3,212 | 4,983 | 4,983 | | 269 | 134.72 | 5,118 | 5,118 |
| 428 | 6,004 | 3,002 | 3,840 | 6,842 | 6,842 | | 426 | 213.15 | 7,055 | 7,055 |
| 122 | 3,697 | 1,849 | 1,093 | 2,942 | 2,942 | | 271 | 135.555 | 3,077 | 3,077 |
| 232 | 1,317 | 659 | 1,010 | 1,669 | 1,669 | | 101 | 50.385 | 1,719 | 1,719 |
| 312 | 10,595 | 5,297 | 7,681 | 12,978 | 12,978 | | 825 | 412.47 | 13,391 | 13,391 |
| 267 | 2,156 | 1,078 | 1,343 | 2,421 | 2,421 | | 149 | 74.295 | 2,495 | 2,495 |
| 368 | 6,158 | 3,079 | 3,729 | 6,808 | 6,808 | | 456 | 228.165 | 7,036 | 7,036 |
| 315 | 5,877 | 2,939 | 3,972 | 6,911 | 6,911 | | 430 | 215.165 | 7,126 | 7,126 |
| 33 | 2,410 | 1,205 | 1,750 | 2,955 | 2,955 | | 171 | 85.275 | 3,040 | 3,040 |
| 32 | 1,080 | 540 | 0 | 540 | 540 | | 77 | 38.38 | 578 | 578 |
| 34 | 8,487 | 4,243 | 553 | 4,796 | 4,796 | | 645 | 322.735 | 5,119 | 5,119 |
| 155 | 6,701 | 3,350 | 3,452 | 6,802 | 6,802 | | 479 | 239.705 | 7,042 | 7,042 |
| 334 | 7,118 | 3,559 | 1,007 | 4,566 | 4,566 | | 533 | 266.485 | 4,832 | 4,832 |
| 170 | 4,534 | 2,267 | 920 | 3,187 | 3,187 | | 332 | 166.04 | 3,353 | 3,353 |
| 43 | 2,354 | 1,177 | 2,137 | 3,314 | 3,314 | | 179 | 89.26 | 3,403 | 3,403 |
| 42 | 2,216 | 1,108 | 2,011 | 3,119 | 3,119 | | 170 | 84.75 | 3,204 | 3,204 |
| 261 | 2,425 | 1,212 | 1,955 | 3,167 | 3,167 | | 360 | 179.855 | 3,347 | 3,347 |
| 41 | 2,649 | 1,324 | 211 | 1,535 | 1,535 | | 199 | 99.715 | 1,635 | 1,635 |
| 272 | 8,316 | 4,158 | 574 | 4,732 | 4,732 | | 636 | 318.1 | 5,050 | 5,050 |
| 356 | 6,158 | 3,079 | 1,031 | 4,110 | 4,110 | | 438 | 219.11 | 4,329 | 4,329 |
| 49 | 1,364 | 682 | 1,225 | 1,907 | 1,907 | | 99 | 49.725 | 1,957 | 1,957 |
| 351 | 8,011 | 4,005 | 7,263 | 11,268 | 11,268 | | 613 | 306.42 | 11,575 | 11,575 |
| 331 | 3,325 | 1,662 | 2,819 | 4,481 | 4,481 | | 254 | 127.17 | 4,608 | 4,608 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 119 | 7,907 | 3,954 | 5,726 | 9,680 | 9,680 | | 562 | 280.76 | 9,960 | 9,960 |
| 172 | 4,239 | 2,119 | 529 | 2,648 | 2,648 | | 324 | 162.135 | 2,811 | 2,811 |
| 417 | 8,660 | 4,330 | 1,080 | 5,410 | 5,410 | | 644 | 322.01 | 5,732 | 5,732 |
| 113 | 8,860 | 4,430 | 3,506 | 7,936 | 7,936 | | 675 | 337.575 | 8,274 | 8,274 |
| 70 | 6,025 | 3,013 | 5,467 | 8,480 | 8,480 | | 630 | 315.07 | 8,795 | 8,795 |
| 363 | 4,675 | 2,338 | 436 | 2,774 | 2,774 | | 355 | 177.5 | 2,951 | 2,951 |
| 354 | 6,161 | 3,081 | 5,586 | 8,667 | 8,667 | | 438 | 219.085 | 8,886 | 8,886 |
| 178 | 4,124 | 2,062 | 3,740 | 5,802 | 5,802 | | 439 | 219.545 | 6,022 | 6,022 |
| 114 | 5,957 | 2,979 | 4,316 | 7,295 | 7,295 | | 439 | 219.695 | 7,514 | 7,514 |
| 75 | 7,531 | 3,765 | 3,966 | 7,731 | 7,731 | | 789 | 394.695 | 8,126 | 8,126 |
| 80 | 6,467 | 3,233 | 1,379 | 4,612 | 4,612 | | 464 | 231.985 | 4,844 | 4,844 |
| 76 | 7,699 | 3,850 | 6,983 | 10,833 | 10,833 | | 541 | 270.66 | 11,103 | 11,103 |
| 84 | 7,730 | 3,865 | 5,610 | 9,475 | 9,475 | | 557 | 278.66 | 9,753 | 9,753 |
| 85 | 1,357 | 678 | 1,225 | 1,903 | 1,903 | | 99 | 49.64 | 1,953 | 1,953 |
| 220 | 1,544 | 772 | 0 | 772 | 772 | | 118 | 59.06 | 831 | 831 |
| 136 | 7,135 | 3,567 | 5,178 | 8,745 | 8,745 | | 526 | 263.03 | 9,008 | 9,008 |
| 415 | 7,703 | 3,851 | 6,983 | 10,834 | 10,834 | | 582 | 291.22 | 11,126 | 11,126 |
| 87 | 6,184 | 3,092 | 0 | 3,092 | 3,092 | | 470 | 235.205 | 3,327 | 3,327 |
| 90 | 10,396 | 5,198 | 5,351 | 10,549 | 10,549 | | 795 | 397.65 | 10,947 | 10,947 |
| 235 | 3,695 | 1,848 | 569 | 2,417 | 2,417 | | 269 | 134.305 | 2,551 | 2,551 |
| 89 | 3,078 | 1,539 | 590 | 2,129 | 2,129 | | 235 | 117.26 | 2,246 | 2,246 |
| 445 | 2,500 | 1,250 | 0 | 1,250 | 1,250 | | 0 | 0 | 1,250 | 1,250 |
| 127 | 6,875 | 3,438 | 2,509 | 5,947 | 5,947 | | 526 | 262.98 | 6,210 | 6,210 |
| 93 | 3,462 | 1,731 | 5,028 | 6,759 | 6,759 | | 265 | 132.405 | 6,891 | 6,891 |
| 202 | 1,380 | 690 | 479 | 1,169 | 1,169 | | 93 | 46.555 | 1,216 | 1,216 |
| 338 | 5,819 | 2,909 | 735 | 3,644 | 3,644 | | 442 | 221.22 | 3,865 | 3,865 |
| 335 | 8,011 | 4,005 | 788 | 4,793 | 4,793 | | 575 | 287.435 | 5,081 | 5,081 |
| 102 | 8,140 | 4,070 | 1,031 | 5,101 | 5,101 | | 658 | 328.85 | 5,430 | 5,430 |
| 248 | 5,542 | 2,771 | 226 | 2,997 | 2,997 | | 581 | 290.45 | 3,287 | 3,287 |
| 135 | 4,161 | 2,081 | 1,277 | 3,358 | 3,358 | | 622 | 310.995 | 3,669 | 3,669 |
| 105 | 8,274 | 4,137 | 6,006 | 10,143 | 10,143 | | 590 | 294.945 | 10,438 | 10,438 |
| 152 | 4,445 | 2,222 | 985 | 3,207 | 3,207 | | 337 | 168.675 | 3,376 | 3,376 |
| | 361,023 | 180,512 | 160,400 | 701,935 | 15,150 | | 27,847 | 13,924 | 354,835 | 13,924 |

# EXHIBIT "5"

1  RON BENDER (SBN 143364)
   MONICA Y. KIM (SBN 180139)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
6  Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

7              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
8                SAN FERNANDO VALLEY DIVISION

9  In re:                              Case No.:

10 SYNAPSE FINANCIAL TECHNOLOGIES,      Chapter 11
   INC.,
11
                                        **ORDER (A) APPROVING BIDDING
12         Chapter 11 Debtor in Possession     PROCEDURES WITH RESPECT TO THE
                                        TRANSFER    AND    SALE    OF
13                                      SUBSTANTIALLY    ALL    OF    THE
                                        DEBTOR'S ASSETS, (B) APPROVING
14                                      BIDDING    PROTECTIONS    FOR    THE
                                        STALKING    HORSE    BIDDER,    (C)
15                                      APPROVING  PROCEDURES  RELATED
                                        TO    THE    ASSUMPTION    AND
16                                      ASSIGNMENT    OF    CERTAIN
                                        EXECUTORY    CONTRACTS    AND
17                                      UNEXPIRED LEASES, (D) APPROVING
                                        THE FORM AND MANNER OF NOTICES
18                                      RELATED    TO    THE    AUCTION    AND
                                        SALE, (E) SCHEDULING THE SALE
19                                      HEARING,    AND    (F)    GRANTING
                                        RELATED RELIEF**
20

21

22         Upon the emergency motion (the "Motion")[1] of Synapse Financial Technologies, Inc.,

23 chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case

24 (the "Debtor"), for, among other things, entry of an order (this "Bidding Procedures Order"): (a)

25 approving (i) the bidding and auction procedures (the "Bidding Procedures"), annexed hereto as

26 _____

27 [1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

28

                              1

**Exhibit A**, with respect to the following: (x) the sale, assignment and transfer of the Debtor's right, title and interest in and to substantially all of its assets (the "Purchased Assets") and (y) the assumption and assignment of certain executory contracts and unexpired leases related thereto (collectively, the "Assigned Contracts"); (ii) the payment of the Break-Up Fee and Expense Reimbursement (collectively, the "Stalking Horse Bidder Fee") to TabaPay Holdings LLC ("Buyer"), which serves as the "stalking horse bidder" (in such capacity, the "Stalking Horse Bidder") pursuant to that certain Asset Purchase Agreement dated as of April __, 2024, by and among the Debtor and Buyer, attached as **Exhibit __** to the Declaration of Sankaet Pathak filed by the Debtor in support of the Motion as Docket Number __ (the "Asset Purchase Agreement"); (iii) approving procedures governing assumption and assignment (the "Assignment Procedures") of the Assigned Contracts; (iv) approving the form and manner of certain notices related to the Auction and sale of the Purchased Assets; (b) scheduling the Auction and a hearing (the "Sale Hearing") to approve the transfer and sale of the Purchased Assets, and the other transactions contemplated under the Asset Purchase Agreement (such transactions, the "Transaction"); and (c) granting related relief, all as more fully set forth in the Motion; and the Court, having reviewed the Motion and other papers and pleadings filed in connection therewith and having heard the statements in support of the relief requested therein at a hearing held before this Court on _____ (the "Hearing"); and due, proper and sufficient notice of the Motion having been given; and the Court, having determined that the legal and factual bases set forth in the Motion, the Declaration of Sankaet Pathak filed in support of the Motion as Docket Number __, and proffered at the Hearing establish just cause for the relief granted herein, and that such relief is in the best interests of the Debtor, its bankruptcy estate and its creditors; and upon all of the pleadings and proceedings before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**[2]

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are

318327985.3

A.   <u>Jurisdiction and Venue.</u> The Court has jurisdiction over the Motion and the transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.   <u>Statutory Predicates.</u> The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9006, 9007, and 9014; and (iii) Local Bankruptcy Rules 9006-1, 9014-1 and 9075-1.

C.   <u>Notice.</u> Good and sufficient notice of the Motion and the relief sought therein has been provided to notice parties specified in the Motion, and no other or further notice is required except as set forth herein. A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to all parties-in-interest.

D.   <u>Justification for Relief.</u> The Debtor has articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures; (ii) approve the Stalking Horse Bidder Fee; (iii) approve the manner and form of notice of certain matters related to the transfer and sale of the Purchased Assets; (iv) approve the Assignment Procedures and the form of the Assignment Notice; (v) set the date for the Sale Hearing; and (vi) grant such additional relief as requested in the Motion as related to the foregoing.  The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate and creditors of its estate and other parties-in-interest.

E.   <u>Bidding Procedures.</u> The Debtor's proposed Bidding Procedures, attached hereto as **<u>Exhibit A</u>**, (i) are designed to maximize the value to be achieved for the Purchased Assets; (ii) will ensure a competitive and efficient bidding process; and (iii) are fair and reasonable under the circumstances.

---

adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

318327985.3

F.      Stalking Horse Bidder Fee. The Stalking Horse Bidder Fee described in the Motion, shall be paid in accordance with the terms of this Order, and (i) if triggered, will be an actual and necessary cost and administrative expense of preserving the Debtor's estate, within the meaning of section 503(b)(1) of the Bankruptcy Code, (ii) is reasonable and appropriate, particularly in light of the size and nature of the Transaction and the efforts and costs and expenses that have been, and are continuing to be, expended by the Stalking Horse Bidder notwithstanding that the proposed transaction is subject to higher and/or better offers for the Purchased Assets, (iii) was negotiated by the parties at arms-length and in good faith, and the Stalking Horse Bidder would not have entered into the Asset Purchase Agreement in the absence of the Debtor's obligation to pay such Stalking Horse Bidder Fee if triggered, and (iv) is necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed transaction on the terms set forth in the Asset Purchase Agreement.

G.      Auction and Sale Hearing Notice. The Debtor's proposed Auction and Sale Hearing Notice, attached hereto as **Exhibit B** , as approved and served in accordance herewith, is appropriate and reasonably calculated to provide all interested parties with timely and sufficient information that they may require about the Auction process, including: (a) announcement that the Court has approved the bidding and Auction process pursuant to the Bidding Procedures; (b) information on how to obtain a copy of the Bidding Procedures and the Bidding Procedures Order; (c) the Bid Deadline; (d) the time, date, and location of the Auction; (e) the time, date, and location of the Sale Hearing; and (f) procedures for objecting to the Auction, the Motion and the transfer and sale contemplated by the Motion. The proposed Auction and Sale Hearing Notice complies with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.

H.      Assumption and Assignment Procedures. The Debtor's proposed Assignment Procedures are designed to ensure that the Debtor assumes and assigns the Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

I.      Assignment Notice. The Debtor's proposed Assignment Notice, attached as **Exhibit C** hereto, as approved and served in accordance herewith, is reasonably calculated to provide all third-party counterparties (the "Counterparties") to the Assigned Contracts with

4

318327985.3

proper notice of the potential assumption and assignment of such Assigned Contracts and any cure or pecuniary loss amounts relating thereto (the "Cure Amount") and will be served on such Counterparties in accordance with paragraphs 12-17 hereof.

J.      Compliance with Bankruptcy Law. The Motion and this Bidding Procedures Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

**NOW THEREORE, IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion relating to the matters covered in this Bidding Procedures Order, is GRANTED and APPROVED as provided herein.

2.      Any and all objections and responses to the Motion relating to the matters covered in this Bidding Procedures Order that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are overruled and denied.

**Bidding Procedures**

3.      The Bidding Procedures are hereby authorized and approved in the form annexed hereto as **Exhibit A.** The Bidding Procedures shall govern the bidding process and the Auction with respect to the Purchased Assets or the sale of assets of the Debtor in addition to the Purchased Assets. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures.

4.      Within one (1) business day of the entry of this Order, the Debtor will cause the Auction and Sale Hearing Notice to be served by, unless otherwise indicated below, first-class mail (postage prepaid) to the following parties: (i) all potential purchasers identified by the Debtor or its professionals (via electronic mail); (ii) the Office of the United States Trustee (the "U.S. Trustee"); (iii) all known creditors and interest holders of the Debtor and its non-debtor subsidiaries; (iv) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002; and (v) Buyer and its counsel (the entities listed in (ii) through (v) are hereby collectively referred to as the "Special Notice Parties").

5.      If, by the Bid Deadline (i.e., April 28, 2024, at 5:00 p.m. (prevailing Pacific time)), the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the

Debtor, after consultation with the Consultation Parties, shall not conduct an Auction, and the Stalking Horse Bidder will be deemed the Winning Bidder and its bid the Winning Bid. If this occurs, the Debtor shall request at the Sale Hearing that the Court approve the transfer and sale of the Purchased Assets to the Stalking Horse Bidder in accordance with the Asset Purchase Agreement and the assumption and assignment of the Assigned Contracts designated to be assumed by the Debtor and assigned to the Stalking Horse Bidder, and request that the Sale Order be entered by the Court and that the Sale Order shall become effectively immediately upon entry, notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules and Rule 62(g) of the Federal Rules of Civil Procedure.

**Stalking Horse Bidder and Stalking Horse Bidder Fee**

6.    Buyer is approved as the Stalking Horse Bidder with respect to the Auction pursuant to the Asset Purchase Agreement.

7.    The Stalking Horse Bidder Fee and the other amounts payable (in each case, to the extent payable under the Asset Purchase Agreement) in accordance with the Asset Purchase Agreement, the Bidding Procedures, and this Order are approved, authorized, and binding upon the Debtor and its estate as an administrative expense pursuant to section 503(b)(1) of the Bankruptcy Code.

8.    In accordance with, and subject to the terms of, the Asset Purchase Agreement, the Debtor is authorized and directed, without further order of this Court to pay the Stalking Horse Bidder Fee to the Stalking Horse Bidder in full in cash (by wire transfer) in conjunction with the closing of sale to a Winning Bidder other than Buyer.

**Objections**

9.    Objections, if any, to the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (c) be filed with the clerk of the Court for the Central District of California (or filed electronically via CM/ECF with the Court) and actually received by the following parties (collectively, the "Notice Parties"): (i) the Debtor's counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P., Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com); Krikor J. Meshefejian (kjm@lnbyg.com), Sankaet Pathak

(s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com); (ii) counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (Robert.honeywell@klgates.com); (iii) counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn:   Alexander G. Rheaume (arheaume@mofo.com); (iv) counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (A) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (B) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com); _____ and (v) the US Trustee, Attn: _____ (_____@usdoj.gov), **on or before 5:00 p.m. PST on April 28, 2024** (the "Objection Deadline").

**Sale Hearing**

10.     The Sale Hearing, and the Auction (if any), shall be held before the Court on April 29, 2024, commencing at _____ p.m. PST. The Sale Hearing may be adjourned without need for any further notice by announcement of the adjourned Sale Hearing date in open Court or by filing a notice thereof as soon as reasonably practicable before the Sale Hearing date with the Court.

11.     At the Sale Hearing, the Debtor will request that the Court (a) approve the Transaction, or, if the Winning Bidder is not the Stalking Horse Bidder, the Transaction contemplated by such Winning Bid; (b) approve the Winning Bid and Winning Back-Up Bid; and (c) enter the Sale Order providing for this relief.

**Assignment Procedures**

12.     Within one (1) business day of entry of this Order the Debtor shall file with the Court and serve, by first-class mail (postage prepaid), on the Counterparties (including non-debtor subsidiaries if applicable) the initial Assignment Notice (the "Initial Assignment Notice") for the Assigned Contracts to be assumed and assigned in accordance with the Asset Purchase Agreement.

13.     If the Winning Bid includes (i) a different list of Assigned Contracts to be assumed and assigned, or (ii) different Cure Amount(s) than those listed in the Initial Assignment Notice, then the Debtor shall file and serve on the same Counterparties that were

served with the Initial Assignment Notice a pleading setting forth the changes to the Initial Assignment Notice (the "Supplemental Assignment Notice"). The Supplemental Assignment Notice shall include, to the extent the Winning Bidder is not the Stalking Horse Bidder, a description of the Winning Bidder and a statement as to its ability pay all required Cure Amounts and perform the Debtor's obligations under such Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

14.     For the avoidance of doubt, the listing of any Assigned Contracts on any Assignment Notice does not require or guarantee that such agreements will be assumed and assigned, and all rights of the Debtor with respect to such agreements are reserved.

15.     Objections to any matter pertaining to the assumption and assignment of the Assigned Contracts, including without limitation as to adequate assurance of future performance or payment of the applicable Cure Amounts, must be filed with the Court no later than (a) April 28, 2024 at 5:00 p.m. (the "Initial Objection Deadline"), with respect to the Initial Assignment Notice, and (b) up until the Sale Hearing (the "Supplemental Objection Deadline"), with respect to the Supplemental Assignment Notice. Any such objections must be served so as to be actually received by the Notice Parties and the Winning Bidder no later than the Initial Objection Deadline or the Supplemental Objection Deadline (as applicable).

16.     To the extent that any Counterparty or other party in interest does not timely serve an objection to the Initial Assignment Notice or Supplemental Assignment Notice as set forth above, such party shall be deemed to have (i) consented to the assumption and assignment of the applicable Assigned Contracts to the Winning Bidder; (ii) agreed that the Winning Bidder has provided adequate assurance of future performance within the meaning of sections 365(b) and (f) of the Bankruptcy Code; (iii) consented to the applicable Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

17.     Upon the filing of an objection by a Counterparty or other party in interest to the Initial Assignment Notice or Supplemental Assignment Notice, the Debtor will contact the objecting party and the Winning Bidder to attempt to consensually resolve any timely filed

318327985.3

objection. The Debtor will work with the Winning Bidder in good faith in this regard, and the Winning Bidder must consent to any increase in the proposed Cure Amount for the applicable Assigned Contract.  If the Debtor and Winning Bidder are unable to resolve such an objection, such objection will be heard at the Sale Hearing (as may be adjourned by the Court without such objecting party's consent); provided, further, that in the event an objection relates solely to a Cure Amount (a "Cure Objection"), then such objecting party will be deemed to consent to the assumption and assignment of its Assigned Contract, notwithstanding such objection.  In the event the Debtor and the Winning Bidder are unable to resolve a Cure Objection prior to the Sale Hearing, the Winning Bidder may elect not to include the applicable contract or lease in its purchase of the Purchased Assets, subject to any conditions set forth in the Asset Purchase Agreement or Alternative APA (as applicable).

**Other Matters**

18.    The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived, and this Bidding Procedures Order shall be effective immediately upon its entry.

19.    All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

20.    The Debtor is authorized to take any and all actions necessary to effectuate and implement the relief granted pursuant to this Bidding Procedures Order.

21.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Bidding Procedures Order.

318327985.3

## EXHIBIT A

## BIDDING PROCEDURES[3]

These bidding procedures (the "<u>Bidding Procedures</u>") relate to the proposed free and clear sale by Synapse Financial Technologies, Inc. (the "<u>Debtor</u>") of substantially all of its assets (except the Excluded Assets) (the "<u>Purchased Assets</u>") and will govern the bidding and auction (the "<u>Auction</u>") for the Purchased Assets.

At a hearing held before the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "<u>Bankruptcy Court</u>") in Case No. _____, the Bankruptcy Court approved these Bidding Procedures, which are intended to ensure that the highest and best possible price is paid for the Purchased Assets by a purchaser who has the financial ability to close on the sale of the Purchased Assets (the "<u>Sale</u>"). A copy of the Bankruptcy Court order approving these Bidding Procedures is attached hereto as Exhibit "1".

The Debtor has entered into that certain Asset Purchase Agreement dated April __, 2024 (the "<u>Asset Purchase Agreement</u>"), by and among the Debtor and TabaPay Holdings, LLC, a Delaware limited liability company ("<u>Buyer</u>" or the "<u>Stalking Horse Bidder</u>") pursuant to which the Debtor shall, among other things, transfer and sell to Buyer the Purchased Assets as set forth set forth in the Asset Purchase Agreement. A copy of the Asset Purchase Agreement is attached as **Exhibit __** to the Declaration of Sankaet Pathak filed as Docket Number __ in support of the Debtor's motion to approve the Bidding Procedures. The transaction contemplated by the Asset Purchase Agreement (the "<u>Sale Transaction</u>") is subject to higher and better offers as set forth in these Bidding Procedures.

### 1.    Free and Clear Sale of Assets

The Debtor is offering for sale the Purchased Assets. Except as otherwise agreed to in the definitive sale documents, all of the Debtor's rights, title and interest in and to the Purchased Assets shall be sold, transferred and assigned free and clear of all Liens (as defined in the Asset Purchase Agreement) (except as otherwise set forth in the Asset Purchase Agreement) pursuant to Section 363(b) and (f) of the Bankruptcy Code, with any Liens that exist against the Purchased Assets that are not Assumed Indebtedness to attach to the proceeds of the sale with the same validity and priority as such Liens have in and to the Purchased Assets.

### 2.    Stalking Horse Bidder

The Court has authorized Buyer (a) to act as the Stalking Horse Bidder in the Auction (if any) for the Purchased Assets, and (b) to receive, in the event that Buyer is not the winning bidder at the Auction and subject to the Asset Purchase Agreement, the Expense Reimbursement (as defined in the Asset Purchase Agreement) subject to a cap of $400,000 plus the Break-Up Fee of $400,000 with the Expense Reimbursement and Break-Up Fee collectively defined here as the "<u>Stalking

---

[3] All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order

318327985.3

Horse Bidder Fee".

### 3. Bidding Process

The Debtor and the Debtor's bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG") will jointly conduct the Auction.

### 4. Key Dates for Interested Bidders

These Bidding Procedures provide interested parties with a detailed explanation of what they need to do to participate in the Auction.

The key dates for the Auction and related free and clear asset sale process are as follows:

| | |
|---|---|
| **April 28, 2024 at 5 p.m. (prevailing Pacific time)** | Deadline by when all prospective overbidders must do all of the following:<br>1. Submit a redlined version of the Asset Purchase Agreement indicating all changes that are requested to be made to the Asset Purchase Agreement along with a proposed purchase price or overbid;<br>2. Submit all documents to enable the Debtor to determine whether the proposed bidder is financially qualified to participate in the Auction; and<br>3. Submit a deposit equal to 10% of the cash portion of the purchase price in the Alternative APA, which deposit would be deemed non-refundable if the overbidder is deemed to be the winning bidder at the Auction and then the Debtors' proposed free and clear sale of the Purchased Assets to the bidder is approved by the Bankruptcy Court. |
| **April 29, 2024 at __:__ p.m. (prevailing Pacific time)** | Auction to be held concurrently with the Sale Hearing |
| **April 29, 2024 at __:__ p.m. (prevailing Pacific time)** | Sale Hearing to be conducted before the Bankruptcy Court for the Bankruptcy Court to approve the Debtor's sale of the Purchased Assets to the winning bidder at the Auction (the "Sale Hearing"). |
| **April 30, 2024** | Outside date by when the Winning Bidder at the Auction is required to close its purchase |

11

| | |
|---|---|
| | of all the Purchased Assets other than Debtor's equity interests in the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary unless the Winning Bidder and the Debtor jointly agree to extend this outside closing date (the "<u>Initial Closing</u>"). |
| **Subject to APA terms** | Outside date by when the Winning Bidder at the Auction is required to close its purchase of the Debtor's equity interests in the Broker-Deal Subsidiary and the State Lender Licensing Subsidiary unless the Winning bidder and the Debtor jointly agree to extend this outside closing date, *provided, however,* that the Winning Bidder shall pay the entirety of the Purchase Price for the Purchased Assets no later than the Initial Closing. |

## 5. Due Diligence Access/Participation Requirements

To participate in the Auction process as an overbidder, a person or entity interested in purchasing the Purchased Assets (a "<u>Potential Overbidder</u>") must deliver or have previously delivered to the Debtor and the Consultation Parties all of the following documents (the "<u>Participation Requirements</u>"): (1) an executed non-disclosure agreement with the form to be obtained from the Debtor; (2) a statement demonstrating a bona fide interest in purchasing the Purchased Assets; and (3) one of the following: (i) written evidence of readily available funds equal to the Potential Overbidder's initial bid and any increase the Potential Overbidder desires to have authority to bid to, with the Debtor to keep such information completely confidential, (ii) a firm commitment for financing sufficient for the Potential Overbidder to timely consummate its purchase of the Purchased Assets, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Overbidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtor (following consultation with the Consultation Parties) to make a reasonable determination as to the Potential Overbidder's financial and other capabilities to timely consummate its purchase of the Purchased Assets. Any Potential Overbidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of these Bidding Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, direct communication with management as the Potential Overbidder desires and the Debtor determines to be appropriate under the circumstances and subject to the availability of such management. For the avoidance of doubt, the Stalking Horse Bidder is deemed to have met the Participation Requirements.

## 6. Due Diligence Limitations

The Debtor shall not be obligated to furnish any due diligence information to any Potential Overbidder after the Bid Deadline. In its discretion, the Debtor may, but shall not be obligated to, furnish additional information after the Bid Deadline to Qualified Bidders. The Debtor reserves the right to withhold any due diligence materials from any Potential Overbidder

that the Debtor determines (following consultation with the Consultation Parties) are business-sensitive or otherwise not appropriate for disclosure to any Potential Overbidder who is a competitor of the Debtor or is affiliated with any competitor of the Debtor.

Neither the Debtor nor any of its representatives or advisors shall be obligated to furnish information of any kind whatsoever to any person or entity who is not determined to have satisfied the Participation Requirements.

**7.    Due Diligence from Potential Overbidders**

Each Potential Overbidder shall comply with all reasonable requests for additional information by the Debtor regarding such Potential Overbidder, including without limitation, the Potential Overbidder's financial ability to close a Sale Transaction.  The failure by a Potential Overbidder to comply with any such requests may be a basis for the Debtor to determine that such Potential Overbidder is not or cannot be a Qualified Bidder.

**8.    Bid Deadline for Prospective Overbidders**

The deadline for all Potential Overbidders to submit their initial bid for the Purchased Assets is **April 28, 2024, at 5:00 p.m. (prevailing Pacific time)** (the "Prospective Overbidder Bid Deadline" or "Bid Deadline").  A bid may be transmitted electronically and must be received on or before the Prospective Overbidder Bid Deadline by the following parties (collectively, the "Receiving Parties"):

(i)    the Debtor, Attn: Sankaet Pathak (s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com);

(ii)    counsel to the Debtor, Levene, Neale, Bender, Yoo & Golubchik L.L.P. Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com) and Krikor J. Meshefejian (kjm@lnbyg.com);

(iii)    counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (robert.honeywell@klgates.com);

(iv)    counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn:  Alexander G. Rheaume (arheaume@mofo.com); and

(v)    counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (a) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (b) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com).

The term "Consultation Parties" shall mean (a) Silicon Valley Bank, (b) TriplePoint Capital LLC, and (c) any official committee of unsecured creditors appointed in this chapter 11 case; provided, that if any party that submits a bid to purchase the Purchased Assets shall no longer be a Consultation Party, so long as such party's bid remains open.

318327985.3

A bid received after the Prospective Overbidder Bid Deadline shall not be considered unless the Debtor, for good cause and following consultation with the Consultation Parties, consents.

## 9.  Bid Requirements

To be eligible to participate in the Auction, each bid and each Potential Overbidder submitting a bid (each, an "Overbidder") must be determined by the Debtor (following consultation with the Consultation Parties) to have satisfied all of the conditions listed below (collectively, the "Bid Requirements"):

(a) *Terms*.  A bid must be accompanied by an executed Asset Purchase Agreement, as modified by the Overbidder (the "Alternative APA"), along with an electronic mark-up showing all changes to the Asset Purchase Agreement.  The form Asset Purchase Agreement in Word format can be obtained by any Potential Overbidder from LNBYG.   The Alternative APA must include binding, executed transaction documents, be signed by an authorized representative of the Overbidder and shall be on substantially the same terms as the Asset Purchase Agreement.

(b) *Minimum Overbid*.  The proposed purchase price to be paid for the Purchased Assets must (i) be in an amount at least $100,000 more than the Cash Purchase Price contained in the Asset Purchase Agreement, plus (ii) provide for the assumption and/or payment in cash at the Initial Closing of the Assumed Indebtedness, plus (iii) include the amount of the Stalking Horse Bidder Fee (the "Minimum Overbid"). Without limiting the generality of the foregoing, a bid (i) may not contain representation or warranties, conditions precedent, covenants, or termination rights materially more onerous to the Debtor in the aggregate than are set forth in the Asset Purchase Agreement, as determined by the Debtor (following consultation with the Consultation Parties), (ii) may not be conditioned upon obtaining financing, or any internal, regulatory, or other third party approvals more onerous than are set forth in the Asset Purchase Agreement, or on the outcome or review of due diligence, (iii) may not provide for a closing date/closing dates that will be later than those set forth in the Asset Purchase Agreement, unless both the Debtor (following consultation with the Consultation Parties) and the winning bidder jointly agree to extend the sale closing date(s) at their sole and absolute discretion, and (iv) may not be conditioned upon the Bankruptcy Court order approving the sale becoming a "final order" and must instead agree that the sale may be consummated immediately upon entry of an order pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(c) *Irrevocable*.  A bid must state that such offer is binding and irrevocable until the conclusion of the Sale Hearing (defined below) and such bid must continue to remain binding and irrevocable through the sale closing if the bid or any other higher bid submitted at the Auction is accepted by the Debtor at the Auction as the Winning Bid (defined below) or the Winning Back-Up Bid (defined below) and approved by the Bankruptcy Court at the Sale Hearing.

(d) *Identity of Bidder*.  A bid must fully disclose the following information (collectively, "Identifying Information"): (A) each entity or person that will be bidding for or

318327985.3

purchasing the Purchased Assets; (B) all material equity holders (i.e., parties that own at least 10% of the equity of the Overbidder) in the case of an Overbidder that is an entity; (C) any entity that will be financing or otherwise participating in connection with such bid, and the complete terms of any such financing or participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid; (D) any connection with or participation by any "insider"  (as defined in section 101(31) of the Bankruptcy Code) of the Debtor or any relative or any affiliate of any "insider" of the Debtor; and (E) any connection with or participation by any current creditor or equity holder of the Debtor or the Stalking Horse Bidder.  A bid must also fully disclose, to the extent such bid includes the acquisition of the equity of S Credit and/or S Brokerage, any provisions in such bid for any internal, regulatory, or other third-party approvals, that may be required for a change in control of such subsidiary or subsidiaries (collectively, "Third Party Approvals").

(e) **_Contact Information_**.  A bid must include the names and contact information (including phone numbers and email addresses) of all authorized representatives of the Overbidder who will be available to answer questions regarding the bid, including advisors and related parties.

(f) **_Deposit_**.  A bid must include a good-faith deposit in immediately available funds equal to the sum of: (i) the Stalking Horse Bidder Fee (defined above) and (ii) ten percent (10%) of the cash portion of the purchase price in the Alternative APA (the sum of (i) and (ii), the "Deposit").  If an Overbidder elects to increase the amount of its bid at the Auction, neither the Overbidder nor the Stalking Horse Bidder will be required to increase the amount of its Deposit.  If a bid is determined to be the Winning Bid at the Auction and the Overbidder who submitted such bid fails to timely close the sale after approval by the Bankruptcy Court at the Sale Hearing, the Deposit shall become non-refundable and be forfeited to the Debtor.  The same shall apply to the Stalking Horse Bidder (subject to the provisions in the APA for the forfeiture of the "Deposit" as defined therein) if determined to be Winning Back-Up Bidders, and any other Winning Back-Up Bidder in the event (a) the Winning Bidder fails to timely close the Sale, (b) the Winning Back-Up Bidder is notified in writing that it is now the Winning Bidder, and (c) the Winning Back-Up Bidder fails to close its purchase by the Outside Closing Date set forth in the applicable Asset Purchase Agreement unless such Winning Back-Up Bidder and the Debtor jointly agree to extend the applicable sale closing date.  All Deposits of all Qualified Bidders shall be held in an account maintained by LNBYG and shall be returned (other than with respect to the Winning Bidder and the Winning Back-Up Bidder) promptly after the conclusion of the Auction, subject to the return conditions set forth in the applicable Asset Purchase Agreement or Alternative APA submitted with such bids.

(g) **_Financing Sources_**.  A bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed sale with appropriate contact information for such financing sources, with the Debtor (following consultation with the Consultation Parties) to determine whether such evidence of financing satisfies these Bidding Procedures and enables the Overbidder

318327985.3

to participate in the Auction, with such determination to be in the Debtor's sole and absolute discretion and reasonably acceptable to each of the Consultation Parties.

