1  ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
   MICHAEL I. GOTTFRIED, State Bar No. 146689
2    *mgottfried@elkinskalt.com*
   10345 W. Olympic Blvd.
3  Los Angeles, California 90064
   Telephone: 310.746.4400
4  Facsimile: 310.746.4499

5  Attorney for YOTTA TECHNOLOGIES, INC.

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

10

11 | In re                              | Case No. 1:24-bk-10646-MB
   |
12 | SYNAPSE FINANCIAL TECHNOLOGIES,    | Chapter 11
   | INC.,                              |
13 |                                    | **LIMITED OPPOSITION TO DEBTOR'S
   |           Debtor.                  | EMERGENCY MOTION FOR AN
14 |                                    | ORDER (A) APPROVING SALE OF
   |                                    | SUBSTANTIALLY ALL OF THE
15 |                                    | DEBTOR'S ASSETS FREE AND CLEAR
   |                                    | OF ALL LIENS, CLAIMS, INTERESTS
16 |                                    | AND ENCUMBRANCES; (B)
   |                                    | APPROVING ASSUMPTION AND
17 |                                    | ASSIGNMENT OF UNEXPIRED LEASES
   |                                    | AND EXECUTORY CONTRACTS AND
18 |                                    | DETERMINING CURE AMOUNTS; (C)
   |                                    | WAIVING THE 14-DAY STAY PERIODS
19 |                                    | OF BANKRUPTCY RULES 6004(h) AND
   |                                    | 6006(d); AND (D) GRANTING RELATED
20 |                                    | RELIEF; DECLARATION OF ADAM
   |                                    | MOELIS**

21        YOTTA TECHNOLOGIES, INC. ("Yotta") hereby files this Limited Opposition to

22 Debtor's Emergency Motion for an Order (A) Approving Sale of Substantially all of the Debtor's

23 Assets Free and Clear of all Liens Claims, interests and Encumbrances; (B) Approving

24 Assumption and Assignment of Unexpired Leases and Executory Contracts; and Determining

25 Cure Amounts; (C) Waiving the 14-Day Stay Periods of Bankruptcy Rules 6004(h) and 6006(d);

26 and (D)  Granting Related Relief (the "Sale Motion"), as it pertains to the cure amount for Yotta as

27 listed in the Notice of: (1) Assumption and Assignment of Executory Contracts and Unexpired

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Leases; (2) Establishment of Cure Amounts In Connection Therewith; (3) Procedures and

Deadlines Regarding Oppositions to Assumption and Assignment, and Cure Amounts; and (4)

Hearing Thereon (the "Cure Notice") [Docket No. 74].

## I.  BACKGROUND

On or about February 13, 2020, Yotta entered into a Master Services Agreement (the

"MSA") with Synapse Financial Technologies, Inc. (the "Debtor") pursuant to which the parties

developed a savings and checking account product initially issued by Evolve Bank & Trust (the

"Program") through which Yotta offers monetary sweepstake prizes to incentive its approximately

600,000 consumer customers to join and remain in the Program, in lieu of paying market interest

rates on deposits.  Per the MSA, Synapse is contractually obligated to pay Yotta "Fed Funds

Target Rate minus 0.25%" and that . . . [annual percentage yield] earned in each calendar month

shall be paid by the 20th business day of the following month."  A copy of the MSA together with

the Thirteenth Amended and Restated Software-As-A-Service Order Form extending the term of

the MSA through June 30, 2024, is attached as Exhibit "A" to the Declaration of Adam Moelis

(the "Moelis Declaration"), a copy of which is filed concurrently herewith.

Based on the applicable Fed Funds rate, and the average number of deposits, the actual

amounts paid to Yotta from January 2023 through August 2023 averaged approximately $900,000

per month.  In September and October 2023, the Debtor failed to make any payments to Yotta,  As

such, on October 24, 2023, counsel for Yotta sent a demand letter to the Debtor requesting that

"Synapse immediately release the total funds Yotta is owed ($1,777,468.90) so that Yotta can pay

the prizes to its customers."  The demand letter further stated that absent such payment, "Yotta

will not be able to pay its customers. Yotta will not be able to continue its business operations, and

they, and end customers, will suffer irreparable harm."  A copy of the demand letter is attached as

"Exhibit "B" to the Moelis Declaration.

/ / /

/ / /

/ / /

/ / /

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Subsequent to the date of the demand letter, the Debtor began to make partial monthly payments to Yotta.[1]  However, the Debtor has never paid Yotta for amounts owed to it from September and October 2023, and as a result of the continuing underpayments the Debtor currently owes Yotta $2,989,845.  An accounting of the amounts owed to Yotta is attached as "Exhibit C" to the Moelis Declaration.

## II.  PAYMENT OF THE FULL CURE AMOUNT IS REQUIRED PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE.

When a contract is assumed under section 365 of the Bankruptcy Code, the non-debtor third-party to that contract must be made whole at the time of the debtor's assumption of the contract.  *See, e.g.*, *In re Entertainment, Inc.,* 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998). Accordingly, to the extent that the Debtor seeks to assume and assign the MSA, the Debtor must pay the full cure amount based upon the actual amounts that are due on the date that the MSA is assumed and assigned ("Effective Date"). See 11 U.S.C. § 365(b)(1).

Inexplicably, the Debtor's Schedules of Assets and Liabilities as well as the Cure Notice provide that Yotta has a claim against the Debtor in the amount of $65,172.  Despite numerous attempts by counsel for Yotta to reconcile its $2,989,845 claim with the Debtor's proposed cure of $65,172, neither counsel for the Debtor nor counsel for the proposed purchaser have provided any explanation of this rather astonishing discrepancy.  Instead, Debtor's counsel has suggested that Yotta discuss the issue with counsel for the proposed purchaser, and counsel for the proposed purchaser has stated only that it is discussing the matter with its client.  To date, however, neither the Debtor's counsel nor the purchaser's counsel has explained to Yotta how the Debtor arrived at the cure amount reflected in the Cure Notice, or that the cure amount would be revised to reflect the actual amounts owed to Yotta.  What is clear, is that based on the historical monthly payments of approximately $900,000 for the first 8 months of 2023, and the Debtor's non-payment of any amounts to Yotta in September and October 2023, and the Debtor's partial payments subsequent to

---

[1] With the exception of one monthly payment in December 2023, all monthly payments made by the Debtor to Yotta were for substantially less than the full amounts due pursuant to the MSA.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   October 2023, the  Debtor's proposed cure payment of $65,172 has no basis in reality.

2       Here, if the Debtor elects to assume and assign the MSA to the proposed purchaser, the

3   Debtor and/or the proposed purchaser must demonstrate that it can promptly pay Yotta $2,989,845

4   plus all amounts accrued in May 2024 through the Effective Date of any assumption and

5   assignment.

6       **WHEREFORE**, Yotta respectfully requests that the Sale Motion be denied as to the

7   potential assumption and assignment of the MSA to the proposed purchaser absent revision of the

8   Cure Notice to reflect the amount of $2,989,845 plus all amounts as may be incurred in May 2024

9   pending any assumption and assignment.

10

11  DATED:  May 7, 2024                    ELKINS KALT WEINTRAUB REUBEN
                                          GARTSIDE LLP
12

13

14                                        By:  _____
                                              MICHAEL I. GOTTFRIED
15                                            Attorneys for YOTTA TECHNOLOGIES, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

5356481.1

LIMITED OPPOSITION

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**DECLARATION OF ADAM MOELIS**

I, Adam Moelis, declare as follows:

1.    I am the Chief Executive Officer of Yotta Technologies, Inc. ("Yotta").  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

2.    On or about February 13, 2020, Yotta entered into a Master Services Agreement (the "MSA") with Synapse Financial Technologies, Inc. (the "Debtor") pursuant to which the parties developed a savings and checking account product initially issued by Evolve Bank & Trust (the "Program") through which Yotta offers monetary sweepstake prizes to incentive its approximately 600,000 consumer customers to join and remain in the Program, in lieu of paying market interest rates on deposits.  Per the MSA, Synapse is contractually obligated to pay Yotta "Fed Funds Target Rate minus 0.25%" and that . . . [annual percentage yield] earned in each calendar month shall be paid by the 20th business day of the following month."  A copy of the MSA together with the Thirteenth Amended and Restated Software-As-A-Service Order Form extending the term of the MSA through June 30, 2024, is attached hereto as Exhibit "A."

3.    Based on the applicable Fed Funds rate, and the average number of deposits, the actual amounts paid to Yotta from January 2023 through August 2023 averaged approximately $900,000 per month.  In September and October 2023, the Debtor failed to make any payments to Yotta,  As such, on October 24, 2023, counsel for Yotta sent a demand letter to the Debtor requesting that "Synapse immediately release the total funds Yotta is owed ($1,777,468.90) so that Yotta can pay the prizes to its customers."  The demand letter further stated that absent such payment, "Yotta will not be able to pay its customers. Yotta will not be able to continue its business operations, and they, and end customers, will suffer irreparable harm."  A copy of the demand letter is attached hereto as Exhibit "B."

/ / /

/ / /

/ / /

/ / /

5356481.1

4.      Subsequent to the date of the demand letter, the Debtor began to make partial monthly payments to Yotta.[2]  However, the Debtor has never paid Yotta for amounts owed to it from September and October 2023, and as a result of the continuing underpayments the Debtor currently owes Yotta $2,989,845.  An accounting of the amounts owed to Yotta that was prepared by me is attached hereto as Exhibit "C."

5.      I am informed by my counsel in this matter that he attempted to reconcile with counsel for the Debtor and counsel for the proposed purchaser the amount owed to Yotta with the amount provided in the Cure Notice and that as of today, he has not received a substantive response from them.  Additionally, I reached out to the proposed purchaser regarding this issue. Similarly, I have not received a substantive response.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed May 7, 2024, at Los Angeles, California.

_____
Adam Moelis

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

---

[2] With the exception of one monthly payment in December 2023, all monthly payments made by the Debtor to Yotta were for substantially less than the full amounts due pursuant to the MSA.

# EXHIBIT A



| MASTER SERVICES AGREEMENT<br>SOFTWARE-AS-A-SERVICE ORDER FORM | |
|---|---|
| **Platform Legal Name:** Benjamin Financial Services Co. | **Contact:** Adam Moelis |
| **Email:** adam@withbenjamin.com | **Phone:** (310) 924-0005 |
| **Website ("Application"):** <u>www.withyotta.com</u> | **Physical Address:** 45 East 22nd St. #33B New York, NY 10010, |

**SERVICES:**

Your subscription shall include the Services selected below and is subject to the terms and conditions included in the Master Service Agreement.

**Payments & Fees:**
- ✓ ACH
  - ✓ Regular (5¢/ea)
  - ✓ Same Day ($1/ea)
- ❑ Pull from Cards*
  - ❑ Debit
  - ❑ Credit
  - ❑ Prepaid
- ❑ Push to Cards*
  - ❑ Debit
  - ❑ Credit
- ❑ Domestic Wires
- ❑ Cross-border Wires
- ❑ Check Issuance
- ❑ Remote Deposit Capture

*Additional 1% per transaction for non-US cards.

**Data Services:**
- ❑ Account Aggregation
  - ❑ White-labeled UI for Link
- ❑ KYC and Sanctions Data
- ❑ Data Enrichment
- ❑ UARs

**Digital Currency Services:**
- ❑ Digital Wallet
- ❑ Conversion Services

**Trade/Conversion Services:**
- ❑ Stocks:
- ❑ ETF:
- ❑ Crypto:

**End-User Support:**
- ❑ Basic:
- ❑ Email

**User Types:**
- ✓ Consumer (domestic)
- ❑ Business (domestic)

**Accounts & Add-Ons:**
- ✓ Deposit Accounts for Platform
- ❑ Interest Checking Account (Users)
  - ❑ Debit Card(s)
  - ❑ Account Number(s)
  - ❑ Premium:
- ❑ Savings Account (Users) - APY
  - ❑ Account Number(s)
  - ❑ Premium:
- ✓ FBO with Sub Accounts
  - ❑ Account Number(s)
  - ✓ Basic: 0.75% APY at $0.00/User
  - ✓ Premium: 1.45% APY at $1.99/User
- ❑ Custodial Accounts
  - ❑ Account Number(s)
  - ❑ Charge Card(s)
  - ❑ Escrow Services
- ❑ Clearing Account
  - ❑ Account Number(s)
- ❑ One-Time Loans
  - ❑ Account Number(s)
  - ❑ Charge Card(s)
- ❑ Revolving Loans
  - ❑ Credit Card(s)
  - ❑ Account Number(s)
- ❑ Crypto Wallet
- ❑ Brokerage Accounts (*coming soon!*)

**Misc.**
- ❑ Transaction Decisioning and Instant Auth

**User Notifications:**

| | |
|---|---|
| ❏ Phone<br><br>**Lending Services:**<br>❏ One-Time Lending<br>❏ Revolving Line of Credit: | ❏ Account Agreements<br>❏ Monthly Statements<br>❏ Transaction Notifications<br>❏ Fraud Alerts<br>❏ Adverse Action Notices<br>✓ Regulatory Alerts (required) |

**Premium Service:** The Parties agree that the platform shall pay a per User fee for each of the premium services elected in this Order Form, which is the fee defined above. Platform understands that each account type shall have a specific fee and each premium service fee will be calculated per product type. Such fee shall be owed by Platform and will be calculated monthly by multiplying the number of Users with an active account at any moment in a calendar month and shall be paid on the 5th day of the following month and shall be billed in the same manner as the subscription fee.
The number of active Users is available to Platform in the dashboard.

**Basic and Premium APY Allocation**: If applicable, Platform may have two different Cashback tiers or APY tiers for user savings accounts, interest checking accounts, or FBO sub-accounts corresponding to the respective basic and premium Cashback percentages or APY rates defined above. On the specification sheet, the Parties shall decide whether and which users will be able to apply for cards or open savings accounts, interest checking accounts, or FBO subaccounts under the basic or the premium tiers. Platform may split the respective APY rates applied to the savings accounts, interest checking accounts, or FBO sub accounts with Users in accordance with the Revenue Split section below.

