BRADLEY ARANT BOULT CUMMINGS LLP
N. Chris Glenos
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
N. Chris Glenos
Email:  cglenos@bradley.com
Phone: 205.521.8000
Fax: 205.488.6721

STRADLING YOCCA CARLSON & RAUTH
Paul R. Glassman (State Bar No. 76536)
Fred Neufeld (State Bar No. 150759)
10100 N Santa Monica Blvd, Suite 1450
Los Angeles, CA 90067
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@stradlinglaw.com
fneufeld@stradlinglaw.com

*Attorneys for Lineage Bank*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>　　　　Debtor and Debtor in Possession | Case No. 1:24-bk-10646-MB<br>Chapter 11<br><br>**LINEAGE BANK'S OBJECTIONS TO: (I) DEBTOR'S EMERGENCY SALE MOTION [DKT NO. 8], (II) DEBTOR'S REJECTION MOTION [DKT NO. 76]; AND (III) DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF SETTLEMENT WITH EVOLVE BANK & TRUST [DKT NO. 9]; DECLARATION OF SHAWN WIKOFF AND EXHIBITS THERETO**<br><br>Hearing Date: May 9, 2024<br>Time: 9:00 a.m.<br>Place: U.S. Bankruptcy Court, Courtroom 303<br>21041 Burbank Boulevard<br>Woodland Hills, CA 91367 |

# **TABLE OF CONTENTS**

Preliminary Statement .................................................................................................. 3

Background .................................................................................................................... 4

Objections to the Sale Transaction ............................................................................... 7

Objections to Assumption of the MSA and Proposed Cure Amount ....................... 9

Objection to Rejection Motion .................................................................................. 10

Objection to Evolve Settlement ................................................................................. 11

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

4868-9987-5260v3/000000-1611                                    1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Citizens Bank of Maryland v. Strumpf,
    516 U.S. 16 (1995) ............................................................................................ 10

In re Commc'n Dynamics, Inc.,
    382 B.R. 219 (Bankr. D. Del. 2008) ............................................................... 10

Lee v. Schweiker,
    739 F.2d 870 (3d Cir. 1984) ............................................................................ 10

In re Monongahela Rye Liquors,
    141 F.2d 864 (3d Cir. 1944) ............................................................................ 10

U.S. v. Arkison (In re Cascade Roads),
    34 F.3d 756 (9th Cir. 1994) ............................................................................. 10

U.S. v. Norton,
    717 F.2d 767 (3d Cir. 1983) ............................................................................ 10

**Federal Statutes**

Bankruptcy Code § 363 .......................................................................................... 8

Bankruptcy Code § 365(f) .................................................................................... 10

Bankruptcy Code § 553 ..................................................................................... 9, 10

Bankruptcy Code § 553(a) ................................................................................. 9, 10

Federal Deposit Insurance Act § 8(b), 12 U.S.C. § 1818(b) ................................. 6

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, AND ALL PARTIES IN INTEREST:**

Lineage Bank ("Lineage"), by and through its undersigned counsel, hereby objects to the:

"*Debtor's Emergency Motion For An Order (A) Approving Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Interests And Encumbrances; (B) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts And Determining Cure Amounts; (C) Waiving The 14-Day Stay Periods Of Bankruptcy Rules 6004(h) And 6006(d); And (D) Granting Related Relief"* (Dkt. 8, the "Sale Motion")";

*Debtor's First Omnibus Motion For Entry Of An Order Authorizing Rejection Of Executory Contracts And Unexpired Leases;* (Dkt. No 76, the Rejection Motion"); and

*Debtor's Emergency Motion For Approval Of Compromise Of Controversy With Evolve Bank & Trust Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure; Memorandum Of Points And Authorities* (Dkt. No 9, the "Evolve Motion")

In support of this Objection, Lineage states the following:

**Preliminary Statement**

Lineage Bank ("Lineage") does not seek to prevent or delay the proposed sale by the Debtor to the Buyer. However, Lineage asserts that its Bank Master Services Agreement ("MSA") with the Debtor must be assumed by the Debtor and assigned to the Buyer so that the winddown provisions of the MSA with Synapse Financial Technologies, Inc. (the "Debtor") can be effectuated and the $60-$80 million in End-User funds in deposit accounts at Lineage can be successfully transitioned to a partner financial institution of the Buyer in accordance with applicable law and the terms of the MSA. Lineage submits this limited objection and reservation of rights to preserve its rights to the extent the

terms of the Sale Motion: (1) are contrary to applicable law; (2) potentially violate the rights and/or interests of End-Users and Lineage under applicable law and the terms of Lineage's Bank Master Services Agreement with the Debtor; and (3) are inconsistent with bank regulatory requirements and a Consent Order issued by the Federal Deposit Insurance Corporation ("FDIC") to which Lineage is subject.

