1  STEVEN T. GUBNER – Bar No. 156593
   DAVID M. POITRAS – Bar No. 141309
2  BG LAW LLP
   21650 Oxnard Street, Suite 500
3  Woodland Hills, CA 91367
   Telephone: (818) 827-9000
4  Facsimile: (818) 827-9099
   Email:    sgubner@bg.law
5            dpoitras@bg.law

6  JEFFREY NAIMON – DC Bar No. 429409 (*Admitted Pro Hac Vice*)
   CAROLINE M. STAPLETON – DC Bar No. 1023477 (*Admitted Pro Hac Vice*)
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   2001 M Street NW
8  Washington, DC 20036
   Telephone: (202) 349-8030
9  Email:    jnaimon@orrick.com
             cstapleton@orrick.com

Attorneys for Evolve Bank & Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>                Debtor and Debtor-in-Possession. | Case No. 1:24-bk-10646-MB<br><br>Chapter 11<br><br>**EVOLVE BANK & TRUST'S ("EVOLVE") STATEMENT OF POSITION CONCERNING: (A) EVOLVE'S ACCESS TO THE SYNAPSE DASHBOARD SYSTEM; (B) THE TEMPORARY FREEZING OF CERTAIN ACCOUNT ACTIVITY; AND (C) THE CURRENT STATUS OF THE FREEZE**<br><br>**DECLARATION OF W. CHRISTOPHER STAAB IN SUPPORT THEREOF**<br><br><u>**Hearing:**</u><br>Date:   May 17, 2024<br>Time:  9:00 a.m.<br>Place:  Courtroom 303<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367 |

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, SECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:**

Evolve Bank & Trust ("Evolve"), a creditor and party-in-interest in the above-referenced chapter 11 case, hereby files this Statement of Position (the "Statement") concerning: (a) Evolve's access to the Synapse Dashboard system ("Dashboard"), (b) the decision to freeze certain accounts and account activity, and (c) the current status of the freeze.

## BACKGROUND INFORMATION

Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor-in-possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), filed a voluntary petition under Chapter 11 of Title 11, 11 U.S.C. Sections 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date").  As of the date of this Motion, the Debtor is continuing to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On May 13, 2024, Evolve filed a motion, on an emergency basis, for *An Order Directing the Debtor to Restore Evolve's Access to the Debtor's Dashboard System; or, Alternatively, Authorizing Evolve to Close All of the Debtor's Demand Deposit Accounts at Evolve Associated With Debtor's Programs; Declaration of W. Christopher Staab in Support Thereof* (the "Evolve Emergency Motion") [Docket No. 137].  The genesis of this motion was Debtor's unilateral decision on the morning of Saturday, May 11, 2024 to revoke Evolve's access to the Dashboard, which is the system Evolve uses to oversee Debtor's activities as its critical service provider and to review and analyze essential information about End User accounts and transactions, and is expected to be used in conjunction with daily ledger files and reports of debit and credit card transactions.  Dashboard access is vital to ensuring Evolve is able to process transactions in a safe, sound, and legally compliant manner.

Without access to the Dashboard, and with no information from the Debtor about when access would be restored, without almost a week of daily ledgers and transaction reports, and with

Synapse having failed to fund End Users' Mastercard transactions, Evolve was faced with the choice of either (i) continuing to process payments with no ability to determine whether a transaction was authorized or fraudulent, view the actual balance within an individual account to determine whether there were adequate funds, or to perform legally-required transaction monitoring for irregular, fraudulent, unauthorized, or unlawful conduct, or (ii) freezing account activity pending system restoration, validation, transaction reconciliation and settlement funding. Evolve determined that, based on applicable law and its obligation to protect the End Users who rely in part on the payment services that Evolve provides, the only viable option was to freeze account activity, which it did on May 11, 2024 at 2:47 p.m., after notifying the Debtor and affected fintech platforms. The freeze did not affect corporate accounts belonging to Debtor or the sweep account holding funds pertaining to the Debtor's non-debtor subsidiary Synapse Brokerage LLP ("Synapse Brokerage").

