RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; myk@lnbyg.com; kjm@lnbyg.com

Proposed Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | ) Case No.: 1:24-bk-10646-MB |
| | ) |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | ) Chapter 11 |
| | ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S RESPONSE TO EMERGENCY MOTION FILED BY OFFICE OF THE UNITED STATES TRUSTEE TO CONVERT CASE TO CHAPTER 7 UNDER 11 U.S.C. § 1112(b) OR, IN THE ALTERNATIVE, TO DIRECT APPOINTMENT OF A CHAPTER 11 TRUSTEE UNDER § 1104(a); DECLARATION OF SINKAET PATHAK** |
| | ) |
| | ) Date:    May 24, 2024 |
| | ) Time:    8:00 a.m. |
| | ) Place:   Courtroom 303 |
| | )             21041 Burbank Boulevard |
| | )             Woodland Hills, CA 91367 |
| | ) |

1

Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor"), hereby submits its response to the motion (the "Motion"), filed on an emergency basis by the Office of the United States Trustee ("UST") to convert this case to Chapter 7 pursuant to 11 U.S.C. § 1112(a) or, in the alternative, to direct the appointment of a Chapter 11 trustee under § 1104(a).

As of the May 24, 2024 hearing, the Debtor has terminated all employees and contractors other than 18 employees and 6 contractors. The Debtor will run out of all available cash, terminate the balance of its employees and cease any remaining operations by the end of the day on May 24, 2024. Thus, without further funding which does not appear to be available, there is no chance of a reorganization or sale of the Debtor's business as a going concern, and the case should be converted to Chapter 7 with a Chapter 7 trustee to investigate and monetize the assets of this estate, including the massive causes of action against Evolve Bank & Trust ("Evolve"), Mercury Technologies, Inc., and other third parties.

More specifically, as of the date hereof, the Debtor is left with a skeletal crew of 18 employees and 6 contractors to best complete the remaining wind-down and migration efforts for its fintech customers and work tirelessly to provide depositors with access to their funds that were frozen by Evolve and Lineage. The Debtor's work in this regard was severely impaired when, on May 21, 2024, the Debtor learned that the two banks – Evolve and American Bank – which were holding the majority of the Debtor's available cash (and the cash collateral of the Debtor's secured lenders), were refusing to release the Debtor's funds which were property of the estate.[1] American Bank indicated that it was putting the Debtor's bank account (which is not a FBO Account) on an "administrative hold" which American Bank argues does not violate the automatic stay, and Evolve stated that it could not understand the balances in the Debtor's accounts, and could not confirm that there was actual cash in these accounts and not simply ledger entries. The Debtor's funds are maintained in Evolve's FBO Accounts and Evolve's positions

---

[1] Currently, the Debtors have approximately $225,000 on deposit at American Bank and at least approximately $627,000 at Evolve. The Debtor's investigation continues given the lack of full access to Evolve's portal.

are the exact same positions relied upon by Evolve in refusing other depositors' access to their funds. Based on these unsubstantiated and unwarranted reasons, the Debtor too has immediately lost access to hundreds of thousands of dollars which it needs to support a wind down.

Attached as Exhibits "1" and "2" to the Declaration of Sankaet Pathak ("Pathak Declaration") annexed hereto are the e-mail exchanges and related documents with American Bank and Evolve as to these issues. While the Debtor has desperately tried to obtain additional funds from its customers to continue with its wind-down and migration activities, the immediate loss and absence of the Debtor's funds from American Bank and Evolve is directly causing the earlier than anticipated demise of the Debtor's operations, further harming the fintechs and depositors that the Debtor is desperately trying to assist.

The Debtor agrees that "cause" exists under 11 U.S.C. § 1112(b)(4) to convert this case to Chapter 7 which is also in the best interests of creditors and the estate. There is substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation without further cash infusion. The Debtor filed this case for the singular purpose of selling its business and assets as a going concern to a stalking horse buyer, Tabapay Holdings LLC ("Buyer"). However, the proposed sale to the Buyer did not close, and there were no other bidders for the Debtor's assets. Currently, though there are purported prospective buyers, there is no prospective buyer willing to provide immediate cash infusion and purchase assets quickly, and, at the end of the day on May 24, 2024 after the hearing, the Debtor will have ceased all operations.[2] The Debtor has no authority to use cash collateral beyond May 24, 2024, and, more critically, the Debtor has no available cash left given Evolve's and American Bank's freeze of the Debtor's funds.

Under these facts, there is no prospect for any reorganization of the Debtor, or any purpose for the Debtor to remain in Chapter 11. The estate will have assets, including possibly future cash

---

[2] The Debtor received broad, non-binding terms of an offer from a third party located overseas interested in purchasing the assets and providing a secured loan, and interest from a third party who is experienced in the BaaS space interested in purchasing the assets (including litigation claims), however, it is not conceivable for the Debtor to negotiate and finalize transactions with these parties within the tight timeline imposed by these parties and/or currently faced by the Debtor as a result of its almost non-existent cash situation.

from its subsidiaries and litigation claims, all of which can be liquidated and monetized by a Chapter 7 trustee in an orderly fashion. A conversion will be necessary at some point, and in the best interests of creditors and the estate.

Finally, the Debtor vigorously disputes the UST's allegations in its Motion, made in support of its alternative request for the appointment of a Chapter 11 trustee, of gross management by the Debtor and its management relative to the freezing of end user accounts. Contemporaneously herewith, the Debtor has filed its "*Status Report Regarding Evolve Bank & Trust's Account Freeze*" which provides detailed information as to the events surrounding the unprecedented and improper actions by Evolve to lock end users from their own funds. Indeed, the Debtor was also locked out of its own funds (which is also property of this bankruptcy estate) on deposit with Evolve which hastened its demise and severely chilled the wind-down and migration tasks being undertaken by the Debtor for its fintech customers and depositors.

Based on the foregoing, the Debtor supports the conversion of this case to Chapter 7.

Dated:  May 23, 2024              SYNAPSE FINANCIAL TECHNOLOGIES, INC.

By:   /s/ Monica Y. Kim
        RON BENDER
        MONICA Y. KIM
        KRIKOR J. MESHEFIJIAN
        LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
        Proposed Attorneys for Debtor and Debtor in Possession

## DECLARATION OF SANKAET PATHAK

I, Sankaet Pathak, hereby declare as follows:

1.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.  I am the Founder and Chief Executive Officer of Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case ("Debtor").

3.  In my capacity as the Founder and CEO of the Debtor, I have access to the Debtor's books and records and am familiar with the organization, operations and financial condition of the Debtor. Any records and documents referred to in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of each act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own review and knowledge of the Debtor's books and records, and my own knowledge of the Debtor's efforts to raise additional capital and market and sell the Debtor's assets as a going concern over the course of the past six+ months.

4.  I make this declaration in support of the Debtor's response to the motion (the "Motion"), filed on an emergency basis by the Office of the United States Trustee ("UST") to convert this case to Chapter 7 pursuant to 11 U.S.C. § 1112(a) or, in the alternative, to direct the appointment of a Chapter 11 trustee under § 1104(a).

5.  As of the May 24, 2024 hearing, the Debtor has terminated all employees and contractors other than 18 employees and 6 contractors. The Debtor will run out of all available cash, terminate the balance of its employees and cease any remaining operations by the end of the day on May 24, 2024. Thus, without further funding which does not appear to be available, there is no chance of a reorganization or sale of the Debtor's business as a going concern, and the case should be converted to Chapter 7 with a Chapter 7 trustee to investigate and monetize the assets

of this estate, including the massive causes of action against Evolve Bank & Trust ("Evolve"), Mercury Technologies, Inc., and other third parties.

6.    More specifically, as of the date hereof, the Debtor is left with a skeletal crew of 18 employees and 6 contractors to best complete the remaining wind-down and migration efforts for its fintech customers and work tirelessly to provide depositors with access to their funds that were frozen by Evolve and Lineage. The Debtor's work in this regard was severely impaired when, on May 21, 2024, the Debtor learned that the two banks – Evolve and American Bank – which were holding the majority of the Debtor's available cash (and the cash collateral of the Debtor's secured lenders), were refusing to release the Debtor's funds which were property of the estate.[3] American Bank indicated that it was putting the Debtor's bank account (which is not a FBO Account) on an "administrative hold" which American Bank argues does not violate the automatic stay, and Evolve stated that it could not understand the balances in the Debtor's accounts, and could not confirm that there was actual cash in these accounts and not simply ledger entries. The Debtor's funds are maintained in Evolve's FBO Accounts and Evolve's positions are the exact same positions relied upon by Evolve in refusing other depositors' access to their funds. Based on these unsubstantiated and unwarranted reasons, the Debtor too has immediately lost access to hundreds of thousands of dollars which it needs to support a wind down.

7.    Attached hereto as Exhibits "1" and "2" are the e-mail exchanges and related documents with American Bank and Evolve as to these issues. While the Debtor has desperately tried to obtain additional funds from its customers to continue with its wind-down and migration activities, the immediate loss and absence of the Debtor's funds from American Bank and Evolve is directly causing the earlier than anticipated demise of the Debtor's operations, further harming the fintechs and depositors that the Debtor is desperately trying to assist.

8.    The Debtor agrees that "cause" exists under 11 U.S.C. § 1112(b)(4) to convert this case to Chapter 7 which is also in the best interests of creditors and the estate. There is substantial

---

[3] Currently, the Debtors have approximately $225,000 on deposit at American Bank and at least approximately $627,000 at Evolve. The Debtor's investigation continues given the lack of full access to Evolve's portal.

and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation without further cash infusion. The Debtor filed this case for the singular purpose of selling its business and assets as a going concern to a stalking horse buyer, Tabapay Holdings LLC ("Buyer"). However, the proposed sale to the Buyer did not close, and there were no other bidders for the Debtor's assets. Currently, though there are purported prospective buyers, there is no prospective buyer willing to provide immediate cash infusion and purchase assets quickly, and, at the end of the day on May 24, 2024 after the hearing, the Debtor will have ceased all operations.[4] The Debtor has no authority to use cash collateral beyond May 24, 2024, and, more critically, the Debtor has no available cash left given Evolve's and American Bank's freeze of the Debtor's funds.

9.      Under these facts, there is no prospect for any reorganization of the Debtor, or any purpose for the Debtor to remain in Chapter 11. The estate will have assets, including possibly future cash from its subsidiaries and litigation claims, all of which can be liquidated and monetized by a Chapter 7 trustee in an orderly fashion. A conversion will be necessary at some point, and in the best interests of creditors and the estate.

10.     Finally, the Debtor vigorously disputes the UST's allegations in its Motion, made in support of its alternative request for the appointment of a Chapter 11 trustee, of gross management by the Debtor and its management relative to the freezing of end user accounts. Contemporaneously herewith, the Debtor has filed its "*Status Report Regarding Evolve Bank & Trust's Account Freeze*" which provides detailed information as to the events surrounding the unprecedented and improper actions by Evolve to lock end users from their own funds. Indeed, the Debtor was also locked out of its own funds (which is also property of this bankruptcy estate) on deposit with Evolve which hastened its demise and severely chilled the wind-down and migration tasks being undertaken by the Debtor for its fintech customers and depositors.

---

[4] The Debtor received broad, non-binding terms of an offer from a third party located overseas interested in purchasing the assets and providing a secured loan, and interest from a third party who is experienced in the BaaS space interested in purchasing the assets (including litigation claims), however, it is not conceivable for the Debtor to negotiate and finalize transactions with these parties within the tight timeline imposed by these parties and/or currently faced by the Debtor as a result of its almost non-existent cash situation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of May, 2024 at Santorini, Greece.

SANKAET PATHAK

# EXHIBIT "1"

| | |
|---|---|
| **From:** | Stan Orszula <stan.orszula@bfkn.com> |
| **Sent:** | Wednesday, May 22, 2024 10:30 AM |
| **To:** | Monica Y. Kim |
| **Cc:** | Ron Bender; Krikor J. Meshefejian; Beth R. Young; micah.lang@am-bank.com; Tracey Guerin; Sankaet Pathak; Pam Wismer; joel.westra@ambankco.com; jenny.kayser@am-bank.com; Justin Steffen; Alexander Berk; Nathan Rugg |
| **Subject:** | RE: Synapse Funds - Automatic Stay |
| **Attachments:** | RE: Online Access |

Monica, please see the attached email that was sent to Ms. Young and Mr. Bender last night. As stated in that email and my conversation with Ms. Young, American Bank is not exercising a set off but rather continues to place an administrative hold on this account, as it is allowed to do so under U.S. Supreme Court precedent. Additionally, the funds in the account are not subject to any type of deposit control agreement or any sort of pledge to any other party that is superior to American Bank's interest.

Additionally, American Bank has not been provided with a proposal on adequate protection as required under the bankruptcy code.

American Bank again disputes allegations raised by you, Ms. Young and the Debtor. American Bank further reserves all rights and nothing contained herein is a limitation or waiver of those rights.

I trust this email will conclude this matter.

Best, Stan

**Stan Orszula**
**Barack Ferrazzano Kirschbaum & Nagelberg LLP**
Partner  |  T. (312) 629-7483  |  stan.orszula@bfkn.com
BFKN – Celebrating 40 Years!

---

**From:** Monica Y. Kim <myk@lnbyg.com>
**Sent:** Wednesday, May 22, 2024 11:50 AM
**To:** Stan Orszula <stan.orszula@bfkn.com>
**Cc:** Ron Bender <RB@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; micah.lang@am-bank.com; Tracey Guerin <tracey@synapsefi.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam@ascentcfo.com>; joel.westra@ambankco.com; jenny.kayser@am-bank.com; Justin Steffen <justin.steffen@bfkn.com>; Alexander Berk <alexander.berk@bfkn.com>; Nathan Rugg <nathan.rugg@bfkn.com>
**Subject:** RE: Synapse Funds - Automatic Stay

Stan,

I see in your communication with Beth that you were going to provide a more fulsome explanation which has yet to be provided. Please provide if I missed it.

The Supreme Court case you cite which applies to an 'administrative hold' and not a 'setoff' (which would clearly violate the stay) states:

Respondent's reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that

belonged to respondent. <mark>That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank.</mark> In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor, see *Bank of Marin* v. *England,* 385 U. S. 99, 101 (1966); *Keller* v. *Frederickstown Sav. Institution,* 193 Md. 292, 296, 66 A. 2d 924, 925 (1949); and petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise.

There can be no dispute that Synapse's bank account at AB consists of **money belonging to Synapse and held by AB** (which I also believe is subject to a DACA with one or more of the secured lenders). Bottom line is that the facts of our case is different, and your reliance of the Supreme Court case is totally misguided. What is the purpose of locking Synapse out of its money? If your client is going to rely on the Supreme Court case you cite, I think it goes without saying that everyone (including the court) needs to know the reasons and not just a reference to a Supreme Court case.

Monica Kim

---

**From:** Stan Orszula <stan.orszula@bfkn.com>
**Sent:** Wednesday, May 22, 2024 9:30 AM
**To:** Monica Y. Kim <myk@lnbyg.com>
**Cc:** Ron Bender <RB@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; micah.lang@am-bank.com; Tracey Guerin <tracey@synapsefi.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam@ascentcfo.com>; joel.westra@ambankco.com; jenny.kayser@am-bank.com; Justin Steffen <justin.steffen@bfkn.com>; Alexander Berk <alexander.berk@bfkn.com>; Nathan Rugg <nathan.rugg@bfkn.com>
**Subject:** RE: Synapse Funds - Automatic Stay

Ms. Kim,

I refer you to the email (attached) that was sent to your colleague Ms. Young last night.

American Bank again disputes all of your allegations and reserves all rights and remedies.

Best, Stan

**Stan Orszula**
**Barack Ferrazzano Kirschbaum & Nagelberg LLP**
Partner | T. (312) 629-7483 | stan.orszula@bfkn.com
BFKN – Celebrating 40 Years!

---

**From:** Monica Y. Kim <myk@lnbyg.com>
**Sent:** Wednesday, May 22, 2024 11:20 AM
**To:** joel.westra@ambankco.com; Stan Orszula <stan.orszula@bfkn.com>; Justin Steffen <justin.steffen@bfkn.com>; micah.lang@am-bank.com; jenny.kayser@am-bank.com
**Cc:** Ron Bender <RB@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; Tracey Guerin <tracey@synapsefi.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam@ascentcfo.com>
**Subject:** Synapse Funds - Automatic Stay

All,

AB has exercised control and possession over Synapse's funds with AB by refusing to release the funds in violation of the automatic stay and bankruptcy court orders.

Synapse needs the funds now to pay expenses including payroll and PTO which were authorized by the court and the secured lenders. Please let us know immediately if and when the funds, which are clearly estate property, will be returned. If AB has no intention of returning the funds, please let us know the reasons AB is exercising control and possession over estate property without any order of the bankruptcy court and in what appears to be an intentional violation of the court's orders on cash collateral and cash management and the automatic stay provisions so that we can advise the court accordingly.

Best, Monica Kim

This message, which contains information from a law firm, may be confidential and privileged. If you have received this communication in error (you are not the addressee or authorized to receive for the addressee), you may not use, copy or disclose the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

We are sending you this e-mail primarily for your information, to meet your needs and further our valued relationship. If you prefer not to receive any further messages from us, just reply to this e-mail and let us know. For more information, please review our privacy notice available here. Thanks.

Any tax advice contained in this email or document was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

| | |
|---|---|
| **From:** | Stan Orszula <stan.orszula@bfkn.com> |
| **Sent:** | Tuesday, May 21, 2024 10:04 PM |
| **To:** | Beth R. Young |
| **Cc:** | Tracey Guerin; Alexander Berk; ljurich@loeb.com; Ron Bender |
| **Subject:** | RE: Online Access |
| **Attachments:** | SYNAPSE FINANCIAL TECHNOLOGIES INC(2597851.1).pdf; Synapse Bank Service Agreement 2-25-2021.pdf; 16 April 24 Default Letter(2606196.1).pdf |

Beth,

As promised, I write to follow up on our conversation from earlier today concerning an ongoing administrative freeze on Synapse Financial Technologies Inc.'s (the "Debtor") bank account held at American Bank. I've also attached the salient documents, which I assume you already have but nevertheless wanted to attach as a convenience and courtesy as well.

The basis for the continuation of such freeze is twofold.

First, American Bank has significant prepetition claims against the Debtor (which may exceed the amount in the account and remain under investigation by American Bank) that are subject to contractual (see Section 16 of the attached account agreement and Section 29 of the attached program agreement) and common law rights of setoff that were preserved by section 553(a) of the Bankruptcy Code when the Debtor commenced its chapter 11 bankruptcy case. Certain of American Bank's prepetition claims are described in greater detail in the attached default notice sent by American Bank to the Debtor on April 16, 2024. Additionally, American Bank has prepetition claims for reimbursable fees and costs under Section 3 of the attached account agreement that governs the Debtor's account at American Bank. Pursuant to the United States Supreme Court's decision in *Citizens Bank of Maryland v. Strumpf*, American Bank may maintain its administrative freeze temporarily and such temporary administrative freeze does not constitute a setoff in violation of the automatic stay. American Bank's present intention is to seek stay relief at an appropriate time to effectuate its setoff rights on account of its prepetition claims, which remain under investigation.

Second, to the extent that any of the funds held in the Debtor's bank account at American Bank are not subject to American Bank's contractual and common law rights of setoff, many concerning facts have recently come to light in the Debtor's chapter 11 case—including allegations of embezzlement and other fraud—that cast doubt on whether the funds would be properly applied and utilized if the administrative freeze was lifted. American Bank cannot be put in a position where it risks exposure by lifting the administrative hold and having the funds subsequently misappropriated by the Debtor before a third-party fiduciary is appointed in the Debtor's chapter 11 case who should be the ultimate decisionmaker concerning how to utilize any such funds held at American Bank that are not subject to its setoff rights, to the extent any exist. Again, as we discussed, American Bank is not exercising a setoff on any funds held at in the Debtor's bank account and will not do so without obtaining appropriate relief from the bankruptcy court, such that there is no risk of any diminishment of property of the estate by allowing the administrative hold to remain in place.

Please do not hesitate to reach out with further questions.

Best, Stan

**Stan Orszula**
**Barack Ferrazzano Kirschbaum & Nagelberg LLP**
Partner | T. (312) 629-7483 | stan.orszula@bfkn.com
BFKN – Celebrating 40 Years!

**From:** Stan Orszula
**Sent:** Tuesday, May 21, 2024 7:07 PM
**To:** Beth R. Young <bry@lnbyg.com>
**Cc:** Tracey Guerin <tracey@synapsefi.com>; Justin Steffen <justin.steffen@bfkn.com>; Alexander Berk
<alexander.berk@bfkn.com>; ljurich@loeb.com; Ron Bender <RB@lnbyg.com>
**Subject:** RE: Online Access

Beth,

We will be providing a more fulsome response to your email below later this evening. To clarify, I referenced the *Strumpf* case in our call (the citation is *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995)). American Bank, N.A. (the "Bank") also disputes the allegations made in your email below and the Bank reserves all of its rights and remedies in this matter.

Best, Stan

**Stan Orszula**
**Barack Ferrazzano Kirschbaum & Nagelberg LLP**
Partner  |  T. (312) 629-7483  |  stan.orszula@bfkn.com
BFKN – Celebrating 40 Years!

**From:** Beth R. Young <bry@lnbyg.com>
**Sent:** Tuesday, May 21, 2024 6:36 PM
**To:** Stan Orszula <stan.orszula@bfkn.com>; Ron Bender <RB@lnbyg.com>
**Cc:** Tracey Guerin <tracey@synapsefi.com>; Justin Steffen <justin.steffen@bfkn.com>; Alexander Berk
<alexander.berk@bfkn.com>; ljurich@loeb.com
**Subject:** RE: Online Access

Stan.  Following up on our call more than one hour ago, I am still waiting for the agreement your referenced and the citation to the Supreme Court case you also referenced but could not discuss or identify with specificity in our call.  Since you have not sent the materials, I hope you are reconsidering your position on this issue.

This will confirm that the Debtor objects to your unilateral "administrative" freeze of the Debtor's funds without having any specific claim or loss to offset.  As I advised, the funds should be directed to the Debtor's DIP account, and were being sent to the DIP account for the purpose of paying payroll to employees who have been working around the clock to prepare ledgers and summaries so that the fintechs and banks have accounting information.  So while you hold these funds for hypothetical claims that you have not identified, the Debtor's payment of payroll is now at risk.  We will bring this to the Court's attention and consider it to be a violation of the automatic stay.

**BETH ANN R. YOUNG,** Esq.
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK  L.L.P.**
2818 La Cienega Avenue  |  Los Angeles, CA   90034
Main  310 229 1234  |  Direct  310 229 3352  |  Mobile  310 409 6708
bry@lnbyg.com   |   www.lnbyg.com

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

🌍 Please consider the environment before printing this email

---

**From:** Stan Orszula <stan.orszula@bfkn.com>
**Sent:** Tuesday, May 21, 2024 2:36 PM
**To:** Ron Bender <RB@lnbyg.com>
**Cc:** Tracey Guerin <tracey@synapsefi.com>; Beth R. Young <bry@lnbyg.com>; Justin Steffen <justin.steffen@bfkn.com>; Alexander Berk <alexander.berk@bfkn.com>; ljurich@loeb.com
**Subject:** RE: Online Access

Ron, I will call you about this shortly.

Thanks, Stan

**Stan Orszula**
**Barack Ferrazzano Kirschbaum & Nagelberg LLP**
Partner | T. (312) 629-7483 | stan.orszula@bfkn.com
BFKN – Celebrating 40 Years!

---

**From:** Sankaet Pathak <s@synapsefi.com>
**Sent:** Tuesday, May 21, 2024 2:41 PM
**To:** Victor Medeiros <victor.medeiros@synapsefi.com>; Joel Westra <joel.westra@ambankco.com>; Stan Orszula <stan.orszula@bfkn.com>; Justin Steffen <justin.steffen@bfkn.com>
**Cc:** Micah Lang <Micah.Lang@am-bank.com>; Jenny Kayser <jenny.kayser@am-bank.com>; Aaron Riley <aaron.riley@synapsefi.com>; Pam+Wismer+ <pam@ascentcfo.com>; Micah Brafford <micah.brafford@synapsefi.com>; Tracey Guerin <tracey@synapsefi.com>; Beth Young <bry@lnbyg.com>
**Subject:** Re: Online Access

Guys we should want you to be aware that holding these funds is going to kill Synapse today. So no more ongoing support for any bank partners, fintechs and depositors. We do not have any financial gain here, the whole team is working round the clock out of the goodness of their heart and to do everything we can to ensure depositors receive their money. But without being able to pay payroll, we cannot continue. Please let us know, we will pivot to chap 7 and shut down by tomorrow without this cash.


--

Sankaet


On Tue, May 21st, 2024 at 12:18 PM, Victor Medeiros <victor.medeiros@synapsefi.com> wrote:

> Thanks Joel.
>
> Stan & Justin,
>
> The funds in the account that we are creating an ACH from are 100% Synapse operational funds. AB has even recently deducted out their invoice balance from that account. We need these funds to be transferred to complete critical payroll funding and wind down operations.
>
> We are requesting that you release funds via the ACH that was created.
>
> On Tue, May 21, 2024 at 1:16 PM Micah Brafford <micah.brafford@synapsefi.com> wrote:

+sankaet, Tracey and synapse outside counsel

Sent from Micah Brafford's i-Phone.

