STEVEN T. GUBNER – Bar No. 156593
DAVID M. POITRAS – Bar No. 141309
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:     sgubner@bg.law
           dpoitras@bg.law

JEFFREY NAIMON – DC Bar No. 429409 (*Admitted Pro Hac Vice*)
CAROLINE M. STAPLETON – DC Bar No. 1023477 (*Admitted Pro Hac Vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2001 M Street NW
Washington, DC 20036
Telephone: (202) 349-8030
Email:     jnaimon@orrick.com
           cstapleton@orrick.com

Attorneys for Evolve Bank & Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>           Debtor and Debtor-in-Possession. | Case No. 1:24-bk-10646-MB<br><br>Chapter 11<br><br>**EVOLVE BANK & TRUST'S ("EVOLVE") STATEMENT OF POSITION CONCERNING: (A) DEBTOR'S FAILURE TO PROVIDE COMPLETE AND ACCURATE ESSENTIAL RECORDS; (B) STATUS OF FREEZE ON CERTAIN ACCOUNT ACTIVITY; AND (C) EVOLVE'S PLAN TO DISTRIBUTE END USER FUNDS**<br><br>**DECLARATION OF W. CHRISTOPHER STAAB IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:   May 24, 2024<br>Time:  8:00 a.m.<br>Place:  Courtroom 303<br>         **ZOOM.GOV ONLY** |

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, SECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:**

Evolve Bank & Trust ("Evolve"), a creditor and party-in-interest in the above-referenced chapter 11 case, hereby files this Statement of Position (the "Statement") concerning: (a) Debtor's failure to provide complete and accurate essential records, including daily ledgers and settlement reports, (b) the reasons why Evolve cannot resume payment processing under current circumstances, and (c) Evolve's plan for funds distribution to help resolve the issue of end user funds inaccessibility.

## INTRODUCTION

Throughout the difficult process of winding down its relationship with Debtor, which began prepetition, Evolve has kept in the forefront two priorities: protecting End Users and maintaining compliance with its regulatory obligations. Evolve submits this Statement to provide the Court with an update regarding Evolve's actions in furtherance of these priorities, including the status of the account activity freeze that Evolve was forced to institute on May 11, 2024 as a result of Debtor's decision to revoke Evolve's access to a critical system containing information necessary to safely and soundly process End User transactions.

There are multiple banks involved in Debtor's programs. To Evolve's knowledge, none of them are currently processing payments in the Debtor's ecosystem.[1] Because both the End User funds and the payment functions have been spread across the various banks, the system only works when all of the banks are participating, and all the banks are confident both in the data and that the funds they might be sending are currently available. Evolve has serious concerns as to the accuracy and completeness of the ledgers and other data Debtor has provided. Indeed, recent ledgers and data provided by Synapse do not align with the actual movement of funds in and out of Evolve.

---

[1] At least two of the other three banks stopped processing payments before Evolve froze its payment processing on May 11, 2024.

1

As set forth in more detail below, Evolve believes the only realistic solution is a wind down with a distribution of funds to the Synapse program's approximately 200,000 or so End Users. Evolve is working diligently with the fintech Platforms that are not part of the Synapse Brokerage program to finalize and transfer End User funds. That process can be completed quickly. For fintech Platforms that migrated to the Brokerage program, Evolve proposes to immediately transmit funds to Synapse Brokerage for it to distribute to its End Users.

Finally, Evolve has reviewed the status report filed by Debtor, which include a range of inaccurate allegations concerning Evolve and others. Evolve generally denies Debtor's claims, including that Evolve owes $150 million to Debtor's end users, and reserves its rights to respond appropriately in due course.

**BACKGROUND INFORMATION**

Synapse Financial Technologies, Inc., the chapter 11 debtor and debtor-in-possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), filed a voluntary petition under Chapter 11 of Title 11, 11 U.S.C. Sections 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date"). As of the date of this Motion, the Debtor is continuing to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On May 13, 2024, Evolve filed a motion, on an emergency basis, for *An Order Directing the Debtor to Restore Evolve's Access to the Debtor's Dashboard System; or, Alternatively, Authorizing Evolve to Close All of the Debtor's Demand Deposit Accounts at Evolve Associated With Debtor's Programs; Declaration of W. Christopher Staab in Support Thereof* (the "Evolve Emergency Motion") [Docket No. 137]. The genesis of this motion was Debtor's unilateral decision on the morning of Saturday, May 11, 2024 to revoke Evolve's access to the Dashboard, which is the system Evolve uses to oversee Debtor's activities as its critical service provider and to review and analyze essential information about accounts and transactions belonging to the end users ("End Users") of fintech platforms that had entered into agreements with Debtor ("Platforms"). The Dashboard is expected to be used in conjunction with daily ledger files and reports of debit and credit card transactions, which Debtor had, at the time of the Evolve Emergency Motion, failed to provide since

May 6, 2024. Dashboard access, ledgers, and transaction reporting are vital to ensuring Evolve is able to process transactions in a safe, sound, and legally compliant manner, and is critical to the accurate servicing of End User accounts. In the absence of this essential information, Evolve was forced to freeze End User account activity.

