JELENA MCWILLIAMS
1601 K STREET NW
WASHINGTON, D.C. 2006-1682
jmcwilliams@cravath.com
Tel. 1-202-869-7710

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>              Debtor. | Case No. 1:24-bk-10646-MB<br><br>Chapter 11<br><br>**CHAPTER 11 TRUSTEE'S INITIAL STATUS REPORT**<br><br>DATE:      June 7, 2024<br>TIME:      1:30 PM PT<br>PLACE:   303<br>21041 Burbank Boulevard<br>Woodland Hills, CA 91367 and<br>Via ZoomGov |

TO THE HONORABLE MARTIN BARASH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:

I, Jelena McWilliams (the "Trustee"), the duly appointed, qualified, and acting chapter 11 trustee for the estate of Debtor Synapse Financial Technologies, Inc. ("Synapse" or the "Debtor"), hereby submit my initial "Chapter 11 Trustee's Status Report" (the Report), and represent as follows:

**I.**

**TIMELINE OF EVENTS**

A.    **Filing of the Chapter 11 Case and Appointment of Chapter 11 Trustee**

On April 22, 2024, the Debtor filed a voluntary chapter 11 petition, schedules, and statement of financial affairs. That same day, the Debtor filed an emergency motion for an order approving the sale of all its assets for $9.7 million to TabaPay Holdings LLC and requested that a hearing take place on April 29, 2024. [Dkt. No. 8]. The Debtor represented that it is a technology company and "has proprietary technology and software which essentially allows financial technology platforms called "fintechs" to provide certain financial products and services to the fintechs' customers (referred to as end users or depositors) though certain banking providers and financial technology providers." *Id.* The Debtor also filed a motion to approve a settlement reached with Evolve Bank & Trust ("Evolve"), one of its Partner Banks.

On May 1, 2024, the Court entered an order approving bidding procedures and set a hearing to approve the sale for May 9, 2024. [Dkt. No. 92]. The Debtor reported at the May 9 hearing that the settlement with Evolve had not been consummated due to disputes over Evolve funding a settlement payment. The buyer reported that it was unwilling to proceed with the sale without the Evolve settlement.

On May 13, 2024, Evolve filed a motion for an order restoring access to the "Debtor's Dashboard System" or, alternatively, "Authorizing Evolve to Close all of the Debtor's Demand Deposit Accounts at Evolve Associated with Debtor's Programs". [Dkt. No. 137]. Evolve alleged that

1

it had been denied access to the Debtor's computer systems and had been forced to freeze end user accounts. *Id*.

On May 13, 2024, the Court conducted a status conference on the sale and a hearing on Evolve's motion. Although extensive arguments were made by counsel and their clients assessing relative blame, it was undisputed that end users had lost access to funds.

On May 14, 2024, the Court conducted another status conference regarding access of end users to their funds and for continued use of cash collateral. The Debtor and secured creditors stated that they had agreed to use of cash collateral through Friday, May 17.

On May 15, 2024, the United States Trustee for the Central District of California (the "U.S. Trustee") filed a motion on an emergency basis requesting that the Court enter an order converting the Chapter 11 Case to chapter 7 for cause, or, in the alternative, for the appointment of a chapter 11 trustee. [Dkt. No. 146].

On May 24, 2024, following a hearing, the Court entered an order appointing a chapter 11 trustee (the "Appointment Order") and Jelena McWilliams was appointed by the U.S. Trustee as the Chapter 11 Trustee in this Chapter 11 Case (the "Case"). [Dkt. No. 196].

As a result of the foregoing, Jelena McWilliams became the duly appointed, qualified and acting Chapter 11 Trustee, and continues to act in this capacity.

B.    **Impact on End Users**

The Trustee and proposed counsel have received voluminous communications from affected end users and are further aware of the impact to these end users through media, public filings, and information shared with the Trustee by parties in interest in this Case. The Trustee shares the Court's urgency to restore access to end user funds and remains laser-focused on this priority. Since the appointment, the Trustee and proposed counsel have been working around the clock to investigate the events that led to the reconciliation issues and freezing of end user accounts and identify a path to unfreezing customer accounts as soon as possible. Aware of many personal stories

from impacted end users, the Trustee and proposed counsel are working diligently and rapidly to facilitate a resolution.

### C.    Update on Ledger Reconciliation and Unfreezing of End User Accounts

In the hearing regarding the Trustee's appointment, Judge Barash stated that "the Trustee can immediately start speaking to parties in interest and developing a plan to fund the continued preservation of Synapse's systems and data, and to continue the process of sharing information and hopefully reaching some agreement with the participating banks that allows funds to be returned to end users, to the rightful owners of those funds, as soon as humanly possible." Restoring access to end user funds is the Trustee's top priority.

