JELENA MCWILLIAMS
1601 K STREET NW
WASHINGTON, D.C. 20006-1682
jmcwilliams@cravath.com
Tel. 1-202-869-7710

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>　　　　Debtor. | Case No. 1:24-bk-10646-MB<br><br>Chapter 11<br><br>**CHAPTER 11 TRUSTEE'S SECOND STATUS REPORT**<br><br>DATE:　June 14, 2024<br>TIME:　　1:30 p.m. PT<br>PLACE:　303<br>21041 Burbank Boulevard<br>Woodland Hills, CA 91367 and<br>Via ZoomGov |

TO THE HONORABLE MARTIN BARASH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:

I, Jelena McWilliams (the "Trustee"), the duly appointed, qualified and acting chapter 11 trustee for the estate of Debtor Synapse Financial Technologies, Inc. ("Synapse" or the "Debtor"), hereby submit my second "Chapter 11 Trustee's Status Report" (the "Report"), and represent as follows:

## I.

## **TIMELINE OF EVENTS**

### A.    **Filing of the Chapter 11 Case and Appointment of Chapter 11 Trustee**

On April 22, 2024, the Debtor filed a voluntary chapter 11 petition, schedules and statement of financial affairs. That same day, the Debtor filed an emergency motion for an order approving the sale of all its assets for $9.7 million to TabaPay Holdings LLC and requested that a hearing take place on April 29, 2024. [Dkt. No. 8]. The Debtor represented that it is a technology company and "has proprietary technology and software which essentially allows financial technology platforms called 'fintechs' to provide certain financial products and services to the fintechs' customers (referred to as end users or depositors) through certain banking providers and financial technology providers." Id. The Debtor also filed a motion to approve a settlement reached with Evolve Bank & Trust ("Evolve"), one of its partner financial institutions.

On May 1, 2024, the Court entered an order approving bidding procedures and set a hearing to approve the sale for May 9, 2024. [Dkt. No. 92]. The Debtor reported at the May 9 hearing that the settlement with Evolve had not been consummated due to disputes over Evolve funding a settlement payment. The buyer reported that it was unwilling to proceed with the sale without the Evolve settlement.

On May 13, 2024, Evolve filed a motion for an order restoring access to the "Debtor's Dashboard System" or, alternatively, "Authorizing Evolve to Close all of the Debtor's Demand Deposit Accounts at Evolve Associated with Debtor's Programs". [Dkt. No. 137]. Evolve alleged that

it had been denied access to the Debtor's computer systems and had been forced to freeze end user accounts. Id.

On May 13, 2024, the Court conducted a status conference on the sale and a hearing on Evolve's motion. Although extensive arguments were made by counsel and their clients assessing relative blame, it was undisputed that end users had lost access to funds.

On May 14, 2024, the Court conducted another status conference regarding access of end users to their funds and for continued use of cash collateral. The Debtor and secured creditors stated that they had agreed to the use of cash collateral through Friday, May 17.

On May 15, 2024, the United States Trustee for the Central District of California (the "U.S. Trustee") filed a motion on an emergency basis requesting that the Court enter an order converting the Chapter 11 Case to chapter 7 for cause, or, in the alternative, for the appointment of a chapter 11 trustee. [Dkt. No. 146].

On May 24, 2024, following a hearing, the Court entered an order appointing a chapter 11 trustee (the "Appointment Order"), and Jelena McWilliams was appointed by the U.S. Trustee as the Chapter 11 Trustee in this Chapter 11 Case (the "Case"). [Dkt. No. 196].

As a result of the foregoing, Jelena McWilliams became the duly appointed, qualified and acting Chapter 11 Trustee, and continues to act in this capacity. On June 6, 2024, the Trustee filed the "Chapter 11 Trustee's Initial Status Report" (the "Initial Report"), and, on June 7, 2024, the Trustee presented the Initial Report at a Status Conference before the Court.

