JELENA MCWILLIAMS
1601 K STREET NW
WASHINGTON, D.C. 2006-1682
jmcwilliams@cravath.com
Tel. 1-202-869-7710

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re | Case No. 1:24-bk-10646-MB |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 |
| | **CHAPTER 11 TRUSTEE'S SIXTH STATUS REPORT** |
| Debtor. | DATE: August 1, 2024 |
| | TIME:  10:00 a.m. PT |
| | PLACE: 303 |
| | 21041 Burbank Boulevard |
| | Woodland Hills, CA 91367 and |
| | Via ZoomGov |

TO THE HONORABLE MARTIN BARASH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:

I, Jelena McWilliams (the "Trustee"), the duly appointed, qualified and acting chapter 11 trustee for the estate of Debtor Synapse Financial Technologies, Inc. ("Synapse" or the "Debtor"), hereby submit my fourth "Chapter 11 Trustee's Status Report" (the "Report"), and represent as follows:

## I.

## **TIMELINE OF EVENTS**

### A.    **Filing of the Chapter 11 Case and Appointment of Chapter 11 Trustee**

On April 22, 2024, the Debtor filed a voluntary chapter 11 petition, schedules and statement of financial affairs.

On May 24, 2024, following a hearing, the Court entered an order appointing a chapter 11 trustee (the "Appointment Order"), and Jelena McWilliams was appointed by the U.S. Trustee as the Chapter 11 Trustee in this Chapter 11 Case (the "Case"). [Dkt. No. 196].

On June 6, 2024, the Trustee filed the "Chapter 11 Trustee's Initial Status Report" (the "Initial Report"), and, on June 7, 2024, the Trustee presented the Initial Report at a Status Conference before the Court. On June 13, 2024, the Trustee filed the "Chapter 11 Trustee's Second Status Report" (the "Second Report"), and, on June 14, 2024, the Trustee presented the Second Report at a Status Conference before the Court. On June 20, 2024, the Trustee filed the "Chapter 11 Trustee's Third Status Report" (the "Third Report"), and, on June 21, 2024, the Trustee presented the Third Report at a Status Conference before the Court. On July 2, 2024, the Trustee filed the "Chapter 11 Trustee's Fourth Status Report" (the "Fourth Report"), and, on July 3, 2024, the Trustee presented the Fourth Report at a Status Conference before the Court. On July 16, 2024, the Trustee filed the "Chapter 11 Trustee's Fifth Status Report" (the "Fourth Report"), and, on July 17, 2024, the Trustee presented the Fifth Report at a Status Conference before the Court. Additional information about the timeline of events in this Case and the Debtor's historical business operations can be found in these previous reports.

**B.    Update on Ledger Reconciliation and Release of End User Funds**

Partner Banks have continued reconciliation efforts with the objective of making distributions of reconciled funds to end-users as soon as possible. At the time of this Report, the Banks' reconciliation process is ongoing. Since May 24, 2024, Synapse-related end users have received only a partial return of funds, as summarized below. Since the Fifth Report, dated July 16, 2024, only AMG has made new distributions. Additionally, Lineage and Evolve have voluntarily provided their own reports with additional details of their reconciliation efforts and distributions to date, which are attached to this Report as **Exhibit A** and **Exhibit B**, respectively.

**1.    *DDA Reconciliation and Distributions***

Since the Fifth Report, no additional DDA funds have been distributed, as detailed below.

| **DDA Funds Summary[1]** | | | | | |
|---|---|---|---|---|---|
| | **American Bank** | **AMG National Trust** | **Evolve Bank and Trust** | **Lineage Bank** | **Total Funds** |
| **Funds Held on May 24, 2024** | N/A | N/A | $6,013,000 | $388,769 | $6,401,769 |
| **Funds Distributed since May 24, 2024** | N/A | N/A | $5,369,000 | $198,601 | $5,567,601 |
| **Remaining Funds on July 16, 2024** | N/A | N/A | $644,000 | $190,167 | $834,167 |
| **Funds Distributed since July 16, 2024** | N/A | N/A | $0 | $0 | $0 |
| **Remaining Funds on July 31, 2024** | N/A | N/A | $644,000 | $190,167 | $834,167 |

Partner Banks have reported the status and issues related to distributions of DDA funds as detailed below.

- Evolve reports that it has not distributed additional DDA funds since the Fifth Report because it has requested additional information to verify balances from each of these 5

---

[1] Partner Banks have reported certain numbers in approximations to the Trustee.

Fintech Partners and has not received responses at the time of this Report. Evolve is also in receipt of a number of returned paper checks and is working with the Fintech Partners to obtain updated end user address information to reprocess these returned payments.