(h) ***Designation of Assigned Contracts and Leases.***  Subject to the ability of the Debtor to obtain an order of the Bankruptcy Court approving of the Debtor's assumption and assignment of any executory contract or unexpired lease to the Winning Bidder, a bid must include an initial list of all of the Debtor's executory contracts and unexpired leases with respect to which the Overbidder seeks assumption and assignment from the Debtor (including without limitation any Debtor contracts or leases to which the Debtor's non-debtor subsidiaries are also parties).

(i) ***Designation of Assumed Liabilities***.  A bid must identify all liabilities that the Overbidder proposes to assume.

(j) ***No Breakup Fee***. A bid must not request or entitle the Overbidder to receive any fee analogous to the Stalking Horse Bidder Fee, any termination fee, transaction or breakup fee, expense reimbursement or similar fee or payment. For the avoidance of doubt, by submitting a bid, the Overbidder agrees that it shall not be entitled to any such fee and waives the right to pursue a substantial contribution claim under 11 U.S.C. §503 related in any way to the submission of its bid or its participation in the Auction.

Each person or entity that submits a bid shall be deemed to have consented to the Debtor making the contents of such bid public, including in filings in the Court.

## 10.    Qualified Bidders and Bids

Potential Overbidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "<u>Qualified Bidders</u>," and bids that meet all of the Bid Requirements described above will be deemed "<u>Qualified Bids</u>," in each case, only if the Debtor (following consultation with the Consultation Parties) concludes in the exercise of its business judgment, that such bid would be consummated if selected as the Winning Bid; <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction, the Debtor (following consultation with the Consultation Parties) shall have the right, in their sole and absolute discretion, to disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or otherwise participate in the Auction.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder, the Stalking Horse Bidder's bid, as set forth in the Asset Purchase Agreement, is a Qualified Bid, and each bid received from the Stalking Horse Bidder at the Auction that complies with the Bidding Procedures shall be a Qualified Bid.

## 11.    Notice of Qualified Bids

As soon as practicable following the Bid Deadline, the Debtor (following consultation with the Consultation Parties) shall identify to all Qualified Bidders: (a) each and every bid that the Debtor considers to be a Qualified Bid and (b) if more than one Qualified Bid has been timely received, the Qualified Bid that will constitute the "<u>Initial Bid</u>" at the Auction (which

must equal at least the Minimum Overbid) and the bidding order in which the Auction will be conducted.

**12.    No Auction if Only One Qualified Bid**

If, by the Bid Deadline, the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the Debtor (following consultation with the Consultation Parties) shall not conduct an Auction and the Stalking Horse Bidder will be deemed the Winning Bidder and its bid the Winning Bid. If this occurs, the Debtor shall proceed to request at the Sale Hearing that the Court approve the transfer and sale of the Purchased Assets to the Stalking Horse Bidder in accordance with Buyer's Asset Purchase Agreement and request that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

**13.    Auction**

If by the Bid Deadline, more than one Qualified Bid has been received by the Debtor, the Debtor will conduct the Auction with all Qualified Bidders. The Auction will be held concurrently with the Sale Hearing in the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division, with virtual participation permitted.

**14.    Participation in and Attendance at Auction**

The Auction will occur at the Sale Hearing, which is a public hearing.

**15.    Consent to Jurisdiction, No Collusion and Good Faith Bona Fide Offer**

All Qualified Bidders shall be deemed to have consented to the exclusive and core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the bidding process, the Auction, the transfer and sale of the Purchased Assets, and any other matter relating to, or contemplated by, Buyer's Asset Purchase Agreement and any Alternative APA. Any and all disputes related to the Auction shall be determined solely by the Bankruptcy Court. Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that: (i)it has not engaged in any collusion with respect to the bidding or with any other bidder or prospective bidder; (ii) its bid is a good-faith *bona fide* offer; (iii) it intends to consummate the proposed transaction if selected as the Winning Bidder; and (iv) it acknowledges that, if chosen, it will serve as the Winning Back-Up Bidder.

### 16.    Initial Bid at the Auction

The bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted by the Bid Deadline, as determined by the Debtor (following consultation with the Consultation Parties). Each subsequent bid shall be in increments of no less than $100,000 and by figures which are wholly divisible by $100,000. The Debtor will notify all Qualified Bidders and the Consultation Parties in advance of the Auction which bid has been accepted as the Initial Bid at the Auction and the order in which the bidding at the Auction will proceed.

### 17.    Conducting the Auction

The Debtor and LNBYG will direct and preside over the Auction. At the start of the Auction, and after each Qualified Bidder acknowledges on the record that (i) it has not engaged in any collusion with respect to the bidding, (ii) that its bid is a good faith bona fide offer, and (iii) that it intends to consummate the proposed transaction if selected as the Winning Bidder or the Winning Back-Up Bidder, the Debtor and LNBYG will identify, confirm and describe the Initial Bid. The bidding will then ensue in the bidding order provided by the Debtor to all Qualified Bidders in advance of the Auction. All bidding after the Initial Bid shall continue in bidding increments of at least $100,000 or figures that are wholly divisible by $100,000. All bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and all Qualified Bidders will be entitled to be present for all bidding with the understanding that the Identifying Information of each bidder and the material terms of each Qualified Bid (including any Third Party Approvals) will be fully disclosed to all Qualified Bidders before the Auction, and all successive bids made at the Auction, will be fully disclosed to all Qualified Bidders. All Qualified Bidders will be permitted to bid at the Auction based on what the Debtor and LNBYG (following consultation with the Consultation Parties), and subject to the Court's approval at the Sale Hearing, determine to be an appropriate amount of time to respond to each prior submitted bid.

Prior to the Auction, the Debtor will randomly assign to each Qualified Bidder a bidder number, except that the bidder whose bid was accepted as the Initial Bid will be assigned bidder number 1. Once the Initial Bid has been described by the Debtor and LNBYG, the bidding will then pass to bidder number 2. Bidder number 2 will have the option of submitting an overbid to the Initial Bid of at least the sum of (A) the Initial Bid (inclusive of the Stalking Horse Bidder Fee) plus (B) $100,000, or dropping out of the Auction. Once a bidder drops out of the Auction, such bidder will no longer be permitted to participate in the Auction. After bidder number 2 either submits a qualifying overbid or drops out of the Auction, the bidding will then pass to bidder number 3. This process will continue until only two Qualified Bidders are left, in which case the Qualified Bidder who submits the highest and best Qualified Bid will be deemed the Winning Bidder at the Auction, and the Qualified Bidder who submits the second highest Qualified Bid will be deemed the Winning Back-Up Bidder at the Auction.

Except as expressly provided in the Bidding Procedures Order or the provisions of these Bidding Procedures, the Debtor (following consultation with the Consultation Parties) shall have the right to conduct the Auction in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtor's bankruptcy estate. The Debtor shall also have the right to deviate from these Bidding Procedures or announce and employ at the

18

Auction other procedural rules without the need for any further order of the Bankruptcy Court if the Debtor reasonably determines, in the exercise of its business judgment and following consultation with the Consultation Parties, that doing so would be in the best interests of the Debtor's bankruptcy estate and is not inconsistent with any of the provisions of the Bankruptcy Code or any previously entered order of the Bankruptcy Court including the Bidding Procedures Order.

The Debtor and LNBYG (following consultation with the Consultation Parties) may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer in terms of both amount and execution risk and (2) reject at any time any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtor or its bankruptcy estate; provided that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the Auction reasonably expected to result (including after taking into account execution risk) in the highest amount of money being paid to the Debtor for the purchase of the Purchased Assets.

### 18.    Selection of the Winning Bid and Winning Back-Up Bid

The Auction shall continue until there is one Qualified Bid that the Debtor determines (following consultation with the Consultation Parties), subject to Bankruptcy Court approval, to be the highest and best bid (the "Winning Bid"), and another Qualified Bid to be the second highest and best bid (the "Winning Back-Up Bid"), at which point the Auction will be deemed concluded.  The Debtor will not consider any bids submitted after the conclusion of the Auction.

Subject to the Bankruptcy Court approving the Winning Bid and entering an order approving of the Debtor's free and clear sale of the Purchased Assets to the Winning Bidder in accordance with the Asset Purchase Agreement or Alternative APA, as the case may be, submitted by the Winning Bidder (the "Sale Order"), the Winning Bidder shall be required to close the sale by the outside closing date set forth in such Asset Purchase Agreement or Alternative APA (unless the Debtor and the Winning Bidder jointly agree to an extension of this outside Sale closing date which will be in their sole and absolute discretion), or the Winning Bidder will be deemed to have forfeited its Deposit to the Debtor subject to the terms and conditions for such forfeiture set forth in such Asset Purchase Agreement or Alternative APA, as applicable.  Promptly following the closing of the sale to the Winning Bidder, LNBYG shall return the Deposit of the Winning Back-Up Bidder to the Winning Back-Up Bidder.

If the Winning Bidder fails to close the sale of all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage by the outside closing date for such initial closing (as set forth in the Asset Purchase Agreement or Alternative APA, as applicable), unless the Debtor and the Winning Bidder mutually agree in their sole and absolute discretion to extend such closing date, the Debtor shall so notify the Winning Back-Up Bidder.  The Winning Back-Up Bidder will then have ten (10) days following the date of having been notified by the Debtor to close the purchase of such assets (i.e., all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage).  If the Winning Back-Up Bidder fails to close the sale within this time period, unless the Debtor, following consultation with the Consultation Parties, and the Winning Back-Up Bidder mutually agree in their sole and absolute discretion to extend such initial closing date, the Winning Back-Up Bidder will be deemed to have forfeited

its Deposit to the Debtor subject to any conditions for such forfeiture in the applicable Asset Purchase Agreement or Alternative APA.

**19.**     **<u>Sale Hearing</u>**

The hearing for the Bankruptcy Court to approve the outcome of the Auction and the Debtor's sale of the Purchased Assets to the Winning Bidder and to the Winning Back-Up Bidder if the Winning Bidder fails to close (the "<u>Sale Hearing</u>") shall be held on April 29, 2024, at __:__ p.m., or at such other date and time set by the Bankruptcy Court.

**20.**     **<u>Jurisdiction</u>**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the transfer and sale of the Purchased Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Winning Bid, the Winning Back-Up Bid, and/or any other matter that in any way relates to the foregoing.

318327985.3

# EXHIBIT "6"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Case No.: |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 Case |
| Chapter 11 Debtor in Possession | **NOTICE OF HEARING ON DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) APPROVING OF DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND DETERMINING CURE AMOUNTS; (C) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF** |
| | Date: |
| | Time: |
| | Place:  Courtroom ____ |
| | 21041 Burbank Blvd. |
| | Woodland Hills, CA 91367 |

   **PLEASE TAKE NOTICE** that a hearing will be held on April __, 2024, commencing at
__:___ _.m., at the above-referenced Courtroom, for the Court to consider approval of the
motion ("Motion") filed by Synapse Financial Technologies, Inc., the chapter 11 debtor and

1

debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), seeking entry of an order of the Court: (1) approving the Debtor's sale of substantially all of its assets (the "Purchased Assets") to TabaPay Holdings LLC ("Buyer") or to the highest or otherwise best overbidder or back-up bidder selected at an auction to be held on April __, 2024 (the "Auction"), free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f); (2) approving the Debtor's assumption and assignment of certain executory contracts and unexpired leases and determining cure amounts and approving the Debtor's rejection of those executory contracts and unexpired leases which are not assumed and assigned which the Debtor determines to reject; (3) waiving the 14-day stay periods set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure; and (4) granting related relief .

**PLEASE TAKE FURTHER NOTICE** that on April __, 2024, the Bankruptcy Court entered an order [Doc ____] approving bidding procedures (the "Bidding Procedures").[1] **Creditors, equity interest holders, prospective bidders and parties in interest should carefully read the Bidding Procedures, which set forth detailed instructions, requirements and deadlines pertaining to bid qualifications, the Auction and the sale of the Purchased Assets. If you would like a copy of the Motion or the Bidding Procedures, please contact proposed bankruptcy counsel to the Debtor – Levene, Neale, Bender, Yoo & Golubchik L.L.P., Attn: Krikor J. Meshefejian, Email: KJM@LNBYG.COM; Telephone: (310) 229-1234.**

**PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion, any relief requested in the Motion, or to the sale of the Purchased Assets as contemplated by the Motion or the Debtor's assumption and assignment of contracts and leases to Buyer or another winning bidder or winning back-up bidder must (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (c) be filed with the clerk of the Court for the Central District of California (or filed electronically via CM/ECF with the Court) and actually received by the following parties (collectively, the "Notice Parties"): (i) the Debtor's counsel, Levene,

---

[1] Capitalized terms not otherwise defined have the same meaning provided to such terms in the Bidding Procedures.

2

Neale, Bender, Yoo & Golubchik L.L.P., Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com); Krikor J. Meshefejian (kjm@lnbyg.com), Sankaet Pathak (s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com); (ii) counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (Robert.honeywell@klgates.com); (iii) counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn:  Alexander G. Rheaume (arheaume@mofo.com); (iv) counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (A) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (B) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com); and (v) the US Trustee, Attn: _____ (_____@usdoj.gov), on or before 5:00 p.m. PST on _____, 2024 (the "Objection Deadline").

    **PLEASE TAKE FURTHER NOTICE** that the failure of a party in interest to file and serve a timely objection to the Motion may be deemed by the Court to constitute such party's consent to all of the relief requested by the Debtor in the Motion.

    **PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice, the Memorandum of Points and Authorities attached to the Motion, any Declarations filed in support of the Motion, and all Exhibits attached thereto, the entire record of the Debtor's bankruptcy case, the statements, arguments, and representations of counsel to be made at the hearing on this Motion, and any other evidence properly presented to the Court.

<u>**Additional Information**</u>

    This case was commenced April 22, 2024 (the "Petition Date") by the Debtor's filing of a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

    The Debtor is a technology company with a mission to ensure that everyone around the world has access to best-in-class financial products, regardless of their net worth.  The Debtor

has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users) through certain banking and financial service providers ("Partner Financial Institutions").

The Debtor is one of the first, if not *the* first, tech company to pioneer a Banking as a Services (Baas) platform for fintechs and Partner Financial Institutions which have agreements with the Debtor to efficiently interface each other to allow for transactions (*i.e.,* the buy and sell) of their financial products and services to the fintechs' end users.

Pre-petition, the Debtor determined that it needed to explore investment, restructuring and sale options, and, in that regard, around the Spring of 2022, the Debtor engaged William Blair as its investment banker to solicit proposals for the infusion of capital. The Debtor also engaged and worked with Sherwood Partners, Inc. as its financial advisor to assist generally with its financial affairs as well as to evaluate all of its options pre-petition. The Debtor later replaced William Blair and sought to engage Jefferies LLC in the Fall of 2023 to assist the Debtor with conducting a marketing process for its sale as a going concern, which the Debtor conducted over a number of months prior to the Petition Date. The Debtor received several offers for the purchase of the Debtor's assets, one of which was made by Buyer. Over the course of the past approximately five months, the Debtor and Buyer engaged in intensive negotiations due diligence activities and the preparation of transaction documents including an Asset Purchase Agreement dated April 19, 2024 (the "APA"). The sale of the Debtor's assets has been a complex, time-intensive process that has involved extensive, time-consuming and heavily-negotiated and documented terms and conditions.

On April 19, 2024, the Debtor and Buyer executed the APA pursuant to which Buyer has agreed to acquire substantially all of the Debtor's assets including the Debtor's equity interests in and to the Debtor's two non-debtor, wholly-owned subsidiaries in exchange for the cash payment of $9,700,000.00 plus other consideration as described in the APA, including Buyer's agreement to assume certain obligations and certain leases and contracts of the Debtor and pay for all cure

obligations associated with the assumed leases and contracts. The sale to Buyer is subject to an expedited overbid process though the Debtor does not anticipate that there will be any overbids given the extensive marketing and sale process already conducted which has not generated any better offers due to the complexity of the Debtor's business.

The APA contemplates a three-tiered closing process, with (i) the initial closing where Buyer will acquire all "Purchased Assets" other than the Debtor's equity interests in its two subsidiaries, to occur by April 30, 2024 (defined in the APA as the "Outside Closing Date") upon the completion of certain conditions to closing, including program reconciliations, the acquisition of certain third-party consents and releases and the occurrence of certain other closing conditions, at which time the $9,700,000.00 Purchase Price will be paid; (ii) a second closing for Buyer's acquisition of the Debtor's equity in its broker-dealer subsidiary, to occur as soon as the "change of ownership or control" can be made with respect to such subsidiary pursuant to the procedures governed by FINRA[2] and the occurrence of certain program reconciliations and other closing conditions, with such closing to occur no later than May 30, 2024; and (iii) a third and final closing for Buyer's acquisition of the Debtor's equity in its lending subsidiary, to occur by April 19, 2025 (*i.e.*, the first anniversary of the date of signing of the APA) upon the acquisition of certain governmental and other third-party consents and the occurrence of certain other closing conditions. Based on the foregoing, the Debtor expects that the full Purchase Price will be funded by April 30, 2024, or shortly thereafter.

The obligation of Buyer to consummate its purchase of the Purchased Assets from Seller at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, at or prior to the applicable closing, of a number of conditions precedent (all as set forth in Article VIII of the APA).

The Debtor's primary assets consist of its cash on hand (which, as of the Petition Date, is approximately $2 million) and its proprietary technology platform, customer agreements, and

---

[2] The Debtor understands that such "change of ownership or control" can occur after approximately 30 days from the filing date of the application to transfer ownership or control with FINRA.

equity interests in its two subsidiaries, which, as evidenced by the APA, will be sold (not including cash) for a cash payment of $9,700,000, and other consideration.  In addition, the Debtor may have causes of action against third parties from which the Debtor believes that it may recover additional funds.

The Debtor prepared, submitted to the Court, and obtained Court approval of the Bidding Procedures, which the Debtor believes provide the optimal procedures and timetable in order to achieve the highest and best price for the Purchased Assets.  The Bidding Procedures explain to prospective bidders how a prospective bidder becomes qualified to participate in the Auction and how the Auction would proceed in the event that there is one or more qualified bidders.

For all of these reasons and the others set forth in the Motion, the Memorandum of Points and Authorities attached to the Motion, and the concurrently filed Declaration(s), the Debtor requests that the Court grant the Motion without delay to allow the Debtor to consummate its sale of the Purchased Assets to the Winning Bidder or the Winning Back-Up Bidder at the hearing on April __, 2024, and immediately thereafter enter the Debtor's proposed sale order.

**WHEREFORE**, the Debtor respectfully requests that the Bankruptcy Court:

1.      Find that notice of the Motion was proper, timely, adequate, appropriate and sufficient and that no other or further notice of the Motion, the hearing on the Motion, or the sale of the Purchased Assets is or shall be required;

2.      Find good, sufficient, and sound business purposes and justification and compelling circumstances for the Debtor's sale of the Purchased Assets;

3.      Approve the sale of the Purchased Assets to the Winning Bidder and the Winning Back-Up Bidder at the Auction free and clear of all liens, claims, encumbrances and other interests;

4.      Find that the Winning Bidder and Winning Back-Up Bidder at the Auction are good faith buyers entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code;

6

5.      Enter a sale order in a form that is mutually agreed to between the Debtor and the Winning Bidder and Wining Back-up Bidder;

6.      Authorize the Debtor to enter into an APA in a form that is consistent with the terms of the sale order;

7.      Waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

8.      Grant such other and further relief as the Court deems just and proper.

Dated: April __, 2024           LEVENE, NEALE, BENDER, YOO
                            & GOLUBCHIK L.L.P.


By:_____
          RON BENDER
          MONICA Y. KIM
          KRIKOR J. MESHEFEJIAN
          Proposed Attorneys for Chapter 11 Debtor
          and Debtor in Possession

# EXHIBIT "7"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>    Chapter 11 Debtor in Possession | Case No.:<br><br>Chapter 11 Case<br><br>**NOTICE OF: (1) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (2) ESTABLISHMENT OF CURE AMOUNTS IN CONNECTION THEREWITH; (3) PROCEDURES AND DEADLINES REGARDING OPPOSITIONS TO ASSUMPTION AND ASSIGNMENT, AND CURE AMOUNTS; AND (4) HEARING THEREON**<br><br>Date:<br>Time:<br>Place:  Courtroom ____<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

    **PLEASE TAKE NOTICE** that a hearing will be held on April __, 2024, commencing at

__:___ _.m., at the above-referenced Courtroom, for the Court to consider approval of the

motion ("Sale Motion") filed by Synapse Financial Technologies, Inc., the chapter 11 debtor and

debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), seeking

entry of an order of the Court (the "Sale Order"): (1) approving the Debtor's sale of substantially

all of its assets (the "Purchased Assets") to TabaPay Holdings LLC ("Buyer") or to the highest or

otherwise best overbidder or back-up bidder selected at an auction to be held on April 24, 2024

1

(the "<u>Auction</u>"), free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f); (2) approving the Debtor's assumption and assignment of certain executory contracts and unexpired leases and determining cure amounts and approving the Debtor's rejection of those executory contracts and unexpired leases which are not assumed and assigned which the Debtor determines to reject; (3) waiving the 14-day stay periods set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure; and (4) granting related relief .

**PLEASE TAKE FURTHER NOTICE** that a schedule of all of the Debtor's known executory contracts and unexpired leases (the "<u>Contracts and Leases Schedule</u>"), along with the Debtor's and Buyer's belief as to all outstanding cure amounts owning by the Debtor to the other parties to those executory contracts and unexpired leases (the "<u>Cure Amount</u>"), is attached hereto as **<u>Exhibit 1</u>**.

**PLEASE TAKE FURTHER NOTICE** that an executory contract and/or unexpired lease to which you are a counterparty may be assumed and assigned to Buyer or to the highest or otherwise best overbidder or back-up bidder (an "<u>Alternative Winning Bidder</u>") selected at the Auction. Any executory contract and/or unexpired lease which is not assumed and assigned may be rejected by the Debtor.

**PLEASE TAKE FURTHER NOTICE** that, by way of the Sale Motion, the Debtor is seeking the Court's authority to assume and assign to Buyer or an Alternative Winning Bidder all of the Debtor's executory contracts and unexpired leases that the Winning Bidder wants to have assigned to it and to fix the required Cure Amounts that would need to be paid to the other parties to the executory contracts and unexpired leases to enable compliance with the provisions of Section 365(b)(1)(A) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule unless the other parties to the executory contracts and unexpired leases file a timely objection to the Sale Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule. By way of the Sale Motion, the Debtor is also seeking a determination by the Court that none of the other parties to

2

the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtor so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b) and (f) of the Bankruptcy Code.

Since the identity of the winning bidder is not known at this time (and will not be known until the conclusion of the Auction), the Debtor has no way of knowing which executory contracts and unexpired leases, if any, the winning bidder will to have assigned to it. Accordingly, this Notice has been served on <u>every</u> counterparty to all executory contracts or unexpired leases; thus, every counterparty to an executory contract or unexpired lease that could be subject to an assumption and assignment should read this Notice and **<u>Exhibit 1</u>** to this Notice and consider the relief being requested by the Debtor, and to the extent they oppose the relief being requested by the Debtor, comply with the procedures and deadlines set forth below.

**PLEASE TAKE FURTHER NOTICE that if you are a party to an executory contract or unexpired lease with the Debtor and you: (A) oppose the Sale Motion; (B) oppose the assumption or assignment of any executory contract or unexpired lease; (C) object to the form of adequate assurance of future performance proposed to be provided or contend that adequate assurance of future performance must be provided; or (D) contend that (i) the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule and/or (ii) you have suffered any actual pecuniary loss resulting from any default by the Debtor and you contend that additional payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b) and (f) of the Bankruptcy Code, <u>you must file a written opposition to the Sale Motion with the Court by no later than              , 2024</u> (the "Objection Deadline"), setting forth your (A) opposition to the assumption and assignment of your contract and/or lease; (B) contention as to adequate assurance of future performance; (C) contention as to the required Cure Amount and/or (D) contention of the extent to which you have suffered actual pecuniary loss resulting from any default by the Debtor that you contend must be**

3

satisfied beyond the proposed Cure Amounts to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code. Any such written opposition must state the basis for such objection, and state with specificity what Cure Amount(s) you believe is required (in all cases with appropriate documentation in support thereof), and actually be received by the following parties: (i) the Debtor's counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P., Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com); Krikor J. Meshefejian (kjm@lnbyg.com), Sankaet Pathak (s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com); (ii) counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (Robert.honeywell@klgates.com); (iii) counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn: Alexander G. Rheaume (arheaume@mofo.com); (iv) counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (A) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (B) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com); and (v) the US Trustee, Attn: _____ (_____@usdoj.gov), on or before the Objection Deadline.

To the extent that any contract counterparty or other party in interest does not timely serve an objection as set forth above, such party shall be deemed to have (i) consented to the assumption and assignment of the applicable contracts or leases to the winning bidder; (ii) agreed that the winning bidder has provided adequate assurance of future performance within the meaning of sections 365(b) and (f) of the Bankruptcy Code; (iii) consented to the applicable Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

PLEASE TAKE FURTHER NOTICE that upon the filing of an objection by a Counterparty or other party in interest to the Initial Assignment Notice or Supplemental Assignment Notice, the Debtor will contact the objecting party and the winning bidder to attempt

4

to consensually resolve any timely filed objection. The Debtor will work with the winning bidder in good faith in this regard, and the winning bidder must consent to any increase in the proposed Cure Amount for the applicable Assigned Contract.  If the Debtor and winning bidder are unable to resolve such an objection, such objection will be heard at the Sale Hearing (as may be adjourned by the Court without such objecting party's consent); provided, further, that in the event an objection relates solely to a Cure Amount (a "Cure Objection"), then such objecting party will be deemed to consent to the assumption and assignment of its contract or lease, notwithstanding such objection.  In the event the Debtor and the winning bidder are unable to resolve a Cure Objection prior to the Sale Hearing, the winning bidder may elect not to include the applicable contract or lease in its purchase of the Purchased Assets, subject to any conditions set forth in its Asset Purchase Agreement.

        **PLEASE TAKE FURTHER NOTICE** that the inclusion of a contract or lease in **Exhibit 1** to this Notice shall not constitute or be deemed a determination or admission by the Debtor, the winning bidder or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed.  The Debtor reserves all of its rights, claims and causes of action with respect to the contracts or leases listed in **Exhibit 1** to this Notice and any other contracts or leases to which the Debtor is a party.

Dated: April __, 2024                    LEVENE, NEALE, BENDER, YOO
                                        & GOLUBCHIK L.L.P.


                              By:_____
                                    RON BENDER
                                    MONICA Y. KIM
                                    KRIKOR J. MESHEFEJIAN
                                    Proposed Attorneys for Chapter 11 Debtor
                                    and Debtor in Possession

# EXHIBIT "8"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Case No.: |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 |
| Chapter 11 Debtor in Possession | **ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES; (B) APPROVING THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING THE DEBTOR'S REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED; (C) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF** |

A hearing was held on April __, 2024 (the "Sale Hearing"), for the Court to consider approval of the sale of substantially all of the assets of Synapse Financial Technologies, Inc., chapter 11 debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), pursuant to the motion (the "Motion")[1] filed by the Debtor seeking an order of the Court (this "Sale Order") approving the sale of substantially all of its assets to TabaPay Holdings LLC

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

(the "Stalking Horse Bidder") in accordance with the terms of that certain Asset Purchase Agreement dated as of April __, 2024, by and among the Debtor and the Stalking Horse Bidder, attached as **Exhibit 1** to the Declaration of Sankeat Pathak filed by the Debtor in support of the Motion as Docket Number __ (the "Stalking Horse APA") or to the highest or otherwise best overbidder selected at the Auction free and clear of all liens (except for assumed obligations).  By way of the Motion, the Debtor also requested the Court's approval of the Debtor's assumption and assignment to Buyer (or the successful overbidder) of those unexpired leases and executory contracts that Buyer (or the successful overbidder) wishes to have assigned to it (the "Assigned Contracts")[2] and to reject certain unexpired leases and executory contracts which are not Assigned Contracts effective as of the Initial Closing or as otherwise provided below.  Appearances were made at the Sale Hearing as set forth on the record of the Court.

At a hearing held on April __, 2024 (the "Bidding Procedures Hearing"), the Court granted the Motion as to the Bidding Procedures by order entered on April __, 2024 as Docket Number __ (the "Bidding Procedures Order").  Among other things, the Bidding Procedures Order explained to potential overbidders how a potential overbidder could become qualified to participate in the Auction and how the Auction would proceed in the event that there was one or more qualified overbidders.

[IF NOT QUALIFIED OVERBIDDERS:]

In accordance with the Bidding Procedures Order, the Debtor did not conduct an Auction because there were no qualified overbidders.  The Stalking Horse Bidder was the winning bidder ("Buyer") with a cash purchase price of $_____ and other consideration set forth in the Stalking Horse APA, and the Stalking Horse APA is herein defined as the "Asset Purchase Agreement."  The Debtor determined that such bid (the "Winning Bid") was the highest and best bid submitted under the Bidding Procedures and should be approved by the Court.

[IF ANY QUALIFIED OVERBIDDERS:]

---

[2] The Assigned Contracts as defined herein is inclusive of those Contracts designated in the Stalking Horse APA as "Assigned Contracts," "Assigned Real Property Leases" and "Assigned Personal Property Leases."

In accordance with the Bidding Procedures Order, the Debtor conducted an Auction on April ___, 2024. _____ was the winning bidder ("Buyer") at the Auction with a cash purchase price of $_____ and other consideration set forth in its asset purchase agreement, and such asset purchase agreement is herein defined as the "Asset Purchase Agreement." The Debtor determined that such bid submitted by _____ at the Auction (the "Winning Bid") was the highest and best bid submitted at the Auction and should be approved by the Court.

The Court, having considered the Motion and all pleadings and evidence filed by the Debtor in support of the Motion and all pleadings and evidence filed in response to the Motion; the statements, arguments and representations of the parties made at the Sale Hearing; and the entire record of this case; and the Court, having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and after due deliberation and sufficient good cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.    Jurisdiction and Venue.    The Bankruptcy Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (A), (M), (N) and (O). Venue of this case is proper in this District and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Statutory Predicates.    The statutory predicates for the relief requested in the Motion are (i) Sections 105(a), 363(b), (f), (k), (l) and (m), and 365 of Title 11 of the United States Code

---

[3] The findings of fact and conclusions of law set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Local Rules 6004-1, 9013-1 and 9075-1.

C.      <u>Notice</u>. The Debtor has provided good and sufficient notice with respect to the following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Purchased Assets, (ii) the Auction and the Sale Hearing, (iii) the selection of the Winning Bid, and (iv) the assumption and assignment of the Assigned Contracts and proposed cure amounts owing under such Assigned Contracts ("<u>Cure Amounts</u>"); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required. A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to all parties-in-interest.

D.      <u>Compliance with the Auction Procedures</u>. The Auction process implemented by the Debtor was conducted in accordance with the Bidding Procedures Order and was fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets. The Auction process afforded a full, fair, and reasonable opportunity for any potential purchaser to become a qualified bidder and to participate in the Auction. As demonstrated by (i) the testimony and/or other evidence proffered and adduced at the Bidding Procedures Hearing and the Sale Hearing, and (ii) the representations of counsel made on the record at the Bidding Procedures and the Sale Hearing, the Debtor has conducted the Auction process in good faith, without collusion and in accordance with the Bidding Procedures Order.

E.      <u>Highest or Otherwise Best Bid</u>. The Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other offer or available alternative. The Debtor's determination that the Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its estate, its creditors and its stakeholders. The consideration to be paid by Buyer for the Purchased Assets is fair and reasonable, is the highest or otherwise best offer therefor, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States.

F.    Arm's Length Transaction. The Asset Purchase Agreement and other agreements, documents and instruments (collectively, the "Transaction Documents") related to and connected with this transaction (the "Transaction") and the consummation thereof were negotiated and entered into by the Debtor and Buyer without collusion, in good faith and through an arm's length bargaining process. Neither Buyer nor any of its affiliates or representatives is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  None of the Debtor, Buyer, or their respective representatives engaged in any conduct that would cause or permit the Asset Purchase Agreement, any of the other Transaction Documents or the Transaction to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner.  The terms and conditions of the Asset Purchase Agreement and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and are not avoidable and shall not be avoided, and no damages may be assessed against Buyer or any other party, as set forth in section 363(n) of the Bankruptcy Code.

G.    Good Faith Purchaser.  Buyer has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) Buyer, in proposing and proceeding with the Transaction in accordance with the Asset Purchase Agreement, recognized that the Debtor was free to deal with other interested parties; (ii) Buyer agreed to provisions in the Asset Purchase Agreement and the Bidding Procedures that would enable the Debtor to accept a higher and better offer; (iii) Buyer complied with all of the provisions in the Auction and the Bidding Procedures Order applicable to Buyer; (iv) all payments to be made by Buyer and other agreements entered into or to be entered into between Buyer and the Debtor in connection with the Transaction have been disclosed; (v) the negotiation and execution of the Asset Purchase Agreement and related Transaction Documents were conducted in good faith and constituted an arm's length transaction; and (vi) the Asset Purchase Agreement was not entered into, and the Transaction being consummated pursuant to and in accordance with the Asset Purchase Agreement is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor.  Buyer is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the Transaction shall not affect the validity of the Transaction or Buyer's status as a "good faith" purchaser.

H.    <u>Justification for Relief</u>. Good and sufficient reasons for approval of the Asset Purchase Agreement and the other Transaction Documents and the Transaction have been articulated to the Bankruptcy Court in the Motion and at the Bidding Procedures Hearing and the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtor, its estate, its creditors and its stakeholders. The Debtor has demonstrated through the Motion and other evidence submitted at the Bidding Procedures Hearing and the Sale Hearing both (i) good, sufficient and sound business purpose and justification, and (ii) compelling circumstances for the transfer and sale of the Purchased Assets as provided in the Asset Purchase Agreement outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate, its creditors and its stakeholders.

I.    <u>Free and Clear</u>. In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transaction pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Purchased Assets and will vest in Buyer, through the consummation of the Transaction, all of the Debtor's right, title, and interest in and to the Purchased Assets, free and clear of all Liens (as defined below) except for the Assumed Obligations (as defined in the Asset Purchase Agreement). The Debtor has demonstrated that one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All holders of Liens in the Purchased Assets are adequately protected by either having their respective Liens assumed by the Buyer in accordance with the Asset Purchase Agreement or attach to the net sale proceeds attributable to the Purchased Assets to the extent any such Liens existed as of the Petition Date and subject to the terms of such Liens with the same validity, force and effect, and in the same order of priority, which such Liens had against the Purchased Assets as of the Petition Date, subject to any rights, claims and defenses the Debtor or its estate may possess with respect thereto.

As used in this Sale Order, "<u>Liens</u>" means any and all liens (as defined in section 101(37) Bankruptcy Code), claims (including those that constitute a "claim" as defined in section 101(5)

of the Bankruptcy Code), causes of action, charges, security interests, mortgages, assignments, pledges, or other encumbrances or rights exercisable by any person having similar effect (other than Assumed Obligations), including, without limitation, (i) any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, or restrictions, (ii) any product liability claims, (iii) any and all claims arising under state or federal antitrust laws, (iv) any environmental liabilities (to the greatest extent allowed by applicable law), (v) any employee pension or benefit claims, multiemployer benefit claims, workers' compensation claims, severance claims, retiree healthcare claims or life insurance claims, (vi) any claims for taxes of or against the Debtor, (vii) any derivative, vicarious, transferee or successor liability claims, (viii) any rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia or any foreign jurisdiction), and (ix) any rights, claims or causes of action related to the Evolve Settlement (as defined below) or the transactions described therein or in the 9019 Motion or the Settlement Order (as such terms are defined below), in each case of the foregoing (including, without limitation, clauses (i) through (ix)) whether arising prior to or subsequent to the commencement of this Chapter 11 case, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise, in each case arising under or out of, in connection with, or in any way related to the Debtor, the Purchased Assets, the transfer of the Purchased Assets to Buyer, or the operation of the Debtor's business before or after the Petition Date and through and including the applicable Closing Date (as defined in the Asset Purchase Agreement), and including without limitation any and all Liens that are not Assumed Obligations pursuant to Section 1.4 of the Asset Purchase Agreement.