**Revenue Split:** Platform may split the Cashback or the APY that is applied to the Interest Checking Accounts, Savings Accounts, or FBO sub-accounts with Users ("Revenue Split"), in which case Platform shall receive its percentage of the Cashback or percentage of the APY as a rebate. The Revenue Split shall be paid monthly to Platform's Deposit Account and the remainder of the Cashback or APY shall be paid to the Users as a rebate or interest.
In the case of APY, in no event shall the Revenue Split result in the Users receiving less than 0.01% APY. The Revenue Split shall be reflected on the Specification Sheet.
Cashback and APY earned in each calendar month shall be paid by the 20th business day of the following month.

**Initial Service Term:** February 13, 2020 – April 30, 2021
**Renewal Term(s):** 1 year (rolling, unless either Party provides a notice of non-renewal at least 30 calendar days before the end of the then-current Term)

**Total Term Subscription Fees:** $132,931.04 for the Initial Service Term to be paid by Platform as follows:

**Payment Schedule:**
- $2,931.04 for the month of February 2020 (prorated); and
- $5,000 per month for the period between March and April 2020; and
- $10,000 per month for the period between May 2020 and April 2021*.

*Discounted Fee:* The Parties agree that Platform's monthly Subscription Fees are discounted from the abovementioned $10,000 monthly fee to $5,000 until either (i) Platform receives $2,000,000 (two million dollars) of funds in any round, or reaches such total amount of funds as a result of different rounds of funding, including, but not limited to, seed or any series; or (ii) Platform's number of Users exceeds 1000 (one thousand) consumer Users or 100 (one hundred) business Users.
Once Platform either reaches the $2,000,000 (two million dollars) of total funding (notice of which must be provided to Synapse within 5 days of such funding closing) or exceeds the abovementioned User limit(s), whichever is earlier, Platform's monthly Subscription Fees shall increase to the $10,000 monthly fee, prorated if applicable.

**Return or Chargeback Fees** : Synapse shall only charge Return or Chargeback Fees in any given calendar month as follows:
- For ACH Returns, $5.00 per return, if Platform has more than 150 returns in such calendar month.
- For Card Chargebacks, $15.00 per chargeback, if Platform has more than 50 chargebacks disputes in such calendar month.
**Failure Fees:** Synapse shall charge Failure Fees as follows:

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

| - For card processing (push/pull) failures, $0.09 per failure. |
| --- |

**Reserve Amount**:  The Initial Reserve Amount should be equal to the Platform's expected daily transactions limit. The daily transactions limit is the maximum aggregated amount in dollars that Platform's Users should be able to transact in one day. This limit will be defined mutually by the Parties in the Specification Sheet.  After six (6) months from the date in which Platform received its Production API Keys, the Reserve Amount may be the lowest of (i) the daily transaction limit or (ii) a 110% of the sum of the amounts debited from the Reserve Account in the previous ninety days.

If, in any period, the Platform daily transaction limit increases, the Reserve Amount in effect shall increase in the same proportion. The Parties agree that, after four (4) months of such increase, the Reserve Amount calculation may revert to the lowest of (i) the daily transaction limit or (ii) a 110% of the sum of the amounts debited from the Reserve Account in the previous ninety days.

**Platform Insurance Requirements:** (1) general liability coverage of $1 million per occurrence and $2 million aggregate; and (2) error and omissions (E&O)/Cyber liability coverage of $1 million.

Platform shall provide proof of insurance before receiving production API Keys, as defined in the Agreement.

**Specification Sheet:**  During Platform's integration with Synapse, the Parties will elaborate a Specification Sheet which will contain the Services, flow of funds, transaction volume and limits, use cases for the Services and Reserve Amount.  Any modification or update to the Specification Sheet must be mutually agreed upon by the Parties.

**Platform deliverables:** Unless otherwise specified, Platform shall deliver to its Users Account Statements and Account Disclosures, which Platform shall be able to access through the APIs.

[*Master Services Agreement Follows*]

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is made as of the Effective Date (as designated below in your signature line), between Synapse Financial Technologies, Inc., a Delaware corporation ("**Synapse**," "**we**," "**us**," or "**our**") and Benjamin Financial Services Co., a corporation organized under the laws of Delaware ("**Platform**," "**you**," or "**yours**").  Synapse and Platform may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

This Agreement incorporates the above Software-as-a-Service Order Form (the "Order Form"), the General Terms and Conditions, all addenda and exhibits attached hereto, and your Specification Sheet, constitutes the entire agreement between the Parties and supersedes all prior agreements, understandings, statements, proposals, written or oral, between the Parties, including, but not limited to, the Master Services Agreement executed on February 13, 2020 at14:55:35 UTC.

The Following documents attached here are incorporated as part of this Agreement:

·        General Terms and Conditions
·        Compliance Services Addendum
·        Transactions Services Addendum
·        FBO Account Services Addendum
·        Service Level Addendum
·        Order Form

The Parties have read, agreed to and executed this Agreement as of the Effective Date.

**Synapse Financial Technologies, Inc.:**

By: _sankaet pathak_____

Name: <u>Sankaet Pathak</u>

Title: <u>Founder & CEO</u>

Synapse Initials:
        SR

**Platform:**

By: _Adam Moelis_____

Name: <u>  Adam Moelis</u>

Title: <u>Founder & CEO</u>

Date: <u>  02 / 13 / 2020</u>

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

## General Terms and Conditions

**1.  SERVICES.**

**1.1.  General**.  The terms and conditions found in the "General Terms and Conditions" section of this Agreement ("General Terms") apply to all Services.  The Parties understand that specific terms and conditions may apply to certain Services, which shall be described in the applicable Addenda incorporated into this Agreement.

**1.2.  Services and API License**.  Synapse shall provide to Platform the Services defined in your Order Form, which may be updated from time to time by mutual agreement between the Parties.  The Parties may execute different Order Forms for different Applications of the same Platform.  Synapse hereby grants to Platform a non-exclusive, non-transferable, revocable, non-sublicensable, limited license to use Synapse's application programming interfaces ("Synapse APIs") solely as required and necessary to use the Services in accordance with the terms and conditions of this Agreement.

**1.2.1.**  The Synapse APIs shall be integrated with Platform APIs and/or Platform Application to enable the Services to be provided as defined in the Order Form and to allow Platform clients ("Users") to access and use the Services. Platform Users shall consent to the Synapse's Terms of Services and specific Synapse User Agreements for certain Services.  The consent shall be collected and stored by Platform, in a format mutually decided by the Parties.

**1.2.2.**  In connection with Platform's use of Synapse API's, Platform shall not (i) copy, transmit, transfer, modify or create derivative works, reverse engineer, reverse compile, reverse assemble or otherwise determine or derive source code of the Synapse APIs, nor permit or authorize any third party to do any of the foregoing or (ii) wrap the Services or Synapse API with your API or Application for resale or otherwise attempt to "white label" Synapse Services with your Application or otherwise.

**1.2.3.**  Synapse has agreements in place with third-party service providers and financial institutions to provide the Services to Platform and Users, including agency appointment for the purposes of contracting financial services to be delivered by such financial institutions. Synapse shall require all such third-party service providers and financial institutions to abide with the confidentiality and security provisions of this Agreement.

**1.3.  API Documentation and Tools**.  Synapse shall provide Platform with tools to access and utilize the Synapse APIs, which includes the API Documentation available at https://docs.synapsefi.com, or a successor webpage as designated by Synapse, and other integration and user guides as applicable.

**1.4.  Synapse Dashboard**.  Synapse shall provide Platform with access with the Synapse Dashboard available at https://dashboard.synapsefi.com/ where Platform shall be able to, among other features, (i) create a Platform account with Synapse; (ii) give access to employees and agents by creating and designating different users and privileges to each employee with access to the Dashboard; (iii) create Users and/or transactions; and (iv) view Users, transactions, and accounts. Synapse may offer additional functionalities in the Synapse Dashboard from time to time.

**1.4.1.**  Platform is solely responsible for all the actions, transactions and information included, created or initiated in the Dashboard and for any inaction or omission by its users.  Platform is also responsible for the use of the User information by its employees or agents with access to the Dashboard.

**1.5.  Deposit Account**.  Synapse shall also establish a demand deposit account for Platform ("Platform Deposit Account") upon the execution of this Agreement.

**1.5.1.**  Platform Deposit Account shall be pre-funded by Platform for the payment of transaction fees and additional costs that Platform may incur, and of which Platform will be billed automatically.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

1.5.2.   Platform shall associate at least one bank account held at third party financial institutions ("Designated Bank Account") from which Synapse may withdraw funds for Platform (i) payment of subscription fees, (ii) payment of API call and ticket request fees, (iii) payment of transaction fees if Platform's Deposit Account does not have sufficient funds for such payments, and (iv) deficiencies of Reserve Account, as defined below.

1.5.3.   Platform authorizes Synapse to debit the Deposit Account, the Designated Bank Account, or the Reserve Account at any time without further notice to or consent of Platform for the reasons provided in Section 6 and 7 herein.

**1.6.   Platform Documents**. Synapse, from time to time, may request among other information, certain corporate, business, financial, or beneficial ownership information from Platform ("Platform Documents"), and Platform shall provide such Platform Documents within seven (7) days from the date of request. Platform shall also inform Synapse of any beneficial ownership information change (a change of ownership of more than ten percent (10%) of the equity interest of Platform or a change of the natural person with significant responsibility to control, direct, or manage Platform) within ten (10) days of such change. Platform understands and agrees that any such information may be shared with Synapse's financial institution partner.

**1.7.   Platform Support.**  Synapse shall provide Platform with all commercially reasonable support, inclusive technical and operational support, to (i) integrate with the Synapse APIs and (ii) provide the Services to final Users, as provided in the Service Level Addendum.

1.7.1.   Platform is responsible for providing User support and dispute resolution for your Application.  Upon the receipt of any inquiry related Synapse's Services or APIs, Platform shall promptly log and forward such inquiry to Synapse in no later than twenty-four (24) hours. Synapse shall define, at its own discretion, if Synapse shall respond such inquiry directly to User or if Synapse shall provide the response to Platform to communicate to User.

1.7.2.   If elected in your Order Form, Synapse shall provide customer services directly to your Users by receiving User's contact, by phone or email as elected, opening a ticket to log the contact and the issue or question, responding to User and/or resolving the issue, to the extent it can be resolved. In such cases, Synapse's contact information shall be visible in Platform's Application in order for Users to be able to reach out to Synapse with any and all questions. Synapse shall provide customer services support to Users and resolve issues that are related to Synapse's Services or APIs. In case User's contact relates to Platform's Application or services, Synapse shall redirect the ticket to Platform.

**1.8.   Non-solicitation of Users**.  During the Term of this Agreement, Synapse shall not solicit or otherwise attempt to establish any direct business relationship with any User that is a User of the Platform under this Agreement; provided, however, that Platform understands and acknowledges that the same User may have accounts and access to the Services via other Platforms that have contracted with Synapse.

**2.   Integration and Development.**

**2.1.   Integration**. Platform shall integrate its APIs and/or its Application to Synapse APIs in accordance with the Integration Requirements.

**2.2.   Integration Requirements**.  Synapse shall provide Platform with all necessary Integration Requirements, as shall be deemed any (i) requirements and information available in the API Documentation; (ii) use cases; (iii) functional and/or technical specifications relating to all available functions and features of Synapse's Services and APIs, in any document form and/or development work to be undertaken by Platform and oral or written guidance from Synapse's personnel during the integration; and (iv) disclosures and legal information that Synapse provides to Platform to make available to the Users in the Application.  The Integration Requirements may be updated from time to time.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**2.3.** **Integration Approval**. Platform shall only make Services available to Users ("Go Live") after Synapse's Integration Approval. The Integration Approval shall be the confirmation in writing by Synapse that Platform integration complies with the Integration Requirements.

**2.3.1.** The process to approve Platform integration may include, but is not limited to: (i) code review; (ii) compliance review; (iii) penetration testing, and (iv) fund of the Reserve Account, as provided herein.

**2.3.2.** Once Platform notifies Synapse that Platform is ready to Go Live, Synapse shall have seven (7) days to perform the adequate Review and Tests, as defined below, and provide feedback or approve the integration.

**2.4.** **API Keys**. After the execution of this Agreement, Synapse shall provide Platform with API Keys specific for Platform Account for the testing environment ("Sandbox"), where the integration shall be completed, and the Parties shall test the Services. After the Integration Approval, Synapse shall provide Platform with production API Keys, which will enable Platform to Go Live. The API Keys is deemed the code used to identify the Platform and authorize the use of the Synapse APIs.

**2.4.1.** Platform shall keep the API Keys confidential and disclose on a need to know basis, and Platform shall not sell, transfer, sublicense, or disclose the API Keys or other Synapse credentials to any third party, other than a service provider performing services on your behalf that has been both disclosed to Synapse and approved by Synapse in writing. Such approval shall be provided or denied in no later than 7-days from Platform's notice.

**2.4.2.** Platform is solely responsible for maintaining adequate security and control of any API Keys, Platform Account credentials and any other Synapse access credentials issued to you by Synapse. Platform is liable for any actions or inactions performed using Platform API Keys, Platform Account credentials or other Synapse credentials, including, but not limited, to actions or inactions performed without User prior knowledge or consent. If Platform believes or has actual knowledge that its API Keys were compromised, Platform shall notify Synapse immediately and Synapse shall suspend or revoke such API Keys and issue new API Keys to Platform once Platform demonstrates that the vulnerability that compromised the API Keys was cured.

**2.4.3.** Synapse may also temporarily suspend or revoke your API Keys at any time for breach of this Agreement, breach of Integration Requirements, and if Synapse believes, in its sole reasonable discretion, that your API Keys or Application has been compromised or your use of the Services is otherwise a misuse or threat to Synapse. In case Synapse suspends Platform API Keys as provided in this Agreement, Synapse shall give Platform notice of such suspension and shall reinstate the API Keys once Platform has demonstrated, to Synapse's sole discretion, that the cause for suspension has been cured.

**2.5.** **Costs**. Platform agrees that all integration activities will be performed by Platform at its sole expenses.

**2.6.** **Modifications**. Synapse may make enhancements to the Services and the Synapse APIs from time to time upon written notice to Platform and Users. In case of changes that may cause backward incompatibility, Synapse shall provide 90-days prior written notice to Platform before the change. In such cases, Platform may terminate this Agreement by providing Synapse notice thereof within thirty (30) days of Platform's receipt of such notice without further financial obligation.