Lineage also objects to the Evolve Motion because it lacks adequate disclosure of critical facts necessary for the Court and creditors to determine whether the $2 Million dollar proposed settlement with Evolve is fair and equitable, all as described in detail below in the Section opposing the proposed Evolve settlement.

Lineage is willing to confer with the Debtor and Buyer in good faith to attempt to resolve the above concerns.

## **Background**

1.     Lineage is Tennessee state-chartered bank headquartered in Franklin, Tennessee.

2.     Effective July 12, 2022, Lineage entered into a Bank Master Services Agreement ("<u>MSA</u>") with Synapse Financial Technologies, Inc. (the "<u>Debtor</u>"). *See* **<u>Exhibit A</u>** to the  Declaration of Shawn Wicoff ("<u>Wicoff Declaration</u>"), attached hereto. Capitalized terms used but not otherwise defined in this Objection shall have the meanings set forth in the MSA.

3.     Pursuant to the MSA, Lineage agreed to make certain banking products and services (referred to in the MSA as "Programs") available to Debtor's network of Fin-Tech customers and End-Users.  The primary Programs provided by Lineage pursuant to the MSA have been automated clearing house (ACH) and wire payment processing and deposit accounts for End-Users.

4.     Lineage's relationship with the Debtor under the MSA has been plagued by the same profound issues involving the Debtor's operations that other

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

bank partners (including Evolve) and Fin-Tech Customers of the Debtor have complained about.  For example:

a.    The MSA required Debtor to maintain a reserve account at Lineage comprised of its own funds to secure Debtor's obligations to Lineage under the MSA (the "Reserve Account").  Lineage discovered that approximately $60 Million in funds transferred by the Debtor in late 2022 to the Reserve Account from an account explicitly titled in the Debtor's name at Evolve Bank and Trust – initially considered to be the Debtor's own funds – were actually End-User funds. Consequently, Lineage moved the funds in the Reserve Account to an FBO account to protect the interests of End-Users. Following this revelation Lineage demanded that the Debtor allocate $60 Million of the Debtor's own funds to the Reserve Account to continue ACH/wire processing services, but the Debtor failed to meet this requirement.

b.    Debtor added originators without prior communication to Lineage, overloading Lineage with massive, unexpected volumes of ACH/wire transactions. The transaction volume resulted in concomitantly higher ACH/wire returns that caused Lineage's federal reserve account to become overdrawn.

c.    Lineage discovered significant data integrity deficiencies and contradictions in the Debtor's record-keeping, including an inability to provide reconciliations of End-User accounts,[1] as well as other practices that subjected Lineage to untenable compliance risks and potential regulatory violations.

5.    On January 30, 2024, Lineage became the subject of a Consent Order issued by the FDIC, pursuant to Section 8(b) of the Federal Deposit Insurance Act, 12 U.S.C. § 1818(b), due in large part to its relationship with the Debtor. *See* **Exhibit B** to the Wikoff Declaration.

---

[1] Funds of End-Users are distributed across various depository institutions in Debtor's network, which complicates reconciliation.  For example, an End-User may have a $50 balance in Bank A, a $100 overdraft in Bank B and $150 in Bank C.

6.      On March 12, 2024, Lineage with the approval of its regulators, including the FDIC, provided written notification to the Debtor that Lineage was terminating the MSA for cause, effective immediately.  *See* **Exhibit C** to the Wikoff Declaration.

7.      On March 14, 2024, the Debtor notified Lineage in writing of its desire to terminate the MSA.  *See* **Exhibit D** to the Wikoff Declaration.

8.      The MSA requires the parties to cooperate to formulate and implement an orderly wind down plan following a notice of termination ("Wind-Down Plan"), and expressly provides that the terms of the MSA shall continue to govern the parties' relationship during the wind down phase.  *See* MSA § 8.d(b) & (c).

9.      Because Lineage is a regulated financial institution, the Wind-Down Plan is subject to the approval and oversight of its regulators, including the FDIC. On April 24, 2024, Lineage provided the Debtor with a proposed Wind-Down Plan approved by Lineage's regulators.  *See* **Exhibit E** to the Wikoff Declaration.