In its emergency motion, Evolve asked the Court to issue an order directing Debtor to restore Evolve's access to the Dashboard, or alternatively, to authorize Evolve to close all End User demand deposit accounts ("DDAs") at Evolve associated with Debtor's programs under the September 23, 2022 Master Bank Services Agreement between Debtor and Evolve (the "MBSA"). The court heard arguments from counsel for Debtor and Evolve regarding the Evolve Emergency Motion at a hearing held on May 13, 2024 at 2:30 p.m. Because Evolve's Dashboard access had been partially restored prior to the hearing, the Court determined that it was not necessary to rule on the Evolve Emergency Motion at that time. However, the Court expressed its grave concerns about the potential impact of the account activity freeze on End Users, and urged the Parties to find a solution as quickly as possible. The Court reiterated these concerns at a hearing on May 14, 2024 at 1:00 p.m.

Evolve is filing this Statement to provide the Court an update on the status of its Dashboard access and the account activity freeze.

///

**OVERVIEW OF THE PROGRAMS**

Under the MBSA, Evolve agreed to provide banking services to the End Users of fintech platforms ("Platforms") that had entered into agreements with Debtor, and Debtor agreed to provide program manager critical services to Evolve ("Evolve Program"). The MBSA expired on September 29, 2023 and entered a wind-down phase, and shortly thereafter in October 2023, Debtor began migrating Platforms and their End Users from the Evolve Program to a cash management program offered through the Debtor's licensed broker-dealer subsidiary, Synapse Brokerage ("Synapse Brokerage Program"). When a Platform migrated its End Users from the Evolve Program to the Synapse Brokerage Program, the funds belonging to the Platform's End Users, which had been held in Evolve DDAs, were transferred by Synapse from the FBO accounts at Evolve to Synapse Brokerage. Evolve had no role in the creation of, or migration of Platforms to, the Synapse Brokerage Program, beyond executing the payment instructions that Synapse provided as part of their fiduciary responsibility overseeing the program. Synapse did not act to close the Evolve DDA accounts of End Users that migrated to the Synapse Brokerage Program, but did transfer the funds held in those DDA accounts.

End Users who enroll in the Synapse Brokerage Program agreed to Terms of Service specific to the Synapse Brokerage Program and enter into a Customer Agreement with Synapse Brokerage. The Terms of Service and Customer Agreement identify Program Banks that participate in the Synapse Brokerage Program. These Program Banks include AMG National Trust ("AMG"), which Evolve understands acts as the primary custodian of End User funds for the Synapse Brokerage Program. Synapse Brokerage Program Banks execute a Program Bank Agreement with Synapse Brokerage, pursuant to which they hold Synapse Brokerage Program End User funds in one or more accounts for the benefit of Synapse Brokerage End Users.

Evolve has never entered into a Synapse Brokerage Program Bank Agreement, and is not, and has never been, a Synapse Brokerage Program Bank. Evolve's only link with the Synapse Brokerage Program has been certain payment processing activities that Evolve continued to perform for End Users of platforms that migrated from the Evolve Program to the Synapse Brokerage Program. These activities include debit and credit card issuing, and acting as a receiving depository

financial institution ("RDFI") for Automated Clearinghouse ("ACH") transactions, but Evolve was not action as an originating depository financial institution. In plain English, if an end user went to their Platform and asked for money to be sent somewhere, Evolve was not performing that service.

Until the freeze on May 11, 2024, Evolve continued performing these activities on behalf of Synapse Brokerage to avoid disrupting Synapse Brokerage End Users' payments services as Debtor tried to identify a Synapse Brokerage Program Bank willing to issue cards and perform other payment activities that Evolve performed for the Evolve Program.

## STATEMENT OF POSITION

### A.     Status of Dashboard Access

On May 13, 2024, Debtor restored Evolve's ability to log into the Dashboard using Synapse-issued credentials. However, Debtor still continues to deny Evolve access to at least one area of the Dashboard, which is the area containing End User account statements ("Statements Portal"). Prior to May 11, 2024, Evolve accessed the Statements Portal daily without restriction to validate End User account balances and reporting provided by Debtor.