On May 21, 2024, at 2:10 PM, Joel Westra <Joel.Westra@ambankco.com> wrote:

+Stan Orszula and Justin Steffen, legal counsel.



**From:** Victor Medeiros <victor.medeiros@synapsefi.com>
**Sent:** Tuesday, May 21, 2024 2:05 PM
**To:** Joel Westra <joel.westra@ambankco.com>
**Cc:** Jenny Kayser <jenny.kayser@am-bank.com>; Aaron Riley <aaron.riley@synapsefi.com>;
Pam+Wismer+ <pam@ascentcfo.com>; Micah Brafford <micah.brafford@synapsefi.com>
**Subject:** Re: Online Access

⚠ EXTERNAL MESSAGE - Think Before You Click ⚠

Joel/AB team,

These are 100% Synapse operational funds, not FBO funds. They  are critical for payroll and wind
down efforts.

On Tue, May 21, 2024 at 12:54 PM Micah Brafford <micah.brafford@synapsefi.com> wrote:

Victor,

AB told us this morning that the our AB acct has been put on hold under their legal teams advice.

Sent from Micah Brafford's i-Phone.

On May 21, 2024, at 1:50 PM, Jenny Kayser <jenny.kayser@am-bank.com> wrote:

+Joel Westra; +MicahBrafford

## Jenny Kayser
**712.546.2345 | am-bank.com**
**American Bank**

**From:** Victor Medeiros <victor.medeiros@synapsefi.com>
**Sent:** Tuesday, May 21, 2024 12:58 PM
**To:** Jenny Kayser <Jenny.Kayser@am-bank.com>
**Cc:** Aaron Riley <aaron.riley@synapsefi.com>; Pam+Wismer+ <pam@ascentcfo.com>
**Subject:** Re: Online Access

⚠️ EXTERNAL MESSAGE - Think Before You Click ⚠️

Jenny,

Are you able to confirm that the ACH went out in a batch today?

On Tue, May 21, 2024 at 8:31 AM Victor Medeiros <victor.medeiros@synapsefi.com> wrote:

Thanks Jenny. That worked.

On Tue, May 21, 2024 at 6:54 AM Jenny Kayser <Jenny.Kayser@am-bank.com> wrote:

You should be okay

I'm guessing you tried this when you went in off the reset.

You just need to login with the token…and not from the password and reset.

## Jenny Kayser

**712.546.2345 | [am-bank.com](am-bank.com)**
**American Bank**

---

**From:** Victor Medeiros <[victor.medeiros@synapsefi.com](victor.medeiros@synapsefi.com)>
**Sent:** Monday, May 20, 2024 7:37 PM
**To:** Jenny Kayser <[Jenny.Kayser@am-bank.com](Jenny.Kayser@am-bank.com)>
**Cc:** Aaron Riley <[aaron.riley@synapsefi.com](aaron.riley@synapsefi.com)>; Pam+Wismer+
<[pam@ascentcfo.com](pam@ascentcfo.com)>
**Subject:** Re: Online Access

⚠️ EXTERNAL MESSAGE - Think Before You Click ⚠️

Thanks Jenny.

I'm getting an error when trying to create a same day ACH. Thoughts on how I can
fix that?

<image001.png>

On Mon, May 20, 2024 at 2:49 PM Jenny Kayser <[Jenny.Kayser@am-bank.com](Jenny.Kayser@am-bank.com)>
wrote:

<image002.png>

Jenny Kayser ([Jenny.Kayser@am-bank.com](Jenny.Kayser@am-bank.com)) has sent you a protected message.

Read the message

Learn about messages protected by Microsoft Purview Message Encryption.

Privacy Statement

Learn More on email encryption.
Microsoft Corporation, One Microsoft Way, Redmond, WA 98052

--

**Victor Medeiros**

Senior Director, Finance & Accounting @ Synapse

The information contained in this e-mail communication is, unless otherwise indicated, confidential and intended solely for the use of the named addressee(s). Access, copying or reuse of the e-mail or any information contained therein by any other person is not authorized. If you are not the intended recipient please destroy the original message and notify us immediately by returning this e-mail to its originator. American Bank, 234 5th Ave. SW, Le Mars, Iowa 51031, 712-546-2345.

TLS Encryption enforced by Microsoft 365.

--

**Victor Medeiros**

Senior Director, Finance & Accounting @ Synapse

--

**Victor Medeiros**

Senior Director, Finance & Accounting @ Synapse

The information contained in this e-mail communication is, unless otherwise indicated, confidential and intended solely for the use of the named addressee(s). Access, copying or reuse of the e-mail or any information contained therein by any other person is not authorized. If you are not the intended recipient please destroy the original message and notify us immediately by returning this e-mail to its originator. American Bank, 234 5th Ave. SW, Le Mars, Iowa 51031, 712-546-2345.

TLS Encryption enforced by Microsoft 365.

--

**Victor Medeiros**

Senior Director, Finance & Accounting @ Synapse

The information contained in this e-mail communication is, unless otherwise indicated, confidential and intended solely for the use of the named addressee(s). Access, copying or reuse of the e-mail or any information contained therein by any other person is not authorized. If you are not the intended recipient please destroy the original message and notify us immediately by returning this e-mail to its originator. Ambank Company, 525 N Main Ave, Sioux Center, Iowa 51250, 712-722-4846.

TLS Encryption enforced by Microsoft 365.

--

**Victor Medeiros**

Senior Director, Finance & Accounting @ Synapse

This message, which contains information from a law firm, may be confidential and privileged. If you have received this communication in error (you are not the addressee or authorized to receive for the addressee), you may not use, copy or disclose the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

We are sending you this e-mail primarily for your information, to meet your needs and further our valued relationship. If you prefer not to receive any further messages from us, just reply to this e-mail and let us know. For more information, please review our privacy notice available here. Thanks.

Any tax advice contained in this email or document was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.



234 5th Ave SW, Le Mars, IA 51031 | 712.546.2345
400 W Hwy 3, Remsen, IA 51050 | 712.786.1153

**VIA EMAIL AND FIRST CLASS MAIL**

April 16, 2024

Synapse Financial Technologies, Inc.
101 2nd Street, Suite 1500
San Francisco, CA 94101
Attn: Sankaet Pathak
legal@Synapsefi.com

    Re:    Bank Services and Deposit Account Agreement between Synapse Financial
           Technologies, Inc. and American Bank, N.A.

Dear Mr. Pathak:

As you know, Synapse Financial Technologies, Inc. ("Synapse") and American Bank, N.A. (the "Bank") are parties to that certain Bank Services and Deposit Account Agreement between dated February 25, 2021 (the "Agreement").

This letter serves as Bank's notice to Synapse of its default under this Agreement under the following sections:

- Section 23(a)(i) for failure to "… comply with all laws, rules, and regulations". See Exhibit A attached hereto listing specific defaults.

- Section 23(a)(ii) for failure in "… performing its duties and obligations related to Bank Services and Company Services under this Agreement, shall comply with all Applicable Law and Bank's policies." See Exhibit A attached hereto listing specific defaults.

- Section 23(a)(iv) for failure to comply with all regulations of OFAC and the related obligations thereunder. See Exhibit A attached hereto listing specific defaults.

- Section 23(a)(viii)(E) for failure to inform Bank of changes in business, strategy, or financial condition.

Synapse may have committed under defaults and/or breaches of this Agreement, which remain under investigation by Bank.

2572339.v1

Accordingly, Bank may, among other things, immediately terminate the Agreement pursuant to <u>Section 31(b)(iii)</u>. Bank, in its sole and absolute discretion, may cease to offer the Banking Services under this Agreement immediately.

Nothing contained in this letter is intended to limit, nor shall it be deemed to limit or in any way affect, any of Bank's rights or remedies under the Agreement. All rights and remedies of Bank, whether at law or in equity, are expressly reserved.

Please contact us at your earliest convenience to discuss the transition and wind-down of the matters under the Agreement.

Sincerely,

Micah D. Lang
President
American Bank, N.A.

2572339.v1

**Exhibit A**

| Regulation | Area | Default |
|---|---|---|
| BSA | BSA Policy | Failure to timely provide Bank BSA policy |
| BSA | BSA Procedure | Failure to timely provide BSA Procedures for Beneficial Ownership |
| BSA | External Auditor Engagement letters | Failure to timely provide Bank external audit |
| Reg E | Reg E Notices | Failure to update Reg E notices and policies |
| Reg E | Reg E Policy/ Procedures | Failure to timely update Reg E policies |
| Reg E | Disputes - Wash/Net Zero Transactions, User to Platform transaction following PC | Failure to follow Reg E in connection with disputes |
| Reg E | Investigation Notes | Failure to timely implement and update Reg E investigation process |
| Reg E | Dispute Spreadsheet dated 1/25/2024 - questions on negative dispute days and greater than 90 dispute days | Failure to properly implement Reg E in connection with disputes |
| Reg E | Reg E Road Map - including Synapse Internal Audit | Failure to timely update and implement Reg E processes |
| Monitoring | Migration to internal process (replace Performline) | Lack of platform oversight |
| Monitoring | Internal Monitoring at Synapse | Failure to provide internal monitoring reports for KYC/BSA and Reg E. |
| BSA/Fraud | Fraud Sample | Failure to provide requested fraud samples. |
| Reg E | Dispute Spreadsheet | Failure to systemically and timely send a Reg E dispute report |
| Fraud | Fraud Process and Procedures | Failure to provide a fraud process and procedures for reporting to Bank |
| Reg E | Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 | Failure to explain discrepancy between open dispute and "chargeback received" |

| Regulation | Area | Default |
|---|---|---|
| | Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 | Failure to timely resolve Reg E dispute (open for approximately 56 days) |
| | Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 | Failure to provide investigation notes for applicable disputes. |
| | Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 | Failure to validate when provisional credit letter was sent |
| | Synapse Reg E Monitoring for 11.30.23 Completed 12.18.23 | Failure to provide any letters on human error disputes |
| Reg E | Synapse Reg E Monitoring for 12.13.23 Completed 12.19.2023 | Failure to explain provisional credit process in connection with disputes for approximately 80% of disputes |
| | Synapse Reg E Monitoring for 12.13.23 Completed 12.19.2023 | Failure to validate if disputes greater than $25.00 met the Reg E investigation timelines |
| | Synapse Reg E Monitoring for 12.13.23 Completed 12.19.2023 | Failure to validate if disputes greater than $25.00 met the Reg E final notification timelines |
| BSA | Synapse Fraud Monitoring Memo 2.14.24 | Failure to monitor ongoing fraud investigation timelines |
| | Synapse Fraud Monitoring Memo 2.14.24 | Failure to monitor fraud and suspicious activity |
| | Synapse Fraud Monitoring Memo 2.14.24 | Failure to retain and produce fraud investigation notes |

| Regulation | Area | Default |
|---|---|---|
| | Synapse Fraud Monitoring Memo 2.14.24 | Failure to maintain fraud monitoring platform roles |
| Reg E | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to provide provisional credit notice on 4 of 9 sampled disputes |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to timely resolve disputes on 4 of 9 disputes |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to show a reversal occurred after a date of a final notice |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to provide documentation was for a canceled dispute |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to follow procedures for provisional credit |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to maintain records regarding date on final notice (does not match date on spreadsheet) |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to maintain records regarding date on final notice (does not match date on spreadsheet) and show whether a reversal took place |
| | Synapse Reg E Monitoring for 1.25.24 Completed 2.21.24 | Failure to provide investigation notes for any of the disputes sampled. |
| BSA | Beneficial Ownership | Failure to properly understand beneficial ownership rules |
| Reg P | Privacy Policy | Failure to provide customer base with accurate Partner Bank privacy policy. |
| Reg E | Cardholder Agreement Updated (OCC requirement) for Reg E | Failure to have the required information within the cardholder agreement as it relates to Synapse relationship with American Bank. |

# BANK SERVICES AND DEPOSIT ACCOUNT AGREEMENT

by and between

## SYNAPSE FINANCIAL SERVICES, INC.

and

## American Bank, N.A.

Effective as of ___02 / 25 / 2021_____

## TABLE OF CONTENTS

                                                                                    **Page**

1.    Definitions and Interpretation                                                    2
2.    Establishment of Deposit Relationships                                           10
3.    Terms and Conditions of the Accounts                                            12
4.    Operation of the Accounts                                                       14
5.    Freezing, Blocking, or Closing an Account Due to Irregular, Unauthorized, or
      Unlawful Activities                                                             16
6.    Termination of an Account                                                       16
7.    Origination Services                                                            16
8.    Wire Services                                                                   19
9.    Debit Card Sponsorship                                                          20
10.   Marketing to and Acceptance of New Gateways, Platforms, and Users              20
11.   User Agreements, User Statements, User Disclosures, and User Communications    23
12.   Books and Records Concerning the Accounts                                       24
13.   Terms of Relationship                                                           25
14.   Compensation/Fees                                                               25
15.   Service Levels                                                                  26
16.   Software and Related Services                                                   26
17.   BSA/AML Services                                                                27
18.   Audit and Monitoring Rights                                                     28
19.   User Privacy                                                                    30
20.   Confidentiality                                                                 31
21.   Data Security                                                                   32
22.   Business Continuity Plan                                                        35
23.   Additional Covenants                                                            35
24.   Representations and Warranties                                                  39
25.   Intellectual Property                                                           42
26.   Use of Subcontractors and Responsibility for Their Work                        42
27.   Monitoring and Recording of Phone Calls                                         42
28.   Remedies                                                                        43
29.   Right of Setoff and Security Interest Against Company Accounts                  43
30.   Notices                                                                         43
31.   Term and Termination; Related Procedures                                        44
32.   Survival                                                                        47
33.   Force Majeure                                                                   47
34.   Disclaimer of Warranties                                                        47
35.   Limitation of Liability and Indemnification and Reimbursement                   48
36.   Expenses                                                                        50
37.   No Assignment by Company                                                        50
38.   No Waivers                                                                      50
39.   No Third-Party Beneficiaries                                                    50
40.   Entire Agreement                                                                50
41.   Severability                                                                    50
42.   Amendments                                                                      51
43.   Governing Law, Venue; Waiver of Jury Trial                                      51

SCI:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

## BANK SERVICES AND DEPOSIT ACCOUNT AGREEMENT
### between
### SYNAPSE FINANCIAL TECHNOLOGIES, INC.
### and
### AMERICAN BANK NATIONAL ASSOCIATION

BANK SERVICES AND DEPOSIT ACCOUNT AGREEMENT, dated as of 02 / 25 / 2021 (this "Agreement"), between SYNAPSE FINANCIAL TECHNOLOGIES, INC., a Delaware corporation ("Company"), and AMERICAN BANK NATIONAL ASSOCIATION, a national banking association ("Bank") with its principal office located at 234 5th Ave. SW, Le Mars, IA 51031.

### RECITALS:

WHEREAS, Company is in the business of providing software services to financial institutions, financial service providers, and other parties that offer financial services to their customers ("Gateways", as more fully defined below), integrating their internet platforms with depository institutions and other financial service providers using Company's application protocol interfaces, and providing other software services so that Gateways may offer banking services to their Users (as defined below) through Platforms (as defined below) developed by Company for the Gateways;

WHEREAS, Company enters into agreements with depository institutions under which those depository institutions agree to accept deposits from, and provide other banking services to, Users through each Gateway's Platforms, and Company provides software and services to those depository institutions to facilitate their provision of such services;

WHEREAS, Bank is a depository institution whose deposits are insured by the Federal Deposit Insurance Corporation (the "FDIC");

WHEREAS, Bank is a member of the National Automated Clearing House Association ("NACHA") and is in the business, among other things, of originating and receiving Entries (as defined below) on behalf of customers;

WHEREAS, Company desires that Bank provide deposit account, payment services, and other banking services to Users that will access those services through Gateways' websites or mobile applications, or by other means, as more particularly described in this Agreement;

WHEREAS, Bank may provide payment and transfer services to Users through wire transfer, ACH, and bill pay services, including check issuance, debit card transactions, or other services agreed to by Bank;

WHEREAS, to facilitate Bank's provision of such services, Company will provide certain software, management, and other software services to Bank as more particularly described in this Agreement;

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

WHEREAS, the Parties (as defined below) desire that Users' deposits will be eligible for FDIC insurance coverage, and that procedures provided for under this Agreement will comply with the requirements of the FDIC relating to direct or "pass-through" insurance coverage of Users' deposits, as applicable; and

WHEREAS, Bank wishes to appoint Company as its agent to handle recordkeeping requirements required to establish such insurance coverage, to execute agreements in the forms specified pursuant to this Agreement in the circumstances specified in this Agreement, to carry out certain actions required to permit Bank to provide ACH transfer and Fedwire Services (as defined below), and to act as Bank's agent as otherwise specified in this Agreement, all as further provided in this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**1.      Definitions and Interpretation**

(a)      <u>Definitions</u>.

"<u>Account</u>" means (i) any FBO Account, (ii) any User Account, (iii) any Gateway Account, (iv) any Reserve Account, and (v) any account established by Bank or Company for the purpose of providing any of the Bank Services including any Checkwriting Account or any similar account, all of which Accounts shall be reflected on the Deposit Ledger maintained by Company on Bank's behalf pursuant to the Company Services.

"<u>Account Agreement</u>" means an FBO Account Agreement, a User Account Agreement, or a Gateway Account Agreement.

"<u>ACH</u>" has the meaning specified in the NACHA Rules.

"<u>ACH Operator</u>" has the meaning specified in the NACHA Rules.

"<u>Agreement</u>" has the meaning specified in the preamble, including the Appendices hereto.

"<u>APIs</u>" means the application protocol interfaces licensed by Company to, and implemented by Company for, the Gateways.

"<u>Applicable Law</u>" means any and all federal, state, and other governmental statutes, codes, ordinances, and laws applicable to a Party, and all regulations, rules, guidance, written directives, orders, and decrees that are made by a Regulatory Authority having jurisdiction over such Party, including the FDIC Rules, and shall, for purposes of Sections 7, 11(d), 12(b), 18, 21, 23, and 24 also include the NACHA Rules.

"<u>Auditing Party</u>" has the meaning specified in Section 18(c).

"<u>Authorized Person</u>" has the meaning specified in Section 2(e).

"Background IP" has the meaning specified in Section 25(a).

"Bank" has the meaning specified in the preamble to this Agreement.

"Bank Services" means the Deposit Services, Origination Services, Fedwire Services, and any other services made available by Bank under this Agreement or included in any Addendum or Amendment to this Agreement executed by the Parties.

"BBOL" has the meaning specified in Section 3(g).

"Breach Indemnitee" has the meaning specified in Section 21(f).

"Breached Party" has the meaning specified in Section 21(c)(i).

"BSA" means the Bank Secrecy Act.

"BSA/AML Policy" means Bank's policy, as amended by Bank from time to time, addressing BSA and AML considerations, to which Company agrees to adhere in the performance of Company's BSA/AML Services.

"BSA/AML Services" means the services provided by Company pursuant to Section 17.

"Business Day" means each day on which Bank is open for business, excluding any Federal Reserve Bank holiday and any day on which the Fedwire funds transfer system is not open for business.

"Call Reports" has the meaning specified in Section 12(d).

"CFPB" means the Consumer Financial Protection Bureau.

"Checkwriting Account" means an Account to which funds will be transferred from an Account in order to settle payments that are initiated by Users through Platforms and that are executed by Bank by issuing checks at Company's instructions.

"Company" has the meaning specified in the preamble to this Agreement.

"Company Account" means any deposit account established by Company with Bank from time to time, of whatever nature. For the avoidance of doubt, a Company Account shall not be an "Account" for purposes of this Agreement.

"Company Services" means the Software Services, the Recordkeeping Services, the BSA/AML Services, and any other services made available by Company under this Agreement or included in any addendum or amendment to this Agreement executed by the Parties.

"Confidential Information" means any and all information that is disclosed by one Party to the other Party and that relates to the Disclosing Party's business and operations or the Parties' business relationship hereunder, including information concerning

-4-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

finances, products, services, customers, and suppliers. All pricing and commercial terms in this Agreement shall also constitute Confidential Information (it being understood that such confidentiality shall not preclude either Party from entering into an agreement with other Persons on similar terms). Confidential Information shall not include information that (i) is in or comes into the public domain without breach of this Agreement by the Receiving Party; (ii) was in the possession of the Receiving Party prior to receipt from the Disclosing Party and was not acquired by the Receiving Party from the Disclosing Party under an obligation of confidentiality or non-use; (iii) is acquired by the Receiving Party from a third party not under an obligation of confidentiality or non-use to the Disclosing Party; or (iv) is independently developed by the Receiving Party without use of any Confidential Information of the Disclosing Party.

"Dashboard" means the online platform created and maintained by Company for Bank through which Bank may view and access all information related to Gateways, Platforms, Users, transactions, Entries and requests, and may perform any other services or view other information as set forth in this Agreement.

"Debit Entries" has the meaning specified in the NACHA Rules, including an order or request for the withdrawal of money from an Account.

"Deposit" means an unpaid balance of money received or held by Bank in an Account for the benefit of Users and Gateways.

"Deposit Ledger" has the meaning specified in Section 2(a).

"Deposit Services" means Bank's services relating to holding and maintaining Deposits on behalf of Users and Gateways.

"Disclosing Party" has the meaning specified in Section 20(a).

"Disclosure Materials" has the meaning specified in Section 11(a).

"Effective Date" means the date of this Agreement.

"Effective Entry Date" means the date specified in an Entry as the date on which settlement is to occur if all applicable requirements have been satisfied.

"Electronic Debit Entry" means an order or request, received via the internet or other electronic means of communication, for the withdrawal of money from the Account, including an Electronic Debit Entry within the meaning of the NACHA Rules.

"Entry" has the meaning specified in the NACHA Rules. Each of the debit Entries effected through an ACH shall be deemed an "item" in accordance with the NACHA Rules.

"Entry Data" means such data as is provided in accordance with Entries made.

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

"Exposure Settlement Limit" means each maximum exposure limit established by Bank in writing with respect to each Gateway, in conjunction with its Platform(s), limiting the debit Entries, credit Entries, or both that may be submitted by such Gateway or by all Gateways collectively under this Agreement, without taking into account or offsetting transactions relating to credit or debit Entries, as applicable, Fedwire Services, or Deposits held in an Account.

"FBO Account" means an omnibus deposit account at Bank established by a Gateway as custodian for its Users pursuant to an agreement between Gateway and Bank (executed by Company, acting as agent on Bank's behalf) in the form agreed by Bank and Company from time to time, in which the Users of a Platform operated by such Gateway may deposit funds using the APIs, which Account shall be reflected on the Deposit Ledger maintained by Company on Bank's behalf pursuant to the Company Services.

"FBO Account Agreement" has the meaning specified in Section 10(b)(iv).

"FDIC" has the meaning specified in the recitals.

"FDIC Rules" means the rules and regulations of the FDIC.

"Fedwire Services" means Bank's services relating to the real-time gross settlement funds transfer system operated by the United States Federal Reserve Banks.

"Fee Amount" means funds held in an Account by a Gateway for the payment by it of fees and other amounts due to Bank or Company in relation to such Account or any other Account or services provided to it by Company or Bank.

"File" has the meaning specified in the NACHA Rules.

"FinCEN" means the Financial Crimes Enforcement Network of the U.S. Department of the Treasury.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States that are applicable to the circumstances as of the date of determination, consistently applied.

"Gateway" means any Person that operates an internet or mobile platform through which it offers financial services to Users and that has entered into a master services agreement with Company.

"Gateway Access Agreement" means the proposed SaaS Subscription Service Agreement between a Gateway and Company, through which a Gateway may have access to certain Bank Services, and any other agreement between Company and a Gateway providing such Gateway with access to Company's services. The Parties

understand and acknowledge that Company may execute the Gateway Access Agreement with a Gateway without Bank's previous consent as long as Bank has approved the Gateway, pursuant to the terms of this Agreement, before Bank becomes bound to provide the Bank Services to such Gateway.

"Gateway Account" means a deposit account at Bank established by a Gateway pursuant to a Gateway Account Agreement between such Gateway and Bank (executed by Company, acting as agent on Bank's behalf) in the form agreed by Bank and Company from time to time, in which such Gateway shall deposit funds using the APIs, for the purpose of paying any fees and other amounts payable by such Gateway and satisfying any other obligations of such Gateway, which Account shall be reflected on the Deposit Ledger maintained by Company on Bank's behalf pursuant to the Company Services.

"Gateway Account Agreement" has the meaning specified in Section 10(b)(iii).

"Initial Term" has the meaning specified in Section 31(a).

"Intellectual Property" means any and all intellectual property and proprietary rights anywhere in the world, including any: (i) patents, patent applications, patent disclosures, and inventions (whether patentable or not); (ii) trademarks, service marks, trade dress, trade names, logos, and registrations and applications for the registration thereof, together with all of the goodwill associated therewith ("Marks"); (iii) internet domain names; (iv) copyrights and copyrightable works (including computer programs and mask works), and registrations and applications thereof; (v) trade secrets, know-how, and other Confidential Information; and (vi) any intellectual property or proprietary rights with respect to data, databases, or software.