The Court held hearings on the Evolve Emergency Motion on May 13, 14, and 17, 2024. In addition, on May 16, 2024, Evolve filed a *Statement of Position Concerning: (A) Evolve's Access to the Synapse Dashboard System, (B) The Temporary Freezing of Certain Account Activity, and (C) The Current Status of the Freeze; Declaration of W. Christopher Staab in Support Thereof* (the "Evolve Statement of May 16, 2024") [Docket No. 154] that, among other things, explained the legal and factual basis for the account activity freeze and the status of the freeze as of the date of the statement's filing. On May 17, 2024, the Court entered an *Interim Order Granting in Part and Denying in Part Emergency Motion of Evolve Bank & Trust for an Order Directing the Debtor to Restore Evolve's Access to the Debtor's Dashboard System; or, Alternatively, to Close All of the Debtor's Demand Deposit Accounts at Evolve Associated with the Debtor's Programs* (the "Interim Order")[Docket No. 157]. The Interim Order required Debtor to maintain Evolve's access to the Dashboard and provide transaction and settlement reports requested by Evolve. The Interim Order further required both Parties to meet and confer no later than May 20, 2024 regarding resolution of the issues in dispute that are denying End Users access to their funds, with the optional attendance of representatives of the other participating banks, certain government representatives, and a private mediator agreed upon by the parties (the "Meet-and-Confer"). The Interim Order provided that the Meet-and-Confer would be governed by Rule 408 of the Federal Rules of Evidence ("FRE 408").

The Meet-and-Confer took place on May 20, 2024 from 10:00 a.m. to approximately 5:30 p.m. The Meet-and-Confer was attended by representatives of the Parties as specified in the Interim Order, retired bankruptcy Judge Mitchel Goldberg as mediator, and representatives of Lineage Bank ("Lineage"), American Bank, N.A. ("American Bank"), and AMG National Trust ("AMG"), which are depository institutions that, along with Evolve (together, "Synapse Ecosystem Banks"), each play different roles in the flow of End User funds as directed by Debtor and/or its subsidiary, Synapse Brokerage LLC ("Brokerage") (collectively, the "Synapse Ecosystem"). Evolve's goal in

3

attending the Meet-and-Confer was to come away with a plan to facilitate distribution of End User funds that would be acceptable to Debtor and other Synapse Ecosystem Banks. The discussions that took place during the Meet-and-Confer were confidential settlement communications subject to FRE 408. Unfortunately, the parties did not reach an agreement during the Meet-and-Confer.

Evolve's foremost priority is to facilitate the distribution of funds in its possession to the End Users to whom they belong as soon as possible, while remaining in compliance with applicable law. In this Statement, Evolve explains (i) why the distribution of End User funds cannot be accomplished by unfreezing Evolve account activity and resuming payment processing, in light of the inaccurate and incomplete records provided to Evolve by Synapse on May 17, 2024, as well as Debtor's imminent cessation of operations and the termination of processing activities at other Synapse Ecosystem Banks, and (ii) Evolve's efforts to accurately distribute End User funds in a safe, sound, and compliant manner, as part of a wind-down plan that Evolve has already begun implementing this week.

## STATEMENT OF POSITION

A. <u>Debtor Remains Unwilling or Unable (or Both) to Provide Complete and Accurate Records</u>

Evolve was forced to freeze End User account activity[2] on May 11, 2024 following what Evolve understands to have been an intentional act on the part of Debtor to prevent Evolve users from accessing the Dashboard. While the majority of Evolve's Dashboard access was restored on May 13, 2024, Evolve's ability to access End User statements[3]—which Evolve's employees were able to access without limitation as recently as May 10, 2024—was not, and still has not been, restored. Prior to the denial of Dashboard access, Evolve relied on End User statements from the Dashboard to evaluate the accuracy of Debtor's ledgers. Evolve has accepted that, at this time, it is

---

[2] The freeze did not impact activity in Debtor's accounts at Evolve—only accounts holding End User funds.

[3] While Debtor sought to diminish these as mere "account summaries" during the last hearing, they are characterized in the Dashboard and labeled as "statements." Regardless of the name debtor chooses to use now, these documents contain account transaction history, balances, fees and other pertinent information typically associated with an account statement.

4

unlikely to regain full access to this portion of the Dashboard, though Evolve questions Debtor's motives for its decision to remove Evolve's system access to End User statements.