The Appointment Order instructed that, "[a]s soon as possible, the chapter 11 trustee is directed to meet and confer with counsel for the various constituents in business with the Debtor, including the financial technology platforms, the partner financial institutions and the Debtor's secured lenders." *Dkt. No. 196*.   Immediately upon appointment on Friday evening, the Trustee and the Trustee's proposed counsel at Cravath, immediately began meeting and conferring with former Synapse officers, Sankaet Pathak and Tracey Guerin. The Trustee began conferring with other parties in interest over the Memorial Day weekend, and we have continued to meet with the Partner Banks and Partner Fintechs to resolve whatever issues need to be resolved to restore end user access to funds to the greatest extent possible and as soon as possible.

### 1.    *Synapse Corporate Structure and Operations*

Through the meetings and communications described below, the Trustee was informed that early in its operations beginning in 2014, Synapse initially opened Demand Deposit Accounts ("DDA") on behalf of approximately 100 financial technology platform partners (collectively, the "Fintech Partners") at four banks. The four banks are: American Bank, AMG National Trust, Evolve, and Lineage Bank (collectively, the "Partner Banks"). At some point in 2020 and later, Synapse developed its cash management program in connection with its subsidiary, Synapse Brokerage LLC, and began opening Cash Management Accounts ("CMA Accounts") on behalf of Fintech Platforms at Partner Banks. According to its privacy policy, Synapse Brokerage provides cash management account and related services to account holders. Additionally, Synapse

1    has another subsidiary, Synapse Credit LLC. According to its privacy policy, Synapse Credit is a

2    licensed U.S. lender of record that offered loan origination, servicing, credit reporting, and

3    marketing and regulatory compliance monitoring services to Fintech Partners. At the time of this

4    Report, neither Synapse Brokerage nor Synapse Credit are debtors in this Case or any other

5    bankruptcy case

6          **2.**    ***Relationship with Partner Banks***

7          Synapse often used multiple Partner Banks to service different functions for the same Fintech

8    Partner. In certain instances, end user deposits through a Fintech Partner were deposited in an account

9    at one Partner Bank, while end user withdrawals through that same Fintech Partner were processed

10   from a different account at a different Partner Bank. This business model makes it both essential and

11   difficult to reconcile transactions and ensure end users receive access to the correct amount of funds

12   due to each end user.

13          *a.*    **American Bank**

14          American Bank held brokered sweep deposits from Synapse Brokerage, LLC and

15   provided debit card issuance services to five Synapse platform clients.  American Bank did not

16   participate in payment processing or lending services.  Prior to the Synapse bankruptcy, at American

17   Bank's request, Synapse and American Bank began executing a winddown plan to terminate the

18   relationship, and as of May 17 had less than $50,000 in sweep deposits

19          *b.*    **AMG National Trust**

20          AMG began accepting brokered sweep deposits from Synapse Brokerage, LLC in August

21   2023.  To facilitate those deposits and other transactional activity, Synapse Brokerage, LLC

22   established deposit accounts at AMG for Synapse Brokerage, LLC and other deposit accounts "for

23   the benefit of" its clients and their customers. Beginning in February 2024, AMG also processed

24   ACH and wire transactions for four of Synapse Brokerage's platform companies but provided no

25   lending, credit card or debit card services. AMG has held no accounts for Synapse and has no

26   official relationship with any platform or platform customer. Synapse Brokerage, LLC was the

27   custodian of record for its platform clients and processed and recorded all customer transactions.

28          *c.*    **Evolve Bank and Trust**

4

Evolve provides to Synapse Financial Technologies Inc., banking services including demand deposit accounts. Further, Evolve provides payment processing services for Synapse Brokerage, LLC.

   *d.*   **Lineage Bank**

Lineage Bank informed the Trustee that it provided ACH and wire transfer processing as an originating depository financial institution for Synapse pursuant to a Master Services Agreement ("MSA"). Lineage asserts that Synapse had established a reserve account at Lineage to secure its obligations pursuant to the MSA.  Lineage stated that in the fall of 2023, it discovered that Synapse transferred approximately $60 million of end user funds to the reserve account, prompting Lineage to move those funds into an FBO account for the benefit of the end users.  As a result, in March 2024, Lineage terminated the MSA for cause.  With the exception of one DDA, Lineage provided only ACH and wire processing services to Synapse. Lineage claims that it has never maintained bank accounts for end users or that it ever entered into customer agreements directly with end users,  that it has only one account with a Fintech Platform, that it was not a Program Bank or a custodian for Synapse Brokerage, LLC, and that it was not involved with Synapse Brokerage, LLC in any way.

   **3.**   ***FBO Funds***

The Partner Banks have informed the Trustee that the end user funds they hold are "FBO" funds held either for the benefit of Synapse or Synapse Brokerage, LLC, as follows:

- AMG National Trust holds FBO Accounts in the name of Synapse Brokerage, LLC and believes FinTech platform customers of the Brokerage are the legal beneficial owners of funds in these accounts.