**B.** **Debtor's History and Partners**

As discussed in the Initial Report, the Trustee was informed that, beginning in 2014, Synapse opened Demand Deposit Accounts ("DDA Accounts") on behalf of approximately 100 financial technology platform partners (collectively, the "Fintech Partners") and their end users at certain banks. Beginning in 2020, Synapse developed its cash management program in connection with its subsidiary, Synapse Brokerage LLC ("Synapse Brokerage"), through which Synapse began opening Cash Management Accounts ("CMA Accounts") on behalf of Fintech Partners and their end users at

2

certain banks. Additionally, Synapse offered secured loan origination services to end users of its Fintech Partners through its subsidiary, Synapse Credit LLC ("Synapse Credit"). Most end user funds are held in omnibus "For Benefit Of" Accounts ("FBO Accounts")[1] and the remaining funds are held in DDA Accounts across four banks. The four banks are: American Bank, AMG National Trust, Evolve Bank and Trust, and Lineage Bank (collectively, the "Partner Banks").

### C.    Update on Ledger Reconciliation and Release of End User Funds

Upon appointment on May 24, the Trustee began learning from Partner Banks, Fintech Partners and other parties in interest of the challenges in the reconciliation process precipitated by Synapse's bankruptcy and abrupt winding down. The Trustee was informed of situations where partner banks lost access to Synapse systems, had reason to believe there were inaccuracies in Synapse's ledger and identified unexpected shortfalls in the FBO Accounts they hold. At the time of the Trustee's appointment, Partner Banks did not have open lines of communication or protective mechanisms in place to facilitate data sharing among each other.

In light of these issues, it was prudent for the Partner Banks to agree to temporarily pause distributions to end users to work to communicate, investigate and reconcile end user accounts and funds across the Banks. In the absence of business-as-usual operations at Synapse, the Trustee facilitated workarounds like interbank data sharing and reconciliation against Fintech Partner trial balances. To enable such workarounds, the Partner Banks and the Trustee entered into a "Stipulated Protective Order" to expedite the flow of information for purposes of the reconciliation of Synapse's and its clients' financial accounts and protect confidential material related thereto. The Court lodged an "Order Approving Stipulated Protective Order" on May 31, 2024 (the "Protective Order"). Over the past two weeks, the Partner Banks have committed extensive resources, populated a shared data room and convened for frequent status meetings to ensure coordination and make progress on the reconciliation of end user funds.

At the time of this Report, these efforts have enabled the partial reconciliation of Synapse-related end user accounts and funds, as detailed below.

---

[1] A "For Benefit Of" or "FBO" account is a type of custodial account. It is a pooled account that allows a company to manage funds on behalf of, or "for the benefit of," one or more of their users without assuming legal ownership of that account.

### 1. *DDA Account Reconciliation*

The Trustee has been informed that all Partner Banks believe that the DDA Accounts they hold have been fully reconciled across all banks. Prior to the submission of this Report, Evolve began distributions of DDA funds on instructions from its regulator. Since the Trustee's appointment, Evolve has distributed approximately $4.09 million of DDA funds, with approximately $2.279 million in funds remaining to be distributed. Lineage holds $388,769.25 of the remaining DDA funds to be distributed. Of the total DDA funds held by Lineage, $235,856.30 are held for one Fintech Partner that is Lineage's direct DDA customer, and $152,912.95 are held for another Fintech Partner as part of an Evolve DDA program. Neither American Bank nor AMG each hold any DDA Accounts or funds for Synapse end users. The Trustee is not aware of any reported shortfall between cash held in DDA Accounts at the Partner Banks and the amounts owed to DDA end users as shown on the Synapse trial balances.

The Trustee has been informed by the Partner Banks that, based on the completed reconciliation, they are comfortable paying out all DDA Account funds as soon as practicable.

### 2. *FBO Account Reconciliation*

As of the time of this Report, the Partner Banks have reported the following results of the reconciliation of FBO Accounts. American Bank holds $43,339.67 of FBO funds related to a single Fintech Partner and plans to transfer these funds to other Partner Banks that are holding funds for this Fintech Partner which will manage distributions to this Fintech Partner. As of June 11, 2024, AMG held $57,732,939.67 in FBO funds for: (1) Fintech Partners that have not already been paid, and (2) to re-issue payments that failed or were returned through May 24, 2024. Approximately $72,000 of these FBO funds may be for unidentified Synapse Brokerage FBO customer use. AMG also holds $150,845.19 in unallocated interest associated with Synapse Brokerage sweep network deposits, which was transferred into AMG FBO Accounts on June 7, 2024. Evolve holds $46,926,558.83 in FBO funds from net Receiving Depository Financial Institution activity from Synapse Brokerage. Lineage holds an aggregate $61,869,727.69 attributed to DDA and FBO Accounts in a single FBO Account. Based on Lineage's reconciliation of $388,769.25 of DDA funds, the remaining $61,480,958.44 in this account are FBO funds.