- Lineage has not distributed additional DDA funds but reports that it is working to distribute approximately $30,000 in additional funds to end users of this Fintech Partner. Additionally, Lineage holds approximately $160,000 DDA funds as part of a DDA loan program and has determined to validate these funds against the Synapse ledger before making distributions.

- Neither American Bank nor AMG hold any DDA funds for Synapse end users.

The Trustee is not aware of any reported shortfall between cash held in DDAs at the Partner Banks and the amounts owed to DDA end users as shown on the Synapse trial balances. The Trustee believes that Partner Banks should be able to successfully repay the remaining DDA funds in the near future.

### 2.    *FBO Account Reconciliation and Distributions*

Since the Fifth Report, an additional $1,001,216 in FBO funds has been distributed by AMG; no other FBO funds have been distributed by other Partner Banks, as detailed below.

| **FBO Funds Summary[2]** | | | | | |
|---|---|---|---|---|---|
| | **American Bank** | **AMG National Trust** | **Evolve Bank and Trust** | **Lineage Bank** | **Total Funds** |
| **Funds Held on May 24, 2024** | $43,339 | $110,290,040 | $46,926,558 | $61,789,889 | $219,049,826 |
| **Funds Distributed since May 24, 2024** | $0 | $104,025,366 | $0 | $0 | $104,025,366 |
| **Remaining Funds on July 16, 2024** | $43,339 | $6,264,674 | $46,926,558 | $61,789,889 | $115,024,460 |
| **Funds Distributed since July 16, 2024** | $0 | $1,001,216 | $0 | $0 | $1,001,216 |

---

[2] Partner Banks have reported certain numbers in approximations to the Trustee.

| **Remaining Funds on July 31, 2024** | $43,339 | $5,263,458 | $46,926,558 | $61,789,889 | $114,023,244 |
|---|---|---|---|---|---|

Partner Banks have reported the status and issues related to distributions of DDA funds as detailed below.

- As of July 31, 2024, American Bank holds no more than $42,339.67 of potential commercial end-user funds. American Bank has informed the Trustee that it is investigating the status of these funds expeditiously.

- As of July 31, 2024, AMG has paid out $105,026,581.97 (95% of total FBO funds) for the benefit of over 88,000 end users, either paid directly to end users or to custodial banks for user check payments or operating Fintech Partners' credit to end users. Of the total payments, AMG has paid out 100% of balances (~$10.8 million) for 8 Fintech Partners and their over 71,000 users and has made partial payments (~$94.2 million) for an additional 8 Fintech Partners and their over 17,000 users. AMG has $5,263,458 in FBO funds left to distribute on behalf of 14 Fintech Partners and their over 11,000 users (includes Fintech Partners where only partial payments were made and where issues with distributions exist). For the remaining funds, AMG is awaiting payment instructions to distribute approximately $1.3 million across 12 fintech platforms to 5,209 end users. These Fintech Partners are actively working with AMG to obtain updated end user payment information, but this is taking longer than expected, especially for end users with small balances. AMG is in active communication with 2 remaining Fintech Partners, but these platforms have not yet provided confirmation of end user balances, direction to pay or payment instructions for approximately $3.961 million across 6,547 end users. This has delayed payments for their end users who had balances assigned by Synapse to AMG. AMG is continuing to work with these Fintech Partners to encourage direction for release of payments and believes it hold balances for a relatively small percentage of these Fintech Partner's total end user accounts. AMG also is working on reprocessing return payments approximating $1.7 million for 846 end users. AMG also holds approximately $72,000 for unidentified Synapse

4

Brokerage FBO customers and $150,845.19 in unallocated interest associated with Synapse Brokerage sweep network deposits, which was transferred into AMG FBO Accounts on June 7, 2024.

- Evolve and Lineage have both reported that they need to complete additional reconciliation efforts to make distributions of FBO funds.

- The amount of the estimated shortfall has not changed since the Fifth Status Report

**C.**    **Further Reconciliation Efforts**

**1.**    ***Procuring Access to Synapse Data***

The Trustee and her advisors are working with the Partner Banks to collect and make available all Synapse ledger records, data and systems on a confidential and read-only basis to facilitate reconciliation.

As discussed in the Fifth Report, Lineage and the Trustee and her advisors have worked together to enable Lineage to backup the core Synapse database and complete the Synapse documentation process to generate nearly 40 million end user monthly account statements for April and May 2024. Lineage has now extended read-only access credentials to all Partner Banks, who are using these records in ongoing reconciliation efforts. The Trustee and Evolve have agreed to a data transfer and analysis process to make available additional information and more efficient reconciliation mechanisms.  This agreement will (i) provide additional detailed information to Evolve to assist with its reconciliation efforts and (ii) provide the estate with approximately $100,000 for the purpose of covering direct estate expenses arising in connection with this data transfer process.