J.    Prompt Consummation. The Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d).  Time is of the essence in consummating the Transaction, and it is in the best interests of the Debtor and its estate to consummate the Transaction within the timeline set forth in the Motion and the Asset Purchase Agreement.

K.    Three Closings.  Buyer's purchase of the Purchased Assets under the terms of the Asset Purchase Agreement will be structured as three closings, at (1) an initial closing where Buyer will

7

acquire all Purchased Assets other than the Debtor's equity interest in S Brokerage and S Credit, (2) a second closing where Buyer will acquire the Debtor's equity interest in S Brokerage after acquiring required governmental and third-party consents for such acquisitions and fulfilling certain other conditions in the Asset Purchase Agreement, and then (3) at a final closing where Buyer will acquire the Debtor's equity interest in S Credit after acquiring required governmental and third-party consents for such acquisitions and fulfilling certain other conditions in the Asset Purchase Agreement. The termination of any party's obligation to effect such second and final closings shall not result in any change to the initial closing or the purchase price paid at such closing.

L.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.    The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts to Buyer in connection with the consummation of the Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtor and its estate.

M.    <u>Cure/Adequate Assurance</u>.    Buyer has cured, or has provided adequate assurance of cure upon the applicable closing, of any default existing prior to such closing under any of the Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts set forth in the Initial Assignment Notices and Supplemental Assignment Notices (together, the "<u>Assignment Notices</u>"). Buyer has provided adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to Buyer under the Asset Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in such Assigned Contracts prohibiting their assignment or transfer. The Debtor has demonstrated that no other parties to any of the Assigned Contracts have incurred any actual pecuniary loss resulting from a default prior to the applicable closing under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to Buyer at the applicable closings shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

N.    <u>Approval of Evolve Settlement</u>.  Pursuant to the separate motion of the Debtor seeking an order of the Court approving the Debtor's settlement agreement and release (the "<u>Evolve Settlement</u>") with Evolve Bank & Trust ("<u>Evolve</u>") pursuant to Federal Rule of Bankruptcy Procedure 9019, filed herein on April __, 2024 (the "<u>9019 Motion</u>"), the Court has entered its order granting the 9019 Motion on _____, 2024 (the "<u>Settlement Order</u>").

O.    <u>Application of Proceeds</u>. Pursuant to the Asset Purchase Agreement, the Debtor is required to use a portion of the Purchase Price to (1) pay the Senior Lender Indebtedness in full and (2) pay the TriplePoint Indebtedness in the agreed upon fixed pay off amount of $7,199,624.29, and such fixed pay off amount of $7,199,624.29 shall satisfy the TriplePoint Indebtedness in its entirety to the extent it is paid by no later than May 6, 2024.  The application of the Purchase Price from the sale of the Purchased Assets pursuant to the immediately preceding sentence complies with the requirements of the Asset Purchase Agreement and is supported by good, sufficient and sound business reasons.

P.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2.    All objections with regard to the relief sought in the Motion as to the sale of the Purchased Assets and assignment of the Assigned Contracts that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Bidding Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.    Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transaction, including the transfer and sale of the Purchased Assets and assignment of the Assigned Contracts to Buyer on the terms set forth in the Asset Purchase Agreement, is approved in all respects, and the Debtor and Buyer are authorized and directed to consummate the Transaction in accordance with the Asset Purchase Agreement, including, without limitation, by executing all of the Transaction Documents and taking all actions necessary and appropriate to effectuate and consummate the

Transaction (including the transfer and sale of the Purchased Assets) in consideration of the Purchase Price (as defined in the Asset Purchase Agreement) upon the terms set forth in the Asset Purchase Agreement, including, without limitation, assuming and assigning to Buyer the Assigned Contracts.

4.      As of each applicable Closing (as defined in the Asset Purchase Agreement), (i) the Transaction set forth in the Asset Purchase Agreement shall effect a legal, valid, enforceable and effective transfer and sale of the Purchased Assets subject to such Closing to Buyer free and clear of all Liens except for the Assumed Obligations subject to such Closing, as further set forth in the Asset Purchase Agreement and this Sale Order; and (ii) the Asset Purchase Agreement, and the other Transaction Documents, and the Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor, any successor thereto including a trustee or estate representative appointed in the bankruptcy case, and all other persons and entities.

5.      Subject to the fulfillment of the terms and conditions of the Asset Purchase Agreement, this Sale Order shall, as of the applicable Closing Date (as defined in the Asset Purchase Agreement), be considered and constitute for all purposes (a) a full and complete general assignment, conveyance, and transfer of the applicable Purchased Assets transferred on such Closing Date and/or (b) a bill of sale transferring all of the Debtor's rights, title and interest in and to the Purchased Assets transferred on such Closing  Date to Buyer as set forth in the Asset Purchase Agreement.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and approved in this Sale Order.

6.      Any person or entity that is currently, or on the applicable Closing Date may be, in possession of some or all of the applicable Purchased Assets is hereby directed to surrender possession of such Purchased Assets either to (a) the Debtor before the applicable Closing Date, or (b) to Buyer or its designee upon the applicable Closing Date.

7.      The transfer of the Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the Transaction, including, without limitation, payment of the portion

10

of the Purchase Price due at the applicable Closing to the Debtor, vest Buyer with all right, title, and interest in the Purchased Assets transferred at such Closing, free and clear of all Liens except for the Assumed Obligations, in accordance with the Asset Purchase Agreement and as of such Closing.

8.      Following the applicable Closing, no holder of any Lien against the Debtor or the Purchased Assets transferred at such Closing shall interfere with Buyer's respective rights in, title to or use and enjoyment of such Purchased Assets.  All valid and perfected Liens in the Purchased Assets shall, as of the applicable Closing, attach to the net Purchase Price proceeds attributable to the Purchased Assets transferred at such Closing immediately upon receipt of the Purchase Price proceeds due at such Closing by the Debtor in the order of priority, and with the same validity, force and effect, which such Liens had against such Purchased Assets as of the filing of the bankruptcy case, subject to any rights, claims and defenses the Debtor and its estate may possess with respect thereto.

9.      Buyer shall not be deemed, as a result of any action taken in connection with, or as a result of the Transaction (including the transfer and sale of the Purchased Assets), to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtor or its estate by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or otherwise, merged with or into the Debtor; or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtor. Other than the Assumed Obligations, Buyer is not assuming any of the Debtor's debts or Liens.

10.      This Sale Order (i) shall be effective as a determination that, on the applicable Closing Date, all Liens against the applicable Purchased Assets transferred on such Closing Date that existed before such Closing Date have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Liens against any Purchased Assets shall not have delivered to the Debtor before the applicable Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which such person or entity has with respect to such Purchased Assets, then Buyer and/or the Debtor are hereby

authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets.

11.     Upon the applicable Closing, the Debtor is authorized to assume, assign and/or transfer each of the Assigned Contracts to Buyer.  In connection with each Closing, Buyer shall pay to all non-Debtor parties to the Assigned Contracts transferred at such Closing the Cure Amounts set forth in the Assignment Notices for all of such Assigned Contracts, and Buyer's payment of such Cure Amounts are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to such Assigned Contracts under section 365(b) of the Bankruptcy Code.  The payment of the applicable Cure Amounts (if any) to any third-party counterparty (a "Counterparty") to each of the Assigned Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate such Counterparty for any actual pecuniary loss resulting from any such default.  Buyer shall then have assigned to it the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtor nor Buyer shall have any further liabilities to any Counterparty other than Buyer's obligations under the Assigned Contracts that accrue and become due and payable on or after the applicable Closing.  In addition, adequate assurance of future performance has been demonstrated by or on behalf of Buyer with respect to the Assigned Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

12.     Each Counterparty to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from (i) raising or asserting against the Debtor or Buyer, or the property of any of them, any assignment fee, acceleration, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to such Assigned Contract, existing as of the date of the applicable Closing, or arising by reason of the consummation of the Transaction contemplated by the Asset Purchase Agreement, including, without limitation, the Transaction and the assumption and assignment of the Assigned Contracts, including any asserted breach relating to or arising out of any change-in-control provisions in such Assigned Contract, or any purported written or oral modification to such Assigned Contract, and (ii) asserting against Buyer any claim, counterclaim, breach, or condition

asserted or assertable against the Debtor existing as of the applicable Closing or arising by reason of the transfer of the Purchased Assets, except for the Assumed Obligations.

13.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the Counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtor's assumption and assignment of such Assigned Contract in accordance with the Asset Purchase Agreement.

14.     The terms and provisions of this Sale Order, as well as the rights granted under the Asset Purchase Agreement and other Transaction Documents, shall continue in full force and effect and are binding upon any successor, reorganized Debtor, or chapter 7 or chapter 11 trustee applicable to the Debtor, notwithstanding any such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in the bankruptcy case or in any order confirming such a plan, nor any order dismissing the bankruptcy case or converting the bankruptcy case to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, any documents or instruments executed in connection therewith, or the terms of this Sale Order.  The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of the bankruptcy case and the entry of any other order that may be entered in the bankruptcy case, including any order (i) confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in the bankruptcy case; or (iv) dismissing the bankruptcy case.

15.     The Transaction contemplated by the Asset Purchase Agreement and other Transaction Documents are undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code.  Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Order to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to Buyer.

16.     The Debtor is authorized and directed to use a portion of the Purchase Price to (1) pay the Senior Lender Indebtedness in full and (2) pay the TriplePoint Indebtedness in the agreed upon fixed pay off amount of $7,199,624.29, and such fixed pay off amount of $7,199,624.29 shall satisfy the TriplePoint Indebtedness in its entirety to the extent it is paid by no later than May 6, 2024.  The application of the Purchase Price from the sale of the Purchased Assets pursuant to the immediately preceding sentence complies with the requirements of the Asset Purchase Agreement and is supported by good, sufficient and sound business reasons.

17.     The failure to specifically include any particular provision of the Asset Purchase Agreement or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Transaction, the Asset Purchase Agreement and the other Transaction Documents be authorized and approved in their entirety.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

18.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14 days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h) and 6006(d).  Time is of the essence in approving the Transaction (including the transfer and the sale of the Purchased Assets).

19.     Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the Asset Purchase Agreement and this Sale Order, the provisions contained in this Sale Order shall govern.

20.     The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe, and enforce the provisions of the Asset Purchase Agreement and this Sale Order in all respects, including, without limitation, to (i) hear and determine all disputes between the Debtor and/or Buyer, as the case may be, and any other Counterparty to, among other things, the Assigned Contracts concerning, among other things, assignment thereof by the Debtor to Buyer and any dispute between Buyer and the Debtor as to their respective obligations with respect to any asset, liability, or claim arising hereunder; (ii) compel delivery of the Purchased Assets to Buyer free and clear of Liens except for the Assumed Obligations; (iii) compel the delivery of the Purchase Price or performance of other obligations owed to

the Debtor under the Asset Purchase Agreement; (iv) interpret, implement, and enforce the provisions of this Sale Order; and (v) protect Buyer against (A) claims made related to any Liens or other obligations that are not Assumed Obligations, (B) any claims of successor or vicarious liability (or similar claims or theories) related to the Purchased Assets or the Assigned Contracts, or (C) any Liens asserted on or against Buyer or the Purchased Assets.

# EXHIBIT "9"

**Execution Version**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time in accordance herewith, the "**Agreement**") is made as of April 19, 2024, by and between TabaPay Holdings LLC, a Delaware limited liability company ("**Buyer**"), and Synapse Financial Technologies, Inc. ("**Seller**"). Certain other capitalized terms used in this Agreement are defined in <u>Exhibit A</u> attached hereto. Buyer and Seller are collectively defined herein as the "**Parties**" and singularly as a "**Party**."

## RECITALS

WHEREAS, Seller designs and develops financial software through the ownership and use of the Purchased Assets (the "**Business**"). Seller serves customers with places of business in the United States.

WHEREAS, Seller intends to file a voluntary petition (the "**Bankruptcy Case**" and the date of such filing, the "**Petition Date**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "**Bankruptcy Court**").

WHEREAS, Buyer desires to purchase and Seller desires to sell to Buyer the Purchased Assets (as defined below), including Seller's equity interests in its Broker-Dealer Subsidiary and State Lender Licensing Subsidiary (but excluding the assets owned by such Subsidiaries, with such Subsidiaries not intending to file their own bankruptcy cases), free and clear of all Liens, pursuant to, among other provisions thereof, sections 363 and 365 of the Bankruptcy Code, subject to the terms and conditions of this Agreement, including, without limitation, the Sale Procedures and Contract Assumption Procedures.

WHEREAS, Buyer's purchase of the Purchased Assets hereunder will be structured as three closings: (1) at an Initial Closing where Buyer will acquire all Purchased Assets other than Seller's equity interests in the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary; then (2) at a BD Closing where Buyer will acquire all of Seller's equity interest in the Broker-Dealer Subsidiary; then (3) at a Final Closing where Buyer will acquire all of Seller's equity interest in the State Lender Licensing Subsidiary after acquiring all Permits required for such acquisition, in each case subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the terms, covenants, and conditions hereinafter set forth, the Parties agree as follows:

## ARTICLE I

## ASSETS BEING PURCHASED; ASSUMPTION OF LIABILITIES

**I.1    Purchased Assets.** Subject to the terms and conditions of this Agreement (including, without limitation, entry of the Sale Order), Buyer hereby agrees to purchase from Seller, and Seller hereby agrees to sell, convey, transfer, assign and deliver to Buyer, on the applicable Closing Date pursuant to the applicable Bill of Sale, all of Seller's right, title and interest in and to all of Seller's assets set forth on <u>Schedule 1.1</u> of this Agreement and any subsection of <u>Schedule 1.1</u> (the "**Purchased Assets**"), in each case, free and clear of all Liens pursuant to sections 363 and 365 of the Bankruptcy Code to

the extent provided in the Sale Order, and in each case, other than any Excluded Assets. Notwithstanding the foregoing, Buyer shall have the right, upon two (2) Business Days' written notice given to Seller before the Initial Closing to exclude any Purchased Asset (whether or not on the schedule of Purchased Assets in Schedule 1.1 or any subsection of Schedule 1.1) from the sale hereunder, thereby deeming such Purchased Asset to be an Excluded Asset.  Any election of this right to exclude any Purchased Asset shall have no effect on the Purchase Price.  For the sake of clarity, all of Seller's equity interests in the Broker-Dealer Subsidiary and all of Seller's equity interests in the State Lender Licensing Subsidiary shall constitute Purchased Assets and shall be transferred, assigned and conveyed to Buyer at the BD Closing and at the Final Closing, respectively, pursuant to and in accordance with the terms hereof.

**I.2**    **Excluded Assets.**  Buyer shall not acquire, and Seller shall retain (subject to all of Seller's rights under the Bankruptcy Code, including under sections 363 and 365 of the Bankruptcy Code), all of Seller's assets that are not Purchased Assets (collectively, the "**Excluded Assets**"), which shall consist solely of the following:

(a)      All Contracts of Seller that are not Assigned Contracts as set forth on Schedule 1.1 (including, without limitation, Schedule 1.1(b), Schedule 1.1(c), Schedule 1.1(k), Schedule 1.1(l)), Assigned Real Property Leases as set forth on Schedule 1.1(i), or Assigned Personal Property Leases as set forth on Schedule 1.1(m);

(b)      All note receivables and any other debt instruments providing for money owing to Seller (but excluding, for the avoidance of doubt, any accounts receivable specifically assigned, transferred and conveyed to Buyer hereunder as a Purchased Asset, including those accounts receivable set forth on Schedule 1.1(d));

(c)      All cash and cash equivalents of Seller and all other items set forth on Schedule 1.2(c);

(d)      The corporate seals, minute books, stock books, tax returns and materials related to such tax returns, and other similar records relating to Seller's corporate organization, and all employee related or employee benefit related files or records other than personnel files of employees hired by Buyer;

(e)      All insurance recovery rights of Seller other than with respect to insurance policies included in the schedule of Purchased Assets in Schedule 1.1 (including, without limitation, Schedule 1.1(k));

(f)      All tax refunds or credits owing to Seller;

(g)      All rights of Seller to all Avoidance Actions and other claims, causes of action, choses in action, rights of recovery, defenses, privileges, counterclaims and rights of set-off (whether choate or inchoate, known or unknown, contingent or non-contingent) (collectively, "**Seller Claims**") other than: (i) any Seller Claims against any banks, broker-dealers, lenders or other institutions related to or arising from account balances owed by such entities to any End-Users who receive services from Seller or any of its Subsidiaries, as applicable, through one or more Transferred Customers; (ii) any Seller Claims that are included in the schedule of Purchased Assets in Schedule 1.1; (iii) any Seller Claims that arise from the ownership of a Purchased Asset; and (iv) any setoff rights of Seller with respect to counterparties to Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases (which Seller Claims in the foregoing clauses (i) through (iv), for the avoidance of doubt, shall be Purchased Assets rather than Excluded Assets). Notwithstanding the aforementioned, and for the sake of clarity, Seller Claims (A) related to or arising from the obligation of any banks, broker-dealers,

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

lenders or other institutions (including but not limited to Evolve (as defined below)) to pay any fees, revenue, compensation, reimbursement or monetary amount to Seller that accrued prior to the Initial Closing Date and/or (B) related to or arising from Seller's right to funds maintained by any bank, broker-dealer, lender or other institution (including but not limited to Evolve) in any reserve, custodial account or other account that are owed to Seller and accrued prior to the Initial Closing Date shall remain Excluded Assets; *provided*, that the Parties acknowledge and agree that (x) all Seller Claims related to the Assigned Contracts of Transferred Customers, including with respect to the account balances included in the Program Reconciliations and the Lending Program Reconciliation, shall be subject to the exclusive ownership and control of Buyer from and after the assignment and assumption of such Contracts to and by Buyer hereunder (the **"Customer Assignment Date"**); (y) in the event any Transferred Customer, bank or other third-party asserts any claims in the Bankruptcy Case against Seller related to the period prior to the applicable Customer Assignment Date or prior to the date on which the assignment of such Contract with such Transferred Customer to Buyer is completed (the "**Contract Assignment Date**"), Seller may assert any defenses, privileges, counterclaims and rights of set-off with respect to such claims that accrued prior to the Customer Assignment Date or Contract Assignment Date, as applicable, for the purpose of defending against such claims; and (z) Seller's retention of the Seller Claims described in the foregoing clause (B) of this sentence shall be without prejudice to Buyer's right to assert claims to any reserves, custodial accounts or other accounts maintained by the institutions described in such clause (B) (including but not limited to Evolve) that are owed to Buyer and any End-Users associated with Transferred Customers and accrue from and after the Initial Closing Date.

(h)      All surety bonds, insurance policies and employee benefit plans other than those specifically included in the schedule of Purchased Assets in Schedule 1.1(k);

(i)       All rights which accrue or will accrue to Seller under this Agreement;

(j)       All bank accounts of Seller, but expressly excluding any bank accounts specifically listed on Schedule 1.1(f);

(k)      Any collateral posted to secure payment or performance of contractual obligations, including with respect to any surety bonds, liability insurance or workers' compensation insurance, but excluding real or personal property lease deposits and any other collateral included in the schedule of Purchased Assets in Schedule 1.1 (including, without limitation, Schedule 1.1(k));

(l)       All of Seller's Permits that are not assignable pursuant to applicable Law and any pending applications therefor and those Permits listed on Schedule 1.2(l); and

(m)     All other assets identified in Schedule 1.2(m).

**I.3      Assumed Obligations.** Buyer hereby agrees to assume and to pay when due all of the following outstanding obligations of Seller (collectively, the "**Assumed Obligations**"):

(a)      All liabilities arising in connection with or from the use of the Purchased Assets, in each case solely attributable to the use of the Purchased Assets, as applicable, on or after the applicable Closing Date on which such Purchased Assets were acquired by Buyer pursuant to the terms hereof;

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(b)      All obligations arising from any actions taken by Buyer after the applicable Closing Date on which any Purchased Assets are acquired with respect to the operation of such Purchased Assets from and after such Closing Date;

(c)      All obligations arising after the applicable Closing Date under the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases assigned, transferred and conveyed to Buyer on such Closing Date, and any required Cure Costs owed to the counter-party to any such Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases required to be paid pursuant to the Bid Procedures Order, the Sale Order or another order of the Bankruptcy Court; and

(d)      Those obligations specifically identified on Schedule 1.3.

Notwithstanding the foregoing, Buyer shall have the right, upon two (2) Business Days' written notice given to Seller before an applicable Closing, to exclude any Assigned Contract, Assigned Real Property Lease or Assigned Personal Property Lease from the schedules thereof, thereby deeming such Contract to be an Excluded Asset and all obligations and Liabilities thereunder shall not be Assumed Obligations but shall instead be subject to Section 1.4 hereof.  Any election of this right to exclude any Contract shall have no effect on the Purchase Price.

**I.4      Liabilities Not Being Assumed.**  Except for the Assumed Obligations, Seller agrees that Buyer shall not be obligated to assume or perform and is not assuming or performing any Liabilities of Seller or any of its Affiliates (other than the Liabilities of the Broker-Dealer Subsidiary and State Lender Licensing Subsidiary whose equity interests held by Seller are being acquired by Buyer hereunder), whether known or unknown, fixed or contingent, certain or uncertain, and regardless of when such liabilities or obligations may arise or may have arisen or when they are or were asserted, and including, without limitation, (w) any and all obligations arising under the WARN Act (29 U.S.C. §§ 2101-2109) or any similar state laws as a result of, arising out of or relating to the consummation of the Transactions; (x) any and all obligations arising under any Severance Contracts, whether or not the Bankruptcy Court has approved Seller's assumption of any Severance Contracts; (y) any and all obligations arising under any Contracts, agreements or arrangements between or among Seller and/or any Subsidiaries (or by which any of them is bound), on the one hand, and any current or former employee, consultant, contractor or advisor of or to Seller or one or more Subsidiaries, on the other hand, whether entered into prior to the date hereof, on the date hereof or after the date hereof, in each case, providing for the payment of any retention bonus, transaction bonus, success bonus, any other one-time or other special bonus payment, or any other similar payment (whether or not characterized as a bonus pursuant to such applicable Contract, agreement or arrangement) to any such current or former employee, consultant, contractor or advisor; and (z) any and all fees, costs and expenses (including, without limitation, all legal fees, costs and expenses) of (1) the Senior Lender or any of its Affiliates or (2) TriplePoint or any of its Affiliates.

## ARTICLE II

## PURCHASE PRICE AND BANKRUPTCY MATTERS

**II.1      Purchase Price.** Subject in all respects to Section 2.1(b), as consideration for the sale to Buyer of the Purchased Assets (including, without limitation, 100% of Seller's equity interest in the Broker-Dealer Subsidiary and 100% of Seller's equity interest in the State Lender Licensing Subsidiary) and the assumption of the Assumed Obligations, Buyer shall pay to Seller an aggregate cash payment of

4

Nine Million Seven Hundred Thousand Dollars and No Cents ($9,700,000.00) (the "**Purchase Price**") pursuant to and in accordance with the terms of this Agreement (including, without limitation, this Section 2.1).

(a)      Concurrently with the execution and delivery of this Agreement, Buyer shall provide a good faith deposit towards the Initial Closing PP Payment (as defined below) of Nine Hundred Seventy Thousand Dollars and No Cents ($970,000.00) (the "**Deposit**"). The Deposit shall be deposited by wire transfer of immediately available funds to, and be maintained in, a segregated account maintained by Seller's bankruptcy counsel Levene, Neale, Bender, Yoo & Golubchik L.L.P. (the "**Escrow Holder**" and such account the "**Escrow Account**"). The Deposit shall not be considered funds of the Seller's bankruptcy estate and shall be carved out from any debtor-in-possession financing liens under any debtor-in-possession financing order and shall be released immediately to Buyer as follows: (A) as to the Deposit in full, upon termination by Buyer of this Agreement under Section 11.1(a), Section 11.1(b), Section 11.1(c), Section 11.1(d), Section 11.1(g), Section 11.1(h), or Section 11.1(i) hereof; or (B) as set forth in the Bid Procedures Order or other order of the Bankruptcy Court.

(b)      At the Initial Closing, but subject in all respects to the final sentence of this Section 2.1(b), Buyer shall pay to Seller a cash payment of Eight Million Seven Hundred Thirty Thousand Dollars and No Cents ($8,730,000.00) (the "**Initial Closing PP Payment**") by wire transfer of immediately available funds and release of the Deposit to an account designated in writing by Seller. The Initial Closing PP Payment shall be paid as follows: (i) at the Initial Closing, the Escrow Holder shall release the Deposit to Seller from the Escrow Account and (ii) at the Initial Closing, Buyer shall transfer, by wire transfer of immediately available funds to an account designated in writing by Seller, an amount equal to Eight Million Seven Hundred Thirty Thousand Dollars and No Cents ($8,730,000.00), representing the balance of the Initial Closing PP Payment. Buyer and Seller each acknowledge and agree that the Purchase Price shall be used to (x) pay the Senior Lender Indebtedness in full in satisfaction of the condition precedent set forth in, and otherwise pursuant to, the first sentence of Section 8.1(e)(13) and (y) pay the TriplePoint Indebtedness in the agreed upon fixed pay off amount of Seven Million One Hundred Ninety-Nine Thousand Six Hundred Twenty-Four Dollars and Twenty-Nine Cents ($7,199,624.29) in satisfaction of the condition precedent set forth in, and otherwise pursuant to, the second sentence of Section 8.1(e)(13), and that any remaining balance of the Purchase Price (if any) shall be used by the Seller as approved by the Bankruptcy Court.

(c)      At the BD Closing and the Final Closing, no further cash payment or any other additional consideration shall be owed or paid by Buyer for its acquisition of the Seller's equity interest in the Broker-Dealer Subsidiary or the State Lender Licensing Subsidiary, respectively, it being acknowledged and agreed that all of the agreements hereunder constitute the consideration for such acquisition, without limitation to any Buyer termination remedies set forth in Article XI hereof.

**II.2**      BUYER AND SELLER HEREBY ACKNOWLEDGE THAT, IN THE EVENT BUYER FAILS TO CLOSE THE PURCHASE OF THE PURCHASED ASSETS AT THE INITIAL CLOSING WHEN REQUIRED TO DO SO UNDER THE TERMS OF THIS AGREEMENT WITHIN THREE (3) BUSINESS DAYS AFTER THE SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH IN ARTICLE VIII (A "DEFAULT") AND SELLER TERMINATES THIS AGREEMENT AS A RESULT OF SUCH DEFAULT PURSUANT TO SECTION 11.1(e) OR SECTION 11.1(f) HEREOF, IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER OR INCUR IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

THE CONTRARY HEREIN, BUYER AND SELLER HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, (1) THE DEPOSIT IN FULL CONSTITUTES A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREIN ARE TERMINATED PURSUANT TO SECTION 11.1(e) OR SECTION 11.1(f) HEREOF. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (i) AND (ii) BELOW, SUCH AMOUNTS SHALL REPRESENT THE AGREED AND LIQUIDATED DAMAGES TO WHICH SELLER IS ENTITLED BY REASON OF BUYER'S DEFAULT. THE PAYMENT OF SUCH AMOUNTS AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT RATHER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. UPON BUYER'S DEFAULT AS DESCRIBED ABOVE AND SELLER'S ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF PURSUANT TO <u>SECTION 11.1(e)</u> OR <u>SECTION 11.1(f)</u>, THIS AGREEMENT SHALL TERMINATE AND, EXCEPT FOR (i) SELLER'S RIGHT TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES PURSUANT TO THIS <u>SECTION 2.2</u>, AND (ii) ANY PROVISIONS AND OBLIGATIONS OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, THE PARTIES HERETO SHALL BE RELIEVED OF ANY FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT IT WAS REPRESENTED BY COUNSEL OF ITS CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT. THE FOREGOING DOES NOT RESTRICT SELLER'S ABILITY TO SEEK EQUITABLE REMEDIES INCLUDING SPECIFIC PERFORMANCE IN THE ALTERNATIVE

**II.3    Allocation of Purchase Price.**  The Purchase Price shall be allocated among the Purchased Assets (including the equity interests of the Broker-Dealer Subsidiary and the equity interests of the State Lender Licensing Subsidiary and further among the assets of such Persons) and the Assumed Obligations, in the manner set forth in <u>Exhibit B</u> attached hereto (the "**Purchase Price Allocation**"). In the event that Exhibit B is not completed prior to the Initial Closing, the Parties agree to complete the Purchase Price Allocation within thirty (30) days after the Initial Closing Date.  To the extent the Parties are unable to agree on a mutually acceptable Purchase Price Allocation, the Bankruptcy Court shall decide the Purchase Price Allocation.  Each of the Parties, when reporting the Transactions in their respective tax returns, shall allocate the Purchase Price paid or received, as the case may be, in a manner that is consistent with the Purchase Price Allocation set forth in <u>Exhibit B</u> hereto or as otherwise ordered by the Bankruptcy Court.  Additionally, each of the Parties will comply with, and furnish the information required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and any regulations thereunder.

**II.4    Third Party Consents.**  Notwithstanding anything to the contrary in this Agreement, but subject in all respects to <u>Section 8.1(e)(3)</u>, <u>Section 8.2(f)(3)</u>, <u>Section 8.2(f)(6)</u>, <u>Section 8.3(f)(3)</u> and <u>Section 8.3(f)(4)</u> hereof, this Agreement shall not constitute an agreement to assign or transfer any governmental approval, instrument, contract, lease, permit, license or other agreement or arrangement, including any Assigned Contract, Assigned Real Property Lease, Assigned Personal Property Lease or Permit, or any claim, right or benefit arising thereunder or resulting therefrom, in each case, solely and exclusively to the extent that an assignment or transfer or an attempt to make such an assignment or transfer without the consent of a third party would constitute a breach or violation thereof or affect adversely the rights of Buyer or Seller thereunder unless such assignment is approved by the

6

Bankruptcy Court; and any transfer or assignment to Buyer by Seller, as applicable, of any interest under any such instrument, contract, lease, permit, license or other agreement or arrangement that requires the consent of a third party shall be made subject to such consent being obtained from the contracting party or approval being obtained from the Bankruptcy Court.  Subject in all respects to Section 8.1(e)(3), Section 8.2(f)(3), Section 8.2(f)(6), Section 8.3(f)(3) and Section 8.3(f)(4) hereof, in the event that any such consent or Bankruptcy Court approval is not obtained on or prior to the Initial Closing Date, the BD Closing Date or the Final Closing Date, as applicable to the Purchased Assets assigned, transferred and conveyed by Seller to Buyer on such Closing Date, Seller shall continue to use all reasonable best efforts (without paying any additional consideration to the other party to such instrument, contract, lease, permit, license or other agreement or arrangement regarding such asset or in connection with obtaining any approval or consent) to (i) obtain any such consent or Bankruptcy Court approval after the applicable Closing Date as promptly as reasonably possible, and Seller will reasonably cooperate with Buyer in any lawful and reasonable arrangement to provide that Buyer shall receive the interest of Seller in the benefits under any such instrument, contract, lease, permit, license or other agreement or arrangement and (ii) at Buyer's request and cost, enforce for the benefit of Buyer the terms and conditions of any such instrument, contract, lease, permit, license or other agreement or arrangement, in each case, to the extent legally permissible, until either (x) such consent or Bankruptcy Court approval is obtained or (y) Buyer designates such asset as an Excluded Asset by notice to Seller. However, it shall be the sole responsibility of Buyer (subject to this Section 2.4 hereof) to satisfy the Bankruptcy Code requirements to enable Seller to assume and assign to Buyer any of the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases, including that it shall be Buyer's sole responsibility to pay any required Cure Costs to the counter-party to any such Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases and to demonstrate Buyer's adequate assurance of future performance, as required by the Bankruptcy Court under Section 365 of the Bankruptcy Code, with respect to all of the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases.

**II.5    Bankruptcy Matters**.

(a)    **Payment of Cure Costs Under Assigned Contracts.**    Concurrently with and as part of the applicable Closing, Seller shall assume and assign to Buyer the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases, and Buyer shall pay in full the Cure Costs for such Contracts, in each case pursuant to the Sale Order, subject to Buyer's provision of adequate assurance as may be required by the Bankruptcy Court under section 365 of the Bankruptcy Code. Notwithstanding anything to the contrary in this Agreement, Buyer expressly acknowledges that Seller's inability to assume and assign any Assigned Contract, Assigned Real Property Lease or Assigned Personal Property Lease by reason of Buyer's failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Buyer's obligation to consummate the transactions set forth herein ("**Transactions**") and any such Assigned Contract, Assigned Real Property Lease or Assigned Personal Property Lease that Seller fails to so assume and assign at the applicable Closing by reason of Buyer's failure to provide such adequate assurance, as determined by the Bankruptcy Court, shall for all purposes thereafter be deemed an Excluded Asset; *provided*, that in the event the assumption and assignment of any Required Contracts by Seller to Buyer is not approved by the Bankruptcy Court despite Buyer having provided its reasonable best efforts to effectuate such assumption and assignment, then Buyer shall have the right to terminate this Agreement pursuant to Section 11.1(h) hereof.  In connection with the assignment and assumption of the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases, Buyer shall pay all required Cure Costs at or prior to the applicable Closing, subject to the right of Buyer to exclude any such Contracts from the Purchased Assets pursuant to Section 1.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

hereof after which Buyer shall have no responsibility for any such Cure Costs and such Contracts shall deemed Excluded Assets and any Liabilities thereunder or related thereto shall be subject to <u>Section 1.4</u> hereof.

(b)      **<u>Non-Transferable Contracts and Permits.</u>**  Anything in this Agreement to the contrary notwithstanding, but subject in all respects to <u>Section 8.1(e)(3)</u>, <u>Section 8.2(f)(3)</u>, <u>Section 8.2(f)(6)</u>, <u>Section 8.3(f)(3)</u> and <u>Section 8.3(f)(4)</u> hereof, this Agreement shall not constitute an agreement to assign or transfer any Assigned Contract, Assigned Personal Property Lease, Assigned Real Property Lease or Permit, or any claim or right or any benefit or obligation thereunder or resulting therefrom, if an assignment or transfer thereof is prohibited by Law or, without the consent of a third party thereto, would, notwithstanding the provisions of sections 363 or 365(f) of the Bankruptcy Code and the effect of the Sale Order, be prohibited by Law and such consent has not been obtained.  If such consent is required and has not been obtained or if an attempted assignment or transfer is ineffective or prohibited by Law, Seller shall use reasonable best efforts to (i) cooperate with Buyer in any reasonable arrangement requested and approved by Buyer to provide for Buyer all of the benefits under, and (ii) enforce for the benefit of Buyer the terms and conditions of, any such Assigned Contract, Assigned Personal Property Lease, Assigned Real Property Lease or Permit until either (x) such consent is obtained, (y) the Bankruptcy Court orders such assignment or transfer, or (z) Buyer designates such Contract or Permit as an Excluded Asset by notice to Seller.  In connection with any such arrangement, (i) Buyer shall bear the expense of structuring and implementing the arrangement and (ii) Buyer shall honor Seller's commitments set forth in any such Assigned Contract, Assigned Personal Property Lease, Assigned Real Property Lease or Permit to the extent arising following the close of business on the applicable Closing Date in connection with Buyer's use of any such Assigned Contract, Assigned Personal Property Lease, Assigned Real Property Lease or Permit that is the subject of such arrangement (or assets or rights relating thereto).

(c)      Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets under the circumstances, including, but not limited to, (A) giving notice of the Transactions to creditors and certain other interested parties as ordered by the Bankruptcy Court and to any additional parties as determined by Seller or the Investment Banker, and (B) giving notice of and an opportunity to object to assumption and proposed Cure Costs to all counterparties to Contracts included in the Purchased Assets (the "**Contract Assumption Procedures**"), in each case of (A) and (B), pursuant to the Bid Procedures Order and Sale Order, each as defined below, and (ii) Buyer must pay all required Cure Costs and provide adequate assurance of future performance under the Assigned Contracts, Assigned Real Property Leases and Assigned Personal Property Leases.