**3.** **APPLICATION REQUIREMENTS AND COMPLIANCE.**

**3.1.** **Accuracy of Information**. All information that you submit to Synapse in connection with your use of the Services must be accurate and complete, and, in the case of User information, you shall submit the information exactly as provided by the User. Platform shall be solely responsible for any error resulting from Platform's and User's failure to furnish correct and complete information for a User, Transaction requests or any other request for Services, including without limitation the correct User, Transaction amount, or the User account for such Transaction.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**3.2.** **Disclosures**.  Depending on the Services selected on Platform's Order Form, Synapse will provide Platform with appropriate disclosures, which shall be provided to Platform's Users.  Such disclosures are regulatory requirements and shall be presented to Platform's Users in the manner set forth in the Specification Sheet, API Documentation, this Agreement, or as otherwise determined by Synapse.

**3.2.1.** Specifically, Platform shall integrate with Synapse APIs to provide Users with certain user agreements and provide accurate User internet protocol address (IP address) information to Synapse.

**3.2.2.** Platform shall clearly disclose to User: the Services provided to Users, all the fees Users will incur while using the Services, the countries to which Platform allows payouts, and any other information relevant to consumers. Synapse shall approve such disclosures and any changes to these aforementioned disclosures or amount of fees.

**3.3.** **Hash Vault**.  The parties agree that Synapse shall be Platform's hash vault provider and secure the information that Platform has to authenticate each User login in Platform's Application. The Parties agree that Synapse shall securely store the hash password and other information that Platform uses to authenticate each of Platform's Users in Platform's own Application.

**3.3.1.** The Parties agree that Synapse may, solely in the case of termination of this Agreement for any reason or revocation of API Keys, make available to Users a login password protected page in Synapse's webpage where Users can access their accounts using the information Platform uses to authenticate their accounts.

**3.4.** **Security Requirements**.  Synapse and Platform shall agree to:

**3.4.1.** Develop, implement, maintain and use appropriate administrative, technical and physical security measures to (i) protect all information provided to the other Party in connection with the Services and Integration against accidental loss, unauthorized alteration, disclosure or access and other unlawful forms of processing, and (ii) preserve the confidentiality, integrity and availability of all electronically maintained or transmitted User Data received from, or on behalf of the Users;

**3.4.2.** Protect such User Data no less rigorously than the Party protects its own confidential information;

**3.4.3.** Periodically, but no less frequently than annually, test the Application and Services for potential security liabilities;

**3.4.4.** Serve all Confidential Information, API requests and transmissions and other information requested by the other Party over HTTPS secure connections which at a minimum, is equivalent to TLS 256-bit encryption technology;

**3.4.5.** Maintain a grade of an "A" or better from SSL Labs (https://www.ssllabs.com).

**3.5.** **Marketing**.  Platform will be responsible for its own costs and expenses associated with the marketing of any Application and will further be responsible for ensuring that all Marketing Materials and Platform's marketing methods comply with regulation and with Synapse's Marketing Guidelines, which shall be delivered to Platform and may be updated from time to time with an appropriate advance notice to Platform.  In marketing the Services, Platform shall (i) portray the Services accurately and consistently, and (ii) adhere and conform at all times to Synapse's Marketing Guidelines.

**3.5.1.** Synapse may request at any time changes to Platform's information, marketing, and disclosures, if Synapse understands that they disagree with the Marketing Guidelines and/or regulation.  In such cases, Synapse shall provide a notice with such modifications to be made and a viable timeframe to do so; provided, however, that changes needed due to regulatory concerns shall be implemented in no later than 7-days from Synapse's notice to Platform.  If Platform cannot perform such changes in the timeframe provided, Platform shall remove any pages related to the Services herein.  The failure of making the changes in the appropriated timeline or to removing such

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

pages from Platform shall be considered a material breach of contract and cause for immediate termination, notwithstanding anything on the contrary provided in this Agreement.

**3.6.** **Press.** In connection to the Section above, Platform agrees that any press release, written materials or interview provided by Platform to either a specialized or a general public shall abide to the Marketing Guidelines. Platform shall provide Synapse with a copy of any press release, written materials or interview provided to Users or the public in general. In the case Synapse believes that any of Platform's press releases, written materials or interviews are not adhering to the Marketing Guidelines properly, Platform understands that Synapse may request that Platform provides clarification or rectification of any issue that may have been showed in discordance with the Marketing Guidelines, and such clarification or rectification shall be issued in no later than seven (7) days from Synapse's request.

**3.6.1.** Synapse also agrees that any press release, media content or marketing material using Platform's name, trademark or logo shall be previously submitted for Platform's approval, and any use shall be limited to the purpose given by Platform in such authorization.

**3.7.** **User Notices and Notifications. Regulatory Alerts**. The Parties understand that Platform manages the relationship between Platform and User. Platform understands that Synapse may need to provide certain notices to Users directly due to the regulated nature of the services (the "Regulatory Alerts"). Synapse reserves the right to determine when Synapse should provide such Regulatory Alerts directly to Users, at Synapse's sole discretion.

**3.8.** **Suspension, Limitation or Termination of Access**. Synapse reserves the right to suspend, revoke, limit or terminate your access to APIs and Services immediately freeze account funds at any moment if Synapse, at its sole discretion, suspects that the Services, the Application or other related services and goods provided to Platform are being used in violation of the integration requirements use cases or to any suspicious illicit activity.

**4.** **REVIEWS AND TESTS.**

**4.1.** **Review and Tests**. Before the Integration Approval, and as a condition to such Approval, and periodically from time to time, Synapse may submit Platform and Platform Application to the following reviews and/or tests ("Review and Tests"): (i) code review; (ii) compliance review; and (iii) penetration test.

**4.1.1.** During integration period, the Parties shall mutually define a date for the Review and Tests. For periodic Review and Tests, Synapse shall notify Platform of such Review and Tests with at least 20-days prior notice, which may be postponed to another reasonable date in case Platform presents a written justification for the postponement.

**4.1.2.** Synapse shall communicate Platform of any vulnerability or issue found in such reviews or tests and Platform shall make all the adjustments to comply with Synapse's Integration Requirements and Security Requirements within the timeline provided by Synapse. If Synapse, at its sole reasonable discretion, understands that the vulnerability or issue found may bring a regulatory concern or serious breach risk, Synapse may provide Platform with less than forty-eight (48) hours for implementation of the necessary changes. In case such changes are not corrected in the timeline provided, Synapse may suspend Platform API Keys.

**4.2.** **Code Review**. Synapse shall perform a Code Review into Platform integration, in which Synapse shall check the code used by Platform in its integration with Synapse APIs in order for the Services to be provided effectively. If Synapse encounters any mistake or issue, Synapse shall inform Platform, which shall correct the code in no later than seven (7) days.

**4.3.** **Compliance Review**. Synapse will perform Compliance Reviews which shall include a review and verification of Platform, Platform Application and APIs integration compliance with regulatory, disclosures and marketing requirements as provided by Synapse.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**4.4.    Penetration Test**.  Synapse may perform a Penetration Test in Platform's Application to verify security vulnerabilities. In this case, Synapse shall present to Platform Synapse's findings and inform which issues shall be fixed immediately, or within a reasonable deadline provided by Synapse, and which issues may be fixed before the following Penetration Test.  Synapse will perform any penetration test in a responsible and professional manner in accordance with the sector's best practices and will use commercially reasonable efforts not to change or amend any applications, data, programs or components of your network or computer system (including hardware and software).  At any time during a penetration test, you may request we stop the testing by emailing security@synapsefi.com.

**5.    DATA AND SECURITY BREACH.**

**5.1.    User Data**.  User Data shall mean means (i) a User's personal information; (ii) a User's sensitive personal information, such as government issued identification, financial account or card number, credit reports, (ii) a User account login and password, if any, (iii) a User's online banking credentials, such as username, password, and security questions and answers; (iv) details relating to a User's bank account detail, such as transaction history; and (vi) any additional Data about a User collected from the User or other sources.

**5.2.    Collection of Data**.  Synapse and Platform collection of User Data shall be limited to which (i) Synapse needs to perform the Services; (ii) Platform needs in order for the User to use the Application, and subject to User consent; and/or (iii) as otherwise permitted by applicable law.  Each Party is responsible for its compliance with laws and regulation and its own privacy policy, and Platform shall include a hyperlink to Synapse's Privacy Policy, found at https://synapsefi.com/privacy, in Platform's Privacy Policy.  Platform shall include in its Privacy Policy that it will provide certain User Data to Synapse.

**5.3.    Data Ownership**.  The Parties agree that Platform shall own data that Platform collects, and Synapse shall own data that Synapse receives and collects to perform the Services, according to each Party's Privacy Policy.  The Parties understand and acknowledge that some of the data each Party owns may be similar or the same.  The Parties also agree that Platform may download any of Platform's data from the Synapse Dashboard upon termination of this Agreement.

**5.4.    Synapse's Use of Data.**  Synapse shall use the data exclusively for the purposes of providing the Services, and for compliance with applicable law and regulation, and shall not share, sell or disclose any of Synapse's data to any third-party other than the financial institution.

**5.5.    Protection of Data**.  Each Party is solely responsible for security of User Data, Confidential Information or other data in each Party's possession or control.  Each Party shall maintain commercially reasonable administrative, technical, and physical procedures to protect User Data and Confidential Information stored on its servers from unauthorized access, accidental loss, modification, or breach, and will comply with applicable laws when handling User Data.

**5.6.    Data Breach**.  In case of a breach of security resulting in unauthorized access, loss or disclosure of the User Data or other Confidential Information, the breached Party shall notify the other Party within 24-hours of the knowledge of such breach, the nature of such breach, and the corrective action taken to respond to the breach.

**5.6.1.**    Each Party shall be responsible for the payment of losses and fines relating to the breach of its own systems or applications (including, without limitation, any fines assessed by any other regulatory authority, costs of necessary regulatory compliance procedures and steps necessary to mitigate and remediate the resulting damages) incurred as a result of confidentiality or data breach and the cost of identity theft protection services (if required by law) for affected Users, which shall be considered direct damages.

**5.6.2.**    In case of breach or unauthorized access to Users' deposit accounts caused or permitted by Synapse, Synapse shall be direct and unlimitedly liable to Users, and shall perform, at its own costs, all the necessary regulatory

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

procedures to notify the breach to Users and mitigate and remediate the damages. Such direct damages to Users are not included in the Limitation of Liability provided in Section 12.1.

**5.6.3.** In the case of a breach on Platform's Application or systems, Synapse, at its sole discretion, may suspend or revoke Platform APIs Keys.

**6. BILLING AND FEES.**

**6.1. Term Fees**. The Term Fees defined in your Order Form shall be payable on a monthly basis, on the 5th day of each month. Synapse reserves the right to change the Fees and to institute new fees at the end of the Initial Service Term or each Renewal Term, upon sixty (60) days prior notice to you. The Parties agree that such increase in the Term Fees for each Renewal Term should not exceed ten percent (10%) from the then current Term Fees, unless there is a change in economic, monetary or political circumstances, such as, but not limited to, inflation, and/or Synapse's costs to provide the Services increase more than expected.

**6.2. API Call Fees and Ticket Request Fees.** If applicable, any incurred API call fees or ticket request fees set forth in the Order Form shall be payable on a monthly basis, on the 5th day of each month.

**6.3. Transaction Fees.** Platform shall define if the Transaction fees defined in the Order Form shall be paid by the User or by Platform. Such Transaction Fees shall be charged at the moment of the transaction. If Platform is responsible for paying the Transaction Fees and Platform's Deposit Account has insufficient funds, the ability to provide transaction services to Users may be limited.

**6.4. Missed Payments**. If any amount is not paid to Synapse on its due date, such amount is considered outstanding. Synapse reserves the right to suspend Platform's API Keys and access to any Services until the outstanding amount plus any additional fees is paid in full, unless this Agreement is otherwise terminated in accordance with its terms. Undisputed outstanding amounts that remain unpaid for thirty (30) days are subject to a finance charge of 1.5% per month on any outstanding balance, or the maximum permitted by law, whichever is lower, plus all expenses of collection and may result in the immediate termination of this Agreement or the revocation of Platform's API Keys and access to any Services.

**6.5. Dispute**. If you believe that Synapse incorrectly billed you, you must email us at help@synapsefi.com no later than sixty (60) days after billing in which the error or problem appeared, in order to receive an adjustment or credit.

**7. RESERVE ACCOUNT.**

**7.1. Platform Responsibilities.** Platform is also responsible for the following amounts: (i) Platform's failure to pay any outstanding fees or liquidated damages (as defined below) owed to Synapse; (ii) any amount related to chargebacks, returns or provisional credit extension of transactions initiated on Platform's Application, via the dashboard or the User use of the Services; and (iii) any additional liability as defined in the specific service Addendum.

**7.2. Reserve Account**. In order to secure Platform's liability to Synapse over the amounts described above, Platform shall establish a Reserve Account with us, separate from Platform's Deposit Account, and fund it in the amount defined in your Order Form ("Reserve Amount"). Platform will maintain funds in an amount at least equal to the Reserve Amount in the Reserve Account at all times and Synapse shall debit from Platform's Designated Bank Account, in each billing cycle, any existing deficit in the Reserve Amount. If requested by Synapse, Platform shall grant Synapse a security interest in the Reserve Account and provide any other requested documentation to perfect such security interest. Platform shall not at any time grant any security interest in or permit a lien to be placed on the Reserve Account to any person or entity without the prior written consent of Synapse. In case of termination of this Agreement, Synapse shall return to Platform, on or before one hundred (100) days after the effective date of termination, any amount still available in the Reserve Account.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**7.3.** **Debit to Reserve Account**.  Platform agrees that Synapse may debit from the Reserve Account the amounts in section 7.1 above.  The Parties agree that Synapse may only debit from the Reserve Account amounts in connection to the list provided in this Section 7.  Each time Synapse debits the Reserve Account, Platform shall receive an electronic notice informing such debit.