10.      Pursuant to the Wind Down Plan, Lineage will cease processing ACH/wire transactions on May 9, 2024.  At that time, Lineage anticipates that it will have between $60 Million and $80 Million of End-User funds in deposit accounts in the name of the Debtor "for the benefit of" End-Users (the "Accounts").  All of the Accounts are FBO Accounts containing End-User funds that are not owned by the Debtor.  The exposure for unauthorized transactions in the Accounts will not be known and quantifiable until ninety (90) days after Lineage ceases processing ACH's and wires – on or about August 9, 2024.  The exposure for liability warranty claims related to the Accounts will not be known for two (2) years following the cessation of payment processing for consumer accounts and one (1) year for non-consumer accounts.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

11. On April 22, 2024, the Debtor commenced this Chapter 11 case and filed the Sale Motion seeking an emergency sale of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code.

12. At present, the MSA remains an executory contract of the Debtor because Lineage continues to process ACH/Wire transactions for End-Users in the Debtor's network (at least until May 9, 2024) and the Wind-Down Plan has yet to be consummated to successfully transition the tens of millions in the Accounts belonging to End-Users to a different financial institution.

**<u>Objections to the Sale Transaction</u>**

13. Schedule 1.1(f) of the APA improperly identifies the Accounts as "Purchased Assets" being acquired by the Buyer. Lineage objects to the proposed sale to the extent the Sale Motion purports to transfer *ownership* of the Lineage Accounts to the Buyer or is otherwise inconsistent with the rights of End-Users in the Accounts. The funds in the Accounts belong to End-Users, not the Debtor. *See* MSA § 14 ("all end-User Funds in the Accounts shall be held in trust for the benefit of End-Users, and neither Bank nor Servicer shall have an equitable interest in End-User Funds…").

14. Lineage objects to the proposed sale to the extent the Sale Motion seeks or purports to transfer the Accounts without the Buyer's assumption of the MSA, which governs the Accounts and the process for transitioning of the Accounts to one or more different financial institutions. The Debtor's and Buyer's intentions in this regard are presently unclear.

15. Lineage objects to the proposed sale to the extent the Sale Motion seeks or purports to compel a transfer of the Accounts to a different financial institution without the approval of Lineage's regulators or the written consent of End-Users as required by MSA § 3.i.(e). The Debtor's and Buyer's intentions in this regard are presently unclear.

16.     Lineage objects to the Sale Motion to the extent it does not ensure the preservation of the transaction data and records required to be kept by law, and that Lineage will be granted access to said data and records to enable Lineage to comply with applicable law and reconcile End-User funds in the Accounts, as required by applicable law, Lineage's regulators and the MSA, including without limitation MSA § 3.f.(a).

17.     Lineage objects to the proposed sale because Section 1.2(g) of the APA purports to impermissibly eliminate or restrict Lineage's setoff and recoupment rights.  Section 1.2(g) provides for the Debtor to retain and pursue claims and causes of action (excluding avoidance actions) against Lineage arising prior to the Initial Closing Date under or relating to the Accounts and MSA, while transferring the Accounts and MSA rights and other claims and causes of action relating thereto to the Buyer. Stated differently, the APA purports to split any alleged claims and causes of action against Lineage under and related to the MSA and the Accounts between Debtor and Buyer. Consistent with its contractual rights and Section 553 of the Bankruptcy Code, Lineage is entitled to set off its pre-petition claims against the Debtor against any pre-petition claims the Debtor may assert against Lineage.  Additionally, Lineage has recoupment rights for its claims against the Debtor to offset any claims the Debtor may assert against Lineage.  Section 1.2(g) of the APA could be construed as eliminating Lineage's setoff and recoupment rights. Lineage objects to the Sale Motion, at a minimum, to ensure its setoff and recoupment rights are not prejudiced.  Section 553(a) of the Bankruptcy Code preserves Lineage's setoff rights:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

1  11 U.S.C. § 553(a).

2  As a general rule, "any right of setoff that a creditor possessed prior to the

3  debtor's filing for bankruptcy is not affected by the Bankruptcy Code." <u>Citizens</u>

4  <u>Bank of Maryland v. Strumpf</u>, 516 U.S. 16, 20 (1995); <u>U.S. v. Arkison (In re</u>

5  <u>Cascade Roads)</u>, 34 F.3d 756, 762-63 (9th Cir. 1994) ((Bankruptcy Code § 553

6  "is generally understood as a legislative attempt to preserve the common-law

7  right of setoff arising out of non-bankruptcy law.") (quoting <u>U.S. v. Norton</u>, 717

8  F.2d 767, 772 (3d Cir. 1983)); <u>In re Commc'n Dynamics, Inc.</u>, 382 B.R. 219, 227

9  (Bankr. D. Del. 2008) ("a creditor's right of setoff may be denied only if there is

10  some basis in equity to do so"). The Debtor does not dispute that Lineage has

11  pre-petition claims in this bankruptcy proceeding. If Debtor asserts pre-petition

12  claims against Lineage, Lineage can setoff such claims with Lineage's pre-

13  petition claims against Debtor.    Additionally, Lineage also has rights of

14  recoupment for its claims against the Debtor which arise out of the same

15  transactions or occurrences as any claims the Debtor may assert against Lineage.