Evolve has requested that the Debtor grant it access to the Statements Portal, but Debtor has refused, and instead has informed Evolve that the account statements are actually summaries, rather than statements, and that Debtor will provide Evolve with copies upon Evolve's request, provided the request identifies the specific statements that Evolve requires. As to the former, Debtor has not explained the distinction between summaries and statements, nor has it explained why this distinction would justify removing Evolve's access to such information. As to the latter, Evolve's monitoring of account statements is a continual, ongoing activity that Evolve cannot feasibly perform if it is required to send individual requests for specific statements to Debtor each time it needs information.

Evolve has serious concerns about the integrity of the Dashboard and the completeness of the information therein in light of (i) the unexpected revocation of Evolve's access over the weekend of May 11-12, 2024, which Debtor has confirmed to Evolve was not the result of any system issues, and therefore was presumably intentional on the part of Debtor—notwithstanding Debtor management's contemporaneous protestations of confusion about the revocation of access—and (ii)

Debtor's continued refusal to grant Evolve full access to all areas of the Dashboard, which Evolve had always had access to prior to the revocation. Evolve continues to perform validation of the Dashboard and monitor access to ensure rapid detection of any future outage.

### B. Decision to Freeze Account Activity on May 11, 2024

Evolve's decision to freeze End User account activity on May 11, 2024 was a time-sensitive decision of necessity, made in response to an unprecedented revocation of Dashboard access, with no notice, and no explanation or promise of restoration from Debtor. Evolve was authorized to take this action under Section 2.11 of the DDA agreement(s) between Evolve and End Users ("DDA Agreement"), which authorizes Evolve to "'freeze' or place a hold" on an End User's DDA in the event Evolve suspects any "irregular, unauthorized, or unlawful activity may be occurring in connection with [the] Account." As thousands of transactions may occur each day, the fraud, anti-money laundering, or sanctions screening processes overseeing the Synapse program have flagged, for example, over 300 suspicious transactions thus far in 2024 (totaling hundreds of millions of dollars), and in the card activity have identified over 20,000 fraudulent transactions totaling millions of dollars. As a result, Evolve reasonably is concerned that there was substantial risk of unauthorized or unlawful activity impacting End User accounts during the time when Evolve lacked the visibility provided by the Dashboard. Moreover, the sudden revocation of system access with no notice or information about restoration was highly irregular, and further supported Evolve's exercise of its authority under Section 2.11 of the DDA Agreement(s) to freeze account activity.

The freeze also was permitted under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, which governs electronic fund transfers ("EFTs"), including ACH and debit card transactions. Under Regulation E, which implements the EFTA, an account-holding financial institution may make immediate changes without prior notice to the terms of a consumer asset account that reduces the "types of available electronic fund transfers" where an immediate change "is necessary to maintain or restore the security of an account or an electronic fund transfer system." 12 C.F.R. § 1005.8(a)(2).

Additionally, Evolve is required by the Bank Secrecy Act and its implementing regulations, as well as by regulations administered by the Federal Reserve Board, to conduct ongoing monitoring

5

and customer due diligence on End Users, including risk-based updates to End User information, and report suspicious activity by those End Users.  31 C.F.R. §§ 1020.210(b)(5) and 1020.320(a); 12 C.F.R. §§ 208.63 and 208.62.  Monitoring for suspicious activity requires access to transaction-level information, which is typically compared against models or algorithms of transactional behavior that may indicate money laundering, fraud, and other financial crime.  Thus, the freeze was necessary to prevent Evolve from violating the suspicious activity reporting requirements of the BSA.  In turn, without the ability to detect suspicious activity by End Users, Evolve could not comply with the requirement to identify risky behavior that may warrant a risk-based update to customer information.

Evolve is also required to comply with U.S. sanctions requirements administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").  OFAC sanctions prohibit U.S. persons such as Evolve from transacting with persons and jurisdictions targeted for sanctions by OFAC.  *See generally* 31 C.F.R. parts 500 to 599.  Compliance with OFAC requirements is achieved by Evolve by screening transactional information against lists of sanctions targets maintained by OFAC.  Without access to this information, the only way to ensure compliance with U.S. sanctions was to prevent transactions altogether.