"Internal Revenue Code" has the meaning specified in Section 23(a)(v).

"Marks" has the meaning set forth in the definition of Intellectual Property.

"Minimum Monthly Revenue" has the meaning specified in Section 14(c).

"Monthly Revenue" has the meaning specified in Section 14(c).

"NACHA" has the meaning specified in the recitals.

"NACHA Rules" means the NACHA Operating Rules & Guidelines published by NACHA.

"Network" means NACHA, the Fedwire system, and any other payment network or credit card settlement system utilized by Bank for purposes of providing the Bank Services.

"Network Membership" means the membership of Bank in NACHA and any other Network required to provide the Bank Services.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

"Network Rules" means the rules of any applicable Network.

"NOC" has the meaning specified in Section 7(i).

"OCC" means the Office of the Comptroller of the Currency.

"ODFI" has the meaning specified in the NACHA Rules.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"On-Us Entry" has the meaning specified in Section 7(d).

"Origination Services" mean the services provided by Bank pursuant to Section 7.

"Originator" has the meaning specified in the NACHA Rules.

"Party" means Company or Bank, and "Parties" means Company and Bank, collectively.

"PCI-DSS" has the meaning specified in Section 21(a)(iv).

"Person" means any natural or legal person, including any individual, corporation, partnership, limited liability company, trust, unincorporated association, or other entity.

"Platform" means an internet or mobile platform operated by a Gateway through which it offers financial services to Users.

"Prenotification Entry" has the meaning specified in the NACHA Rules.

"QSA" has the meaning specified in Section 21(a)(iv).

"RDFI" has the meaning specified in the NACHA Rules.

"Receiver" has the meaning specified in the NACHA Rules.

"Receiving Party" has the meaning specified in Section 20(a).

"Recordkeeping Agent" has the meaning specified in Section 12(a).

"Recordkeeping Services" means the services provided by Company pursuant to Section 12.

"Regulation GG" has the meaning specified in Section 24(a)(xii).

"Regulatory Authority" means a governmental authority that is charged with monitoring and/or overseeing the business practices of the Parties or administering regulations applicable to Parties, including the Board of Governors of the Federal

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

Reserve System, the FDIC, the OCC, and the CFPB, or any successor body that regulates financial institutions and financial service providers.

"Renewal Term" has the meaning specified in Section 31(a).

"Reserve Account" means a deposit account at Bank established by a Gateway pursuant to a Gateway Account Agreement between such Gateway and Bank (executed by Company, acting as agent on Bank's behalf) in the form agreed by Bank and Company from time to time, in which such Gateway, using the APIs, shall deposit all Reserve Amounts applicable to such Gateway and/or its Platforms, which Account shall be reflected on the Deposit Ledger maintained by Company on Bank's behalf pursuant to the Company Services.

"Reserve Amount" means, with respect to any Gateway, deposits of such Gateway held in such Gateway's Reserve Account, and such other amounts as are necessary for the purposes of protecting Bank against losses under this Agreement (including relating to returns from Entries) arising from the inclusion of such Gateway's Platforms in the arrangements provided for under this Agreement. A Reserve Amount shall be set for each Gateway and, if a Gateway operates more than one Platform, each such Platform. The Reserve Amounts for each Gateway and/or Platform shall be as determined and adjusted based on metrics mutually agreed upon by the Parties to measure such Gateway's or Platform's activity.

"SAR" means a Suspicious Activity Report provided to FinCEN in accordance with the BSA.

"Security Breach" means (i) any act or omission that materially compromises either the security, confidentiality, or integrity of User Data or the physical, technical, administrative, or organizational safeguards put in place by a Party or a Subcontractor that relate to the protection of the security, confidentiality, or integrity of User Data; or (ii) a complaint or report of any incident in relation to the privacy and data security practices of a Party or any of its Subcontractors, that upon investigation, provides a reasonable basis to believe that a breach or alleged breach of the security, confidentiality, or integrity of User Data has occurred. Without limiting the foregoing, a material compromise shall include any unauthorized access to, unauthorized disclosure of, or unauthorized acquisition of, User Data.

"Security Program" means a comprehensive, written information security program complying with Section 21 that contains appropriate administrative, technical, and physical safeguards designed to (i) protect the security, confidentiality, and integrity of User Data; (ii) ensure against any anticipated vulnerabilities, threats, or hazards to the security and integrity of User Data; (iii) protect against unauthorized access to or use of User Data that could result in substantial harm or inconvenience to any User or potential User; and (iv) ensure the proper disposal of User Data.

"Service Level" means the performance baselines, performance measurements, and performance and operational standards with which the Company Services or the

Bank Services are intended to comply, as stated in <u>Appendix B</u> to this Agreement or another supplemental agreement agreed by Bank and Company from time to time.

"<u>Service Level Agreement</u>" means an agreement that is supplemental to this Agreement providing further specifications regarding any of the Company Services or the Bank Services.

"<u>Settlement Date</u>" has the meaning specified in the NACHA Rules.

"<u>Software Services</u>" has the meaning specified in Section 16(a).

"<u>Subcontractor</u>" means any Person engaged by Company (or any of its affiliates) to perform any aspects of the Company Services or other obligations of Company hereunder or any Person engaged by Bank (or any of its affiliates) to perform any aspects of the Bank Services or other obligations of Bank hereunder, or either Party's subcontractors or representatives.

"<u>Term</u>" means the period commencing on the Effective Date and terminating as set forth in Section 31.

"<u>Termination Transition Period</u>" means the period commencing upon the expiration or termination of this Agreement and ending six (6) months later.

"<u>Third-Party Service Provider</u>" has the meaning specified in the NACHA Rules.

"<u>U.S. Money Laundering and Customer Identification Requirements</u>" means the Bank Secrecy Act, the USA PATRIOT Act, and any other anti-money laundering, anti-terrorist financing, customer due diligence, and customer identification program required by Applicable Law, and the sanctions administered by OFAC.

"<u>UDAAP</u>" means Unfair, Deceptive, or Abusive Acts or Practices, as prohibited by Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 1031.

"<u>User</u>" means each Person that is a customer of a Gateway and that is authorized to access financial services, including the Bank Services provided by Bank pursuant to this Agreement, through a Platform operated by that Gateway.

"<u>User Account</u>" means any deposit account at Bank established by a User through a Platform maintained by a Gateway pursuant to an agreement between such User and Bank (executed by Company, acting as agent on Bank's behalf) in the form agreed by Bank and Company from time to time, in which such User may deposit funds using the APIs, which Account shall be reflected on the Deposit Ledger maintained by Company on Bank's behalf pursuant to the Company Services.

"<u>User Access Agreement</u>" has the meaning specified in Section 10(c)(i).

"<u>User Account Agreement</u>" has the meaning specified in Section 10(c)(iii).

"User Data" means any data or information of any User or prospective User that is provided to or obtained by a Party, as applicable, in connection with the performance of its obligations under this Agreement, including "nonpublic personal information" as defined in 15 U.S.C. § 6809(4), including: (i) an individual's name, address, email address, IP address, telephone number, and/or social security number; (ii) the fact that an individual has a relationship with Bank, Company, a Platform, and/or their respective affiliates; or (iii) an individual's account information, including financial transactions.

(b)    Interpretation. Except as otherwise expressly provided or the context otherwise requires:

(i)    The definitions ascribed to capitalized terms in Section 1(a) and elsewhere in this Agreement apply equally to both the singular and plural forms of the terms defined.

(ii)    Any pronoun includes the corresponding masculine, feminine, and neuter forms.

(iii)    The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation".

(iv)    The words "hereby", "herein", "hereof", "hereunder", and words of similar import refer to this Agreement as a whole (including any appendices and schedules hereto) and not merely to the specific section, paragraph, or clause in which such word appears.

(v)    All references herein to Articles, Sections, Appendices, and Schedules are references to Articles and Sections of, and Appendices and Schedules to, this Agreement.

(vi)    All references to any statute, rule, or regulation refer to that statute, rule, or regulation as amended or replaced from time to time.

(vii)    All references to any agreement refer to that agreement as amended from time to time.

(viii)    All references to a Person are to that Person or its successors.

## 2.    Establishment of Deposit Relationships

(a)    Subject to the conditions set forth in this Agreement, Bank hereby agrees to accept and maintain Accounts for Gateways and Users at Bank as and when provided in this Agreement. Company agrees that it shall maintain, as Bank's agent, the ledger recording all such Accounts (the "Deposit Ledger") and Bank and Company agree that the Deposit Ledger shall be Bank's definitive ledger setting forth the title, ownership, and content of each Account. Company shall make the Deposit Ledger available to Bank and shall provide Bank with access to the Deposit Ledger at all times as provided in Section 12. Each Account maintained on the

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

Deposit Ledger by Company shall be titled in a manner to distinguish it from each other Account. As set forth in Section 12, and for the purposes set forth in such Section 12, Company shall maintain information and deposit records with respect to the Deposits held in the Accounts related to a User, Gateway or Platform through which deposits are received.

(b)    The Parties acknowledge that due to system limitations, all the Accounts reflected on the Deposit Ledger may be reflected on Bank's general ledger as a single deposit account with a title indicating that the funds are those of customers who have made deposits with Bank through Platforms, using the APIs, pursuant to this Agreement, similar in substance to "Clearing Account for Deposit Ledger maintained by Synapse Financial Technologies, Inc. U/A 3/11/2019". For the avoidance of doubt, the Parties acknowledge and agree that the establishment of any such account on the ledger maintained by Bank on its own systems has been completed solely to address Bank's system limitations and does not reflect the existence of any account in Company's name or in the name of any Gateway or User, and that the Deposit Ledger is Bank's definitive ledger setting forth the title, ownership, and content of each Account as provided in Section 2(a). Both Parties agree and understand that there are as many separate Accounts as are evidenced by Company's Deposit Ledger and that such Deposit Ledger shall be acknowledged by Bank as providing the proper title, number, name, ownership, and other details of the Accounts.

(c)    Each Account, and the funds on deposit in such Account, may be accessed by Users and Gateways only through the APIs as provided in this Agreement, and neither Company nor any User or Gateway shall have the right to access any Account by dealing directly with Bank or in any other manner.

(d)    Neither Company nor any Gateway shall have any right to or interest in the funds that are on deposit with any User Account. Company shall have no interest in any Gateway Account or Reserve Account. Bank's obligation to repay the amounts on deposit in any Account shall be owed to the User or Gateway that deposited such amounts.

(e)    A Gateway that has been approved by Bank pursuant to Section 10(b) may establish an FBO Account in which funds may be deposited on an omnibus basis by Users of a Platform operated by such Gateway that have also been approved by Bank pursuant to Section 10(b). Each such FBO Account shall be opened, on the terms and subject to the conditions set forth in this Agreement, upon the execution by the relevant Gateway and by Bank (by Company acting as agent on Bank's behalf) of an FBO Account Agreement and receipt by Bank of all documentation acceptable for Bank to approve a Gateway or a Platform maintained by a Gateway and a list of persons authorized to provide instructions to Bank relating to such Account ("Authorized Persons").

(f)    If a Platform has been approved by Bank to offer individual User Accounts pursuant to Section 10(b), a User of such Platform may establish a User Account through such Platform. Each such User Account shall be opened, on the terms and subject to the conditions set forth in this Agreement, upon the execution by the relevant User and Bank (by Company acting as agent on Bank's behalf) of a User Account Agreement.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(g)      Each Gateway will, upon its approval by Bank pursuant to Section 10(b), establish a Gateway Account and a Reserve Account. Company shall cause such Gateway (i) to deposit in such Gateway Account such amounts as may be required to pay any fees and charges payable by Gateway to Company from time to time, and (ii) to deposit Reserve Amounts in such Reserve Account in such amounts and at such times as may be required by Section 4. Each Gateway will open a Reserve Account and a Gateway Account, regardless of the number of Platforms established by such Gateway, which shall hold all Reserve Amounts or amounts to be deposited in such Gateway Account for all Platforms that are established by such Gateway and use any Bank Services. Such Gateway Account and Reserve Account shall be opened, on the terms and subject to the conditions set forth in this Agreement, upon the execution by the relevant Gateway and by Bank (by Company acting as agent on Bank's behalf) of a Gateway Account Agreement and a list of Authorized Persons.

(h)      Financial institutions, such as Bank, are required by law, including pursuant to the U.S. Money Laundering and Investor Identification Requirements, to obtain, verify, and record information that identifies each Person who opens an account at the financial institution. In connection with Bank's establishment of any Account, or acceptance of Deposits from any User or Gateway, Bank may (1) request information regarding such User or Gateway, including any Platform operated by such Gateway, and, in the case of an FBO Account or Gateway Account, also regarding the Authorized Persons, Users, or investors in or other customers of such Gateway, or any other such Person, and (2) require background checks on any individuals with significant responsibility for managing the Gateways (*i.e.*, executive officers or senior management) and all Gateway owners with at least 20% ownership unless such requirement is excluded by Applicable Law.  For the avoidance of doubt, Bank may also request any additional information that, in Bank's interpretation, it is required to request under Applicable Law, as it may be amended from time to time.

(i)      When any Account is opened, Company shall assign to such Account an identifying account number within the range provided by Bank from time to time. Company, each Gateway, and each User should use the applicable account number when referring to such Account on all correspondence and other documents relating to such Account.

## 3.      Terms and Conditions of the Accounts

Unless otherwise required by law or regulation, the Parties agree that each Account shall be governed by the following terms and conditions in addition to the applicable Account Agreement:

(a)      The relationship between the Users or the Gateway, on the one hand, and Bank, on the other hand, with respect to each such Account shall be a debtor-creditor relationship governed by the applicable Account Agreement. Upon deposit into any such Account, the funds so deposited will become assets of Bank and cease to be assets of the Users or Gateway. Bank's only obligation to Company, the Users, or any Gateway with respect to the deposited funds shall be the obligation to repay to the Users or the Gateway the amount of funds then held in such Account upon receipt of and in accordance with the instructions given in accordance with this Agreement and satisfaction of any conditions set forth in this Agreement.

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(b)      Funds on deposit in any such Account will not be held by Bank in a trust, fiduciary, or custodial account. Bank will not be acting as a trustee or fiduciary, or in a custodial capacity, with respect to such funds or for Company, Gateways, or Users.

(c)      At no point will Company have or enjoy any custody over any funds deposited into any Account. Funds in the Accounts shall not at any time be subject to any right, charge, security interest, lien, or claim of any kind against Company in favor of Bank or any person claiming through Bank, and Bank shall not exercise any right of set-off or recoupment with respect to liabilities owed by Company against such Accounts. For the avoidance of doubt, there can be no lien or security granted, created, or suffered by Company against any funds deposited in any Account.

(d)      Bank shall retain any right, charge, security interest, lien, or right of set-off or recoupment with respect to liabilities owed by any User or Gateway against any Account to the extent of the interest of such User or Gateway, as applicable.

(e)      Deposits to and withdrawals from any Account shall be made only in accordance with the procedures set forth in this Agreement and the applicable Account Agreement, and in no event shall Bank make any discretionary decisions concerning the funds in such Account.

(f)      Bank will provide Company with access to such Accounts through the Bank's Business Banking Online ("BBOL") Service, including access to any functionality required to permit Company to cause Bank to issue a check on behalf of a User to the extent so instructed by the User through a Platform, and to enable Company to provide other Bank Services to Gateways and Users under this Agreement. The Parties agree that Bank and Company may use a third-party vendor to print and mail the checks.

(g)      Bank will recognize and adopt the Deposit Ledger as the record of the Accounts and the interests of the Users or Gateway in each Account for the purposes of determining the insurance status of the Deposits under the FDIC Rules as provided in Section 12. The insurance status of the Deposits under the FDIC Rules may be direct or pass-through insurance depending on the type of Account.

(h)      Subject to the applicable Account Agreement, Bank may change the terms and conditions applicable to such Account in its sole discretion. Bank will provide Company with at least forty-five (45) calendar days' prior written notice of any material changes to such terms and conditions (or, if a shorter period is required by Applicable Law, such shorter period), which Company shall provide to Gateways and Users as provided in Section 11, and continued use of an Account by any Gateway or any User, or continued provision of services through such Account by Company, will constitute the consent of such Person to any such change. Bank will make the terms and conditions applicable to an Account available to Company at any time upon request.

## 4.      Operation of the Accounts

(a)      Deposits. Deposits of federal or other immediately available funds may be made into any Account by any User via a Platform, on any Business Day after such Account has been opened. Company shall cause funds to be delivered to such Account by means of ACH credit, as

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

provided in Section 7. Each Account shall hold U.S. dollar deposits only and in no event shall Bank hold, nor shall Company permit any User to deliver to Bank, deposits in currencies other than U.S. dollars, or securities or other assets other than U.S. dollar deposits. If any ACH credit Entry is received by Bank prior to the Parties' agreed-upon evening settlement time, the funds so deposited shall be credited to the Account effective on that Business Day; if any such ACH credit Entry is not received prior to the Parties' agreed-upon evening settlement time, the funds so deposited shall be credited to the applicable Account effective on the next following Business Day. Funds deposited in accordance with this Section 4 shall be available for immediate withdrawal upon the date on which they are credited to such Account.  The aforementioned settlement times shall be included in an integration specification document ("Integration Specification Document"), which shall be created by the Company and approved by the Bank.

(b)     <u>Withdrawals</u>. Any withdrawal from an Account may be made prior to the Parties' agreed-upon evening settlement times, as provided in the Integration Specification Document, only by means of (i) an ACH transfer initiated through a Platform; or (ii) in the case of a Checkwriting Account, as a payment initiated by a User through a Platform that is executed by Bank, by the Bank issuing checks at Company's instructions. Bank will not have any liability for refusing to honor any withdrawal requested in any other form or manner. Bank shall transfer any funds withdrawn from the Account to such account or accounts at such other depository institution, or Bank shall issue and mail a check made out as, the User may indicate in the instructions delivered pursuant to this Section 4(b). Upon the settlement of any withdrawal of funds or payment of any check pursuant to this Section 4(b), Bank shall have no further obligation, and shall be discharged as to Company and to any User or Gateway, with respect to such funds other than the Company compensation, as specified in <u>Appendix A</u>, if any, relating to those funds.

(c)     <u>Settlement</u>. Settlement will occur daily as established by the Network, as applicable.

(d)     <u>Provisional Credits</u>. Bank may, in its sole discretion, upon reasonable notice to Company on the same day as the relevant transaction (via a file type agreed upon by the Parties), refuse a deposit, limit the amount that may be deposited, or return all or part of any deposit. Any credit given to a User from a funds transfer consisting of an ACH transaction will be provisional based on final settlement. If Bank does not receive final settlement of any item deposited, Bank shall be entitled to charge the applicable Account for the amount of the credit.

(e)     <u>Company's Obligation to Maintain Adequate Balance in the Accounts and to Reimburse Overdrafts</u>.

(i)     Bank shall have no obligation to honor any withdrawal if such withdrawal would result in an overdraft in any Account. Company agrees that it shall not make any withdrawal from any Account in any manner (including by submitting any Entries pursuant to Section 7 or otherwise), or permit any User or Gateway to do so, if such withdrawal would cause an overdraft in the Account or would result in a withdrawal in excess of such User's or Gateway's interest in such Account, and Company shall reimburse, indemnify, and hold Bank harmless for any overdraft that may occur. Company agrees that it shall at all times have in

-15-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

place agreements with each Gateway pursuant to which that Gateway will assume responsibility for curing any overdrafts in any Account established by such Gateway or any of its Users or through any Platform established by such Gateway, and Company will immediately initiate such transfers of funds from such Gateway's Reserve Account or, to the extent such Reserve Account is not sufficient, from such Gateway's Gateway Account to any Account to the extent necessary to satisfy any such overdraft.

(ii)    Each Business Day, Company shall verify that settlement has been completed and that the Accounts have been properly funded and balanced. Bank may, without prior notice or demand, obtain payment of any amount due and payable to it under this Agreement by debiting the relevant Account. Company shall at all times ensure that all Accounts maintain a balance of available funds to cover the applicable Gateway's or User's payment obligations under this Agreement and to ensure that funds belonging to one User or Gateway cannot be used for another User or Gateway. In the event that any FBO Account or User Account does not contain sufficient available funds to cover the obligations of any relevant Gateway or User, Company shall transfer funds from the applicable Gateway Account or Reserve Account, or from any Company Account, to such FBO Account or User Account to cover any such overdraft or insufficiency. Company agrees that, if Company does not cure any such overdraft or insufficiency immediately upon notice from Bank, Bank may debit any Company Account maintained by Company with Bank or that Bank may set off against any amount it owes to Company in order to cover any such overdraft or insufficiency in a User Account, FBO Account, or Gateway Account.

(f)    <u>Procedures in the Case of Conflicting Claims</u>. In the case of any dispute or conflicting claims by any Person or Persons with respect to the funds held in any Account, Bank shall be entitled to refuse to act until either: (i) such dispute or conflicting claim shall have been finally determined by a court of competent jurisdiction or finally settled by an agreement binding the conflicting parties, and Bank shall have received written evidence satisfactory to it of such determination or agreement; or (ii) Bank shall have received an indemnity, security, or both, satisfactory to it and in its sole discretion sufficient to hold Bank harmless from and against any and all loss, liability, and expense that Bank may incur as a result of its actions.

(g)    <u>Reserve Amounts and Exposure Settlement Limits</u>. Before any funds may be deposited in accordance with a new Gateway, a Reserve Amount and Exposure Settlement Limits shall be determined, and the Gateway shall deposit such Reserve Amount in the relevant Reserve Account. Bank will notify Company promptly, and in any event within five (5) Business Days, of any changes to any such Reserve Amount or Exposure Settlement Limit. Company shall notify the appropriate Gateway of any changes promptly, and in any event within five (5) Business Days, of receiving such notice from Bank.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

5.      **Freezing, Blocking, or Closing an Account Due to Irregular, Unauthorized, or Unlawful Activities**

Company agrees that if Bank suspects that any irregular, unauthorized, or unlawful activity may be occurring in connection with any Account, Bank may "freeze" or place a hold on the balance in such Account pending an investigation of such activities. If Bank freezes any Account, it will give any notice required under the circumstances by the laws governing the Account. If investigation confirms Bank's suspicions of irregular, unauthorized, or unlawful activity then, notwithstanding anything to the contrary in this Agreement, Bank may immediately close such Account, and may also close any or all other Accounts, if necessary, to comply with Applicable Law. Company agrees that Bank may also freeze, block, or close any Account as necessary in order to comply with regulations issued by OFAC.

6.      **Termination of an Account**

(a)      If any Account is to be terminated, Company, as Bank's agent, shall return such funds through Company APIs. With respect to FBO Accounts, Company, as Bank's agent, shall process the return of the balance of such Account to the relevant Gateway and/or its Users in accordance with the applicable FBO Agreement and Applicable Law. With respect to User Accounts, Company, as Bank's agent, shall process such User Account terminations and return the balance of each such User Account to the appropriate User reflected on the Deposit Ledger in accordance with the terms of the User Agreement and Applicable Law.

(b)      If withdrawals from any Account cause the deposit balance therein to be reduced to zero, Bank shall nevertheless continue to maintain such Account until such Account is closed by Company pursuant to this Section 6 or this Agreement is terminated in accordance with Section 31.

(c)      If a Gateway terminates its agreement with Company or Bank with respect to any Platform, then any FBO Account relating to such Platform and any User Account accessed through such Platform will also be closed (it being understood, however, that if a Gateway terminates one Platform, any agreements relating to any other Platform established by such Gateway shall remain in effect unless terminated in accordance with such other agreements).

7.      **Origination Services**

(a)      <u>Provision of Origination Services</u>. Company shall, as a Third-Party Service Provider, transmit Entries initiated by Users or Gateways through Platforms and submit such Entries to Bank for processing and settlement in accordance with this Agreement. Entries may be submitted by Company pursuant to this Agreement only to the extent they arise as a result of instructions (i) submitted by a User to a Platform and transmitted by such Platform to Bank using the APIs, or (ii) submitted by a Gateway to Bank using the APIs.

(b)      <u>Transmittal of Entries by Company</u>. Company shall (i) submit Entries to Bank in compliance with the NACHA Rules; (ii) prior to such Entry submission, ensure all debit or credit authorizations have been obtained as required by the NACHA Rules; and (iii) following the secure transmission of a File, submit a matching confirmation File to Bank. In no event shall the total dollar amount of Entries, or the total dollar amount of any type of Entries or Entries,

-17-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

submitted by any Gateway submitted by Company to Bank on any day, exceed any applicable Exposure Settlement Limit. Company may submit Entries only to the extent it is instructed to do so by a Gateway, and such Gateway, and not Company, shall be the Originator of such Entry for purposes of the NACHA Rules. Company shall be responsible to ensure that Gateways comply with all obligations of an Originator or Receiver as set forth in the NACHA Rules in respect of any Entry that it submits (or fails to submit) in time to meet NACHA deadlines. Company shall be responsible for satisfying all obligations of a Third-Party Service Provider as set forth in the NACHA Rules.