However, separate from Dashboard access but equally important for payment processing, Debtor continues to deny Evolve access to essential records, including daily ledgers and card settlement reports. Debtor is required to provide these records to Evolve under the Parties' Master Bank Services Agreement.[4] During the May 17, 2024 hearing, Debtor informed the Court and Evolve that earlier that day, Debtor had provided Evolve with a ledger for May 15, 2024. However, Debtor failed to provide daily ledgers for the period from May 7, 2024 through May 14, 2024, claiming that generating these required reports would require significant manual intervention due to Evolve's alleged cessation of ACH processing on May 8, 2024. Setting aside the factual inaccuracy regarding the date that Evolve froze ACH activity, which was May 11, 2024 (in response to the denial of Dashboard access), the fact that manual intervention is required does not excuse Debtor from producing daily ledgers, which are essential to Evolve being able to perform necessary daily reconciliation.

Moreover, having thoroughly analyzed the May 15, 2024 ledger, Evolve will need the Debtor to provide daily information for the period from May 7–14, 2024—because, once again, Evolve has identified further material ledger irregularities from Debtor. Specifically:

- According to Debtor's ledger for May 6, 2024, the total balance of funds in all Non-Brokerage End User accounts was $9,793,471.

- According to Debtor's ledger for May 15, 2024, the total balance of funds in all Non-Brokerage End User accounts was $14,862,212.

---

[4] "Program Manager shall provide to Bank any Records, including but not limited to data or other information in its possession or in the possession of its Subcontractors which is required to reconcile accounts or substantiate information concerning fees, transactions or Settlement or as required by any Regulatory Authority or Applicable Law. Such records shall include, but is not be (sic) limited to, daily entries of activity (beginning balance, daily transactions, and ending balance) for each Deposit Account and FBO Account, as applicable. . . . Program Manager shall maintain the Deposit Ledger and such Deposit Ledger shall, at all times, be complete and accurate and maintained and updated regularly and in a timely manner (at least daily). Program Manager acknowledges that Bank may treat and assume the Deposit Ledger as its definitive ledger setting forth the title, ownership, and content of each Deposit and related Bank Service; provided, however, Bank may require Program Manager to make changes to Deposit Ledger as Bank may determine in its sole and reasonable discretion. Program Manager shall make the Deposit Ledger available to Bank and shall provide Bank with access to the Deposit Ledger through the Dashboard at all times throughout the Term of this Agreement." MBSA, Sec. 7(o)(ii) and (vi).

- This means that from May 6, 2024 through May 15, 2024 – *including five days when account activity was frozen* – the total ledger balance for Non-Brokerage End User accounts *increased* by $5,068,741.

- However, the actual activity—dollars going in and out the door--for the 18 Evolve FBO accounts holding Non-Brokerage End User funds reveals a net *decrease* of $3,294,597.

- In other words, when the total cash in the 18 FBO accounts at issue decreased by approximately $3.3 million, the ledger should have decreased by that same amount. Instead, the May 15, 2024 ledger provided by Debtor shows that the total balance increased by approximately $5.1 million. This reflects a difference of approximately $8.4 million between the ledger balance and the actual End User funds in the accounts.

The ledger values simply do not match the actual flow of funds. Evolve therefore needs the daily ledgers for this period to determine the cause of this $8.4 million discrepancy in Debtor's records. Evolve has communicated its findings to Debtor and asked for daily ledger reports for the entire period from May 7-14, 2024 in order to research when the irregularities appeared and what their cause may be. Pending further research by Evolve, it is clear that the alleged account balances provided by Debtor for Brokerage End Users are not accurate and cannot support a responsible return to payment processing.

Notably, this is not the first instance in recent weeks that Evolve has observed significant and deeply concerning irregularities in Debtor's daily Brokerage ledgers:

- When Evolve received the April 29, 2024 daily ledger provided by Debtor, it was shocked to see that for a single Brokerage Platform, Debtor's ledger showed an increase of approximately $85 million in Brokerage End User funds at Evolve in one day, when during that period Evolve received only $2,686,233 of incoming End User funds.

- In addition, for another Brokerage Platform, the April 29, 2024 daily Brokerage ledger from Debtor showed $21,527,213 in Brokerage End User Funds – but on April 30, 2024 the Debtor's ledger showed that Brokerage End User funds for the same Platform totaled only $461,101, a decrease of $21,066,112. Yet during that period, Evolve sent out only $814,134 of outgoing End User funds.

These are just two examples of numerous irregularities in recent ledgers provided by Debtor. They speak to Evolve's urgent need for daily, accurate ledgers from Debtor as soon as possible for the entire period in which Debtor ceased providing necessary reporting and records.