- Evolve has FBO accounts in the name of Synapse, which is where the DDA funds are held, and FBO accounts in the name of Synapse Brokerage, LLC. Over several months, Synapse Brokerage, LLC moved approximately $650 million from Evolve to AMG and other banks as part of the migration of platforms and end users to Synapse Brokerage, LLC. Some of those funds were subsequently further moved among Partner Banks. Synapse Brokerage, LLC continued to regularly direct cash movement between banks as part of its sweep program. Moreover, Evolve has indicated that for

payment processing purposes, Synapse Brokerage, LLC has leveraged omnibus accounts, which were not in the name of individual platforms but, rather, in the name of Synapse.  In addition, based on the terms and conditions that were provided to customers whose accounts were migrated to Synapse Brokerage, LLC, the Synapse Brokerage, LLC leveraged "Program Banks"[1] to hold customer funds.

- ( Bank holds an FBO Account that is designated for the benefit of Synapse Financial Technologies, Inc. However, the Debtor assigned the funds under their brokerage program to Lineage. As a result, the majority of the funds at Lineage with the exception of those associated with one Fintech Partner) belong to programs where the end users are the customers of Synapse Brokerage, LLC.[2]

The Trustee was informed that, in ordinary circumstances, Partner Banks holding FBO Accounts on behalf of Synapse Brokerage would release those funds to Synapse Brokerage and then the Brokerage would distribute those funds to the respective Fintech Platforms that are customers of the Brokerage. The Trustee learned that, while Synapse Brokerage is not in bankruptcy, Synapse Brokerage and the Debtor shared employees, functions and systems. For example, the Trustee was informed that Synapse Brokerage and the Debtor maintained a single, intertwined ledger database on MongoDB and engineers formally employed by the Debtor were tasked with generating reports for Synapse Brokerage. The Trustee and proposed counsel met and conferred with the former President of Synapse Brokerage and learned that he and the only other employee of the Brokerage had been terminated effective May 24, 2024. At this time, there are no employees left at Synapse Brokerage. Therefore, the Trustee believes that releasing funds to Synapse Brokerage will not result in the timely restoration of funds to end users.

The Trustee was also informed that Evolve has not been able to reconcile its deposits against the Synapse ledgers due in part to their view that Synapse's proprietary ledger system is difficult to interpret without expertise from persons familiar with the systems. Evolve's position is that it can

---

[1] List of Program Banks (synapsefi.com) As of May 22, 2024, the list of Program Banks on Synapse's website includes American Bank, AMG, and Lineage.
[2] A "For Benefit Of" or "FBO" account is a type of custodial account. It is a pooled account that allows a company to manage funds on behalf of, or "for the benefit of," one or more of their users without assuming legal ownership of that account.

reconcile the DDA it has through Synapse Financial Technologies, but it cannot reconcile Synapse brokerage accounts as it only performed payment processing.

Due to the lack of funds, the Debtor terminated all Synapse employees and independent contractors effective May 24, 2024 so there are no employees left at Debtor's business to provide the necessary expertise to interpret the Synapse ledger. Over the Memorial Day weekend, the Trustee and proposed counsel had several meetings with a well-regarded third-party forensics firm to consider a potential engagement with regard to the reconciliation, but their fee estimate was prohibitive in light of the lack of estate resources. Due to the lack of any funds, the Trustee is neither able to engage former Synapse employees on an independent contractor basis nor a third-party forensics firm to provide this expertise. Even if a third-party could be engaged, the Trustee has learned it could take many weeks or more to have an independent third party to complete the reconciliation and the Debtor's estate currently does not have sufficient funds to pay for such an effort.

As a result of the foregoing, the Trustee agreed with the recommendation put forth by certain of the Partner Banks that the Partner Banks complete a reconciliation with each other in order to determine the amount of Synapse-related FBO funds held by each Partner Bank and the correct amount of funds due to each end user (the "Initial Bank Reconciliation"). Between May 25 and May 29, the Trustee and proposed counsel met and conferred with each of the Partner Banks several times. During these meetings, the Partner Banks expressed the need to collectively share information in order to be able to reconcile ledgers among themselves. On May 29, the Trustee met with the Partner Banks collectively to discuss the process for conducting the Initial Bank Reconciliation.

To facilitate the information sharing necessary to complete the Initial Bank Reconciliation, the Partner Banks and the Trustee entered into a "Stipulated Protective Order." The Court lodged an "Order Approving Stipulated Protective Order" on May 31, 2024 (the "Protective Order"). The Protective Order governs the disclosure and discussion of information and documents by and among the Banks and the Debtor, including confidential trial balances or other financial account reconciliation information exchanged by the Banks regarding the Debtor and/or its affiliates in connection with the this Case. The purpose of the Protective Order is to expedite the flow of information for purposes of the reconciliation of the Debtor's and its clients' financial accounts, protect confidential material

related thereto, ensure that the parties are permitted reasonable, necessary use of such material, and address the handling of such material at the end of the Case.