3.    ***FBO Account Shortfall***

As of the time of the Initial Report, reconciliation efforts indicated an estimated shortfall of $85 million between the cash held in FBO Accounts among all Partner Banks and the Synapse trial balance. At the time of this Report, the Trustee has been informed by at least one Partner Bank that there exists an approximate shortfall of $65 – $96 million according to reconciliation progress to date. The change in estimated shortfalls is due to additional interbank reconciliation efforts since the Initial Report was filed one week ago. The range in estimated shortfall is due to there being held at certain Partner Banks approximately $31 million in Synapse-related funds from interest and rebate payments; however, further reconciliation efforts must be completed to determine the extent to which these funds belong to end users.

Not every Partner Bank has reported an estimated shortfall in its deposits on-hand as compared to the Synapse trial balance and Fintech Partner's ledgers.

- American Bank has reported no shortfall in the FBO funds it holds. Rather, American Bank believes it is owed approximately $2,337,000 by the other Partner Banks as a result of unsettled debit transactions from May 8 to May 23, 2024. American Bank has stated that, as it maintains all card data transactions by customer, reconciling against other Partner Banks' ledgers by account (*i.e.*, node) will enable American Bank to determine the amounts each Partner Bank owes American Bank.

- AMG has reported no shortfall and believes that it has reconciled all FBO funds dollar for dollar against the Synapse trial balance and all the Fintech Partners for which it holds funds, with the exception of two Fintech Partners holding small balances that have not responded or recently responded to outreach.

- Evolve has reported that it has not yet completed sufficient reconciliation across all Banks to determine if there is a shortfall in the FBO funds it holds, the amount of the shortfall, the source of the shortfall or how many end users would be impacted by the shortfall.

- Lineage has reported that it does not have adequate data or information for non-direct Lineage end users to determine if there is a shortfall in the FBO funds it holds, the

1  amount of the shortfall, the source of the shortfall or how many end users would be

2  impacted by the shortfall.

3  Based on communications with the Partner Banks, the Trustee believes that the Partner Banks

4  may be able to complete most of the work regarding further reconciliation, settlement payments among

5  banks and identifying the sources of shortfalls in the next two weeks. Whatever shortfall the Partner

6  Banks are unable to reconcile in that timeframe is most likely unreconcilable without far more

7  extensive efforts, expense and technical expertise, which would require resources that the estate does

8  not have. Even if these efforts could be undertaken, full reconciliation to the last dollar with the

9  Synapse ledger and Fintech Partner's ledgers may not be possible. The Trustee believes that further

10  reconciliation efforts are likely to result in a shortfall that predates Synapse's bankruptcy petition, as

11  has been previously reported by Mr. Pathak[2] and been the subject of an ongoing legal dispute.[3]

12  **D.    The Trustee's Authority and Potential Distributions to End Users**

13  Pursuant to The United States Bankruptcy Code (the "Bankruptcy Code"), the Trustee has the

14  authority to direct the disposition of property of the Synapse bankruptcy estate. However, the Trustee

15  does not have the authority to direct the disposition of property that is not part of the Synapse

16  bankruptcy estate.

17  Relevant to this issue, on June 10, 2024, at the continued Meeting of Creditors, pursuant to

18  section 341(a) of the Bankruptcy Code (the "Creditors' Meeting"), Sankaet Pathak and Tracey Guerin

19  gave sworn testimony that all funds held in Synapse-related DDA and FBO Accounts at Partner Banks

20  belong to end users. Most end users are individual depositors and some end users are Fintech Platforms

21  that deposited operational or other company funds at Partner Banks via Synapse. Mr. Pathak and Ms.