The Trustee understands that this ongoing phase of reconciliation work will involve an ecosystem-wide reconciliation of money movements across all Synapse Partner Banks and other financial institutions, including payment processors and the ADMC sweep network. Due to the transaction volume and ledger complexity, this is expected to require significant effort and time.  The focus areas for ongoing reconciliation efforts are as follows:

- Continue reconciliation of FBO funds held at Evolve and Lineage, with the goal of enabling these banks to make full or partial distributions to end users.

- Continue to facilitate communication among Partner Banks, Fintech Partners and end users to enable to Partner Banks to make distributions and/or reissue failed payments where workarounds are required.

- Reconcile funds from interest payments and reserve accounts to enable Partner Banks to distribute these funds across the estate, Fintech Partners and end users.

- Reconcile unsettled credit and debit card transactions across Partner Banks.

- Reconcile Fintech Partner overdrafts and negative balances to determine funds owned to Partner Banks and/or Synapse estate.

    **2.**    ***Communications among Partner Banks and with End Users and Fintech Platforms***

The Trustee is continuing to facilitate communication among the Partner Banks and Fintech Partners and other parties in interest to reconcile individual end user accounts, obtain payment instructions, establish workarounds and resolve other reconciliation and distribution questions. Since the Fifth Report, the Trustee has received a disproportionate number of inquiries from certain Fintech Partners and end users with regard to funds purportedly held at Evolve. These Fintech Partners and end users informed the Trustee that they have requested information about the location of their funds and received no response or a confusing response from Evolve. The Trustee has worked collaboratively to connect affected end users with senior management at Partner Banks in order to enable end users' access to their funds. While appreciating the complexities involved in the reconciliation process and recognizes that additional work is underway to synchronize data, the Trustee continues to urge all Partner Banks to respond promptly to end user inquiries and collaborate with Fintech Partners to advance reconciliation efforts.

The Trustee has also been informed that Partner Banks have had difficulties obtaining information from several Fintech Partners in some instances which has delayed distributions to certain end users. The Trustee urges the handful of Fintech Partners which have been unresponsive to outreach from the Partner Banks or which have not provided information to verify end user balances and direct payments to cooperate fully and quickly with the Partner Banks to enable the release of their end users' funds. Additionally, the Trustee has been informed that some end users do not have up-to-date

payment information on file with their respective Fintech Partners, which has delayed distributions to these end users.  The Trustee urges all end users to check their information in their Fintech's app or website and provide current bank routing and account numbers to receive payments, or in the alternative, current mailing addresses to receive paper checks.

**D.    Evolve Data Breach**

As discussed at the Status Conference on July 3, 2024, the Trustee is aware of a recent data breach at Evolve in May 2024. The Trustee continues to be in communication with Evolve, but at this time the bank has not provided information about the impact of the data breach to Synapse end users or Synapse company information beyond their publicly available statements. The Trustee urges Evolve to make that information publicly available as soon as possible.

**E.    Estate Funding**

Since the Fifth Report, the Trustee and her advisors have focused on identifying estate receivables and prepayments that could be collected to pay necessary expenses for the reconciliation process and sale efforts.  To date, the Trustee has collected $76,857 in cash for the estate, consisting of returns of unused portions of retainers and prepayments for services not rendered.  The Trustee and her advisors have identified other potential cash assets of the estate and estate receivables and have been in contact with persons holding these funds.  The Trustee and her advisors have been in discussion with the Debtor's secured creditors as to use of this cash collateral to support reconciliation work and cover necessary sale expenses associated with a sale process.  Although the amounts collected to date are not material when compared to the substantial amounts owed to Synapse end users, it is the hope of the Trustee that these funds can be used to facilitate progress in this Case.

**F.    Post-Petition Expenses**

The Trustee and her advisors have compiled an estimate of the significant administrative expenses incurred by the estate since petition was filed on April 22, 2024.  As the time of this Report, the Trustee estimates that the estate has incurred approximately $1.3 million of unpaid business operating expenses since the petition date.  Although the Trustee and her advisors have been in contact with several post-petition vendors, it is possible that expenses have been incurred that have not been invoiced to the Trustee and that actual expenses incurred are larger than this.  The most significant

unpaid vendor invoices or expected are associated with MongoDB and AWS, which the Trustee estimates to be on the order of $1.1 million (inclusive of July usage not yet billed). The Trustee and her advisors have initiated scaling-down services provided through MongoDB, which is expected to reduce costs to approximately $14,000 per month from the previous $60,000-75,000 per month. The Trustee and her advisors intend to scale back or terminate other business operating expenses when they are comfortable that any such changes will not impede the reconciliation process and that information hosted on services can be safely retained.