(d)      Promptly, but in no event later than three (3) Business Days after the Petition Date, Seller shall file with the Bankruptcy Court a motion (the "**Bid Procedures Motion**") and notices seeking the Bankruptcy Court's entry of an order in the same form of **Exhibit C** hereto or in such other form and manner as may be reasonably acceptable to Buyer (the "**Bid Procedures Order**"): (A) approving the Bidding Procedures and Contract Assumption Procedures in substantially the same form as those included in **Exhibit C**; (B) approving the Break-Up Fee and Expense Reimbursement (as such terms are defined in the Bid Procedures Motion); (C) scheduling a hearing to consider approval of this Agreement and the Transactions contemplated hereby (the "**Sale Hearing**"); and (D) approving the form and manner of the Contract Assumption Procedures, Sale Motion and Sale Hearing.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(e)      Promptly, but in no event later than seven (7) Business Days after the Petition Date, Seller shall file with the Bankruptcy Court a motion (the "**Sale Motion**") and notices, each in form and substance satisfactory to Buyer, seeking the Bankruptcy Court's entry of an order in the form of **Exhibit D** hereto or in such other form and manner as may be acceptable to Buyer in its sole discretion (the "**Sale Order**"): (A) finding that notice of the Sale Hearing was given in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and constitutes proper notice as is appropriate under the particular circumstances; (B) finding that Buyer is a "good faith" buyer entitled to the protections afforded by § 363(m) of the Bankruptcy Code; (C) finding that the Purchased Assets are sold, assigned, and transferred to Buyer free and clear of all Liens, except for the Assumed Obligations and (D) approving the Transactions proposed by this Agreement, including, without limitation, the sale, assignment, and transfer of the Purchased Assets and the assumption and assignment of the Assigned Contracts, Assigned Real Property Leases, and Assigned Personal Property Leases pursuant to Sections 363 and 365 of the Bankruptcy Code and as contemplated in the Sale Motion.

(f)      Seller shall serve a copy of the notice of the Sale Motion (but not the entire Sale Motion) on all known creditors of Seller and all known creditors of any Subsidiary.

(g)      Seller shall use commercially reasonable efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of Seller (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days prior to the filing thereof, unless the exigencies of time prevent the period from being that long prior to the filing thereof in the Bankruptcy Case, so as to allow Buyer to provide reasonable comments for incorporation into the same; except that the Bid Procedures Motion and the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Buyer at least three (3) Business Days prior to its filing.

(h)      Upon the terms and subject to the conditions of this Agreement, each of the Parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable to obtain Bankruptcy Court approval of the Bid Procedures Motion and the Sale Motion and to timely consummate the Transactions.  Without limiting the foregoing, prior to the Initial Closing, Seller shall not voluntarily dismiss the Bankruptcy Case once filed and shall use commercially reasonable efforts to:

(1)      commence the Bankruptcy Case within three (3) Business Days following the date of this Agreement;

(2)      file the Bid Procedures Motion within three (3) Business Days following the Petition Date;

(3)      file the Sale Motion within seven (7) Business Days following the Petition Date;

(4)      obtain the Bankruptcy Court's entry of the Bid Procedures Order on or prior to April 24, 2024; and

(5)      obtain the Bankruptcy Court's entry of the Sale Order on or prior to April 29, 2024.

(i)      Seller agrees to comply with each of the procedures, terms, conditions and provisions set forth in **Exhibit C** and **Exhibit D** hereto.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(j)      Concurrently with filing of the Sale Motion with the Bankruptcy Court, Seller shall seek the Bankruptcy Court's approval of any settlement agreements and releases (or other similar Contracts) with Evolve Bank & Trust ("**Evolve**"), by filing a motion with the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019 with respect to such settlement agreements and releases (or such other similar Contracts) (the "**9019 Motion**"). If Seller files the 9019 Motion under seal, it shall expressly ask the Bankruptcy Court to provide that Buyer (and counsel to Buyer (or counsel to one or more of Buyer's Affiliates, as designated by Buyer in its sole discretion)) shall be provided access to the full and complete unsealed motion, together with all unsealed exhibits, annexes and other supporting materials thereto.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the disclosures and exceptions set forth in the disclosure schedules attached hereto as **Exhibit E** (the "**Disclosure Schedule**"), Seller hereby makes the representations and warranties set forth hereinafter in this ARTICLE III to Buyer as of the date hereof and as of each Closing Date:

**III.1      Authority and Binding Effect**.  Subject to the entry of the Sale Order, Seller has the full power and authority to execute and deliver this Agreement and the Bills of Sale (as hereinafter defined) to Buyer.  This Agreement, the Bills of Sale, and the consummation by Seller of its obligations contained herein and therein have been duly authorized by all necessary corporate actions of Seller and such agreements have been duly executed and delivered by Seller.  Subject to the entry of the Sale Order, this Agreement is a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, and, upon execution and delivery, the Bills of Sale will be a valid and binding agreement of Seller and shall be enforceable against Seller in accordance with its terms.

**III.2      Organization and Standing.**  Seller is a corporation incorporated in accordance with the State of Delaware, and Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller has the requisite limited liability company power and authority to conduct the Business as it is now conducted and to own or lease the Purchased Assets, and to use such Purchased Assets in the conduct of the Business.

**III.3      Condition and Title to Purchased Assets.**

(a)      **Purchased Assets**.  Buyer acknowledges and agrees that it is purchasing, and shall take possession of, the Purchased Assets in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and that Buyer has previously been given the opportunity to conduct, and has conducted, such investigations and inspections of the Purchased Assets as Buyer has deemed necessary or appropriate for the purposes of this Agreement.

(b)      **No Warranties Regarding Purchased Assets**.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES REGARDING THE CONDITION, QUANTITY OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS OR CONCERNING THE PAST, PRESENT OR FUTURE PROFITABILITY OR VIABILITY OF THE BUSINESS, AND ANY AND

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLER.

(c)  **Title to and Adequacy of Purchased Assets**.  Seller has, and on the applicable Closing Date will convey and transfer to Buyer, good, complete, and marketable title to all of the Purchased Assets conveyed and sold to Buyer at the applicable Closing, free and clear of all Liens, but subject to the Assumed Obligations, pursuant to sections 363 and 365 of the Bankruptcy Code to the extent provided in the Sale Order.  All of the Purchased Assets are in the exclusive possession and control of Seller, and, subject to the Sale Order, Seller has the right to use, and to sell to Buyer in accordance with the terms and provisions of this Agreement, all of the Purchased Assets without interference from and free of the rights and claims of others.

(d)  **Subsidiaries**. The equity interests in the Broker-Dealer Subsidiary owned by Seller and the equity interests in the State Lender Licensing Subsidiary owned by Seller constitute all of the issued and outstanding equity interests of the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary, respectively, and there are no shares of capital stock, voting securities or other equity interests of the Broker-Dealer Subsidiary or the State Lender Licensing Subsidiary reserved for issuance and outstanding. All equity interests of the Broker-Dealer Subsidiary and all equity interests of the State Lender Licensing Subsidiary are duly authorized, validly issued, fully paid and nonassessable, and there are no outstanding or authorized options, warrants, rights (including repurchase rights, rights of first refusal, redemption rights and "tag-along" and "drag-along" rights), stock-settled performance units, undertakings, calls, subscriptions, claims of any character, agreements, obligations, convertible or exchangeable securities, or other commitments, contingent or otherwise, relating to any equity interests of the Broker-Dealer Subsidiary, any equity interests of the State Lender Licensing Subsidiary, or any other interest in either such entity pursuant to which such applicable entity is or may become obligated to (i) issue, deliver, redeem, acquire or sell, or caused to be issued, delivered, redeemed, acquired or sold, any equity interests or any securities convertible into, exchangeable for, or evidencing the right to subscribe for, any equity interests or (ii) provide funds to or make any equity investment in any other Person.

(e)  **Indebtedness**. Neither Seller nor any Subsidiary is a party to, has incurred or has otherwise guaranteed any Indebtedness that is secured by any Lien on any asset of Seller or any Subsidiary, in each case, other than the Senior Lender Indebtedness and the TriplePoint Indebtedness.

**III.4    Insurance.**  Seller has delivered to Buyer true and correct copies of all policies of fire, general liability, worker's compensation, errors and omissions, malpractice and other forms of insurance maintained by or on behalf of Seller in connection with the Business.  All of such policies are now in full force and effect.  Seller has not received any notice of cancellation or material amendment of any such policies.  No coverage thereunder is being disputed; and all material claims thereunder have been filed in a timely fashion.

**III.5    Registered Broker-Dealer**.

(a)    The Broker-Dealer Subsidiary is, and since its formation has been, the only entity owned directly or indirectly by Seller registered, or required to be registered, as a broker-dealer under the Exchange Act or the applicable Law of any state. The Broker-Dealer Subsidiary is, and at all times so required has been, (i) registered with the SEC as a broker-dealer under the Exchange Act and (ii) registered, licensed or qualified as a broker-dealer under the applicable Law of any state or other jurisdiction (other than the Exchange Act) in which it is required to be registered, licensed or qualified.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

The Broker-Dealer Subsidiary is, and at all times so required has been, a member in good standing of FINRA and any other Self-Regulatory Organization which would require membership or registration in connection with its activities and is in compliance in all material respects with all rules and regulations of each such Self-Regulatory Organization, except as set forth in Section 3.5(a) of the Disclosure Schedule. The Broker-Dealer Subsidiary is and has been at all times in compliance with applicable Law requiring registration, licensing or qualification as a broker-dealer, and is in compliance with applicable Law concerning its operations as a broker-dealer under the Exchange Act in all material respects, except as set forth in Section 3.5(a) of the Disclosure Schedule.

(b)    Seller has made available to Buyer a true, complete and correct copy of (i) the Uniform Application for Broker-Dealer Registration on Form BD of the Broker-Dealer Subsidiary, reflecting all amendments thereto that are in effect on the date hereof ("**Form BD**"); (ii) the Broker-Dealer Subsidiary's membership agreement with FINRA and each other Self-Regulatory Organization; and (iii) each Financial and Operational Combined Uniform Single Report ("**Focus Report**") filed since June 1, 2019. Seller will make available to Buyer upon request any forms, registrations, reports and material correspondence as are filed or submitted by the Broker-Dealer Subsidiary with or to any Governmental Authority from and after the date of this Agreement and prior to the Initial Closing. Each Form BD, Focus Report and other registration, report and form filed with or submitted to the SEC and/or FINRA since June 1, 2019 complied and complies in all material respects with the applicable requirements of the Exchange Act and any other applicable Laws, except as set forth in Section 3.5(b) of the Disclosure Schedule.

(c)    Since June 1, 2019, the Broker-Dealer Subsidiary has filed all regulatory reports, schedules, forms, registrations and other documents that it was required to file with any applicable Governmental Authority, together with any amendments required to be made with respect thereto (collectively, the "**BD Regulatory Filings**"), and has paid all fees and assessments due and payable in connection therewith. Since June 1, 2019, except as set forth in Section 3.5(c) of the Disclosure Schedule, the information contained in the Broker-Dealer Subsidiary's BD Regulatory Filings was true, complete and correct in all material respects at the time of filing, and the Broker-Dealer Subsidiary has made all material amendments to such BD Regulatory Filings as it is required to make under any applicable Law. The Broker-Dealer Subsidiary is operating in compliance with the terms and conditions of its FINRA membership agreement, and no action is pending with FINRA to amend such membership agreement.

(d)    No fact relating to the Broker-Dealer Subsidiary or any "control affiliate" of the Broker-Dealer Subsidiary, as defined in Form BD, requires any response in the affirmative to any question in Item 11 of Form BD, except to the extent that such facts have been reflected on Form BD of the Broker-Dealer Subsidiary or are otherwise set forth in Section 3.5(d) of the Disclosure Schedule.

(e)    Except as set forth in Section 3.5(e) of the Disclosure Schedule: (i) none of the Broker-Dealer Subsidiary or, to Seller's Knowledge, any of Seller's or the Broker-Dealer Subsidiary's officers, directors, security holders, employees or "associated persons" (as such term is defined in the Exchange Act and the rules and bylaws of FINRA) who are individuals ("**Associated Persons**") has received notice of any proceeding, audit, sweep letter, examination or other inquiry by any Governmental Authority pending or, to Seller's Knowledge, threatened, against the Broker-Dealer Subsidiary or against or involving any officer, director, security holder, employee or Associated Persons of the Broker-Dealer Subsidiary, as the case may be, and no examination or inspection has, to Seller's Knowledge, been started or completed for which no documentation has been provided to Buyer; (ii) neither the Broker-Dealer Subsidiary nor, to Seller's Knowledge, any Associated Person thereof (x) is

12

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

ineligible or disqualified pursuant to section 15(b) of the Exchange Act to act as a broker-dealer or as an associated person of a registered broker-dealer or (y) is or has been subject to "statutory disqualification" within the meaning of section 3(a)(39) of the Exchange Act, "heightened supervision" under the rules of FINRA, or any other restriction on its activities or future activities under applicable Law; (iii) there is no finding or action pending or, to Seller's Knowledge, threatened, that would reasonably be expected to result in Seller or the Broker-Dealer Subsidiary having its authorization to conduct business as a broker-dealer denied, suspended, revoked, not renewed or restricted or any Associated Person thereof becoming ineligible to act in such capacity or becoming subject to statutory disqualification, heightened supervision, censure or any other limitations on its activities, functions or operations as an Associated Person; and (iv) neither the Broker-Dealer Subsidiary nor any Associated Person is subject to a disqualification under Rule 262 of Regulation A under the Securities Act or Rule 506(d) of Regulation D under the Securities Act, or any similar disqualification provisions under Regulation E under the Securities Act, except as would not reasonably be expected to be, individually or in the aggregate, material to Seller and its Subsidiaries, taken as a whole.

(f)      Neither the Broker-Dealer Subsidiary nor any Associated Person of the Broker-Dealer Subsidiary, is subject to any order or action of any Governmental Authority that permanently enjoins such person from engaging in or continuing to conduct or practice in connection with any activity involving or in connection with the activities of the Broker-Dealer Subsidiary as now conducted that has not been disclosed in any Form BD or Form U-4 filed by the Broker-Dealer Subsidiary prior to the date of this Agreement. Neither the Broker-Dealer Subsidiary nor any Associated Person of the Broker-Dealer Subsidiary is, or has been, the subject of any action or disciplinary event requiring disclosure on Form BD, Form U-4, Form U-5 or otherwise with any Governmental Authority that has not been so disclosed.

(g)      Each of the Broker-Dealer Subsidiary's Associated Persons and independent contractors, who are required under applicable Law to be registered, licensed or qualified as a principal, a representative, an agent or a salesperson (or a limited subcategory thereof) of the Broker-Dealer Subsidiary with any Governmental Authority are, and have been since June 1, 2019 (or such more recent date on which such Person first became associated with the Broker-Dealer Subsidiary), duly registered as such and such registrations are and were, since June 1, 2019 (or such more recent date), in full force and effect, or are or were in the process of being registered as such within the time periods required by any Governmental Authority, as applicable, except as would not be, individually or in the aggregate, reasonably expected to be material to Business.

(h)      Except as set forth in Section 3.5(h) of the Disclosure Schedule, the Broker-Dealer Subsidiary is in compliance with all applicable net capital requirements under the Exchange Act and FINRA rules and the applicable Law of any jurisdiction in which the Broker-Dealer Subsidiary conducts business and maintains, and since June 1, 2019 has maintained, net capital in an amount sufficient to ensure that it is not, and has not been, required to file notice under Rule 17a-11 under the Exchange Act. The Broker-Dealer Subsidiary has no agreement, arrangement or understanding with any Governmental Authority to increase its regulatory capital above the amounts required to be maintained pursuant to Rule 15c3-1 under the Exchange Act.

(i)      The Broker-Dealer Subsidiary has adopted written supervisory procedures that are reasonably designed to detect and prevent any violations in any material respect under applicable Law, which have been in all material respects implemented pursuant to and in accordance with FINRA Rule 3120(a), and except as set forth in Section 3.5(i) of the Disclosure Schedule, there has been no material non-compliance by the Broker-Dealer Subsidiary or any of its directors, officers, employees or Associated

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Persons with respect to the foregoing requirements or its own internal procedures and policies related to the foregoing. No material customer complaints, including those reportable on a Form U4, have been made, are pending, or, to Seller's Knowledge, are threatened, since June 1, 2019.

(j)      Reserved.

(k)      The Broker-Dealer Subsidiary is disregarded as an entity separate from Seller for U.S. federal income tax purposes.

**III.6    Lending Subsidiary**. The State Lender Licensing Subsidiary is disregarded as an entity separate from Seller for U.S. federal income tax purposes.

**III.7    Compliance**. Except as set forth in Section 3.7 of the Disclosure Schedule, Seller and each Subsidiary are, and since January 1, 2022 have been, in compliance in all material respects with all applicable Laws and, since January 1, 2022, have not received any written or, to Seller's Knowledge, oral communication from any Person or Governmental Authority that Seller or any Subsidiary is the subject of a complaint, claim or investigation with respect to any material violation of any applicable Law.

**III.8    Other Permits**. Seller and each Subsidiary and their respective employees and contractors have obtained and hold all material licenses, certificates, approvals, consents, filings, registrations, notifications, authorizations and permits (collectively, "**Permits**") from each Governmental Authority required under applicable Law with respect to the ownership or use of any Purchased Assets. Section 3.8 of the Disclosure Schedule sets forth a complete and correct list of all Permits. All such Permits are in full force and effect and are not subject to any suspension, cancellation, modification or revocation or any proceedings related thereto, and, to Seller's Knowledge, no such suspension, cancellation, modification or revocation or proceeding is threatened. Seller and each Subsidiary are and, since January 1, 2022, have been, in compliance in all material respects with all the Permits held by such entity. No Governmental Authority has given written or, to Seller's Knowledge, oral notice of cancellation, revocation, non-renewal, impairment, suspension or material default, or an intention to do any of the foregoing, concerning any such Permit since January 1, 2022, and to Seller's Knowledge, there is no reasonable basis for any such cancellation, revocation, non-renewal, impairment or suspension. None of the Permits will be terminated as a result of the consummation of the Transactions.

**III.9    No Broker**.      Seller is not currently using, and shall not hereafter retain or use without the approval of the Bankruptcy Court, the services of any agent, finder, or broker in connection with the Transactions.  Seller shall be solely responsible for the payment of any such fees, costs and expenses.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby makes the representations and warranties set forth in this ARTICLE IV to Seller as of the date hereof and as of each Closing Date:

**IV.1    Authority and Binding Effect**. Buyer has the full corporate power and authority to execute and deliver this Agreement and the Bills of Sale.  This Agreement and the Bills of Sale and the consummation by Buyer of its obligations contained herein and therein have been duly authorized by all necessary corporate actions of Buyer and this Agreement has been, and as of each Closing the

14

applicable Bill of Sale has been, duly executed and delivered by Buyer. This Agreement is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, and, upon execution and delivery, the Bills of Sale will be a valid and binding agreement of Buyer and shall be enforceable against it in accordance with its terms. Except with respect to the Sale Order, it is not necessary for Buyer to take any action or to obtain any approval, consent, or release by or from any third person, governmental or other, to enable Buyer to enter into or perform its obligations under this Agreement and the Bills of Sale.

**IV.2    Organization and Standing.** Buyer is a limited liability company duly organized and validly existing under and is in good standing under the laws of the State of Delaware. Buyer has all requisite power to own and operate its properties and assets, and to continue its business as presently conducted. Buyer is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business conducted by it or the location of the properties owned or leased by it make such qualification necessary.

**IV.3    Compliance with Other Instruments.** The execution and delivery of this Agreement, the Bills of Sale and all other agreements to be entered into in connection herewith and the consummation of the Transactions will not conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to Buyer or its properties or assets, or conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, (i) any provision of the Certificate of Incorporation or bylaws of Buyer; or (ii) any material agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license or any writ, order or decree to which Buyer is a party or by which Buyer or any of its property is bound.

**IV.4    Governmental Consent, etc.** Except with respect to the Sale Order, no consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by Buyer of the Transactions.

**IV.5    No Broker.** Buyer has not retained or used the services of any agent, finder, or broker in connection with the Transactions. Buyer shall pay, and shall indemnify, hold harmless and defend Seller from and against, all commissions, finder's and other fees and expenses charged or asserted by any agent, finder, or broker, by reason of any such retention or use of the services of any such agent, finder, or broker by Buyer.

**IV.6    Investigation.** Buyer and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller in connection with the determination by Buyer to enter into this Agreement and consummate the Transactions, and all such questions have been answered to the reasonable satisfaction of Buyer. Buyer acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections of the Purchased Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties of Seller or any other party other than those expressly set forth in ARTICLE III of this Agreement. Buyer acknowledges and agrees that except for the representations and warranties of Seller expressly set forth in ARTICLE III, the Purchased Assets are being acquired AS IS, WHERE IS WITH ALL FAULTS AND WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

IMPLIED WARRANTY.  In connection with Buyer's investigation of Seller, Seller's Business, the Purchased Assets and the Transactions contemplated herein, Buyer may have received from or on behalf of Seller certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any other party with respect thereto.  Accordingly, Seller makes no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections, and forecasts) except as set forth in ARTICLE III.

## ARTICLE V

## COVENANTS

**V.1** **Access.**  From and after the date of execution of this Agreement and until the earlier of the Initial Closing or the date this Agreement is terminated in accordance herewith, and (1) from the Initial Closing through the BD Closing but during such period solely with respect to the Broker-Dealer Subsidiary, and (2) from the Initial Closing through the Final Closing but during such period solely with respect to the State Lender Licensing Subsidiary, Seller shall give to Buyer and its representatives reasonable access during normal business hours to the premises, employees, agents and consultants of Seller, and such copies of Seller's books and records, contracts and leases and other documentation, so as to enable Buyer to inspect and evaluate all aspects of the Business and operations, the Purchased Assets, operating results, financial condition, capitalization, ownership, and legal affairs relating to the Business pending the applicable Closing.  Buyer agrees to conduct its review, and to cause its representatives to conduct their review, in a manner designed to minimize any disruption of the Business.  Buyer will hold any confidential information obtained pursuant to this <u>Section 5.1</u> in accordance with the confidentiality provisions of any non-disclosure agreement ("**NDA**") entered into between Buyer and Seller.

**V.2** **Conduct of the Business.**  From and after the date of execution of this Agreement and until the earlier of (i) with respect to the ownership, use and operation of all Purchased Assets other than the equity interests of the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary (x) the Initial Closing or (y) the date this Agreement is terminated in accordance herewith, and (ii) with respect to the ownership of the equity interests of the Broker-Dealer Subsidiary (and the operation of such Subsidiary), (x) the BD Closing or (y) the date this Agreement is terminated in accordance herewith, and (iii) with respect to the ownership of the equity interests of the State Lender Licensing Subsidiary (and the operation of such Subsidiary), (x) the Final Closing or (y) the date this Agreement is terminated in accordance herewith, Seller shall, and shall cause each of its Affiliates to, (A) operate and conduct the Business in the ordinary course, consistent with past practices, including, without limitation, with respect to (1) the Broker-Dealer Services Agreement, the State Lender Licensing Subsidiary Intercompany Services Agreement, and any other Contracts and services provided between and among Seller, the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary, and (2) any Required Contracts; (B) (1) pay and perform all of its debts and other obligations (including taxes) when due; (2) use reasonable best efforts to collect accounts receivable when due, and not extend credit outside of the ordinary course of business consistent with past practice; (3) sell the products and

16

services of Seller, the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary consistent with past practice as to discounting, license, service and maintenance terms, incentive programs, revenue recognition and other terms; and (4) preserve intact its present business organizations, keep available the services of its present officers and employees, and preserve its relationships with customers, suppliers, distributors, licensors, licensees, contractors, regulators and others having business dealings with it, to the end that its goodwill and ongoing business shall be unimpaired at both the Initial Closing and the Final Closing; (C) ensure that each of its Contracts entered into after the date hereof will not require the procurement of any consent, waiver, notice or novation or provide for any material change in the obligations of any party thereto in connection with, or automatically terminate as a result of the consummation of, the Transactions, and shall give reasonable advance written notice to Buyer prior to allowing any Material Contract or right thereunder to lapse or terminate by its terms; and (D) preserve and maintain in good standing all Permits, except in the case of each of the foregoing, as otherwise approved by the Bankruptcy Court (with the consent of Buyer, which shall not be unreasonably withheld, conditioned, or delayed) or as otherwise expressly set forth in any cash collateral or debtor-in-possession financing orders approved by the Bankruptcy Court (with the consent of Buyer, which shall not be unreasonably withheld, conditioned, or delayed).  In furtherance thereof and without limitation of the foregoing, except as set forth on Section 5.2 of the Disclosure Schedule, unless Buyer's prior consent to do otherwise is obtained (which consent shall not be unreasonably withheld, conditioned, or delayed), during the period commencing on the date hereof and continuing until the earlier of (i) with respect to the ownership, use and operation of all Purchased Assets other than the equity interests of the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary (x) the Initial Closing or (y) the date this Agreement is terminated in accordance herewith, and (ii) with respect to the ownership of the equity interests of the Broker-Dealer Subsidiary (and the operation of such Subsidiary), (x) the BD Closing or (y) the date this Agreement is terminated in accordance herewith, and (iii) with respect to the ownership of the equity interests of the State Lender Licensing Subsidiary (and the operation of such Subsidiary), (x) the Final Closing or (y) the date this Agreement is terminated in accordance herewith, Seller shall not do, cause or permit, whether directly or indirectly, any of the following, with respect to Seller or any Subsidiary:

(a)    **Charter Documents**. Cause, propose or permit any amendments to the organizational or governing documents of Seller or any Subsidiary;

(b)    **Merger, Reorganization**. Merge or consolidate itself with any other Person or adopt a plan of complete or partial liquidation, dissolution, consolidation, restructuring, recapitalization or other reorganization, recognizing that Seller will be consummating a sale of the Purchased Assets pursuant to the terms hereof, which sale shall not violate this provision;

(c)    **Dividends; Changes in Share Capital**. Declare or pay any dividends or make any other distributions (whether in cash, stock or other property) in respect of any equity interests of Seller or any Subsidiary, or split, combine or reclassify any equity interests of Seller or any Subsidiary, or issue or authorize the issuance of any equity interests or other securities in respect of, in lieu of, or in substitution for any equity interests of Seller or any Subsidiary, or repurchase or otherwise acquire, directly or indirectly, any equity interests of Seller or any Subsidiary;

(d)    **Issuance of Equity Interests**. Issue, deliver or sell or authorize or propose the issuance, delivery or sale of, or purchase or propose the purchase of, any equity interests of any Subsidiary, or enter into or authorize or propose to enter into any Contracts of any character obligating it to issue any equity interests of any Subsidiary;

17

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(e)  **Employees and Contractors**. (i) Hire or engage any (A) additional officers or (B) employees or contractors whose annual base compensation is in excess of $75,000 individually or $150,000 in the aggregate in respect of such new hires and/or engagements, (ii) terminate the employment or engagement, change the title, office or position, or materially reduce the responsibilities of any employee or any contractor of Seller or any Subsidiary, or induce or encourage any employee or contractor of Seller or any Subsidiary to resign other than in accordance with the terms of any such employment or engagement, (iii) enter into, amend or extend the term of any employment or engagement agreement with any officer, employee, or contractor of Seller or any Subsidiary other than in the ordinary course of business consistent with past practice, (iv) enter into any Contract with a labor union or collective bargaining agreement or (v) make any representations or issue any communications (solely to the extent that such representations or communications have not been previously approved in writing by Buyer), to any employees or contractors of Seller or any Subsidiary regarding offers of employment or engagement, or the terms and conditions of any actual or prospective offers of employment or engagement, from or with Buyer or any of its direct or indirect subsidiaries or any of their respective Affiliates;

(f)  **Loans and Investments**. Make any loans or advances to, or any investments in or capital contributions to, any Person, or forgive or discharge in whole or in part any outstanding loans or advances, or prepay any Indebtedness, except solely to the extent required by applicable Law in the reasonable determination of the Seller (after reasonable consultation with Buyer) to the extent necessary to maintain and operate the Broker-Dealer Subsidiary and State Lender Licensing Subsidiary in compliance with applicable Law – recognizing that payments made by Seller to any of Seller's pre-bankruptcy secured creditors solely to the extent authorized or ordered by the Bankruptcy Court shall not be violative of this provision;

(g)  **Intellectual Property**. Transfer or license, other than in the ordinary course of business consistent with past practice, to or from any Person any Intellectual Property Rights or data, or transfer or provide a copy of any source code to any Person (including any current or former employee or contractor of Seller or any Subsidiary or any commercial partner of Seller or any Subsidiary), other than providing access to source code to employees and contractors of Seller or any Subsidiary involved in the development of the products and services of Seller or any Subsidiary on a need to know basis in the ordinary course of business consistent with past practice, recognizing that Seller will be consummating a sale of the Purchased Assets pursuant to the terms hereof, which sale shall not violate this provision;

(h)  **Patents**. Take any action regarding a patent, patent application or other Intellectual Property Right, other than filing continuations for existing patent applications or completing or renewing registrations of existing patents, domain names, trademarks or service marks or continuing the prosecution of any currently pending (as of the signing of this Agreement) litigation with respect to such Intellectual Property Rights, in each case in the ordinary course of business consistent with past practice, recognizing that Seller will be consummating a sale of the Purchased Assets pursuant to the terms hereof, which sale shall not violate this provision;

(i)  **Dispositions**. Other than Seller consummating a sale of the Purchased Assets pursuant to the terms hereof, which sale shall not violate this provision, sell, lease, license or otherwise dispose or permit to lapse of any of its material tangible or intangible assets, other than sales and nonexclusive licenses of products and services of Seller or any Subsidiary in the ordinary course of business consistent with its past practice, or enter into any Contract with respect to the foregoing;

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(j)      **Indebtedness**. Incur or guarantee any Indebtedness or place or allow the creation of any Lien on any of its properties, other than Indebtedness or Liens approved by the Bankruptcy Court as debtor-in-possession financing provided by Buyer on terms acceptable to Buyer in its sole discretion or by another lender on terms reasonably acceptable to Buyer;

(k)      **Payment of Obligations**. (i) Pay, discharge or satisfy (A) any claim or Liability to any Person who is a holder of equity interests in Seller or any Subsidiary or an officer or director of Seller or any Subsidiary, or any Affiliate or family member of any of the foregoing (other than compensation due for services as an officer or director in the ordinary course of business consistent with past practice) or (B) any claim or Liability arising other than in the ordinary course of business consistent with past practice, other than the payment, discharge or satisfaction of Liabilities reflected or reserved against in the financial statements of Seller; or (ii) give any discount, accommodation or other concession other than in the ordinary course of business consistent with past practice, in order to accelerate or induce the collection of any receivable;

(l)      **Capital Expenditures**. Make any capital expenditure, capital additions or capital improvements, except solely to the extent required by applicable Law in the reasonable determination of the Seller (after reasonable prior consultation with Buyer) to the extent necessary to maintain the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary in compliance with applicable Law or as otherwise authorized by the Bankruptcy Court;

(m)      **Termination or Waiver**. Cancel, release or waive any material claims or rights held by Seller or any Subsidiary;

(n)      **Pay Increases**.  Except as provided in <u>Section 5.2(o)</u> hereof, (i)  Pay any bonus or special remuneration to any officer or employee or any non-employee director or contractor of Seller or any Subsidiary, (ii) declare, pay, commit to, approve, or undertake any obligation of any other kind for the payment by Seller or any Subsidiary of a bonus, commission or additional salary, compensation (of any type or form, including equity, equity-based or equity-linked compensation) or employee benefits to any such Person (including under any profit sharing, management by objective, incentive, gainsharing, competency or performance plan), or (iii) increase the salaries, wage rates, fees or other compensation (of any type or form, including equity, equity-based or equity-linked compensation) payable to any employee or contractor of Seller or any Subsidiary other than to the extent any such increase is expressly (x) set forth in detail on <u>Section 5.2(n)</u> of the Disclosure Schedule or (y) authorized by the Bankruptcy Court;

(o)      **Severance Arrangements**. Except to the extent approved by the Bankruptcy Court, grant or pay amounts under, or enter into (or make any commitment to enter into) any Severance Contract;

(p)      **Lawsuits and Settlements**. (i) Commence a lawsuit or other dispute other than (A) in such cases where Seller in good faith determines that failure to commence suit would result in the material impairment of a valuable aspect of the business of Seller or any Subsidiary (provided, that Seller consults with Buyer prior to the filing of such a suit or otherwise commencing any dispute) or where Seller in good faith determines that the counter-party to such a lawsuit or other dispute owes Seller or a Subsidiary money or is impairing the ability of Seller or a Subsidiary to fulfill a condition required by this Agreement (provided, that Seller consults with Buyer prior to the filing of such a suit or otherwise commencing any dispute), or (B) for a breach of this Agreement or (ii) settle or agree to settle any pending or threatened lawsuit or other dispute;

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(q)      **Accounting**. Change any accounting methods or practices or revalue any of its assets, except in each case as required by changes in United States generally accepted accounting principles upon the written advice of Seller's independent accountants and after written notice to Buyer;

(r)      **Insurance.**  Fail to maintain insurance consistent with past practices, not take any action to terminate or modify, or permit the lapse or termination of, the present insurance policies and coverages of Seller or any Subsidiary;

(s)      **Agreements.**

(1)      Enter into, amend or modify any (A) Contract that would reasonably be considered to be material to the business of Seller or any of its Subsidiaries (any such Contract, whether in effect as of the date hereof or entered into after the date hereof in accordance herewith, a "**Material Contract**"), except for any renewal of such Material Contract entered into automatically or in the ordinary course, or (B) any Contract requiring a novation, consent or notice in connection with the Transactions;

(2)      Fail to observe and perform in any respect any of its post-bankruptcy obligations under any Assigned Contract, Assigned Personal Property Lease, or Assigned Real Property Lease;

(3)      Except as required by any existing contracts or agreements or as approved by the Bankruptcy Court, amend, cancel, terminate, assign, or waive or release any material right or claim under any Assigned Contract, Assigned Personal Property Lease, or Assigned Real Property Lease; and

(4)      Fail to promptly notify Buyer in writing of the occurrence of any post-bankruptcy breach or default of any Assigned Contract, Assigned Personal Property Lease, or Assigned Real Property Lease known to Seller;

(t)      **Consents; Compliance with Laws to the Extent Related to the Business.**

(1)      Fail to maintain all Permits and other rights necessary to operate the Business granted by any Governmental Authority;

(2)      Take any action, or fail to take any action, which, in either case, would reasonably be expected to result in a violation in any material respect of, or in the noncompliance in any material respect with, any Laws applicable to Seller, any Subsidiary or the Business; and

(3)      Fail to reasonably cooperate with Buyer and render to Buyer such assistance as Buyer may reasonably request, at Buyer's sole expense, in obtaining any approval required hereunder; and

(u)      **Taxes.** (i) Fail to pay, when due, and prior to the imposition or assessment of any interest, penalties, or Liens by reason of the nonpayment of, all post-bankruptcy taxes, due or assessed against them, except for any taxes being contested in good faith; (ii) make or change any material election in respect of any taxes; (iii) adopt or change any material accounting method in respect of any taxes; (iv) file any original or amended federal, state, or foreign tax return without the consent of Buyer prior to filing (which consent shall not be unreasonably denied, delayed or conditioned); (v) enter into any tax sharing or similar agreement (other than any commercial agreement entered into in the ordinary course of business the primary purpose of which does not relate to taxes) or closing agreement; (vi) settle any claim or assessment in respect of taxes; (vii) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of any taxes or (viii) enter into intercompany transactions giving rise to deferred gain or loss of any kind.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**V.3**    **Efforts**. Subject to the terms and conditions hereof, each Party hereto shall use its commercially reasonable efforts to consummate the Transactions as promptly as practicable. The "commercially reasonable efforts" of any Party hereto shall not require such Party, its affiliates or representatives to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to any other Party hereto for consummation of the Transactions; provided, that if such Party, its affiliates or representatives remedy any such breach, such Party shall not be deemed to be in breach of such representation or warranty for purposes of determining the other Party's obligations to consummate the Transactions.