**8.** **INTELLECTUAL PROPERTY.**

**8.1.** **Ownership**.  Synapse is the exclusive owner of and retains all rights, titles and interests to Synapse APIs and Services, the Synapse network and system and all modifications, enhancements, upgrades and updates thereto, Synapse trade names, trademarks, logos, domain names, copyrights, source code, data, User Data and Confidential Information and all intellectual property rights therein and thereto (collectively, "Synapse IP").  Platform shall retain all rights, title and interest in the intellectual property of the portions of your Application that do not include the Services or any other Synapse IP, and to any of Platform's trade names, trademarks, logos, and domain names ("Platform IP").  There are no implied licenses under this Agreement.  Except as set out in the Agreement, neither Party shall acquire any rights in the foregoing and neither Party shall copy, transmit, transfer, modify or create derivative works, reverse engineer, reverse compile, reverse assemble or otherwise determine or derive source code of the other Party's IP, nor permit or authorize any third party to do any of the foregoing.

**8.2.** **Synapse Trademarks**.  Synapse grants Platform a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use Synapse's trade names, trademarks, logos, and domain names ("Synapse Marks") as provided by Synapse in the Marketing Guidelines and Integration Requirements.  Synapse may revoke this license at any time at our discretion.  If revoked, you agree to promptly remove any Synapse Marks from your website, Application, marketing materials, and any other material provided to Users or other third parties.

**9.** **CONFIDENTIALITY.**

**9.1.** **Confidential Information.** Confidential Information shall include (1) any non-public information communicated by the disclosing Party ("Discloser") in connection with this Agreement marked or declared as "Confidential" or if not so marked or declared, should be reasonably understood from the context of disclosure or from the information itself to be confidential to the Party obligated to keep the information confidential ("Recipient").  Confidential Information shall also include, without limitation, the following non-public information: technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, processes, formulas, techniques, engineering designs and drawings, regulatory information, agreements with third parties, lists of, or information relating to: suppliers and customers, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, business model, financial forecasts, historical financial data, budgets or other business information, including Platform Documents.  Notwithstanding any failure to identify it, however, all of Synapse's systems and protocols relating to (i) user on-boarding and identity verification, (ii) compliance program, (iii) bank account verification, (iv) risk mitigation, (v) fraud prevention, and (vi) data security shall be Confidential Information of Synapse.

**9.1.1.** The following information will not be considered Confidential Information: (a) information that is in the public domain or that enters the public domain through no fault of the Receiving Party; (b) information independently developed by the Receiving Party, without any use of information disclosed by the other Party; (c) information rightfully disclosed to the Receiving Party by a third party without continuing restrictions on its use; and (d) information known to the Receiving Party prior to the Agreement Effective Date which was not obtained from the Disclosing Party to this Agreement.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**9.2.**   **Non-disclosure**.  Recipient shall not use any Confidential Information disclosed to it by Discloser for its own use or for any purpose other than to carry out the integration and this Agreement.  Recipient shall not disclose or permit disclosure of any Confidential Information of Discloser to third parties or to employees of Recipient, other than directors, officers, employees, consultants, or agents of Recipient who are required to have the information in order to carry out this Agreement. Recipient shall take reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Discloser in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information.  Such measures shall include the degree of care that Recipient utilizes to protect its own Confidential Information of a similar nature which shall no less be reasonable care.  Recipient shall notify Discloser of any misuse, misappropriation or unauthorized disclosure of Confidential Information of Discloser which may come to Recipient's attention.

    **9.2.1.**   Notwithstanding the above, Platform understands and agrees that Synapse may share Confidential Information with the financial institution.

**9.3.**   **Remedies**. Each party's obligations set forth in this Agreement are necessary and reasonable in order to protect Discloser and its business.  The Parties agree that monetary damages may be inadequate to compensate Discloser for any breach by Recipient of its covenants and agreements set forth in this Agreement.  Accordingly, the parties each agree and acknowledge that any such violation or threatened violation may cause irreparable injury to Discloser and, in addition to any other remedies that may be available, in law, in equity or otherwise, Discloser shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Recipient.

**10.** **REPRESENTATIONS AND WARRANTIES.**

**10.1.**   **Mutual Representations and Warranties**.  Each Party warranties and represents to the other that:

    **10.1.1.**   It has the authority to enter into this Agreement, and its agreement and ability to perform the obligations hereunder do not violate any agreement or obligation between such Party and any third-party.

    **10.1.2.**   It has obtained and is in compliance with all requirements and conditions of, all licenses, permits, memberships, consents and authorizations from all regulatory authorities, and additional agreements with third-parties, required to enter into this Agreement, provide the Services to the Other Party and to Users and perform its obligations under this Agreement, and engage in the advertising and sale of the goods or services offered for sale or use by that Party, throughout the Term of this Agreement.

    **10.1.3.**   When executed and delivered, this Agreement, its exhibits and addenda, will constitute the legal, valid, and binding obligation of each Party, enforceable in accordance with its terms.

    **10.1.4.**   No information or technology delivered to the other Party under this Agreement will infringe on any copyright, patent, trade secret or other proprietary right held by any third party.

    **10.1.5.**   It will disclose to the other Party any changes in representations and warranties made in no more than two (2) business days after such change came into such Party's knowledge.

**10.2.**   **Platform Representations and Warranties**.  Platform represents and warrants to Synapse that:

    **10.2.1.**   Platform shall use the Synapse APIs and Services in compliance with all laws, regulations, rules, orders of any governmental authority, Synapse's Integration Requirements, Marketing Guidelines, and proper User consent.

    **10.2.2.**   All other of Platform's information, communications, representations, warranties and Platform Documents provided to Synapse to create your Platform Account and pursuant to your Specification Sheet and this Agreement are materially true and accurate.

    **10.2.3.**   Except as otherwise disclosed in in writing by Platform to Synapse, neither Platform nor, to the knowledge of the Platform, any person directly or indirectly owning ten percent (10%) or more of the equity interests in Platform,

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

any officer or director of the Platform or any person actively participating, or having the right to participate, in the control of Platform's business ("Principal of Platform") is or has been subject to the following: (i) criminal conviction (except minor traffic offenses and other petty offenses); (ii) administrative or enforcement proceedings commenced by any state or federal Regulatory Authority (including, but not limited to, the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade Commission, federal or state financial institution or money transmitter regulator); and (iii) Restraining order, decree, injunction, or judgment in any proceeding or lawsuit, alleging fraud or unfair or deceptive practices on the part of Platform or any Principal thereof.

10.2.4.   Except as otherwise disclosed in in writing by Platform to Synapse, there are no pending or threatened against Platform, any litigation or legal proceeding of any kind, including without limitation, any judicial, tax, administrative or arbitration proceeding, which if adversely determined could reasonably be expected to materially and adversely affect Platform's business, continuing operation, or ability to perform its obligations under this Agreement.

**10.3.   Synapse Representations and Warranties**.  Synapse represents and warrants to Platform that:

10.3.1.   The Services shall conform in all materials respects with this Agreement, addenda, generally accepted industry standards and shall be performed in a good, workman-like and professional manner.

10.3.2.   The Services shall be performed in compliance with applicable laws and regulation.

10.3.3.   It has agreements in place with third-party service providers and financial institutions necessary to provide the Services to Platform and Users, including agency appointment for the purposes of contracting the financial services herein that will be delivered by such financial institutions.

**10.4.   Warranty.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NO OTHER REPRESENTATIONS AND WARRANTIES ARE GIVEN BY SYNAPSE OR PLATFORM AND THE SERVICES, APPLICATION AND OTHER SERVICES PROVIDED UNDER THIS AGREEMENT ARE PROVIDED "AS IS" AND "AS AVAILABLE," WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.  EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY THAT THE SERVICES WILL MEET YOUR REQUIREMENTS, BE CONTINUOUS, UNINTERRUPTED, OR ERROR-FREE.  THIS DISCLAIMER OF WARRANTY SECTION SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

**11.   TERM AND TERMINATION.**

**11.1.   Term**.  This Agreement will commence on the Effective Date and shall remain in effect until either Party terminates the Agreement as set forth herein.  Each Order Form shall specify its Initial Term, which shall be automatically renewed for the Renewal Term, without limitation, unless either Party notifies the other thirty (30) days before the end of the Term (Initial Term and Renewal Term collectively defined as "Term").

**11.2.   Termination.**  This Agreement may be terminated by either Party:

11.2.1.   In the event of material breach by the other Party and, to the extent that such breach can be cured, fails to cure such breach within thirty (30) days after receipt of notice by the other Party; or immediately in the case of a false or untrue representation or warranty; provided, however that in the event of Platform failure to pay the Fees in two months within the previous twelve months or fails to replenish the Reserve Account after a 5-days' notice, Synapse may terminate the agreement without previous notice.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

11.2.2.   In the event (i) the other Party becomes insolvent; (ii) an insolvency proceeding is begun against a Party and not dismissed or stayed within thirty (30) days; or (iii) any material portion of a Party's assets is attached, seized, levied on, or comes into possession of a trustee or receiver and the attachment, seizure or levy is not removed within ten (10) days.

11.2.3.   Upon direction from any Regulatory Authority to either Party to cease or materially limit the performance of the rights or obligations under this Agreement or the inability to obtain any required regulatory approvals.

11.2.4.   In the event of an adverse change in applicable law (or a new adverse interpretation or enforcement policy with respect to existing applicable law) or an adverse regulatory action (including conclusion of regulatory proceeding, investigation, or inquiry) regarding the application of any applicable laws that prohibits, materially impairs or renders commercially impracticable a Party's ability to perform its obligations as contemplated by this Agreement, or a Party has been advised by legal counsel that there is a material risk that its continued performance under this Agreement would violate applicable laws (collectively, "Adverse Change").

11.3.   **Platform's right to terminate due to unsatisfactory services**.  Notwithstanding anything to the contrary in the Agreement, the Parties agree that Platform may terminate the agreement if the Services are not provided by Synapse as reasonably expected by Platform.  If Platform reasonably understands that the Services are not satisfactory, Platform shall notify Synapse to correct or adjust the Services as detailed by Platform and Synapse shall have fifteen (15) business days to make the appropriate changes or to provide Platform with a plan of action.  If Synapse fails to appropriately respond to Platform's notice within this timeline, Platform may terminate the Agreement by providing 7-days prior notice without further financial obligation.

11.4.   **Platform's right to terminate for business closure or non-use of Services.** Provided that Platform gives Synapse fifteen (15) days written notice, Platform may terminate this Agreement for the following two reasons: (i) Platform anticipates that its business will close (cease to operate) or (ii) Platform decides not to offer to its Users the Services or any other similar services furnished by another service provider for at least one (1) year from the termination effective date of this Agreement. Such notice shall reference one of the aforementioned reasons for termination and include a representation and warranty that the provided reason is true and correct.

11.5.   **Synapse's right to terminate the contract**.  Synapse may terminate the agreement if, in its reasonable discretion, or a Regulatory Authority, determines Platform may be subject to undue risk of privacy or security breach, fraud, illegal activity or money laundering, or in the case Synapse would not be able to provide services to an ultimate beneficial owner of Platform ("Undue Burdens").  In such cases, Synapse may, with notice, suspend entirely or partially the Services provided to you until Synapse or the Regulatory Authority has had a reasonable opportunity to investigate or resolve such event or activity.  If Synapse, at its sole reasonable discretion, determines that Platform represents an Undue Burden, Synapse may terminate the agreement with a 15-days prior notice.

11.6.   **Effect of Termination.**  In case of the Termination of the Agreement, the Parties agree that:

11.6.1.   If this Agreement is terminated for any reason except non-payment of Fees, Synapse will provide commercially reasonable efforts to transition Platform and related User Data to a subsequent bank services provider. Additionally, Platform may have view only access of User Data through the Services for thirty (30) days after termination unless notified otherwise by Synapse.

11.6.2.   In the event Platform terminates this Agreement for a reason not set forth in this Section 11, prior to the end of the Initial Service Term or during any subsequent Renewal Term, Platform shall be obligated to immediately pay Synapse, as liquidated damages for lost profits and not as a penalty, an early termination fee equal to the amount of remaining Term Fees left on the then-current Term.  Such early termination fee shall be presumed to be the

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

amount of damages sustained by Synapse as a result of such early termination and Platform agrees that it is reasonable under the circumstances.

11.6.3.  In no event will either Party make any public statement or customer communication regarding the termination or wind-down of this Agreement without the express prior written approval of the other Party, which approval shall not be unreasonably withheld or delayed.   Notwithstanding the foregoing, the Parties agree that any communication to the public about termination of this Agreement must not contain any value judgement, and Platform agrees that Synapse may communicate the termination or expiration of this Agreement to the Users and any other party that Platform has contracted with to provide any marketing.

11.6.4.  In any case of termination, Platform understands that Synapse shall terminate all Users account and that Users shall receive notice of the closure of the accounts. In the case Platform is replacing to a new service provider or a partner financial institution, Platform shall not discriminate against Users that will be onboarded with the new service provider or partner bank. Platform shall provide all Users the opportunity to migrate or open a new account with the new service provider or partner financial institution.

## 12.  LIMITATION OF LIABILITY AND INDEMNIFICATION.

12.1.  **Limitation of Liability.** IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY, DAMAGES OR LOSSES, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES INCURRED IN CONNECTION WITH: (i) THIS AGREEMENT, (ii) A DEPOSIT AGREEMENT, (iii) THE TERMS OF SERVICE, OR (iv) YOUR USE OF, INABILITY TO USE, OR UNAVAILABILITY OF THE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT (INCLUDING NEGLIGENCE), CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER SYNAPSE OR PLATFORM HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.   IN NO EVENT WILL EITHER PARTY'S LIABILITY EXCEED THE FEES SYNAPSE HAS RECEIVED FROM PLATFORM DURING THE PRECEDING TWELVE (12) MONTHS.   THIS LIMITATION OF LIABILITY SECTION WILL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW.   THE PARTIES AGREE THAT THE LIMITATION OF LIABILITY PROVIDED HEREIN SHALL NOT APPLY TO DIRECT DAMAGES RELATED TO (i) ANY AMOUNTS OWED IN DUE FEES OR PROVIDED IN SECTION 7.1, (ii) ANY AMOUNTS OWED TO USERS AS PROVIDED IN SECTION 5.6, (iii) FRAUD OR INTENTIONAL MISCONDUCT OF A PARTY OR ITS EMPLOYEES, (iv) ANY AMOUNT DUE AS A RESULT OF SECTION 12.2.