16  *See* <u>Lee v. Schweiker</u>, 739 F.2d 870, 875 (3d Cir. 1984) (finding recoupment an

17  available defense to a creditor in bankruptcy to extinguish certain mutual claims

18  that could not be "setoff" under section 553 of the Bankruptcy Code) (citing <u>In re</u>

19  <u>Monongahela Rye Liquors</u>, 141 F.2d 864 (3d Cir. 1944)).

20  **<u>Objections to Assumption of the MSA and Proposed Cure Amount</u>**

21  18.    Lineage objects to the assumption and assignment of the MSA unless

22  and until certain defaults of the Debtor under the MSA are cured. Lineage objects

23  to the Debtor's proposed cure amount of $276,812.26, and asserts that the proper

24  cure amount for assumption of the MSA is $755,550.04. *See* **Exhibit F** to Wikoff

25  Declaration.

26  19.    Lineage further objects to the assumption and assignment of the

27  MSA unless and until Lineage is provided with "adequate assurance of future

28  performance" of the MSA as required by Bankruptcy Code Section 365(f). To

date, Debtor and Buyer have not demonstrated Buyer's intent and ability to successfully effectuate the Wind-Down Plan as required by the MSA and applicable law, including without limitation the following:          .

a.    Complying with the terms of the MSA, including § 8.d, to successfully transition the Accounts to another financial institution and otherwise implement the Wind-Down Plan;

b.    Preserving and providing Lineage with access to data and records to enable Lineage to comply with applicable law and reconcile the End-User funds in the Accounts, as required by applicable law, Lineage's regulators and the MSA, including without limitation MSA § 3.f.(a);

c.    Establishing a satisfactory reserve account in compliance with MSA § 2.g., or an adequate threshold "holdback" amount, to cover ACH returns and warranty claims arising out of or related to the Accounts (and/or provide such other adequate assurance of the payment of same);

d.    Reimbursing Lineage's reasonable costs and expenses in connection with the transfer of the Accounts to a successor qualified financial institution and/or the Wind-Down Plan as required by the MSA, including without limitation MSA § 3.i(e) and § 8.d(a); and

e.    Honoring any terms, requirements or restrictions imposed by Lineage's regulators, including the FDIC, and applicable law in connection with any transfer of the Accounts to another financial institution, including Sections § 3.i.(e) and § 4.b(a) of the MSA.

## **Objection to Rejection Motion**

20.    Lineage objects to the proposed sale to the extent the Sale Motion seeks or purports to transfer the Accounts without the Buyer's assumption of the MSA, which governs the Accounts (including reconciliation of the Accounts) and the process for transitioning of the Accounts to one or more different financial institutions.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

4868-9987-5260v3/000000-1611                                         10

21.    Lineage Bank respectfully requests that the Court deny the Debtor's Rejection Motion with respect to the MSA and condition approval of the Debtor's Sale Motion on the following (unless the APA and proposed Sale Order are modified to cure or otherwise address Lineage's objections):

a.    Assumption and assignment of the MSA governing the Accounts so that the Wind-Down Plan required by the MSA can be consummated and the Accounts can be successfully reconciled and transitioned to a bank partner of the Buyer over the coming months;

b.    Payment to Lineage of the proper cure amount owed by Debtor under the MSA;

c.    Buyer providing adequate assurance to Lineage that Buyer will comply with the terms of the MSA governing (a) the preservation of databases and records in a secure and accessible manner to allow for proper settlement and return of End-User funds; (b) the winddown of the relationship and transitioning of the Programs and Accounts in compliance with the terms of the MSA and applicable law and regulatory requirements, including posting an adequate reserve account to secure any ACH/wire return exposure related to the Accounts; and

d.    Removal of the language from Section 1.2(g) of the APA and the Sale Order suggesting that the Debtor will retain claims or causes of action against Lineage for pre-Closing compensation or other relief under the APA (excluding avoidance claims).