Finally, Evolve is a state member bank regulated by the Arkansas State Bank Department, the Board of Governors of the Federal Reserve System ("Federal Reserve Board"), and the Federal Reserve Bank of St. Louis.  As a state member bank, Evolve is required to "at all times conduct its business and exercise its powers with due regard to safety and soundness."  12 C.F.R. § 208.3(d)(1).  The principles of safety and soundness are fundamental to banking regulation and are the backdrop against which all of a bank's decisions must be made.

In sum, while the Bank regrets that it was forced to make the decision to freeze account activity on May 11, 2024, this action was authorized by the DDA Agreement(s) and in alignment with applicable law.

### C.    Status of the Freeze as of May 16, 2024

As of May 16, 2024, Evolve's Dashboard login capabilities have been restored and Evolve has access to most areas of the system. However, as explained in the Evolve Emergency Motion, since May 6, 2024, Debtor has failed to provide Evolve with daily ledger files and reports of debit and credit card transactions, both of which are essential to ensuring accurate transaction recording and reconciliation for banks providing payments and electronic funds transfer ("EFT") services. Indeed, the Federal Reserve Board expects that for banks providing payments and EFT services, "[a]ll funds transfers should be reconciled at the end of each business day." Federal Reserve Board, Commercial Bank Examination Manual, Sec. 5320.1, Payment System Risk and Electronic Funds Transfer Activities, at *10 (Apr. 2009). It is impossible for Evolve to reconcile funds transfers daily without a daily ledger and transaction reports.

Debtor has now deprived Evolve of this fundamental reporting for more than a week, despite multiple requests from Evolve. Debtor's explanation for its failure to produce ledgers and transaction reporting is that Evolve allegedly failed to process ACH transactions on May 8, 2024, which then allegedly caused disruption to Debtor's ability to produce ledger files. This explanation is inaccurate and misleading. *First*, prior to the account activity freeze, including on and after May 8, 2024, Evolve was processing ACH transactions as a receiving depository financial institution ("RDFI") for Evolve Program End Users whose funds were not migrated to the Synapse Brokerage Program.[1] *Second*, for Synapse Brokerage Program End Users, Synapse had ceased sending ACH transactions through Evolve starting in the Fall of 2023, as it migrated the Synapse Brokerage Program End Users to the Synapse Brokerage. This ACH origination activity (where the originating financial institution is called an "ODFI"), was performed by Lineage Bank ("Lineage"), which ceased all ACH services for the Synapse Brokerage Program on May 9, 2024. While Debtor and Evolve discussed the possibility of Evolve taking on the ACH activity that Lineage previously performed for Synapse Brokerage End Users, Evolve ultimately decided not to move forward with this proposal. Notwithstanding Evolve's decision, Synapse sent Evolve an ACH origination file for

---

[1] The terms "ODFI" and "RDFI" are different roles in the ACH payment network, run by Nacha. The ACH network is one of the nation's principal payment systems. See https://www.nacha.org/

processing on May 8, which Evolve returned. Evolve continued to process transactions as an RDFI -- i.e., receiving transactions—until the freeze went into effect.

The contractual and legal authorities and obligations set forth in Section B above are not specific to the Dashboard access issue that resulted in the original freeze on May 11, 2024. These provisions are in place to protect banks, their customers, and the financial system from significant risks associated with unlawful, unauthorized, fraudulent, or irregular activity. They require Evolve to have daily ledgers and transaction reports to process payments. They necessitate the validation of information received from third parties that, like Debtor, have demonstrated indications of heightened risk, and they require that outgoing transactions are already funded, or if not, that the bank understands how it will be repaid for making a customer payment. And where these requirements are not satisfied, these authorities and obligations prevent Evolve from lifting the account activity freeze. Until Evolve is able to (i) perform a reconciliation using ledgers and transaction reporting starting on May 7, 2024 and going forward to the present, (ii) receive daily ledgers and transaction reporting from Debtor, and (iii) receive funds needed to fund transactions that require the bank to transmit funds to other parties, it cannot process transactions in a safe, sound, and compliant manner.

Evolve recognizes and regrets that, in delivering this message, it will be disappointing End Users seeking access to their funds. Evolve is working urgently, including with its regulators, to find ways for it to provide End Users with their funds in as timely a fashion as possible.