(c)    Processing, Transmittal and Settlement by Bank. Except as provided in Section 7(d) and Section 7(e), Bank shall (i) process Entries received from Company in conformity with the file specifications set forth in the NACHA Rules; (ii) compare such Entries to the matching confirmation File to confirm that the total amount of such Entries matches such confirmation File; (iii) transmit such Entries as an ODFI to the ACH Operator; and (iv) settle for such Entries as provided in the NACHA Rules. For purposes of this Agreement, Entries shall be deemed received by Bank by electronic transmission when the transmission (and compliance with any related security procedures provided for herein) is completed, subject to the completion and confirmation of the File totals. If such requirements are not met, Bank shall use reasonable efforts to transmit such Entries to the ACH Operator by the next deadline of the ACH Operator.

(d)    On-Us Entries. Except as provided in Section 7(e), in the case of an Entry received for credit to an account maintained with Bank (an "On-Us Entry"), Bank shall credit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry, and Company shall reflect the credit in the Deposit Ledger, provided that the requirements set forth in clauses (i) and (ii) of Section 7(a) are met. If either of those requirements is not met, such Entry may be rejected. In the case of On-Us Entries related only to the Accounts, Company, as an agent of the Bank, may make the appropriate credit and debit of Entries.

(e)    Rejection of Entries. Bank may reject any Entry (including any On-Us Entry) that does not comply with the requirements of the Company's ACH Procedure Document, as defined below.

(f)    Notice of Returned Entries. Bank shall notify Company through File transmission of the receipt from the ACH Operator of a returned or changed Entry no later than 10:00 p.m. (CT)/8:00 p.m. (PT) on the Business Day on which Bank receives such Entry.

(g)    Electronic Debit Entries. Bank shall credit the applicable Account with immediately available funds for any Electronic Debit Entries initiated by Company in accordance with this Agreement not later than the close of business on the Business Day on which Bank receives notice of the Settlement Date of the items.

(h)    ACH Operating Procedures. The Parties agree that all the procedures related to the Origination Services, included further details on the process established in this Agreement, will be defined in an ACH Procedure Document ("ACH Procedure Document"), or any document in similar subject, to be designed by Synapse and approved by Bank. Bank understands and agrees that Company may update this document from time to time. The Parties agree that the ACH Procedure Document shall define at least the following procedures: (i)

-18-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

cancellation or amendment of Entries by Synapse; (ii) error detection; (iii) notice of returned Entries and respective action; (iv) notification of changes and related actions; (v) provisions for holding accounts or amounts, if and when necessary; and (vi) any other related provision. The Parties agree that the approved ACH Procedure Document will supersede any conflicting timelines defined in this Agreement.

(i)     <u>Bank's Rights if Company Fails to Maintain Adequate Balance in the Accounts</u>. In the event any Account does not have collected funds sufficient on any Settlement Date to cover the total amount of all Entries related to such Account to be paid on such Settlement Date, Bank may (i) refuse to process all Entries related to such Account, in which event Bank shall return the data relating to such credit Entries to Company, and Bank shall have no liability to Company or to any third party as a result thereof; or (ii) process that portion of the credit Entries that the relevant Account holds sufficient collected funds to cover, in whatever order Bank in its sole discretion shall elect to process, in which event Bank shall return the data relating to such credit Entries as are not processed to Company, and Bank shall have no liability to Company or any Gateway, User, or other third party as a result of such actions. In the event Bank elects to process any credit Entries initiated by Company and the relevant Account does not have sufficient collected funds with Bank to cover them, Bank may direct Company to set off the overdraft against the relevant Gateway's Reserve Account and, if Bank determines that it cannot or would not be fully protected in exercising such right of setoff, the total amount of the insufficiency advanced by Bank on behalf of such User or Gateway shall be immediately due and payable by Company to Bank without any further demand from Bank as provided in Section 4(e). Company agrees to reflect any such entries by Bank on the Deposit Ledger.  If Bank elects to process any Entry as provided in clause (ii) above on any one or more occasions, Bank's election to do so shall not be considered a waiver of Bank's rights to refuse to do so at any other time nor shall it be an agreement by Bank to pay other items.

(j)     <u>Impact of Reserves and Exposure Settlement Limits</u>. In the event any Exposure Settlement Limit may be exceeded on a Business Day, Company and Bank will work diligently to resolve such excess and update the Exposure Settlement Limit and/or the Reserve Amount prior to the batch time of the Business Day in which the Exposure Settlement Limit would otherwise be met or exceeded. Notwithstanding the above, if Bank desires to change the Exposure Settlement Limit and/or Reserve Amount, Bank shall provide Company with written notice of such proposed changes as provided in Section 4(g).

## 8.    Wire Services

(a)     <u>Fedwire Services</u>. The Parties agree that the Bank shall process and settle real-time electronic transfers of funds via the system operated by the United States Federal Reserve. Such transfers shall be submitted by Synapse to Bank pursuant to this Agreement only to the extent they arise as a result of instructions (i) submitted by a User to a Platform and transmitted by such Platform to Bank using the APIs, or (ii) submitted by a Gateway to Bank using the APIs.

(b)     <u>SWIFT Wire Services</u>. The Parties agree that the Bank shall process and settle real-time international electronic transfers of funds via the system operated by the Society for Worldwide Interbank Financial Telecommunication. Such international transfers shall be submitted by Synapse to Bank pursuant to this Agreement only to the extent they arise as a result

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

of instructions (i) submitted by a User to a Platform and transmitted by such Platform to Bank using the APIs, or (ii) submitted by a Gateway to Bank using the APIs.

(c)    <u>Wire Standard Operating Procedures</u>. The Parties agree that all the procedures related to the Wire Services, included further details on the process established in this Agreement, should be defined in the Wire Procedure Document ("Wire Procedure Document"), or any document in similar subject, to be designed by Synapse and approved by Bank. Bank understands and agrees that Company may update or amend this document from time to time, subject to Bank's written approval. The Parties agree that the    Wire Procedure Document, and any amendments thereto that are approved by Bank in writing, shall supersede the timelines defined in this Agreement.

### 9.    Debit Card Services.

(a)    <u>Debit Card Issuance Services</u>. The Parties agree that Bank    may provide services related to debit card issuance for Users, Platforms and Gateways. With respect to Users, Platforms and/or Gateways for which Bank has agreed to provide debit card issuance,    the debit card issuance service shall be performed in the form of a developed program to each Platform of a Gateway that has specifically contracted with Synapse for such services.

(b)    <u>Card Program</u>. Bank shall have oversight and control of the services which will enable Users, Platforms and Gateways to utilize a Card to perform electronic funds transfers submitted to the card Network rules and will be settled against Users' funds deposited in the Bank.

(c)    <u>Processor</u>. The Parties agree that Synapse shall be the sole processor    with respect to any card programs established pursuant to this Agreement    .

(d)    <u>Card Program Standard Operating Procedures</u>. The Parties agree that all the procedures related to the Debit Card Services,    including further details on the process established in this Agreement,    will be defined in a    procedure    document ("Card Program Procedure Document"), or any document in similar subject, to be designed by Synapse and approved by Bank. The Parties agree that the Card Program Procedure Document will contain, at least, the procedures related to: (i) approval of a Gateway and/or a Platform to issue the cards to its Users; (ii) marketing rules for the debit cards; (iii) customer services and card issues resolutions; (iv) card transaction disputes submission, review and responses; (v) provisional credit related to disputes; and (vi) Synapse's responsibilities as the processor for the issuance of cards. Bank understands and agrees that Company may update or amend this document from time to time, subject to Bank's written approval of any amendments thereto.

(e)    <u>BIN Sponsorship</u>. Bank shall, if requested by Synapse and if permitted by applicable card Network, sponsor Synapse for a    unique Bank Identification Number ("BIN") with the    card Network under which the debit cards under this Agreement    will be issued. The Parties agree that Synapse will be responsible for all costs that may be incurred by Bank in order to secure access to any payment Networks that may be required in order to support card programs under this Agreement.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(f)    User Cardholder Agreement. If a Platform has been approved to offer individual User debit cards, a User of such Platform may    request a debit card to be issued through such Platform.  Each such User debit card shall be issued, on the terms and subject to the conditions set forth in this Agreement,    following the execution by the relevant User Cardholder Agreement. The form and content of    such Cardholder Agreement shall be designed by Synapse, is subject to Bank's written approval, and shall define the rights and obligations of such User, Platform, Synapse and    Bank in connection with the card that is issued to such User.

(g)    PCI-DSS Compliance. Synapse    will comply with the Payment Card Industry Data Security (PCI-DSS) applicable to    all card programs at all times. Synapse shall also be responsible to    ensure that any Platform that collects, uses, accesses, storages, transmits, or routes through its servers, certain card non-public personal information    will be in compliance with PCI-DSS at all times.

(h)    Customer Service. The Parties agree that Synapse    will provide directly to Users customer service related to the Card Program.  Without limitation, Synapse    will (i) answer and resolve issues in a timely manner as defined in the Card Program Procedure Document; (ii) provide Bank with a monthly report of all issues related to card inquiries made by Users; (iii) receive and submit to Bank card transaction disputes; and (iv) supervise Platforms and Gateways customer services and assure that Platforms and Gateways are forwarding to Synapse communications with Users related to the Card Program. Bank understands and agrees that Company may update or amend the Card Program Procedure Document from time to time, subject to Bank's written approval. The Parties agree that in the event of conflict, the approved Card Program Procedure Document will supersede any requirements defined in this Agreement.

## 10.    Marketing to and Acceptance of New Gateways, Platforms, and Users

(a)    Marketing of Accounts and Bank Services

(i)    Subject to the terms and conditions of this Agreement, Bank hereby appoints Company as Bank's authorized agent to market the Accounts to Gateways and Users, and to facilitate agreements between Bank and Gateways and their Users, as applicable. Bank must expressly approve in advance any materials that discuss or reference Bank or Bank Services that Company may use for marketing the Accounts, or in any other conversations with potential Gateways or Platforms on Bank's behalf. Company agrees that it shall limit any marketing outreach that includes any reference to Bank to Gateways, and shall only use materials in accordance with the terms of this Agreement.

(ii)    Company hereby acknowledges and agrees that all Company and Gateway marketing materials for the Accounts must comply with all UDAAP requirements. Company agrees that all agreements between Company and Gateway will include provisions that allow Company to terminate the Gateway Access Agreement with such Gateway or suspend the services to any Gateway not in compliance with UDAAP requirements. Bank may inform Company that it will cease providing services to any Gateway not in compliance with UDAAP requirements.

-21-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(b)     <u>New Gateways and Platforms</u>.

(i)     Bank shall have the right, in its sole and absolute discretion, to accept or reject as a Bank customer any Gateway identified to it by Company. Unless Bank otherwise agrees with respect to any particular Gateway, Company shall provide to Bank all information and due diligence materials that Bank may request to facilitate Bank's consideration of accepting a Gateway pursuant to this Agreement, and covenants, represents, and warrants that it will faithfully, accurately, and completely convey to Bank any information provided to it by any Gateway. Each Gateway must also provide any agreed upon information for that particular Gateway, on an annual basis going forward. Bank's acceptance of a Gateway as a customer shall not preclude Bank from terminating the agreement with Gateway at any time, either in its entirety or in connection with any particular Platform maintained by such Gateway, by sending written notice to Company of Bank's intent to terminate the relationship with such Gateway or any Platform maintained by such Gateway. Upon any termination, Bank shall return all funds deposited in any Account associated with such Gateway in accordance with Section 6.

(ii)     Upon Bank's receipt of all the documents required by Bank pursuant to Section 10(b)(i) for a proposed Gateway or any Platform maintained by a Gateway, Bank shall notify Company within five (5) Business Days whether Bank either accept, rejects, or needs an additional five (5) Business Days to determine whether it accepts or rejects, such Gateway or Platform as a customer or to establish an account for on behalf of such Gateway or in connection with such Platform. Communications pursuant to this Section 10(b)(ii) shall be provided by email. Company shall ensure that the service agreement between Company and such Gateway pursuant to which such Gateway is permitted to allow its Users to access Bank's services (a "<u>Gateway Access Agreement</u>") shall include all the provisions set forth in <u>Appendix F</u>, unless Bank otherwise agrees in its sole discretion. Without prejudice to the requirements of the preceding sentence, Company agrees (x) to provide written notice to Bank at least ten (10) Business Days prior to (A) making any material changes (that deviate materially from the template of section B of this paragraph) to any Gateway Access Agreement between Company and any Gateway to which Bank is then providing Bank Services, or (B) utilizing a form of Gateway Access Agreement that differs materially from the last form provided to Bank, and (y) to provide Bank with the current form of Gateway Access Agreement annually.

(iii)     Before such Gateway may access any Bank Services, such Gateway must execute an agreement establishing a Gateway Account and a Reserve Account (a "<u>Gateway Account Agreement</u>"). Bank authorizes Company, as its agent, to execute such Gateway Account Agreement on Bank's behalf in exactly the form agreed by Company and Bank from time to time. A formal amendment to this Agreement is not required to update the form Gateway Account Agreement.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(iv)    If such Gateway wishes to establish an FBO Account, Bank authorizes Company, as its agent, to execute on Bank's behalf one or more agreements in exactly the form agreed by Company and Bank from time to time, with such Gateway (an "<u>FBO Account Agreement</u>"), subject to the terms and conditions of this Agreement. A formal amendment to this Agreement is not required to update the form FBO Account Agreement.

(v)    For the avoidance of doubt, Company's authority to execute Gateway Account Agreements and FBO Account Agreements on Bank's behalf is conditioned upon (A) Bank's approval of such Gateway and the relevant Platform, after reviewing the due diligence materials, and (B) such Gateway Account Agreement or FBO Account Agreement being in the exact form and on the exact terms specified in the form of FBO Account Agreement agreed by Company and Bank from time to time.

(c)    <u>New Users and User Accounts</u>

(i)    Subject to this Section 10(c), the Users of a Platform established by a Gateway may utilize the Bank Services that Bank has agreed to make available to Users of such Platform under this Agreement. Company shall ensure that all agreements between a Platform and a User (or any other party) establishing a relationship pursuant to which such User may be permitted to access the Bank Services (a "<u>User Access Agreement</u>") shall include at least (A) a provision in which the User agrees to exculpate Bank from any and all liability arising in respect of the Bank Services to the fullest extent permitted under Applicable Law and (B) the other provisions set forth in <u>Appendix G</u>. Company shall notify each User that Bank has the right to accept or reject such User at any time, and that such User shall have no right to compel Bank to grant such User access to Bank Services either initially or at any time after such services have been initiated. Without prejudice to the requirements of the preceding sentence, Company agrees (x) to provide written notice to Bank at least ten (10) Business Days prior to (A) making any material changes to any User Access Agreement between Company and any User to which Bank is then providing Bank Services, or (B) utilizing a form of User Access Agreement that differs materially from the last form provided to Bank, and (y) to provide Bank with the current form of User Access Agreement annually.

(ii)    If the relevant Gateway has established an FBO Account to hold funds on behalf of the Users of a Platform, such Users may deposit funds in such FBO Account on the terms set forth in the applicable User Access Agreement and the applicable FBO Account Agreement.

(iii)    If Bank has agreed to permit Users of a Platform to establish User Accounts, then a User of such Platform may establish a User Account by executing an agreement in exactly the form agreed by Company and Bank from time to time (a "<u>User Account Agreement</u>"). A formal amendment to this Agreement is not required to update the form User Account Agreement.

-23-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

Company shall ensure that the execution of a User Agreement by a User through a Platform shall constitute a valid electronic signature under the laws in effect in the jurisdiction in which such User is located, and that such User Agreement is in exactly the form User Account Agreement or any other form provided by Bank from time to time. Bank's determination to permit Users of a Platform to establish User Accounts in no way limits Bank from terminating such agreement and ceasing to provide Bank Services to any User at any time by notifying Company of Bank's desire to terminate such agreement. Upon any termination, Bank shall return funds deposited by the User in accordance with Section 6.

(iv)    Company shall prepare a daily file identifying all new Users authorized to use the Bank Services on such day, specifying the identity of the User, the information obtained to verify the User's identity, and which Bank Services shall be available to such User, and provide such file to Bank via a secured method that is mutually agreed to by Company and Bank from time to time and that meets Bank's security expectations not later than 8:30 p.m. (CT)/6:30 p.m. (PT) on the applicable Business Day. Company shall also make such User information accessible to Bank through the Dashboard. Within two (2) Business Days of receiving any such file from Company, Bank will notify Company as to whether Bank will accept or decline each User identified in such file. If Bank declines any User, Company shall block such User from any and all access to the Bank Services within one (1) Business Day after the delivery of such notice by Bank.

**11.    User Agreements, User Statements, User Disclosures, and User Communications**

(a)    Company represents, warrants, and covenants that it will provide Bank with a copy of (i) all Company, User, Gateway, and Platform materials (including hard copies of any online content) that describe or relate to Bank, Bank's role (whether by name or not), any Account or any Bank Services, and all agreements relating to the foregoing (together, the "Disclosure Materials") so that Bank may confirm that such matters are accurately described; and (ii) any proposed new Disclosure Materials or any proposed revisions to any existing Disclosure Materials that include any such description at least two (2) calendar weeks prior to publication in any form, so that Bank may review such Disclosure Materials or revisions to confirm that it, its role, and the Accounts and Bank Services are accurately described. Bank shall use reasonable efforts to provide any comments within one (1) calendar week after receipt of the relevant materials. If Bank determines that it requires additional time to review such revisions, it shall notify Company of its estimated time frame for providing comments. Bank shall have the absolute right to control the use of its name and Marks and the manner in which it, its role, and the Accounts and Bank Services are described, and Company agrees that it shall not use or distribute any Disclosure Materials that contains any such information unless such matters are accurately described to the satisfaction of Bank. Company may update, correct, or rectify any Disclosure Materials provided to Bank before Bank's final confirmation as provided in this Section 11(a). Notwithstanding the foregoing, the Parties acknowledge that Bank's review shall be for the purpose of its own protection and will have no responsibility for providing the Disclosure Materials to Users, Platforms, or Gateways or for their completeness or accuracy.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(b)    Company agrees to provide each User and Gateway with Disclosure Materials that include a description of Bank, its role, and the Accounts and Bank Services, substantially in the form reviewed and confirmed by Bank pursuant to this Section 11, prior to or simultaneously with the applicable User's agreement to deposit funds in any Account or the Gateway's agreement with Company to access the Bank Services, as applicable. Company shall also ensure that each Gateway makes all disclosures required under Applicable Law to each User, including any fees.

(c)    Company agrees to prepare and provide each User with a statement on a monthly, quarterly, or other basis required by Applicable Law or applicable agreement, which shall reflect each deposit or withdrawal of the User's Deposits during the previous period, the closing balance of such Deposits at the end of the previous period, each transaction affecting such balance during the previous period, and any other disclosure required by Applicable Law or applicable agreement. The parties acknowledge that Bank will have no responsibility for providing such periodic statements or for the completeness or accuracy thereof.

(d)    Company shall be responsible for receiving and reviewing communications from Users and Gateways relating to the User Deposits or Bank Services, and any other User or Gateway communications, and for conveying such communications to Bank whenever Bank's interests are or may be affected. Company agrees to accept notices from Users and Gateways on behalf of Bank regarding disputes, complaints, and unauthorized activity affecting their Deposits. Company shall be responsible for responding to all User disputes and complaints in a timely manner, and shall coordinate with Bank whenever the dispute or complaint relates to the terms and conditions of a User Account Agreement, FBO Account Agreement, Gateway Account Agreement, or is not clearly determinable based upon published interpretations of applicable Network Rules or the NACHA Rules, *provided* that Company may not resolve any User dispute or complaint that alleges any wrongdoing or violation by Bank without Bank's prior written consent. Company shall provide any such notices that relate or may relate to Bank or its interests to Bank in a single report on a weekly basis, and such weekly communication report shall include all notices received from a User or Gateway since the prior report no more than one (1) calendar week earlier. Communications pursuant to this Section 11(d) may be provided by email.

## 12.    Books and Records Concerning the Accounts

(a)    In addition to maintaining the Deposit Ledger as the ledger of the Bank with respect to the Accounts, Company shall act as agent and recordkeeper for Bank (in this capacity, the "Recordkeeping Agent") with respect to the Accounts and, in such capacity, (i) will perform all recordkeeping functions with respect to Users' and/or Gateway's interests in the Accounts; (ii) maintain all books and records with respect to Users' and/or Gateway's beneficial interests in Deposits in accordance with FDIC requirements for deposit insurance coverage and any requirements of the OCC or any other applicable Regulatory Authority; and (iii) ensure compliance with the FDIC direct or pass-through insurance regulations and other FDIC and OCC rules (including Part 330 of the FDIC's regulations).

(b)    Company shall provide Bank with access to the Deposit Ledger through the Dashboard at all times and in accordance with all applicable Service Levels. Company shall also

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

make all information related to Gateways, Users, transactions, Entries and requests available to Bank for review and access through the Dashboard.

(c)    Upon the request of Bank, Company shall prepare and deliver to Bank, as promptly as is reasonably practicable, such information regarding Users, Deposits, and withdrawals made from any Account, and any other information that Bank may reasonably request, to facilitate or demonstrate its compliance with Regulation D or any other Applicable Law.

(d)    Three business days following the end of each calendar quarter, Company shall furnish to Bank such information, in such format, as Bank may specify from time to time, in connection with the preparation of its quarterly Consolidated Reports of Condition and Income ("Call Reports") or comparable report to be filed with the FDIC, the OCC, any other member of the Federal Financial Institutions Examination Council, or any other governmental, regulatory or self-regulatory organization with authority over Bank. Bank must specify any change to the format in which such information must be provided no later than the last day of such calendar month to which the report shall refer.

(e)    Without prejudice to the other provisions of this Agreement, Company covenants that it shall at all times maintain, or cause to be maintained, a business continuity plan to ensure that the books and records concerning any Account will be retrievable within a reasonable period of time in the event of a computer failure or malfunction and any additional requirements under Section 22.

(f)    Company agrees to provide Bank with such reports as Bank may reasonably request from time to time including, but not limited to, reports in connection with Bank's asset/liability management and forecasting programs.

## 13.    Terms of Relationship

(a)    <u>Independent Contractors</u>. It is understood that the Parties hereto are independent contractors and engage in the operation of their own respective businesses. Each Party shall be fully responsible for its own employees, servants, and agents. The employees, servants, and agents of one Party shall not be deemed to be employees, servants, and agents of the other Party for any purpose whatsoever.

(b)    <u>Bank's Obligations</u>. Bank's role, and Bank's obligation, is limited to acting as depository and providing the Bank Services and complying with the obligations expressly set forth in this Agreement.

(c)    <u>Agency</u>. In maintaining the Deposit Ledger and providing related services in Sections 2 and 3, engaging in Gateway and User communications on behalf of Bank as provided in Section 11, acting as Recordkeeping Agent in Section 12, and in the other capacities as specified in Sections 6(a), 6(d), 8, 9, and 10, Company is acting as the agent of Bank. In conducting its other obligations under this Agreement, Company shall not be acting as the agent of Bank.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(d)      <u>Gateways, Platforms, and Users</u>. Company shall maintain a separate relationship with each Gateway and User, and Bank shall not have any obligation to any Gateway or User, except to repay the Deposits to Users or Gateways when due in accordance with their terms and provide the other Bank Services that such User or Gateway is permitted to require under this Agreement. In conveying Entries, payment instructions, and other communications from Users through Platforms to Bank, Company is acting as a Third-Party Service Provider to Gateway.

(e)      <u>Non-Exclusivity</u>. Bank and Company agree that this Agreement is not intended to create an exclusive relationship of any type between Bank and Company. Bank and Company may each enter into similar arrangements with one or more third parties.

## 14.    Compensation/Fees

(a)      As compensation for Bank's performance under this Agreement, Company shall pay to Bank certain compensation as set forth in <u>Appendix A</u> on a monthly basis ("Bank's Compensation"). Company shall maintain a Company Account with a balance sufficient to satisfy Bank's Compensation. Bank may debit a Company Account for Bank's Compensation that is due and payable for the preceding month, on the fifth (5th) Business Day of the succeeding calendar month. Bank's Compensation under this Section 14(a) will take effect upon the first Gateway becoming live, and Bank and Company acknowledge that neither party shall not be entitled to any fee or compensation of any kind until such time.

(b)      Bank shall pay Company compensation for the Company Services as set forth in <u>Appendix A</u> on a monthly basis ("Company's Compensation"). Bank shall credit a Company Account designated by Company from time to time for Company's Compensation that is due and payable in respect to any calendar month, on the fifth (5th) Business Day of the succeeding calendar month.

(c)      The fees, charges and compensation paid to either Bank or Company is Confidential Information and not to be disclosed to third parties.

(d)      Both Bank and Company acknowledge that the fees, charges and compensation are subject to change by agreement of Bank and Company in a signed writing.

## 15.    Service Levels

Company will carry out its obligations under this Agreement in compliance with this Agreement and the applicable Service Levels (except where such Service Level noncompliance is a result of a breach by Bank of its obligations under this Agreement). Bank's remedies for any Service Level noncompliance shall be as set forth in <u>Appendix B</u> or other Service Level Agreement agreed by Bank and Company from time to time.