In addition, prior to May 6, 2024, Debtor provided Evolve daily Mastercard settlement reports ("Card Settlement Reports") that Evolve relies on to reconcile account data. On May 17,

6

2024, Debtor provided Card Settlement Reports for May 5 through May 16 that did not contain information necessary to ensure accurate settlement and regulatory compliance in light of the observed ledger irregularities:

- All card numbers for each transaction
- All credited and debited transactions for the given settlement date
- Interchange for all transactions
- Corrected transaction and settlement dates
- Include program identifier with each transaction
- A complete Cardholder File including all registered Cardholders regardless of status as of the close of May 6th business day. This file must include all Evolve's field expectations.
- Corrected Transaction or Posting files to include:
  - All card numbers for each transaction.
  - All credited and debited transactions for the given settlement date.
  - Interchange for all transactions.
  - Corrected transaction and settlement dates.
  - Include program identifier with each transaction.

Unfreezing account activity without this information could lead to Synapse processing transactions through Evolve that would cause the Bank to violate regulatory compliance requirements and safety and soundness principles.

      B.    <u>Unfreezing Account Activity Without Complete and Accurate Records Would Be Disastrous for End Users and Evolve</u>

The Bank is permitted to freeze activity under Section 2.11 of the Demand Deposit Agreement ("<u>DDA Agreement</u>") with End Users, which provides that "if the Bank suspects that any irregular, unauthorized, or unlawful activity may be occurring in connection with your Account, Bank may 'freeze' or place a hold on the balance in such Account pending an investigation of such activities." In these circumstances, as explained above, there is ample evidence of irregular and potentially unauthorized or unlawful activity by Synapse that may be occurring in connection with End Users' accounts. Accordingly, the Bank was justified, and remains justified, in instituting the

freeze, particularly given its statutory and regulatory obligations as an insured depository institution. These requirements were described in Evolve's Statement of Position filed with the Court on May 16, and they include Bank Secrecy Act and Anti Money Laundering requirements ("BSA/AML"),[5] Office of Foreign Asset Control ("OFAC") requirements,[6] safety and soundness requirements applicable to Arkansas-chartered banks[7] and state member banks of the Federal Reserve System[8], and thus consistent with the expectations set forth in the Federal Reserve System's Commercial Bank Examination Manual (see especially Section 5310.1 - Electronic Banking and Section 5320.1 - Payment System Risk and Electronic Funds Transfer Activities)[9].

Because of these many legal requirements, and the Bank's obligation to protect both End Users and itself, it uses all the data tools to ensure compliance. In order to complete its investigation of irregular activity under Section 2.11 of the DDA Agreement, the Bank must have access to complete and accurate information documenting End User balances and transactions beginning on May 7, 2024. While Dashboard access to the Statements would facilitate this investigation, as they can be used to verify the accuracy of the ledger and transaction reports, the ledger and reports themselves are essential in order for the Bank's investigation to progress. The Bank urges the Court to order the Debtor to provide complete and accurate ledgers and card settlement reports.

Finally, over the course of the past two weeks, the functionality of the Synapse Ecosystem has completely disintegrated and cannot support payment processing by any one Synapse Ecosystem Bank. Lineage stopped processing payments in the Synapse Ecosystem on May 8, 2024. Evolve understands that American Bank and AMG have also stopped processing payments in the Synapse Ecosystem. As to Evolve, Debtor rejected all agreements with Evolve effective May 8, 2024. With Debtor on the verge of ceasing operations, and Debtor's CEO having stated publicly that final ledger

---

[5] *See,* 31 USC 5311 et seq., 12 USC 1829b, 1951-1959, and 12 USC 1818(s), 12 USC 1818(s), 12 USC 1829b

[6] 31 C.F.R. parts 500 to 599; *see* OFAC list of sanctions laws at https://ofac.treasury.gov/additional-ofac-resources/ofac-legal-library/united-states-statutes

[7] Arkansas Code 23-47-101

[8] 12 C.F.R. 208

[9] https://www.federalreserve.gov/publications/files/cbem-5000-202310.pdf

reports were sent as of May 21, 2024,[10] it is clear that there is no going back to business as usual prior to the Dashboard access revocation.

Returning to processing payments for End Users enrolled in any Debtor program at this point, particularly given the very real concerns about the accuracy of Debtor's recordkeeping and Evolve's legal and compliance obligations, would be an unsafe and unsound banking practice that is prohibited for insured depository institutions like Evolve. Moreover, based on recent public statements by Debtor's CEO, Evolve reasonably believes that End Users may have funds at multiple Synapse Ecosystem Banks, and that these banks may not all be reconciled with Synapse and/or Brokerage. In such circumstances, requiring Evolve to process payments that in many cases may need to be funded by End User balances at other institutions, for which Debtor cannot provide reliable recordkeeping or settlement support, would place enormous counterparty risk on Evolve, which has no agreements with other Synapse Ecosystem Banks or with Brokerage that would facilitate the transfer of End User balances to settle transactions.