Since the entry of the Protective Order, the Banks have disclosed and discussed data and documents to facilitate the Initial Bank Reconciliation in order to unfreeze end user accounts, including creating and populating a shared data room. Since May 29, 2024 the Trustee has had frequent status meetings with the Partner Banks to ensure coordination and the progress of the Initial Bank Reconciliation. The Trustee has directed the Partner Bank's communication requests to Sankaet Pathak, the former chief executive officer of the Debtor, who is familiar with the Synapse systems, to provide information and answer questions regarding the Synapse ledger system to facilitate the Initial Bank Reconciliation. As of the date of this report, the Partner Banks have indicated that they require additional information to complete the Initial Bank Reconciliation, including:

- The role, transactions and funds attributed to Synapse Credit LLC, including whether unsecured loans were provided to end users and how those loans were funded;

- Whether Synapse Brokerage LLC maintained its own ledger system or were the systems intertwined such that platform level reports include transactions and balances for multiple Synapse entities;

- Whether current Synapse systems are capable of generating a full trial balance as of May 17[3] inclusive of balances at all Partner Banks;

- Whether current Synapse systems are capable of generating customer statements as of May 17 and, if so, would those statements reconcile with the Synapse ledger and trial balances as of May 17;

- The make-up of negative balances and overdrafts associated with certain Fintech Partners on the Synapse ledger;

- The criteria used to decide which of the Partner Banks were allocated negative-balance accounts on the Synapse trial balance and why some Partner Banks have no negative account balances while other Partner Banks have significant negative account balances;

---

[3] The Partner Banks generally agree that May 17, 2024 is the last date of which Synapse ledgering was completed and accessible.

- Whether negative account balances and their allocations match or approximate the actual FBO cash balance;

- Whether money owed for financial transaction settlements was deducted from end user accounts as is shown on certain trial balances and whether that money should have been deducted from excess bank balances instead;

- Whether Synapse turned off the automation that triggered settlement payments on or around May 8 or whether Synapse continued to send payment instructions for settlements which were denied by certain Partner Banks;

- Whether Synapse changed allocations for Fintech Partner funds between May 8 and May 17 as is indicated on the Synapse ledger and, if so, how the Partner Banks should fund settlements among one another; and

- Whether reserve funds associated with specific Fintech Partners can be distinguished from end user funds and from reserve funds associated with other Fintech Partners and whether details of the timeline, means and history of funding those reserves can be traced and reconciled with the Fintech Partner's records of funding reserves?

The Partner Banks have advised the Trustee of the following, as of June 6, 2024:

- Partner Banks hold approximately $180 million in total cash (both DDA and FBO accounts) associated with Fintech Partner end users and potential platform reserves.

- The remaining trial balance, after distributions made by certain Partner Banks prior to the appointment of the Trustee on May 24, 2024, is approximately $265 million.

- As a result, the trial balances from the Fintech Partners and Synapse that served as inputs for the Initial Bank Reconciliation reflects a shortfall of $85 million.

- The source of the shortfall, including whether end user funds and negative balance accounts were moved among Partner Banks in a way that increased or decreased the respective shortfalls that may have existed at each Partner Bank at an earlier time, is not known at this time.

- It would take some Partner Banks several weeks (if not longer) to completely reconcile which payments among the Partner Banks relate to which Fintech Partner accounts and

agree on the amounts due to Fintech Partners and their underlying end users by each Partner Bank.

- While it appears that Synapse assigned customer balances to the Partner Banks via a ledger, those customers may not have funds with those Partner Banks to the extent that they are Synapse Brokerage, LLC customers.

- Some Partner Banks believe that they would be able to reconcile certain amounts of FBO funds with the applicable Fintech Partners and that those funds (the "Reconciled FBO Funds") could be distributed to the relevant end users, recognizing that such a distribution could result in the overall shortfall.

- Access to Synapse's systems, especially the database hosted on MongoDB and AWS, is essential to completing the reconciliation process.

### 4. *Partner Banks' Proposed Next Steps*

#### a. **American Bank**

American Bank has informed the Trustee that, as of the date of this report, it holds $43,339.67 in customer funds and is owed approximately $2,337,000 by the other Partner Banks as a result of unsettled debit transactions from May 8 to May 23, 2024. American Bank has stated that, while it has all card data transactions by customer, it requires other Partner Banks' ledgers by account (i.e., node) so it can correctly determine the amounts each Partner Bank owes American Bank.