22  Guerin testified that, prior to the bankruptcy, Synapse had deposited operational funds at Evolve in

23  accounts in the Synapse ecosystem. Thus, Evolve holds Synapse property in an FBO Account on

24  behalf of Synapse as an end user of Synapse's own ecosystem. Mr. Pathak testified that the amount of

25

26  [2]Sankaet Pathak, *Mercury Reconciliation Issues*, MEDIUM (May 9, 2024),
https://medium.com/@sankaet/mercury-reconciliation-issues-7f3c8dec9b93.

27  [3]Petition to Initiate Proceedings for Provisional Relief in Connection with an Arbitrable Controversy
Under Code of Civil Procedure Section 1281.8, *Mercury Technologies Inc. vs. Synapse Financial*

28  *Technologies, Inc.*, December 11, 2023 (Superior Court for the State of California for the County of
San Francisco).

Synapse property held in the Evolve FBO is verifiable according to the Synapse trial balances. It is the Trustee's understanding that, to the extent that Evolve distributes FBO funds to end users, Synapse property would be distributed to the Synapse estate.

At the Creditors' Meeting, Mr. Pathak and Ms. Guerin also testified that Synapse maintained an operational account at American Bank, but, to their knowledge, this account was maintained separately from the Synapse ecosystem. Mr. Pathak and Ms. Guerin testified that, to their knowledge, AMG and Lineage did not hold operational funds or any other property of Synapse Technologies.

Additionally, the Trustee and proposed counsel have conducted an analysis of the legal ownership of the funds held in DDA and FBO Accounts at Partner Banks, any interest the Synapse bankruptcy estate may have in these funds and by extension what legal authority the Trustee may or may not have with regard to these funds. Particularly, Synapse's 2021 contract with American Bank, 2022 contract with Evolve, and 2022 contract with Lineage include clauses specifying that Synapse does not have any right to or interest in the funds deposited in an end user's account.

As a result of this legal analysis, and the testimony of Mr. Pathak and Ms. Guerin, the Trustee believes that the cash held in DDA and FBO Accounts at Partner Banks belongs to end users and not to the Synapse bankruptcy estate, except to the extent that Synapse is an end user of an FBO Account held at Evolve, where the amount due to Synapse is identifiable and would be distributed to the Synapse estate in its capacity as an end user. The Trustee believes that the funds in the DDA and FBO Accounts are not property of the Synapse bankruptcy estate and that the Partner Banks' distribution of end user funds would not result in the unauthorized disposition of estate property. The Trustee does not have legal authority to direct the timing, amounts or method of Partner Banks' disposition of these funds.

Accordingly, on June 11, 2024, the Trustee communicated to the Partner Banks that they must proceed with regard to the end user funds held in DDA and FBO Accounts as they deem appropriate and on advice of their respective legal counsel. While the Trustee has no authority to direct the Partner Banks' actions with regard to end user funds, the Trustee is aware of certain decisions that Partner Banks may have to make to the extent they proceed with the release of end user funds. These decisions may include:

- Determining to make pro rata payments to Fintech Partners or end users if a Partner Bank or Banks has reported a shortfall in FBO funds held;

- Delaying the reconciliation and payout of amounts less than $1 per end user to prioritize repaying amounts over $1 (*e.g.*, AMG has reported 31,914 end user accounts with less than $1; Lineage has reported some 10,000 end user accounts with less than $1; Evolve has reported 3,620 end user accounts with less than $1);

- Distributing funds to the appropriate Fintech Partner instead of end users if unable to locate end users;

- Distributing funds to end users directly even if funds are held in FBO Accounts in the name of a Fintech Partner if that Fintech Partner has ceased operations or otherwise would be unable to facilitate in-turn distributions to end users; and

- Determining the method of distributing funds (*e.g.*, check, wire).

### E. **Further Reconciliation Efforts**

To facilitate further reconciliation efforts, the Trustee is working to collect and make available all Synapse ledger records, data, and systems on a confidential and read-only basis to all Partner Banks. The Trustee has been informed that the key Synapse systems that support and store ledger records are MongoDB and Amazon Web Services ("AWS"). The Trustee appreciates that AWS and MongoDB have continued services to date, despite the Debtor's inability to keep current on its payments and is working to transition data and winddown these services as soon as practicable.