At the time of this Report, the Trustee estimates approximately $1.3 million in professional fees incurred across her proposed counsel Cravath, proposed local counsel and conflicts counsel KBK and proposed financial advisor B. Riley. The Trustee does not have insight into professionals' fees incurred to date by the Official Committee of Unsecured Creditors, debtor-in-possession counsel, or technology consultant Klouddata at this time.

None of the Trustee's proposed advisors have received any payments in this Case. To the best of the Trustee's knowledge, no other estate professionals have received payments in this case either. Any payment of these fees will be subject to approval of the Bankruptcy Court and availability of estate funds to pay these expenses. For the avoidance of doubt, the Trustee believes that funds held by Partner Banks for the benefit of end users are **not** property of Synapse but property of end users. The Trustee has no authority or intention to use end-user property to pay estate professionals or other creditors of the estate.

The information in the foregoing paragraphs is provided solely for informational purposes and is not an admission that any amounts invoiced to the Debtor are valid administrative expenses in the amounts asserted.

**G.    Sale Process**

The Trustee and her advisors have continued to field inbounds from potential purchasers of estate assets. The Trustee and her advisors intend to file a bidding procedures motion and formally kick off a sale process for estate assets upon reaching agreement with the Debtor's secured creditors on use of cash collateral that will permit the Trustee to use the Debtor's cash recovered to date to fund expenses it will be necessary to incur for a value-maximizing sale process.

### H.    Meetings with Parties in Interest

Since July 17, 2024, the Trustee and her advisors have had follow-up meetings and communications with known parties in interest as well as initial meetings and communications with additional constituents.

#### 1.    *Bank Partners*

The Trustee and her advisors continue to have open lines of communication with the Partner Banks and their respective counsel, individually and collectively. The purpose of these communications has been to ensure the progress of and resolve open issues and questions related to ongoing reconciliation efforts. In particular, the Trustee and her advisors are working closely with executives, counsel and technical leads for Lineage and Evolve regarding data extraction efforts. Since the Fifth Report, the Trustee held a meeting across all Partner Banks to coordinate and expedite additional information sharing alongside Lineage's data sharing efforts.

#### 2.    *Debtor's Former Officers, Key Employees and Contractors*

The Trustee and her advisors have reached out to former employees of Synapse with the intention of engaging one or more persons with intimate technical knowledge of Synapse's systems as independent contractors to aid in the reconciliation process and other estate administration activities.  To date, the Trustee has not engaged any former Synapse employees as independent contractors but hopes to do so in short order.

#### 3.    *Financial Technology Platform Partners*

The Trustee and her advisors have continued to meet and communicate with many of the Fintech Partners of Synapse and their respective counsel, with a focus on connecting Fintech Partners with Partner Banks to facilitate reconciliation efforts against Fintech Partner ledgers and provide updates on reconciliation efforts.

#### 4.    *Regulatory and Government Bodies*

The Trustee has had further discussions with staff from FINRA regarding their oversight of Synapse Brokerage and consumer protection resources for affected end users. FINRA sent a response to the Trustee's letter to FINRA and other financial regulators dated June 22, 2024, which is attached

to this Report as **Exhibit C**. In the letter, FINRA outlined the scope of its mandate and capabilities vis-à-vis Synapse Brokerage LLC and the nature and applicability of SIPC insurance.

Additionally, the Trustee has briefed congressional staff on Synapse developments and the reconciliation process and has recommended that congressional staff seek assistance from regulatory agencies to aid end users in their efforts to identify where their funds are held and to assist with the repayment process.

### 5.    *End Users*

The Trustee and her advisors have had additional meetings and communications with affected end users. The purpose of these meetings and communications has been to further understand the impact to end users, inform end users that the Trustee's top priority continues to be restoring access to end user funds and provide updates on the reconciliation process.

### 6.    *Vendors and Suppliers*

The Trustee continues to receive and catalogue in-bound communications from creditors with unpaid invoices. The Trustee's advisors are continuing to communicate with certain key vendors to ensure records preservation and plan efficient data transition. She appreciates their cooperation to date and their continued cooperation until all the Debtor's records and information can be properly retained.

## I.    Retention of Professionals

### 1.    *Counsel to the Trustee*

On July 17, 2024, the Trustee filed the "Chapter 11 Trustee's Application for Order Authorizing Employment of Cravath, Swaine & Moore LLP as Counsel" which seeks an order of this Court authorizing the employment of Cravath, Swaine & Moore LLP, the firm at which the Trustee is a partner, to act as the Trustee's counsel, effective as of May 24, 2024, the date of appointment. Cravath has received additional information requests from the US Trustee on its retention application and will file an additional informational supplement with the Court.