**V.4**    **Permits**.

(a)    Seller shall, and shall cause each Subsidiary to, (i) (A) file such applications, notices, registrations and requests as may be required or advisable to be filed by it with any Governmental Authority regarding the commencement of the Bankruptcy Case and in order to consummate the Transactions; and (B) use its reasonable best efforts to obtain all consents, authorizations, orders and approvals of all such Governmental Authorities referred to in the immediately preceding clause (A) (including, without limitation, the FINRA Approval and each Lending License Consent (each as defined below)) and use its reasonable best efforts to satisfy all conditions, undertakings and requirements as may be necessary or appropriate to obtain all such consents, authorizations, orders and approvals or as may be set forth therein, (ii) subject to applicable Law, furnish Buyer with copies of all documents and correspondence (A) prepared by or on behalf of such party for submission to any Governmental Authority and (B) received by or on behalf of such party from any Governmental Authority, in each case in connection with the Transactions and (iii) subject to applicable Law, use its reasonable best efforts to consult with and keep Buyer informed as to the status of such matters. Subject to applicable Law, to the extent that any application, notice, registration or request so filed by or on behalf of Seller or any Subsidiary contains any significant information relating to Buyer, prior to submitting such application, notice, registration or request to any Governmental Authority, Seller shall, and shall cause each Subsidiary to, permit Buyer to review such information and will consider in good faith the suggestions of Buyer with respect thereto.

(b)    Subject to applicable Law, Buyer and Seller shall (and Seller shall cause each Subsidiary to) use reasonable best efforts to cooperate with the other in the preparation and filing of any applications, notices, registrations and responses to requests for additional information from Governmental Authorities in connection with the Transactions, including providing such information as may be reasonably necessary for inclusion in such applications, notices, registrations and responses. Subject to applicable Law, Seller and each Subsidiary, on the one hand, and Buyer on the other hand, shall promptly advise the other party upon receiving any communication relating to the Transactions from any Governmental Authority.

(c)    Seller shall, as promptly as practicable, but in no event later than five (5) Business Days following the date hereof, cause the Broker-Dealer Subsidiary to file or cause to be filed an application for approval of a change in ownership or control of the Broker-Dealer Subsidiary under FINRA Rule 1017 with FINRA (the "**FINRA CMA**") and request "Fast Track" treatment. As soon as reasonably practicable, Seller shall cause the Broker-Dealer Subsidiary to file or cause to be filed written notification regarding the change in ownership or control of the Broker-Dealer Subsidiary to any other Self-Regulatory Organization of which it is a member and any notice or other filing with any applicable state securities authority. Without the prior written consent of Buyer, neither the Broker-Dealer Subsidiary or any of its Affiliates shall agree to any material restriction to be imposed by FINRA as a condition to the approval of the FINRA CMA, including any requirement to maintain an amount of

21

regulatory capital in excess of the amount of regulatory capital required under Rule 15c3-1 of the Exchange Act as of the date hereof. Prior to filing the FINRA CMA and any other materials or documents with FINRA, and prior to making a filing with any other Self-Regulatory Organization and any state securities authority, Seller shall provide Buyer with a reasonable opportunity (not less than three (3) Business Days) to review and comment on such FINRA CMA, materials, documents or filings. Seller shall, or shall cause the Broker-Dealer Subsidiary to, draft the responses to any written or oral questions received from FINRA regarding the FINRA CMA and shall consider in good faith reasonable comments provided by Buyer, but is not required to accept such comments other than those relating solely to information regarding Buyer and its Affiliates and business. Each Party shall, and shall cause its Affiliates to, as promptly as practicable, supply any information or documentary material that may be requested by the other party, required or reasonably necessary to complete any of the applications or filings set forth in this Section 5.4, including with respect to any inquiries or requests for additional information or documents made by FINRA or an applicable state securities authority. Any such notification and report form and other consents shall be in substantial compliance with the requirements of applicable Law. Buyer and Seller, and each of their respective Affiliates, shall keep each other apprised of the status of any communications with and any inquiries or requests for additional information from FINRA and shall comply promptly with any such inquiry or request and shall promptly provide any supplemental information requested in connection with the filings made hereunder pursuant to applicable Law. Any such supplemental information shall be in substantial compliance with the requirements of applicable Law.

(d)      From the date hereof until the earlier of the termination of this Agreement in accordance with Article XI or the consummation of the BD Closing, Seller shall (and shall cause any of its Affiliates to) (i) provide all information and documentation reasonably requested by Buyer relating to any examination, audit, review, investigation or any other similar action by FINRA involving Seller or any of its Subsidiaries, in each case, to the extent pending at any time prior to the BD Closing, and (ii) keep Buyer reasonably informed about, and consult in good faith with Buyer with respect to, any and all matters relating to any such examination, audit, review, investigation or other similar action by FINRA, in each case of the foregoing clauses (i) and (ii), to the extent permitted by applicable Law and to the extent compliance with foregoing clauses (i) and (ii) would not reasonably be expected to result in a loss of attorney-client privilege between Seller and its counsel.

**V.5    Indebtedness Repayment.** From and after the date hereof until the earlier of the termination of this Agreement in accordance with Article XI or the consummation of the Initial Closing, Seller shall (and shall cause each of its Affiliates to) provide all assistance, information, and documentation reasonably requested by Buyer, TriplePoint, Senior Lender or any of their respective Affiliates to consummate the repayment of the TriplePoint Indebtedness and the Senior Lender Indebtedness at the Initial Closing pursuant to Section 8.1(e)(13) and to otherwise facilitate the satisfaction of the condition precedent to the Initial Closing set forth in Section 8.1(e)(13).

## ARTICLE VI

## OBLIGATIONS SURVIVING THE CLOSINGS

**VI.1    Further Assurances.**    Each Party shall execute and deliver after the date hereof such instruments and take such other actions as the other Party may reasonably request in order to carry out the intent of this Agreement or to better evidence or effectuate the Transactions.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**VI.2    Expenses.**  Each Party shall pay all of its respective costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in carrying out and closing the Transactions whether or not this Agreement or the Transactions are ever consummated.

**VI.3    Taxes.**  Buyer shall pay all sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes arising from the sale and transfer of the Purchased Assets to Buyer.  Seller shall be responsible for all taxes of any kind or nature arising from the conduct or operation of the Business up to the Initial Closing Date with respect to the Purchased Assets sold, transferred, assigned and conveyed to Buyer at the Initial Closing; Seller shall be responsible for all taxes of any kind or nature arising from the conduct or operation of the Business up to the BD Closing Date with respect to the Purchased Assets sold, transferred, assigned and conveyed to Buyer at the BD Closing; and Seller shall be responsible for all taxes of any kind or nature arising from the conduct or operation of the Business up to the Final Closing Date with respect to the Purchased Assets sold, transferred, assigned and conveyed to Buyer at the Final Closing.  If any taxes required under this <u>Section 6.3</u> to be borne by Seller are assessed against Buyer or any of the Purchased Assets, Buyer shall notify Seller in writing promptly thereafter.  Notwithstanding the foregoing, Buyer may (but shall not be obligated to) pay any such taxes assessed against it, its business or any of the Purchased Assets, but which are payable by Seller pursuant hereto, if Buyer's failure to do so, in the reasonable judgment of Buyer, could result in the immediate imposition of a Lien on or against any of the Purchased Assets or any other assets of Buyer. Buyer and Seller shall (i) cooperate, as and to the extent reasonably requested, in connection with the filing and preparation of tax returns or reports related to the Purchased Assets and any proceeding related thereto, and (ii) make all filings, returns, reports and forms as may be required to comply with all applicable Laws and the terms of this Agreement.

**VI.4    Broker-Dealer Subsidiary Payments**. To the extent that, following the BD Closing, the Broker-Dealer Subsidiary receives payment of revenue that accrued prior to the BD Closing from Transferred Customers that Seller otherwise may owe to Transferred Customers for services provided prior to the BD Closing in accordance with the applicable Contracts with such Transferred Customers (*e.g.*, rebate revenue or service fee income), Buyer shall cause the Broker-Dealer Subsidiary to (i) notify Seller of receipt of such revenue, (ii) consult with Seller in good faith to determine the amount owed to Seller's bankruptcy estate with respect to such amounts, and (iii) remit such funds to Seller in a timely manner. In addition, promptly upon the BD Closing, Buyer shall remit to Seller the balance of any funds maintained in bank accounts of the Broker-Dealer Subsidiary     as of the BD Closing Date; <u>provided</u>, that Seller shall not, and shall cause each of its Affiliates not to, in the period between the date hereof and the BD Closing or the Final Closing, as applicable, to transfer any funds contained in any account held by, in the name of or for the benefit Broker-Dealer Subsidiary or State Lender Licensing Subsidiary, as applicable, to any account maintained by, in the name of or on behalf of Seller.

**VI.5    Lending Subsidiary Cash**. Promptly upon the Final Closing, Buyer shall remit to Seller the balance of any funds maintained in bank accounts of the State Lender Licensing Subsidiary which are sold, assigned and transferred to Buyer as a Purchased Asset hereunder as of the Final Closing Date.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## ARTICLE VII

## SURVIVAL

All of the respective representations and warranties of Seller and Buyer set forth in this Agreement or in any of such Party's disclosure schedules, or in any certificates delivered by such Party on the BD Closing Date or the Final Closing Date, shall terminate effective as of the Initial Closing, except for representations and warranties related to the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary which shall terminate effective as of the BD Closing or the Final Closing, as applicable to each Subsidiary and the equity interests therein. All covenants and agreements of Buyer, Seller or any Subsidiary set forth herein shall survive in accordance with their respective terms.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligation of Buyer to consummate its purchase of the Purchased Assets from Seller at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Buyer, (1) of the Bankruptcy Court's entry of an order approving the 9019 Motion and (2) at or prior to the Initial Closing, the BD Closing or Final Closing, as applicable, of each of the following conditions precedent set forth in <u>Section 8.1</u> (in the case of the Initial Closing), <u>Section 8.2</u> (in the case of the BD Closing), and <u>Section 8.3</u> (in the case of the Final Closing):

**VIII.1  Initial Closing.**

(a)     **Representations and Warranties.**  The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Initial Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)     **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets to be consummated at the Initial Closing pursuant to <u>Article X</u>.

(c)     **Performance of Obligations.**  Seller shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed or complied with by Seller prior to the Initial Closing.

(d)     **No Material Adverse Effect**. Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(e)     **Delivery of Additional Documents and Instruments.**  On the Initial Closing Date, Seller shall deliver, or cause to be delivered to Buyer, the following documents and instruments, in form and substance reasonably satisfactory to Buyer (except for the different standard of approval with respect

24

to any matter set forth in this Section 8.1(e), to the extent any provision of this Section 8.1(e) expressly provides for such a different standard of approval), unless waived in writing by Buyer:

(1)      Initial Closing Bill of Sale. The Bill of Sale and Assignment and Assumption Agreement in a form reasonably acceptable to each of Buyer and Seller, duly executed by Seller (the "Initial Closing Bill of Sale"), which shall consummate the transfer, assignment and conveyance of all Purchased Assets to Buyer other than the equity interests of the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary, which shall be the sole and exclusive Purchased Assets transferred, assigned and conveyed to Buyer at the Final Closing.

(2)      Officer's Certificate. A certificate executed by an authorized officer of Seller certifying on behalf of Seller that each of the conditions set forth in Section 8.1(a) and Section 8.1(c) have been satisfied.

(3)      Third-Party Consents.  Evidence of the receipt of (a) the third-party consents to the consummation of the Transactions from the counterparties (or, to the extent acceptable to Buyer, any Affiliate thereof) identified on Schedule 8.1(e)(3) for any Contract with such counterparty (or Affiliate thereof) of Seller to be assigned to Buyer at the Initial Closing, except to the extent the Bankruptcy Court enters an order approving of Seller's assumption and assignment to Buyer of such Contract; and (b) for any such Contract to which a Subsidiary is also a party, the third-party consents identified on Schedule 8.1(e)(3), which shall be required in addition to the requirement of the foregoing clause (a).

(4)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

(5)      Certificate of Good Standing. A certificate of good standing (or comparable certificate) of Seller and each Subsidiary from the Secretary of State (or similar governing body) where Seller or such Subsidiary, as applicable, is incorporated, formed or otherwise organized, in each case, as of a date not earlier than five (5) days prior to the Initial Closing.

(6)      IRS Form W-9. An IRS Form W-9 of Seller.

(7)      Broker-Dealer Services Agreement. A Broker-Dealer Services Agreement in a form reasonably acceptable to Buyer and Seller (on behalf of itself and the Broker-Dealer Subsidiary) (the "**Broker-Dealer Services Agreement**"), duly executed by Seller and the Broker-Dealer Subsidiary, together with written evidence reasonably satisfactory to Buyer that Seller and Broker-Dealer Subsidiary shall have caused to be terminated, effective as of the Initial Closing, all existing intercompany services agreements between Seller and the Broker-Dealer Subsidiary (which termination shall provide, among other matters, that Seller releases, on behalf of itself and its Affiliates, the Broker-Dealer Subsidiary from all liabilities and obligations to Seller from and after the termination of such agreement(s) and that no obligations of the Broker-Dealer Subsidiary shall survive any such termination).

(8)      State Lender Licensing Subsidiary Intercompany Services Agreement. An Intercompany Services Agreement in a form reasonably acceptable to Buyer and Seller (on behalf of itself and the State Lender Licensing Subsidiary) (the "**State Lender Licensing Subsidiary Intercompany Services Agreement**"), duly executed by Seller and the State Lender Licensing Subsidiary, together

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

with written evidence reasonably satisfactory to Buyer that Seller and State Lender Licensing Subsidiary shall have caused to be terminated, effective as of the Initial Closing, all existing intercompany services agreements between Seller and the State Lender Licensing Subsidiary (which termination shall provide, among other matters, that Seller releases, on behalf of itself and its Affiliates, the State Lender Licensing Subsidiary from all liabilities and obligations to Seller from and after the termination of such agreement(s) and that no obligations of the State Lender Licensing Subsidiary shall survive any such termination).

(9)    <u>State Lender Licensing Subsidiary Audit</u>.  The audited financial statements of the State Lender Licensing Subsidiary for the fiscal year ending December 31, 2023 shall have been completed and timely filed with all Governmental Authorities that have jurisdiction over such Subsidiary and require such filing.

(10)    [Reserved].

(11)    <u>Reconciliation Matters</u>. Seller shall have provided Buyer with written evidence, in each case, such evidence satisfactory to Buyer in its reasonable discretion (subject to such documentation delivered pursuant to <u>Section 8.1(e)(11)(i)</u>) of each of the following:

(i)    <u>Funding of End-User Demand Deposit Accounts</u>. All banks, banking institutions, brokerages, lenders and any other applicable financial institution or other entity shall have fully funded all account balances of all End-User demand deposit accounts of all Transferred Customers to the extent maintained by or on behalf of, or otherwise affiliated with or related to, any such bank, banking institution, brokerage, lender, other financial institution or other entity, in each case, to Buyer's satisfaction in its sole and exclusive discretion.

(ii)    <u>Program Reconciliation</u>. Except to the extent expressly addressed by <u>Section 8.1(e)(11)(iii)</u> or <u>Section 8.1(e)(11)(iv)</u>, as applicable, all account balances involving Transferred Customers and any related demand deposit accounts, savings accounts, reserve accounts, FBO accounts, or accounts similar to any of the foregoing at any bank, lender or other institutions are reconciled with Seller's ledger records, in each case, in form and substance and with results satisfactory to Buyer in its sole and exclusive discretion (a "**Program Reconciliation**") as of the Initial Closing Date.

(iii)    <u>Reconciliation of Programs Involving Transferred Customers</u>. All account balances held by or at the Broker-Dealer Subsidiary with respect to Transferred Customers, including in brokerage, sweep, and cash management accounts of such Transferred Customers, shall be reconciled in full with Seller's ledger records as of the Initial Closing Date.

(iv)    <u>Reconciliation of Lending Programs Involving Transferred Customers</u>. Seller shall produce records demonstrating that, in Buyer's reasonable discretion, the State Lender Licensing Subsidiary holds, controls or has rights to reserve account balances of End-Users or Transferred Customers that are at least equal to the total balance of loans issued and outstanding by the State Lender Licensing Subsidiary (defined as a "**Lending Program Reconciliation**") as of the Initial Closing Date.

(v)    <u>Audit</u>. Buyer shall have the right to conduct and complete an audit, or shall have the right to engage a third-party audit firm to conduct and complete an audit, at Buyer's sole cost and expense, in respect of the satisfaction of any of the conditions set forth in <u>Section 8.1(e)(11)(ii)-(iv)</u> (inclusive), and Seller shall use its reasonable best efforts to cooperate, and to cause each of its

26

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Affiliates to cooperate, with any such audit (including, without limitation, by providing data relating to the satisfaction of any of the conditions set forth in <u>Section 8.1(e)(11)(ii)-(iv)</u> (inclusive) in any manner as Buyer or its third-party audit firm may reasonably request). In the event that Buyer elects to undertake an audit of the satisfaction of any of the conditions set forth in <u>Section 8.1(e)(11)(ii)-(iv)</u> (inclusive), then, as an express condition precedent to Buyer's obligation to consummate the Initial Closing, the audit shall have been completed and the results of the audit shall be satisfactory to Buyer in its reasonable discretion; <u>provided</u>, that, solely with respect to the condition precedent set forth in <u>Section 8.1(e)(11)(iii)</u>, such audit shall not have demonstrated any material inaccuracies in the completion of the Program Reconciliation contemplated by <u>Section 8.11(e)(iii)</u>. Buyer shall have twenty (20) days from the date hereof to complete any audit pursuant to this <u>Section 8.1(e)(11)(v)</u>; <u>provided</u>, that the period of time in which Buyer shall be required to complete any such audit shall be tolled (and shall not run) for so long as Seller or any of its Subsidiaries is in breach of any of its obligations pursuant to this <u>Section 8.1(e)(11)(v)</u>.

(12)   <u>Reserved</u>.

(13)   <u>Repayment of the Senior Lender Indebtedness and TriplePoint Indebtedness</u>. Buyer, Seller and the Senior Lender shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of Seller and its Subsidiaries securing obligations under the Indebtedness arising under the Senior Lender Loan Agreement and the other Senior Lender Loan Documents as of the Initial Closing (such Indebtedness, the "**Senior Lender Indebtedness**"), each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, the Senior Lender shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the Senior Lender Indebtedness such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this <u>Section 8.1(e)(13)</u>, the Senior Lender Indebtedness shall be repaid in full and all Senior Lender Loan Documents shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.  Buyer, Seller and TriplePoint Capital (together with each of its Affiliates, "**TriplePoint**") shall have executed and entered into one or more payoff letters, together with related releases of all Liens and instruments of termination or discharge, or documents committing to the release of all Liens or termination or discharge obligations contingent upon the Initial Closing having occurred, to the extent reasonably requested by Buyer in order to release all Liens over the properties and assets of Seller and its Subsidiaries securing obligations under the Indebtedness arising under the TriplePoint Loan Agreement and the other TriplePoint Loan Documents as of the Initial Closing (the "**TriplePoint Indebtedness**") at the agreed upon payoff amount set forth in <u>Section 2.1(b)</u>, each in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, effective upon the Initial Closing, TriplePoint shall receive an amount in cash, by wire transfer of immediately available funds in an amount equal to the agreed upon payoff amount set forth in <u>Section 2.1(b)</u>, such that, effective upon the consummation of the Initial Closing and the execution, delivery and effectiveness of the payoff letter(s) contemplated by this <u>Section 8.1(e)(13)</u>, the TriplePoint Indebtedness shall be repaid in full and all TriplePoint Loan Documents shall be terminated in full and of no further force or effect immediately upon consummation of the Initial Closing.

(14)   <u>PCI-DSS Audit</u>. Seller shall have provided Buyer with: (i) its most recent final Report on Compliance, which is in progress as of the date hereof, based on a full audit of Seller's security controls for its applicable systems and environments conducted by a Qualified Security Assessor (as designated

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

by the Payment Card Industry (PCI) Security Standards Council (SSC)) and reflected on its website) which Report must show no matters requiring remediation; (ii) evidence that the Report on Compliance was accepted by Seller and transmitted to the applicable payment card networks; and (iii) an Attestation of Compliance by Seller with respect to the matters covered in such Report on Compliance. The Report on Compliance and the Attestation of Compliance shall address all Seller systems that are in scope for Seller's PCI DSS compliance obligations, including, without limitation, Seller's card processing systems, cardholder environments, tokenization and card data storage systems and environments and any other system or environment maintained by or on behalf of Seller, any Subsidiary or any third party that transmits, stores or processes any cardholder data received by Seller or any Subsidiary for purposes of facilitating payment card processing.

(15)   Evolve Assignment. Buyer and Evolve shall have executed and delivered a letter agreement, in form and substance satisfactory to Buyer in its sole and exclusive discretion, pursuant to which, among other matters, Evolve unconditionally consents in all respects to the consummation of the Transactions contemplated by this Agreement (including, without limitation, the assignment of the Evolve Agreement and the assignment, amendment or termination of that certain letter agreement, dated October 1, 2023, between Seller and Evolve).

(16)   Approval of Settlement Agreement. The Bankruptcy Court shall have unconditionally approved in all respects the 9019 Motion.

## VIII.2  BD Closing.

(a)   **Representations and Warranties.**  The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the BD Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)   **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets to be consummated at the BD Closing pursuant to Article X.  For the avoidance of doubt, this Section 8.2(b) pertains solely to the purchase and sale of the equity interests of the Broker-Dealer Subsidiary and not to the purchase and sale of any other Purchased Assets.

(c)   **Performance of Obligations.**  Seller shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed or complied with by Seller prior to the BD Closing.

(d)   **No Material Adverse Effect.** Since the Initial Closing, there shall not have occurred any Material Adverse Effect as to the Broker-Dealer Subsidiary.

(e)   **Compliance with the Services Agreement.** The Broker-Dealer Services Agreement shall remain in full force and effect and Broker-Dealer Subsidiary shall not be in breach, in any material respect, of any requirement of the Broker-Dealer Services Agreement as of the date of the BD Closing.

28

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(f)    **Delivery of Additional Documents and Instruments.**  On the BD Closing Date, Seller shall deliver, or cause to be delivered to Buyer, the following documents and instruments, in form and substance reasonably satisfactory to Buyer (except for the different standard of approval with respect to any Program Reconciliation), unless waived in writing by Buyer:

(1)    <u>BD Closing Bill of Sale</u>**.** The Bill of Sale and Assignment and Assumption Agreement in a form reasonably acceptable to Buyer and Seller, duly executed by Seller (the "**BD Closing Bill of Sale**"), which shall consummate the transfer, assignment and conveyance to Buyer of 100% of the equity interests of the Broker-Dealer Subsidiary.

(2)    <u>Officer's Certificate</u>. A certificate executed by an authorized officer of Seller certifying on behalf of Seller that each of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(c)</u> have been satisfied.

(3)    <u>Third-Party Consents</u>. Evidence of the receipt of (a) the third-party consents to the consummation of the Transactions from the counterparties (or, to the extent acceptable to Buyer, any Affiliate thereof) identified on <u>Schedule 8.1(e)(3)</u> for any Contract with such counterparty (or Affiliate thereof) of Seller to be assigned to Buyer at the BD Closing, except to the extent the Bankruptcy Court enters an order approving of Seller's assumption and assignment to Buyer of such Contract; and (b) for any such Contract to which a Subsidiary is also a party, the third-party consents identified on <u>Schedule 8.1(e)(3)</u>, which shall be required in addition to the requirement of the foregoing clause (a).

(4)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

(5)    <u>Certificate of Good Standing</u>. A certificate of good standing (or comparable certificate) of the Broker-Dealer Subsidiary from the Secretary of State (or similar governing body) where the Broker-Dealer Subsidiary is incorporated, formed or otherwise organized, in each case, as of a date not earlier than five (5) days prior to the BD Closing.

(6)    <u>FINRA Approval</u>. Either: (i) the Broker-Dealer Subsidiary shall have received the written approval of FINRA for the transactions contemplated hereby pursuant to FINRA Rule 1017 ("**FINRA Approval**"); or (ii) (A) thirty-five (35) calendar days shall have elapsed after the making of the Rule 1017 application with respect to the Transactions and such application shall not have been rejected or otherwise terminated or withdrawn; (B) the Broker-Dealer Subsidiary shall have notified FINRA that the parties hereto intend to consummate the BD Closing in accordance with FINRA 1017(c) at least five (5) Business Days prior to the BD Closing; and (C) FINRA shall not have advised that the parties are prohibited from consummating the BD Closing without FINRA's approval of the transactions contemplated hereby, that FINRA otherwise objects to such BD Closing without prior approval or that FINRA intends to deny the application or impose any material restrictions on any Seller or any Subsidiary or Buyer pursuant to Rule 1017(c) or otherwise.  For the avoidance of doubt, Seller shall have no further responsibility or obligation whatsoever to Buyer with respect to obtaining FINRA Approval after the BD Closing provided that the conditions of this <u>Section 8.2(f)(6)</u> were otherwise satisfied in all respects at the time of the BD Closing.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(7)    <u>Program Reconciliation</u>. A Program Reconciliation shall be completed as of the date of the BD Closing with respect to all Transferred Customers doing business with the Broker-Dealer Subsidiary. Buyer shall have the right to conduct and complete audit, or shall have the right to engage a third-party audit firm to conduct and complete an audit, at Buyer's sole cost and expense, in respect of the satisfaction of the conditions set forth in the immediately preceding sentence, and Seller shall cause its Affiliates to cooperate, with any such audit (including, without limitation, by providing data relating to the satisfaction of the conditions set forth in the immediately preceding sentence in any manner as Buyer or its third-party audit firm may reasonably request). In the event that Buyer elects to undertake an audit of the satisfaction of any of the conditions set forth in the first sentence of this <u>Section 8.2(f)(7)</u>, then, as an express condition precedent to Buyer's obligation to consummate the BD Closing, the audit shall have been completed results of the audit shall be satisfactory to Buyer in its reasonable determination.

(8)    <u>IRS Form W-9</u>. An IRS Form W-9 of Seller.

(9)    <u>Fidelity Bond</u>. Evidence of the receipt of the consent of National Union Fire Insurance Company (or American Insurance Group, on behalf of National Union Fire Insurance Company) to the consummation of the Transactions contemplated by the BD Closing in respect of that certain Broker-Dealer Guard Blanket Fidelity Bond for Securities Dealers issued to Broker-Dealer Subsidiary as the first named insured thereunder, dated December 4, 2023.

**VIII.3  Final Closing.**

(a)    **Representations and Warranties.**  The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Final Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)    **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets to be consummated at the Final Closing pursuant to <u>Article X</u>.  For the avoidance of doubt, this <u>Section 8.3(b)</u> pertains solely to the purchase and sale of the equity interests of the State Lender Licensing Subsidiary and not to the purchase and sale of any other Purchased Assets.

(c)    **Performance of Obligations.**  Seller shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed or complied with by Seller prior to the Final Closing.

(d)    **No Material Adverse Effect**. Since the Initial Closing, there shall not have occurred any Material Adverse Effect as to the State Lender Licensing Subsidiary.

(e)    **Compliance with Services Agreement**. The State Lender Licensing Subsidiary shall not be in material breach of any requirement of the State Lender Licensing Subsidiary Intercompany Services Agreement as of the date of the Final Closing.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(f)    **Delivery of Additional Documents and Instruments.**  On the Final Closing Date, Seller shall deliver, or cause to be delivered to Buyer, the following documents and instruments, in form and substance reasonably satisfactory to Buyer (except for the different standard of approval with respect to any Program Reconciliation), unless waived in writing by Buyer:

(1)    Final Closing Bill of Sale**.** The Bill of Sale and Assignment and Assumption Agreement in a form reasonably acceptable to Buyer and Seller, duly executed by Seller (the "**Final Closing Bill of Sale**" and, together with the Initial Closing Bill of Sale and the BD Closing Bill of Sale, the "**Bills of Sale**"), which shall consummate the transfer, assignment and conveyance to Buyer of 100% of the equity interests of the Sate Lender Licensing Subsidiary.

(2)    Officer's Certificate. A certificate executed by an authorized officer of Seller certifying on behalf of Seller that each of the conditions set forth in Section 8.3(a) and Section 8.3(c) have been satisfied.

(3)    Lending License Consents. Seller and the State Lender Licensing Subsidiary shall have received and provided to Buyer all consents, waivers, authorizations and approvals of any Governmental Authority with authority over the State Lender Licensing Subsidiary (each, a "**Lending License Consent**") for approval of the consummation of the Transactions in respect of all Permits, in each case, to the extent required by applicable Law.

(4)    Third-Party Consents.   Evidence of the receipt of (a) the third-party consents to the consummation of the Transactions from the counterparties (or, to the extent acceptable to Buyer, any Affiliate thereof) identified on Schedule 8.1(e)(3) for any Contract with such counterparty (or Affiliate thereof) of Seller to be assigned to Buyer at the Final Closing, except to the extent the Bankruptcy Court enters an order approving of Seller's assumption and assignment to Buyer of such Contract; and (b) for any such Contract to which a Subsidiary is also a party, the third-party consents identified on Schedule 8.1(e)(3), which shall be required in addition to the requirement of the foregoing clause (a).

(5)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

(6)    Certificate of Good Standing. A certificate of good standing (or comparable certificate) of the State Lender Licensing Subsidiary from the Secretary of State (or similar governing body) where the State Lender Licensing Subsidiary, as applicable, is incorporated, formed or otherwise organized, in each case, as of a date not earlier than five (5) days prior to the Final Closing.

(7)    Surety Bonds. To the extent required by any underwriter of any surety bond held by State Lender Licensing Subsidiary as of the date hereof (or at any time after the date hereof and prior to the Final Closing) in connection with the consummation of the Transactions and the Final Closing, Buyer shall have obtained replacement surety bonds from each such underwriter in respect of State Lender Licensing Subsidiary in order to permit Buyer to own all of the outstanding equity interests of State Lender Licensing Subsidiary from and after the Final Closing.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligation of Seller to consummate the sale of the Purchased Assets to Buyer at each of the Initial Closing, the BD Closing and the Final Closing, as applicable, in each case, is subject to the fulfillment, or the waiver in writing by Seller, at or prior to the Initial Closing, the BD Closing or the Final Closing, as applicable, of each of the following conditions precedent set forth in Section 9.1 (in the case of the Initial Closing), Section 9.2 (in the case of the BD Closing), and Section 9.3 (in the case of the Final Closing):

**IX.1    Initial Closing**.

(a)    **Representations and Warranties.**  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Initial Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)    **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets to be consummated at the Initial Closing pursuant to Article X.

(c)    **Performance of Obligations.**  Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement to have been performed by it at or prior to the Initial Closing.

(d)    **Delivery of Additional Instruments.**  On the Initial Closing Date, Buyer shall deliver, or cause to be delivered to Seller, the Initial Closing Bill of Sale, the Broker-Dealer Services Agreement, the State Lender Licensing Subsidiary Intercompany Services Agreement, each duly executed by Buyer.

(e)    **Delivery of Consideration.** At the Initial Closing, Buyer shall deliver to Seller a cash payment in the remaining amount of the Initial Closing PP Payment (after the deposit) as specified in Section 2.1(b) hereof.

(f)    **Sale Order.**  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

**IX.2    BD Closing.**

(a)    **Representations and Warranties.**  The representations and warranties made by Buyer in this Agreement related to the Broker-Dealer Subsidiary shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

correct in all respects, on the date hereof and at and as of the BD Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)      **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets related to the Broker-Dealer Subsidiary to be consummated at the BD Closing pursuant to Article X.

(c)      **Required State Preapprovals**. As of the BD Closing Date, Seller or the Broker-Dealer Subsidiary shall have received each required approval or non-objection, as applicable, from any state regulatory authorities ("**BD State Approvals**"), to the extent that consummating the BD Closing absent prior receipt of such BD State Approvals would be prohibited by applicable Law, including without limitation: (i) written approval or non-objection of the Transaction from the State of Florida Office of Financial Regulation, Division of Securities pursuant to paragraph Rule 69W-600.001(11)(d)(1), F.A.C.; and (ii) written approval or non-objection of the Transaction from the State of Kentucky Department of Financial Institutions, Division of Securities pursuant to 808 Kentucky Administrative Regulation 10:460.

(d)      **Performance of Obligations.**  Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement related to the Broker-Dealer Subsidiary to have been performed by it at or prior to the BD Closing.

(e)      **Delivery of Additional Instruments.**  On the BD Closing Date, Buyer shall deliver, or cause to be delivered to Seller, the BD Closing Bill of Sale duly executed by Buyer.

(f)      **[Reserved].**

(g)      **Sale Order.**  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

**IX.3     Final Closing.**

(a)      **Representations and Warranties.**  The representations and warranties made by Buyer in this Agreement related to the State Lender Licensing Subsidiary shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Final Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date), with the same force and effect as if made again at and as of that time.

(b)      **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order or directive that has been issued, within the applicable deadlines, by any Governmental Authority having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets related to the State Lender Licensing Subsidiary to be consummated at the Final Closing pursuant to Article X.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(c)      **Performance of Obligations.**  Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement related to the State Lender Licensing Subsidiary to have been performed by it at or prior to the Final Closing.

(d)      **Delivery of Additional Instruments.**  On the Final Closing Date, Buyer shall deliver, or cause to be delivered to Seller, the Final Closing Bill of Sale duly executed by Buyer.

(e)      **Sale Order.**  The Bankruptcy Court shall have entered the Sale Order, which shall either (a) have become a Final Order or (b) have included both (i) a finding that Buyer purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code, and (ii) an order that the Sale Order shall take effect immediately upon entry and is not stayed notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE X

## THE CLOSINGS

The consummation of the Transactions shall collectively take place at three separate closings (the first such closing hereunder, the "**Initial Closing**," the second such closing hereunder, the "**BD Closing**," and the third and final such closing hereunder, the "**Final Closing**" and, together with the Initial Closing and the BD Closing, the "**Closings**" and each a "**Closing**").  Each Closing shall take place virtually by conference call and the electronic transfer of signature pages and fully executed and compiled deliverables on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in (x) Section 8.1 and Section 9.1, in the case of the Initial Closing, (y) (y) Section 8.2 and Section 9.2, in the case of the BD Closing, and (z) Section 8.3 and Section 9.3, in the case of the Final Closing, or, in respect of each Closing, at such other time and place as the Parties may otherwise agree in writing.  The date on which the Initial Closing occurs in accordance with the preceding sentences of this Article X is referred to in this Agreement as the "**Initial Closing Date**"; the date on which the BD Closing occurs in accordance with the preceding sentences of this Article X is referred to in this Agreement as the "**BD Closing Date**"; and the date on which the Final Closing occurs in accordance with the preceding sentences of this Article X is referred to in this Agreement as the "**Final Closing Date**" (and, together with the Initial Closing Date and the BD Closing Date, the "**Closing Dates**" and each a "**Closing Date**").

**X.1      Closing Deliveries of Seller.**  At the Initial Closing, Seller shall deliver, or cause to be delivered, to Buyer, the documents and instruments set forth in Section 8.1 above.  At the BD Closing, Seller shall deliver, or cause to be delivered, to Buyer, the documents and instruments set forth in Section 8.2 above.  At the Final Closing, Seller shall deliver, or cause to be delivered, to Buyer, the documents and instruments set forth in Section 8.3 above.