12.2.  **Indemnification.**   Each Party agrees to defend, indemnify and hold harmless the other party or their affiliates, subsidiaries, officers, directors, agents, employees, and suppliers (collectively, the "Indemnitees") from any third party claims, actions, proceedings, and suits and related liabilities, damages, settlements, penalties, fines, costs, or expenses (including reasonable attorneys' fees and other litigation expenses) ("Claims") arising from such Party's: (a) violation of this Agreement, Terms of Service, API Documentation, or any other applicable terms or policies; (b) access or use of the Services; (c) negligence or misconduct; and/or (d) actual or alleged violation of any User's or other third party's intellectual property rights.   The obligations of the Indemnifying Party to defend, indemnify and hold the other Party harmless are conditioned upon the Indemnified Party promptly notifying the Indemnifying Party of the Claim and allowing the Indemnifying Party sole control of the defense of the Claim, related settlement negotiations and settlement of the Claim (for which consent is not required so long as (i) no financial or material burden is imposed on the Indemnified Party or (ii) no admission of guilt is required from the Indemnified Party). The Indemnified Party shall have the right to participate in the defense with its own counsel and at its own expenses. The obligation of either Party to

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

indemnify the other shall be reduced to the extent that any loss claimed by the Party seeking indemnification was caused by, or could have been prevented or reduced by, any act or omission of that Party.

**13. GENERAL TERMS.**

**13.1. Notice and Electronic Communication**.  To the fullest extent permitted by law and this Agreement, notices and other communications (collectively, "Communications") from one Party to the other regarding this Agreement may be provided electronically, and each Party consents and agrees to receive those Communications in an electronic form and is fully responsible to communicate any change in such party's email address. All Communications in electronic format will be considered to be "in writing," and to have been received no later than twenty-four (24) hours after posting or dissemination. A Party's consent to receive Communications electronically is valid until revoked upon proper notice.

**13.1.1.**  Notice to Platform.  Electronic Communications may be posted on the pages within the Synapse's website, the dashboard for your Platform Account provided and/or delivered by Synapse to the email address noted on your Order Form or associated with your Platform Account.

**13.1.2.**  Notice to Synapse.  Platform may give notice to Synapse by emailing Synapse at legal@synapsefi.com.

**13.2. Choice of Law**.  This Agreement shall be governed by and construed in accordance with the laws (excluding conflict of laws rules) of the State of California, and the obligations, rights and remedies of the Parties hereunder shall be determined in accordance with such laws.

**13.3. Arbitration**.  Any controversy or claim arising out of or relating to this Agreement, as well as any extension or modification thereof, shall be settled by arbitration administered by the American Arbitration Association (the "Association"), conducted on a confidential basis, under the then current Commercial Arbitration Rules including the Optional Rules for Emergency Measures of Protection, strictly in accordance with the terms of this Agreement and the substantive law of the State of California.  The arbitration shall be held at the regional office of the Association located in San Francisco, California and conducted by three arbitrators.  Unless otherwise agreed, the arbitration decision shall be issued within 30 days after the date of closing of the arbitration hearing.  The arbitrators may grant any remedy or relief that could otherwise be awarded under the law.  The award rendered by the arbitrators may be entered and enforced in any court of competent jurisdiction.  The parties will jointly pay arbitration costs pending a decision by the arbitrators. The losing party will pay the costs of the arbitration and the reasonable legal fees and expenses of the prevailing party, as determined by the arbitrators.

**13.4. Independent Contractors**. Platform and Synapse are independent contractors and shall have no power or authority to assume or create any obligation or responsibility on behalf of each other.  This Agreement shall not be construed to create or imply any partnership, agency or joint venture.

**13.5. Expenses; Taxes**.  Except as otherwise specified in this Agreement, each Party will bear its own costs of performance under this Agreement.  Each Party shall be liable for all taxes, duties, levies or tariffs or charges of any kind imposed by any federal, state or local governmental entity with respect to the net income recognized by such Party in connection with this Agreement and/or the sale of its products and services.

**13.6. Force Majeure**.  Neither Party hereto shall be responsible for any failure to perform its obligations under this Agreement if such failure is caused by acts of God, war, strikes, revolutions, lack or failure of transportation facilities, laws or governmental regulations or other causes that are beyond the reasonable control of such Party.  Obligations hereunder, however, shall in no event be excused but shall be suspended only until the cessation of any cause of such failure.

**13.7. Severability**.  If any provision of this Agreement is found illegal or unenforceable, it will be enforced to the maximum extent permissible, and the legality and enforceability of the other provisions of this Agreement will not be affected.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

13.8.  **Amendments in Writing**. This Agreement may only be modified, or any rights under it waived, by a written document executed by the Parties.

13.9.  **Successors and Assigns**.  This Agreement binds and is for the benefit of the successors and permitted assigns of each Party.  Platform shall not transfer, assign or delegate this Agreement or any rights under this Agreement, in whole or in part, by operation of law or otherwise, without Synapse's prior written consent, and any such transfer or assignment shall be voidable if not consented.

13.10. **Survival.**  Notwithstanding any other provision of this Agreement, the representations, warranties, covenants and indemnities of or by either Party contained herein or in any certificate, document or instrument delivered pursuant to the Integration Requirements, or this Agreement, including, but not limited to Sections 5, 6, 7, 8, 9, and 12 shall survive the termination of this Agreement.

13.11. **Miscellaneous**.  The Agreement, the Integration Requirements, and any applicable Synapse agreements that you have entered into, constitute the entire agreement between the Parties.  To the extent that the terms of the Agreement conflict with our Terms of Service or Privacy Policy, with respect to your use of the Services, the Agreement will control.  Any failure of Synapse to enforce any right or provision of the Agreement will not constitute a waiver of such right or provision.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**Compliance Services Addendum**

This Addendum governs your use of the Compliance Services, as defined below. Use of the Compliance Services is subject to all terms and conditions of this Compliance Services Addendum, the Agreement and your Order Form. Capitalized terms not otherwise defined herein have the meaning assigned to them under the Agreement.

1. **Compliance Services**. As specified in your Order Form, Synapse shall provide you with one or more of the following Compliance Services:

1.1. **Linking Users Bank Accounts**. Synapse shall provide Platform with account login services for third-party financial institutions, if available, and, if not available, micro deposit verification services for third-party financial institutions available for ACH related services (collectively, the "Account Authentication Services"). Such services shall only be used to authenticate a User's account at a financial institution. Synapse may also provide Platform with the ability to access and refresh the raw and analyzed transaction data, and other account data associated with the User account authenticated with account logins for certain financial institutions noted in the API Documentation (collectively, the "Account Aggregation Services"). Platform understands and acknowledges that such services do not guarantee that an account at a financial institution can be verified or that the data returned from such account will be accurate or complete, or such authentication will otherwise prevent User fraud. Platform understands that there will be additional disclosures that shall be provided to Users, as instructed by Synapse, and that in order to provide the Account Authentication or Aggregation Services to Users, User Consent of such disclosures is required.

1.2. **Know Your Client Data**. Synapse may provide Platform with the ability of accessing and refreshing (i) a User's complete identity and compliance file, including but not limited to, the Personal Information and government-issued identification numbers provided by the User; (ii) identity validation information generated by Synapse on the User from such identity and compliance file; and (iii) the results of the sanctions screening for the User.

2. **Compliance Checks**. Synapse shall provide Platform with Compliance Checks services in conformity with the Bank Secrecy Act ("BSA"), anti-money laundering ("AML") and anti-terrorist financing provisions, and the checks required by the Office of Foreign Assets Control ("OFAC"), to be used in connection with Platform's and its User's use of Bank services. The Compliance Checks do not guarantee Platform against User fraud. The Compliance Checks Services are intended to address certain BSA, AML and OFAC risks that may arise in connection with Platform's and Users' use of the Services, which shall assist Platform in verifying a User's identity, performing sanction screenings, and complying with applicable AML laws. Platform is liable for the users that Platform onboards with Synapse. Synapse shall provide Platform with compliance monitoring and risk mitigation tools, which may flag a User or a User's transaction requests for risk factors related to the Compliance Checks services, and Synapse and Platform shall monitor and conduct independent risk analysis in connection with the use of services and Platform's Users.

2.1. Platform understands and acknowledges that Synapse may refuse to provide Services to you or any of your Users or customers that have not been screened and authenticated using the Compliance Checks. Platform shall have in place compliance and risk monitoring policies to screen and monitor Users and Users' activities.

2.2. Platform understands and acknowledges that User transaction requests may be delayed for additional review and/or may be canceled by Synapse as a result of the Compliance Checks.

2.3. Platform also understands that Synapse may block or lock Users as a result of the Compliance Checks and other information that Synapse may obtain regarding those Users, including related to such Users use of other Services. Platform may also request Synapse to review Users to verify for potential risk or unusual activity.

3. **Fraud Mitigation**. In connection with certain Services, Synapse will provide Platform with guidelines intended to assist Platform with identifying and mitigating User fraud ("The Fraud and Mitigation Policy"). Platform shall at all times comply with the Fraud and Mitigation Policy, as updated from time to time.

3.1. Platform understands and acknowledges that The Fraud and Mitigation Policy does not guarantee against identifying, reducing or eliminating User fraud.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

3.2.  Platform understands and acknowledges that Synapse may refuse to provide or suspend certain Services to Platform or Users if Synapse determines in its sole discretion that Platform is not complying with the Fraud and Mitigation Policy.

4.  **Use of Compliance Services**.  Platform understands that the Compliance Services are not guaranteed to comply with all laws and regulations applicable to Platform Application and services that are not being provided by Synapse.

4.1.  Platform shall comply with all requirements of all applicable state and federal laws, rules, regulations, and orders or requests of any governmental authority, including, but not limited to, applicable state and/or federal registrations related to its services and Application, which shall require additional risk mitigation and compliance checks and reports to appropriate authorities other than the ones provided herein, which shall be provided exclusively by Platform.

4.2.  Platform is solely responsible for Platform's and Platform's Users compliance with all applicable laws and regulation relating to third-parties and transactions which do not originate from Platform's use of Synapse's Services and are not screened by Synapse's Compliance Services.

5.  **Relationship to Agreement**. All terms and conditions of the Agreement shall remain in full force and effect.  In the event of any conflict of this Addendum and the terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail as related to the subject matter hereunder.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

**Transaction Services Addendum**

This Addendum governs your use of the Transaction Services, as defined below. Use of the Transaction Services is subject to all terms and conditions of this Transaction Services Addendum and your Order Form. Capitalized terms not otherwise defined herein have the meaning assigned to them under the Agreement.

1. **Transaction Services**. If specified in your Order Form, Synapse shall provide you with one or more of the following Transaction Services:

1.1. **ACH**. Synapse shall provide you with Automated Clearing House ("ACH") services, which shall allow Platform or its Users to originate request to transmit debit and credit entries according to the NACHA Operating Rules and Guidelines ("NACHA Rules").

    1.1.1. All ACH Services shall be performed in compliance with the NACHA Rules.

    1.1.2. Platform acknowledges that it is subject to all obligations of an Originator or a Third-Party Sender under the NACHA Rules, including any indemnities, covenants, representations or warranties that are required to be made, given or performed by and comply with all the data retention necessary by an Originator or a Third-Party Senders under the NACHA Rules as provided in the Integration Requirements. If needed, you will cooperate with Synapse to complete any required registrations under the NACHA Rules. Without limiting the foregoing, you shall (a) identify the originator of each Transaction as directed by Synapse; (b) perform the requirements of an ODFI as defined under the NACHA Rules (to the extent you perform any obligations of an ODFI under the Rules); and (c) indemnify Synapse for any failure to perform such obligations in accordance with the guidelines Synapse may have provided you, subject to the terms and conditions applicable to indemnification under the Agreement.

    1.1.3. At your cost and expense, you will retain data on file adequate to permit remaking of ACH Entries for thirty (30) days following the date of their transmittal as provided herein and shall provide such data upon request.

    1.1.4. Platform understands that NACHA defines, from time to time, certain thresholds or levels for the Unauthorized Return Rate (returns on the basis that the transaction was unauthorized), the Administrative Return Rate (returns for administrative reasons) and the Overall Return Rate (all returns regardless of the cause). Platform shall not exceed ninety-five percent (95%) of such thresholds under any circumstances in any given sixty (60) days period.

    1.1.5. In the case that Platform reaches or exceeds ninety-five percent (95%) of any of NACHA's thresholds, as defined in the Section above, Platform shall provide Synapse with a written explanation of the reasons for such return rates and the plan of action to reduce the return rate levels. In addition, Synapse may take one or more of the following actions: (i) require that Platform's use of the ACH Services be subject to periodic ACH volume limitations; (ii) suspend Platform's use of all or a portion of the ACH Services until Platform has demonstrated that Platform has a reasonable plan for reducing the respective high return rate level; and/or (iii) adjust Platform's Initial Reserve Requirement.

    1.1.6. In case any of Platform's return rate reaches any of the thresholds defined by NACHA, Synapse may at any time in its sole discretion cease processing and reject Platform's entries. Platform agrees that neither Synapse shall have any liability to Platform or any other User arising from Synapse's decision at any time to cease or suspend processing of ACH entries.

1.2. **Wire Transfer**. Synapse shall provide services to cause wire transfers to be delivered or executed on behalf of Platform User's in accordance with Platform's instruction ("Wire Services"), according to the details of your Specification Sheet.

    1.2.1. Platform shall be responsible for ensuring all appropriate and necessary authorizations from Users for purposes of providing the Wire Services and for ensuring compliance with applicable law.

    1.2.2. Platform shall implement a dual-control or a Two-Factor Authentication ("2FA") for Users to create Wire Transfers, as a Security Procedure as defined below, in order to ensure proper authorization for the transaction.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

Platform understands that this authentication should be implemented in addition to any other Security Procedure used by Users to login into their account.