## Objection to Evolve Settlement

22.    At the most basic level, the Debtor has not submitted sufficient information for creditors and the Court to determine whether the Evolve Motion satisfies the requirements of A & C Properties, 784 F.2d 1377 (9th Cir. 1986) that a settlement with Evolve in the amount of $2 million dollars is fair and equitable. The Debtor offers very little, if any detail regarding numerous aspects of the

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
LOS ANGELES

settlement that creditors and the Court are entitled to know in evaluating the fairness of the settlement.  For example:

(i)    There are no disclosures at all in the Evolve Motion regarding what property of the Debtor Evolve is retaining, or what its value might be.

(ii)    Regarding the FBO Account Claims referenced in the Evolve Motion, the Debtor states that the "parties each have alleged claims against the other relating to the funding and reconciliation of the FBO Accounts." What are each party's allegations? What are the dollar amounts? What reconciliation issues? Reconciliation issues will  certainly impact other parties in the Debtor's network.

(iii)    Regarding the Reserve Balance Claims referenced in the Evolve Motion, the Debtor states that "the parties have each alleged claims against the other relating to the funding of the Program Manager Reserve Account including Evolve's funding, withdrawal and use of funds totaling $43,225,507 in, to and from the Reserve Account."  What are each party's allegations concerning funding? What are each party's allegations concerning withdrawal? What are each party's allegations concerning use?  What are the dollar amounts involved for each category?

(iv)    What is the source of funds in the Reserve Account(s)?  Presumably, any reserve account involves Debtor-owned funds (as opposed to end user funds). A large Reserve Account balance would be the largest asset in the case.

(v)    What is the present balance in the Reserve Account(s)? The Debtor has only just yesterday filed its Summary of Assets and Liabilities and related schedules.

(vi)    How much of the Debtor's funds does each party contend went into the Reserve Account?

(vii)    Regarding the Tabapay Funding Condition referenced in the Evolve Motion, are the FBO accounts fully funded? What is the shortfall? What happened

to the missing funds?  What is the source of the funds to cover any shortfall and fully-fund the FBO Accounts? Are the Debtor's funds being used to fully fund the FBO accounts? How did Evolve attempt to "cut the Debtor out from the revenue stream?"  See Motion, page 13, lines 24-25.

(viii)  Regarding "Evolve's Alleged MBSA Breaches" referenced in the Evolve Motion, how much of Debtor's compensation does the Debtor contend was diverted to the Reserve Account? Does/did Evolve have $50 million dollars of Debtor's money in a Reserve Account?

(ix)    Regarding "Debtor's Alleged MBSA Breaches" referenced in the Evolve Motion, what does Evolve contend Debtor's breaches are concerning transaction accounting, maintaining ledgers supporting End User and fintech accounts, and funding the FBO Accounts. Did the Debtor misappropriate End-User funds?  These appear to be similar to allegations made by other parties, including Lineage. These are serious allegations that potentially impact everyone in the Debtor's network due to the inter-relations of the parties within the Debtor's network, including Bank Partners (like Lineage), Fin-Techs and most importantly End-Users.

(x)     Regarding the "Underpayment Claim" referenced in the Evolve Motion, how much does the Debtor contend is owed by Evolve?

23.    These questions should be answered by the Debtor before the fairness of a $2 million dollar settlement can be determined.

24.    Lineage requests such other and further relief as the Court deems just and equitable.

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS LLP

and

Dated: May 7, 2024         STRADLING YOCCA CARLSON & RAUTH,

By:   */s/ Paul Glassman*_____
                    Attorneys for Lineage Bank

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10100 N. Santa Monica Blvd, Suite 1450, Los Angeles, CA 90067

A true and correct copy of the foregoing document  LINEAGE BANK'S OBJECTIONS TO: (I) DEBTOR'S EMERGENCY SALE MOTION [DKT NO. 8], (II) DEBTOR'S REJECTION MOTION [DKT NO. 76]; AND (III) DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF SETTLEMENT  WITH EVOLVE BANK & TRUST [DKT NO. 9]; DECLARATION OF SHAWN WIKOFF AND EXHIBITS THERETO will be served or was served (a) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On May 7, 2024 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

        See Attached Service List

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**  On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows:

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  May 7, 2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:

**VIA FEDERAL EXPRESS**
The Honorable Martin R. Barash
United States Bankruptcy Court, Central District of California
San Fernando Valley Division
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 7, 2024 | Suzanne Johnson | /s/ Suzanne Johnson |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.