DATED: May 16, 2024

Respectfully submitted,

BG LAW LLP

By: /s/ David M. Poitras
    Steven T. Gubner
    David M. Poitras
Attorneys for Evolve Bank & Trust

**DECLARATION OF W. CHRISTOPHER STAAB**

I, W. Christopher Staab, hereby declare as follows:

1.      I am the Chief Technology Officer ("CTO") of Evolve Bank & Trust ("Evolve"). I have held this position since 2022. As CTO, my duties and responsibilities include overseeing all of the technology for Evolve. In addition, I have worked extensively with Evolve's Open Banking Division, which supports fintech clients and aggregators such as Synapse Financial Technologies, Inc. ("Synapse"). For the last eight months I have been working closely with the Synapse team as they have struggled with issues related to maintaining a ledger for their brokerage business at Synapse Brokerage LLC ("Synapse Brokerage"). This has included material deficiencies with the balances held by Synapse Brokerage customers at AMG, American Bank, Lineage and ADMC. Through this work I have become familiar with the Synapse platform, including the Synapse dashboard system ("Dashboard"). The Synapse systems are leveraged by various departments within Evolve for the oversight of customer activity. I hold a bachelor's degree in business administration from Boston University. I have more than twenty years of experience in the financial services industry. Capitalized terms used in this declaration and not specifically defined herein shall have the meaning ascribed to such terms in the Motion.

2.      the latter, Evolve's monitoring of account statements is a continual, ongoing activity that Evolve cannot feasibly perform if it is required to send individual requests for specific statements to Debtor each time it needs information.

3.      Under the MBSA, Evolve agreed to provide banking services to the End Users of fintech platforms ("Platforms") that had entered into agreements with Debtor, and Debtor agreed to provide program manager critical services to Evolve ("Evolve Program"). The MBSA expired on September 29, 2023 and entered a wind-down phase, and shortly thereafter in October 2023, Debtor began migrating Platforms and their End Users from the Evolve Program to a cash management program offered through the Debtor's licensed broker-dealer subsidiary, Synapse Brokerage ("Synapse Brokerage Program"). When a Platform migrated its End Users from the Evolve Program to the Synapse Brokerage Program, the funds belonging to the Platform's End Users, which had been held in Evolve DDAs, were transferred by Synapse from the FBO accounts at Evolve to

9

Synapse Brokerage. Evolve had no role in the creation of, or migration of Platforms to, the Synapse Brokerage Program, beyond executing the payment instructions that Synapse provided as part of their fiduciary responsibility overseeing the program. Synapse did not act to close the Evolve DDA accounts of End Users that migrated to the Synapse Brokerage Program, but did transfer the funds held in those DDA accounts.

4.   End Users who enroll in the Synapse Brokerage Program agreed to Terms of Service specific to the Synapse Brokerage Program and enter into a Customer Agreement with Synapse Brokerage. The Terms of Service and Customer Agreement identify Program Banks that participate in the Synapse Brokerage Program. These Program Banks include AMG National Trust ("AMG"), which Evolve understands acts as the primary custodian of End User funds for the Synapse Brokerage Program. Synapse Brokerage Program Banks execute a Program Bank Agreement with Synapse Brokerage, pursuant to which they hold Synapse Brokerage Program End User funds in one or more accounts for the benefit of Synapse Brokerage End Users.

5.   Evolve has never entered into a Synapse Brokerage Program Bank Agreement, and is not, and has never been, a Synapse Brokerage Program Bank. Evolve's only link with the Synapse Brokerage Program has been certain payment processing activities that Evolve continued to perform for End Users of platforms that migrated from the Evolve Program to the Synapse Brokerage Program. These activities were include debit and credit card issuing, and acting as a receiving depository financial institution ("RDFI") for Automated Clearinghouse ("ACH") transactions, but Evolve was not action as an originating depository institution.

6.   On May 13, 2024, Debtor restored Evolve's ability to log into the Dashboard using Synapse-issued credentials. However, Debtor still continues to deny Evolve access to at least one area of the Dashboard, which is the area containing End User account statements ("Statements Portal"). Prior to May 11, 2024, Evolve accessed the Statements Portal daily without restriction to validate End User account balances and reporting provided by Debtor.