## 16.    Software and Related Services

(a)      In addition to other Company Services described in this Agreement, Company shall provide software services (the "<u>Software Services</u>") to Bank, including the following: (i) maintaining the Deposit Ledger as provided in this Agreement, (ii) providing Bank with access to the Platforms and conveying communications among Bank, Company, Platforms,

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

Gateways and Users as provided in this Agreement; (iii) balancing and managing the Deposits held by Gateways and Users in the Accounts as provided in this Agreement; (iv) providing credentials to certain Bank employees and other Persons designated by Bank permitting such Persons to access the Dashboard and access the Company Services as provided in this Agreement, (v) maintaining records for User and Gateway authorizations, Origination Services, Fedwire Services, Deposit Services, and any additional payment, transfer, or other services for Users and Gateways, in accordance with Section 12 and as required by Applicable Law; (vi) providing notifications and statements to Users and Gateways, in accordance with Section 11 and as required by Applicable Law; and (vii) providing Bank with access to the Dashboard through which it can view and manage information relating to Gateways, Platforms, Users, Deposits, and other information in order for Bank to provide the Bank Services under this Agreement, and to satisfy Bank's requirements described in Section 17.

(b)     Company shall provide thirty (30) calendar days' advance notice of any proposed changes to any system affecting the Company Services or Software Services.

(c)     Company is responsible for ensuring that the Company Services are secure and that only parties applying valid credentials in accordance with Company's access procedures are able to access the Company Services.

(d)     Bank is responsible for determining which of its employees and agents should be permitted to access the Company Services, including the Dashboard and all applications, systems, and services provided by Company, and for providing access credentials only to such employees and agents, and Company shall not have any responsibility for any disclosure or misuse of such credentials by such employees or agents so long as they utilize such credentials in accordance with Company's access procedures.

## 17.    BSA/AML Services

(a)     Company shall develop, administer, and maintain an effective BSA anti-money laundering, anti-terrorist financing, customer due diligence, and customer identification program that satisfies Bank's obligations with U.S. Money Laundering and Customer Identification Requirements in connection with the Bank Services and that, at a minimum: (i) complies with Applicable Law; (ii) satisfies all U.S. Money Laundering and Customer Identification Requirements and compliance program requirements, including but not limited to beneficial ownership requirements, applicable to Bank with respect to the Bank Services; (iii) includes a system of internal controls to ensure ongoing compliance and regular independent testing of compliance with U.S. Money Laundering and Customer Identification Requirements; (iv) designates a BSA compliance officer responsible for managing compliance of the Bank Services with U.S. Money Laundering and Customer Identification Requirements; (v) provides appropriate and ongoing training for Company personnel; and (vi) provides monitoring for unusual or potentially suspicious activity.  At least once per year, Company shall provide Bank with (a) a detailed report setting forth the results of a BSA audit performed by a qualified third party, and (b) a transaction monitoring model validation report.  Bank shall treat such audit reports as Company's Confidential Information under this Agreement and promptly address any exceptions noted in such BSA audit report with the development and implementation of a corrective action plan by Company's management.  Bank may require Company to revise or

-28-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

expand the scope of the BSA audit report or transaction monitoring model validation report as Bank reasonably believes is necessary.

(b)    Bank may rely upon Company's systems, programs, and onboarding processes for all initial BSA/AML and OFAC screening but will also retain full access to the Dashboard and may, for its own protection, utilize any or all data accessible through the Dashboard or otherwise provided to Bank to carry out its own BSA/AML and OFAC sanctions monitoring and screening. Upon request, Company will provide bank with any additional information reasonably required in order to permit Bank to carry out its own BSA/AML and OFAC sanctions monitoring and screening activities.

(c)    Company will provide to Bank such reports, data, and other information, in such form as Bank may require, as specified in Section 15, this Section 17, Appendix B to this Agreement, and any additional Service Level Agreements, to the extent needed for Bank to comply with its obligations under U.S. Money Laundering and Investor Identification Requirements, any Applicable Law, or any otherwise as Bank reasonably believes is necessary. Company shall provide Bank with access to all supporting data through the Dashboard.

(d)    Company shall monitor Gateway and User activities and provide Bank with an unusual activities report on a weekly basis. Company shall review the activities performed in any given calendar week and provide the unusual activities report with all, if any, activities identified as unusual two (2) Business Days after the end of such calendar week. Company's unusual activities report shall identify any suspicious activity in any Account, including any activity that suggests or indicates potential money laundering or other potential criminal activity, does not appear to have a valid business purpose, or is not consistent with the activities expected of such User. Bank shall assess the information contained in any such report and, after performing such investigation as it considers appropriate in light of such information, determine whether or not to file a Suspicious Activity Report ("SAR") with FinCEN or any other applicable regulatory agency. Notwithstanding Company's obligation to provide unusual activity reports, Bank shall be responsible for monitoring such reports and shall have sole discretion and responsibility as to whether to file a SAR with respect to any activity identified in an unusual activities report.

## 18.    Audit and Monitoring Rights

(a)    Company will perform a security and integration audit on all Gateways and Platforms. At all times, Bank shall have the right to control, oversee, and audit Company's use of the Bank Services and provision of Company Services to verify that such use and performance comply with Applicable Law and Bank's policies and the terms of this Agreement. Bank may require Company to expand the scope of such audits as Bank reasonably believes is necessary.

(b)    Company will reasonably monitor, evaluate, and adjust its information security systems and procedures in response to relevant changes in technology, changes in the sensitivity of data, vulnerabilities, and internal and external threats to information security. Company shall perform annual reporting on Service Organization Controls (SOC) audits for Type II SOC 1, SOC 2 and, if available, SOC 3 audits relating to reconcilements, subject to Statement on Standards for Attestation Engagements (SSAE) No. 18 or any revision thereto. Company will further provide, at Bank's request, copies of Company's internal security and control policies

-29-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

and procedures, as well as any other audit reports and other third-party attestations. Company will perform annual NACHA audits and provide, at Bank's request, copies of all NACHA audit reports and underlying documentation for Bank's review. At least once per year, Company shall provide Bank with an ACH audit performed by a qualified third party. If any of the foregoing are found by Bank to be inadequate, Bank shall notify Company, and Company will take steps to immediately correct any deficiencies so identified, though (for the avoidance of doubt) the foregoing requirements, and compliance with them, shall not relieve Company of its obligations for the security of data.

(c)     Company agrees to submit to any audit or examination that may be required by any Regulatory Authority or Network (any such Person, an "Auditing Party") with audit or examination authority over Bank or its affiliates. Company shall also provide to Bank any information which may be required by any Auditing Party in connection with its audit or review of Bank, Bank Services, or Company Services and shall cooperate with such Auditing Party, to the fullest extent requested by such Auditing Party or Bank, in connection with any audit or review of Bank. Company shall also provide such other information as Bank or any Auditing Party may from time to time reasonably request with respect to the financial condition of Company and such other information as Bank may from time to time reasonably request with respect to third parties contracted with Company. Company agrees that Bank, its authorized representatives and agents, and any Auditing Party shall have the right, at any time during normal business hours and upon reasonable prior written notice of no less than five (5) Business Days, or at any other time required by an Auditing Party, to inspect, audit, and examine all of Company's facilities, records, books, accounts, data, reports, papers, and computer records relating to the activities contemplated by this Agreement, including financial records and reports, any Security Program employed by Company to protect User Data to which Company may have access, associated audit reports, summaries of test results, or equivalent measures taken by Company to ensure that the Security Program meets the requirements imposed by any Regulatory Authority with respect to third-party vendors to verify Company's compliance with Applicable Law and Bank's policies. Company shall make all requested documentation and facilities available to the Auditing Party for the purpose of conducting such inspections and audits, exclusively to the extent that such requested documentation relates to the Company Services provided under this Agreement, and the Auditing Party shall have the right to make copies and abstracts of any records and documentation pertaining to the subject matter of this Agreement.

(d)     Company, at its sole expense, shall deliver to Bank, as soon as available, but in any event within one hundred twenty (120) calendar days following the end of the fiscal year of Company ending December 31, 2020, a consolidated balance sheet and profit and loss statement of Company and its subsidiaries as at the end of such fiscal year certified by an officer of Company.  Commencing with the fiscal year ending December 31, 2021, Company, at is sole expense, shall deliver to Bank, as soon as available, but in any event within one hundred twenty (120) calendar days following the end of each fiscal year of Company, a consolidated balance sheet of Company and its subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, audited (and certified) by, and accompanied by a report and opinion of a firm of independent certified public accountants of nationally recognized standing (and which is

-30-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

a member of the American Institute of Certified Public Accounts), which report and opinion shall have been prepared in accordance with GAAP.

(e)    Company acknowledges and understands that the performance of Company Services by Company for Bank is subject to OCC examination oversight, including access to all work papers, drafts, and other materials. Company further acknowledges and understands that the arrangements under this Agreement are subject to 12 U.S.C. § 1867(c) and 12 U.S.C. § 1464(d)(7), and that the OCC generally has the authority to examine Company with respect to this Agreement, as well as Company's compliance with any Applicable Law to the same extent as Bank. Any functions or operations Company performs or provides for Bank are subject to the same level of oversight as if they were performed by Bank itself on its own premises.

(f)    Company shall deliver to Bank a copy of all material notices or correspondence that it receives from any third party, relating to Bank's sponsorship of Company under this Agreement, promptly after receipt of such notice or correspondence.

(g)    All information provided by Company or the resulting work product under any provision of this Section 18 shall be considered Confidential Information of Company, except to the extent provided in the definition of such term. Without prejudice to the other obligations set forth in this Section 18 or elsewhere in this Agreement, any exceptions noted on any audit report will be promptly addressed with the development and implementation of a corrective action plan by Company's management.

## 19.    User Privacy

(a)    Each of Bank and Company hereby acknowledges that it is subject to the privacy regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq*., pursuant to which law Company is required to obtain certain undertakings from Bank, and Bank is required to obtain certain undertakings from Company, with regard to the privacy, use, and protection of nonpublic personal financial information of their respective Users or prospective Users. Therefore, notwithstanding anything to the contrary contained in this Agreement, each of Bank and Company agrees that, except as provided and expressly agreed to by the Parties in Section 20, (i) it shall not disclose or use any User Data except to the extent necessary to carry out its obligations under this Agreement and for no other purpose; (ii) it shall not disclose User Data to any third party, including to any Subcontractor, without the prior consent of the other Party and an agreement in writing from the third party to use or disclose such User Data only to the extent necessary to carry out Bank's obligations or Company's obligations under this Agreement and compliance with applicable regulatory requirements or relevant internal oversight, management, or analytics uses, and for no other purposes, and, in any case, the Party disclosing such User Data shall be liable for any losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind resulting from such third party's use of the User Data; (iii) it shall maintain, and shall require all third parties approved under Section 20 or clause (ii) of this Section 19(a) to maintain, effective information security measures to protect User Data from unauthorized disclosure or use; and (iv) it shall provide the other with information regarding such security measures upon reasonable request and promptly provide information regarding any failure of such security measures or any Security Breach related to User Data. Company further agrees to provide each User with copies

-31-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

of Company's and Bank's privacy policies as in effect from time to time, and to comply with the provisions of Company's and Bank's privacy policies. In furtherance of the foregoing, each Party agrees to take appropriate remedial actions upon the occurrence of any breach of such privacy policies or any federal or state privacy, customer information security or similar laws, regulations or guidelines. The obligations set forth in this Section 19 shall survive termination of this Agreement.

(b)      Notwithstanding any other provision of this Agreement, Company and Bank may disclose User Data (i) pursuant to a request by any governmental or regulatory agency or individual body having authority or jurisdiction over Company or Bank, as the case may be, pursuant to a request or order under Applicable Law, and (ii) to their affiliates, regulatory examiners, auditors, and counsel in connection with the transactions contemplated hereby. In the event a subpoena or other legal process concerning User Data disclosed by Bank to Company, or by Company to Bank, is served upon Company or Bank, as the case may be, Company or Bank, as the case may be, agrees that it will notify the other promptly upon receipt of such subpoena or other legal process, if such disclosure is permissible under the subpoena, and will reasonably cooperate with the other in any lawful effort by the other to contest the legal validity of such subpoena or other legal process.

## 20.   Confidentiality

(a)      Unless otherwise agreed to in advance, in writing, by the disclosing Party or except as expressly permitted by this Agreement, a Party (the "Receiving Party") that receives Confidential Information of the other Party (the "Disclosing Party") will not, except as required by law or court order, use the Confidential Information of the other Party or disclose it to any third party.

(b)      The Receiving Party may disclose Confidential Information of the Disclosing Party only to those of its employees or contractors who need to know such information in order to perform or receive the services and discharging the Receiving Party's other obligations under the Agreement or managing the business of the Receiving Party and its affiliates, including financial and operational management and reporting, risk management, legal and regulatory compliance, and client service management. In addition, prior to any disclosure of such Confidential Information to any such employee or contractor, the Receiving Party shall inform such employee or contractor of the confidential nature of the Confidential Information and shall execute, or shall already be bound by, a non-disclosure agreement containing terms and conditions consistent with the terms and conditions of this Agreement. In any event, the Receiving Party shall be responsible for any breach of the terms and conditions of this Agreement by any of its employees or contractors.

(c)      This Section 20 shall not prohibit any disclosure of Confidential Information by the Receiving Party (i) as expressly permitted by Section 19; (ii) to comply with any legal or regulatory proceeding, investigation, audit, examination, subpoena, civil investigative demand, or other similar process; (iii) as required by operation of law or regulation, by the request or requirement of any Regulatory Authority with jurisdiction over the Receiving Party or the Disclosing Party; or (iv) for which the Disclosing Party has received the prior written consent of the Party providing the information, which consent shall not be unreasonably withheld.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(d)    The Receiving Party shall use the same degree of care to avoid disclosure of the Disclosing Party's Confidential Information as the Receiving Party employs with respect to its own Confidential Information of like importance, but not less than a reasonable degree of care.

(e)    Each Party shall, upon learning of any unauthorized disclosure or use of the other Party's Confidential Information, notify the other Party promptly and cooperate fully with such Party in protecting its Confidential Information and remediating such unauthorized disclosure.

(f)    The obligations of each Party under this Section 20 are in addition to its obligations under Section 19.

(g)    The Parties acknowledge that disclosure of any Confidential Information by a Receiving Party will cause irreparable injury to the Disclosing Party, its customers, and other Persons, and is inadequately compensable in monetary damages. Accordingly, a Party may seek injunctive relief in any court of competent jurisdiction for the breach or threatened breach of this Section 20, in addition to any other remedies in law or equity, and neither Party will raise the defense of an adequate remedy at law in opposition to any such petition for injunctive relief.

(h)    Upon the termination or expiration of this Agreement for any reason, the Receiving Party will deliver to the Disclosing Party all of the Disclosing Party's property or Confidential Information in tangible form that the Receiving Party may have in its possession or control. Notwithstanding anything in this Section 20 to the contrary, each Party may keep records of the other Party's Confidential Information for recordkeeping purposes as required by Applicable Law; *provided* that the confidentiality of all such Confidential Information is maintained in a manner consistent with the requirements of this Agreement.

(i)    This Section 20 will survive the termination of this Agreement.

**21.    Data Security**

(a)    <u>Company Data Security Obligations</u>.

(i)    Company represents and warrants that its creation, collection, receipt, access, use, storage, disposal, and disclosure of User Data does and will comply with all applicable federal and state privacy and data protection laws, as well as all other Applicable Law and applicable directives. At a minimum, pursuant to NACHA Rules, Company must use at least 256 bit RC4 encryption technology for the entry and transmission of Entries.

(ii)    Without limiting Company's obligations under Section 21(a)(i), Company shall implement administrative, physical, and technical safeguards to protect User Data from unauthorized access, acquisition, or disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than accepted industry practices, and shall ensure that all such safeguards, including the manner in which User Data is created, collected, accessed, received, used, stored, processed, disposed of, and disclosed, comply with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement.

-33-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(iii)    At least once per year, Company shall conduct a site audit of the information technology and information security controls for all facilities used in complying with its obligations under this Agreement, including obtaining a network-level vulnerability assessment performed by a recognized third-party audit firm based on recognized industry best practices. Company shall provide Bank Company's latest Type II SOC 1 and SOC 2 and, if available, SOC 3 audit reports with no material findings, subject to SSAE No. 18 or any revision thereto, and any other audit reports relating to Company's information technology security controls as soon as such reports are available to Company. Bank shall treat such audit reports as Company's Confidential Information under this Agreement. Any exceptions noted on the SOC reports or other audit reports will be promptly addressed with the development and implementation of a corrective action plan by Company's management.

(iv)    Company and any Gateways that collect, use, access, store or route through their servers credit or debit card information shall comply with the Payment Card Industry Data Security Standards, as such standards may be amended from time to time ("PCI-DSS"). Company and each such Gateway shall be assessed on an annual basis for compliance with the PCI-DSS, such assessment to be performed by a qualified security assessor approved by the PCI Security Standards Council (a "QSA"). Company will submit to Bank for approval the name of the QSA engaged to perform the PCI-DSS assessment with respect to it no later than thirty (30) calendar days prior to each annual assessment. Bank has approved Frazier & Deeter, L.L.C. as Company's current QSA. In the event Company desires to select a new QSA, Bank reserves the right in its reasonable discretion to reject Company's selected QSA, at which time Company shall submit an alternative name reasonably acceptable to Bank. In no event shall Bank's disapproval of a QSA relieve Company of the obligation to provide the PCI-DSS assessment report to Bank annually. Promptly upon completion of such assessment, a copy thereof shall be provided to Bank. Company shall ensure that each Gateway agrees to the requirements of this Section 21(a)(iv) for the benefit of Bank, as applicable.

(b)    Security Program. Each Party shall, and shall require its Subcontractors that receive User Data to, establish and maintain a Security Program as long as it stores User Data. At all times during and after the Term and any Termination Transition Period, (i) each Party shall use at least the same degree of care in protecting User Data against unauthorized disclosure as it accords to its other confidential customer information, but in no event less than the industry standard of care for financial institutions; and (ii) the Security Program shall comply with all information and data security requirements of each Network and with Applicable Law. Within thirty (30) calendar days of Bank's written request, Company shall provide to Bank a summary of Company's written Security Program, and thereafter upon Bank's request will provide updates on the status of such Security Program. Each Party's Security Program shall be Confidential Information of such Party.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(c)    <u>Security Breach Procedures</u>.

(i)    Each Party shall notify the other Party of a Security Breach as soon as practicable, but no later than seventy-two (72) hours after the breached Party becomes aware of any Security Breach suffered by such Party. The Party that suffers a Security Breach shall be referred herein as the "<u>Breached Party</u>".

(ii)    Immediately following notification under Section 21(c)(i) of a Security Breach, the Parties shall coordinate with each other to investigate the Security Breach. The Breached Party agrees to fully cooperate with the other Party in handling the matter, including: (A) assisting with any investigation; (B) providing the other Party with physical access to the facilities and operations affected; (C) facilitating interviews with the Breached Party's employees and others involved in the matter; and (D) making available all relevant records, logs, files, data reporting, and other materials required to comply with any Applicable Law, regulation, industry standards, or as otherwise reasonably required by the other Party.

(iii)    The Breached Party shall, at its own expense, use best efforts to immediately contain and remedy any Security Breach and prevent any further Security Breach, including taking any and all action necessary to comply with Applicable Laws relating to privacy and privacy rights. The Breached Party shall reimburse the other Party for all actual reasonable costs incurred by the other Party in responding to, and mitigating damages caused by, any Security Breach, including all costs of notice and/or remediation pursuant to Section 21(c)(iv).

(iv)    The Breached Party agrees that it shall not inform any third party of any Security Breach without first obtaining the other Party's prior consent, other than to inform a complainant that the matter has been forwarded to the other Party's legal counsel, or to comply with any Applicable Law or requirement or guidance of any Regulatory Authority. Further, the Breached Party agrees that the other Party shall have the sole right to determine: (A) whether notice of the Security Breach is to be provided to any individuals, regulators, law enforcement agencies, consumer reporting agencies, or others as required by law or regulation, or otherwise in the other Party's discretion; and (B) the contents of such notice, whether any type of remediation may be offered to affected persons, and the nature and extent of any such remediation.

(v)    The Breached Party agrees to maintain and preserve all documents, records, and other data related to any Security Breach.

(vi)    In the event of any Security Breach, the Breached Party shall promptly use its best efforts to prevent a recurrence of any such Security Breach.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(vii)    The Parties agree that Company shall communicate to Bank any notice received by Company concerning a Security Breach suffered by a Gateway by following the steps provided in this Section 21(c).

(d)    Equitable Relief. The Breached Party acknowledges that any breach of its covenants or obligations set forth in this Section 21 may cause the other Party irreparable harm for which monetary damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the other Party is entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which the other Party may be entitled at law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

(e)    Material Breach. The Breached Party's failure to comply with any of the provisions of this Section 21 is a material breach of this Agreement. In such event, the other Party may terminate the Agreement effective immediately upon written notice to the Breached Party without further liability or obligation to the Breached Party.

(f)    Indemnification. The Breached Party shall defend, indemnify, and hold harmless the other Party and its subsidiaries, affiliates, and their respective officers, directors, employees, agents, successors, and permitted assigns (each, a "Breach Indemnitee") from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers, arising out of or resulting from any third-party claim against any Breach Indemnitee arising out of or resulting from the Breached Party's failure to comply with any of its obligations under this Section 21.

## 22.    Business Continuity Plan

(a)    At all times during the Term and any Termination Transition Period, each Party shall prepare and maintain written disaster recovery, business resumption, and contingency plans appropriate for the nature and scope of the activities of, and the obligations to be performed by, such Party. Each Party shall ensure that its plans are sufficient to enable such Party to meet the business continuity plan services set forth in Appendix B or any other Service Level Agreement and to promptly resume, except as provided in Section 33, the performance of its obligations hereunder in the event of a natural disaster, destruction of facilities or operations, utility or communication failures, or similar interruption in operations. Each Party shall ensure that all material records and programs, including User Data, are backed up and otherwise protected in a manner sufficient to survive any disaster or business interruption. Each Party shall periodically, and no less than annually, test its respective disaster recovery, business resumption, and contingency plans as may be appropriate and prudent in light of the nature and scope of its obligations hereunder.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(b)      Company must provide such written disaster recovery, business resumption, and contingency plans to Bank at least annually, including the results of testing activities and/or exercises, and any remediation information.

(c)      Each Party will notify the other Party as soon as possible of any material alterations to its business continuity plan that would impair its ability to meet its agreed upon business continuity plan services or otherwise recover and resume any interrupted services it provides to the other Party or Parties. Each Party will promptly notify the other Party of any actual, threatened, or anticipated event that does or may disrupt or impact the services provided by it to the other Party pursuant to this Agreement and will cooperate fully with the other Party to minimize any such disruption and promptly restore and recover the services.

## 23.   Additional Covenants

(a)      <u>Additional Covenants of Company</u>.

(i)      Company shall comply with all laws, rules, and regulations applicable to it in the conduct of its business. Without prejudice to Bank's rights pursuant to Section 18, Bank shall have no obligation to review, monitor, or otherwise ensure compliance by Company or any other Person with (A) any law, regulation, policy, restriction, or guideline applicable to Company or any other Person; (B) any term, restriction, or guideline set forth in any organizational document of Company or any related document; or (C) any term or condition of any agreement between Company and any third party.

(ii)      At all times, Company, in performing its duties and obligations related to Bank Services and Company Services under this Agreement, shall comply with all Applicable Law and Bank's policies, including all securities, cryptocurrency, money transmitter, and other laws and regulations, and all rules, regulations, or requirements of any regulatory agency or self-regulatory organization applicable to the performance of such obligations hereunder, and in a manner consistent with industry best practices, all as in effect from time to time.

(iii)      Company shall not use or attempt to use Bank Services (A) to engage in any illegal purpose or activity or to violate any Applicable Law, rule or regulation; (B) to breach any contract or agreement by which Company is bound; (C) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction; or (D) to engage in any transaction or activity that is not specifically authorized and permitted by this Agreement. Bank may decline to execute any transaction or activity that Bank believes violates the terms of this Agreement.

(iv)      Company shall comply with all regulations of OFAC, including: (A) ensuring that all Users are screened as required by Applicable Law and the BSA/AML Policy through a screening system implemented to comply with OFAC regulations and the BSA/AML Policy, and (B) complying with all

-37-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

OFAC and Bank directives regarding the prohibition or rejection of unlicensed trade and financial transactions with OFAC specified countries, entities, and individuals in connection with Bank Services. Company shall provide Bank with copies of its policies or procedures relating to BSA/AML or OFAC compliance, customer due diligence practices, risk assessment, or risk tolerance, and will provide a copy of any proposed revision to any such policy or procedure, at least thirty (30) calendar days prior to the effective date of such policies, procedures, or agreement.