C.    Evolve Has Developed a Plan for the Efficient Distribution of End User Funds

Evolve is committed to implementing a solution that provide End Users timely access to their funds. Accordingly, Evolve has proposed a wind-down plan that will facilitate the distribution of Non-Brokerage and Brokerage End User funds to the appropriate accountholders and custodians (the "Plan"). The Plan addresses End Users in two categories: Non-Brokerage and Brokerage.

1.    *Plan for Non-Brokerage End Users*

For Non-Brokerage End Users (*i.e.*, End Users who did not migrate to Synapse Brokerage), Evolve is working directly with Platforms to determine the best way to distribute funds to End Users. Evolve will begin distributing Non-Brokerage End User funds as soon as possible, pending confirmation by Platforms.

---

[10] As of this filing, Evolve has not received this "final ledger report" but is obviously highly concerned that it will be similarly inaccurate and unreliable.

9

2.     *Plan for Brokerage End Users*

Evolve's Plan for distributing Brokerage End User funds is rooted in the structure of the Brokerage Program and the functions of the various participants in the Synapse Ecosystem. Evolve presents a summary of this information below as context for the key elements of its Plan.

a)     Overview of Brokerage Program

As explained in the Evolve Statement of May 16, 2024, the Brokerage Program was a cash management program offered through Debtor's licensed broker-dealer subsidiary, Brokerage. In addition to maintaining accounts as part of the Brokerage Program, Brokerage End Users maintained DDAs at Evolve for payment processing purposes – *i.e.*, receiving Brokerage End Users' funds via ACH and wire, and processing outbound transfers of Brokerage End Users' funds to settle card transactions, to satisfy ACH debits received from non-End User originators, and to AMG as custodian bank for the Brokerage Program. Importantly, Evolve was *not* a Program Bank or Participating Financial Institution for Brokerage or the Brokerage Program, as evidenced by Debtor's own website listing these institutions, as referenced in Brokerage End Users' customer agreements and terms of service. Evolve never entered into a Program Bank or Participating Financial Institution agreement with Brokerage, but was exclusively a Program Bank of Debtor.

In connection with its payment processing role on behalf of Brokerage End Users who maintained Evolve DDAs, Evolve holds $46,926,558.85 in net Brokerage End User funds in 3 FBO Accounts. Evolve believes these funds are appropriately distributed to AMG, which Evolve understands acts as the bank for Brokerage, and which is the Brokerage bank that has been holding hundreds of thousands of Brokerage End User funds since Debtor instructed they be transferred out of Evolve to AMG beginning in October 2023.

Evolve believes this proposal is in line with plans being proposed by other Synapse Ecosystem Banks. Only Brokerage is in a position to be able to reconcile and distribute Brokerage End User balances that are fragmented across multiple institutions in the Synapse Ecosystem, each of which play different and mutually exclusive roles in payment processing. The import of centralized distribution is magnified when considering that Evolve only holds one piece to the Brokerage puzzle, with other Synapse Ecosystem Banks, and Brokerage itself, holding their own

pieces that are not visible to Evolve. Especially now that no Synapse Ecosystem Banks are processing payments, only Brokerage is in a position to make the determination regarding the total amount and distribution of End User funds, through the custodian bank for the Brokerage program, AMG.

                          b)       <u>Plan for Distribution of Funds to Brokerage End Users</u>

Evolve proposes to send via wire or ACH all funds at Evolve belonging to Brokerage End Users to AMG, as the custodian bank for Brokerage. If, for whatever reason, AMG is unwilling or unable to receive the funds, Evolve is prepared to send Brokerage End User funds to another third-party responsible for Brokerage Program administration and funds distribution, as we are properly instructed. The total amount of Brokerage End User funds to be transferred by Evolve to AMG is $79,586,887.85, comprising:

- The total amount of net Brokerage End User funds referenced in subsection (a) above, <u>plus</u>
- The amount of known deficiencies in the FBO Account wholly unrelated to the Brokerage Program or Brokerage migration, which total $32,660,329.

With respect to the known deficiencies referenced above, under Section 7(o) and (p) of the September 23, 2022 Master Bank Services Agreement between Evolve and Debtor, Debtor was obligated to ensure the FBO Account was reconciled and was "responsible and liable for any failure of the FBO Account, Deposit Account or any transaction requested in connection with a Program to be fully funded" and warranted "that the balance in each Deposit Account will be at all times appropriately funded by deposits placed at Bank by the End User associated with such Deposit Account in an amount that is no less than 100% of the total amount of currency represented as active and available to End Users of the current day's Deposit Account balance, and that the balance in each FBO Account equals 100% of the amount of funds Deposited by End Users in connection with such FBO Account." While Evolve therefore appropriately denies any and all responsibility for Debtor's failure to fully fund the FBO Account, Evolve is committed to ensuring that known deficiencies unrelated to the Brokerage Program are not passed onto Brokerage End Users to their detriment, and has addressed this in its Plan for the distribution of Non-Brokerage End User funds.