#### b. **AMG National Trust**

AMG has informed the Trustee that, since Synapse ceased operations, it has reached out to all of the platforms that are on its Synapse/Brokerage-assigned Trial Balance to confirm with the platform that the customer balances on the Trial Balance are correct for payment purposes. AMG believes that, (1) if a platform expects to continue its operations, AMG should be able to have the total of its customers' funds transferred to another custodian to continue those operations, and (2) for platforms winding down their operations, AMG should be able to work with the platforms to determine the best way to make distributions to the underlying end users.

AMG believes that reconciling Synapse ledgers against platform information is the best source of truth.  AMG has informed the Trustee of its observations throughout the reconciliation process: (1) a platform's customer accounting system that tracks all details of its customer transactions and balances, (2) multiple examples of account balance records platform customers have provided that match the amounts in the Trial Balance and (3) other evidence that the platforms are actively confirming that the underlying customers' information is correct.  AMG has stated it has been in continuous correspondence with the platforms, nearly all of which have confirmed all balances with AMG as of the date of this Report.

AMG has informed the Trustee that it could make initial distributions for all of the funds it holds for users on the AMG trial balance within two weeks, with most of the dollar amount flowing out within a week. AMG has conveyed to the Trustee a request that it be authorized make distributions for the full amounts.

*c.*    **Evolve Bank and Trust**

Evolve has informed the Trustee that it sees two potential paths forward, for both of which Evolve would seek the Trustee's or the Court's authorization to:

- Instruct all Partner Banks to consolidate all the Synapse Brokerage, LLC FBO cash into one account and have the Trustee or the Court determine the amount to be paid to each platform or end user.

- Allow the Trustee or the Court to determine the amount to be paid to each platform or end user and, based on the cash balances held by each Partner Bank, instruct them as to the amount to be paid out even if there is a shortfall.

Evolve has informed the Trustee of its position that it would be improper for any bank performing payment processing and holding funds in an omnibus account for Synapse Brokerage, LLC to otherwise distribute those funds to platforms or end users at this time as the end users are Synapse Brokerage, LLC customers, and Evolve does not have the authority to determine how to distribute such customer funds.

*d.*    **Lineage Bank**

Lineage has informed the Trustee that it believes that all remaining funds outside of DDA-related programs are verifiably for the benefit of Synapse Brokerage, LLC, and the two banks that Lineage believes have had direct relationships with Synapse Brokerage, LLC, AMG National Bank and American Deposit Management Co., and that such funds should be transferred directly to those banks.

**D.    Meetings with Constituents**

The Appointment Order stipulates that, "[a]s soon as possible, fthe chapter 11 trustee is directed to meet and confer with counsel for the various constituents in business with the Debtor, including the financial technology platforms, the partner financial institutions and the Debtor's secured lenders." Immediately upon notice from the U.S. Trustee of the impending Appointment Order on May 24, the Trustee and proposed counsel began scheduling meetings with constituents over the Memorial Day weekend and during the next week. The Trustee appreciates all the constituents who share in the urgency to restore access to end user accounts and funds and accommodated requests to meet on weekends, holidays and at all hours. Since appointment, the Trustee has met, either by video conference, or by telephone, with numerous constituents in the Case. The substance of those meetings, generally stated, are described below:

**1.    *Debtor's Former Officers, Key Employees and Contractors***

The Trustee and proposed counsel have had several meetings and continue to maintain open lines of communication with Sankaet Pathak, founder and former Chief Executive Officer of the Debtor, Tracey Guerin, former General Counsel of the Debtor, and Pam Wismer, an independent contractor from Ascent CFO Solutions who provided fractional Chief Financial Officer services to the Debtor. The purpose of these meetings and communications has been to discuss the history of the Case, the events that led to the reconciliation issues and freezing of end user accounts, and to obtain key contacts, systems access and information to facilitate the ledger reconciliation process that is underway.

**2.    *Bank Partners***

The Trustee and proposed counsel have had several meetings with the Partner Banks of Synapse and their respective counsels: American Bank, N.A., AMG National Trust, Evolve Bank

and Trust, and Lineage Bank. The Trustee had initial meetings with each of the Banks and their counsel to discuss the history of their relationship with Synapse, the events that led to the reconciliation issues and freezing of end user accounts, and the current status of their internal reconciliation process. The Trustee is continuing to meet and communicate with the Partner Banks individually and collectively to track the status of the Initial Bank Reconciliation and to resolve open issues and questions related to the Initial Bank Reconciliation and other avenues to unfreeze end user accounts.  The Trustee has generally been successful in getting participation in these meetings and efforts from senior (CEO level) executives at the Partner Banks.

### 3. *Financial Technology Platform Partners*

The Trustee and proposed counsel have had meetings with many of the FinTech Partners of Synapse and their respective counsels, including: Changed Inc., Copper, Gig Wage, Grabr, Gravy, IDT, Juno, Mercury, Sunny Day Fund, TClub (d/b/a Abound), Yieldstreet, and Yotta. The purpose of these meetings discuss the history of their relationship with Synapse, the events that led to the reconciliation issues and freezing of end user accounts, the volume of affected customers and funds and the current status of their internal reconciliation process.