As of the date of this Report, the Trustee and proposed counsel have obtained administrative access to MongoDB from Synapse's former officers. The Trustee was informed that master credentials to the Synapse AWS environment were known to only two former Synapse engineers, Samip Mehra and Chester Mui, who have not responded to the Trustee and proposed counsel's communications and requests to provide credentials. As a workaround, the Trustee is working with AWS to gain access to the Synapse environment.

The Trustee and proposed counsel plan to facilitate uploading read-only copies of the data contained in MongoDB and AWS to the interbank data room established pursuant to the Protective Order for use by the Partner Banks in further reconciliation efforts. The Trustee also encourages and

will facilitate to the extent possible, ongoing interbank communication and data sharing to enable further reconciliation.

**F.    Trustee's Authority with regard to Non-Debtor Subsidiaries**

Synapse Brokerage is a fully owned subsidiary of Synapse. Based on research, discussions with Synapse Brokerage constituents, and the sworn testimony of Mr. Pathak at the Creditors' Meeting, Synapse Brokerage was founded with the view to establishing programs for Cash Management Accounts and Money Market Accounts. Operationally, Synapse Brokerage has not yet established such programs but has only deployed a sweep network at American Deposit Management Company ("ADMC") for the purpose of increasing the pool of FDIC insurance coverage available to depositors and earning interest on sweep network deposits, which was distributed among Synapse, Fintech Platforms and end users according to respective agreements among Synapse and its customers.

Synapse Credit is a fully owned subsidiary of Synapse. Based on research, discussions with Partner Banks and Fintech Platforms and the sworn testimony of Mr. Pathak at the Creditors' Meeting, Synapse Credit is a state-by-state lending entity that provided one-time or revolving secured loans to individuals and businesses. The loans were secured by one-to-one collateral that was either held in Fintech Platform reserves in the Synapse ecosystem or deposited by end users, depending on the type of loan program under which the loan was issued.

At the time of this Report, neither Synapse Brokerage or Synapse Credit is debtor in this Case or any other bankruptcy case. As both entities are wholly owned subsidiaries of Synapse, the Trustee has indirect authority over both entities vis-à-vis the Debtor's sole equity ownership of the subsidiaries. However, the Trustee does not have legal authority to directly manage the businesses of or otherwise control Synapse Brokerage and Synapse Credit.

It is possible that certain property of the Synapse estate resides at Synapse Brokerage or Synapse Credit, such as due portions of revenue sharing agreements or interest owed by a subsidiary to the parent. The Trustee and proposed counsel are working to identify such property of the estate, recovery options and mechanisms by which recovered property can be used to fund reconciliation efforts and other administrative expenses.

**G.    Meetings with Parties in Interest**

Since June 7, 2024, the Trustee and proposed counsel have had follow-up meetings and communications with known parties in interest as well as initial meetings and communications with additional constituents.

### 1.    *Bank Partners*

The Trustee and proposed counsel continue to have frequent meetings and daily communications with the Partner Banks and their respective counsel, individually and collectively. The purpose of these meetings has been to ensure the progress of and resolve open issues and questions related to ongoing reconciliation efforts. On June 11, 2024, the Trustee communicated to the Partner Banks that the Trustee does not have authority to direct the Partner Banks' distribution of end user funds and that the Partner Banks should proceed with regard to the end user funds held in DDA and FBO Accounts as they deem appropriate and on advice of their respective legal counsel.

### 2.    *Meeting of Creditors*

On June 10, 2024, the continued Meeting of Creditors pursuant to section 341(a) of the Bankruptcy Code was held. Former Synapse officers Mr. Pathak and Ms. Guerin, and former Debtor's counsel Krikor L Meshefejin of the law firm Levene, Neale, Bender, Yoo & Golubchik LLP, attended this meeting as a courtesy even though they no longer manage or represent the Synapse estate since the appointment of the Trustee. At this meeting, the Trustee asked Mr. Pathak and Ms. Guerin questions about Synapse's business and Mr. Pathak and Ms. Guerin gave sworn testimony in response to these questions.

### 3.    *Debtor's Former Officers, Key Employees and Contractors*

The Trustee and proposed counsel continue to meet and communicate with Mr. Pathak, Ms. Guerin, Pam Wismer, an independent contractor from Ascent CFO Solutions who provided part-time CFO services to the Debtor and Jack Doan, the former chief human resources officer of the Debtor. The purpose of these meetings and communications has been to discuss open questions and issues related to the ongoing reconciliation efforts and to obtain key contacts, systems access and data critical to the reconciliation process.