### 2.    *Local Counsel to the Trustee*

On July 23, 2024, the Trustee filed the "Chapter 11 Trustee's Application for Order Authorizing Employment of Keller Benvenutti Kim LLP as Local Counsel" which seeks an order of

this Court authorizing the employment of Keller Benvenutti Kim LLP, a California firm, to act as the Trustee's local counsel, effective as of May 24, 2024, the date of appointment.

### 3. *Financial Advisor to the Trustee*

On July 30, 2024, the Trustee filed the "Chapter 11 Trustee's Application for Order Authorizing Employment of B. Riley Advisory Services" which will seek an order of this Court authorizing the employment of B. Riley Advisory Services to act as the Trustee's financial advisor, effective as of June 25, 2024, the first day B. Riley provided services to the Trustee.

### J. Conversion

The Trustee believes this Case should remain in chapter 11 for the time being and, as of the time of this Report, is not seeking conversion to chapter 7.

## II.

## CONCLUSION AND RECOMMENDATION

The Trustee continues to facilitate the Partner Bank's additional efforts with regard to reconciliation, settlement payments among banks and identifying the sources of any shortfalls. The Trustee and her advisors are working with Partner Banks and key vendors to collect and preserve Synapse records across platforms used by Synapse. These efforts will facilitate further reconciliation. B. Riley is continuing to develop a strategy and materials to facilitate a potential asset sale.

The Trustee will present the foregoing at the Status Conference scheduled for August 1, 2024, at 10:00 a.m. Pacific Time.

DATED: July 31, 2024

JELENA MCWILLIAMS
CHAPTER 11 TRUSTEE

By: */S/ Jelena McWilliams*
_____
Jelena McWilliams
Chapter 11 Trustee

###

11

# Exhibit A

**Lineage Bank**
**Status Update**

The Synapse-linked FBO funds held at Lineage Bank ("Lineage") are the subject of Lineage's ongoing reconciliation efforts with the Trustee and other Partner Banks. Many end users who were associated with the Synapse Financial Technologies ("Synapse") platform are still unable to access their funds due to the sudden financial collapse of Synapse, and Lineage acknowledges the frustration and hardship this situation has created for many. Lineage remains committed to resolving these issues as swiftly and accurately as possible and submits this Status Report to update all parties on its Synapse-related data preservation and reconciliation efforts.

## Background

Lineage terminated its contract with Synapse in March of 2024, and was winding down its relationship when Synapse filed bankruptcy. Lineage operated primarily as a third-party payment processor for Synapse. Simply put, Lineage originated ACH and wire transfers based on money movement instructions it received from Synapse. Lineage has reconciled the cash that it processed at the direction of Synapse against the Federal Reserve's records. Lineage's cash balance of FBO funds reconciles with the Federal Reserve's records. However, Synapse's final trial balance contains numerous material errors, contradictions and irregularities, and attributes a materially-different purported FBO account balance to Lineage than the actual cash balance at Lineage that has been verified against the Federal Reserve's records.

The FBO funds at Lineage relate to Synapse's brokerage program and are the subject of Lineage's ongoing reconciliation efforts with the Trustee and other Partner Banks. Due to the issues with Synapse's final trial balance, Lineage has been forced to undertake to reconcile end user accounts and calculate end user balances based on the information that has been made available to it by the Trustee through the bankruptcy process. Lineage engaged, at its own

expense, a former Synapse engineer familiar with Synapse's systems to access the Synapse accounting databases to assist with recovering, preserving and analyzing the Synapse data. Since Lineage first obtained access to Synapse's critical accounting databases, it has worked tirelessly to collect and preserve Synapse's available data for the benefit of all affected parties. Unfortunately, this process has been complicated and time-consuming given the significant scrutiny and attention to detail required for these unprecedented circumstances.

<u>**Update on Lineage's Reconciliation Efforts**</u>

Despite multiple and substantial complications with reconciliation, some of which have been outlined in previous filings, Lineage has made substantial progress in this endeavor and welcomes this opportunity to update the Court and the public on its efforts since the prior status hearing. Lineage Bank recognizes that some of these updates may be highly technical. By sharing these detailed updates, Lineage aims to provide an overview of its reconciliation processes and methodology. The intent of this approach is to ensure that all stakeholders, regardless of background, have access to this important information.

- Lineage has been able to access the Synapse data needed for reconciliation thanks to the assistance of the Trustee and B Riley. Lineage has completed the generation of 16,660,690 May customer statements for purposes of obtaining more accurate representations of customer ending balances.
- Lineage has validated that bank-to-bank wires (movements of funds to or from Partner Banks) are balanced with Lineage's internal records and collaborated with the Partner Banks to investigate various accounting discrepancies.
- The data preservation process is substantially complete, ensuring financial records have been accurately captured and securely stored. This critical step involved meticulously gathering, verifying and safeguarding relevant data, which will serve as the foundation for the subsequent stages of Lineage's reconciliation efforts.
- With the data preservation process substantially complete, Lineage has moved into the analysis phase of reconciliation. Lineage is conducting a comprehensive computed data analysis that relies on all available data sources. For example, Lineage is comparing and scrutinizing the preserved records against its own internal financial entries and other Partner Bank records, and using data balances from the generated Synapse statements to compute whole-account transactions balances. This thorough analysis is essential for ensuring the accuracy and reliability of distributions.