**X.2      Closing Deliveries of Buyer.**  At the Initial Closing, Buyer shall deliver, or cause to be delivered, to Seller, the documents and instruments set forth in Section 9.1 above.  At the BD Closing, Buyer shall deliver, or cause to be delivered, to Seller, the documents and instruments set forth in Section 9.2 above.  At the Final Closing, Buyer shall deliver, or cause to be delivered, to Seller, the documents and instruments set forth in Section 9.3 above.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## ARTICLE XI

## TERMINATION

**XI.1**    **Termination.**    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Initial Closing Date by written notice by the terminating Party to the other Party as follows:

(a)    by mutual written agreement of Buyer and Seller;

(b)    by either Buyer or Seller if the Initial Closing shall not have occurred on or before April 30, 2024 (the "**Outside Closing Date**"); provided, the right to terminate this Agreement under this Section 11(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Initial Closing to occur on or before the Outside Closing Date;

(c)    by Buyer if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Seller contained in this Agreement such that any of the conditions set forth in Section 8.1(a) or Section 8.1(c) would not be satisfied at the Initial Closing and such breach shall not have been waived by Buyer or cured by Seller to the satisfaction of Buyer prior to the Initial Closing;

(d)    by either Buyer or Seller if any judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction enjoining Buyer or Seller from consummating the Transactions shall have been entered;

(e)    by Seller if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Buyer contained in this Agreement such that any of the conditions set forth in Section 9.1(a) or Section 9.1(c) would not be satisfied at the Initial Closing and such breach shall not have been waived by Seller or cured by Buyer to the satisfaction of Seller prior to the Initial Closing;

(f)    by Seller if (i) all of the conditions set forth in Section 8.1 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Initial Closing) and (ii) Buyer fails to proceed with and consummate the Initial Closing within three Business Days after receipt of written notice from Seller that Seller is ready, willing, and able to proceed with and consummate the Initial Closing;

(g)    by Buyer if (i) all of the conditions set forth in Section 9.1 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Initial Closing) and (ii) Seller fails to proceed with and consummate the Initial Closing within three Business Days after receipt of written notice from Buyer that Buyer is ready, willing, and able to proceed with and consummate the Initial Closing; or

(h)    by Buyer if (i) the assumption and assignment of any Required Contracts by Seller to Buyer is not approved by the Bankruptcy Court prior to the Initial Closing, or (ii) prior to the Initial Closing, any of the Required Contracts or Required Permits held by Seller, the Broker-Dealer Subsidiary or the State Lender Licensing Subsidiary have been terminated, suspended or revoked (or are subject to a pending notice of termination, suspensions or revocation) or are otherwise not in effect.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**XI.2    Termination Prior to BD Closing.** Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties to effect the BD Closing under this Agreement may be terminated at any time following the Initial Closing Date but prior to the BD Closing Date, without any change to the Initial Closing or the assumption of the Assumed Obligations assumed as of the Initial Closing:

(a)    by mutual written agreement of Buyer and Seller;

(b)    by Buyer if the BD Closing shall not have occurred on or before May 30, 2024;

(c)    by Buyer if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Seller contained in this Agreement which survives the Initial Closing, such that any of the conditions set forth in Section 8.2(a) or Section 8.2(c) would not be satisfied at the BD Closing and such breach shall not have been waived by Buyer or cured by Seller to the satisfaction of Buyer prior to the BD Closing;

(d)    by either Buyer or Seller if any judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction enjoining Buyer or Seller from consummating the Transactions shall have been entered; provided, for the avoidance of doubt, that termination pursuant to this Section 11.2(d) may only be made to the extent that such judgement, injunction, order or decree pertains to those Transactions to be consummated at the BD Closing and does not pertain to any Transactions to be consummated at the Initial Closing; and provided further, that any termination pursuant to this Section 11.2(d) after the Initial Closing shall not entitle Buyer to the return of or give rise to any claim by Buyer to the Purchase Price;

(e)    by Seller if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Buyer contained in this Agreement which survives the Initial Closing, such that any of the conditions set forth in Section 9.2(a) or Section 9.2(c) would not be satisfied at the BD Closing and such breach shall not have been waived by Seller or cured by Buyer to the satisfaction of Seller prior to the BD Closing

(f)    by Seller if (i) all of the conditions set forth in Section 8.2 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the BD Closing) and (ii) Buyer fails to proceed with and consummate the BD Closing within three Business Days after receipt of written notice from Seller that Seller is ready, willing, and able to proceed with and consummate the BD Closing;

(g)    by Buyer if (i) all of the conditions set forth in Section 9.2 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the BD Closing) and (ii) Seller fails to proceed with and consummate the BD Closing within three Business Days after receipt of written notice from Buyer that Buyer is ready, willing, and able to proceed with and consummate the BD Closing: or

(h)    by Buyer if prior to the BD Closing, any of the Required Contracts or Required Permits held by the Broker-Dealer Subsidiary have been terminated, suspended or revoked (or are subject to a pending notice of termination, suspensions or revocation) or are otherwise not in effect.

**XI.3    Termination Prior to Final Closing.** Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties to effect the Final Closing under this Agreement may be

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

terminated at any time following the Initial Closing Date but prior to the Final Closing Date, without any change to the Initial Closing, the BD Closing or the assumption of the Assumed Obligations as of the Initial Closing or the BD Closing:

(a)      by mutual written agreement of Buyer and Seller;

(b)      by Buyer if the Final Closing shall not have occurred on or before the first anniversary of the date of this Agreement;

(c)      by Buyer if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Seller contained in this Agreement which survives the Initial Closing, such that any of the conditions set forth in Section 8.3(a) or Section 8.3(c) would not be satisfied at the Final Closing and such breach shall not have been waived by Buyer or cured by Seller to the satisfaction of Buyer prior to the Final Closing;

(d)      by either Buyer or Seller if any judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction enjoining Buyer or Seller from consummating the Transactions shall have been entered; provided, for the avoidance of doubt, that termination pursuant to this Section 11.3(d) may only be made to the extent that such judgement, injunction, order or decree pertains to those Transactions to be consummated at the Final Closing and does not pertain to any Transactions to be consummated at the Initial Closing or the BD Closing; and provided further, that any termination pursuant to this Section 11.3(d) after the Initial Closing shall not entitle Buyer to the return of or give rise to any claim by Buyer to the Purchase Price;

(e)      by Seller if there has or will have been a breach of any representation, warranty, covenant or agreement on the part of Buyer contained in this Agreement which survives the Initial Closing, such that any of the conditions set forth in Section 9.3(a) or Section 9.3(c) would not be satisfied at the Final Closing and such breach shall not have been waived by Seller or cured by Buyer to the satisfaction of Seller prior to the Final Closing

(f)      by Seller if (i) all of the conditions set forth in Section 8.3 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Final Closing) and (ii) Buyer fails to proceed with and consummate the Final Closing within three Business Days after receipt of written notice from Seller that Seller is ready, willing, and able to proceed with and consummate the Final Closing;

(g)      by Buyer if (i) all of the conditions set forth in Section 9.3 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Final Closing) and (ii) Seller fails to proceed with and consummate the Final Closing within three Business Days after receipt of written notice from Buyer that Buyer is ready, willing, and able to proceed with and consummate the Final Closing: or

(h)      by Buyer if prior to the Final Closing, any of the Required Contracts or Required Permits held by the State Lender Licensing Subsidiary have been terminated, suspended or revoked (or are subject to a pending notice of termination, suspensions or revocation) or are otherwise not in effect.

**XI.4    Procedure Upon Termination.**  In the event of termination of this Agreement by Buyer or Seller or by both Buyer and Seller pursuant to Section 11.1 hereof, all Transactions described hereunder shall be abandoned without further action by Buyer or Seller.  In the event of termination of

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

this Agreement by Buyer or Seller or by both Buyer and Seller pursuant to Section 11.2 or Section 11.3 hereof, the Transactions described in such provisions, as applicable, shall be abandoned without further action by Buyer or Seller.  In addition, if this Agreement is terminated as provided herein:

(a)    Seller shall deliver any notices of such termination to any Governmental Authorities or Self-Regulatory Organizations as may be required by applicable Law.

(b)    Each Party will redeliver all documents, workpapers and other material of any other party relating to the terminated Transactions, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(c)    All information of a confidential nature received by any Party hereto with respect to the business of any other Party (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any Governmental Authority) shall continue to be subject to any NDA between Buyer and Seller.

(d)    Upon any termination of this Agreement pursuant to this ARTICLE XI or upon automatic termination pursuant to Section 12.1(a) hereof, the respective obligations of the Parties under this Agreement with respect to the terminated Transactions shall terminate and no Party shall have any liability whatsoever to any other Party by reason of such termination, irrespective of the cause of such termination, except that the provisions of Section 2.1, Section 3.8, Section 6.2, this Section 11.4, Section 13.3 and Section 13.10 shall survive any termination hereof and Seller shall be required to pay the Break-Up Fee and Expense Reimbursement to Buyer to the extent required by the Bid Procedures Order.

## ARTICLE XII

## ADDITIONAL BANKRUPTCY MATTERS

### XII.1  Motion for Approvals.

(a)    No later than the times set forth in this Agreement, Seller shall (subject to Buyer's and Seller's rights and obligations set forth in Section 12.1(c) below), make all filings and give all notices relating to this Agreement as Seller is required to make and give pursuant to the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to obtain entry of the Bid Procedures Order and the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bid Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under section 363(m) of the Bankruptcy Code.  Except for Seller's obligations under Section 12.1(b) hereof, both Buyer's and Seller's obligations to consummate the Transactions shall be conditioned upon the Bankruptcy Court's entry of the Sale Order.  If the Bankruptcy Court refuses to enter the Sale Order or to approve a sale of the Purchased Assets to Buyer at the Sale Hearing or otherwise, or if the Bankruptcy Court enters an order approving the sale of any of the Purchased Assets to a Person other than Buyer, then this Agreement shall automatically terminate and Seller and Buyer shall be relieved of any further liability or obligation hereunder, except

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

for the Parties' obligations under Sections 11.2(c) and 12.1(b) hereof, and Buyer shall be entitled to the Break-Up Fee and Expense Reimbursement pursuant to the Bid Procedures Order. Upon entry of the Sale Order, the condition set forth in this Section 12.1(a) shall conclusively be deemed satisfied.

(b)    If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions are appealed by any person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order or the Sale Order, or other such order), subject to the rights otherwise arising from this Agreement, Seller shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; *provided*, *however*, nothing herein shall be deemed to require Seller to so pursue any such appeal or other actions beyond the Outside Closing Date if this Agreement is terminated in accordance with its terms after the Outside Closing Date.

(c)    Buyer and Seller shall consult with each other regarding pleadings, notices and filings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect, the Bankruptcy Court's approval of the Bid Procedures Motion, the Sale Motion, or the Transactions contemplated hereby, including, sharing in advance any drafts for the other's review and comment, it being agreed that each Party shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments the other(s) may provide within a reasonable time prior to the filing of any such pleading, notice or filing.  No Party hereto shall seek any modification to the Bid Procedures Order or the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without prior written consent of the other Party in its sole discretion.

## ARTICLE XIII

## MISCELLANEOUS

**XIII.1  Assignment.**  Neither Seller nor Buyer may assign this Agreement, or assign any of their rights or delegate any of their duties hereunder, without the prior written consent of the other Party; *provided* that Buyer may assign this Agreement and all of its rights and duties hereunder to any Affiliate of Buyer upon prior written notice to Seller so long as such assignment does not impair Buyer or Seller's ability to satisfy all related conditions, covenants, obligations necessary to effectuate the Transactions. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and assigns.

**XIII.2  Severability.**  Any provision of this Agreement which is illegal, invalid, or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

**XIII.3  Governing Law; Exclusive Jurisdiction of Bankruptcy Court.**  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, to the extent applicable, and, where state law is implicated, the internal laws of the state of California, without giving effect to any principles of conflicts of law.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

all disputes relating to this Agreement.  The Bankruptcy Court shall have sole jurisdiction over such matters and the parties affected thereby, and Buyer and Seller each hereby consent and submit to such jurisdiction; *provided*, *however*, that if the Bankruptcy Case has closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Central District of California and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in <u>Section 13.8</u> hereof, unless another address has been designated by such Party in a notice given to the other Party in accordance with the provisions of <u>Section 13.8</u> hereof.

**XIII.4  Entire Agreement; Amendment.**  This Agreement and the Exhibits and Schedules hereto, and each additional agreement and document to be executed and delivered pursuant hereto, constitute all of the agreements of the Parties with respect to, and supersede all prior agreements and understandings relating to the subject matter of, this Agreement or the Transactions.  This Agreement may not be modified or amended except by a written instrument specifically referring to this Agreement signed by each of the Parties.

**XIII.5  Waiver.**  No waiver by one Party of the other Party's obligations, or of any breach or default hereunder by any other Party, shall be valid or effective, unless such waiver is set forth in writing and is signed by the Party giving such waiver; and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature or any other breach or default by such other Party.

**XIII.6  Interpretation; Headings.**  This Agreement is the result of arms'-length negotiations between the Parties and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a Party by reason of the fact that such Party or its legal counsel was the drafter of that provision.  The section, subsection and any paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit or affect, and shall not be considered in connection with, the interpretation of any of the terms or provisions of this Agreement.

**XIII.7  Counterparts.**  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective when counterparts have been signed by each of the Parties and delivered personally or by facsimile, email or by other electronic means to the other Party.  Signatures transmitted by electronic or facsimile transmission (including by email, portable document format (.pdf), or electronic signature complying with the U.S. Federal ESIGN Act of 2000 (e.g., www.docusign.com), or by other similar generally accepted electronic means intended to preserve the original graphic and pictorial appearance of a document) shall be deemed to have the same effect as physical delivery of a paper document bearing an original signature.

**XIII.8  Notices.**  Any notice shall be in writing and shall be deemed to have been duly given or made when personally delivered, sent by email, or when mailed by registered or certified mail, postage

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

prepaid, return receipt requested, addressed or directed as follows, or as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) Business Days' prior notice, to the following parties. Notices and other communications given or made pursuant to this Agreement shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified, (ii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. Any Party may from time to time, by written notice to the other Party, designate a different address, which shall be substituted for the one specified below.  In addition to any other means of deliverance provided, all notices provided hereunder must also be delivered by email.

       If to Seller:

              Synapse Financial Technologies Inc.
              Sankaet Pathak, CEO
              s@synapsefi.com
              Tracey Guerin, General Counsel
              tracey@synapsefi.com

       with a simultaneous copy to (which shall not constitute notice) given in a like manner to each of:

              Ron Bender, Esq.
              Monica Y. Kim, Esq.
              Krikor J. Meshefejian, Esq.
              Levene, Neale, Bender, Yoo & Golubchik L.L.P.
              2818 La Cienega Ave.
              Los Angeles, California 90034
              Email: RB@LNBYG.COM; MYK@LNBYG.COM; KJM@LNBYG.COM
              Fax: (310) 229-1244

              Ethan Silver
              Lowenstein Sandler LLP
              1251 Avenue of the Americas
              New York, NY 10020
              Email: esilver@lowenstein.com

              William Brannan
              Lowenstein Sandler LLP
              1251 Avenue of the Americas
              New York, NY 10020
              Email: wbrannan@lowenstein.com

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

If to Buyer, to:

      TabaPay, Inc.
      Rodney Robinson, Manager
      605 Ellis Street, #110
      Mountain View, CA 94043
      Email: rodney@tabapay.com
      Daniel D. Meyers, General Counsel
      Email:  dan@tabapay.com

with a simultaneous copy to (which shall not constitute notice) given in a like manner to:

      Robert Honeywell, Esq.
      K&L Gates LLP
      599 Lexington Ave.
      New York, NY 10022
      Email: robert.honeywell@klgates.com

**XIII.9  Public Announcements.**  Neither Seller nor Buyer will make any public announcements concerning matters set forth in this Agreement or the negotiation thereof without the prior written consent, not to be unreasonably withheld, conditioned or delayed, of the other Party unless such disclosure is required by Law or court order or the information is otherwise publicly available, including in the Bid Procedures Motion, the Sale Motion or any other filings with the Bankruptcy Court.  Any such disclosure shall be provided for review to the other Party at least two (2) Business Days in advance of public release to the extent reasonably practical.

**XIII.10      Attorneys' Fees.**  If any action or proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought by a Party against the other Party, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs, and disbursements (in addition to any other relief to which the prevailing Party may be entitled) to the extent provided by an order of the Bankruptcy Court.

**XIII.11      Third-Party Beneficiaries**. This Agreement is solely for the benefit of the Parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

**XIII.12      Disclosure Schedule**.  The Disclosure Schedule is arranged solely for purposes of convenience in separate sections corresponding to sections of this Agreement; *provided*, that any item disclosed in any section of the Disclosure Schedule referenced by a particular section in this Agreement shall be deemed to have been disclosed with respect to every other section in this Agreement if the relevance of such disclosure to such other sections is reasonably apparent on its face. The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Seller or the Business.  In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the ordinary course of business for purposes of this Agreement.

**XIII.13** **Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, from and after the entry of the Sale Order, Seller, on the one hand, and Buyer on the other hand, will be entitled to seek to obtain an injunction or injunctions to prevent breach of the provisions of this Agreement and to seek to enforce specifically this Agreement and its terms and provisions, without the necessity of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity, and without the requirement to obtain, furnish or post any bond or similar instrument with or as a condition to obtaining any order of specific performance.

**[*SIGNATURES ARE CONTAINED ON THE FOLLOWING PAGE*]**

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

IN WITNESS WHEREOF, each of Seller and Buyer has caused a duly authorized representative to execute this Asset Purchase Agreement on the date first written above.

**BUYER:**

**TABAPAY HOLDINGS LLC,**
a Delaware limited liability company

By: _____

Name:  Rodney Robinson
Title:  President


**SELLER**:

**SYNAPSE FINANCIAL TECHNOLOGIES INC.,**
a Delaware Corporation

By:  *sankaet pathak*

Name:  Sankaet Pathak
Title:  CEO

*[Signature Page to Asset Purchase Agreement]*

## <u>SCHEDULES</u>

| | |
|---|---|
| <u>Schedule 1.1(a)</u> | Purchased Fixed Assets |
| <u>Schedule 1.1(b)</u> | Assigned Contracts |
| <u>Schedule 1.1(c)</u> | Required Contracts |
| <u>Schedule 1.1(d)</u> | Accounts Receivable |
| <u>Schedule 1.1(e)</u> | Cash Reserves and Deposits |
| <u>Schedule 1.1(f)</u> | Bank Accounts |
| <u>Schedule 1.1(g)</u> | Permits |
| <u>Schedule 1.1(h)</u> | Required Permits |
| <u>Schedule 1.1(i)</u> | Assigned Real Property Leases and Related Deposits |
| <u>Schedule 1.1(j)</u> | Intellectual Property Rights |
| <u>Schedule 1.1(k)</u> | Surety Bonds, Insurance Policies and Related Collateral |
| <u>Schedule 1.1(l)</u> | Customer Contracts |
| <u>Schedule 1.1(m)</u> | Assigned Personal Property Leases and Related Deposits |
| Schedule 1.2(a)-(b) | Intentionally Omitted |
| <u>Schedule 1.2(c)</u> | Cash and Cash Equivalents |
| Schedule 1.2 (d)-(e) | Intentionally Omitted |
| <u>Schedule 1.2(f)</u> | Tax Refunds |
| Schedule 1.2 (g)-(k) | Intentionally Omitted |
| <u>Schedule 1.2(l)</u> | Non-Assignable Permits |
| <u>Schedule 1.2(m)</u> | Other Excluded Assets |
| <u>Schedule 1.3</u> | Other Assumed Obligations |
| Schedule 2-8.0 | Intentionally Omitted |
| <u>Schedule 8.1(e)(3)</u> | Third-Party Consents |

# EXHIBITS

Exhibit A       Definitions

Exhibit B       Purchase Price Allocation

Exhibit C       Bid Procedures Order and Bid Procedures

Exhibit D       Sale Order

Exhibit E       Disclosure Schedules

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**EXHIBIT A**

**Definitions**

For the purposes of this Agreement, unless the context otherwise requires, the following terms shall have the respective meanings set forth below and grammatical variations of such terms shall have corresponding meanings:

"**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, limited partner, managing member, officer or director of such Person or any venture capital fund or other investment entity now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.  For purposes of this definition, the term "control" when used with respect to any Person, shall mean the power to direct the management or policies of such Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"**Assigned Contracts**" means those Contracts listed in Schedule 1.1(b).

"**Assigned Personal Property Leases**" means those Contracts listed in Schedule 1.1(m).

"**Assigned Real Property Leases**" means those Contracts listed in Schedule 1.1(i).

"**Avoidance Actions**" means any and all claims and causes of action arising under Sections 542, 547, 548, 549 and 553 of the Bankruptcy Code and equivalent state law remedies.

"**Bidding Procedures**" means the process and procedures established in the Bid Procedures Order with respect to the conduct of the Transactions and Seller's disposition of the Purchased Assets.

"**Broker-Dealer Subsidiary**" means Synapse Brokerage LLC, a Delaware limited liability company.

"**Business Day**" means any day which is not a Saturday, Sunday or a day on which banks in San Francisco, California, are authorized or obligated by law or executive order to be closed.

"**Contract**" means any contract, obligation, understanding, commitment, lease, license, purchase order, work order, bid or other agreement, whether written or oral and whether express or implied, together with all amendments and other modifications thereto.

"**Cure Costs**" means the monetary amounts that must be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Assigned Contract, Assigned Real Property Lease or Assigned Personal Property Lease, as agreed upon by Seller and Buyer or determined by an order of the Bankruptcy Court pursuant to the Bid Procedures Order or the Sale Order.

"**Customer**" means any business or financial technology company that Seller (or any of its Subsidiaries, as applicable) considers its customer and with which it has a binding, enforceable Contract pursuant to which Seller (or its applicable Subsidiary, as applicable) provides to such

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

customer and all of its End-Users with access to financial services. Customers are distinguished from End-Users to avoid confusion with the End-Users who are not direct customers of the Seller.

"**Disclosure Schedule**" means the Disclosure Schedule delivered by Seller to Buyer on the date of this Agreement, as amended, modified, or supplemented in accordance with this Agreement.

"**End-User**" means any end-user (individual or entity) to whom the Seller provides access to certain financial services provided by a bank, the Broker-Dealer Subsidiary, the State Lender Licensing Subsidiary, or other financial institution through the applicable Customer's mobile or web application pursuant to the Contract in place between Seller (or its applicable Subsidiary, as applicable) and such Customer. End-Users have a direct contractual customer relationship with the applicable bank, Broker-Dealer Subsidiary, State Lender Licensing Subsidiary, or other financial institution providing the service to the End-User.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"**Final Order**" means an order, judgment or other decree of any Governmental Authority as to which (a) the operation or effect has not been reversed, stayed, modified, or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all periods for appeal or moving for reconsideration have expired.

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**Governmental Authority**" means any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including the SEC or any other authority, agency, department, board, commission or instrumentality of the United States, any state of the United States or any political subdivision thereof or any foreign jurisdiction, any court, tribunal or arbitrator(s) of competent jurisdiction and any United States or foreign governmental or non-governmental self-regulatory organization, agency or authority.

"**Indebtedness**" means as to any Person at any time: (i) obligations of such Person for borrowed money; (ii) obligations of such Person evidenced by bonds, notes, debentures or other similar instruments; (iii) obligations of such Person to pay the deferred purchase price of property or services (including earnouts and similar arrangements), except trade accounts payable of such Person arising in the ordinary course of business that are not past due by more than 120 days and for which adequate reserves have been established on the financial statements of such Person; (iv) obligations arising under capitalized leases, conditional sales Contracts or other similar title retention instruments; (v) reimbursement obligations of such Person relating to amounts drawn and outstanding under letters of credit, bankers' acceptances, surety or other bonds or similar instruments; (vi) Liabilities of such Person relating to unfunded, vested benefits under any employee benefit plan (excluding (A) vacation pay, sick pay or benefits that are accrued in the ordinary course of business consistent with past practice and (B) obligations of Seller to deliver stock of Seller pursuant to stock options or stock ownership plans); (vii) net payment obligations incurred by such Person pursuant to any hedging agreement; (viii) Liabilities of such Person under any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement or other similar agreement designed to protect such Person against fluctuations in interest rates; (ix) any guarantees of the foregoing items in

A-2

clauses (i) through (viii) for the benefit of another Person; and (x) all interest, fees, penalties, breakage costs and other expenses owed with respect to the items described in the foregoing clauses (i) through (ix) or the repayment thereof.

"**Intellectual Property Rights**" means, collectively, all (i) U.S. and foreign, whether registered or unregistered, patents, trademarks, trade names, trade dress, service marks, copyrights, mask works and applications therefor (together with any reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof), (ii) Software, (iii) industrial models, inventions, invention disclosures, author's rights, designs, utility models, inventor rights, schematics, technology, (iv) trade secrets, know-how, and other tangible information or material, (v) confidential information and any other proprietary data or information of any nature or form, (vi) inventions (whether patentable or unpatentable and whether or not reduced to practice) and improvements thereto, (vii) copies and tangible embodiments and expressions (in whatever form or medium), all improvements and modifications and derivative works of any of the foregoing, (viii) licenses in or to any of the foregoing, (ix) rights to sue at law or in equity for any past or future infringement or other impairment of any of the foregoing, and (x) goodwill associated with any of the foregoing.

"**Knowledge**" of a party shall mean the actual knowledge of any executive officer and the knowledge that a reasonable person in such capacity would have obtained in the conduct of his or her business under the same circumstances of service.

"**Law**" means any federal, state or local law, statute, ordinance, by-law, regulation, rule, treaty or order of any Governmental Authority which, although not necessarily having the force of law, is regarded by such Governmental Authority as requiring compliance as if it had the force of law, including, without limitation, the rules and regulations of a national securities exchange or trading system.

"**Liability**" means any liability, obligation or commitment of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due (including, without limitation, any "claim" as defined in section 101(5) of the Bankruptcy Code).

"**Lien**" means, with respect to any asset (including, without limitation, any Purchased Asset), any mortgage, easement, encroachment, equitable interest, right of way, deed of trust, lien (statutory or other), pledge, charge, security interest, title retention device, conditional sale or other security arrangement, collateral assignment, claim (including, without limitation, any "claim" as defined in section 101(5) of the Bankruptcy Code), community property interest, adverse claim of title, ownership or right to use, right of first refusal, or any other encumbrance similar to any of the foregoing in respect of such asset.

"**Material Adverse Effect**" means any result, occurrence, fact, change, event or effect that, individually or in the aggregate, has or is reasonably likely to have a material adverse effect on any of the Purchased Assets or the Business, liabilities, financial condition, property or results of operations of Seller or any Subsidiary (taken as a whole); provided, however, that any such effect resulting or arising from any of the following matters will not be considered when determining whether a Material Adverse Effect has occurred or would be reasonably likely to occur: (a) the announcement or pendency of this Agreement or the Transactions or the identity of Buyer and its Affiliates, (b) changes in global or United States economic, financial, regulatory or geopolitical conditions, (c) changes in the credit,

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

debt, financial or capital markets or changes in interest or exchange rates, in each case, in the United States or elsewhere in the world where the Business operates as of the date hereof (including but not limited to any decline in the price of any security or market index or any change in prevailing interest rates or currency markets), (d) any actual or proposed changes in Law or any accounting principles or the interpretation of any of the foregoing, in each case, solely to the extent applicable to the Business, (e) changes in general in the industries in which the Business operates or the markets it operates in, or changes in the general business or economic conditions affecting such industries or markets, (f) force majeure events, (g) any protests, riots, demonstrations or public disorders, military conflict, outbreak or escalation of hostilities or war or act of foreign or domestic terrorism or any escalation or worsening thereof, (h) any action taken or omitted to be taken by Buyer or any of its Affiliates after the date hereof and on or prior to the Initial Closing or the Final Closing except to the extent expressly permitted, contemplated or required by this Agreement or the transactions contemplated by this Agreement, (i) any failure by the Seller to meet internal or published projections, forecasts or estimates of the Business (it being understood that any event, occurrence, fact, circumstance, or change giving rise to such failure may be taken into account to determine whether there has been a Material Adverse Effect), (j) COVID-19, any other epidemic or pandemic, (k) any action taken by the Seller expressly permitted, contemplated or required by this Agreement or the transactions contemplated by this Agreement, or (l) matters solely to the extent of and as expressly disclosed in the Schedules to this Agreement, except, in the cases of clauses (b), (c), (d), (e), (f), (g), and (j) to the extent such changes or conditions disproportionately affect in any adverse manner the Business as compared to any of the Business's competitors or to other Persons engaged in the same industries.

"**Person**" means any individual, corporation, limited liability company, partnership, company, sole proprietorship, joint venture, trust, estate, association, organization, labor union, Governmental Authority or other entity.

"**Required Contracts**" means those Contracts listed in Schedule 1.1(c).

"**Required Permits**" means those Permits listed in Schedule 1.1(h).

"**Sale Procedures**" means the process and procedures established in the Sale Procedures Order with respect to the conduct of the Transactions and Seller's disposition of the Purchased Assets.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder

"**Self-Regulatory Organization**" means FINRA, each national securities exchange in the United States, each non-U.S. securities exchange, and each other commission, board, agency or body, whether United States or foreign, that is charged with the supervision or regulation of brokers, dealers, commodity pool operators, commodity trading advisers, futures commission merchants, securities underwriting or trading, stock exchanges, commodities exchanges, insurance companies or agents, investment companies or investment advisors, or to the jurisdiction of which Seller or any Subsidiary is subject.

"**Senior Lender**" means Silicon Valley Bank.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

"**Senior Loan Agreement**" means that certain Loan and Security Agreement, dated February 19, 2021, between Seller and Senior Lender (as amended, restated, supplemented or otherwise modified from time to time in accordance therewith).

"**Senior Loan Documents**" means all Contracts and other agreements, instruments, certificates or other documents entered into pursuant to or in connection with the Senior Loan Agreement.

"**Severance Contract**" means any Contract providing for the granting of any severance, retention or termination pay or bonuses, the creation of any retention-related pool of cash, stock or other payments, or the acceleration of vesting or other benefits, to any Person.

"**Software**" means (i) computer programs, including any software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation, including user manuals and other training documentation, related to any of the foregoing.

"**State Lender Licensing Subsidiary**" means Synapse Credit LLC, a Delaware limited liability company.

"**Subsidiary**" means each of the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary.

"**Transferred Customer**" means any Customer which has one or more Contracts with Seller or its applicable Subsidiary, as applicable, which are included as an Assigned Contract.

"**TriplePoint Loan Agreement**" means that certain Plain English Growth Capital Loan and Security Agreement, dated as of July 29, 2022, between Seller and TriplePoint (as amended, restated, supplemented or otherwise modified from time to time in accordance therewith).

"**TriplePoint Loan Documents**" means all Contracts and other agreements, instruments, certificates or other documents entered into pursuant to or in connection with the TriplePoint Loan Agreement.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**EXHIBIT B**

**<u>Purchase Price Allocation</u>**

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**EXHIBIT C**

**Form of Bid Procedures Order and Bid Procedures**

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

1   RON BENDER (SBN 143364)
    MONICA Y. KIM (SBN 180139)
2   KRIKOR J. MESHEFEJIAN (SBN 255030)
    LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3   2818 La Cienega Avenue
    Los Angeles, California 90034
4   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
5   Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
    Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession
6

7                   UNITED STATES BANKRUPTCY COURT
                    CENTRAL DISTRICT OF CALIFORNIA
8                   SAN FERNANDO VALLEY DIVISION

9   In re:                                Case No.:

10  SYNAPSE FINANCIAL TECHNOLOGIES,      Chapter 11
    INC.,
11                                        **ORDER (A) APPROVING BIDDING
12          Chapter 11 Debtor in Possession   PROCEDURES WITH RESPECT TO THE
                                          TRANSFER    AND    SALE    OF
13                                        SUBSTANTIALLY    ALL    OF    THE
                                          DEBTOR'S ASSETS, (B) APPROVING
14                                        BIDDING   PROTECTIONS   FOR   THE
                                          STALKING   HORSE   BIDDER,   (C)
15                                        APPROVING PROCEDURES RELATED
                                          TO   THE   ASSUMPTION   AND
16                                        ASSIGNMENT   OF    CERTAIN
                                          EXECUTORY   CONTRACTS   AND
17                                        UNEXPIRED LEASES, (D) APPROVING
                                          THE FORM AND MANNER OF NOTICES
18                                        RELATED TO THE AUCTION AND
                                          SALE, (E) SCHEDULING THE SALE
19                                        HEARING,    AND    (F)    GRANTING
                                          RELATED RELIEF**
20

21

22          Upon the emergency motion (the "Motion")[1] of Synapse Financial Technologies, Inc.,

23  chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case

24  (the "Debtor"), for, among other things, entry of an order (this "Bidding Procedures Order"): (a)

25  approving (i) the bidding and auction procedures (the "Bidding Procedures"), annexed hereto as

26
    _____
27  [1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
    Motion.
28

                                          1

1   **Exhibit A**, with respect to the following: (x) the sale, assignment and transfer of the Debtor's

2   right, title and interest in and to substantially all of its assets (the "Purchased Assets") and (y) the

3   assumption and assignment of certain executory contracts and unexpired leases related thereto

4   (collectively, the "Assigned Contracts"); (ii) the payment of the Break-Up Fee and Expense

5   Reimbursement (collectively, the "Stalking Horse Bidder Fee") to TabaPay Holdings LLC

6   ("Buyer"), which serves as the "stalking horse bidder" (in such capacity, the "Stalking Horse

7   Bidder") pursuant to that certain Asset Purchase Agreement dated as of April ___, 2024, by and

8   among the Debtor and Buyer, attached as **Exhibit ___** to the Declaration of Sankaet Pathak filed by

9   the Debtor in support of the Motion as Docket Number ___ (the "Asset Purchase Agreement"); (iii)

10  approving procedures governing assumption and assignment (the "Assignment Procedures") of

11  the Assigned Contracts; (iv) approving the form and manner of certain notices related to the

12  Auction and sale of the Purchased Assets; (b) scheduling the Auction and a hearing (the "Sale

13  Hearing") to approve the transfer and sale of the Purchased Assets, and the other transactions

14  contemplated under the Asset Purchase Agreement (such transactions, the "Transaction"); and (c)

15  granting related relief, all as more fully set forth in the Motion; and the Court, having reviewed

16  the Motion and other papers and pleadings filed in connection therewith and having heard the

17  statements in support of the relief requested therein at a hearing held before this Court on

18  _____ (the "Hearing"); and due, proper and sufficient notice of the Motion having

19  been given; and the Court, having determined that the legal and factual bases set forth in the

20  Motion, the Declaration of Sankaet Pathak filed in support of the Motion as Docket Number ___,

21  and proffered at the Hearing establish just cause for the relief granted herein, and that such relief

22  is in the best interests of the Debtor, its bankruptcy estate and its creditors; and upon all of the

23  pleadings and proceedings before the Court; and after due deliberation and sufficient cause

24  appearing therefor,

25          **THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]**

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by
Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are

318327985.3                                                    Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

A.    <u>Jurisdiction and Venue.</u> The Court has jurisdiction over the Motion and the transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    <u>Statutory Predicates.</u> The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9006, 9007, and 9014; and (iii) Local Bankruptcy Rules 9006-1, 9014-1 and 9075-1.

C.    <u>Notice.</u> Good and sufficient notice of the Motion and the relief sought therein has been provided to notice parties specified in the Motion, and no other or further notice is required except as set forth herein. A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to all parties-in-interest.

D.    <u>Justification for Relief.</u> The Debtor has articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures; (ii) approve the Stalking Horse Bidder Fee; (iii) approve the manner and form of notice of certain matters related to the transfer and sale of the Purchased Assets; (iv) approve the Assignment Procedures and the form of the Assignment Notice; (v) set the date for the Sale Hearing; and (vi) grant such additional relief as requested in the Motion as related to the foregoing.  The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate and creditors of its estate and other parties-in-interest.

E.    <u>Bidding Procedures.</u> The Debtor's proposed Bidding Procedures, attached hereto as **<u>Exhibit A</u>**, (i) are designed to maximize the value to be achieved for the Purchased Assets; (ii) will ensure a competitive and efficient bidding process; and (iii) are fair and reasonable under the circumstances.