1.2.3.     Platform acknowledges that the Wire Services shall be governed by all applicable operating circulars of any Federal Reserve Bank which may handle any request for Wire Services. To the extent allowed by federal law, use of the Wire Services also shall be subject to the operating rules and other governing documents of the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") or any other funds transfer or advice service or facilitator, and by the laws of any foreign nation having jurisdiction over the Transaction (or any segment thereof, to the extent of that segment only). Platform understand and acknowledges that the SWIFT Wires may have restrictions and the list of countries to and from which Synapse may make these services available may vary over time, according to Synapse's own risk assessment and discretion, and the list of countries to or from which this service is available in any given moment should be updated in the Platform's Specification Sheet.

1.2.4.     Synapse will not be liable for any loss arising directly or indirectly from its failure to provide Wire Services if a Transaction request would result in violation of any present or future risk control program of the Federal Reserve.

1.3.     **Check**.  Synapse shall provide services to allow for your submission of requests to print, insert and mail checks drawn on funds deposited by your Platform or your Users ("Check Services").

1.3.1.     Platform shall be responsible for ensuring all appropriate and necessary authorizations from Users for purposes of providing the Check Services and for ensuring compliance with all applicable law.

1.3.2.     Platform and/or Users will not be permitted to issue checks unless it has sufficient available funds. In the event a check is returned for insufficient funds, Platform shall be liable for all fees charged therefore. In the event a check is lost or returned as undeliverable for any reason, Platform shall be required to issue a new check and shall be responsible for all fees applicable to such reissuance.

1.3.3.     Platform shall be responsible for canceling a check payment within two (2) business day from the date that User requested such cancelation to Platform. Platform shall be liable for User losses due to the check not canceled on time and Synapse may debit such amount from Platform's Reserve Account.

1.4.     **Card Processing**.  Synapse may provide Platform and Platform Users with the ability of processing payments with external credit and debit cards ("Card Processing"), including to fund Users Deposit Accounts in case we are providing you and your Users with Deposit Account Services.  Platform shall ensure that it has all the appropriate and necessary authorizations from Users to use Card Processing Services, and Platform shall keep in a record of such authorization.

1.4.1.     Synapse shall comply with the applicable Payment Card Industry Data Security Standards ("PCI DSS") at all times.

1.4.2.     Platform shall at all times comply with applicable data privacy and security requirements under the PCI DSS, as they may be amended from time to time, in the case that Platform collects, uses, accesses, storages, or routes through its servers, certain credit or debit card non-public personal information.  If required, Platform shall also register with the appropriate card association. Synapse may provide Platform with additional requirements related to Platform's collection, usage, storage or routing of the User Data, as may be defined in your Specification Sheet or further notices, if an update is needed.  Platform must provide Synapse with documentation demonstrating Platform's PCI compliance upon request.  If Synapse is unable to validate Platform's PCI compliance, Synapse may suspend the Card Processing Services provided herein. The Parties also agree that Platform may not need to comply with PCI DSS if Platform does not have access to credit or debit card non-public personal information and routes it from Synapses APIs directly to the User's device.

1.4.3.     The Parties agree that the card networks supported by this service shall be defined in the Specification Sheet and may be updated from time to time to include additional networks.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

1.5.    **Remote Deposit Capture**.  If elected in your Order Form, Synapse shall provide you with the Remote Deposit Capture ("RDC") Service, through which your Users may transmit check images for deposit into their DDA or Savings Accounts.

1.5.1.    The Parties agree that RDC transactions shall be settled in one business day as a provisional credit and that Platform shall be liable for any loss as a consequence of a return of a remotely deposited check that was not endorsed properly for remote deposit only, as provided in the API Documentation.

2.    **Clearing Account**.  The Transaction Services provided herein may be facilitated via a pooled deposit account, which is owned and controlled by the Bank (the "Clearing Account") as specified in your Order Form and detailed in your Specification Sheet.  Such account is not eligible for pass-through FIDC deposit insurance.

2.1.    **Subnet Services**.  If elected in your Order Form, Synapse may provide Platform and its Users with virtual account and routing numbers to enable Wire and ACH Services in such Clearing Account.

3.    **Reliance on Instructions.**  Platform understands and acknowledges that the Transactions Services rely on the data that Platform provides to Synapse and represents that all the data provided to Synapse will be accurate as provided by Users. Platform understands and acknowledges that Synapse shall rely solely on the numbers contained in a request for Wire, Check, ACH or Card Processing Services in the event of any inconsistency between the numbers and the words contained in such request.

4.    **Return. Fees.**  You acknowledge that you will be liable for any of the following losses resulting from your use of any of the Transaction Services: transaction returns and reversals from chargebacks (collectively "Returns"), error resolution costs, provisional settlement costs, and negative account balances.  Synapse may, in our discretion, charge you a fee per Return of Platform's Transactions, as set forth in your Order Forms.

4.1.    Platform acknowledges that any Transaction request may be returned by the receiving institution for insufficient funds or other reasons.  In the event a Transaction is returned or charged back due to lack of authorization, any attempt by Platform to resubmit such request may be denied or conditioned upon submission of proof of authorization prior to attempting to reprocess such Transaction.  All Returns to Platform or Users of a disputed Transaction will remain final unless the receiving institution otherwise accepts proof of authorization and disputed Transaction.

4.2.    Platform understands and acknowledges that the Returns may take longer depending on the Users.

5.    **No Stop Payment.** All Transaction requests originated under this Addendum shall be final and shall not be subject to stop payment or recall orders.  Synapse shall not be liable to Platform or any User for any failure or inability to stop a payment.

6.    **Security Procedures**.  Synapse may define certain Security Procedures in Platform's Specification Sheet and in API Documentation, both of which may be updated from time to time and shall be followed by Platform at all times.  The security procedures are intended to verify authenticity of an order and not to detect any errors in Transactions orders, and may include using any code, password, personal identification number, user identification technology, token, certificate, or other element, means, or method of authentication or identification (collectively, "Access Devices"), constitute commercially reasonable security procedures under applicable law for the initiation of any electronic funds transfer.  The Platform and Users shall expressly agree that authenticity of the payment and transfers orders issued to Synapse shall be verified by the Security Procedures, that such Security Procedures are commercially reasonable methods of providing security against unauthorized payment orders, and that User shall be bound by any payment order, whether or not authorized, issued in its name and accepted by Synapse in compliance with the Security Procedures.

7.    **Liability for Unauthorized Transactions**.  Synapse, Platform and Users shall be liable for any unauthorized transaction as defined in the Applicable Law, including, but not limited to, Regulation E (12 C.F.R. §1005) and U.C.C. §4A.  Platform agrees to offer the proper disclosures about unauthorized transactions as instructed by Synapse.

8.    **Limitation of Liability for Transactions**.  The following limitation of liability shall apply exclusively for Transactions provided in this Addendum:

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

8.1.  **U.C.C. §4A.**  For Transactions subject to U.C.C. §4A, Synapse shall only be liable for damages provided in therein.

8.2.  **Other Transactions**.  For all other Transactions, except if otherwise provided in this Agreement, Synapse liability shall be limited to direct damages resulting directly from Synapse's willful misconduct or failure to exercise reasonable care, and, in any case, shall not exceed: (i) in case of an excessive debit to an account, the amount of the excess plus compensation equivalent to interest; (ii) in case of payment to an account not specified by Platform, the amount of the payment plus compensation equivalent to interest; (iii) in case of any delay in crediting a debit entry to Platform's Account, the amount of compensation equivalent to interest for the period of delay.  In any case of compensation payment, such interests shall correspond to the average federal funds rate at the Federal Reserve Bank of New York for the period involved.

8.3.  **Exclusion of liability**.  Synapse shall not be liable, directly or indirectly, in whole or in part, from any (i) inaccuracy, act or failure to act on the part of any person other than Synapse, (b) ambiguity in the instructions and Transaction requests transmitted to Synapse, or (c) Synapse's reliance on instructions or Transaction requests from persons purporting to be Platform, Users, authorized representatives or agents who initiate Transaction requests in compliance with the Security Procedures.

9.  **Records**.  Platform shall retain data on file adequate to remake and retrace all Transactions performed under this Addendum for the period required by applicable law, for no less than two (2) years from the Transaction. Such data includes, but is not limited to, User consent and authorization and proper Transaction request.  Synapse shall be responsible for the retention of all transaction data as required by applicable law.

10.  **Use of services**.  Platform understands that the Transaction Services are not guaranteed against reversals.  Platform is solely responsible for maintaining compliance with applicable law related to Platform's services and applications.

10.1.  Platform represents that it shall not use, or allow its Users to use, the Transaction Services in a way that may violate the applicable law, or for any illegal purposes. Platform understands that Synapse may block or lock a User if there is suspicion of illegal or fraudulent activity by such User.

10.2.  Platform shall provide to Users all the disclosures and information detailed in the Integration Requirements, as well as the disclosures prescribed by applicable law, including, but not limited to, the Unlawful Internet Gambling Enforcement Act of 2006 (Regulation GG), Regulation E (12 C.F.R. §1005) and U.C.C. §4A.

10.3.  The use of the Transaction Services may be limited by either volume of Transactions or dollar volume, based on risk-based parameters established in your Specification Sheet or otherwise by Synapse from time to time.

10.4.  Platform shall comply with all requirements of all applicable state and federal laws, rules, regulations, and orders of any governmental authority, other than laws, rules, regulations, including, but not limited to, applicable state and/or federal registrations related to its services and Application.  If Platform is required to obtain any specific license or registration, Platform shall provide Synapse with a true copy of such license or registration at Synapse's request.  In such cases, Platform may also have to complete an additional due diligence informational form.

10.5.  Platform shall also provide commercially reasonable assistance to Synapse in recovering an amount of any overpayment for which Synapse may be liable hereunder.

10.6.  If Platform is a Money Service Business ("MSB"), Platform shall conduct, no less than once every year, at Platform's own expense, an independent review and assessment of the anti-money laundering policies, procedures and monitoring systems of Platform with respect to its operations and activities that deem it an MSB. Platform will provide Synapse a summary of the review upon request.

11.  **Relationship to Agreement**. All terms and conditions of the Agreement shall remain in full force and effect.  In the event of any conflict of this Addendum and the terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail as related to the subject matter hereunder.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

## FBO Account Services Addendum

This Addendum governs your use of the FBO Account Services, as defined below. Use of the FBO Account Services is subject to all terms and conditions of this FBO Account Services Addendum, the Agreement your Order Form. Capitalized terms not otherwise defined herein have the meaning assigned to them under the Agreement.

1. **FBO Account Services**. As specified in your Order Form, Synapse shall provide you with a custodial pooled deposit account ("FBO Account"), owned and controlled by Platform on behalf of its Users, and in which you may enable your Users to establish sub-accounts ("Sub-Account"). Platform agrees with the Bank's Deposit Agreement for Custodial Accounts available at https://synapsefi.com/legal.

1.1. **Ledger**. Synapse shall provide ledger services to track Users' balances in each User's Sub-Account.

1.2. **FDIC Insurance**. FBO Accounts qualify for FDIC deposit insurance ("FDIC Insurance") as permitted by applicable law.

1.3. **Interest Bearing FBO Account**. If elected in your Order Form, the FBO Account shall earn periodic interest, which may be subject to review and recalculation from time to time. Such interests shall be compounded daily based on the actual number of days in any given year, which shall be credited to the respective FBO Account on a daily basis.

1.3.1. **Interest and Rebate**. The Parties may decide that the interests paid to the FBO may be paid as a rebate in the User's Sub-Accounts or paid as interests to Platform, as defined in your Specification Sheet.

1.3.2. **Rate**. The annual percentage yield ("APY") applied to your Interest Bearing FBO Account shall be defined in your Order Form. The Parties agree that, if the Federal Reserve Funds Rate varies at least ten basis point, (i) Platform may notify Synapse to increase the APY rate in the same increased proportion, or (ii) Synapse may notify Platform that it will decrease the APY rate in the same reduced proportion.

1.4. **Transactions Services**. Synapse may provide to Platform and its Users, in connection to the FBO Account Services, one or more of the Transaction Services as defined in the Transaction Services Addendum and elected in Platform's Order Form.

1.4.1. **Overdraft**. Synapse may refuse to process any Transaction request if the related Sub-Account Account does not have sufficient balance to cover such request. In case any Sub-Account has a negative balance for more than ninety (90) calendar days, Synapse shall collect such amount from Platform's Deposit Account.

1.5. **Subnet Services**. If elected in your Order Form, Synapse may provide Platform and its Users Sub-Accounts with virtual account and routing numbers to enable Wire and ACH Services in such Sub-Accounts ("Subnet Services"). Platform shall inform Users that funds credited to a Sub-Account via the Subnet Services may not be immediately available for use.

1.6. **Transactions between Sub-Accounts Services**. Synapse may provide Platform and its Users with services to allow for transfers between your Platform and/or Users Sub-Accounts, as defined and detailed in your Specification Sheet.

1.7. **Informational Tax Reporting**. Synapse shall provide Users with the state and federal income tax information reporting applicable to the User's Sub-Account.

2. **Account Disclosures, Statements, and E-SIGN**. As required by applicable law, the Parties agree with the following:

2.1. **Account Disclosures**. Platform shall provide to Users all the disclosures and information prescribed by all the applicable law and the Integration Requirements and in Synapse's Marketing and Disclosures Guidelines, including, but not limited, to Regulation E (12 C.F.R. §1005). Platform shall ensure that (i) each User agrees and accepts Platform's User Agreements including such language by "checking the box;" and that (ii) Platform maintain records of such acceptance for at least two (2) years after the User's Sub-Account is closed.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

2.2.    **Account Statements**.  The Parties shall elect in the Order Form which Party is responsible for delivering the appropriate Account Statements to Users.

2.3.    **E-SIGN Compliance**.  Platform shall ensure its Users qualify for receipt of electronically delivered User Agreements with appropriate disclosure language and Account Statements in accordance with the Electronic Signature Electronic Signatures in Global and National Commerce Act ("E-Sign Act") and other Applicable Law, and obtain Users consent to receive such User Agreements, Account Disclosures, and Account Statements electronically.  Platform shall also maintain records of such consents accurately and that such records are accessible to Users for the period required by Applicable Law.

2.4.    **Updates**.  Synapse may provide Platform with updates or additional provisions ("Updates") to User Agreements, Account Statements or Account Disclosures from time to time.  Platform shall ensure such Updates are delivered to Users within the timeframe defined by Synapse.