7.   Evolve has requested that the Debtor grant it access to the Statements Portal, but Debtor has refused, and instead has informed Evolve that the account statements are actually summaries, rather than statements, and that Debtor will provide Evolve with copies upon Evolve's

request, provided the request identifies the specific statements that Evolve requires. As to the former, Debtor has not explained the distinction between summaries and statements, nor has it explained why this distinction would justify removing Evolve's access to such information. As to the latter, Evolve's monitoring of account statements is a continual, ongoing activity that Evolve cannot feasibly perform if it is required to send individual requests for specific statements to Debtor each time it needs information.

8. Evolve has serious concerns about the integrity of the Dashboard and the completeness of the information therein in light of (i) the unexpected revocation of Evolve's access over the weekend of May 11-12, 2024, which Debtor has confirmed to Evolve was not the result of any system issues, and therefore was presumably intentional on the part of Debtor—notwithstanding Debtor management's contemporaneous protestations of confusion about the revocation of access—and (ii) Debtor's continued refusal to grant Evolve full access to all areas of the Dashboard, which Evolve had always had access to prior to the revocation. Evolve continues to perform validation of the Dashboard and monitor access to ensure rapid detection of any future outage.

9. Evolve's decision to freeze End User account activity on May 11, 2024 was a time-sensitive decision of necessity, made in response to an unprecedented revocation of Dashboard access, with no notice, and no explanation or promise of restoration from Debtor. Evolve was authorized to take this action under Section 2.11 of the DDA agreement(s) between Evolve and End Users ("DDA Agreement"), which authorizes Evolve to "'freeze' or place a hold" on an End User's DDA in the event Evolve suspects any "irregular, unauthorized, or unlawful activity may be occurring in connection with [the] Account." As thousands of transactions may occur each day, the fraud, anti-money laundering, or sanctions screening processes overseeing the Synapse program have flagged, for example, over 300 suspicious transactions thus far in 2024 (totaling hundreds of millions of dollars), and in the card activity have identified over 20,000 fraudulent transactions totaling millions of dollars. As a result, Evolve reasonably is concerned that there was substantial risk of unauthorized or unlawful activity impacting End User accounts during the time when Evolve lacked the visibility provided by the Dashboard. Moreover, the sudden revocation of system access

with no notice or information about restoration was highly irregular, and further supported Evolve's exercise of its authority under Section 2.11 of the DDA Agreement(s) to freeze account activity.

10. Additionally, Evolve is required by the Bank Secrecy Act and its implementing regulations, as well as by regulations administered by the Federal Reserve Board, to conduct ongoing monitoring and customer due diligence on End Users, including risk-based updates to End User information, and report suspicious activity by those End Users. Monitoring for suspicious activity requires access to transaction-level information, which is typically compared against models or algorithms of transactional behavior that may indicate money laundering, fraud, and other financial crime. Thus, the freeze was necessary to prevent Evolve from violating the suspicious activity reporting requirements of the BSA. In turn, without the ability to detect suspicious activity by End Users, Evolve could not comply with the requirement to identify risky behavior that may warrant a risk-based update to customer information.

11. Evolve is also required to comply with U.S. sanctions requirements administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). OFAC sanctions prohibit U.S. persons such as Evolve from transacting with persons and jurisdictions targeted for sanctions by OFAC. Compliance with OFAC requirements is achieved by Evolve by screening transactional information against lists of sanctions targets maintained by OFAC. Without access to this information, the only way to ensure compliance with U.S. sanctions was to prevent transactions altogether.

12. Finally, Evolve is a state member bank regulated by the Arkansas State Bank Department, the Board of Governors of the Federal Reserve System ("Federal Reserve Board"), and the Federal Reserve Bank of St. Louis. As a state member bank, Evolve is required to "at all times conduct its business and exercise its powers with due regard to safety and soundness." The principles of safety and soundness are fundamental to banking regulation and are the backdrop against which all of a bank's decisions must be made.