(v)     Company shall prepare and file, on a timely basis and in the manner prescribed by the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), and applicable regulations thereunder, all information returns that may be required by Company in whatever capacity with respect to the Deposits (with the customary copies thereof for state and local taxing authorities) and shall furnish a copy of all information returns and notifications prescribed by the Internal Revenue Code and applicable regulations thereunder with respect to any User holding a beneficial interest in a Deposit to the User; *provided, however*, that in the event Company does not have available to it the information required to complete such information return and such information is available to Bank, Company shall request such information from Bank, and upon receipt of such information in a timely manner, Company shall prepare and file such return in a timely manner. Company shall cause to be obtained and retained in its files any necessary exemption certificates from its respective customers with respect to the filing of any information return and the withholding of taxes.

(vi)     Company shall withhold in a timely and proper manner any and all taxes required to be withheld under Applicable Law in connection with the payment or crediting of any interest on any beneficial interest in any Account and shall pay in a timely and proper manner such amount to the appropriate governmental agency or its designated agent.

(vii)     Company will promptly advise Bank of any legal or administrative action of which Company obtains knowledge by any state, federal or other court, agency, or authority, including any self-regulatory authority, taken or threatened to be taken that would preclude, limit, or otherwise restrict the provision of the Company Services or the Bank Services as contemplated by this Agreement or indicate any such Person's intent to take any adverse action with regards to the Bank, the Company, the Company Services or the Bank Services.

(viii)     Company will notify Bank promptly upon becoming aware of any of the following events:

A.     any information breach, data loss, service or system interruption, compliance lapse, enforcement action, or other regulatory action against or affecting any User, Gateway, or Platform;

-38-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

B.      any service disruption, security breach, or other event affecting any User, Gateway, or Platform that may pose a significant risk to Bank;

C.      any significant changes to the operations utilized by Company in providing Company Services or services to Users or Gateways, or to the manner in which Company manages or conducts such operations, including any significant acquisition, subcontracting, off-shoring, internal reorganization, or management or key personnel change, or implementation of new or revised policies, processes, and information technology;

D.      any significant change in ownership of Company, excluding changes during the Initial Term, and any Renewal Term(s) of this Agreement, that in the aggregate, affect more than 20% of Company's outstanding equity ownership; or

E.      any significant change to the business, strategy, or financial condition of Company, including any merger, acquisition, joint venture, divestiture, or other business activities that could affect the activities involved.

(ix)    Company shall maintain adequate insurance, to Bank's satisfaction, including liability coverage and intellectual property insurance, notify Bank of any material changes to any such coverage, and provide evidence of the existence and adequacy of such coverage upon request.

(x)     Company hereby covenants that the services and software do not and will not contain or transmit any computer code designed to disrupt, disable, harm, or otherwise impede in any manner, including aesthetical disruptions or distortions, the operation of the software, or any system.

(xi)    Company hereby covenants that the software will properly operate as provided in this Agreement. Without limiting the foregoing, Company covenants that the software used to provide the services will operate properly in conjunction with Bank's systems and in conjunction with any reasonable standard upgrades to such systems.

(xii)   Company affirms that to the best of Company's knowledge, no employee or agent providing services to Bank has been the subject of any criminal investigation nor engaged in an act of dishonesty, breach of trust, money laundering, or the illegal sale, distribution, or trafficking of controlled substances, and Company will continue to screen and monitor its employees or agents providing services to Bank accordingly.

(xiii)  Company will provide: (A) the financial statements required by Section 18(d) in accordance with such Section, and (B) as soon as available, but in any event within forty-five (45) calendar days after the end of each of the first three fiscal quarters (commencing with the fiscal quarter ended March 30, 2021), a balance sheet and profit and loss statement, certified by an officer of Company.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(b)    Additional Covenants of Bank.

(i)    At all times, Bank, in performing its duties and obligations related to the Services under this Agreement, shall comply with all Applicable Laws.

(ii)    At its sole expense, Bank shall (A) maintain its status as an insured depository institution in good standing and shall timely pay all fees, dues, and assessments associated with such status; (B) maintain its Network Memberships; (C) promptly give notice, if permitted under Applicable Law, to Company if Bank receives notice from NACHA, the FDIC, or another Regulatory Authority of a material breach by Bank of Applicable Law, including any breach of FDIC Rules that may jeopardize Bank's status as an insured depository institution; and (D) use commercially reasonable efforts to promptly resolve any such breach.

(iii)    Bank will promptly advise Company, if permitted under Applicable Law, of any legal or administrative action of which Bank obtains knowledge by any state or federal court, agency, or authority, including any self-regulatory authority, taken or threatened to be taken, that would preclude or limit or otherwise restrict the provision of the Company Services or the Bank Services as contemplated by this Agreement or indicate any such Person's intent to take any adverse action with regards to the Bank, the Company, the Company Services or the Bank Services.

(iv)    Bank has provided, and while any Account is maintained shall provide, Company with all information that Bank is required to provide beneficial owners of Deposits under any federal or state law, rule, or regulation governing deposits held under arrangements similar to the arrangements required by this Agreement.

(v)    From time to time, Bank may be served with subpoenas, restraining orders, writs of attachment, garnishments or execution, tax levies by the Internal Revenue Service, or other legal process relating to an Account. Bank must comply with the legal process in accordance with Applicable Laws and Company agrees, and will require each User and Gateway to agree, that no provision of this Agreement shall be breached by Bank's compliance with any such legal process.

(vi)    Bank may employ agents, Subcontractors, consultants, and other third parties, including affiliates, to provide or assist Bank in the provision of any part of the services or the discharge of any other obligations or duties under this Agreement without the consent or approval of Company. Bank shall be responsible for the acts and omissions of any such person so employed as if Bank had committed such acts and omissions itself.

-40-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(c)    <u>Mutual Further Assurances</u>. Each Party shall execute and deliver, or cause to be executed and delivered, such further agreements and documents and take such other action as the other Party may reasonably require to carry out the matters contemplated by this Agreement.

**24.    Representations and Warranties**

(a)    <u>Representations and Warranties of Company</u>.

(i)    Company is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has full corporate power and authority to carry on its business as currently conducted.

(ii)    Company has full power and authority to do and perform all acts contemplated by this Agreement.

(iii)    This Agreement constitutes the legal, valid, and binding obligation of Company, enforceable in accordance with its terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency, liquidation, or other similar laws affecting generally the enforcement of creditors' rights.

(iv)    Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, the fulfillment of, or compliance with, the terms and provisions of this Agreement, nor the performance of its obligations under this Agreement will conflict with, or result in a breach of any of the terms, conditions, or provisions of (A) any Applicable Law, (B) the articles of incorporation or bylaws of Company, or (C) any material agreement to which Company is a party or by which it may be bound.

(v)    Company holds all registrations and licenses required to operate its business, and all such registrations and licenses are currently valid.

(vi)    All Company agreements constitute the legal, valid, and binding obligation of Company, enforceable in accordance with their respective terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency, liquidation, or other similar laws affecting generally the enforcement of creditors' rights.

(vii)    Company is the authorized representative of each User, Gateway, and Platform in establishing, maintaining, making deposits to and withdrawals from, and effecting other transactions in the Accounts, and taking any other action it is authorized or required to take under this Agreement, and is authorized to transmit instructions to Bank on behalf of the Users, Gateways, and Platforms with respect to any Account. Company shall transmit all such instructions faithfully, accurately, completely, and in a timely manner, and Bank may conclusively rely without further inquiry on such instructions transmitted by Company on behalf of the Users, Gateways, and Platforms or otherwise in connection with this Agreement.

-41-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(viii)    Company shall transmit to each of the Users, Gateways, and Platforms any information, including disclosure information, that Bank may provide in connection with an Account, including any disclosure information required by Applicable Law, and shall deliver such information to the Users, Gateways, and Platforms faithfully, accurately, completely, and in a timely manner, and in any event within any applicable time periods required by Applicable Law, this Agreement, any Account Agreement, or any other relevant agreement.

(ix)    The statements made in the Disclosure Materials are true and accurate in all material respects.

(x)    Except as expressly permitted under this Agreement or otherwise in writing, Company will not use Bank's Intellectual Property or Confidential Information.

(xi)    There is no action, suit, proceeding, inquiry, or investigation by or before any court, governmental agency, public board or body pending or, to the knowledge of Company, threatened or contemplated by any governmental agency that could reasonably be expected to materially impair the ability of Company to perform its obligations under this Agreement.

(xii)    Company hereby represents and warrants that it does not engage in an "Internet gambling business", as such term is defined in Section 233.2(r) of Federal Reserve Regulation GG (12 C.F.R. § 233) ("Regulation GG"). Company covenants that it shall not engage in an internet gambling business. In accordance with Regulation GG, Company is hereby notified that "restricted transactions", as such term is defined in Section 233.2(y) of Regulation GG (12 C.F.R. § 233.2(y)), are prohibited in any dealings with Company pursuant to this Agreement or otherwise between the Parties hereto.

(xiii)    Company hereby represents and warrants that: (A) it has and will have all rights, titles, licenses, Intellectual Property rights, permissions, and approvals necessary for its performance under this Agreement and to grant Bank the rights granted hereunder; and (B) none of the services or related software contemplated under this Agreement infringe, misappropriate, or otherwise violate any third-party rights with respect to any Intellectual Property.

(b)    Representations and Warranties of Bank.

(i)    Bank is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has full corporate power and authority to carry on its business as currently conducted.

(ii)    Bank has full power and authority to do and perform all acts contemplated by this Agreement.

-42-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(iii)    This Agreement constitutes the legal, valid, and binding obligation of Bank, enforceable in accordance with its terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency, liquidation, or other similar laws affecting generally the enforcement of creditors' rights.

(iv)    Bank is an insured depository institution in good standing under FDIC Rules.

(v)    Bank holds all registrations, licenses, and memberships required to operate its business and offer the Bank Services provided herein, and all such registrations, licenses, and memberships are currently valid and shall be valid during any Term of this Agreement.

(vi)    Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, the fulfillment of, or compliance with, the terms and provisions of this Agreement, nor the performance of its obligations under this Agreement will conflict with, or result in a breach of any of the terms, conditions, or provisions of (A) any Applicable Law, (B) the articles of incorporation or bylaws of Bank, or (C) any material agreement to which Bank is a party or by which it may be bound.

## 25.    Intellectual Property

(a)    To the extent that Intellectual Property owned or otherwise licensable by Company ("Background IP") is incorporated into or necessary or useful for the exploitation of any services or work product provided by Company or its designees pursuant to this Agreement, Company hereby grants to Bank, exclusively during the Term of this Agreement, the Termination Transition Period, and any time after which Bank continues to utilize any Company Services in accordance with this Agreement, a worldwide, non-exclusive, transferable, sublicensable, fully-paid-up, royalty-free, irrevocable (except in accordance with Section 31) license to use, practice, display, and perform such Background IP in connection with the receipt, use, and other exploitation of the services or related work product in connection with Bank Services.

(b)    Without limiting the rights granted under Section 25(a), neither Party shall use the trademarks, trade names, service marks, logos, or copyrighted materials of the other Party in any advertising, publicity, promotional marketing, or other material without the prior written consent of such other Party.

## 26.    Use of Subcontractors and Responsibility for Their Work

If Company delegates performance of any of the Company Services, or any portion of such Company Services, to a Subcontractor, Company must notify Bank of its intent to use a Subcontractor prior to implementing any such delegation. Company will remain fully responsible for any activities or actions by its Subcontractors. All Subcontractors must explicitly agree to comply with all Applicable Laws and the terms of this Agreement. Bank may periodically request, and Company shall be responsible for providing to Bank, evidence or

-43-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

assurances regarding any significant Subcontractors' performance and/or compliance with the terms of this Agreement. Company shall be responsible for ensuring that Bank may exercise its monitoring, auditing, and oversight rights under this Agreement with respect to any such Subcontractor and shall be responsible for any additional costs and resources required for such exercise. In addition to the above, for any Subcontractor located at a location outside of the United States, Company shall provide Bank sixty (60) calendar days' advance notice of its intention to contract with the Subcontractor, and Company shall seek Bank's prior approval of such offshore Subcontractor, such approval not to be unreasonably withheld.

## 27.    Monitoring and Recording of Phone Calls

Bank may electronically record any telephone conversation between Bank and an Authorized Person or Company representative, and Company hereby consents to such recording on behalf of the Authorized Person or other Company representative. However, the decision to record is solely within Bank's discretion. Bank will not be liable for failure to record any conversation, whether intentionally or otherwise, or for Bank's inability to produce a recording of a telephone conversation. If Bank's records regarding a telephone conversation differ from those of Company, Bank's records shall control.

## 28.    Remedies

(a)    Remedies that may be triggered as a result of Company's failure to meet targets established by Service Level Agreements, other than termination, will be set forth in Appendix B, as may be amended from time to time, or any other Service Level Agreement between Bank and Company.  For the avoidance of doubt, any remedies available under Service Level Agreements are not intended to limit Company's indemnity obligations under this Agreement or to serve as Bank's exclusive remedy for any damages that Bank may experience as a result of Company's negligence, misconduct or other breach of this Agreement.

## 29.    Right of Setoff and Security Interest Against Company Accounts

Company hereby grants to Bank a security interest in and right of setoff against all Company Accounts and all other deposit accounts of Company at Bank for the purpose of securing any indebtedness of Company to Bank pursuant to this Agreement. The security interest and right of setoff granted by this Agreement are consensual and are in addition to any other security interest or right of setoff that Bank or any of its affiliates may have by agreement or Applicable Law. Any pledge or assignment by Company to third parties of any Company Account for any purpose remains subject to Bank's right of setoff and security interest, which must take priority over any such grant of a security interest to a third party. To the extent any of the funds to be set off are entitled to any exemption from execution, levy, attachment, garnishment, seizure, or other legal or equitable process, then, to the maximum extent allowed by Applicable Law, Company hereby knowingly, affirmatively, and unequivocally waives such exemption and consents to Bank's or it's affiliate's setoff against such funds as contemplated by this Agreement. All payments received by setoff or by exercise of Bank's security interest may be applied to Company's obligations under this Agreement in such order as Bank in its sole discretion may determine.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

**30.    Notices**

(a)    Except where this Agreement specifies that communications may be given in electronic form, all notices and communications under this Agreement will be in writing and email and will be sent:

If to Bank, to:

| **Primary:** | **With a copy to:** |
|---|---|
| Joel Westra | Micah Lang |
| joel.westra@ambankiowa.com | micah.lang@am-bank.com |
| **525 N Main Ave** | **234 5th Ave SW** |
| **Sioux Center, IA 51250** | **Le Mars, IA 51031** |

If to Company, to:

| **Primary:** | **With a copy to:** |
|---|---|
| Synapse Financial Technologies, Inc. | Synapse Financial Technologies, Inc. |
| 101 2nd Street, Suite 1500 | legal@synapsefi.com |
| San Francisco, CA 94105 | 101 2nd Street, Suite 1500 |
| Attention: Sankaet Pathak | San Francisco, CA 94105 |
| | Attention: Legal Department |

(b)    Unless otherwise expressly specified in this Agreement, all notices sent or delivered hereunder shall be deemed to be given or become effective for all purposes of this Agreement as follows: (i) when delivered in person, when delivered; (ii) when sent by registered, certified, or express mail, or by private courier, on the earlier of (A) the third (3rd) Business Day after the date of deposit in the United States mail or dispatch by the courier and (B) the date of receipt; (iii) when sent by telegram, telecopy, overnight delivery, or other form of rapid transmission, when receipt of such transmission is received by the sender; and (iv) when sent electronically, when the email has been transmitted by the server of the sender.

**31.    Term and Termination; Related Procedures**

(a)    Term. This Agreement shall commence on the Effective Date and shall, unless earlier terminated pursuant to this Section 31 or another provision of this Agreement, continue for a term of five (5) years following the Effective Date (the "Initial Term") and the Agreement shall be automatically renewed for additional rolling one (1) year periods (the "Renewal Term" and collectively with the Initial Term, the "Term").

(b)    Termination by Bank. Bank shall have the right to terminate this Agreement:

(i)    Upon notice to Company, in the circumstances specified in Section 21(e);

(ii)    Upon five (5) calendar days' notice to Company, if Company breaches any of its obligations under this Agreement in any material respect, or if any representation of Company in this Agreement proves to have been false in any material respect when made, and Company fails to cure such

breach or such false representation within forty-five (45) calendar days of receipt of written notice of such breach from Bank or such shorter period as may be required to comply with Applicable Law; and

(iii)    Immediately, if Company or any of its affiliates (A) is dissolved (other than pursuant to a consolidation, amalgamation, or merger); (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (C) makes a general assignment, arrangement, or composition with or for the benefit of its creditors; (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed, or restrained in each case within ten (10) calendar days of the institution or presentation thereof; (E) has a resolution passed for its winding-up, official management, or liquidation (other than pursuant to a consolidation, amalgamation, or merger); (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official for it or for all or substantially all its assets; (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration, or other legal process levied, enforced, or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within ten (10) calendar days thereafter; (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) to (G) (inclusive); or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(c)    Termination by Company. Company shall have the right to terminate this Agreement:

(i)    Upon notice to Bank, in the circumstances specified in Section 21(e);

(ii)    Upon five (5) calendar days' notice to Bank, if Bank breaches any of its obligations under this Agreement in any material respect, or if any representation of Bank in this Agreement proves to have been false in any material respect when made, and Bank fails to cure such breach or such false representation within forty-five (45) calendar days of receipt of written notice of such breach from Company, or such shorter time as may be required to comply with Applicable Law; and

-46-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

(iii)    Immediately, if Bank (A) is dissolved (other than pursuant to a consolidation, amalgamation, or merger); (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (C) makes a general assignment, arrangement, or composition with or for the benefit of its creditors; (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed, or restrained in each case within ten (10) calendar days of the institution or presentation thereof; (E) has a resolution passed for its winding-up, official management, or liquidation (other than pursuant to a consolidation, amalgamation, or merger); (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official for it or for all or substantially all its assets; (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration, or other legal process levied, enforced, or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within ten (10) calendar days thereafter; (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) to (G) (inclusive); or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(d)    <u>Termination by Either Party</u>. Either Bank or Company shall have the right to terminate this Agreement upon (I) ninety (90) calendar days' written notice (or such shorter period as required by Applicable Law) of (a) any change to or enactment of any Applicable Law, or Network Rules that would substantially alter a significant obligation of such Party or result in the prohibition of the underlying purpose of the business arrangements contemplated by this Agreement; or (b) any violation of any Applicable Law, or Network Rules relating to the performance of this Agreement through no fault of either Party (including if termination of this Agreement is directed by a Regulatory Authority); *provided*, in either case, that the Parties have negotiated in good faith to make any required material change to this Agreement that would enable this Agreement to be in full compliance with such law or regulation and have been unable to reach agreement on such modifications, or (II) twenty four (24) months written notice, for any or no reason.

(e)    A Party's right to terminate this Agreement pursuant to this Section 31 shall not be the exclusive remedy for breach of this Agreement, but shall be in addition to all other remedies under this Agreement or available at law or in equity (unless expressly precluded herein).

(f)     Following notice of any termination of this Agreement pursuant to this Section 31 or any other provision of this Agreement, Bank and Company shall, as soon as practicable, use their reasonable best efforts in good faith to jointly develop and adopt a plan for the orderly transition of the Deposits held in the Accounts to a successor depository institution or successor depository institutions or for the return of Deposits to the relevant Users, and such plan shall provide for the continued provision of services, to the extent desired by the non-breaching Party or, if there is no breaching Party, agreed by both Parties for a period at least equal to the Termination Transition Period.

(g)     From and after the effective date of the termination of this Agreement and during Termination Transition Period, Company shall cooperate fully with Bank in order to effect an orderly wind down of Bank Services, including a determination of how Account records shall be maintained. Company acknowledges that after termination, Bank will require Account records and other records to be maintained for as long as required by Applicable Law, and for that purpose Company shall transfer to the Bank the data, information, and records related to the services provided in this Agreement, for all Users, Gateways, Accounts, and Entries related to each of such Accounts, in a format mutually agreed upon between the Parties, with a data dictionary detailing the data fields to be included in such transfer, as may be reasonably necessary or useful for Bank to comply with its obligations, including pursuant to Applicable Law. The rights and obligations imposed by this Section 31(g) shall survive termination of this Agreement. If and to the extent that, following termination of the Term of this Agreement and any Termination Transition Period, a license under any Background IP is required for Bank to use, practice, display, perform, or access any of the data or records transferred to Bank in accordance with this Section 31(g), Company shall grant and hereby grants a limited, worldwide, non-exclusive, transferable, sublicensable, fully-paid-up, royalty-free, perpetual and irrevocable right and license under such Background IP solely for such purpose.

(h)     In the event of a breach of this Agreement or any Applicable Law, the breaching Party shall be responsible for all transition and termination costs. If this Agreement is terminated for any other reason, each Party shall bear its own costs and obligations associated with transition and termination.

## 32.     Survival

Sections 10(a)(i); 18(f); 19; 20; 21(c), 21(d), 21(e), 21(f); 25; 31; 35; 36; 38; 39; 40; and 43 shall survive the termination of this Agreement, as well as any other provision which species its survival in this Agreement. Section 12 shall survive the termination of this Agreement until no longer required under any Applicable Law. Section 18, with the exception of Section 18(f), shall survive the termination of this Agreement for one (1) year following the termination, and Sections 21(a) and 21(b) shall survive the termination of this Agreement for as long as Company possesses any Bank data. Any obligations that have accrued but have not been performed shall survive any expiration or termination of this Agreement and any amount of payment due to a Party before termination shall continue to remain due to such Party. All other sections of this Agreement shall survive until the Accounts are closed.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

33.     **Force Majeure**

Either Party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including acts of God, acts of war, fire, insurrection, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions, or other acts of nature.

34.     **Disclaimer of Warranties**

(a)     EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, EACH PARTY SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS HEREBY EXCLUDED BY BOTH PARTIES UNDER THIS AGREEMENT.

(b)     EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITHOUT ANY REPRESENTATION OF WARRANTY, WHETHER EXPRESSED, IMPLIED OR STATUTORY. USE OF COMPANY SOFTWARE SERVICES IS AT BANK'S OWN RISK. COMPANY DOES NOT WARRANT THE SERVICES WILL MEET BANK'S REQUIREMENTS, BE CONTINUOUS, UNINTERRUPTED, SECURE, TIMELY, OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY SHALL NOT BE RESPONSIBLE FOR ANY SOFTWARE SERVICE INTERRUPTIONS OR SERVICE FAILURES THAT MAY AFFECT THE SERVICES.

(c)     THE DISCLAIMER OF WARRANTIES SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

35.     **Limitation of Liability and Indemnification and Reimbursement**

(a)     Bank shall have no liability to Company, any User or Gateway, or any other Person for any action taken or omitted by it in good faith and without gross negligence or willful misconduct. Bank shall have no liability to Company, any User or Gateway, or any other Person for any loss, damage, claim, cost, expense, or other liability resulting from or caused by: (i) events or circumstances beyond the reasonable control of Bank, including acts of war or terrorism, governmental or quasi-governmental actions, strikes, failure of electronic or mechanical equipment, interruptions of telecommunications or other utilities, severe weather, other causes commonly known as "acts of God", and other force majeure events; (ii) errors by Company, any Gateway, any Platform, any User or any of their agents, representatives, or authorized persons in any instructions to Bank, or any unauthorized payments or transfers made by Bank in good faith, consistent with the provisions of this Agreement; (iii) the failure of Company, any Gateway, any Platform, any User, or any of their agents, representatives, or Authorized Persons to adhere to Bank's operational policies and procedures as in effect from time to time; (iv) any delay or inability by Bank to perform relevant duties that result from any software service interruptions or service failures by Company or any breach by Company of this

-49-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

Agreement; or (v) any delay or inability by Bank to perform relevant duties that result from any disorder in market infrastructure. In no event shall Bank be liable for indirect, special, or consequential damages of any kind or nature whatsoever.

(b)     Except as otherwise set forth in this Agreement, Company shall have no liability to Bank for any action taken or omitted by it in good faith and without gross negligence or willful misconduct. Company shall have no liability to Bank, any User or Gateway, or any other Person for any loss, damage, claim, cost, expense, or other liability resulting from or caused by: (i) events or circumstances beyond the reasonable control of Company, including acts of war or terrorism, governmental or quasi-governmental actions, strikes, failure of electronic or mechanical equipment not within the control of Company, interruptions of telecommunications or other utilities, severe weather, other causes commonly known as "acts of God", and other force majeure events; (ii) errors by Bank, any Gateway, any Platform, any User or any of their agents, representatives, or authorized persons in any instructions to Company, consistent with the provisions of this Agreement; (iii) the failure of any Gateway, any Platform, any User, or any of their agents, representatives, or Authorized Persons to adhere to Bank's operational policies and procedures as in effect from time to time; (iv) any delay or inability by Company to perform relevant duties that result from any software service interruptions or service failures by Bank or any breach by Bank of this Agreement; or (v) any delay or inability by Company to perform relevant duties that result from any disorder in market infrastructure. In no event shall Company be liable for indirect, special, or consequential damages of any kind or nature whatsoever.

(c)     The scope of Company's authority as an agent of Bank is limited to the terms expressly stated in this Agreement. Company is liable for any activities undertaken by Company outside the scope of such terms.