Finally, Evolve wishes to address concerns raised by Brokerage End Users about the propriety of their Platform's and Debtor's decision to migrate them to a Brokerage Account beginning in October 2023. Pursuant to each End User's DDA Agreement, each End User agreed that by opening an account through the Platform's website, the End User authorized the Bank to accept all instructions provided by the Platform or Debtor on the End User's behalf. For the migration transfers, as with all transactions involving Evolve DDAs, Evolve relied on the representations of its service provider, Debtor, in accordance with Debtor's contractual obligations under the MBSA, that such transfers were authorized. Evolve was in no way involved in the Brokerage Program or Brokerage migration, though it understood that Platforms sent notices to End Users regarding this change. To the extent End Users were unsatisfied with such notice, or unaware of this change in their account status, Evolve stands ready to assist with any information that it can provide.

## CONCLUSION

Evolve appreciates the opportunity to provide this update to the Court, and is open to working with all banks in the Synapse Ecosystem to collaborate on implementing wind-down plans for End Users of Debtor's various programs.

DATED: May 23, 2024                             Respectfully submitted,

                                                BG LAW LLP


                                                By: /s/ David M. Poitras
                                                    Steven T. Gubner
                                                    David M. Poitras
                                                Attorneys for Evolve Bank & Trust

**DECLARATION OF W. CHRISTOPHER STAAB**

I, W. Christopher Staab, hereby declare as follows:

1. I am the Chief Technology Officer ("CTO") of Evolve Bank & Trust ("Evolve"). I have held this position since 2022. As CTO, my duties and responsibilities include overseeing all of the technology for Evolve. In addition, I have worked extensively with Evolve's Open Banking Division, which supports fintech clients and aggregators such as Synapse Financial Technologies, Inc. ("Synapse"). For the last eight months I have been working closely with the Synapse team as they have struggled with issues related to maintaining a ledger for their brokerage business at Synapse Brokerage LLC ("Synapse Brokerage"). This has included material deficiencies with the balances held by Synapse Brokerage customers at AMG, American Bank, Lineage and ADMC. Through this work I have become familiar with the Synapse platform, including the Synapse dashboard system ("Dashboard"). The Synapse systems are leveraged by various departments within Evolve for the oversight of customer activity. I hold a bachelor's degree in business administration from Boston University. I have more than twenty years of experience in the financial services industry. Capitalized terms used in this declaration and not specifically defined herein shall have the meaning ascribed to such terms in the Motion.

2. Prior to the denial of Dashboard access, Evolve relied on End User statements from the Dashboard to evaluate the accuracy of Debtor's ledgers.

3. Separate from Dashboard access but equally important for payment processing, Debtor continues to deny Evolve access to essential records, including daily ledgers and card settlement reports. Debtor is required to provide these records to Evolve under the Parties' Master Bank Services Agreement.

4. Evolve has identified material ledger irregularities from the ledger provided by Debtor on May 17, 2024. Specifically:

> According to Debtor's ledger for May 6, 2024, the total balance of funds in all Non-Brokerage End User accounts was $9,793,471.
>
> According to Debtor's ledger for May 15, 2024, the total balance of funds in all Non-Brokerage End User accounts was $14,862,212.

This means that from May 6, 2024 through May 15, 2024 – *including five days when account activity was frozen* – the total ledger balance for Non-Brokerage End User accounts *increased* by $5,068,741.

However, the actual activity—dollars going in and out the door--for the 18 Evolve FBO accounts holding Non-Brokerage End User funds reveals a net *decrease* of $3,294,597.

In other words, when the total cash in the 18 FBO accounts at issue decreased by approximately $3.3 million, the ledger should have decreased by that same amount. Instead, the May 15, 2024 ledger provided by Debtor shows that the total balance increased by approximately $5.1 million. This reflects a difference of approximately $8.4 million between the ledger balance and the actual End User funds in the accounts.

5. The ledger values simply do not match the actual flow of funds. Evolve therefore needs the daily ledgers for this period to determine the cause of this $8.4 million discrepancy in Debtor's records. Evolve has communicated its findings to Debtor and asked for daily ledger reports for the entire period from May 7-14, 2024 in order to research when the irregularities appeared and what their cause may be. Pending further research by Evolve, it is clear that the alleged account balances provided by Debtor for Brokerage End Users are not accurate and cannot support a responsible return to payment processing.

6. Notably, this is not the first instance in recent weeks that Evolve has observed significant and deeply concerning irregularities in Debtor's daily Brokerage ledgers:

- When Evolve received the April 29, 2024 daily ledger provided by Debtor, it was shocked to see that for a single Brokerage Platform, Debtor's ledger showed an increase of approximately $85 million in Brokerage End User funds at Evolve in one day, when during that period Evolve received only $2,686,233 of incoming End User funds.