### 4. *End Users*

The Trustee had several meetings with impacted end users....

### 5. *Debtor's Counsel*

The Trustee and proposed counsel have met with and maintain open lines of communication with counsel for the Debtor, Levene, Neale, Bender, Yoo, & Golubchik LLP. The purpose of these meetings and communications has been to discuss the history of the Case, open issues regarding the administration of this Case and the events that led to the reconciliation issues and freezing of end user accounts.

### 6. *Counsel to Secured Creditors*

The Trustee and proposed counsel have met with McDermott, Will & Emery LLP, counsel to TriplePoint Capital and Morrison Foerster, counsel to First Citizens Bank (acquirer of Silicon Valley Bank). The purpose of these meetings has been to discuss the history of the Case and potential conditions under which cash collateral may be used in the event the estate is able to obtain funding

arrangements in light of the priority to complete the Initial Bank Reconciliation and unfreeze end user accounts.   To date, no viable funding arrangements have materialized.

### 7.    *Kroll, Inc.*

The Trustee and proposed counsel have met with and maintain open lines of communication with Kroll, Inc., who was engaged by the Synapse Audit Committee to conduct an audit and reconciliation of the Synapse ledgers in 2023. The purpose of these meetings and communications has been to discuss the findings of the audit and reconciliation conducted by the Kroll team as regards Synapse systems, transaction history and governance.

### 8.    *Regulatory and Government Bodies*

The Trustee and proposed counsel have had several meetings and communications with impacted end users. The purpose of these meetings has been to discuss the impacts to end users and assure end users of the Trustee's priority to restore access to funds as soon as possible.

### 9.    *Regulatory Counsel*

The The Trustee and proposed counsel have met with staff from the Federal Reserve and the Federal Deposit Insurance Corporation (the "FDIC"). The purpose of these meetings was to discuss the history of this Case and their view of the events that led to the reconciliation issues and freezing of end user accounts.

### 10.    *Brokerage Subsidiary Constituents*

The Trustee and proposed counsel have met with Jeff Stanley, the former President and CEO of Synapse Brokerage LLC and Patten Training & Review, who provides financial services to and serves as an outsourced principal of Synapse Brokerage LLC. The purpose of these meetings has been to discuss the history of the Synapse Brokerage LLC and its relationship to the Debtor, ongoing FINRA and SEC exams and the events that led to the reconciliation issues and freezing of end user accounts.

### 11.    *Official Committee of Unsecured Creditors*

The Trustee and proposed counsel have had meetings with Saul Ewing LLP and Boies Schiller Flexner LLP, proposed co-counsel to the Official Committee of Unsecured Creditors (the "UCC") and Kroll, Inc., financial advisor to the UCC. The purpose of this meetings was to discuss

the history of the Case, to gain an understanding of the Committee's position on the outstanding issues in this Case, and to discuss potential coordination and appropriate cooperation in the pursuit of estate causes of action once the Trustee's primary objective of starting the return of end user funds has been accomplished.

### 12.    *Vendors and Suppliers*

The Trustee has received numerous in-bound communications from creditors with unpaid invoices and the like.  The Trustee has focused and have instructed proposed counsel to focus on restoration of end user access as a priority over these inquiries.  For certain "critical vendors" such as AWS and MongoDB, which host or provide database services, the Trustee has through proposed counsel reached out to implore them to continue to provide services for the time being because if access were lost, end users whose funds are inaccessible could suffer irreparable harm.

### 13.    *Potential Asset Purchasers*

The Trustee has received several in-bound inquiries from potential purchasers of assets of the Debtor.  As is typical in a chapter 11 context, it is not clear how serious or actionable any of these inquiries may be, and the Trustee's primary focus now is on restoring end user access.  Accordingly, the Trustee has had proposed counsel acknowledge receipt of the in-bounds and note that we are focusing on restoring end user access but will respond in due course as appropriate. The Trustee am investigating mechanisms by which funding from a purchaser and / or proceeds from a sale may provide cash collateral that can be used to fund critical Debtor operations to facilitate the Initial Bank Reconciliation and unfreezing of customer accounts

### E.    Obtaining Access to Debtor's Systems, Accounts and Records

### 1.    *Synapse Systems Access*

The Trustee and proposed counsel have obtained access to Debtor's database platform, MongoDB, communications platform, Slack, HR system, Rippling, and the data room populated to facilitate TabaPay, Inc.'s due diligence in connection with its canceled asset purchase. The Trustee and proposed counsel are working to obtain access to Debtor's cloud computing platform, Amazon Web Services and email accounts.