### 4.    *Financial Technology Platform Partners*

The Trustee and proposed counsel have continued to have meetings and communications with many of the Fintech Partners of Synapse and their respective counsel, including: Changed Inc., Copper, Gig Wage, Grabr, Gravy, IDT, Juno, Latitud, Mercury, Sunny Day Fund, TClub (d/b/a Abound), Yieldstreet and Yotta. The purpose of these meetings and communications has been to intake information from newly identified Fintech Partners, facilitate reconciliation efforts against Fintech Partner ledgers and provide key updates on reconciliation efforts.

### 5. *Financial Advisors*

The Trustee and proposed counsel have received several in-bound communications from individual and institution experts in finance, accounting and forensics who have offered discounted or free third-party reconciliation and audit services. The Trustee through proposed counsel is following up with these experts to discuss the scope of reconciliation work with a view to engage or refer for engagement by Partner Banks or Fintech Partners financial advisor(s) that may be able to assist with further reconciliation efforts.

### 6. *End Users*

The Trustee and proposed counsel have had additional meetings and communications with affected end users. The purpose of these meetings and communications has been to further understand the impact to end users and inform end users that the Trustee's top priority continues to be restoring access to end user funds as soon as possible.

### 7. *Kroll, Inc.*

The Trustee and proposed counsel have continued to meet with and maintain open lines of communication with Kroll, Inc., which was engaged by the Synapse Audit Committee to conduct an audit and reconciliation of the Synapse ledgers in 2023. The purpose of these meetings and communications has been to further discuss the findings of the audit and reconciliation conducted by the Kroll team as regards Synapse systems, transaction history and governance.

### 8. *Regulatory and Government Bodies*

The Trustee and proposed counsel have had meetings with staff from the Financial Industry Regulatory Authority ("FINRA"). The purpose of these meetings was to discuss FINRA staff's engagement with Synapse Brokerage and relevant personnel, FINRA staff's understanding of and

access to the firm's books and records, and more generally to share and compare information concerning the status of end user funds.

### 9.   *Regulatory Counsel*

The Trustee and proposed counsel have met with Lowenstein Sandler LLP, regulatory counsel to the Debtor and Synapse Brokerage. The purpose of these meetings has been to discuss the relationship between the trusteeship of Synapse and the regulatory history of Synapse Brokerage, including recent communications that Lowenstein Sandler LLP has had with FINRA and SEC staff concerning Synapse Brokerage.

### 10.   *Brokerage Subsidiary Constituents*

The Trustee and proposed counsel have continued to communicate with Jeff Stanley, the former president and chief executive officer of Synapse Brokerage. The purpose of these communications has been to discuss Synapse Brokerage's operational funds and accounts and their location and the types and location of accounts holding funds belonging to end users of Synapse brokerage.

### 11.   *Vendors and Suppliers*

The Trustee continues to receive numerous in-bound communications from creditors with unpaid invoices and the like. The Trustee continues to be focused and has instructed proposed counsel to focus on restoration of end user access as a priority over these inquiries. For certain "critical vendors" such as AWS and MongoDB, which host or provide database services, the Trustee has through proposed counsel has reached out to discuss continued service and options to obtain credentials and access to AWS.

### 12.   *Potential Asset Purchasers*

The Trustee continues to receive in-bound inquiries from potential purchasers of assets of the Debtor. As is typical in a chapter 11 context, it is not clear how serious or actionable any of these inquiries may be, and the Trustee's primary focus now is on restoring end user access. Accordingly, the Trustee has had proposed counsel acknowledge receipt and request additional preliminary offer information from potential purchasers. The Trustee is investigating mechanisms by which funding

from a purchaser and/or proceeds from a sale may provide cash that can be used to fund critical Debtor operations to facilitate further reconciliation efforts.

### H.    Obtaining Access to Debtor's Systems, Accounts and Records

#### 1.    *Synapse Systems Access*

The Trustee and proposed counsel have obtained access to Debtor's MongoDB database platform, Slack communications platform, Rippling HR system and the data room populated to facilitate TabaPay, Inc.'s due diligence in connection with its canceled asset purchase. The Trustee and proposed counsel are working to obtain access to Debtor's cloud computing platform, Amazon Web Services and email accounts.