- As part of the analysis phase, Lineage has requested processing and distribution records from Partner Banks for purposes of further validating the movement of funds and avoiding duplicative distributions. Lineage has received this information from one Partner Bank and is currently undertaking that review and analysis.

### **Conclusion**

Given the magnitude and complexity of the task of analyzing the millions of transactions required for the reconciliation project, there remains substantial work to be done. However, Lineage estimates that it will be in a position to begin distributing Synapse FBO funds before the end of August. Lineage will continue to cooperate with the Trustee and the other Partner Banks to restore the FBO funds held at Lineage to their rightful owners as soon as possible.

# Exhibit B

**Evolve Bank & Trust: Update on Ledger Reconciliation and Release of End User Funds**

Evolve Bank & Trust ("Evolve" or "Bank") is providing this update to document the Bank's recent progress in performing a reconciliation that, once completed, will enable Evolve to distribute end user funds in its possession.

**I.      Why is Reconciliation Necessary?**

Evolve continues to receive communications from end users and other parties who are unable to access their funds following the bankruptcy of Synapse Financial Technologies, Inc. ("Synapse"). The vast majority of these individuals are customers of Synapse Brokerage LLC ("Synapse Brokerage"), a wholly-owned broker-dealer subsidiary of Synapse.  Many Synapse Brokerage customers feel that no one is able to give them a clear understanding of where their funds are, and why it is taking so long for them to be released.  They are understandably frustrated and worried about when they will receive distributions from Evolve or other entities in the Synapse ecosystem.

Evolve was not a program bank of Synapse Brokerage.  Evolve is holding approximately $46 million in accounts created so that the Bank could continue to perform payment processing activities for Synapse Brokerage end users following their fintech platforms' migration from Evolve to Synapse Brokerage in Fall 2023.  In order to distribute these funds to Synapse Brokerage end users, the Bank needs to know the following two essential pieces of information:

1.  <u>Which</u> Synapse Brokerage end users have funds at Evolve?

2.  For those Synapse Brokerage end users with funds at Evolve, <u>how much</u> does the Bank owe to each end user?

Synapse communicated this information to Evolve in a final ledger on May 17, 2024.  However, the ledgers that Synapse provided to Evolve are incorrect.  In reviewing the ledgers, Evolve has observed significant differences in Synapse Brokerage end users' balances from one day to the next, without a corresponding movement of funds.  Evolve has provided examples of these irregularities in prior filings with the Court.

<u>Without an accurate ledger, Evolve does not have either of the two essential pieces of information it needs to distribute funds.</u>  In order to calculate these pieces of information, it is necessary to perform a process called reconciliation.  Through this process, which will take account of Synapse Brokerage end user transactions in and out of Evolve, the Bank will be able to determine (1) which Synapse Brokerage end users have funds at Evolve, and (2) the amount of their funds at Evolve. Evolve will then be able to distribute funds to the appropriate Synapse Brokerage end users, in the correct amount.

II.    **Evolve Is Performing Reconciliation Right Now**

As noted above, Synapse failed to accurately reconcile Synapse Brokerage end user transactions and accounts at Evolve.  As a result, end users and Synapse ecosystem banks find themselves in the regrettable situation of not knowing who is owed what.

This is why Evolve has developed, and is in the process of executing, a Reconciliation Plan.  The essential components of this Plan are:

- Collection of Synapse's account and transaction data;

- Thorough analysis of this data, along with Evolve's own data, to track the flow of funds into and out of Synapse Brokerage end users' accounts; and

- Calculation of the funds actually owed by Evolve to end users, which will support the distribution of funds at Evolve to the appropriate end users.

Implementation of the Reconciliation Plan is underway, with staff at Evolve working around the clock to collect data, write code to analyze data, and track the movement of end user funds down to the individual transaction level.

In addition, since our last status update, Evolve has engaged Ankura Consulting Group, a third-party firm with strong expertise in accounting and reconciliation, to assist with executing the Reconciliation Plan.  Evolve is also continuing to work with Synapse Brokerage platforms to determine whether they have their own data that should be considered in the reconciliation. Throughout this process,  the Evolve team is providing updates to the Trustee to ensure transparency and cooperation, and will continue to provide summaries of our progress to the Court and the public as our work continues.