---

adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

F.    Stalking Horse Bidder Fee. The Stalking Horse Bidder Fee described in the Motion, shall be paid in accordance with the terms of this Order, and (i) if triggered, will be an actual and necessary cost and administrative expense of preserving the Debtor's estate, within the meaning of section 503(b)(1) of the Bankruptcy Code, (ii) is reasonable and appropriate, particularly in light of the size and nature of the Transaction and the efforts and costs and expenses that have been, and are continuing to be, expended by the Stalking Horse Bidder notwithstanding that the proposed transaction is subject to higher and/or better offers for the Purchased Assets, (iii) was negotiated by the parties at arms-length and in good faith, and the Stalking Horse Bidder would not have entered into the Asset Purchase Agreement in the absence of the Debtor's obligation to pay such Stalking Horse Bidder Fee if triggered, and (iv) is necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed transaction on the terms set forth in the Asset Purchase Agreement.

G.    Auction and Sale Hearing Notice. The Debtor's proposed Auction and Sale Hearing Notice, attached hereto as **Exhibit B** , as approved and served in accordance herewith, is appropriate and reasonably calculated to provide all interested parties with timely and sufficient information that they may require about the Auction process, including: (a) announcement that the Court has approved the bidding and Auction process pursuant to the Bidding Procedures; (b) information on how to obtain a copy of the Bidding Procedures and the Bidding Procedures Order; (c) the Bid Deadline; (d) the time, date, and location of the Auction; (e) the time, date, and location of the Sale Hearing; and (f) procedures for objecting to the Auction, the Motion and the transfer and sale contemplated by the Motion. The proposed Auction and Sale Hearing Notice complies with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.

H.    Assumption and Assignment Procedures. The Debtor's proposed Assignment Procedures are designed to ensure that the Debtor assumes and assigns the Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

I.    Assignment Notice. The Debtor's proposed Assignment Notice, attached as **Exhibit C** hereto, as approved and served in accordance herewith, is reasonably calculated to provide all third-party counterparties (the "Counterparties") to the Assigned Contracts with

4

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

proper notice of the potential assumption and assignment of such Assigned Contracts and any cure or pecuniary loss amounts relating thereto (the "Cure Amount") and will be served on such Counterparties in accordance with paragraphs 12-17 hereof.

J.      Compliance with Bankruptcy Law. The Motion and this Bidding Procedures Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

**NOW THEREORE, IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion relating to the matters covered in this Bidding Procedures Order, is GRANTED and APPROVED as provided herein.

2.      Any and all objections and responses to the Motion relating to the matters covered in this Bidding Procedures Order that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are overruled and denied.

**Bidding Procedures**

3.      The Bidding Procedures are hereby authorized and approved in the form annexed hereto as **Exhibit A.** The Bidding Procedures shall govern the bidding process and the Auction with respect to the Purchased Assets or the sale of assets of the Debtor in addition to the Purchased Assets. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures.

4.      Within one (1) business day of the entry of this Order, the Debtor will cause the Auction and Sale Hearing Notice to be served by, unless otherwise indicated below, first-class mail (postage prepaid) to the following parties: (i) all potential purchasers identified by the Debtor or its professionals (via electronic mail); (ii) the Office of the United States Trustee (the "U.S. Trustee"); (iii) all known creditors and interest holders of the Debtor and its non-debtor subsidiaries; (iv) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002; and (v) Buyer and its counsel (the entities listed in (ii) through (v) are hereby collectively referred to as the "Special Notice Parties").

5.      If, by the Bid Deadline (i.e., April 28, 2024, at 5:00 p.m. (prevailing Pacific time)), the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Debtor, after consultation with the Consultation Parties, shall not conduct an Auction, and the Stalking Horse Bidder will be deemed the Winning Bidder and its bid the Winning Bid. If this occurs, the Debtor shall request at the Sale Hearing that the Court approve the transfer and sale of the Purchased Assets to the Stalking Horse Bidder in accordance with the Asset Purchase Agreement and the assumption and assignment of the Assigned Contracts designated to be assumed by the Debtor and assigned to the Stalking Horse Bidder, and request that the Sale Order be entered by the Court and that the Sale Order shall become effectively immediately upon entry, notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules and Rule 62(g) of the Federal Rules of Civil Procedure.

**Stalking Horse Bidder and Stalking Horse Bidder Fee**

6.      Buyer is approved as the Stalking Horse Bidder with respect to the Auction pursuant to the Asset Purchase Agreement.

7.      The Stalking Horse Bidder Fee and the other amounts payable (in each case, to the extent payable under the Asset Purchase Agreement) in accordance with the Asset Purchase Agreement, the Bidding Procedures, and this Order are approved, authorized, and binding upon the Debtor and its estate as an administrative expense pursuant to section 503(b)(1) of the Bankruptcy Code.

8.      In accordance with, and subject to the terms of, the Asset Purchase Agreement, the Debtor is authorized and directed, without further order of this Court to pay the Stalking Horse Bidder Fee to the Stalking Horse Bidder in full in cash (by wire transfer) in conjunction with the closing of sale to a Winning Bidder other than Buyer.

**Objections**

9.     Objections, if any, to the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (c) be filed with the clerk of the Court for the Central District of California (or filed electronically via CM/ECF with the Court) and actually received by the following parties (collectively, the "Notice Parties"): (i) the Debtor's counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P., Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com); Krikor J. Meshefejian (kjm@lnbyg.com), Sankaet Pathak

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com); (ii) counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (Robert.honeywell@klgates.com); (iii) counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn:   Alexander G. Rheaume (arheaume@mofo.com); (iv) counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (A) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (B) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com);  _____ and (v) the US Trustee, Attn:  _____ (_____@usdoj.gov), **on or before 5:00 p.m. PST on April 28, 2024** (the "Objection Deadline").

**Sale Hearing**

10.    The Sale Hearing, and the Auction (if any), shall be held before the Court on April 29, 2024, commencing at _____ p.m. PST. The Sale Hearing may be adjourned without need for any further notice by announcement of the adjourned Sale Hearing date in open Court or by filing a notice thereof as soon as reasonably practicable before the Sale Hearing date with the Court.

11.    At the Sale Hearing, the Debtor will request that the Court (a) approve the Transaction, or, if the Winning Bidder is not the Stalking Horse Bidder, the Transaction contemplated by such Winning Bid; (b) approve the Winning Bid and Winning Back-Up Bid; and (c) enter the Sale Order providing for this relief.

**Assignment Procedures**

12.    Within one (1) business day of entry of this Order the Debtor shall file with the Court and serve, by first-class mail (postage prepaid), on the Counterparties (including non-debtor subsidiaries if applicable) the initial Assignment Notice (the "Initial Assignment Notice") for the Assigned Contracts to be assumed and assigned in accordance with the Asset Purchase Agreement.

13.    If the Winning Bid includes (i) a different list of Assigned Contracts to be assumed and assigned, or (ii) different Cure Amount(s) than those listed in the Initial Assignment Notice, then the Debtor shall file and serve on the same Counterparties that were

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

served with the Initial Assignment Notice a pleading setting forth the changes to the Initial Assignment Notice (the "Supplemental Assignment Notice"). The Supplemental Assignment Notice shall include, to the extent the Winning Bidder is not the Stalking Horse Bidder, a description of the Winning Bidder and a statement as to its ability pay all required Cure Amounts and perform the Debtor's obligations under such Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

14.     For the avoidance of doubt, the listing of any Assigned Contracts on any Assignment Notice does not require or guarantee that such agreements will be assumed and assigned, and all rights of the Debtor with respect to such agreements are reserved.

15.     Objections to any matter pertaining to the assumption and assignment of the Assigned Contracts, including without limitation as to adequate assurance of future performance or payment of the applicable Cure Amounts, must be filed with the Court no later than (a) April 28, 2024 at 5:00 p.m. (the "Initial Objection Deadline"), with respect to the Initial Assignment Notice, and (b) up until the Sale Hearing (the "Supplemental Objection Deadline"), with respect to the Supplemental Assignment Notice. Any such objections must be served so as to be actually received by the Notice Parties and the Winning Bidder no later than the Initial Objection Deadline or the Supplemental Objection Deadline (as applicable).

16.     To the extent that any Counterparty or other party in interest does not timely serve an objection to the Initial Assignment Notice or Supplemental Assignment Notice as set forth above, such party shall be deemed to have (i) consented to the assumption and assignment of the applicable Assigned Contracts to the Winning Bidder; (ii) agreed that the Winning Bidder has provided adequate assurance of future performance within the meaning of sections 365(b) and (f) of the Bankruptcy Code; (iii) consented to the applicable Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

17.     Upon the filing of an objection by a Counterparty or other party in interest to the Initial Assignment Notice or Supplemental Assignment Notice, the Debtor will contact the objecting party and the Winning Bidder to attempt to consensually resolve any timely filed

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

objection. The Debtor will work with the Winning Bidder in good faith in this regard, and the Winning Bidder must consent to any increase in the proposed Cure Amount for the applicable Assigned Contract.  If the Debtor and Winning Bidder are unable to resolve such an objection, such objection will be heard at the Sale Hearing (as may be adjourned by the Court without such objecting party's consent); provided, further, that in the event an objection relates solely to a Cure Amount (a "Cure Objection"), then such objecting party will be deemed to consent to the assumption and assignment of its Assigned Contract, notwithstanding such objection.  In the event the Debtor and the Winning Bidder are unable to resolve a Cure Objection prior to the Sale Hearing, the Winning Bidder may elect not to include the applicable contract or lease in its purchase of the Purchased Assets, subject to any conditions set forth in the Asset Purchase Agreement or Alternative APA (as applicable).

**Other Matters**

18.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived, and this Bidding Procedures Order shall be effective immediately upon its entry.

19.     All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

20.     The Debtor is authorized to take any and all actions necessary to effectuate and implement the relief granted pursuant to this Bidding Procedures Order.

21.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Bidding Procedures Order.

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## EXHIBIT A

## BIDDING PROCEDURES[3]

These bidding procedures (the "Bidding Procedures") relate to the proposed free and clear sale by Synapse Financial Technologies, Inc. (the "Debtor") of substantially all of its assets (except the Excluded Assets) (the "Purchased Assets") and will govern the bidding and auction (the "Auction") for the Purchased Assets.

At a hearing held before the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Bankruptcy Court") in Case No. _____, the Bankruptcy Court approved these Bidding Procedures, which are intended to ensure that the highest and best possible price is paid for the Purchased Assets by a purchaser who has the financial ability to close on the sale of the Purchased Assets (the "Sale"). A copy of the Bankruptcy Court order approving these Bidding Procedures is attached hereto as Exhibit "1".

The Debtor has entered into that certain Asset Purchase Agreement dated April __, 2024 (the "Asset Purchase Agreement"), by and among the Debtor and TabaPay Holdings, LLC, a Delaware limited liability company ("Buyer" or the "Stalking Horse Bidder") pursuant to which the Debtor shall, among other things, transfer and sell to Buyer the Purchased Assets as set forth set forth in the Asset Purchase Agreement. A copy of the Asset Purchase Agreement is attached as **Exhibit __** to the Declaration of Sankaet Pathak filed as Docket Number __ in support of the Debtor's motion to approve the Bidding Procedures. The transaction contemplated by the Asset Purchase Agreement (the "Sale Transaction") is subject to higher and better offers as set forth in these Bidding Procedures.

### 1.    Free and Clear Sale of Assets

The Debtor is offering for sale the Purchased Assets. Except as otherwise agreed to in the definitive sale documents, all of the Debtor's rights, title and interest in and to the Purchased Assets shall be sold, transferred and assigned free and clear of all Liens (as defined in the Asset Purchase Agreement) (except as otherwise set forth in the Asset Purchase Agreement) pursuant to Section 363(b) and (f) of the Bankruptcy Code, with any Liens that exist against the Purchased Assets that are not Assumed Indebtedness to attach to the proceeds of the sale with the same validity and priority as such Liens have in and to the Purchased Assets.

### 2.    Stalking Horse Bidder

The Court has authorized Buyer (a) to act as the Stalking Horse Bidder in the Auction (if any) for the Purchased Assets, and (b) to receive, in the event that Buyer is not the winning bidder at the Auction and subject to the Asset Purchase Agreement, the Expense Reimbursement (as defined in the Asset Purchase Agreement) subject to a cap of $400,000 plus the Break-Up Fee of $400,000 with the Expense Reimbursement and Break-Up Fee collectively defined here as the "Stalking

---

[3] All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Horse Bidder Fee".

**3.**     **Bidding Process**

The Debtor and the Debtor's bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG") will jointly conduct the Auction.

**4.**     **Key Dates for Interested Bidders**

These Bidding Procedures provide interested parties with a detailed explanation of what they need to do to participate in the Auction.

The key dates for the Auction and related free and clear asset sale process are as follows:

| | |
|---|---|
| **April 28, 2024 at 5 p.m. (prevailing Pacific time)** | Deadline by when all prospective overbidders must do all of the following: <br> 1. Submit a redlined version of the Asset Purchase Agreement indicating all changes that are requested to be made to the Asset Purchase Agreement along with a proposed purchase price or overbid; <br> 2. Submit all documents to enable the Debtor to determine whether the proposed bidder is financially qualified to participate in the Auction; and <br> 3. Submit a deposit equal to 10% of the cash portion of the purchase price in the Alternative APA, which deposit would be deemed non-refundable if the overbidder is deemed to be the winning bidder at the Auction and then the Debtors' proposed free and clear sale of the Purchased Assets to the bidder is approved by the Bankruptcy Court. |
| **April 29, 2024 at __:__ p.m. (prevailing Pacific time)** | Auction to be held concurrently with the Sale Hearing |
| **April 29, 2024 at __:__ p.m. (prevailing Pacific time)** | Sale Hearing to be conducted before the Bankruptcy Court for the Bankruptcy Court to approve the Debtor's sale of the Purchased Assets to the winning bidder at the Auction (the "Sale Hearing"). |
| **April 30, 2024** | Outside date by when the Winning Bidder at the Auction is required to close its purchase |

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

| | |
|---|---|
| | of all the Purchased Assets other than Debtor's equity interests in the Broker-Dealer Subsidiary and the State Lender Licensing Subsidiary unless the Winning Bidder and the Debtor jointly agree to extend this outside closing date (the "<u>Initial Closing</u>"). |
| **Subject to APA terms** | Outside date by when the Winning Bidder at the Auction is required to close its purchase of the Debtor's equity interests in the Broker-Deal Subsidiary and the State Lender Licensing Subsidiary unless the Winning bidder and the Debtor jointly agree to extend this outside closing date, *provided, however,* that the Winning Bidder shall pay the entirety of the Purchase Price for the Purchased Assets no later than the Initial Closing. |

### 5.    <u>Due Diligence Access/Participation Requirements</u>

To participate in the Auction process as an overbidder, a person or entity interested in purchasing the Purchased Assets (a "<u>Potential Overbidder</u>") must deliver or have previously delivered to the Debtor and the Consultation Parties all of the following documents (the "<u>Participation Requirements</u>"): (1) an executed non-disclosure agreement with the form to be obtained from the Debtor; (2) a statement demonstrating a bona fide interest in purchasing the Purchased Assets; and (3) one of the following: (i) written evidence of readily available funds equal to the Potential Overbidder's initial bid and any increase the Potential Overbidder desires to have authority to bid to, with the Debtor to keep such information completely confidential, (ii) a firm commitment for financing sufficient for the Potential Overbidder to timely consummate its purchase of the Purchased Assets, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Overbidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtor (following consultation with the Consultation Parties) to make a reasonable determination as to the Potential Overbidder's financial and other capabilities to timely consummate its purchase of the Purchased Assets. Any Potential Overbidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of these Bidding Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, direct communication with management as the Potential Overbidder desires and the Debtor determines to be appropriate under the circumstances and subject to the availability of such management.  For the avoidance of doubt, the Stalking Horse Bidder is deemed to have met the Participation Requirements.

### 6.    <u>Due Diligence Limitations</u>

The Debtor shall not be obligated to furnish any due diligence information to any Potential Overbidder after the Bid Deadline. In its discretion, the Debtor may, but shall not be obligated to, furnish additional information after the Bid Deadline to Qualified Bidders.  The Debtor reserves the right to withhold any due diligence materials from any Potential Overbidder

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

that the Debtor determines (following consultation with the Consultation Parties) are business-sensitive or otherwise not appropriate for disclosure to any Potential Overbidder who is a competitor of the Debtor or is affiliated with any competitor of the Debtor.

Neither the Debtor nor any of its representatives or advisors shall be obligated to furnish information of any kind whatsoever to any person or entity who is not determined to have satisfied the Participation Requirements.

## 7.    **Due Diligence from Potential Overbidders**

Each Potential Overbidder shall comply with all reasonable requests for additional information by the Debtor regarding such Potential Overbidder, including without limitation, the Potential Overbidder's financial ability to close a Sale Transaction.  The failure by a Potential Overbidder to comply with any such requests may be a basis for the Debtor to determine that such Potential Overbidder is not or cannot be a Qualified Bidder.

## 8.    **Bid Deadline for Prospective Overbidders**

The deadline for all Potential Overbidders to submit their initial bid for the Purchased Assets is **April 28, 2024, at 5:00 p.m. (prevailing Pacific time)** (the "Prospective Overbidder Bid Deadline" or "Bid Deadline").  A bid may be transmitted electronically and must be received on or before the Prospective Overbidder Bid Deadline by the following parties (collectively, the "Receiving Parties"):

(i)    the Debtor, Attn: Sankaet Pathak (s@synapsefi.com) and Tracey Guerin (tracey@synapsefi.com);

(ii)    counsel to the Debtor, Levene, Neale, Bender, Yoo & Golubchik L.L.P. Attn: Ron Bender (rb@lnbyg.com), Monica Y. Kim (myk@lnbyg.com) and Krikor J. Meshefejian (kjm@lnbyg.com);

(iii)    counsel to the Stalking Horse Bidder, K&L Gates LLP, Attn: Robert T. Honeywell (robert.honeywell@klgates.com);

(iv)    counsel to Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon Street, Floor 21 Boston, Massachusetts 02116, Attn:  Alexander G. Rheaume (arheaume@mofo.com); and

(v)    counsel to TriplePoint Capital LLC, McDermott Will & Emery LLP, (a) 2049 Century Park E., Suite 3800, Los Angeles, California 90067, Attn: Gary Rosenbaum (grosenbaum@mwe.com) and Michael Rostov (mrostov@mwe.com) and (b) One Vanderbilt Ave., New York, New York 10017-3852, Attn: Darren Azman (dazman@mwe.com).

The term "Consultation Parties" shall mean (a) Silicon Valley Bank, (b) TriplePoint Capital LLC, and (c) any official committee of unsecured creditors appointed in this chapter 11 case; provided, that if any party that submits a bid to purchase the Purchased Assets shall no longer be a Consultation Party, so long as such party's bid remains open.

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

A bid received after the Prospective Overbidder Bid Deadline shall not be considered unless the Debtor, for good cause and following consultation with the Consultation Parties, consents.

### 9.    Bid Requirements

To be eligible to participate in the Auction, each bid and each Potential Overbidder submitting a bid (each, an "Overbidder") must be determined by the Debtor (following consultation with the Consultation Parties) to have satisfied all of the conditions listed below (collectively, the "Bid Requirements"):

(a) **Terms**.  A bid must be accompanied by an executed Asset Purchase Agreement, as modified by the Overbidder (the "Alternative APA"), along with an electronic mark-up showing all changes to the Asset Purchase Agreement.  The form Asset Purchase Agreement in Word format can be obtained by any Potential Overbidder from LNBYG.  The Alternative APA must include binding, executed transaction documents, be signed by an authorized representative of the Overbidder and shall be on substantially the same terms as the Asset Purchase Agreement.

(b) **Minimum Overbid**.  The proposed purchase price to be paid for the Purchased Assets must (i) be in an amount at least $100,000 more than the Cash Purchase Price contained in the Asset Purchase Agreement, plus (ii) provide for the assumption and/or payment in cash at the Initial Closing of the Assumed Indebtedness, plus (iii) include the amount of the Stalking Horse Bidder Fee (the "Minimum Overbid"). Without limiting the generality of the foregoing, a bid (i) may not contain representation or warranties, conditions precedent, covenants, or termination rights materially more onerous to the Debtor in the aggregate than are set forth in the Asset Purchase Agreement, as determined by the Debtor (following consultation with the Consultation Parties), (ii) may not be conditioned upon obtaining financing, or any internal, regulatory, or other third party approvals more onerous than are set forth in the Asset Purchase Agreement, or on the outcome or review of due diligence, (iii) may not provide for a closing date/closing dates that will be later than those set forth in the Asset Purchase Agreement, unless both the Debtor (following consultation with the Consultation Parties) and the winning bidder jointly agree to extend the sale closing date(s) at their sole and absolute discretion, and (iv) may not be conditioned upon the Bankruptcy Court order approving the sale becoming a "final order" and must instead agree that the sale may be consummated immediately upon entry of an order pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(c) **Irrevocable**.  A bid must state that such offer is binding and irrevocable until the conclusion of the Sale Hearing (defined below) and such bid must continue to remain binding and irrevocable through the sale closing if the bid or any other higher bid submitted at the Auction is accepted by the Debtor at the Auction as the Winning Bid (defined below) or the Winning Back-Up Bid (defined below) and approved by the Bankruptcy Court at the Sale Hearing.

(d) **Identity of Bidder**.  A bid must fully disclose the following information (collectively, "Identifying Information"): (A) each entity or person that will be bidding for or

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

purchasing the Purchased Assets; (B) all material equity holders (i.e., parties that own at least 10% of the equity of the Overbidder) in the case of an Overbidder that is an entity; (C) any entity that will be financing or otherwise participating in connection with such bid, and the complete terms of any such financing or participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid; (D) any connection with or participation by any "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtor or any relative or any affiliate of any "insider" of the Debtor; and (E) any connection with or participation by any current creditor or equity holder of the Debtor or the Stalking Horse Bidder. A bid must also fully disclose, to the extent such bid includes the acquisition of the equity of S Credit and/or S Brokerage, any provisions in such bid for any internal, regulatory, or other third-party approvals, that may be required for a change in control of such subsidiary or subsidiaries (collectively, "Third Party Approvals").

(e) **Contact Information**. A bid must include the names and contact information (including phone numbers and email addresses) of all authorized representatives of the Overbidder who will be available to answer questions regarding the bid, including advisors and related parties.

(f) **Deposit**. A bid must include a good-faith deposit in immediately available funds equal to the sum of: (i) the Stalking Horse Bidder Fee (defined above) and (ii) ten percent (10%) of the cash portion of the purchase price in the Alternative APA (the sum of (i) and (ii), the "Deposit"). If an Overbidder elects to increase the amount of its bid at the Auction, neither the Overbidder nor the Stalking Horse Bidder will be required to increase the amount of its Deposit. If a bid is determined to be the Winning Bid at the Auction and the Overbidder who submitted such bid fails to timely close the sale after approval by the Bankruptcy Court at the Sale Hearing, the Deposit shall become non-refundable and be forfeited to the Debtor. The same shall apply to the Stalking Horse Bidder (subject to the provisions in the APA for the forfeiture of the "Deposit" as defined therein) if determined to be Winning Back-Up Bidders, and any other Winning Back-Up Bidder in the event (a) the Winning Bidder fails to timely close the Sale, (b) the Winning Back-Up Bidder is notified in writing that it is now the Winning Bidder, and (c) the Winning Back-Up Bidder fails to close its purchase by the Outside Closing Date set forth in the applicable Asset Purchase Agreement unless such Winning Back-Up Bidder and the Debtor jointly agree to extend the applicable sale closing date. All Deposits of all Qualified Bidders shall be held in an account maintained by LNBYG and shall be returned (other than with respect to the Winning Bidder and the Winning Back-Up Bidder) promptly after the conclusion of the Auction, subject to the return conditions set forth in the applicable Asset Purchase Agreement or Alternative APA submitted with such bids.

(g) **Financing Sources**. A bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed sale with appropriate contact information for such financing sources, with the Debtor (following consultation with the Consultation Parties) to determine whether such evidence of financing satisfies these Bidding Procedures and enables the Overbidder

15

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

to participate in the Auction, with such determination to be in the Debtor's sole and absolute discretion and reasonably acceptable to each of the Consultation Parties.

(h) ***Designation of Assigned Contracts and Leases.***  Subject to the ability of the Debtor to obtain an order of the Bankruptcy Court approving of the Debtor's assumption and assignment of any executory contract or unexpired lease to the Winning Bidder, a bid must include an initial list of all of the Debtor's executory contracts and unexpired leases with respect to which the Overbidder seeks assumption and assignment from the Debtor (including without limitation any Debtor contracts or leases to which the Debtor's non-debtor subsidiaries are also parties).

(i) ***Designation of Assumed Liabilities***.  A bid must identify all liabilities that the Overbidder proposes to assume.

(j) ***No Breakup Fee***. A bid must not request or entitle the Overbidder to receive any fee analogous to the Stalking Horse Bidder Fee, any termination fee, transaction or breakup fee, expense reimbursement or similar fee or payment. For the avoidance of doubt, by submitting a bid, the Overbidder agrees that it shall not be entitled to any such fee and waives the right to pursue a substantial contribution claim under 11 U.S.C. §503 related in any way to the submission of its bid or its participation in the Auction.

Each person or entity that submits a bid shall be deemed to have consented to the Debtor making the contents of such bid public, including in filings in the Court.

## 10.    Qualified Bidders and Bids

Potential Overbidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "Qualified Bidders," and bids that meet all of the Bid Requirements described above will be deemed "Qualified Bids," in each case, only if the Debtor (following consultation with the Consultation Parties) concludes in the exercise of its business judgment, that such bid would be consummated if selected as the Winning Bid; provided, however, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction, the Debtor (following consultation with the Consultation Parties) shall have the right, in their sole and absolute discretion, to disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or otherwise participate in the Auction.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder, the Stalking Horse Bidder's bid, as set forth in the Asset Purchase Agreement, is a Qualified Bid, and each bid received from the Stalking Horse Bidder at the Auction that complies with the Bidding Procedures shall be a Qualified Bid.

## 11.    Notice of Qualified Bids

As soon as practicable following the Bid Deadline, the Debtor (following consultation with the Consultation Parties) shall identify to all Qualified Bidders: (a) each and every bid that the Debtor considers to be a Qualified Bid and (b) if more than one Qualified Bid has been timely received, the Qualified Bid that will constitute the "Initial Bid" at the Auction (which

16

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

must equal at least the Minimum Overbid) and the bidding order in which the Auction will be conducted.

## 12.    No Auction if Only One Qualified Bid

If, by the Bid Deadline, the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the Debtor (following consultation with the Consultation Parties) shall not conduct an Auction and the Stalking Horse Bidder will be deemed the Winning Bidder and its bid the Winning Bid. If this occurs, the Debtor shall proceed to request at the Sale Hearing that the Court approve the transfer and sale of the Purchased Assets to the Stalking Horse Bidder in accordance with Buyer's Asset Purchase Agreement and request that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

## 13.    Auction

If by the Bid Deadline, more than one Qualified Bid has been received by the Debtor, the Debtor will conduct the Auction with all Qualified Bidders. The Auction will be held concurrently with the Sale Hearing in the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division, with virtual participation permitted.

## 14.    Participation in and Attendance at Auction

The Auction will occur at the Sale Hearing, which is a public hearing.

## 15.    Consent to Jurisdiction, No Collusion and Good Faith Bona Fide Offer

All Qualified Bidders shall be deemed to have consented to the exclusive and core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the bidding process, the Auction, the transfer and sale of the Purchased Assets, and any other matter relating to, or contemplated by, Buyer's Asset Purchase Agreement and any Alternative APA.  Any and all disputes related to the Auction shall be determined solely by the Bankruptcy Court.  Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding or with any other bidder or prospective bidder; (ii) its bid is a good-faith *bona fide* offer; (iii) it intends to consummate the proposed transaction if selected as the Winning Bidder; and (iv) it acknowledges that, if chosen, it will serve as the Winning Back-Up Bidder.

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

### 16. <u>Initial Bid at the Auction</u>

The bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted by the Bid Deadline, as determined by the Debtor (following consultation with the Consultation Parties). Each subsequent bid shall be in increments of no less than $100,000 and by figures which are wholly divisible by $100,000. The Debtor will notify all Qualified Bidders and the Consultation Parties in advance of the Auction which bid has been accepted as the Initial Bid at the Auction and the order in which the bidding at the Auction will proceed.

### 17. <u>Conducting the Auction</u>

The Debtor and LNBYG will direct and preside over the Auction. At the start of the Auction, and after each Qualified Bidder acknowledges on the record that (i) it has not engaged in any collusion with respect to the bidding, (ii) that its bid is a good faith bona fide offer, and (iii) that it intends to consummate the proposed transaction if selected as the Winning Bidder or the Winning Back-Up Bidder, the Debtor and LNBYG will identify, confirm and describe the Initial Bid. The bidding will then ensue in the bidding order provided by the Debtor to all Qualified Bidders in advance of the Auction. All bidding after the Initial Bid shall continue in bidding increments of at least $100,000 or figures that are wholly divisible by $100,000. All bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and all Qualified Bidders will be entitled to be present for all bidding with the understanding that the Identifying Information of each bidder and the material terms of each Qualified Bid (including any Third Party Approvals) will be fully disclosed to all Qualified Bidders before the Auction, and all successive bids made at the Auction, will be fully disclosed to all Qualified Bidders. All Qualified Bidders will be permitted to bid at the Auction based on what the Debtor and LNBYG (following consultation with the Consultation Parties), and subject to the Court's approval at the Sale Hearing, determine to be an appropriate amount of time to respond to each prior submitted bid.

Prior to the Auction, the Debtor will randomly assign to each Qualified Bidder a bidder number, except that the bidder whose bid was accepted as the Initial Bid will be assigned bidder number 1. Once the Initial Bid has been described by the Debtor and LNBYG, the bidding will then pass to bidder number 2. Bidder number 2 will have the option of submitting an overbid to the Initial Bid of at least the sum of (A) the Initial Bid (inclusive of the Stalking Horse Bidder Fee) plus (B) $100,000, or dropping out of the Auction. Once a bidder drops out of the Auction, such bidder will no longer be permitted to participate in the Auction. After bidder number 2 either submits a qualifying overbid or drops out of the Auction, the bidding will then pass to bidder number 3. This process will continue until only two Qualified Bidders are left, in which case the Qualified Bidder who submits the highest and best Qualified Bid will be deemed the Winning Bidder at the Auction, and the Qualified Bidder who submits the second highest Qualified Bid will be deemed the Winning Back-Up Bidder at the Auction.

Except as expressly provided in the Bidding Procedures Order or the provisions of these Bidding Procedures, the Debtor (following consultation with the Consultation Parties) shall have the right to conduct the Auction in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtor's bankruptcy estate. The Debtor shall also have the right to deviate from these Bidding Procedures or announce and employ at the

18

Auction other procedural rules without the need for any further order of the Bankruptcy Court if the Debtor reasonably determines, in the exercise of its business judgment and following consultation with the Consultation Parties, that doing so would be in the best interests of the Debtor's bankruptcy estate and is not inconsistent with any of the provisions of the Bankruptcy Code or any previously entered order of the Bankruptcy Court including the Bidding Procedures Order.

The Debtor and LNBYG (following consultation with the Consultation Parties) may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer in terms of both amount and execution risk and (2) reject at any time any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtor or its bankruptcy estate; <u>provided</u> that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the Auction reasonably expected to result (including after taking into account execution risk) in the highest amount of money being paid to the Debtor for the purchase of the Purchased Assets.

**18.**     <u>**Selection of the Winning Bid and Winning Back-Up Bid**</u>

The Auction shall continue until there is one Qualified Bid that the Debtor determines (following consultation with the Consultation Parties), subject to Bankruptcy Court approval, to be the highest and best bid (the "<u>Winning Bid</u>"), and another Qualified Bid to be the second highest and best bid (the "<u>Winning Back-Up Bid</u>"), at which point the Auction will be deemed concluded. The Debtor will not consider any bids submitted after the conclusion of the Auction.

Subject to the Bankruptcy Court approving the Winning Bid and entering an order approving of the Debtor's free and clear sale of the Purchased Assets to the Winning Bidder in accordance with the Asset Purchase Agreement or Alternative APA, as the case may be, submitted by the Winning Bidder (the "<u>Sale Order</u>"), the Winning Bidder shall be required to close the sale by the outside closing date set forth in such Asset Purchase Agreement or Alternative APA (unless the Debtor and the Winning Bidder jointly agree to an extension of this outside Sale closing date which will be in their sole and absolute discretion), or the Winning Bidder will be deemed to have forfeited its Deposit to the Debtor subject to the terms and conditions for such forfeiture set forth in such Asset Purchase Agreement or Alternative APA, as applicable. Promptly following the closing of the sale to the Winning Bidder, LNBYG shall return the Deposit of the Winning Back-Up Bidder to the Winning Back-Up Bidder.

If the Winning Bidder fails to close the sale of all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage by the outside closing date for such initial closing (as set forth in the Asset Purchase Agreement or Alternative APA, as applicable), unless the Debtor and the Winning Bidder mutually agree in their sole and absolute discretion to extend such closing date, the Debtor shall so notify the Winning Back-Up Bidder. The Winning Back-Up Bidder will then have ten (10) days following the date of having been notified by the Debtor to close the purchase of such assets (*i.e.*, all of the Purchased Assets other than the Debtor's equity interests in S Credit and S Brokerage). If the Winning Back-Up Bidder fails to close the sale within this time period, unless the Debtor, following consultation with the Consultation Parties, and the Winning Back-Up Bidder mutually agree in their sole and absolute discretion to extend such initial closing date, the Winning Back-Up Bidder will be deemed to have forfeited

its Deposit to the Debtor subject to any conditions for such forfeiture in the applicable Asset Purchase Agreement or Alternative APA.

**19.    Sale Hearing**

The hearing for the Bankruptcy Court to approve the outcome of the Auction and the Debtor's sale of the Purchased Assets to the Winning Bidder and to the Winning Back-Up Bidder if the Winning Bidder fails to close (the "Sale Hearing") shall be held on April 29, 2024, at __:__ p.m., or at such other date and time set by the Bankruptcy Court.

**20.    Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the transfer and sale of the Purchased Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Winning Bid, the Winning Back-Up Bid, and/or any other matter that in any way relates to the foregoing.

318327985.3

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**EXHIBIT D**

**Form of Sale Order**

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No.: |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 |
| Chapter 11 Debtor in Possession | **ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES; (B) APPROVING THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING THE DEBTOR'S REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED; (C) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF** |

A hearing was held on April __, 2024 (the "Sale Hearing"), for the Court to consider approval of the sale of substantially all of the assets of Synapse Financial Technologies, Inc., chapter 11 debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), pursuant to the motion (the "Motion")[1] filed by the Debtor seeking an order of the Court (this "Sale Order") approving the sale of substantially all of its assets to TabaPay Holdings LLC

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

(the "<u>Stalking Horse Bidder</u>") in accordance with the terms of that certain Asset Purchase Agreement dated as of April __, 2024, by and among the Debtor and the Stalking Horse Bidder, attached as **Exhibit 1** to the Declaration of Sankaet Pathak filed by the Debtor in support of the Motion as Docket Number __ (the "<u>Stalking Horse APA</u>") or to the highest or otherwise best overbidder selected at the Auction free and clear of all liens (except for assumed obligations).  By way of the Motion, the Debtor also requested the Court's approval of the Debtor's assumption and assignment to Buyer (or the successful overbidder) of those unexpired leases and executory contracts that Buyer (or the successful overbidder) wishes to have assigned to it (the "<u>Assigned Contracts</u>")[2] and to reject certain unexpired leases and executory contracts which are not Assigned Contracts effective as of the Initial Closing or as otherwise provided below.  Appearances were made at the Sale Hearing as set forth on the record of the Court.

At a hearing held on April __, 2024 (the "<u>Bidding Procedures Hearing</u>"), the Court granted the Motion as to the Bidding Procedures by order entered on April __, 2024 as Docket Number __ (the "<u>Bidding Procedures Order</u>").  Among other things, the Bidding Procedures Order explained to potential overbidders how a potential overbidder could become qualified to participate in the Auction and how the Auction would proceed in the event that there was one or more qualified overbidders.