3.    **Use of services**.

3.1.    Platform represents that it shall not use, or allow its Users to use, the FBO Account Services in a way that may violate the applicable law, or for any illegal purposes.

3.2.    Platform shall adopt commercially reasonable processes and procedures to resolve errors and to assist Users in resolving errors in connection with the FBO Account Services as required by Applicable Law, including, but not limited, to the Integration Requirements.

3.3.    Platform shall provide commercially reasonable assistance to SynapseFI in recovering any amount from Users that are due to Synapse, including, but not limited, the collection of a negative balance in User accounts.  Platform acknowledges that it is liable for any negative balance in its Users' accounts and that Synapse may collect such amount from Platform's Deposit Account or Reserve Account.

3.4.    Platform shall hold Synapse harmless from and against all liability, Losses, or third-party claims arising from incorrect, illegal or improper record of information, data, or other documentation submitted by Platform or on behalf of a User in connection with the FBO Account Services, including, but not limited, to Card Processing and Subnet Services.

4.    **Relationship to Agreement**. All terms and conditions of the Agreement shall remain in full force and effect.  In the event of any conflict of this Addendum and the terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail as related to the subject matter hereunder.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

## Service Level Addendum

This Service Level Addendum shall be used to (1) govern Platform's use of the Services provided by Synapse, and (2) describe Platform's responsibilities with respect to complaints. This Service Level Addendum is incorporated into and is subject to all terms and conditions of the Agreement. Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Agreement.

1. **Services Level Agreement**. Notwithstanding anything in the contrary in this Agreement, the Parties agree to the following Service Levels for Services and products in production environment:

1.1. **Support**. Synapse shall provide support to Platform as follows:

   1.1.1. Synapse shall respond to a ticket for critical support within three (3) hours of its submission by Platform.

   1.1.2. Synapse shall respond to a ticket for high severity support (i) within twelve (12) hours of its submission by Platform if during the business week, from Monday to Friday, or (ii) within 2 hours of the first business day following its submission by Platform if between Friday 6:00 PM PST and Monday 8:00 AM PST; and

   1.1.3. Synapse shall respond to any other ticket within two (2) business days of its submission.

   1.1.4. The Parties agree that (i) "critical support" applies to the complete unavailability of any critical post and patch calls for a product; and (ii) "high severity support" shall be applicable to issues affecting at least five percent (5%) of Platform's Users within any given twenty-four (24) hour period, or a regulatory concern.

   1.1.5. On each ticket that Platform submits, Platform shall specify the initial level of support, Synapse may downgrade the ticket if it determines in its sole discretion that the initial level of support does not correspond to the support levels set forth above.

   1.1.6. If Synapse fails to respond to a support ticket as stated herein, Platform will be eligible for a credit of $80.00 per failure in each quarter. The Parties agree that all of Synapse's responses to tickets should provide with Platform reasonable information about the issues and the steps to solve them.

1.2. **Compliance Reviews**. Synapse shall review all flagged Users, queued transactions or other compliance issues ("Compliance Review") within two (2) business days from the time Synapse first became aware of the compliance issue.

   1.2.1. If Synapse fails to perform a Compliance Review as stated herein, Platform will be credited with $80.00 per failure in each calendar quarter.

1.3. **Uptime Level**. Synapse Services shall be available no less than 99.99% of the total number of minutes in any given quarter ("Uptime Level").

   1.3.1. If Synapse fails to provide such Services availability in any given calendar quarter, Platform will be credited with $80.00 per hour (prorated to the nearest minute) of unavailability of Services below the Uptime Level.

   1.3.2. Platform shall subscribe to timely updates of the status of APIs uptime on Synapse's Status Page at status.synapsefi.com.

1.4. **API Calls Error Rate**. Synapse API calls shall not return with an error or failure at least 99.99% ("API Calls Error Rate") for any non-beta products in any given calendar quarter.

   1.4.1. If Synapse fails to provide Platform with such API Call Error Rate in any given calendar quarter, Platform will be credited with $80.00 per API Call Error below the Uptime Level.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

1.5.   **Webhooks Generation**. Synapse shall generate 99.99% of the webhooks subscribed by Platform ("Webhooks Generation Rate") in any given calendar quarter.

    1.5.1.   If Synapse fails to provide Platform with such Webhook Generation Rate in any given calendar quarter, Platform will be credited with $80.00 per Webhook not generated.

    1.5.2.   Platform understands and acknowledges (i) that Platform must subscribe to receive a Webhook per scope as provided in the API Documentation and (ii) that if a webhooks delivery fails for reasons related to Platform, Synapse will continue trying to send the request every hour until Synapse is successful in delivering the webhook, up to twenty-four (24) hours.

2.   **Exclusions**.  The Service Levels provided herein shall not apply under the following cases:

    2.1.   During a scheduled maintenance as previously informed by Synapse. Synapse agrees notify Platform at least seven (7) days before the scheduled maintenance;

    2.2.   Events or issues that occur due to a failure or omission of the Platform or a Platform's third-party service provider, including, but not limited, to Platform own equipment, software or other technology and/or Platform's third-party equipment, software or other technology;

    2.3.   Services are suspended by Synapse as provided in the Agreement;

    2.4.   Services relating to Testing Environment, Account Authentication, Account Aggregation Services and other beta-products or beta-services; and

    2.5.   Any event of Force Majeure as defined in the Agreement.

3.   **Credit Procedure**.

    3.1.   In order to be eligible for the abovementioned credits, Platform must submit a written credit request within thirty (30) days of any incident in which Synapse did not comply with the Service Levels provided in this Service Level Addendum. The credit request must include: (i) the words "SLA Credit Request" in the subject line; (ii) the dates and times of each incident that Platform claims occurred; and (iii) the dollar amount Platform claims it should receive for each incident and the total incidents.

    3.2.   On a quarterly basis, Synapse shall review Platform's credit requests. If the Service Levels incidents are confirmed by Synapse and are less than the Service Levels provided in this Addendum, Synapse shall calculate the total credit to which Platform has a right in such quarter and such credit will be applied to Platform's next monthly fee. For avoidance of doubt, the Parties agree that the quarters shall follow the calendar year quarters (Q1: January, February and March; Q2: April, May and June; Q3: July, August and September; and Q4: October, November and December) and that the credits shall be applied on the second moth of the following quarter. As an example, the credits for Q1 shall be applied to the monthly fee related to the month of May.

    3.3.   The Parties agree that the credits accrued in any given calendar quarter shall be limited to twenty percent (20%) of Platform's monthly subscription fee.

4.   **Platform Complaints.**

    4.1.   Platform shall use best efforts to avoid receiving any complaints or having any complaints lodged with regulatory authorities that are associated with Synapse's Services and Platform's Application, products, or services. Without limiting the foregoing, such complaints, include but are not limited to, complaints related to Platform's responses or lack of responses to User or regulatory inquires, Platform's customer service in general, Users' access to funds, or required notices or lack of such notices to Users.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

4.2.  In the event Synapse (or its financial institution(s)) receives a regulatory complaint about Platform that are associated with Synapse's Services, Synapse shall review the complaint and determine in its sole discretion whether the complaint was the result of or connected to Platform's actions or inactions. Synapse may reach out to Platform for additional information regarding the complaint, in which case Platform shall respond to any requests for additional information within twenty-four (24) hours.

4.3.  Platform understands that if Synapse determines the complaint was a result of or connected to Platform's actions or inactions, Synapse reserves the right to charge Platform $1,000 (one thousand dollars) for each and every such complaint.

4.4.  On a calendar quarterly basis, Synapse shall calculate based on the number of complaints it has received and assessed the total amount of complaint fees platform is obligated to pay Synapse. Any complaint fees will be added to Platform's following monthly subscription fee.

5.  **Relationship to Agreement**. All terms and conditions of the Agreement shall remain in full force and effect.  In the event of any conflict of this Addendum and the terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail as related to the subject matter hereunder.

Doc ID: 27962ff704a828166c043327aa76bbc1410acba3

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | MSA: Synapse Benjamin |
| **FILE NAME** | Benjamin - MSA - 02.13.2020.pdf |
| **DOCUMENT ID** | 27962ff704a828166c043327aa76bbc1410acba3 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SENT | **02 / 13 / 2020**<br>18:41:53 UTC | Sent for signature to Adam Moelis (adam@withbenjamin.com) and Sankaet Pathak (s@synapsefi.com) from sabrina@synapsefi.com<br>IP: 38.88.175.154 |
| VIEWED | **02 / 13 / 2020**<br>19:19:38 UTC | Viewed by Adam Moelis (adam@withbenjamin.com)<br>IP: 24.193.226.30 |
| VIEWED | **02 / 13 / 2020**<br>21:43:50 UTC | Viewed by Sankaet Pathak (s@synapsefi.com)<br>IP: 38.88.175.154 |
| SIGNED | **02 / 13 / 2020**<br>19:21:53 UTC | Signed by Adam Moelis (adam@withbenjamin.com)<br>IP: 24.193.226.30 |
| SIGNED | **02 / 13 / 2020**<br>21:43:56 UTC | Signed by Sankaet Pathak (s@synapsefi.com)<br>IP: 38.88.175.154 |
| COMPLETED | **02 / 13 / 2020**<br>21:43:56 UTC | The document has been completed. |

## THIRTEENTH AMENDED AND RESTATED
## SOFTWARE-AS-A-SERVICE ORDER FORM

| | |
|---|---|
| **Platform Legal Name:** Yotta Technologies Inc. | **Contact:** Adam Moelis |
| **Email:** adam@withyotta.com | **Phone:** (310) 924-0005 |
| **Master Services Agreement Effective Date:** 2/13/2020 | **Previous Software-As-A-Service Order Form Effective Date:** 12/28/2022 |
| **Website ("Application"):** www.withyotta.com | **Physical Address:** 45 East 22nd St. #33B New York, NY 10010 |

**SERVICES:**
Your subscription shall include the Services selected below and is subject to the terms and conditions included in the Agreement (as defined below).

**Transactions & Payments:**
- ✔ ACH
- ✔ Pull from Cards
- ✔ Push to Cards
- ✔ RPPS
- ✔ RTP
- ✔ Domestic Wires
- ❑ Cross-border Wires
- ✔ Check Issuance
- ✔ Remote Deposit Capture
- ✔ Account and Routing Issuance

**Native Card Issuance:**
- ✔ Debit Cards (linked to deposit account)
- ✔ Credit Cards (linked to open loans)

**Data Services:**
- ❑ Account Aggregation
- ❑ KYC and Sanctions Data
- ❑ Data Enrichment
- ❑ Transaction Decisioning and Instant Auth
- ❑ Credit Checks (coming soon)

**Digital Currency Services:**
- ✔ Digital Wallet
- ✔ Conversion Services

**User Types:**
- ✔ Consumer
- ❑ Business

**User Base:**
- ✔ Domestic
- ❑ International

**Accounts & Add-Ons:**
- ✔ Deposit Accounts for Platform
- ✔ Interest Checking Account
- ❑ Savings Account
- ✔ FBO with Sub Accounts
- ❑ Custodial Accounts
- ❑ Clearing Account
- ✔ One-Time Loans
- ❑ Revolving Loans
- ✔ Open Loans

**Cash Advance:**
- ❑ Cash Advance Accounts

**User Support:**
- ✔ Manual Inquiries

**SERVICE FEES:** Subject to the terms of the Agreement, the following Fees correspond to the Services selected above.

| Transactions | ACH | $0.03/trx | |
|---|---|---|---|
| | Same Day ACH | $0.08/trx | |
| | ACH Microdeposits | $0.05/each of the two microdeposits | |
| | ACH RDFI paid (outgoing transaction) or deposited (incoming transaction) | $0.10/trx | |
| | Wires | **Domestic**<br>Incoming<br>Outgoing | **Fee**<br>$1.50/trx<br>$5.00/trx |
| | | **International**<br>Incoming | **Fee**<br>$30.00/trx |
| | Card Processing | Link a Card | $0.08/card linked |
| | | Pull from Cards | Network Fee + $0.35/trx*<br><br>*Additional 1% per transaction for non-US cards. |
| | | Push to Cards | Network Fee + $0.29/trx*<br><br>*Additional 1% per transaction for non-US cards. |
| | Check Issuance | $1.00/trx | |
| | RPPS | $0.15 + Network Fee/trx | |
| | RTP | Set Up Fee | **Fee**<br>$2,500.00/set up |
| | | Trx Fee | **Fee**<br>$0.25/trx**<br><br>** monthly minimum of 6,000 transactions ($1,500) required |
| | Remote Deposit Capture (RDC) | $0.20/trx | |
| | Transaction Monitoring | $0.05/trx (for all payment transactions) | |
| **Data Services** | Domestic Address Verification | $0.00 per verification attempt | |
| | Foreign Document Verification | $1.80 per verification attempt | |
| **Accounts + Add On(s)** | **Supported Types of Accounts:**<br>- Interest Checking Accounts<br>- FBO with Sub Accounts | **Monthly Base Fee: $17,000/month** | |
| | | **Nr. of Consumer Users (per month)**<br>0-1,000<br>1,001+ | **Fee**<br>$0/User<br>$0.30/User |
| **Loans** | **Supported Types of Loans**<br>- Open Loans<br>- One-Time Loans | **Nr. of Consumer Users (per month)**<br>0-1,000<br>1,001-100,000<br>100,001+ | **Fee**<br>$0/User<br>$1.99/User<br>$1.79/User |
| **Digital Wallets** | **Supported Types of Accounts:**<br>- Digital Wallets | **Nr. of Consumer Users (per month)**<br>0-1,000<br>1,001+ | **Fee**<br>$0/User<br>$0.20/User |

| **Native Card Issuance** | **Supported Types of Cards:**<br>- Debit Cards<br>- Credit Cards | **Nr. of Consumer Users (per month)**<br>0-1,000<br>1,001+ | **Fee**<br>$0/User<br>$0.36/User |
|---|---|---|---|
| | **Physical Cards** | **Sub-BIN (setup or change)** | $2,000.00/Sub-BIN |
| | | **Card Printing: Demand Cards** | *$6.00\**<br>*Card Pricing is an estimate. Subject to change upon final submission of art.* |
| | | **Card Printing: Inventory Cards** | *TBD\**<br>*Card Pricing is an estimate. Subject to change upon final submission of art.* |
| **Digital Currency** | **Digital Currency Conversion** | **Conversion Fee:**<br>0.10% | |
| **Notifications** | **Notification Method**<br>Text<br>Email<br>Push | **Fee\*\***<br>$0.010/text attempt<br>$0.015/email attempt<br>$0.010/push attempt<br><br>\*\*Pricing applies to US notifications only. Non-US notifications will have custom pricing per country) | |