13. As of May 16, 2024, Evolve's Dashboard login capabilities have been restored and Evolve has access to most areas of the system. However, as explained in the Evolve Emergency Motion, since May 6, 2024, Debtor has failed to provide Evolve with daily ledger files and reports of

debit and credit card transactions, both of which are essential to ensuring accurate transaction recording and reconciliation for banks providing payments and electronic funds transfer ("EFT") services.  Indeed, the Federal Reserve Board expects that for banks providing payments and EFT services, "[a]ll funds transfers should be reconciled at the end of each business day."  Federal Reserve Board, Commercial Bank Examination Manual, Sec. 5320.1, Payment System Risk and Electronic Funds Transfer Activities, at *10 (Apr. 2009).  It is impossible for Evolve to reconcile funds transfers daily without a daily ledger and transaction reports.

14. Debtor has now deprived Evolve of this fundamental reporting for more than a week, despite multiple requests from Evolve.  Debtor's explanation for its failure to produce ledgers and transaction reporting is that Evolve allegedly failed to process ACH transactions on May 8, 2024, which then allegedly caused disruption to Debtor's ability to produce ledger files.  This explanation is inaccurate and misleading.  *First*, prior to the account activity freeze, including on and after May 8, 2024, Evolve was processing ACH transactions as a receiving depository financial institution ("RDFI") for Evolve Program End Users whose funds were not migrated to the Synapse Brokerage Program.[2] *Second*, for Synapse Brokerage Program End Users, Synapse had ceased sending ACH transactions through Evolve starting in the Fall of 2023, as it migrated the Synapse Brokerage Program End Users to the Synapse Brokerage.   This ACH origination activity (where the originating financial institution is called an "ODFI"), was performed by Lineage Bank ("Lineage"), which ceased all ACH services for the Synapse Brokerage Program on May 9, 2024.  While Debtor and Evolve discussed the possibility of Evolve taking on the ACH activity that Lineage previously performed for Synapse Brokerage End Users, Evolve ultimately decided not to move forward with this proposal.  Notwithstanding Evolve's decision, Synapse sent Evolve an ACH origination file for processing on May 8, which Evolve returned.  Evolve continued to process transactions as an RDFI - - i.e., receiving transactions—until the freeze went into effect.

15. The contractual and legal authorities and obligations set forth in Section B above are not specific to the Dashboard access issue that resulted in the original freeze on May 11, 2024.

---

[2] The terms "ODFI" and "RDFI" are different roles in the ACH payment network, run by Nacha.  The ACH network is one of the nation's principal payment systems.  See https://www.nacha.org/

These provisions are in place to protect banks, their customers, and the financial system from significant risks associated with unlawful, unauthorized, fraudulent, or irregular activity.  They require Evolve to have daily ledgers and transaction reports to process payments.  They necessitate the validation of information received from third parties that, like Debtor, have demonstrated indications of heightened risk, and they require that outgoing transactions are already funded, or if not, that the bank understands how it will be repaid for making a customer payment.  And where these requirements are not satisfied, these authorities and obligations prevent Evolve from lifting the account activity freeze.  Until Evolve is able to (i) perform a reconciliation using ledgers and transaction reporting starting on May 7, 2024 and going forward to the present, (ii) receive daily ledgers and transaction reporting from Debtor, and (iii) receive funds needed to fund transactions that require the bank to transmit funds to other parties, it cannot process transactions in a safe, sound, and compliant manner.

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of May, 2024, at Hingham, Massachusetts.

_____
W. CHRISTOPHER STAAB

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the foregoing document entitled**: EVOLVE BANK & TRUST'S ("EVOLVE") STATEMENT OF POSITION CONCERNING: (A) EVOLVE'S ACCESS TO THE SYNAPSE DASHBOARD SYSTEM; (B) THE TEMPORARY FREEZING OF CERTAIN ACCOUNT ACTIVITY; AND (C) THE CURRENT STATUS OF THE FREEZE; DECLARATION OF W. CHRISTOPHER STAAB IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **May 16, 2024,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **_____,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**\*\*JUDGE'S COPY NOT REQUIRED IF LESS THAN 25 PAGES (GENERAL ORDER 23-01).**

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 16, 2024,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL**

**Official Committee of Unsecured Creditors**

Kroll Associates, Inc.
Attn: Heather Elizabeth Saydah
55. East 52nd Street, 17th Floor
New York, NY 10055
Heather.saydah@kroll.com