(d)     At any time, each Party may apply to any officer of the other Party for instructions, and may consult with legal counsel (which may be counsel for such Party of the other Party) with respect to any matter arising in connection with this Agreement; and it shall have no liability for any action taken or omitted by it in good faith in reliance upon such instructions or upon the advice of such counsel. Bank will be protected in acting upon any paper or document, including any orders, directions, or instructions, reasonably believed by it to be genuine and to have been signed by an Authorized Person or Persons, and Bank will not be held to have notice of any change of authority of any Person authorized by Company until receipt of written notice of such change from Company given in accordance with this Agreement.

(e)     Company shall indemnify and hold Bank and its affiliates, agents, directors, officers, and employees harmless from and against all claims, actions, costs, charges, losses, damages, and expenses (including reasonable attorney's fees and disbursements) that Bank may incur or sustain in connection with (i) the performance of its duties hereunder, or in connection with any and all actions undertaken or omitted for the benefit of Company, including providing services, incurring expenses, or advancing funds, and including any claims by or from Company's or Bank's investors, customers, regulators, and any other Person, as well as claims resulting from Bank acting upon any instructions reasonably believed by it to have been duly authorized by or for Company, any Gateway, any User, or any of their agents, representatives, or Authorized Persons, (ii) Company's breach of any provision of this Agreement, or (iii) any claim that any of the products or services provided by Company to Bank pursuant to this Agreement,

-50-

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

or Bank's use thereof, including with respect to any of the Company Services, infringe, misappropriate or violate any third-party rights with respect to Intellectual Property; *provided, however*, that Company shall not be obligated to indemnify Bank for any liability or expense resulting directly from Bank's own fraud, gross negligence, or willful misconduct in connection with the performance of its duties hereunder.

(f)     Bank shall indemnify and hold Company and its affiliates, agents, directors, officers, and employees harmless from and against all claims, actions, costs, charges, losses, damages, and expenses (including reasonable attorney's fees and disbursements) that Company may incur or sustain in connection with the performance of its duties hereunder, or in connection with any and all actions undertaken or omitted for the benefit of Bank, including providing services, incurring expenses, or advancing funds and including any claims by or from Company's or Bank's investors, customers, regulators, and any other Person, as well as claims resulting from Company acting upon instructions reasonably believed by it to have been duly authorized by or for Bank, or any of their agents, representatives; *provided however*, that such indemnification shall be limited to the amount of fees collected from Company by Bank under this Agreement and that Bank shall not be obligated to indemnify Company for any liability or expense resulting directly from Company's own fraud, gross negligence, or willful misconduct in connection with the performance of its duties hereunder.

(g)     Each Party agrees to reimburse the other Party for costs of subpoenas and other legal action arising out of the Accounts and to pay reasonable attorney's fees in the event such Party must initiate a collection action to collect any amounts owed under this Agreement.

## 36.    Expenses

Except as otherwise set forth herein, each Party hereto shall pay its own expenses incident to the preparation, execution, and performance of this Agreement and the consummation of the transactions contemplated herein.

## 37.    No Assignment by Company

Company may not, without written approval of Bank, assign this Agreement or transfer its interest or any part thereof under this Agreement to any third party, and any purported assignment or transfer without such approval shall be void.

## 38.    No Waivers

The failure of either Party to require performance by the other Party of any provision of this Agreement shall in no way affect the full right to require such performance at any time thereafter. All rights or remedies of a Party specified in this Agreement and all other rights or remedies that either Party may have at law, in equity, or otherwise shall be distinct, separate, and cumulative rights or remedies, and no one of them, whether exercised by the Party seeking enforcement or not, shall be deemed to be in exclusion of any other right or remedy of such Party.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

### 39.    No Third-Party Beneficiaries

This Agreement is entered into for the sole and exclusive benefit of the Parties hereto. Nothing in this Agreement shall be construed to grant any Person other than the Parties hereto, and their respective successors and permitted assigns, any right, remedy, or claim under or with respect to this Agreement or any provision hereof.

### 40.    Entire Agreement

This Agreement, together with all attached Appendices and Schedules and any Service Level Agreements, constitutes the entire agreement of the Parties on the subject hereof and supersedes all prior understandings and instruments on such subject. If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable. All waivers and modifications must be in a writing signed by both Parties and failure to enforce a provision shall not constitute a waiver. The Agreement may be executed in one or more counterparts.

### 41.    Severability

If any provision or condition of this Agreement is held invalid or unenforceable by any court or regulatory agency, such invalidity or unenforceability attaches only to such provision or condition, and the validity of the remaining provisions and conditions remain unaffected and shall be enforced to the fullest extent permitted by Applicable Law.

### 42.    Amendments

The terms of this Agreement cannot be modified, supplemented, or rescinded by a Party to this Agreement except in writing signed by each of the Parties hereto.

### 43.    Governing Law, Venue; Waiver of Jury Trial

This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa (United States), without giving effect to any choice of law or conflict of law provisions that might require the applications of the laws of another jurisdiction. THE PARTIES AGREE THAT ALL ACTIONS, PROCEEDINGS AND COUNTERCLAIMS ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT IN STATE OR FEDERAL COURT IN THE STATE OF TENNESSEE, U.S.A. AND IN CONNECTION WITH ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM, TO THE EXCLUSIVE JURISDICTION OF, AND AGREE TO VENUE IN, SUCH COURTS. EACH OF THE PARTIES HERETO ALSO IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

IN WITNESS WHEREOF, and intending to be legally bound, the Parties have duly executed this Bank Services and Deposit Account Agreement by their authorized representatives as of the date first written above.

SYNAPSE FINANCIAL TECHNOLOGIES, INC.

By: _____

    Name:  Sankaet Pathak

    Title:   Chief Executive Officer

AMERICAN BANK NATIONAL ASSOCIATION

By: _____

    Name:  Micah Lang

    Title:   President

SC1:4793237

## APPENDIX A

**Schedule of Compensation, Fees and Charges as of the Effective Date of This Agreement**

### *Company Compensation for Company Services*

Bank shall pay to Company an amount equal to the fees and other charges applicable to Company for a given month as set forth in the "Fee Schedule," which follows on Pages A-2 to A-4 of this **Appendix A**, each page of which is to be initialed by both Parties.

### *Bank Compensation for Bank Services*

Company shall pay to Bank an amount equal to the *greater* of (1) fees and other charges applicable to Bank for a given month as set forth in the Fee Schedule which follows on Pages A-2 to A-5 of this Appendix A ("Monthly Revenue"); or (2) $5,000.00 ("Monthly Minimum"). If the Monthly Revenue is lower than the Monthly Minimum in any calendar month, Company shall pay the difference of the Monthly Revenue and the Monthly Minimum to Bank by the fifth (5th) Business Day of the succeeding calendar month.  For avoidance of doubt, no part of the Monthly Minimum is owed to Bank in the event Monthly Revenue equals at least $5,000.00.



SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

## FEE SCHEDULE

### Deposit Services:

| Ref | Description | Unit Price | Comments |
|-----|-------------|-----------|----------|
| DS 1.1 | Depository Assessment Fee (per $1,000 in balances) | $0.00 | *FDIC cost of funds usually offset by deposit interest split* |
| DS 1.2 | Electronic Deposits | $0.00 | *per item* |
| DS 1.3 | Electronic Items Paid | $0.00 | *per item* |
| DS 1.4 | DDA Account Maintenance | $0.00 | *per month* |
| DS 1.5 | Deposits | $0.00 | *per item charge for paper-based deposit transactions* |
| DS 1.6 | Checks/Items Paid | $0.00 | *per item charge for paper-based items paid* |
| DS 1.7 | Invoice Service Fee | $0.00 | *Monthly charge assessed for being invoiced for Account Analysis service charges owed instead of being directly debited.* |
| DS 1.8 | Interest Split | variable 5bps | *Baseline to then be discussed on a case by case basis* |

### ACH:

| Ref | Description | Unit Price | Comments |
|-----|-------------|-----------|----------|
| AC 1.1 | ACH Originated Debit | $0.02 | *per item* |
| AC 1.2 | ACH Originated Credit | $0.02 | *per item* |
| AC 1.3 | ACH Originated Same-Day Debit | $0.08 | *per item* |
| AC 1.4 | ACH Originated Same-Day Credit | $0.08 | *per item* |
| AC 1.5 | ACH Return Item - Debit/Credit | $0.01 | *per item* |
| AC 1.6 | ACH Return Item - Unauthorized | $4.00 | *per item* |
| AC 1.7 | ACH Transmission-Per File | $5.00 | *per file* |
| AC 1.9 | ACH Originated Addenda | $0.00 | *per item (non-disclosed high volume activity)* |
| AC 1.10 | ACH Positive Pay Maintenance | $0.00 | *per month* |
| AC 1.11 | ACH Positive Pay Approval | $0.00 | *per paid exception* |



A-2

SC1:4793237.12E

**RDC:**

| Ref | Description | Unit Price | Comments |
|---|---|---|---|
| RD 1.1 | Originated Debit | $0.02 | *per item* |
| RD 1.2 | Return Item - Debit | $0.01 | *per item* |
| RD 1.3 | Return Item - Unauthorized | $4.00 | *per item* |
| RD 1.4 | ACH Positive Pay Maintenance | $0.00 | *per month* |
| RD 1.5 | ACH Positive Pay Approval | $0.00 | *per paid exception* |

**Wires:**

| Ref | Description | Unit Price | Comments |
|---|---|---|---|
| W 1.1 | Wire Incoming Fed Transfer | $0 | *per wire (bank standard pricing)* |
| W 1.2 | Wire Outgoing | $2.50 | *per wire (bank standard pricing)* |

**Issuance:**

| Ref | Description | Unit Price | Synapse Comments |
|---|---|---|---|
| I 1.1 | Association, Network, Gateway, and Other Third Party Fees | Pass-Through | |
| I 1.2 | Interchange Split | 5% | *Bank to keep 5% on the interchange revenue generated through Synapse BINs* |



SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

**Other Fees:**

| Ref | Description | Unit Price | Comments |
|-----|-------------|------------|----------|
| O 1.1 | Internal Bank Transfer | $0.00 | *per transfer* |
| O 1.2 | BBOL Maintenance | $0.00 | *per month* |
| O 1.3 | Monthly Minimum | $5,000.00 | Only paid to the extent provided on page A-1 of the Agreement |



A-4

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

## APPENDIX B

### Service Level Agreement

1.  **Synapse Service Levels.** The Parties agree to the following Service Levels:

    1.1.  **Uptime Level**.  Dashboard shall be available no less than 99.99% of the total number of minutes in any given calendar month ("Uptime Level").

        1.1.1.  If Company fails to provide such Uptime Level in any given calendar month, Bank will be credited with $80.00 per hour (prorated to the nearest minute) of unavailability below the Uptime Level to be added to the following month's fees.

    1.2.  **Support**.  Company shall provide Support to Bank as follows:

        1.2.1.  Company shall respond to a ticket for critical support within three (3) hours of its submission by Bank.

        1.2.2.  Company shall respond to a ticket for high severity support (i) within twelve (12) hours of its submission by Bank if during the business week, from Monday to Friday, or (ii) within two (2) hours of the first business day following its submission if between Friday 8:00 p.m. (CT)/6:00 p.m. (PT) and Monday 10:00 a.m. (CT)/8:00 a.m. (PT).

        1.2.3.  Company shall respond to any other ticket within two (2) Business Days of its submission.

        1.2.4.  The Parties agree that (i) "critical support" shall be applicable to the complete unavailability of any of Company's Services; and (ii) "high severity support" shall be applicable to issues affecting specific functions in the Dashboard.

        1.2.5.  Bank shall open a ticket indicating the level of support intended, and Company may downgrade the ticket if it does not correspond to the severity levels defined above.

        1.2.6.  If Company fails to respond to a support ticket as stated herein, Bank will be credited with $100.00 per failure in each calendar month to be added to the following month's fees.

    1.3.  **Business Continuity Plan Services**.  Company shall ensure that its written disaster recovery, business resumption, and contingency plans utilize a strategy in which critical data and systems are replicated to an alternate location ensuring accessibility in the event of a disaster, including data retention and back-up procedures. Company's business continuity plan services shall address its Recovery Point Objective ("RPO") and Recovery Time Objective ("RTO"), as defined herein. The RPO is the point in time to which systems and data must be recovered

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

after an outage. RPOs are used as the basis for the deployment of backup strategies and as a determinant of the amount of data that may need to be recreated after the systems or function have been recovered. RTO is the period of time within which systems, applications, or functions must be recovered after an outage. RTOs are used as the basis for the development of recovery strategies, and as a determinant as to whether or not to implement the recovery strategies during a disaster situation. Company shall meet its agreed upon RTO of four (4) hours for Company Services of critical applications and systems, and an RPO for critical data is at point of failure.

1.4.    **Reports**.  Company shall provide all and any reports, as specified in the Agreement or this Appendix B, to Bank in the appropriate timeline defined for such report.

1.4.1.  If Company fails to provide the Report on time, Bank will be credited with $100.00 per day of delay to be added to the following month's fees.

1.4.2.  In addition to the Reports specified in the Agreement, Company shall provide the following additional Reports:

- **Call Report Data** – quarterly information for Bank to prepare its quarterly Consolidated Reports of Condition and Income.

- **Unusual Activity Report** – frequency of report based on activity and whether there is information related to any suspected violations of BSA/AML laws and regulations.

- **Ledger Balancing Reports** – daily report detailing transaction activity by Platform and User, including, but not limited to, account names, total balance, total reserve balance, total balance plus reserve balance, and total transaction clearings.

- **FDIC Report** – daily report of direct User accounts.

- **Complaint Resolution Report** – monthly report.

- **Communications Report** – weekly report of any User or Gateway notices that relate or may relate to Bank or its interests.

2.  **Bank Service Levels.** The Parties agree to the following Service Levels:

2.1.    **Support.** Bank shall provide Support to Company as follows:

2.1.1.   Bank shall respond to a ticket/request for critical support, which will be defined as such in the ticket, within three (3) hours of its submission by Company.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

2.1.2. Bank shall respond to a ticket for high severity support (i) within twelve (12) hours of its submission by Company if during the business week, from Monday to Friday, or (ii) within two (2) hours of the first business day following its submission if between Friday 8:00 p.m. (CT)/6:00 p.m. (PT) and Monday 10:00 a.m. (CT)/8:00 a.m. (PT).

2.1.3. Bank shall respond to any other ticket within two (2) Business Days of its submission.

2.1.4. The Parties agree that (i) "critical support" shall be applicable to (a) restrictions to Users ability to access their funds in their accounts, including, but not limited, to verification of missing transactions (ACH or Cards) or discrepancies in balances and (b) to files that were not processed by Bank on the appropriate time; and (ii) "high severity support" shall be applicable to issues affecting specific functions related to Users' support and review, including, but not limited to, compliance or legal issues.

2.1.5. The Parties understand and acknowledge that Company will require Bank's support in providing the services to Gateways that may require Bank to review a User, provide certain documentation or respond to certain inquiries from such Gateways. These interactions will be intermediated by Company and Company will provide to Bank the necessary information for resolving such inquiry and that Bank will provide responses and resolutions within the Service Levels defined herein.

2.1.6. Company shall open a ticket indicating the level of support intended, and Bank may downgrade the ticket if it does not correspond to the severity levels defined above.

2.1.7. If Bank fails to respond to a support ticket as stated herein, Synapse will be credited with $100.00 per failure in each calendar month.

2.2. **Reports**. Bank shall provide files, as identified in this Appendix B, to Company in the appropriate timeline defined for such file.

2.2.1. Bank shall provide Company the following files identified below by the next Business Day.

2.2.2. ACH Returns – a daily file of returned ACH transactions using a NACHA format whenever these occur.

2.2.3. ACH Trace ID – a daily ACH outgoing TraceID file after transactions are processed.

2.2.4. Incoming Subnet File Report – a daily file using a NACHA format for incoming transaction involving virtual accounts (incoming/received from Fed).

B-3

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

2.2.5.  Checks Cleared – a daily cleared check file.

2.2.6.  Dishonored Returns – a daily file containing all the dishonored returns, which shall be sent to Company on the following day that Bank received notification of such dishonored return.

2.2.7.  If Bank fails to provide the Report on time, Company will be credited with $100.00 per day of delay to be added to the following month's fees.

**2.3.    File Processing.**

2.3.1.  Bank shall process all transaction files submitted by Company on time.

2.3.2.  If Bank fails to process any file on time, Company will be credited with $2,000.00 per day of delay.

2.    **Credit Procedure**.  The affected Party shall notify the other Party of any case in which such Party has not complied with the Service Level provided herein pursuant to which such Party will add the credits to the following month's fee.

B-4

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

# **APPENDIX C**

## **[Intentionally Omitted]**

C-1

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

**<u>APPENDIX D</u>**

**[Intentionally Omitted]**

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

## APPENDIX E

## [Intentionally Omitted]

E-1

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

<u>**APPENDIX F**</u>

**Terms Required in Each Gateway Access Agreement**

- A provision that such Gateway will provide the due diligence materials requested by Bank pursuant to Section 10(b)(i) not less frequently than annually and upon Bank's reasonable request.

- A provision that such Gateway agrees to engage Bank to provide ACH services for it, and that Company is acting as such Gateway's Third-Party Service Provider.

- A provision that such Gateway will assume responsibility for any overdrafts, and will permit Company to access its Reserve Account to cover any overdrafts.

- A determination of whether Users of the relevant Platform will be able to open individual User Accounts.

- Identification of which Bank Services the Users of the applicable Platform will be permitted to access.

- A covenant that Gateway will promptly communicate any Security Breach to Company and acknowledgement that Company will communicate such breach to Bank.

- An agreement that Company may cease to provide services to such Gateway if Company or Bank determines that such Gateway, the applicable Platform, or any marketing materials, contracts, practices, policies, or procedures of such Gateway or Platform do not comply with UDAAP requirements.

- A provision that Gateway agrees to the requirements of Section 21(a)(iv) if the Gateway will collect, use, access, store, or route through its servers Users' credit or debit card information.

- A provision in which Gateway acknowledges that no provision of the Agreement shall be breached by compliance with any legal process contemplated in Section 23(b)(v).

- A requirement that the Gateway provide to Company certain information an annual basis and that such information shall be shared with Bank.

- Other provisions as agreed by Bank and Company from time to time.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

## APPENDIX G

### Terms Required in Each User Access Agreement

- A provision agreeing to the use of electronic signatures to execute agreements with Company and with Bank.
- A provision agreeing to the electronic delivery of statements and communications relating to any Bank Services.
- A provision in which User acknowledges that Bank has the right to accept or reject such User at any time, and that such User shall have no right to compel Bank to grant such User access to Bank Services, either initially or at any time after such Bank Services have been initiated.
- A provision in which User acknowledges that Bank is exculpated from any and all liability arising in respect of the Bank Services to the fullest extent permitted under Applicable Law.
- A provision in which User acknowledges that no provision of the Agreement shall be breached by Bank's compliance with any legal process contemplated in Section 23(b)(v).
- Other provisions as agreed by Bank and Company from time to time.

SC1:4793237.12E

Doc ID: f7f4de4914b3fe4811090f7a4797176cb932ad09

H-1

SC1:4793237.12E

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Synapse - American Bank - Bank Services Agreement... |
| **FILE NAME** | Synapse - America... (2.22.2021).docx |
| **DOCUMENT ID** | f7f4de4914b3fe4811090f7a4797176cb932ad09 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **02 / 22 / 2021** 23:40:38 UTC | Sent for signature to Micah Lang (micah.lang@am-bank.com) and Sankaet Pathak (s@synapsefi.com) from tracey@synapsefi.com IP: 67.188.255.7 |
| **VIEWED** | **02 / 23 / 2021** 13:43:57 UTC | Viewed by Micah Lang (micah.lang@am-bank.com) IP: 66.43.198.122 |
| **SIGNED** | **02 / 25 / 2021** 13:55:07 UTC | Signed by Micah Lang (micah.lang@am-bank.com) IP: 66.43.198.122 |
| **VIEWED** | **02 / 25 / 2021** 14:10:34 UTC | Viewed by Sankaet Pathak (s@synapsefi.com) IP: 172.58.35.134 |
| **SIGNED** | **02 / 25 / 2021** 14:10:53 UTC | Signed by Sankaet Pathak (s@synapsefi.com) IP: 172.58.35.134 |
| **COMPLETED** | **02 / 25 / 2021** 14:10:53 UTC | The document has been completed. |



**AMERICAN**BANK NA

Member FDIC

Le Mars office: 234 5th Avenue S.W.  Le Mars, IA 51031  Ph. (712)546-2345   Remsen office:  400 W Hwy 3  Remsen, IA 51050  Ph. (712)786-1153
www.am-bank.com        E-mail: am-bank@am-bank.com

07/21/2023

# BUSINESS CHECKING

**This is not an interest bearing checking account.**
**No minimum opening deposit.**

**Other Account Terms:**
**You will receive a monthly statement with check images.**
**With a $1,500 average available (collected) balance there is no monthly fee.  For accounts with less than a $1,500 average available (collected) balance, the monthly fee is $5.00 for the first twenty checks and $0.10 per check thereafter, plus sales tax.  If your business account is subject to account analysis charges, a schedule of charges is a available upon request.**
**Our daily cutoff time is 4:00 p.m.**

The following charges may be assessed against your account:

| | |
|---|---|
| NSF return charge item/day* | $30/$150 max |
| NSF charge item/day* | $25/$150 max |
| Stop item request** | $25 |
| Recurring stop item** | $30 |
| Wire transfer | |
|     Outgoing | $20 |
|     Outgoing international | $60 |
|     Incoming | $10 |
|     Incoming international | $20 |
| Electronic Funds Transfers (EFT) | |
|     Next Day | $5 |
|     Same Day | $20 |
| Bookkeeping research/hour** | $15 |
|     minimum fee** | $5 |
|     per statement** | $5 |
|     per check(front & back)** | $1 |
|     per deposit(front & back)** | $1 |
| Personalized check orders** | Prices may vary |
| Debit/ATM replacement card** | $15 |

**LOBBY HOURS**
LE MARS OFFICE:
MON - FRI  8:30 am to 4:00 pm
REMSEN OFFICE:
MON - FRI  8:30 am to 3:00 pm
SATURDAY  8:00 am to 11:00 am
**DRIVE-UP**
LE MARS OFFICE:
MON - FRI  8:30 am to 5:00 pm
SATURDAY  8:00 am to 11:00 am
REMSEN OFFICE:
MON - FRI  8:00 am to 4:00 pm
SATURDAY  8:00 am to 11:00 am

*The fee applies to overdrafts created by check, in-person withdrawal, or other electronic means.

** Fee is subject to sales tax where required by law.

07/20

(page 1 of 2)

## FUNDS AVAILABILITY DISCLOSURE

This policy statement applies to "transaction" accounts.  Transaction accounts, in general are accounts which permit an unlimited number of payments to third persons and an unlimited number of telephone and pre authorized transfers to other accounts of yours with us.  Checking accounts are the most common transaction accounts.  Feel free to ask us whether any of your other accounts might also be under this policy.

Our policy is to make funds from your cash or check deposits available to you on the first business day after the day we receive your deposit. Electronic direct deposits will be available on the day we receive the deposit. Once the funds are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

DETERMINING THE AVAILABILITY OF A DEPOSIT

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays.  If you make a deposit before 4:00 p.m. at the LeMars Office, Remsen Office, or at an Automated Teller Machine (ATM) we own or operate on a business day that we are open, we will consider that day to be the day of your deposit.  However, if you make a deposit after these cut-off times or on a day we are not open, we will consider that deposit was made on the next business day we are open.

If you make a deposit through Mobile Banking by 2:00 P.M. on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit through Mobile Banking after 2:00 P.M. or on a day that we are not open, we will consider that the deposit was made on the next business day we are open.

LONGER DELAYS MAY APPLY

IIf we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit.  We will also tell you when the funds will be available.  If your deposit is not made to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after the day we received your deposit.

If you will need the funds from a deposit right away,  you should ask us when the funds will be available.

Funds you deposit by check may be delayed for a longer period under the following circumstances:

>We believe a check you deposit will not be paid.

>You deposit checks totaling more than $5,525 on any one day.

>You redeposit a check that has been returned unpaid.

>You have overdrawn your account repeatedly in the last six months.

>There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we tell you when the funds will be available.  They will generally be available no later than the seventh business day after the day of your deposit.

DEPOSITS AT AUTOMATED TELLER MACHINES(ATM 'S)

Funds from any deposits (cash or checks) made at ATM's we do not own or operate will be made available on the next business day after the day of deposit.  This rule does not apply at ATM's that we own or operate.  All ATMs we own or operate are identified as our machines.

SPECIAL RULES FOR NEW ACCOUNTS

    If you are a new customer, the following special rules will apply during the first 30 days your account is open.

    Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,525 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525 will not be available until the second business day after the day of your deposit.

    Funds from all other check deposits will be available on the ninth business day after the day of your deposit.


ACH and WIRE TRANSFERS

This agreement is subject to Article 4A of the Uniform Commercial Code in the state in which you have your account with us.  If you originate a fund transfer for which Fedwire is used, and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment.  We may rely on the number even if it identifies a financial institution, person or account other than the one named.  You agree to be bound by automated clearing house association rules.  These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code.   If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited.  If we receive a credit to an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit, unless otherwise agreed to.