- In addition, for another Brokerage Platform, the April 29, 2024 daily Brokerage ledger from Debtor showed $21,527,213 in Brokerage End User Funds – but on April 30, 2024 the Debtor's ledger showed that Brokerage End User funds for the same Platform totaled only $461,101, a decrease of $21,066,112. Yet during that period, Evolve sent out only $814,134 of outgoing End User funds.

7. In addition, prior to May 6, 2024, Debtor provided Evolve daily Mastercard settlement reports ("Card Settlement Reports") that Evolve relies on to reconcile account data. On May 17, 2024, Debtor provided Card Settlement Reports for May 5 through May 16 that did not

14

contain information necessary to ensure accurate settlement and regulatory compliance in light of the observed ledger irregularities.

8.  Because of these many legal requirements, and the Bank's obligation to protect both End Users and itself, it uses all the data tools to ensure compliance. In order to complete its investigation of irregular activity under Section 2.11 of the DDA Agreement, the Bank must have access to complete and accurate information documenting End User balances and transactions beginning on May 7, 2024. While Dashboard access to the Statements would facilitate this investigation, as they can be used to verify the accuracy of the ledger and transaction reports, the ledger and reports themselves are essential in order for the Bank's investigation to progress. The Bank urges the Court to order the Debtor to provide complete and accurate ledgers and card settlement reports.

9.  Finally, over the course of the past two weeks, the functionality of the Synapse Ecosystem has completely disintegrated and cannot support payment processing by any one Synapse Ecosystem Bank. Lineage stopped processing payments in the Synapse Ecosystem on May 8, 2024. Evolve understands that American Bank and AMG have also stopped processing payments in the Synapse Ecosystem. As to Evolve, Debtor rejected all agreements with Evolve effective May 8, 2024. With Debtor on the verge of ceasing operations, and Debtor's CEO having stated publicly that final ledger reports were sent as of May 21, 2024,[11] it is clear that there is no going back to business as usual prior to the Dashboard access revocation.

10. Returning to processing payments for End Users enrolled in any Debtor program at this point, particularly given the very real concerns about the accuracy of Debtor's recordkeeping and Evolve's legal and compliance obligations, would be an unsafe and unsound banking practice that is prohibited for insured depository institutions like Evolve. Moreover, based on recent public statements by Debtor's CEO, Evolve reasonably believes that End Users may have funds at multiple Synapse Ecosystem Banks, and that these banks may not all be reconciled with Synapse and/or Brokerage. In such circumstances, requiring Evolve to process payments that in many cases may

---

[11] As of this filing, Evolve has not received this "final ledger report" but is obviously highly concerned that it will be similarly inaccurate and unreliable.

15

need to be funded by End User balances at other institutions, for which Debtor cannot provide reliable recordkeeping or settlement support, would place enormous counterparty risk on Evolve, which has no agreements with other Synapse Ecosystem Banks or with Brokerage that would facilitate the transfer of End User balances to settle transactions.

11. In connection with its payment processing role on behalf of Brokerage End Users who maintained Evolve DDAs, Evolve holds $46,926,558.85 in net Brokerage End User funds in 3 FBO Accounts. Evolve believes these funds are appropriately distributed to AMG, which Evolve understands acts as the bank for Brokerage, and which is the Brokerage bank that has been holding hundreds of thousands of Brokerage End User funds since Debtor instructed they be transferred out of Evolve to AMG beginning in October 2023.

12. The total amount of Brokerage End User funds to be transferred by Evolve to AMG is $79,586,887.85, comprising:

The total amount of net Brokerage End User funds referenced in subsection (a) above, plus

The amount of known deficiencies in the FBO Account wholly unrelated to the Brokerage Program or Brokerage migration, which total $32,660,329.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of May, 2024, at Hingham, Massachusetts.

_____
W. CHRISTOPHER STAAB

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the foregoing document entitled: **EVOLVE BANK & TRUST'S ("EVOLVE") STATEMENT OF POSITION CONCERNING: (A) DEBTOR'S FAILURE TO PROVIDE COMPLETE AND ACCURATE ESSENTIAL RECORDS; (B) STATUS OF FREEZE ON CERTAIN ACCOUNT ACTIVITY; AND (C) EVOLVE'S PLAN TO DISTRIBUTE END USER FUNDS; DECLARATION OF W. CHRISTOPHER STAAB IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 23, 2024,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**\*\*JUDGE'S COPY NOT REQUIRED IF LESS THAN 25 PAGES (GENERAL ORDER 23-01).**

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 23, 2024,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL**

**Official Committee of Unsecured Creditors**

| | |
|---|---|
| Kroll Associates, Inc.<br>Attn: Heather Elizabeth Saydah<br>55. East 52nd Street, 17th Floor<br>New York, NY 10055<br>Heather.saydah@kroll.com | Mercury Technologies, Inc.<br>Attn Celeste Ferber<br>333 Bush Street, Suite 1900<br>San Francisco, CA 94104<br>celeste@mercury.com |