### 2.    *Records Collection and Preservation*

The Trustee and proposed counsel have had several communications with Amazon Web Services ("AWS") and MongoDB, two key service providers that host records and databases of the Debtor. Based on discussions with former Synapse officers and employees, the Trustee determined that the continuation of these services is essential to facilitate the Initial Bank Reconciliation and unfreezing of end user accounts. The Trustee and proposed counsel contacted AWS and MongoDB to make them aware of the irreparable harm that would result to the Debtor and end users if access to these hosting services was interrupted or records were deleted. The Trustee appreciates AWS and MongoDB's recognition of the urgency to unfreeze end user accounts and assurances of continued service during the reconciliation process, even in light of the Debtor's inability to keep current on its payments.

### 3. *Bank Accounts*

The Trustee and proposed counsel have identified the banks and key accounts in which the Debtor held operational funds. I have been in contact with bank personnel to obtain access to the Debtor's primary operational accounts held at First Citizens Bank (acquiror of Silicon Valley Bank) to verify balances and transfer funds to trustee accounts as appropriate. I am in the process of gaining access to secondary operational and other bank accounts.

### F.    Retention of Professionals

#### 1. *General Bankruptcy Counsel*

The Trustee plans to file the "Chapter 11 Trustee's Application for Order Authorizing Employment of Cravath, Swaine & Moore LLP as General Bankruptcy Counsel" which will seek an order of this Court authorizing the employment of Cravath, Swaine & Moore LLP, a firm at which the Trustee is a partner, to act as the Trustee's general bankruptcy counsel, effective as of May 24, 2024, the date of appointment.

#### 2. *Local Counsel*

The Trustee plans to file the "Chapter 11 Trustee's Application for Order Authorizing Employment of Keller Benvenutti Kim LLP as Local Counsel" which will seek an order of this Court authorizing the employment of Keller Benvenutti Kim LLP, a California firm, to act as the Trustee's local counsel, effective as of May 24, 2024, the date of appointment.

### 3.    *Financial Advisors*

The Trustee and proposed counsel have had meetings and communications with potential financial advisors to discuss the engagement of forensic accounting services to assist with the ledger reconciliation process in order to unfreeze customer accounts. Due to current estate funding constraints, I do not plan to engage outside financial advisors at this time. I am maintaining open lines of communication with several potential financial advisors to determine whether to engage their services pending the timely and accurate outcome of the Initial Bank Reconciliation and funding.

## II.

## SIGNIFICANT ISSUES

### A.    Cash Collateral and Wind-Down Budget

The Debtor currently appears to have zero available liquidity and has no arrangement with secured lenders to access cash collateral in the event that the estate obtains funding. The Trustee and proposed counsel are working to identify sources of funding for the estate and developing a winddown plan that minimizes expenses. In the meantime, the Trustee is focused on the priority to restore end user access and funds and am determined to resolve this issue even while the estate lacks funding to hire independent contractors, engage third-party investigative and account experts or pay administrative creditors (including the Trustee and proposed counsel). I appreciate the creative solutions and commitment of resources offered by Partner Banks and Partner Fintechs to facilitate the Initial Bank Reconciliation and unfreezing of end user accounts while estate funding remains unclear.

### B.    Conversion

The Trustee believes this Case should remain in chapter 11 for the time being, and, as a result, does not intend to seek conversion to chapter 7 at the time of this Report.

## III.

## CONCLUSION AND RECOMMENDATION

Partner Banks have been able to reconcile and return funds to some DDA end users. The Trustee has instructed Partner Banks to continue such reconciliation and the return of funds to the remaining DDA end users.

With regard to the FBO accounts, under more optimal circumstances, Partner Banks would fully reconcile balances with each other, with the Synapse ledger and with the individual Fintech Partner's ledgers, and subsequently have that reconciliation audited and confirmed by an independent third party. Given that Synapse has no apparent funds for a third party reconciliation and that a full reconciliation among the Partner Banks is likely to take weeks to complete, the Trustee believes that this approach is not feasible and would delay the repayment of funds.

Nonetheless, the Trustee believes that providing Fintech Partners and end users access to their funds before such reconciliation efforts are concluded would likely result in certain end users being given access to funds in an amount (1) different from the amount they would be due under a fully reconciled ledger and (2) less than is shown to be owed to them under the Synapse ledgers. In the interest of restoring end user funds promptly, it is the Trustee's recommendation, as described in more detail below, that the Reconciled FBO Funds be distributed to end users as promptly as practicable following the status conference relating to this initial Chapter 11 Trustee's Status Report.

As such, there are three potential pathways for resolution of outstanding FBO funds for consideration by the Court and parties in interest.

1) Full Payment to Reconciled FBO Accounts and No Payment to Unreconciled FBO Accounts: End user funds held in Reconciled FBO Accounts should be released as soon as practicable after the status conference. For end user funds held in accounts for which Partner Banks and Fintech Platforms who have not been able to reconcile their respective accounts against the Synapse ledgers or individual Fintech Platform ledgers, or where there is a current shortfall between end user balances and actual FBO balances, those funds should not be repaid entirely or partially while reconciliation efforts continue.