#### 2.    *Records Collection and Preservation*

The Trustee and proposed counsel have had several communications with AWS and MongoDB, two key service providers that host records and databases of the Debtor. Based on discussions with former Synapse officers and employees, the Trustee determined that the continuation of these services is essential to facilitate ongoing reconciliation efforts. The Trustee and proposed counsel contacted AWS and MongoDB to make them aware of the irreparable harm that would result to the Debtor and end users if access to these hosting services was interrupted or records were deleted.

#### 3.    *Bank Accounts*

The Trustee and proposed counsel have identified the banks and key accounts in which the Debtor held operational funds. The Trustee has been in contact with bank personnel to obtain access to the Debtor's primary operational accounts held at First Citizens Bank (acquiror of Silicon Valley Bank) to verify balances and transfer funds to trustee accounts as appropriate. The Trustee is in the process of gaining access to secondary operational and other bank accounts.

### I.    Retention of Professionals

#### 1.    *General Bankruptcy Counsel*

The Trustee plans to file the "Chapter 11 Trustee's Application for Order Authorizing Employment of Cravath, Swaine & Moore LLP as General Bankruptcy Counsel" which will seek an order of this Court authorizing the employment of Cravath, Swaine & Moore LLP, the firm at which

the Trustee is a partner, to act as the Trustee's general bankruptcy counsel, effective as of May 24, 2024, the date of appointment.

**2.     *Local Counsel***

The Trustee plans to file the "Chapter 11 Trustee's Application for Order Authorizing Employment of Keller Benvenutti Kim LLP as Local Counsel" which will seek an order of this Court authorizing the employment of Keller Benvenutti Kim LLP, a California firm, to act as the Trustee's local counsel, effective as of May 24, 2024, the date of appointment.

**II.**

**SIGNIFICANT ISSUES**

**A.     Proceeds from Sales, Cash Collateral and Wind-Down Budget**

The Debtor continues to appear to have no available liquidity and has no arrangement with secured lenders to access cash collateral in the event that the estate obtains funding. The Trustee and proposed counsel are working to identify sources of funding for the estate and developing a winddown plan that minimizes expenses. As described above, the Trustee and proposed counsel have had preliminary communications with various parties regarding offers to purchase assets from the estate and related financing. However, the Trustee believes that, based on the estimated value of Debtor's assets in their current condition and the estimated effort and expense to conduct an auction of these assets, which would be incurred on an administrative expense priority basis, that it is inadvisable to pursue the sale of Debtor's assets while the Case remains in chapter 11. Instead, the Trustee anticipates conversion to chapter 7 in the near future, under which an orderly and cost-effective liquidation may take place.

**B.     Conversion**

The Trustee believes this Case should remain in chapter 11 for the time being, and, as of the time of this Report, anticipates seeking conversion to chapter 7 shortly after making certain Synapse records available to Partner Banks to enable their further reconciliation efforts.

**III.**

**CONCLUSION AND RECOMMENDATION**

In the hearing regarding the Trustee's appointment, Judge Barash stated that "the Trustee can immediately start speaking to parties in interest and developing a plan to fund the continued preservation of Synapse's systems and data, and to continue the process of sharing information and hopefully reaching some agreement with the participating banks that allows funds to be returned to end users, to the rightful owners of those funds, as soon as humanly possible." To this end, the Appointment Order instructed that, "[a]s soon as possible, the chapter 11 trustee is directed to meet and confer with counsel for the various constituents in business with the Debtor, including the financial technology platforms, the partner financial institutions and the Debtor's secured lenders." [Dkt. No. 196]. Over the past three weeks, the Trustee's top priority has remained restoring access to end user funds.

As directed by the Court, the Trustee immediately began and continues to meet and confer with parties in interest to determine paths to releasing customer funds. In the wake of the abrupt winddown of Synapse's operations, termination of all employees and lack of funds in the Synapse estate, the Trustee facilitated various workarounds to enable reconciliation. These workarounds have included interbank data sharing and communications, reconciliations among banks and with Fintech Partners, and communications with former Synapse officers and employees who continue to cooperate with requests for information.