\*      \*      \*

The Bank appreciates the opportunity to provide this update, and will continue to apprise the Trustee, the Court, and the public of our progress on completing the Reconciliation Plan and distributing end user funds.

2

# Exhibit C



**Robert Colby**
Executive Vice President
and Chief Legal Officer

July 31, 2024

**VIA EMAIL (jmcwilliams@cravath.com)**

Dear Ms. McWilliams:

Thank you for your letter to FINRA and other financial regulators dated June 22, 2024, and for your subsequent communications with us.  We appreciate your leadership in resolving Synapse Financial Technologies LLC ("SynapseFi").

In your letter and subsequent communications, you asked us to provide an explanation of FINRA's role when a FINRA member, such as Synapse Brokerage LLC ("SynapseBD"), a wholly-owned subsidiary of SynapseFi, encounters financial distress and may need to be liquidated for the protection of its customers or clients.

FINRA is a not-for-profit, self-regulatory organization ("SRO") responsible for regulating its member broker-dealers and their associated persons pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). While FINRA supports the Securities and Exchange Commission ("SEC") in overseeing this segment of the securities industry—and is itself subject to extensive SEC oversight—FINRA is not a federal agency and was not created by the federal government. FINRA does not have jurisdiction over financial intermediaries that are not registered broker-dealer members, including banks.

FINRA fulfills its mission of investor protection and market integrity by, among other things examining its member firms for compliance with FINRA rules, the Exchange Act, SEC regulations, and certain other rules related to broker-dealer activities.  When FINRA believes that a member firm may have violated any of these provisions, FINRA investigates and, as appropriate, takes enforcement action.  Consistent with the practices of other regulators, FINRA's investigations are confidential.

Our oversight activities, including examinations and investigations, address, among other obligations, our member firms' compliance with the SEC's financial responsibility rules under Exchange Act Section 15(c)(3), including the Net Capital Rule (Rule 15c3-1), the Customer Protection Rule (Rule 15c3-3), and the related books and records requirements (Rules 17a-3 and 17a-4).  Under certain conditions, FINRA can direct a FINRA member firm to limit or reduce its business.  FINRA cannot, however, conduct a liquidation of a FINRA member firm, nor does FINRA have any authority to order or otherwise initiate a bankruptcy or other insolvency proceeding for a FINRA member firm.

When FINRA has reason to believe that a FINRA member firm is in or approaching financial difficulty, we notify the Securities Investor Protection Corporation ("SIPC") and the SEC under

Section 5(a) of the Securities Investor Protection Act ("SIPA").[1]  If SIPC determines that a member firm has failed or is in danger of failing to meet its obligations to customers and is also either insolvent, the subject of insolvency proceedings, out of compliance with certain SEC or SRO rules, or unable to establish compliance with such rules, then SIPC may initiate a liquidation of the firm under SIPA if the firm has "customers"[2] whose claims could be satisfied by SIPC advances.  We understand that SynapseBD is a SIPC member but does not appear to be eligible for a SIPA liquidation because it was not actively conducting a securities business and persons with claims for cash deposited with a firm for purposes other than investing in securities are not "customers" as defined in SIPA.

FINRA member firms can also file voluntary petitions under the Bankruptcy Code.  Most FINRA member firms are "stockbrokers" as defined in the Bankruptcy Code and therefore eligible for Chapter 7 liquidations but ineligible for reorganization under Chapter 11.  That Chapter 11 exclusion does not apply to a member firm that does not have any "customers" as defined in Bankruptcy Code section 741; a member firm without such "customers" is not a "stockbroker" as defined in the Bankruptcy Code and therefore is eligible for bankruptcy under either Chapter 7 or Chapter 11.

Again, FINRA does not have the power to direct a member firm to file a bankruptcy petition nor to file such a petition on behalf of the member firm.  It would appear that the SynapseFi trustee could either cause SynapseBD to file a bankruptcy petition or appoint a president for Synapse BD with instructions to file such a petition for the firm.  SynapseFi is the sole member of SynapseBD and the Operating Agreement for SynapseBD provides that the sole member "shall have all right, power and authority to manage, operate, and control the business and affairs" of SynapseBD and allows the sole member to fill any vacancy in any office at any time in its sole discretion.

---

[1]    FINRA member firms are generally required to be SIPC members.  Notice under SIPA Section 5(a) is not applicable to the small minority of FINRA member firms that are excluded from SIPC membership.