[IF NOT QUALIFIED OVERBIDDERS:]

In accordance with the Bidding Procedures Order, the Debtor did not conduct an Auction because there were no qualified overbidders.  The Stalking Horse Bidder was the winning bidder ("<u>Buyer</u>") with a cash purchase price of $_____ and other consideration set forth in the Stalking Horse APA, and the Stalking Horse APA is herein defined as the "<u>Asset Purchase Agreement</u>."  The Debtor determined that such bid (the "<u>Winning Bid</u>") was the highest and best bid submitted under the Bidding Procedures and should be approved by the Court.

[IF ANY QUALIFIED OVERBIDDERS:]

---

[2] The Assigned Contracts as defined herein is inclusive of those Contracts designated in the Stalking Horse APA as "Assigned Contracts," "Assigned Real Property Leases" and "Assigned Personal Property Leases."

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

In accordance with the Bidding Procedures Order, the Debtor conducted an Auction on April ___, 2024. _____ was the winning bidder ("Buyer") at the Auction with a cash purchase price of $_____ and other consideration set forth in its asset purchase agreement, and such asset purchase agreement is herein defined as the "Asset Purchase Agreement." The Debtor determined that such bid submitted by _____ at the Auction (the "Winning Bid") was the highest and best bid submitted at the Auction and should be approved by the Court.

The Court, having considered the Motion and all pleadings and evidence filed by the Debtor in support of the Motion and all pleadings and evidence filed in response to the Motion; the statements, arguments and representations of the parties made at the Sale Hearing; and the entire record of this case; and the Court, having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and after due deliberation and sufficient good cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.    Jurisdiction and Venue.  The Bankruptcy Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M), (N) and (O).  Venue of this case is proper in this District and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Statutory Predicates.  The statutory predicates for the relief requested in the Motion are (i) Sections 105(a), 363(b), (f), (k), (l) and (m), and 365 of Title 11 of the United States Code

---

[3] The findings of fact and conclusions of law set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

(the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Local Rules 6004-1, 9013-1 and 9075-1.

C.    <u>Notice</u>. The Debtor has provided good and sufficient notice with respect to the following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Purchased Assets, (ii) the Auction and the Sale Hearing, (iii) the selection of the Winning Bid, and (iv) the assumption and assignment of the Assigned Contracts and proposed cure amounts owing under such Assigned Contracts ("<u>Cure Amounts</u>"); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required. A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to all parties-in-interest.

D.    <u>Compliance with the Auction Procedures</u>. The Auction process implemented by the Debtor was conducted in accordance with the Bidding Procedures Order and was fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets. The Auction process afforded a full, fair, and reasonable opportunity for any potential purchaser to become a qualified bidder and to participate in the Auction. As demonstrated by (i) the testimony and/or other evidence proffered and adduced at the Bidding Procedures Hearing and the Sale Hearing, and (ii) the representations of counsel made on the record at the Bidding Procedures and the Sale Hearing, the Debtor has conducted the Auction process in good faith, without collusion and in accordance with the Bidding Procedures Order.

E.    <u>Highest or Otherwise Best Bid</u>. The Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other offer or available alternative. The Debtor's determination that the Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its estate, its creditors and its stakeholders. The consideration to be paid by Buyer for the Purchased Assets is fair and reasonable, is the highest or otherwise best offer therefor, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

F.    Arm's Length Transaction. The Asset Purchase Agreement and other agreements, documents and instruments (collectively, the "Transaction Documents") related to and connected with this transaction (the "Transaction") and the consummation thereof were negotiated and entered into by the Debtor and Buyer without collusion, in good faith and through an arm's length bargaining process. Neither Buyer nor any of its affiliates or representatives is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  None of the Debtor, Buyer, or their respective representatives engaged in any conduct that would cause or permit the Asset Purchase Agreement, any of the other Transaction Documents or the Transaction to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner.  The terms and conditions of the Asset Purchase Agreement and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and are not avoidable and shall not be avoided, and no damages may be assessed against Buyer or any other party, as set forth in section 363(n) of the Bankruptcy Code.

G.    Good Faith Purchaser.  Buyer has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) Buyer, in proposing and proceeding with the Transaction in accordance with the Asset Purchase Agreement, recognized that the Debtor was free to deal with other interested parties; (ii) Buyer agreed to provisions in the Asset Purchase Agreement and the Bidding Procedures that would enable the Debtor to accept a higher and better offer; (iii) Buyer complied with all of the provisions in the Auction and the Bidding Procedures Order applicable to Buyer; (iv) all payments to be made by Buyer and other agreements entered into or to be entered into between Buyer and the Debtor in connection with the Transaction have been disclosed; (v) the negotiation and execution of the Asset Purchase Agreement and related Transaction Documents were conducted in good faith and constituted an arm's length transaction; and (vi) the Asset Purchase Agreement was not entered into, and the Transaction being consummated pursuant to and in accordance with the Asset Purchase Agreement is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor.  Buyer is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

consummate the Transaction shall not affect the validity of the Transaction or Buyer's status as a "good faith" purchaser.

H.    <u>Justification for Relief</u>. Good and sufficient reasons for approval of the Asset Purchase Agreement and the other Transaction Documents and the Transaction have been articulated to the Bankruptcy Court in the Motion and at the Bidding Procedures Hearing and the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtor, its estate, its creditors and its stakeholders.  The Debtor has demonstrated through the Motion and other evidence submitted at the Bidding Procedures Hearing and the Sale Hearing both (i) good, sufficient and sound business purpose and justification, and (ii) compelling circumstances for the transfer and sale of the Purchased Assets as provided in the Asset Purchase Agreement outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate, its creditors and its stakeholders.

I.    <u>Free and Clear</u>. In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transaction pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Purchased Assets and will vest in Buyer, through the consummation of the Transaction, all of the Debtor's right, title, and interest in and to the Purchased Assets, free and clear of all Liens (as defined below) except for the Assumed Obligations (as defined in the Asset Purchase Agreement).  The Debtor has demonstrated that one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  All holders of Liens in the Purchased Assets are adequately protected by either having their respective Liens assumed by the Buyer in accordance with the Asset Purchase Agreement or attach to the net sale proceeds attributable to the Purchased Assets to the extent any such Liens existed as of the Petition Date and subject to the terms of such Liens with the same validity, force and effect, and in the same order of priority, which such Liens had against the Purchased Assets as of the Petition Date, subject to any rights, claims and defenses the Debtor or its estate may possess with respect thereto.

As used in this Sale Order, "<u>Liens</u>" means any and all liens (as defined in section 101(37) Bankruptcy Code), claims (including those that constitute a "claim" as defined in section 101(5)

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

of the Bankruptcy Code), causes of action, charges, security interests, mortgages, assignments, pledges, or other encumbrances or rights exercisable by any person having similar effect (other than Assumed Obligations), including, without limitation, (i) any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, or restrictions, (ii) any product liability claims, (iii) any and all claims arising under state or federal antitrust laws, (iv) any environmental liabilities (to the greatest extent allowed by applicable law), (v) any employee pension or benefit claims, multiemployer benefit claims, workers' compensation claims, severance claims, retiree healthcare claims or life insurance claims, (vi) any claims for taxes of or against the Debtor, (vii) any derivative, vicarious, transferee or successor liability claims, (viii) any rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia or any foreign jurisdiction), and (ix) any rights, claims or causes of action related to the Evolve Settlement (as defined below) or the transactions described therein or in the 9019 Motion or the Settlement Order (as such terms are defined below), in each case of the foregoing (including, without limitation, clauses (i) through (ix)) whether arising prior to or subsequent to the commencement of this Chapter 11 case, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise, in each case arising under or out of, in connection with, or in any way related to the Debtor, the Purchased Assets, the transfer of the Purchased Assets to Buyer, or the operation of the Debtor's business before or after the Petition Date and through and including the applicable Closing Date (as defined in the Asset Purchase Agreement), and including without limitation any and all Liens that are not Assumed Obligations pursuant to Section 1.4 of the Asset Purchase Agreement.

J.    <u>Prompt Consummation</u>. The Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d).  Time is of the essence in consummating the Transaction, and it is in the best interests of the Debtor and its estate to consummate the Transaction within the timeline set forth in the Motion and the Asset Purchase Agreement.

K.    <u>Three Closings</u>.  Buyer's purchase of the Purchased Assets under the terms of the Asset Purchase Agreement will be structured as three closings, at (1) an initial closing where Buyer will

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

acquire all Purchased Assets other than the Debtor's equity interest in S Brokerage and S Credit, (2) a second closing where Buyer will acquire the Debtor's equity interest in S Brokerage after acquiring required governmental and third-party consents for such acquisitions and fulfilling certain other conditions in the Asset Purchase Agreement, and then (3) at a final closing where Buyer will acquire the Debtor's equity interest in S Credit after acquiring required governmental and third-party consents for such acquisitions and fulfilling certain other conditions in the Asset Purchase Agreement. The termination of any party's obligation to effect such second and final closings shall not result in any change to the initial closing or the purchase price paid at such closing.

L.    <u>Assumption of Executory Contracts and Unexpired Leases</u>. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts to Buyer in connection with the consummation of the Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtor and its estate.

M.    <u>Cure/Adequate Assurance</u>. Buyer has cured, or has provided adequate assurance of cure upon the applicable closing, of any default existing prior to such closing under any of the Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts set forth in the Initial Assignment Notices and Supplemental Assignment Notices (together, the "<u>Assignment Notices</u>"). Buyer has provided adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to Buyer under the Asset Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in such Assigned Contracts prohibiting their assignment or transfer. The Debtor has demonstrated that no other parties to any of the Assigned Contracts have incurred any actual pecuniary loss resulting from a default prior to the applicable closing under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to Buyer at the applicable closings shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

N.      Approval of Evolve Settlement.  Pursuant to the separate motion of the Debtor seeking an order of the Court approving the Debtor's settlement agreement and release (the "Evolve Settlement") with Evolve Bank & Trust ("Evolve") pursuant to Federal Rule of Bankruptcy Procedure 9019, filed herein on April __, 2024 (the "9019 Motion"), the Court has entered its order granting the 9019 Motion on _____, 2024 (the "Settlement Order").

O.      Application of Proceeds.  Pursuant to the Asset Purchase Agreement, the Debtor is required to use a portion of the Purchase Price to (1) pay the Senior Lender Indebtedness in full and (2) pay the TriplePoint Indebtedness in the agreed upon fixed pay off amount of $7,199,624.29, and such fixed pay off amount of $7,199,624.29 shall satisfy the TriplePoint Indebtedness in its entirety to the extent it is paid by no later than May 6, 2024.  The application of the Purchase Price from the sale of the Purchased Assets pursuant to the immediately preceding sentence complies with the requirements of the Asset Purchase Agreement and is supported by good, sufficient and sound business reasons.

P.      Legal and Factual Bases.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2.      All objections with regard to the relief sought in the Motion as to the sale of the Purchased Assets and assignment of the Assigned Contracts that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Bidding Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.      Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transaction, including the transfer and sale of the Purchased Assets and assignment of the Assigned Contracts to Buyer on the terms set forth in the Asset Purchase Agreement, is approved in all respects, and the Debtor and Buyer are authorized and directed to consummate the Transaction in accordance with the Asset Purchase Agreement, including, without limitation, by executing all of the Transaction Documents and taking all actions necessary and appropriate to effectuate and consummate the

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Transaction (including the transfer and sale of the Purchased Assets) in consideration of the Purchase Price (as defined in the Asset Purchase Agreement) upon the terms set forth in the Asset Purchase Agreement, including, without limitation, assuming and assigning to Buyer the Assigned Contracts.

4.      As of each applicable Closing (as defined in the Asset Purchase Agreement), (i) the Transaction set forth in the Asset Purchase Agreement shall effect a legal, valid, enforceable and effective transfer and sale of the Purchased Assets subject to such Closing to Buyer free and clear of all Liens except for the Assumed Obligations subject to such Closing, as further set forth in the Asset Purchase Agreement and this Sale Order; and (ii) the Asset Purchase Agreement, and the other Transaction Documents, and the Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor, any successor thereto including a trustee or estate representative appointed in the bankruptcy case, and all other persons and entities.

5.      Subject to the fulfillment of the terms and conditions of the Asset Purchase Agreement, this Sale Order shall, as of the applicable Closing Date (as defined in the Asset Purchase Agreement), be considered and constitute for all purposes (a) a full and complete general assignment, conveyance, and transfer of the applicable Purchased Assets transferred on such Closing Date and/or (b) a bill of sale transferring all of the Debtor's rights, title and interest in and to the Purchased Assets transferred on such Closing  Date to Buyer as set forth in the Asset Purchase Agreement.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and approved in this Sale Order.

6.      Any person or entity that is currently, or on the applicable Closing Date may be, in possession of some or all of the applicable Purchased Assets is hereby directed to surrender possession of such Purchased Assets either to (a) the Debtor before the applicable Closing Date, or (b) to Buyer or its designee upon the applicable Closing Date.

7.      The transfer of the Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the Transaction, including, without limitation, payment of the portion

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

of the Purchase Price due at the applicable Closing to the Debtor, vest Buyer with all right, title, and interest in the Purchased Assets transferred at such Closing, free and clear of all Liens except for the Assumed Obligations, in accordance with the Asset Purchase Agreement and as of such Closing.

8.      Following the applicable Closing, no holder of any Lien against the Debtor or the Purchased Assets transferred at such Closing shall interfere with Buyer's respective rights in, title to or use and enjoyment of such Purchased Assets.  All valid and perfected Liens in the Purchased Assets shall, as of the applicable Closing, attach to the net Purchase Price proceeds attributable to the Purchased Assets transferred at such Closing immediately upon receipt of the Purchase Price proceeds due at such Closing by the Debtor in the order of priority, and with the same validity, force and effect, which such Liens had against such Purchased Assets as of the filing of the bankruptcy case, subject to any rights, claims and defenses the Debtor and its estate may possess with respect thereto.

9.      Buyer shall not be deemed, as a result of any action taken in connection with, or as a result of the Transaction (including the transfer and sale of the Purchased Assets), to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtor or its estate by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or otherwise, merged with or into the Debtor; or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtor. Other than the Assumed Obligations, Buyer is not assuming any of the Debtor's debts or Liens.

10.     This Sale Order (i) shall be effective as a determination that, on the applicable Closing Date, all Liens against the applicable Purchased Assets transferred on such Closing Date that existed before such Closing Date have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Liens against any Purchased Assets shall not have delivered to the Debtor before the applicable Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which such person or entity has with respect to such Purchased Assets, then Buyer and/or the Debtor are hereby

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

1

2

authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets.

3

4

11.     Upon the applicable Closing, the Debtor is authorized to assume, assign and/or transfer

5

each of the Assigned Contracts to Buyer.  In connection with each Closing, Buyer shall pay to all non-

6

Debtor parties to the Assigned Contracts transferred at such Closing the Cure Amounts set forth in the

7

Assignment Notices for all of such Assigned Contracts, and Buyer's payment of such Cure

8

Amounts are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to such

9

Assigned Contracts under section 365(b) of the Bankruptcy Code.  The payment of the applicable Cure

10

Amounts (if any) to any third-party counterparty (a "Counterparty") to each of the Assigned Contracts

11

shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate such Counterparty for any

12

actual pecuniary loss resulting from any such default.  Buyer shall then have assigned to it the Assigned

13

Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such

14

Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts,

15

neither the Debtor nor Buyer shall have any further liabilities to any Counterparty other than Buyer's

16

obligations under the Assigned Contracts that accrue and become due and payable on or after the

17

applicable Closing.  In addition, adequate assurance of future performance has been demonstrated by or

18

on behalf of Buyer with respect to the Assigned Contracts within the meaning of sections 365(b)(1)(c),

19

365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

20

12.     Each Counterparty to an Assigned Contract hereby is forever barred, estopped, and

21

permanently enjoined from (i) raising or asserting against the Debtor or Buyer, or the property of any

22

of them, any assignment fee, acceleration, default, breach, or claim of pecuniary loss, or condition to

23

assignment, arising under or related to such Assigned Contract, existing as of the date of the applicable

24

Closing, or arising by reason of the consummation of the Transaction contemplated by the Asset

25

Purchase Agreement, including, without limitation, the Transaction and the assumption and assignment

26

of the Assigned Contracts, including any asserted breach relating to or arising out of any change-in-

27

control provisions in such Assigned Contract, or any purported written or oral modification to such

28

Assigned Contract, and (ii) asserting against Buyer any claim, counterclaim, breach, or condition

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

asserted or assertable against the Debtor existing as of the applicable Closing or arising by reason of the transfer of the Purchased Assets, except for the Assumed Obligations.

13.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the Counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtor's assumption and assignment of such Assigned Contract in accordance with the Asset Purchase Agreement.

14.     The terms and provisions of this Sale Order, as well as the rights granted under the Asset Purchase Agreement and other Transaction Documents, shall continue in full force and effect and are binding upon any successor, reorganized Debtor, or chapter 7 or chapter 11 trustee applicable to the Debtor, notwithstanding any such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in the bankruptcy case or in any order confirming such a plan, nor any order dismissing the bankruptcy case or converting the bankruptcy case to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, any documents or instruments executed in connection therewith, or the terms of this Sale Order.  The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of the bankruptcy case and the entry of any other order that may be entered in the bankruptcy case, including any order (i) confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in the bankruptcy case; or (iv) dismissing the bankruptcy case.

15.     The Transaction contemplated by the Asset Purchase Agreement and other Transaction Documents are undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code.  Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Order to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to Buyer.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

16.     The Debtor is authorized and directed to use a portion of the Purchase Price to (1) pay the Senior Lender Indebtedness in full and (2) pay the TriplePoint Indebtedness in the agreed upon fixed pay off amount of $7,199,624.29, and such fixed pay off amount of $7,199,624.29 shall satisfy the TriplePoint Indebtedness in its entirety to the extent it is paid by no later than May 6, 2024.  The application of the Purchase Price from the sale of the Purchased Assets pursuant to the immediately preceding sentence complies with the requirements of the Asset Purchase Agreement and is supported by good, sufficient and sound business reasons.

17.     The failure to specifically include any particular provision of the Asset Purchase Agreement or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Transaction, the Asset Purchase Agreement and the other Transaction Documents be authorized and approved in their entirety.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

18.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14 days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h) and 6006(d).  Time is of the essence in approving the Transaction (including the transfer and the sale of the Purchased Assets).

19.     Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the Asset Purchase Agreement and this Sale Order, the provisions contained in this Sale Order shall govern.

20.     The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe, and enforce the provisions of the Asset Purchase Agreement and this Sale Order in all respects, including, without limitation, to (i) hear and determine all disputes between the Debtor and/or Buyer, as the case may be, and any other Counterparty to, among other things, the Assigned Contracts concerning, among other things, assignment thereof by the Debtor to Buyer and any dispute between Buyer and the Debtor as to their respective obligations with respect to any asset, liability, or claim arising hereunder; (ii) compel delivery of the Purchased Assets to Buyer free and clear of Liens except for the Assumed Obligations; (iii) compel the delivery of the Purchase Price or performance of other obligations owed to

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

the Debtor under the Asset Purchase Agreement; (iv) interpret, implement, and enforce the provisions of this Sale Order; and (v) protect Buyer against (A) claims made related to any Liens or other obligations that are not Assumed Obligations, (B) any claims of successor or vicarious liability (or similar claims or theories) related to the Purchased Assets or the Assigned Contracts, or (C) any Liens asserted on or against Buyer or the Purchased Assets.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**EXHIBIT E**

**Disclosure Schedules**

E-1

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**DISCLOSURE SCHEDULE TO**

**ASSET PURCHASE AGREEMENT**

by and between

TabaPay Holdings LLC as **BUYER**

and

Synapse Financial Technologies, Inc. as **SELLER**

Dated effective as of

April 19, 2024

1

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

These Disclosure Schedules (the "Schedules") are arranged in separate parts corresponding to sections of the Asset Purchase Agreement between Buyer and Seller (the "Agreement"). Unless the context otherwise requires, all capitalized terms used in the Schedules shall have the respective meanings assigned to such terms in the Agreement.

Any item disclosed in any Schedule shall be deemed to have been disclosed with respect to one or more other Schedules if the relevance of such disclosure to such other Schedule or Schedules is reasonably apparent on its face. Certain information set forth in the Schedules is included solely for informational purposes and may not be required to be disclosed pursuant to the Agreement. Inclusion of information in any Schedule will not be deemed or construed as an admission or otherwise imply: (a) that such information (i) is material to the business, results of operations or financial condition of the Seller or any of its affiliates; or (ii) represents a material exception or material fact, event or circumstance or that such information has had or would have a Material Adverse Effect; or (b) that disclosure of any such information is required under any applicable Law. The specification of any dollar amount in the information provided in any Schedule is not intended to imply that such amount, or higher or lower amounts or the items so included or other items, are or are not material, and no Party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, items or matter not described herein or included in a Schedule is or is not material for purposes of the Agreement. No disclosure in any Schedule relating to any possible breach of, violation of, or conflict with, any contract or applicable Law shall be construed as an admission or indication that any such breach, violation or conflict exists or has actually occurred. Nothing disclosed in any Schedule will be deemed or will constitute an admission of any liability or obligation of the Seller any of its affiliates to any third party, nor an admission to any third party against the interests of any or all of the parties. The inclusion of information in any of such Schedules hereto shall not be construed as an admission that such information is material to the Seller or the Buyer. In addition, matters reflected in such Schedules are not necessarily limited to matters required by the Agreement to be reflected in such Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. In disclosing the information in any Schedule, neither the Seller nor any of its affiliates are waiving any attorney-client privilege associated with such information or any protection afforded by any confidentiality requirements or the work-product doctrine with respect to any of the matters disclosed or discussed herein.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Section 3.5(a)</u>

**Registered Broker-Dealer – Compliance with rules and regulations of FINRA and SROs;
compliance with applicable Law concerning operations under the Exchange Act**

On October 26, 2023, the active Financial Operations Principal (the "Prior FinOp") of Synapse Brokerage LLC ("Broker") at the time, filed a Rule 17a-11 notification (the "17a-11 Notification") with FINRA, which indicated that Broker's regulatory net capital had fallen below the minimum amount required pursuant to SEA Rule 17a-11(b).

The 17a-11 Notification related to a period from approximately October 1, 2023 through October 6, 2023 when the Prior FinOp determined that there was a net capital deficiency at Broker, resulting from a failed net settlement process with one of Broker's third-party partner banks where Broker did not receive fund transfers as expected in the days leading up to the potential net capital deficiency.

Promptly thereafter, Broker engaged new compliance personnel including a new Financial Operations Principal (the "Current FinOp"), which replaced the Prior FinOp. Broker, its principals and the Current FinOp agree that the original 17a-11 Notification filed with FINRA by the Prior FinOp was erroneous and should not have been filed, and agree that it was based on the Prior FinOp's misunderstanding of the underlying facts, and that no net capital deficiency actually existed at Broker during the time period in question.

As a result of the 17a-11 Notification filing, FINRA subsequently opened a cause exam with Broker relating to the 17a-11 Notification and underlying events (the "Exam"). The Exam is ongoing as of April 18, 2024 and Broker and its principals and personnel are coordinating with outside legal counsel and FINRA staff to provide supplemental information in response to additional FINRA requests which have been made to Broker via its FINRA Gateway (the "Requests"). There have been approximately 13 Requests made by FINRA as of April 18, 2024 relating to various information and data of Broker, some of which is directly related to the 17a-11 Notification filing. Broker expects that the Exam will continue to be ongoing over the course of potentially several more weeks or months before its conclusion and expects that additional Requests will be made and/or that the Exam will expand in scope. FINRA has not imposed any disciplinary action or penalty on Broker or any of its personnel in connection with the 17a-11 Notification or the Exam as of April 18, 2024.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>**Section 3.5(b)**</u>

**Registered Broker-Dealer – Compliance with applicable requires of Exchange Act and other applicable Laws**

Please refer to the disclosures in Section 3.5(a) hereof.

4

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## Section 3.5(c)

**Registered Broker-Dealer – All information contained in BD Regulatory Filings was true, complete and correct in all material respects at the time of filing**

As described in the disclosures in Section 3.5(a) hereof, the Prior FinOp identified a potential net capital deficiency of Broker beginning on October 1, 2023.  Broker's FOCUS reports and other regulatory and financial reports initially filed with FINRA relating to such period may have failed to disclose such potential net capital deficiency properly.

Additionally, the current principals of Broker, including the Current FinOp, have communicated to FINRA staff that the original 17a-11 Notification filed with FINRA should not have been filed, that it was based on the Prior FinOp's misunderstanding of the underlying facts, and that no net capital deficiency actually existed at Broker during the time period in question.  Accordingly, the Company believes that the original 17a-11 Notification made to FINRA was inaccurate in that the Company believes there was no net capital deficiency at Broker, contrary to what was filed in such 17a-11 Notification.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## Section 3.5(d)

## Registered Broker-Dealer – No required affirmative Item 11 responses required on Form BD

As described in the disclosures in Section 3.5(a) hereof, Broker is currently in the process of responding to the Exam and its related Requests. The potential for FINRA and/or SEC disciplinary action and/or penalties arising from the Exam exists, and none of the existence of the Exam, its underlying facts and context, or the potential for penalties has been disclosed on Form BD.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>**Section 3.5(e)**</u>

**Registered Broker-Dealer – No pending or threatened regulatory actions, examinations, etc.**

Please refer to the disclosures in Section 3.5(a), 3.5(c), and 3.5(d) hereof.  As described therein, Broker is currently responding to FINRA staff in connection with the Exam, which may result in penalties and/or disciplinary action against Broker and/or its personnel.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## <u>Section 3.5(h)</u>

**Registered Broker-Dealer – Material compliance with all applicable net capital requirements**

Please refer to the disclosures in Section 3.5(a), 3.5(c), and 3.5(d) hereof.  While the Company believes that the original 17a-11 Notification made to FINRA was inaccurate and that there was no net capital deficiency at Broker, FINRA is actively evaluating the issue in connection with the Exam.  Accordingly, FINRA may determine that a net capital deficiency existed at Broker during the period in question, contrary to the Company's assertion that no net capital deficiency existed.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**<u>Section 3.5(i)</u>**

**Registered Broker-Dealer – WSPs and implementation in compliance with FINRA Rule 3120(a)**

Please refer to the disclosures in Section 3.5(a), 3.5(c), and 3.5(d) hereof.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

## Section 3.7

### Compliance

Please refer to the disclosures in Section 3.5(a), 3.5(c), and 3.5(d) hereof.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**Section 3.8**

**Other Permits**

No Permits of Seller.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

**Section 5.2**

**Conduct of the Business**

N/A.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.1(a)</u>

Purchased Fixed Assets

All of Seller's supplies, equipment, technical equipment, hardware, computers and related equipment utilized by Seller personnel, and other similar assets or tangible personal property, including, without limitation, (i) all laptops and monitors; (ii) all equipment utilized by or on behalf of Seller in any data center; (iii) access devices to any data center; (iv) all mobile telephones, tablets and other similar equipment; (v) all VPN or other similar access devices (whether client or server) for any data center; and (vi) all VPN or other similar access devices for Amazon Web Services or any other database.

Schedule 1.1(b)

Assigned Contracts

All Contracts with Customers (including, without limitation, any Transferred Customer) to which Seller is a party or by which Seller or any Purchased Asset is bound (including, without limitation, any Contract to which Seller is a party or by which Seller or any Purchased Asset is bound with respect to any products or services provided to any End-User for which Seller or any Subsidiary is involved (whether with respect to any Transferred Customer or otherwise), including, without limitation, with respect to any End-User that has any funds, whether in an FBO account or otherwise.

All Contracts with vendors, contractors, and third-party service providers to which Seller is a party or by which Seller or any Purchased Asset or Assumed Obligation is bound.

Master Bank Service Agreement, effective as of September 23, 2022, between Evolve and Seller (as amended by that certain Amendment to Master Bank Services Agreement, dated September 28, 2022, between Evolve and Seller) (as further amended, restated, supplemented or otherwise modified from time to time in accordance therewith, the "**Evolve Agreement**").

<u>Schedule 1.1(c)</u>

Required Contracts

1.  The Synoptek Agreement (as defined below).
2.  The Digital 365 Main Agreement (as defined below).
3.  All Contracts between or among Seller or any of its Subsidiaries, on the one hand, and MongoDB or any of its Affiliates, on the other hand.
4.  All Contracts between or among Seller or any of its Subsidiaries, on the one hand, and MasterCard or any of its Affiliates, on the other hand (including, without limitation, any Contract relating to MasterCard MNGS).

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.1(d)</u>

Accounts Receivable

None.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Schedule 1.1(e)

Cash Reserves and Deposits

None.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.1(f)</u>

Bank Accounts

All bank accounts in Seller's name or otherwise maintained on behalf of Seller which are required by the applicable financial institution to provide services to Contracts with Transferred Customers, but excluding any cash and cash equivalents in any such account at the applicable Closing at which such account is transferred.  Without limitation of the foregoing, Purchased Assets pursuant to this <u>Schedule 1.1(f)</u> shall include any and all accounts in Seller's name or otherwise maintained on behalf of Seller at the following institutions: (i) Lineage Bank; (ii) AMG National Trust; (iii) American Deposit Management; (iv) American Bank; (v) Customers Bank; (vi) CBW Bank; (vii) First Horizon Bank; and (viii) Evolve.

Schedule 1.1(g)

Permits

Buyer is not acquiring any Permits issued to Seller in Seller's name; provided, Buyer shall acquire all Permits held by Broker-Dealer Subsidiary or State Lender Licensing Subsidiary, as applicable, by virtue of Buyer's acquisition of 100% of the outstanding equity interests of each such Subsidiary at the applicable Closing pursuant to this Agreement, and all such Permits shall constitute Purchased Assets as a result thereof.

Schedule 1.1(h)

Required Permits

None.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.1(i)</u>

Assigned Real Property Leases and Related Deposits

None.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.1(j)</u>

Intellectual Property Rights

All of Seller's Intellectual Property Rights, including, without limitation, (i) all information, data and other Intellectual Property Rights related to Seller's provision of services to Customers (including, without limitation, all Transferred Customers); (ii) all Software, applications, source code, object code, models, inventions, designs, databases, production and test data, and data stored within databases maintained by or on behalf of Seller; (iii) all application program interfaces; (iv) all licenses to any Intellectual Property Rights granted by or to Seller or any Subsidiary; (v) all Intellectual Property Rights or other assets relating to security, maintenance, disaster recovery, redundancy, backup, archiving and virus or malicious device scanning/protection measures; (vi) all marketing materials and materials relating to any customer insight surveys, customer satisfaction surveys and any other similar studies or surveys relating to customer behavior or preference; (vii) all production and test data in the MongoDB service; (viii) all reporting data and data warehouse data; (ix) all Excel or other similar data used by accounting, reporting or transaction monitoring or analysis; (x) all pricing sheets and network pricing sheets relating to any products or services offered by or on behalf of Seller or any of its Subsidiaries; (xi) all data of Customers (including, without limitation, any Transferred Customer) and all End-Users required to provide any products or services of Seller or any of its Subsidiaries or otherwise required to be maintained by or on behalf of Seller or any of its Subsidiaries by applicable Law; (xii) all transaction records and related data required to be maintained or retained by Seller or any of its Subsidiaries in accordance with applicable Law; and (xiii) all records supporting or relating to any Program Reconciliation.

All domain names and registrations related thereto owned or otherwise registered to Seller.

All social media accounts owned or purported to be owned by Seller or any Subsidiary, including all access rights and information relating thereto.

<u>Schedule 1.1(k)</u>

Surety Bonds, Insurance Policies and Related Collateral

| Policy | Insurance Carrier |
| --- | --- |
| FI Bond | Hiscox Insurance Company Inc. |

Schedule 1.1(l)

Customer Contracts

All Contracts with Customers (including, without limitation, all Transferred Customers) to which
Seller is a party.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Schedule 1.1(m)

Assigned Personal Property Leases and Related Deposits

The leased hardware, Software and services provided pursuant to the Master Services Agreement with Synoptek, LLC (as amended, restated, supplemented or otherwise modified from time to time in accordance therewith, the "**Synoptek Agreement**").

The license and services provided in the Master Terms and Conditions with Digital 365 Main, LLC (as amended, restated, supplemented or otherwise modified from time to time in accordance therewith, the "**Digital 365 Main Agreement**").

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.2(c)</u>

Cash and Cash Equivalents

Any and all cash and cash equivalents.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.2(f)</u>

Tax Refunds

Any and all tax refunds.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

<u>Schedule 1.2(l)</u>

Non-Assignable Permits

None.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Schedule 1.2(m)

Other Excluded Assets

The trademark issued to Seller; Serial number: 8643988; Registration number: 4912014,
registered on 03/08/2016.

<u>Schedule 1.3</u>

Other Assumed Obligations

The payments described in Section VI.4.

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

Schedule 8.1(e)(3)

Third-Party Consents

1.  MasterCard MNGS
2.  American Bank
3.  AMG National Trust
4.  American Deposit Management LLC
5.  MongoDB, Inc.
6.  Cartana LLC
7.  Baker Tilly Virchow Krause, LLP
8.  Unit21, Inc.
9.  Thompson Reuters
10. Lighthouse Services
11. Yodlee
12. Twilio
13. Mailchimp
14. Zendesk
15. Arroways
16. Cardtronics
17. Datadog
18. Docker
19. Ekata
20. EMVCo
21. Fraudguard
22. Json-csv

Doc ID: 34b036dce0fca9ff7d5112b636197f60c3f1a1bc

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **DECLARATION OF SANKAET PATHAK IN SUPPORT OF ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ***April 22, 2024***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyg.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) ***April 22, 2024***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ***April 22, 2024***, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL ON
SECURED CREDITORS, THE 20 LARGEST UNSECUREDS, ALL KNOWN POTENTIAL BIDDERS, ANY STALKING HORSE BIDDER, ANY REGULATORY AGENCY WITH AN INTEREST IN THE ASSETS TO BE SOLD, & THE UNITED STATES TRUSTEE**

☒ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 22, 2024 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                              **F 9013-3.1.PROOF.SERVICE**

Amazon Web Services, Inc.
PO Box 84023
Seattle, WA 98124-8423


Bergeson LLP
111 Market Street, Suite 600
San Jose, CA 95113


Digital 365 Main, LLC
365 Main Street Suite 1500
San Francisco, CA 94105


First Horizon Bank
4385 Poplar Avenue
ATTN: Proctor Ford
Memphis, TN 38117


Fiserv, Inc
Po Box 208457
Dallas, TX 75320-8457


FlemingMartin, LLC
822 Hartz Way Suite 215
Danville, CA 94526


Shinette Parin
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111


Jones Day
555 California Street 26th Floor
San Francisco, CA 94104-1500

Benjamin Au
Kroll Associates, Inc
600 3rd Ave Fl 4
New York, NY 10016


Lineage Bank
3359 Aspen Grove Drive Suite 150
Franklin, TN 37067


Linkedin Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622


Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068


MasterCard International
2200 Mastercard Boulevard
O' Fallon, MO 63368-7263


John Rodriguez
Newfront Insurance, Inc
55 2nd Street, 18th Floor
San Francisco, CA 94105


Performiline, Inc
58 South Street 2nd Floor
Morristown, NJ 07960


Sloanne & Company, LLC
285 Fulton Street 69th Floor
New York, NY 10007

TabaPay, Inc
605 Ellis Street 110
Mountain View, CA 94043


Thomson Reuters
PO Box 6292 - West Payment Center
Carol Stream, IL 60197-6292


Trulioo Information Services, Inc
400-114 East 4th St
Vancouver, CA 94104


Adam Moelis
Yotta Technologies Inc
33 Irving Pl
New York, NY 10003

Russell Clementson
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Robert T. Honeywell
K&L Gates LLP
599 Lexington Ave.
New York, NY 10022

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

U.S. Securities and Exchange
Commission  Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

California Department of Tax and
Fee Administration
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA  94279-0029

Los Angeles County Tax Collector
P. O. Box 54110
Los Angeles, CA 90054-0110

FINRA
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071

Silcon Valley Bank, a division of
First-Citizens Bank & Trust Company
1437 7th Street, Suite 300
Santa Monica, CA 90401

TriplePoint Capital LLC
2755 Sand Hill Rd.
Suite 150
Menlo Park, CA 94025

David Poitras
BG Law
21650 Oxnard Street
Suite 500
Woodland Hills, CA 91367