| **Support:** Subject to the terms of the Agreement, the following support fees correspond to the Services selected above. | | | |
|---|---|---|---|
| **User Support** | **Manual Support** | **Manual Support Inquiries** | $30.00/inquiry |
| | **Automated Support** | **Automated Support Inquires**<br>Card UI<br>EDD UI<br>Link Account UI<br>Other Inquires | **Fee**<br>$0.01/inquiry<br>$0.01/inquiry<br>$0.01/inquiry<br>$1.00/inquiry |
| **Platform Support** | **Default Support** | **(fee waived)** | |

| **Revenue Share:** Subject to the terms of the Agreement, the following correspond to the Services selected above. | | |
|---|---|---|
| **Deposit Revenue** | **Supported Account Types:**<br>- Interest Checking Accounts<br>- IB FBO with Sub Accounts | **Available APY**<br>Fed Funds Target Rate minus 0.25% or APY percentage passed through from Synapse's partner bank, whichever is higher. |
| **Digital Wallet Revenue** | Applies to Sub-Savings Digital Wallets | **Interest Percentage:** 100% |
| **Interchange Revenue** | Applies to Native Issued Cards | **Interchange Split\***<br>90%<br><br>\*Net of reversals, network fees, push to card fees and bank split |

| **Penalties & Disincentives:** Subject to the terms of the Agreement, the following correspond to the Services selected above. | | |
|---|---|---|
| **Account** | Account closure | $5.00 per account closed |

| | | | |
|---|---|---|---|
| **Closure** | | | |
| **ACH** | Unauthorized Returns | **Nr. of Successful Transactions**<br>1-250,000<br>250,001-1,000,000<br>1,000,001+ | **Fee**<br>$10.00/return<br>$8.00/return<br>$6.00/return |
| | Other ACH returns & Notice of Change (Administrative, NSF, etc.): | **Nr. of Successful Transactions**<br>1-250,000<br>250,001-1,000,000<br>1,000,001+ | **Fee**<br>$0.06/return or notice<br>$0.05/return or notice<br>$0.04/return or notice |
| | Proof of Authorization Request (from RDFI or to ODFI): | $10.00 per request | |
| | Reclamations | $15.00 per reclamation | |
| **Account/ Routing Issuance** | Domestic – LOI (for receiving & honoring) | $50.00 per LOI | |
| | International – Wire Recall | $50.00 per recall | |
| **Wires** | Return | $50.00 per return | |
| | International MT103 Request | $3.00 per request | |
| | Proof of Authorization Request (from RDFI or to ODFI): | $10.00 per request | |
| **Card Processing** | Card Failures (push/pull) | **Nr. of Successful Transactions**<br>1-50,000,000<br>50,000,001-100,000,000<br>100,000,001+ | **Fee**<br>$0.11/failure<br>$0.10/failure<br>$0.09/failure |
| | Deletes | $0.30/delete | |
| | Chargebacks | $25.00/chargeback | |
| **RDC** | Unauthorized Returns | $4.00 per return | |
| | Administrative Returns | $0.06 per return | |
| **Checks** | Returns | $10.00 per return | |
| **RPPS** | Prenotes, Core Returns, Noc's | $0.30/each | |
| | Reversals | $3.00/reversal | |
| | Research Fee | $50.00/research request | |
| **Enhanced Due Diligence** | Enhanced Due Diligence (EDD) Reviews | **User Type**<br>Consumer<br>Business | **Fee**<br>$2.00/review<br>$4.00/review |
| **Native Card Issuance** | Disputes | $30.00 per dispute | |
| **Network & Pass-Through Fees** | Pass Through | | |
| **Regulatory Complaint** | $10,000 per Regulatory Complaint (as defined in the Service Level Addendum (the "**SLA**"))<br>$2,500 for each day that a complete response is not provided to Synapse past the due date by Platform regarding a Regulatory Complaint, as determined by Synapse in its reasonable discretion | | |
| **Support Requests** | $30.00 per Support Request (as defined in the SLA) | | |
| **Order Form Terms** | | | |

**Service Term:** Amendment Effective Date – June 30, 2024

**Renewal Term(s):** 1 year (rolling, unless either Party provides a notice of non-renewal at least 30 calendar days before the end of the then-current Term)

**Evolve Transition**: In the event Synapse needs to transition Platform from Evolve Bank & Trust to another partner bank, Platform may terminate the Agreement with at least sixty (60) days prior notice, subject to Section 11 of the MSA.

**Joint and Minor Account**: In the event Synapse is not able to offer joint and/or minor accounts, Platform may terminate the Agreement with at least sixty (60) days prior notice.

**Credit Card Program**: In the event Synapse is not able to relaunch a credit card program, Platform may terminate the Agreement with at least sixty (60) days prior notice.

**Term Base Fees:**

- <u>Monthly Base Fee</u>: $17,000 per month

**Reserve Amount**: The Initial Reserve Amount, to be funded by Platform prior to Implementation, shall be $20,000.00. After Platform receives Full Approval, the Reserve Amount shall be the greater of (1) $20,000.00 or (2) the number of Users allowed to be created by Platform, as approved by Synapse in its sole and reasonable discretion (the "**User Cap**"), multiplied by the applicable Synapse reserve factor (the "**Reserve Factor**"). The Reserve Factor is calculated by determining the risk associated with Platform's use of the Synapse products and features. The Reserve Factor may be adjusted if, in Synapse's sole discretion, (i) there are changes to the products and features being offered by Platform, (ii) changes occur that impact the product and features to be used by Platform or (iii) changes occur to the perceived risk of Platform's use of such products and features. Platform may request that the User Cap be increased from time to time; provided, that, if Synapse agrees to such increase, such increase shall not be effective until Platform has funded the increased Reserve Amount (i.e., the Reserve Factor times the new User Cap).

**Platform Insurance Requirements:** (1) general liability coverage of $1 million per occurrence and $2 million aggregate; and (2) error and omissions (E&O)/Cyber liability coverage of $1 million.

Platform shall provide proof of insurance before receiving production API Keys, as defined in the Agreement.

**Specification Sheet:** During Platform's integration with Synapse, the Parties will elaborate a Specification Sheet which will contain the Services, flow of funds, transaction volume and limits, use cases for the Services and Reserve Amount. Any modification or update to the Specification Sheet must be mutually agreed upon by the Parties.

**Platform deliverables:** Unless otherwise specified, Platform shall deliver to its Users Account Statements and Account Disclosures, which Platform shall be able to access through the APIs.

The Parties agree that this Thirteenth Amended and Restated Software-As-A-Service Order Form ("**Amended and Restated Order Form**") amends and restates the Twelfth Amended and Restated Software-As-A-Service Order Form, dated as of November 28, 2021 and is hereby incorporated into that certain Master Services Agreement and Software-As-A-Service Order Form, dated as of February 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**"). The Parties agree that all other terms in the Agreement (including the General Terms and Conditions and all its addenda and exhibits) shall remain in full force and effect.

This Amended and Restated Order Form shall be effective as of the date signed below (the "**Amendment Effective Date**") and replaces and supersedes all previous Order Forms executed between the Parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Amended and Restated Order Form is executed by the Parties' authorized officers or representatives as of the Amendment Effective Date.

**SYNAPSE FINANCIAL TECHNOLOGIES, INC.**          **YOTTA TECHNOLOGIES INC.**

By: *sankaet pathak*                              By: *Adam Moelis*
Name: Sankaet Pathak                              Name:   Adam Moelis
Title:   Founder & CEO                            Title:   CEO
                                                  Date:   07 / 05 / 2023

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Synapse - Yotta - A&R Order Form |
| **File name** | Yotta - 13UOF - (FINAL).pdf |
| **Document ID** | 88280eb46a8e88f2494ce142a9e1bc7d11c8c3c2 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**
**07 / 05 / 2023**
17:07:15 UTC

Sent for signature to Adam Moelis (adam@withyotta.com) and
Sankaet Pathak (s@synapsefi.com) from
chris.cosmedy@synapsefi.com
IP: 54.71.136.144

**VIEWED**
**07 / 06 / 2023**
01:54:28 UTC

Viewed by Adam Moelis (adam@withyotta.com)
IP: 72.226.74.220

**SIGNED**
**07 / 06 / 2023**
01:54:52 UTC

Signed by Adam Moelis (adam@withyotta.com)
IP: 72.226.74.220

**VIEWED**
**07 / 06 / 2023**
02:23:17 UTC

Viewed by Sankaet Pathak (s@synapsefi.com)
IP: 104.28.123.101

**SIGNED**
**07 / 06 / 2023**
02:23:25 UTC

Signed by Sankaet Pathak (s@synapsefi.com)
IP: 104.28.123.101

**COMPLETED**
**07 / 06 / 2023**
02:23:25 UTC

The document has been completed.

# EXHIBIT B



McGregor Johnson
**PARTNER**
DIRECT: 816-691-2485
Mcgregor.johnson@stinson.com

October 24, 2023

SynapseFi
Sankaet Pathak
Via e-mail: s@synapsefi.com

Re:    Yotta Technologies, Inc.

Dear Sankaet:

I am writing on behalf of our firm's client, Yotta Technologies, Inc. ("Yotta").

As you know, Yotta has partnered with Synapse since February 2020, when they entered into a Master Services Agreement (the "MSA"). Under the MSA, they developed a savings and checking account product issued by Evolve Bank & Trust (the "Program"). Yotta has nearly 600,000 customers. Yotta offers monetary sweepstake prizes to incentivize its consumer customers to join and remain in the Program, in lieu of paying market interest rates on deposits. The prizes are a fundamental part of the Program. Yotta funds these prizes with Yotta's share of the interest on Program deposits. Historically, those interest rebates have been remitted from Synapse to Yotta, and Yotta to its consumer customers.

Per the MSA between Synapse and Yotta, Synapse is contractually obligated to pay Yotta "Fed Funds Target Rate minus 0.25%" and that "... APY earned in each calendar month shall be paid by the 20th business day of the following month." Synapse is in breach of contract.  Yotta has not received any rebate payments for August (for which it is owed $919,755.70) and September ($857,713.20), and no amount has been paid to Yotta for October.

**We demand that Synapse immediately release the total funds Yotta is owed ($1,777,468.90) so that Yotta can pay the prizes to its customers**. If these funds are not released immediately, Yotta will not be able to pay its customers, Yotta will not be able to continue its business operations, and they, and end customers, will suffer irreparable harm. Yotta is prepared to pursue all available remedies to achieve the release of these funds, including filing lawsuits. This will be a disastrous result for all parties involved.


Sincerely,


McGregor (Greg) Johnson

CORE/3519044.0005/185175661.1

# EXHIBIT C

| | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | PERIOD OF UNDERPAYMENT | | | | | |
| Fed Funds midpoint | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% | 5.38% |
| Contractual Rate from Synapse | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% | 5.13% |
| Avg deposits | $257,164,112 | $249,646,750 | $242,263,622 | $234,885,270 | $226,564,921 | $217,876,353 | $209,564,319 | $205,388,739 | $196,037,898 | $188,651,363 | $185,632,278 | $181,580,626 | $177,029,419 | $170,611,292 | $164,908,855 | $150,679,535 |
| | | | | | | | | | | | | | | | | |
| Expected payment | | | | | | | | | $819,535 | $763,477 | $776,417 | $735,133 | $740,785 | $714,187 | $645,997 | $626,527 |
| Actual payment | $890,773 | $922,800 | $860,273 | $942,742 | $915,283 | $957,772 | $900,420 | $919,106 | $0 | $0 | $321,235 | $784,111 | $659,377 | $463,392 | $369,439 | $234,659 |
| Underpayment | | | | | | | | | $819,535 | $763,477 | $455,182 | -$48,978 | $81,408 | $250,795 | $276,558 | $391,868 |
| | | | | | | | | | | | | | | | | |
| % of expected paid | | | | | | | | | 0% | 0% | 41% | 107% | 89% | 65% | 57% | 37% |
| | | | | | | | | | | | | | | | | |
| Total underpayment | $2,989,845 | | | | | | | | | | | | | | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10345 W. Olympic Blvd., Los Angeles, CA 90064.

A true and correct copy of the foregoing document entitled (*specify*):

**LIMITED OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; (C) WAIVING THE 14-DAY STAY PERIODS OF BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF; DECLARATION OF ADAM MOELIS**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 7, 2024  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 7, 2024 | Tahmineh Parizad Tamerani | */s/ Tahmineh Parizad Tamerani* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- **Ron Bender**     rb@lnbyg.com
- **J Scott Bovitz**     bovitz@bovitz-spitzer.com
- **Russell Clementson**     russell.clementson@usdoj.gov
- **Andrew Michael Cummings**     andrew.cummings@hklaw.com,
  philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
- **Michael G. Farag**     mfarag@gibsondunn.com
- **Michael I. Gottfried**     mgottfried@elkinskalt.com,
  cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Steven T Gubner**     sgubner@bg.law, ecf@bg.law
- **Robert T. Honeywell**     robert.honeywell@klgates.com
- **Lance N Jurich**     ljurich@loeb.com,
  pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
- **Monica Y Kim**     myk@lnbyg.com, myk@ecf.inforuptcy.com
- **Jeffrey C Krause**     jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
- **Adam A Lewis**     alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
- **Krikor J Meshefejian**     kjm@lnbyg.com
- **David M Poitras**     dpoitras@bg.law
- **Brandy A Sargent**     brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
- **Jason D Strabo**     jstrabo@mwe.com, jbishopjones@mwe.com
- **United States Trustee (SV)**     ustpregion16.wh.ecf@usdoj.gov
- **Jeffrey C Wisler**     jwisler@connollygallagher.com, dperkins@connollygallagher.com
- **Beth Ann R. Young**     bry@lnbyg.com, bry@lnbyb.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**