Mercury Technologies, Inc.
Attn Celeste Ferber
333 Bush Street, Suite 1900
San Francisco, CA 94104
celeste@mercury.com

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 16, 2024 | Mela Galvan | /s/ Mela Galvan |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**AND**

3. **VIA EMAIL:**

- **Ron Bender**   rb@lnbyg.com
- **J Scott Bovitz**   bovitz@bovitz-spitzer.com
- **Russell Clementson**   russell.clementson@usdoj.gov
- **Andrew Michael Cummings**   andrew.cummings@hklaw.com, philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
- **Michael G. Farag**   mfarag@gibsondunn.com
- **Paul R. Glassman**   pglassman@stradlinglaw.com
- **Michael I. Gottfried**   mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Steven T Gubner**   sgubner@bg.law, ecf@bg.law
- **Ralph P Guenther**   rguenther@guentherlawgroup.com
- **Robert T. Honeywell**   robert.honeywell@klgates.com
- **Lance N Jurich**   ljurich@loeb.com, pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
- **Monica Y Kim**   myk@lnbyg.com, myk@ecf.inforuptcy.com
- **Jeffrey C Krause**   jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
- **Adam A Lewis**   alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
- **Krikor J Meshefejian**   kjm@lnbyg.com
- **Fred Neufeld**   fneufeld@sycr.com, tingman@sycr.com
- **David M Poitras**   dpoitras@bg.law
- **Paul M Rosenblatt**   prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
- **Brandy A Sargent**   brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
- **Zev Shechtman**   Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com
- **Jason D Strabo**   jstrabo@mwe.com, jbishopjones@mwe.com
- **United States Trustee (SV)**   ustpregion16.wh.ecf@usdoj.gov
- **Jeffrey C Wisler**   jwisler@connollygallagher.com, dperkins@connollygallagher.com
- **Beth Ann R. Young**   bry@lnbyg.com, bry@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL:**

**Request for Special Notice**

Jason D. Strabo, Esq.
McDermott Will & Emery
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
jstrabo@mwe.com

Darren Azman, Esq.
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-3852
dazman@mwe.com

Jake Jumbeck, Esq.
McDermott Will & Emery LLP
444 W. Lake Street, Suite 4000
Chicago, Illinois 60606-0029
jjumbeck@mwe.com

Jeffrey C. Krause, Esq.
Ilissa Samplin, Esq.
Daniel Nowicki, Esq.
Michael G. Farag, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
jkrause@gibsondunn.com
isamplin@gibsondunn.com
dnowicki@gibsondunn.com
mfarag@gibsondunn.com

Robert T. Honeywell, Esq.
K&L Gates LLP
599 Lexington Ave
New York, NY 10022
robert.honeywell@klgates.com

Brandy A. Sargent, Esq.
K&L Gates LLP
1 SW Columbia Street, Suite 1900
Portland, OR 97258
brandy.sargent@klgates.com

Robert J. Labate, Esq.
400 South Hope Street, 8th Floor Los Angeles, CA 90071
robert.labate@hklaw.com

Andrew M. Cummings, Esq.
Holland & Knight LLP
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
andrew.cummings@hklaw.com

Jeffrey C. Wisler, Esq.
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
jwisler@connollygallagher.com

Chris Glenos, Esq.
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
cglenos@bradley.com

Paul R. Glassman, Esq.
Fred Neufeld, Esq.
Stradling Yocca Carlson & Rauth LLP
10100 N. Santa Monica Blvd.
Suite 1450
Los Angeles, CA 90067
pglassman@stradlinglaw.com
fneufeld@stradlinglaw.com

Benjamin Waisbren, Esq.
Boies, Schiller Flexner LLP
1401 New York Avenue, N.W.
11th Floor
Washington, DC 20005
bwaisbren@bsfllp.com

John Kucera, Esq.
Boies, Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
jkucera@bsfllp.com

Simon Leen, Esq.
Boies, Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
sleen@bsfllp.com

Marc Ayala, Esq.
Boies, Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
mayala@bsfllp.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                          **F 9013-3.1.PROOF.SERVICE**