UNLAWFUL INTERNET GAMBLING NOTICE: Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

# Terms and Conditions of Your Account

**Contents:**

**(1)** Important Information about Procedures for Opening a New Account
**(2)** Agreement
**(3)** Liability
**(4)** Deposits
**(5)** Withdrawals
   *Important Terms for Accounts Where More Than One Person Can Withdraw*
   *Postdated Checks*
   *Checks and Withdrawal Rules*
   *Cash Withdrawals*
   *Multiple Signatures, Electronic Check Conversion, and Similar Transactions*
   *Notice of Withdrawal*
**(6)** Ownership of Account and Beneficiary Designation
   *Individual Account*
   *Joint Account - With Survivorship*
   *Joint Account - No Survivorship*
   *Revocable Trust or Pay-on-Death Account*
**(7)** Business, Organization, and Association Accounts
**(8)** Stop Payments
**(9)** Telephone Transfers
**(10)** Amendments and Termination
**(11)** Correction of Clerical Errors
**(12)** Notices
**(13)** Statements
   *Your Duty to Report Unauthorized Signatures (Including Forgeries and Counterfeit Checks) and Alterations on Checks and Other Items*
   *Your Duty to Report Other Errors or Problems*
   *Errors Relating to Electronic Fund Transfers or Substitute Checks*
   *Duty to Notify if Statement Not Received*

**(14)** Reimbursement of Federal Benefit Payments
**(15)** Temporary Account Agreement
**(16)** Setoff
**(17)** Check Processing
**(18)** Check Cashing
**(19)** Truncation, Substitute Checks, and Other Check Images
**(20)** Remotely Created Checks
**(21)** Unlawful Internet Gambling Notice
**(22)** ACH and Wire Transfers
**(23)** International ACH Transactions
**(24)** Facsimile Signatures
**(25)** Authorized Signer
**(26)** Restrictive Legends or Endorsements
**(27)** Account Transfer
**(28)** Endorsements
**(29)** Death or Incompetence
**(30)** Fiduciary Accounts
**(31)** Credit Verification
**(32)** Legal Actions Affecting Your Account
**(33)** Account Security
   *Your Duty to Protect Account Information and Methods of Access*
   *Positive Pay and Other Fraud Prevention Services*
**(34)** Instructions From You
**(35)** Monitoring and Recording Telephone Calls and Account Communications
**(36)** Claim of Loss
**(37)** Early Withdrawal Penalties
**(38)** Changes in Name and Contact Information
**(39)** Resolving Account Disputes
**(40)** Waiver of Notices
**(41)** Additional Terms

## (1) Important Information about Procedures for Opening a New Account

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 1 of 14

## (2) Agreement

This document, along with any other documents we give you pertaining to your account(s), is a contract (also referred to as "this agreement") that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you open the account (whether in-person, electronically, or by any other method permitted by us) or continue to use the account after receiving a notice of change or amendment, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this agreement. If you have any questions, please ask us.

This agreement is subject to applicable federal laws, the laws of the state of Iowa and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

1. summarize some laws that apply to common transactions;

2. establish rules to cover transactions or events which the law does not regulate;

3. establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

4. give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this agreement is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this agreement is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this agreement the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this agreement are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this agreement should be construed so the singular includes the plural and the plural includes the singular.

## (3) Liability

You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and we can deduct any amounts deposited into the account and apply those amounts to the shortage. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 2 of 14

## (4) Deposits

We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of endorsement or lack of endorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error, counterfeit cashier's check or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check or draft for deposit, we may require any third-party endorsers to verify or guarantee their endorsements, or endorse in our presence.

## (5) Withdrawals

**Important Terms for Accounts Where More Than One Person Can Withdraw.** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to endorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated Checks.** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and Withdrawal Rules.** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted by our policy, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply any frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify your account as another type of account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

**Cash Withdrawals.** We recommend you take care when making large cash withdrawals because carrying large amounts of cash may pose a danger to your personal safety. As an alternative to making a large cash withdrawal, you may want to consider a cashier's check or similar instrument. You assume full responsibility of any loss in the event the cash you withdraw is lost, stolen, or destroyed. You agree to hold us harmless from any loss you incur as a result of your decision to withdraw funds in the form of cash.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 3 of 14

## (5) Withdrawals, Continued

**Multiple Signatures, Electronic Check Conversion, and Similar Transactions.** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the signatures or otherwise examine the original check or item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of Withdrawal.** We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account, other than a time deposit or demand deposit, or from any other savings deposit as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your separately provided notice of penalty for early withdrawal.

## (6) Ownership of Account and Beneficiary Designation

These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We reserve the right to refuse some forms of ownership and beneficiary designations on any or all of our accounts unless otherwise prohibited by law. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account.** This is an account in the name of one person.

**Joint Account - With Survivorship.** *(And Not As Tenants In Common)*. This is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship.** *(As Tenants In Common)*. This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust or Pay-on-Death Account.** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

## (7) Business, Organization, and Association Accounts

Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 4 of 14

## (8) Stop Payments

The rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because the most effective way for us to execute a stop-payment order is by using an automated process, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop-payment order is given to us in writing it is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if you do not confirm your order in writing within that time period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

## (9) Telephone Transfers

A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Limitations on the number of telephonic transfers from a savings account, if any, are described elsewhere.

## (10) Amendments and Termination

We may change any term of this agreement. For such changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also suspend or terminate a service or close this account at any time upon reasonable notice to you and, if we close the account, tender of the account balance personally or by mail. Reasonable notice depends on the circumstances, and in some cases, such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new terms.

When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account.

Items presented for payment after the account is closed may be dishonored.

Note: Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. In addition, for changes governed by a specific law or regulation, we will follow the specific timing and format notice requirements of those laws or regulations.

## (11) Correction of Clerical Errors

Unless otherwise prohibited by law, you agree, if determined necessary in our reasonable discretion, to allow us to correct clerical errors, such as obtaining your missing signature, on any account documents or disclosures that are part of our agreement with you. For errors on your periodic statement, please refer to the Statements section.

## (12) Notices

Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive any notice in time to have a reasonable opportunity to act on it. If a notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Notice we give you via the United States Mail is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we currently have on file. Notice we give you through your email of record, or other electronic method to which you agreed, will be treated as delivered to you when sent. Notice to any of you is notice to all of you.

## (13) Statements

**Your Duty to Report Unauthorized Signatures (Including Forgeries and Counterfeit Checks) and Alterations on Checks and Other Items.** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures (including forgeries and counterfeit checks) or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures or alterations in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your Duty to Report Other Errors or Problems.** In addition to your duty to review your statements for unauthorized signatures and alterations, you agree to examine your statement with reasonable promptness for any other error or problem - such as an encoding error or an unexpected deposit amount. Also, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing endorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors Relating to Electronic Fund Transfers or Substitute Checks.** *(For consumer accounts only).* For information on errors relating to electronic fund transfers (e.g., online, mobile, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**Duty to Notify if Statement Not Received.** You agree to immediately notify us if you do not receive your statement by the date you normally expect to receive it. Not receiving your statement in a timely manner is a sign that there may be an issue with your account, such as possible fraud or identity theft. Absent a lack of ordinary care by us, a failure to receive your statement in a timely manner does not extend the time you have to conduct your review under this agreement.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 6 of 14

## (14) Reimbursement of Federal Benefit Payments

If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other available legal remedy to recover the amount of our liability.

## (15) Temporary Account Agreement

If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

## (16) Setoff

We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

## (17) Check Processing

We process items mechanically by relying almost exclusively on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and endorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of endorsements unless you notify us in writing that the check requires multiple endorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

## (18) Check Cashing

We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

## (19) Truncation, Substitute Checks, and Other Check Images

If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

## (20) Remotely Created Checks

Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

## (21) Unlawful Internet Gambling Notice

Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

## (22) ACH and Wire Transfers

This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 8 of 14

## (23) International ACH Transactions

Financial institutions are required by law to scrutinize or verify any international ACH transaction (IAT) that they receive against the Specially Designated Nationals (SDN) list of the Office of Foreign Assets Control (OFAC). This action may, from time to time, cause us to temporarily suspend processing of an IAT and potentially affect the settlement and/or availability of such payments.

## (24) Facsimile Signatures

Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

## (25) Authorized Signer (Individual Accounts only)

A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf. The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

## (26) Restrictive Legends or Endorsements

The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive endorsements or other special instructions on every check. For this reason, we are not required to honor any restrictive legend or endorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive endorsement.

## (27) Account Transfer

This account may not be transferred or assigned without our prior written consent.

## (28) Endorsements

We may accept for deposit any item payable to you or your order, even if they are not endorsed by you. We may give cash back to any one of you. We may supply any missing endorsement(s) for any item we accept for deposit or collection, and you warrant that all endorsements are genuine.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

American Bank Revised: 11/2022

TC-IA 6/1/2022
(2206).00
Page 9 of 14

## (28) Endorsements, Continued

To ensure that your check or share draft is processed without delay, you must endorse it (sign it on the back) in a specific area. Your entire endorsement (whether a signature or a stamp) along with any other endorsement information (e.g., additional endorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Endorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all endorsement information within 1 1/2" of that edge.



It is important that you confine the endorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed endorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your endorsement, another endorsement, or information you have printed on the back of the check obscures our endorsement. These endorsement guidelines apply to both personal and business checks.

## (29) Death or Incompetence

You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

## (30) Fiduciary Accounts

Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

## (31) Credit Verification

You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

## (32) Legal Actions Affecting Your Account

If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action as required by applicable law. However, nothing in this agreement shall be construed as a waiver of any rights you may have under applicable law with regards to such legal action. Subject to applicable law, we may, in our sole discretion, choose to freeze the assets in the account and not allow any payments or transfers out of the account until there is a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action and applicable law. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees, and our internal expenses) may be charged against your account, unless otherwise prohibited by applicable law. The list of fees applicable to your account(s) - provided elsewhere - may specify additional fees that we may charge for responding to certain legal actions.

## (33) Account Security

**Your Duty to Protect Account Information and Methods of Access.** Our policy may require methods of verifying your identity before providing you with a service or allowing you access to your account. We can decide what identification is reasonable under the circumstances. For example, process and identification requirements may vary depending on whether they are online or in person. Identification may be documentary or physical and may include collecting a fingerprint, voiceprint, or other biometric information.

It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your accounts. You should also safeguard your username, password, and other access and identifying information when accessing your account through a computer or other electronic, audio, or mobile device or technology. If you give anyone authority to access the account on your behalf, you should exercise caution and ensure the trustworthiness of that agent. Do not discuss, compare, or share information about your account numbers with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device or information and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you did not contact us directly and order the payment.

You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

**Positive Pay and Other Fraud Prevention Services.** Except for consumer electronic fund transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered. You will not be responsible for such transactions if we acted in bad faith or to the extent our negligence contributed to the loss. Such services include positive pay or commercially reasonable security procedures. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected. The positive pay service can help detect and prevent check fraud and is appropriate for account holders that issue a high volume of checks, a lot of checks to the general public, or checks for large dollar amounts.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-IA 6/1/2022
(2206).00
Page 11 of 14

## (34) Instructions From You

Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission, email, voicemail, or phone call to a facsimile number, email address, or phone number not designated by us for a particular purpose or for a purpose that is unrelated to the request or instruction.

## (35) Monitoring and Recording Telephone Calls and Account Communications

Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record, and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account, we may need to contact you about your account from time to time by telephone, text messaging, or email. In contacting you about your account, we may use any telephone numbers or email addresses that you have previously provided to us by virtue of an existing business relationship or that you may subsequently provide to us.

You acknowledge that the number we use to contact you may be assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service, or any other service for which you may be charged for the call. You acknowledge that we may contact you by voice, voicemail, or text messaging. You further acknowledge that we may use pre-recorded voice messages, artificial voice messages, or automatic telephone dialing systems.

If necessary, you may change or remove any of the telephone numbers, email addresses, or other methods of contacting you at any time using any reasonable means to notify us.

## (36) Claim of Loss

The following rules do not apply to a transaction or claim related to a consumer electronic fund transfer governed by Regulation E (e.g., an everyday/one-time consumer debit card or ATM transaction). The error resolution procedures for consumer electronic fund transfers can be found in our initial Regulation E disclosure generally titled, "Electronic Fund Transfers." For other transactions or claims, if you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

## (37) Early Withdrawal Penalties (and involuntary withdrawals)

We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your separately provided notice of penalty for early withdrawal for additional information.

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-IA 6/1/2022
(2206).00
Page 12 of 14

## (38) Changes in Name and Contact Information

You are responsible for notifying us of any change in your name, address, or other information we use to communicate with you. Unless we agree otherwise, notice of such a change must be made in writing. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent information you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

## (39) Resolving Account Disputes

We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

## (40) Waiver of Notices

To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit an item and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

*[This area intentionally left blank.]*

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-IA 6/1/2022
(2206).00
Page 13 of 14

## (41) Additional Terms

\* An overdraft charge, also known as a NSF (nonsufficient funds) charge, could be charged if an item drafted by you (such as a check or withdrawal) or a transaction you set up (such as a preauthorized transfer) is presented for payment in an amount that is more than the amount of money available in your account, and we decide to pay the item or transaction, you agree that we can charge you a NSF Charge for paying the payment. The categories of transactions for which an overdraft charge may be imposed are those by any of the following means: check, in-person withdrawal, recurring POS withdrawal, or other electronic means.

\* \*  A NSF (nonsufficient funds) Return Charge could be charged if an item drafted by you (such as a check or withdrawal) or a transaction you set up (such as a preauthorized transfer) is presented for payment in an amount that is more than the amount of money available in your account and we decide not to pay the item or transaction. You agree that we can charge you a NSF Return Charge for not paying the payment. Be aware that such an item or payment may be presented multiple times. We do not monitor or control the number of times a transaction is presented for payment. You agree that we may charge you a NSF Return Charge each time a payment is presented if the amount of money available in your account is not sufficient to cover the payment, regardless of the number of times the payment is presented. The categories of transactions for which a NSF Return Charge may be imposed are those by any of the following means: check, in-person withdrawal, recurring POS withdrawal, or other electronic means.

Unless prohibited by applicable law or regulation, we also reserve the right to chargeback to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payer bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgement justifies reversal of the credit

Terms and Conditions-IA
© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-IA 6/1/2022
(2206).00
Page 14 of 14

# ACCOUNT AGREEMENT

AMERICAN BANK NA

234 5TH AVENUE SW   PO BOX 310
LE MARS IA  51031

Agreement Date: ___07/21/2023___ By: LYDIA DONOVAN
☐ EXISTING Account - This agreement replaces previous agreement(s).

**Account Description:** BUSINESS CHECKING

_____
☒ Checking  ☐ Savings  ☐ NOW  ☐ _____
Initial Deposit $ 0.00 _____ Source: _____

## Ownership of Account - CONSUMER Purpose

☐ Individual        ☐ _____
☐ Joint - With Survivorship *(and not as tenants in common)*
☐ Joint - No Survivorship *(as tenants in common)*
☐ Trust - Separate Agreement:

☐ Revocable Trust    or    ☐ Pay-on-Death Designation
as Defined in this Agreement
(Name and Address of Beneficiaries):

## Ownership of Account - BUSINESS Purpose

☐ Sole Proprietorship  ☐ Single-Member LLC  ☐ Partnership
☐ LLC  *(LLC tax classification:* ☐ *C Corp* ☐ *S Corp* ☐ *Partnership)*
☐ C Corporation  ☐ S Corporation        ☐ *Non-Profit*
☐ _____
Business:

## Backup Withholding Certifications *(Non-"U.S. Persons" - Use separate Form W-8)*

☒ By signing at right, I, SYNAPSE FINANCIAL TECHNOLOGIES INC ,
certify under penalties of perjury that the statements made in this section are true.

☒ **TIN:** 46-5396710 _____ The Taxpayer Identification
Number (TIN) shown is my correct taxpayer identification number.

☐ **Not Subject to Backup Withholding.** I am NOT subject to backup
withholding either because I have not been notified that I am subject to backup
withholding as a result of a failure to report all interest or dividends, or the Internal
Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipient.** I am an exempt recipient under the Internal Revenue
Service Regulations. Exempt payee code (if any) _____

**FATCA Code.** The FATCA code entered on this form (if any) indicating that I am
exempt from FATCA reporting is correct.

**U.S. Person. I am a U.S. citizen or other U.S. person (as defined
in the instructions).**

---

**Account Number:** 3144720   PORT 1012506

**Account Owner(s) Name & Address**
SYNAPSE FINANCIAL TECHNOLOGIES INC

101 SECOND ST SUITE 1500
SAN FRANCISCO   CA  94105

**Additional Information:**

**Signature(s).** The undersigned certifies the accuracy of the information he/she has
provided and acknowledges receipt of a completed copy of this form. The undersigned
authorizes the financial institution to verify credit and employment history and/or have
a credit reporting agency prepare a credit report on the undersigned, as individuals.
The undersigned also acknowledge the receipt of a copy and agree to the terms of the
following agreement(s) and/or disclosure(s):
☒ Terms & Conditions  ☒ Truth in Savings  ☒ Funds Availability
☐ Electronic Fund Transfers  ☐ Privacy  ☐ Substitute Checks
☐ Common Features     ☐ _____

The Internal Revenue Service does not require your consent to any
provision of this document other than the certifications required to
avoid backup withholding.

(1): X_____
    SANKAET PATHAK-AUTHORIZED SIGNER
    I.D. # 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 _____ D.O.B. __11/18/1989__

(2): X_____
    MICHAEL RASIC-AUTHORIZED SIGNER
    I.D. # 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 _____ D.O.B. __02/19/1966__

(3): X_____
    I.D. # _____ D.O.B. _____

(4): X_____
    I.D. # _____ D.O.B. _____
☐ Authorized Signer (Individual Accounts Only)

    X_____
    I.D. # _____ D.O.B. _____

# EXHIBIT "2"

| | |
|---|---|
| **From:** | David M. Poitras <dpoitras@bg.law> |
| **Sent:** | Wednesday, May 22, 2024 11:14 AM |
| **To:** | Monica Y. Kim; Stapleton, Caroline; Tracey Guerin; Scot Lenoir; Ron Bender; Beth R. Young; Krikor J. Meshefejian; Sankaet Pathak; Pam Wismer; Victor Medeiros; Naimon, Jeffrey; Steven T. Gubner |
| **Subject:** | RE: Synapse - Release of Synapse Funds |

Monica,

Evolve is researching the issue the Debtor first raised in Tracey Guerin's email sent on Tuesday May 21, 2024 at 4:42pm Pacific Time (the "Initial Email")(as I believe you are aware, Evolve and its advisors are generally on Central and Eastern time).

In the Initial Email, four accounts are referenced. Two of the accounts were listed in the Debtor's schedules. For those two accounts (35DF & CFOF), the listed balances in the accounts in the schedules were $47,341 and $40,462, while the Initial Email asserts balances of $102,983.01 and $101,281.63. Please help us understand how the Debtor claims these balances increased postpetition and how the Debtor claims there is actual cash in these accounts and not simply ledger entries.

By all indications, the other two accounts were not listed in the Debtor's schedules and Evolve has no line of sight into those accounts, as its ability to download transactions or to see statements was taken away. Please provide whatever detail the Debtor has regarding these accounts, including cash balances as opposed to ledger entries, and we will research further. To that end, we can make Evolve representatives available to discuss these issues with the Debtor's financial people.

If it can be established that the Debtor is entitled to any of the funds referenced in this email string, Evolve will turn them over to the Debtor forthwith.

Any further information that the Debtor can provide regarding these funds would be helpful and appreciated.

Regards,

David



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

www.bg.law

**David M. Poitras**
Partner

(818) 827-9000   Main
(818) 827-9115   Direct / Text / Fax

dpoitras@bg.law

    David M. Poitras

The preceding e-mail message is subject to BG LAW's e-mail policies, which can be found at: https://www.bg.law/web-disclaimer

**From:** Monica Y. Kim <myk@lnbyg.com>
**Sent:** Wednesday, May 22, 2024 7:40 AM
**To:** Stapleton, Caroline <cstapleton@orrick.com>; Tracey Guerin <tracey@synapsefi.com>; Scot Lenoir <slenoir@getevolved.com>; Ron Bender <RB@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam.wismer@synapsefi.com>; Victor Medeiros

<victor.medeiros@synapsefi.com>
**Cc:** David M. Poitras <dpoitras@bg.law>
**Subject:** RE: Synapse - Release of Synapse Funds

CAUTION: This email originated from an external source.

Caroline and David, Synapse needs the funds now to pay expenses including payroll and PTO which were authorized by the court and the secured lenders. Please let us know immediately if and when the funds, which are clearly estate property, will be returned. If Evolve has no intention of returning the funds, please let us know the reasons Evolve is exercising control over estate property without any order of the bankruptcy court and in violation of the court's orders on cash collateral and cash management so that we can advise the court accordingly.

Best, Monica Kim

---

**From:** Stapleton, Caroline <cstapleton@orrick.com>
**Sent:** Tuesday, May 21, 2024 7:21 PM
**To:** Tracey Guerin <tracey@synapsefi.com>; Scot Lenoir <slenoir@getevolved.com>; Ron Bender <RB@lnbyg.com>; Monica Y. Kim <myk@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam.wismer@synapsefi.com>; Victor Medeiros <victor.medeiros@synapsefi.com>
**Subject:** Re: Synapse - Release of Synapse Funds

Tracey,

Thank you for bringing this to our attention - this is the first I had heard of this.  Please provide any additional detail you have that supports this claim.  We will investigate and respond accordingly.

Best,
Caroline

Get Outlook for iOS

---

**From:** Tracey Guerin <tracey@synapsefi.com>
**Sent:** Tuesday, May 21, 2024 7:42 PM
**To:** Scot Lenoir <slenoir@getevolved.com>; Stapleton, Caroline <cstapleton@orrick.com>; Ron Bender <RB@lnbyg.com>; Monica Y. Kim <myk@lnbyg.com>; Beth R. Young <bry@lnbyg.com>; Krikor J. Meshefejian <KJM@lnbyg.com>; Sankaet Pathak <s@synapsefi.com>; Pam Wismer <pam.wismer@synapsefi.com>; Victor Medeiros <victor.medeiros@synapsefi.com>
**Subject:** Synapse - Release of Synapse Funds

[EXTERNAL]

Scot and Caroline:

Evolve continues to hold at least **$554,100.80** of operating capital of Synapse Financial Technologies, Inc. as documented below and. I understand that the Synapse team has continued to request that Evolve wire the funds to Synapse, to which Evolve has failed to acknowledge and confirm. **Please confirm no later than**

<mark>7:00pm PST that $554,100.80 will be wired pursuant to the instructions provided below first thing
tomorrow, otherwise Synapse will take appropriate action for Evolve's continued intentional violation of
the stay for refusing to give the estate its funds.</mark>node_id                          balance

559339aa86c273605ccd35df 102,983.91
5af4e9b8bdceaf0044ce69cc 260,033.78
5e4748a9f41aebdbcd685aa1 89,801.48
5c340e3fef349b9a55c2c40f 101,281.63**Wiring instructions are:**
TO: SVB, a division of First Citizens Bank
ROUTING & TRANSIT #: 121140399
FOR THE CREDIT OF: Synapse Financial Technologies, Inc
101 2ND STREET
 SUITE 1500
SAN FRANCISCO CA 94105
ACCOUNT #: 3303419909

Best,
Tracey

--
**Tracey Guerin**
General Counsel @ Synapse

This email may contain confidential and privileged information. Any review, use, distribution, or disclosure by anyone other than the
intended recipient(s) is prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of
this message.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you
received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of
the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at
https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

2818 La Cienega Avenue, Los Angeles, California 90034

A True And Correct Copy Of The Foregoing Document Entitled (*Specify*): **Debtor's Response To Emergency Motion Filed By Office Of The United States Trustee To Convert Case To Chapter 7 Under 11 U.S.C. § 1112(B) Or, In The Alternative, To Direct Appointment Of A Chapter 11 Trustee Under § 1104(A); Declaration Of Sinkaet Pathak** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **May 23, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below.

- Ron Bender    rb@lnbyg.com
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Russell Clementson    russell.clementson@usdoj.gov
- Andrew Michael Cummings    andrew.cummings@hklaw.com, philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
- Michael G. Farag    mfarag@gibsondunn.com
- Michael I. Gottfried    mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- Steven T Gubner    sgubner@bg.law, ecf@bg.law
- Robert T. Honeywell    robert.honeywell@klgates.com
- Lance N Jurich    ljurich@loeb.com, pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
- Monica Y Kim    myk@lnbyg.com, myk@ecf.inforuptcy.com
- Jeffrey C Krause    jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
- Adam A Lewis    alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
- Krikor J Meshefejian    kjm@lnbyg.com
- David M Poitras    dpoitras@bg.law
- Brandy A Sargent    brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
- Jason D Strabo    jstrabo@mwe.com, jbishopjones@mwe.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Jeffrey C Wisler    jwisler@connollygallagher.com, dperkins@connollygallagher.com
- Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) **May 23, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

8

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_May 23, 2024_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service by **OVERNIGHT MAIL/FEDEX** information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 23, 2024 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Printed Name | Signature |