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 23, 2024 | Mela Galvan | /s/ Mela Galvan |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

   **AND**

3. <u>**VIA EMAIL:**</u>

   - **Raymond O Aghaian**   raghaian@kilpatricktownsend.com, ndelman@kilpatricktownsend.com; dboss@kilpatricktownsend.com
   - **Ron Bender**   rb@lnbyg.com
   - **J Scott Bovitz**   bovitz@bovitz-spitzer.com
   - **Rudy J Cerone**   rcerone@mcglinchey.com, lgraff@mcglinchey.com;jingargiola@mcglinchey.com
   - **Sara Chenetz**   schenetz@perkinscoie.com, docketLA@perkinscoie.com; cmallahi@perkinscoie.com; jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com
   - **Russell Clementson**   russell.clementson@usdoj.gov
   - **Andrew Michael Cummings**   andrew.cummings@hklaw.com, philip.dobbs@hklaw.com; hapi@hklaw.com;reena.kaur@hklaw.com
   - **Michael G. Farag**   mfarag@gibsondunn.com
   - **Paul R. Glassman**   pglassman@stradlinglaw.com
   - **Nicholas Christian Glenos**   cglenos@bradley.com
   - **Michael I. Gottfried**   mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
   - **Steven T Gubner**   sgubner@bg.law, ecf@bg.law
   - **Ralph P Guenther**   rguenther@guentherlawgroup.com
   - **Robert T. Honeywell**   robert.honeywell@klgates.com
   - **Lance N Jurich**   ljurich@loeb.com, pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
   - **Monica Y Kim**   myk@lnbyg.com, myk@ecf.inforuptcy.com
   - **Jeffrey C Krause**   jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
   - **Adam A Lewis**   alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
   - **Krikor J Meshefejian**   kjm@lnbyg.com
   - **Fred Neufeld**   fneufeld@sycr.com, tingman@sycr.com
   - **David M Poitras**   dpoitras@bg.law
   - **Paul M Rosenblatt**   prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
   - **Brandy A Sargent**   brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
   - **Zev Shechtman**   Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com
   - **Jason D Strabo**   jstrabo@mwe.com, jbishopjones@mwe.com
   - **United States Trustee (SV)**   ustpregion16.wh.ecf@usdoj.gov
   - **Jeffrey C Wisler**   jwisler@connollygallagher.com, dperkins@connollygallagher.com
   - **Beth Ann R. Young**   bry@lnbyg.com, bry@lnbyb.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                                    **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL:**

**Request for Special Notice**

Jason D. Strabo, Esq.
McDermott Will & Emery
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
jstrabo@mwe.com

Darren Azman, Esq.
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-3852
dazman@mwe.com

Jake Jumbeck, Esq.
McDermott Will & Emery LLP
444 W. Lake Street, Suite 4000
Chicago, Illinois 60606-0029
jjumbeck@mwe.com

Jeffrey C. Krause, Esq.
Ilissa Samplin, Esq.
Daniel Nowicki, Esq.
Michael G. Farag, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
jkrause@gibsondunn.com
isamplin@gibsondunn.com
dnowicki@gibsondunn.com
mfarag@gibsondunn.com

Robert T. Honeywell, Esq.
K&L Gates LLP
599 Lexington Ave
New York, NY 10022
robert.honeywell@klgates.com

Brandy A. Sargent, Esq.
K&L Gates LLP
1 SW Columbia Street, Suite 1900
Portland, OR 97258
brandy.sargent@klgates.com

Robert J. Labate, Esq.
400 South Hope Street, 8th Floor Los Angeles, CA 90071
robert.labate@hklaw.com

Andrew M. Cummings, Esq.
Holland & Knight LLP
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
andrew.cummings@hklaw.com

Jeffrey C. Wisler, Esq.
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
jwisler@connollygallagher.com

Chris Glenos, Esq.
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
cglenos@bradley.com

Paul R. Glassman, Esq.
Fred Neufeld, Esq.
Stradling Yocca Carlson & Rauth LLP
10100 N. Santa Monica Blvd.
Suite 1450
Los Angeles, CA 90067
pglassman@stradlinglaw.com
fneufeld@stradlinglaw.com

Benjamin Waisbren, Esq.
Boies, Schiller Flexner LLP
1401 New York Avenue, N.W.
11th Floor
Washington, DC 20005
bwaisbren@bsfllp.com

John Kucera, Esq.
Boies, Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
jkucera@bsfllp.com

Simon Leen, Esq.
Boies, Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
sleen@bsfllp.com

Marc Ayala, Esq.
Boies, Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
mayala@bsfllp.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**