18

2)  <u>Full Payment to Reconciled FBO and Partial Payment to Unreconciled FBO Accounts</u>: End user funds held in Reconciled FBO Accounts should be released as soon as practicable after the status conference. For end user funds held in accounts for which Partner Banks and Fintech Platforms who have not been able to reconcile their respective accounts against the Synapse ledgers or individual Fintech Platform ledgers, or where there is a current shortfall between end user balances and actual FBO balances, those funds should not be repaid entirely or partially while reconciliation efforts continue. Any shortfall should be allocated pro rata among the total end users or Fintech Platforms. Partner Banks should release pro rata amounts of end user funds immediately and the remaining balances will not be paid out while reconciliation efforts continue.

3)  <u>Partial Payment to All FBO Accounts</u>: Reconciled FBO Accounts would not receive full payments. Rather, any shortfall should be allocated pro rata among the total end users or Fintech Platforms. Partner Banks should release pro rata amounts of end user funds immediately and the remaining balances will not be paid out while reconciliation efforts continue.

4)  <u>No Payment to Any FBO Accounts</u>: No Fintech Platform end user funds would be repaid at this time while reconciliation efforts continue.

The Trustee will present the foregoing at the Status Conference scheduled for June 7, 2024 at 1:30 pm Pacific Time. Depending on the outcome of the Status Conference and other certain meetings and communications, the Trustee may respectfully request that Court grant certain relief as the Court deems appropriate after the Status Conference.

DATED: June 6, 2024

**JELENA MCWILLIAMS**
**CHAPTER 11 TRUSTEE**


By: /s/ Jelena McWilliams
Jelena McWilliams
Chapter 11 Trustee


###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Cravath, Swaine & Moore LLP, 2 Manhattan West, 375 Ninth Avenue, New York, NY 10001

A true and correct copy of the foregoing document entitled (*specify*): _____
CHAPTER 11 TRUSTEE'S INITIAL STATUS REPORT _____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 6/6/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Raymond O Aghaian    raghaian@kilpatricktownsend.com, ndelman@kilpatricktownsend.com
Ron Bender    rb@lnbyg.com
J Scott Bovitz    bovitz@bovitz-spitzer.com
Rudy J Cerone    rcerone@mcglinchey.com, lgraff@mcglinchey.com;jingargiola@mcglinchey.com
Sara Chenetz    schenetz@perkinscoie.com,
docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com
Russell Clementson    russell.clementson@usdoj.gov
Andrew Michael Cummings    andrew.cummings@hklaw.com,
philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
Michael G. Farag    mfarag@gibsondunn.com
Paul R. Glassman    pglassman@stradlinglaw.com
Nicholas Christian Glenos    cglenos@bradley.com
Michael H Goldstein    mgoldstein@goodwinprocter.com, ASchaefer@goodwinlaw.com
Michael I. Gottfried    mgottfried@elkinskalt.com,
cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
Steven T Gubner    sgubner@bg.law, ecf@bg.law
Ralph P Guenther    rguenther@guentherlawgroup.com
Robert T. Honeywell    robert.honeywell@klgates.com
Lance N Jurich    ljurich@loeb.com,
pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
Monica Y Kim    myk@lnbyg.com, myk@ecf.inforuptcy.com
Jeffrey C Krause    jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
William J Levant    wlevant@kaplaw.com, wlevant@gmail.com
Adam A Lewis    alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
Jelena McWilliams (TR)    jmcwilliams@cravath.com, mao@cravath.com
Krikor J Meshefejian    kjm@lnbyg.com
Fred Neufeld    fneufeld@stradlinglaw.com, tingman@sycr.com
David M Poitras    dpoitras@bg.law
Paul M Rosenblatt    prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
Brandy A Sargent    brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
Zev Shechtman    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com
Jason D Strabo    jstrabo@mwe.com, jbishopjones@mwe.com
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
Jeffrey C Wisler    jwisler@connollygallagher.com, dperkins@connollygallagher.com
Claire K Wu    claire.wu@pillsburylaw.com, irene.hooper@pillsburylaw.com;docket@pillsburylaw.com
Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                              **F 9013-3.1.PROOF.SERVICE**

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 6/6/2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Darren Azman
One Vanderbilt Avenue
New York, NY 10017-3852

Jake Jumbeck
MCDERMOTT WILL & EMERY LLP
444 W. Lake Street, Suite 4000
Chicago, CA 60606-0029

Robert J Labate
400 South Hope Street, 8th Floor
Los Angeles, CA 90071

Neda Shapourian
Unit21, Inc.
49 Geary St. Ste 200
San Francisco, CA 94108

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 6/6/2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/6/2024 | Jelena McWilliams | /s/ *Jelena McWilliams* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                              **F 9013-3.1.PROOF.SERVICE**