After three weeks of effort, the Partner Banks have been able to fully reconcile DDA Accounts, return some DDA funds to end users and prepare to return the remaining DDA funds as soon as practicable. Additionally, Partner Banks have been able to partially reconcile end user FBO accounts and prepare to release reconciled end user funds as soon as practicable.

Based on the legal analysis of the nature of end user funds held in DDA and FBO Accounts at Partner Banks, it appears that those funds are not property of the Synapse bankruptcy estate and that the Trustee has no authority to direct the Partner Banks' disposition of end user funds. Thus, the Trustee has communicated to the Partner Banks that they must proceed on the advice of their respective counsel to make decisions regarding the distribution of end user funds.

While there is additional work to be done with regard to reconciliation, settlement payments among banks and identifying the sources of any shortfalls, the Trustee estimates that most achievable efforts may be completed in the next two weeks. During these two weeks, the Trustee and proposed counsel will complete their work to obtain key systems access and populate the existing data room with Synapse ledger records, to facilitate further reconciliation.

The Trustee will present the foregoing at the Status Conference scheduled for June 14, 2024, at 1:30 p.m. Pacific Time. Depending on the outcome of the Status Conference and other meetings and communications, the Trustee may respectfully request that Court grant certain relief as the Court deems appropriate after the Status Conference.

1

2       DATED: June 13, 2024                    **JELENA MCWILLIAMS**
                                                **CHAPTER 11 TRUSTEE**
3

4
                                         By:  _/S/ Jelena McWilliams_
5
                                             Jelena McWilliams
6                                            Chapter 11 Trustee

7

8                                       ###

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Cravath, Swaine & Moore LLP, 2 Manhattan West, 375 Ninth Avenue, New York, NY 10001

A true and correct copy of the foregoing document entitled (*specify*): _____
CHAPTER 11 TRUSTEE'S SECOND STATUS REPORT _____
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 6/13/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Raymond O Aghaian     raghaian@kilpatricktownsend.com, ndelman@kilpatricktownsend.com
Ron Bender     rb@lnbyg.com
J Scott Bovitz     bovitz@bovitz-spitzer.com
Rudy J Cerone     rcerone@mcglinchey.com, lgraff@mcglinchey.com;jingargiola@mcglinchey.com
Sara Chenetz     schenetz@perkinscoie.com,
docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com
Russell Clementson     russell.clementson@usdoj.gov
Andrew Michael Cummings     andrew.cummings@hklaw.com,
philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
Michael G. Farag     mfarag@gibsondunn.com
Paul R. Glassman     pglassman@stradlinglaw.com
Nicholas Christian Glenos     cglenos@bradley.com
Michael H Goldstein     mgoldstein@goodwinprocter.com, ASchaefer@goodwinlaw.com
Michael I. Gottfried     mgottfried@elkinskalt.com,
cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
Steven T Gubner     sgubner@bg.law, ecf@bg.law
Ralph P Guenther     rguenther@guentherlawgroup.com
Robert T. Honeywell     robert.honeywell@klgates.com
Lance N Jurich     ljurich@loeb.com,
pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
Monica Y Kim     myk@lnbyg.com, myk@ecf.inforuptcy.com
Jeffrey C Krause     jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
William J Levant     wlevant@kaplaw.com, wlevant@gmail.com
Adam A Lewis     alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
Jelena McWilliams (TR)     jmcwilliams@cravath.com, mao@cravath.com
Krikor J Meshefejian     kjm@lnbyg.com
Fred Neufeld     fneufeld@stradlinglaw.com, tingman@sycr.com
David M Poitras     dpoitras@bg.law
Paul M Rosenblatt     prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
Brandy A Sargent     brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
Zev Shechtman     Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com
Jason D Strabo     jstrabo@mwe.com, jbishopjones@mwe.com
United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
Jeffrey C Wisler     jwisler@connollygallagher.com, dperkins@connollygallagher.com
Claire K Wu     claire.wu@pillsburylaw.com, irene.hooper@pillsburylaw.com;docket@pillsburylaw.com
Beth Ann R. Young     bry@lnbyg.com, bry@lnbyb.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 6/13/2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 6/13/2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 6/13/2024 | Robert N. Greenfield | /s/ *Robert N. Greenfield* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**