[2]    "Customers" has a specific meaning in the context of SIPA and does not necessarily include all individuals or entities with which a broker-dealer may interact.  In relevant part, section 16(2) of SIPA, 15 U.S.C. §78*lll*(2), provides that:

> The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.
>
> \*          \*          \*
>
> The term 'customer' includes-
> (i) any person who has deposited cash with the debtor for the purpose of purchasing securities;
> (ii) any person who has a claim against the debtor for cash, securities, futures …contracts, or options on futures contracts received, acquired, or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission; and
> (iii) any person who has a claim against the debtor arising out of sales or conversions of such securities.

When a broker-dealer is not the subject of a proceeding under SIPA or the Bankruptcy Code, the SEC can petition a court for the appointment of a receiver for the firm and its assets, an action it has taken at certain times in the past.  FINRA's authority does not include filing a petition for the appointment of a receiver for a FINRA member.

If a customer believes that a member firm or an associated industry professional has treated them unfairly, and the member firm or associated person is unable or unwilling to resolve the issue to the customer's satisfaction, the customer can file a complaint with FINRA through our online complaint form at https://www.finra.org/investors/need-help/file-a-complaint.  As discussed previously, FINRA investigates complaints against member firms and their associated persons— and can take disciplinary actions against them.  Sanctions may include fines, suspensions or bars from FINRA membership, or other appropriate measures.

Individuals may also contact FINRA's Office of the Ombuds, which is an independent, neutral, and confidential resource for anyone with questions or concerns about the activities of FINRA and its employees. As a designated neutral, the Office of the Ombuds does not represent or act as an advocate for any individual or entity, including FINRA. The Office of the Ombuds advocates for fair processes and fair administration of those processes.  For information about contacting FINRA's Office of the Ombuds, including a confidential, third-party portal, see https://www.finra.org/about/office-ombuds#omb.

We thank you again for your letter and subsequent communications with us.  We look forward to continuing our engagement with you and, while we are not able to report the status of a FINRA investigation or disclose information from an investigative file, continuing to exchange information with your team and other regulators where permitted and appropriate.

Very truly yours,

Robert Colby

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Cravath, Swaine & Moore LLP, 2 Manhattan West, 375 Ninth Avenue, New York, NY 10001

A true and correct copy of the foregoing document entitled (*specify*): _____
CHAPTER 11 TRUSTEE'S SIXTH STATUS REPORT _____
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 7/31/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Raymond O Aghaian    raghaian@kilpatricktownsend.com, ndelman@kilpatricktownsend.com;moroberts@ktslaw.com
Ron Bender    rb@lnbyg.com
David A Berkley    david.berkley@wbd-us.com, mary.koo@wbd-us.com;Sul.Lee@wbd-us.com
J Scott Bovitz    bovitz@bovitz-spitzer.com
Rudy J Cerone    rcerone@mcglinchey.com, lgraff@mcglinchey.com;jingargiola@mcglinchey.com
Sara Chenetz    schenetz@perkinscoie.com,
docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com
Russell Clementson    russell.clementson@usdoj.gov
Andrew Michael Cummings    andrew.cummings@hklaw.com,
philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
Michael G. Farag    mfarag@gibsondunn.com
Paul R. Glassman    pglassman@stradlinglaw.com
Nicholas Christian Glenos    cglenos@bradley.com
Michael H Goldstein    mgoldstein@goodwinprocter.com, ASchaefer@goodwinlaw.com
Michael I. Gottfried    mgottfried@elkinskalt.com,
cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
Steven T Gubner    sgubner@bg.law, ecf@bg.law
Ralph P Guenther    rguenther@guentherlawgroup.com
Robert T. Honeywell    robert.honeywell@klgates.com
Lance N Jurich    ljurich@loeb.com,
pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
Monica Y Kim    myk@lnbyg.com, myk@ecf.inforuptcy.com
Jeffrey C Krause    jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
William J Levant    wlevant@kaplaw.com, wlevant@gmail.com
Adam A Lewis    alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
Jelena McWilliams (TR)    jmcwilliams@cravath.com, mao@cravath.com
Krikor J Meshefejian    kjm@lnbyg.com
Fred Neufeld    fneufeld@stradlinglaw.com, tingman@sycr.com
Valerie Bantner Peo    vbantnerpeo@buchalter.com
David M Poitras    dpoitras@bg.law
Paul M Rosenblatt    prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
Brandy A Sargent    brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
Callan C Searcy    bk-csearcy@texasattorneygeneral.gov
Zev Shechtman    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com
Jason D Strabo    jstrabo@mwe.com, jbishopjones@mwe.com
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
Jeffrey C Wisler    jwisler@connollygallagher.com, dperkins@connollygallagher.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Claire K Wu    claire.wu@pillsburylaw.com, irene.hooper@pillsburylaw.com;docket@pillsburylaw.com
Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 7/31/2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 7/31/2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/31/2024 | Robert N. Greenfield | /s/ *Robert N. Greenfield* |
|-----------|----------------------|----------------------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**