| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Holly Roark (SBN 234638)<br>Roark Law Offices<br>950 Bannock St. Ste. 1100<br>Boise, ID 83702<br>T 208.536.3638<br>F 310.553.2601<br>holly@roarklawboise.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Synoptek, LLC | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION

| In re:<br>SYNAPSE FINANCIAL TECHNOLOGIES, INC. | CASE NO.: 1:24-bk-10646-MB<br><br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations (PERSONAL PROPERTY) (AND TERMINATE AGREEMENT)** |
| Debtor(s). | DATE: 09/10/2024<br>TIME: 10:00 am<br>COURTROOM: 303 |

**Movant:** Synoptek, LLC

1. **Hearing Location**:

   ☐ 255 East Temple Street, Los Angeles, CA 90012        ☐ 411 West Fourth Street, Santa Ana, CA 92701
   ☒ 21041 Burbank Boulevard, Woodland Hills, CA 91367   ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (if any)(Responding Parties), their attorneys (if any), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay, as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 1                          **F 4001-1.RFS.PP.MOTION**

4. When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5. If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6. ☒ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file a written response to this motion with the court and serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the hearing and appear at the hearing of this motion.

7. ☐ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

   a. ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b. ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c. ☐ An application for order setting hearing on shortened notice and remains pending.  After the court has ruled on that application, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date:  08/14/2024

Roark Law Offices
Printed name of law firm (if applicable)

Holly Roark
Printed name of individual Movant or attorney for Movant

Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                   Page 2                          **F 4001-1.RFS.PP.MOTION**

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO PERSONAL PROPERTY (**AND TERMINATE AGREEMENT**)

1. Movant has a perfected security interest in the Property.

2. **The Property at Issue (Property):**

   a. ☐ Vehicle (*year, manufacturer, type, and model*):

      *Vehicle Identification Number*:
      *Location of vehicle (if known)*:

   b. ☒ Equipment (*manufacturer, type, and characteristics*): Gen3 and Gen4 rack mounts

      *Serial number(s)*:

      *Location (if known)*: Gen3 rack mount is in Los Angeles, CA. Gen4 rack mount is in San Francisco, CA.

   c. ☐ Other Personal Property (*type, identifying information, and location*):

3. **Bankruptcy Case History:**

   a. ☒ A voluntary bankruptcy petition   ☐ An involuntary bankruptcy petition
      under chapter   ☐ 7   ☒ 11   ☐ 12   ☐ 13   was filed on (*date*)  04/22/2024  .

   b. ☐ An order to convert this case to chapter   ☐ 7   ☐ 11   ☐ 12   ☐ 13   was entered on (*date*) _____.

   c. ☐ Plan was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:

      (1) ☐ Movant's interest in the Property is not adequately protected.

         (A) ☐ Movant's interest in the Property is not protected by an adequate equity cushion.

         (B) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

         (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

         (D) ☐ Other (*see attached continuation page*).

      (2) ☐ The bankruptcy case was filed in bad faith.

         (A) ☐ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case commencement documents.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

(C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

(D) ☐ Other bankruptcy cases were filed in which an interest in the Property was asserted.

(E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition. Schedules and statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

(3) ☐ (*Chapter 12 or 13 cases only*) All payments on account of the Property are being made through the plan and plan payments have not been made to the chapter 12 or chapter 13 trustee for payments due
☐ postpetition preconfirmation    ☐ postpetition postconfirmation.

(4) ☐ The lease has matured, been rejected or deemed rejected by operation of law.

(5) ☐ The Debtor filed a statement of intention that indicates the Debtor intends to surrender the Property.

(6) ☐ Movant regained possession of the Property on (*date*) _____, which is
☐ prepetition ☐ postpetition.

(7) ☒ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

5. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew that the bankruptcy petition had been filed and Movant would have been entitled to relief from stay to proceed with those actions,

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions,

c. ☐ Other (*specify*):


6. ☒ **Evidence in Support of Motion: *(Declaration(s) must be signed under penalty of perjury and attached to this motion)***

a. ~~The PERSONAL PROPERTY DECLARATION on page 6 of this motion.~~

b. ☒ Supplemental declaration(s).

c. ☐ The statements made by the Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in the Debtor's case commencement documents. Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit(s) _____.

d. ☒ Other: Request for Judicial Notice


7. **An optional Memorandum of Points and Authorities is attached to this motion.**

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014    Page 4    **F 4001-1.RFS.PP.MOTION**

**Movant requests the following relief:**

1. Relief from the stay is granted under:  ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to repossess and sell the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☐ The stay is annulled retroactive to the petition date.  Any postpetition actions taken by Movant to enforce its remedies regarding the Property do not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

8. ☐ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days, so that no further stay shall arise in that case as to the Property.

10. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be

    ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☐ If relief from stay is not granted, the court orders adequate protection.

12. ☒ See continuation page for other relief requested

Date:  08/14/2024

Roark Law Offices
_____
Print name of law firm

Holly Roark
_____
Print name of individual Movant or attorney for Movant

_____
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 5                        F 4001-1.RFS.PP.MOTION

# PERSONAL PROPERTY DECLARATION

I, (*name of declarant*) _____, declare:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto.  I am over 18 years of age.  I have knowledge regarding Movant's interest in the Property (*specify*):

    a.  ☐  I am the Movant.

    b.  ☐  I am employed by Movant as (*title and capacity*):

    c.  ☐  Other (*specify*):

2.  a.  ☐  I am one of the custodians of the books, records and files of Movant that pertain to loans, leases, or extensions of credit given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate.  Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (see attached):

3.  The Property is:

    a.  ☐  Vehicle (*year, manufacturer, type and year*):

        *Vehicle Identification Number*:
        *Location of vehicle (if known)*:

    b.  ☒  Equipment (*manufacturer, type, and characteristics*): Gen3 and Gen4 rack mounts

        *Serial number(s)*:
        *Location (if known)*: Gen3 rack mount is in Los Angeles, CA. Gen4 rack mount is in San Francisco, CA.

    c.  ☐  Other personal property (*type, identifying information, and location*):

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                  Page 6                                  **F 4001-1.RFS.PP.MOTION**

4.  The nature of Debtor's interest in the Property is:

    a.  ☐  Sole owner

    b.  ☐  Co-owner (*specify*):

    c.  ☐  Lessee

    d.  ☐  Other (*specify*):

    e.  ☐  Debtor ☐ did ☐ did not   list the Property in the schedules filed in this case.

5.  ☐  The lease matured or was rejected on (*date*) _____:

    a.  ☐  rejected

      (1)  ☐  by operation of law.

      (2)  ☐  by order of the court.

    b.  ☐  matured.

6.  Movant has a perfected security interest in the Property.

    a.  ☐  A true and correct copy of the promissory note or other document that evidences the debt owed by the Debtor to Movant is attached as Exhibit _____.

    b.  ☐  The Property is a motor vehicle, boat, or other personal property for which a certificate of title is provided for by state law. True and correct copies of the following items are attached to this motion:

      (1)  ☐  Certificate of title ("pink slip") (Exhibit _____).

      (2)  ☐  Vehicle or other lease agreement (Exhibit _____).

      (3)  ☐  Security agreement (Exhibit _____).

      (4)  ☐  Other evidence of a security interest (Exhibit _____).

    c.  ☐  The Property is equipment, intangibles, or other personal property for which a certificate of title is not provided for by state law. True and correct copies of the following items are attached to this motion:

      (1)  ☐  Security agreement (Exhibit _____).

      (2)  ☐  UCC-1 financing statement (Exhibit _____).

      (3)  ☐  UCC financing statement search results (Exhibit _____).

      (4)  ☐  Recorded or filed lien (Exhibit _____).

      (5)  ☐  Other evidence of perfection of a security interest (Exhibit _____).

    d.  ☐  The Property is consumer goods.  True and correct copies of the following items are attached to this motion:

      (1)  ☐  Credit application (Exhibit _____).

      (2)  ☐  Purchase agreement (Exhibit _____).

      (3)  ☐  Account statement showing payments made and balance due (Exhibit _____).

      (4)  ☐  Other evidence of perfection of a security interest (*if necessary under state law*) (Exhibit _____).

    e.  ☐  Other liens against the Property are attached as Exhibit _____.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

7. Status of Movant's debt:

    a.   The amount of the monthly payment: $ _____.

    b.   Number of payments that became due and were not tendered:  ☐ prepetition  ☐ postpetition.

    c.   Total amount in arrears: $ _____.

    d.   Last payment received on (*date*): _____.

    e.   Future payments due by the anticipated hearing date (*if applicable*): _____
        An additional payment of $ _____ will come due on (*date*) _____, and on
        the _____ day of each month thereafter.  If the payment is not received by the _____
        day of the month, a late charge of $ _____ will be charged under the terms of the loan.

8.  ☐  Attached as Exhibit _____ true and correct copy of a POSTPETITION payment history that accurately
     reflects the dates and amounts of payments made by the Debtor since the petition date.

9. Amount of Movant's debt:

    a.  Principal:.......................................................................................... $ _____
    b.  Accrued interest: ............................................................................ $ _____
    c.  Costs (attorney's fees, late charges, etc.): .................................. $ _____
    d.  Advances (property taxes, insurance): ......................................... $ _____
    e.  TOTAL CLAIM as of _____:............................................ $ _____

10.  ☐  (*Chapter 7 and 11 cases only*) Valuation: The fair market value of the Property is: $ _____.
     This valuation is based upon the following supporting evidence:

    a.  ☐  This is the value stated for property of this type, model, and general features in the reference guide
         most commonly used source for valuation that is used in the ordinary course of its business for
         determining the value of this type of property.  True and correct copies of the relevant excerpts of the most
         recent edition of the reference guide are attached as Exhibit _____.

    b.  ☐  This is the value determined by appraisal or other expert opinion.  True and correct copies of the
         expert's report and/or declaration are attached as Exhibit _____.

    c.  ☐  The Debtor's admissions in the Debtor's schedules filed in the case.  True and correct copies of the relevant
         portions of the Debtor's schedules are attached as Exhibit _____.

    d.  ☐  Other basis for valuation (*specify*):

> **NOTE:**  If valuation is contested, supplemental declarations providing additional foundation for the
>             opinions of value should be submitted.

11. Calculation of equity in Property:

    a.  ☐  **11 U.S.C. § 362(d)(1) - Equity Cushion:**

         I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s)
         senior to Movant's debt is $ _____ and is _____% of the fair market value of the
         Property.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                        Page 8                        **F 4001-1.RFS.PP.MOTION**

b. ☐ **11 U.S.C. § 362(d)(2)(A) - Equity**:

By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 10 above, I calculate that the Debtor's equity in the Property is $ _____.

12. ☐ The fair market value of the Property is declining because:

13. ☐ The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

14. ☐ Movant regained possession of the Property on (*date*) _____, which is:  ☐ prepetition  ☐ postpetition.

15. ☐ (*Chapter 12 or 13 case*) _____ s of Movant's debt and other bankrup_____ ____formation:

a. The 341(a) meeting of cred____ ____ently scheduled for (or conclu____ ____te) _____
A plan confirmation hearing is ____ ____cheduled for (or conclude____ _____) _____
The plan was confirmed on (*if a____ ____date*) _____

b. Postpetition preconfirmation paymen____ ____UT REMAINING ____ ____ter the filing of the case:

| Number of Payments | Number of Late Charges | Amou____ ____ Payment or____ ____e | ____otal |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |
| | | ____ | |
| | | $ | |
| | | $ | |
| | | $ | |

(See attachment for additional breakd___ ____nation____ ____s Exhibit _____.)

c. Postconfirmation payments due B____ ____ING UNPAID ___ ____n confirmation date (*if applicable*):

| Number of Payments | Number of Late Charges | A____ ____ach Payment ____e Charge | |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

d. Postpetition advances or other charges due but unpaid:                          $
   (*For details of type and amount, see Exhibit _____*)

e. Attorneys' fees and costs:                                                             $
   (*For details of type and amount, see Exhibit _____*)

f. Less suspense account or partial paid balance:                          $ [                    ]

          TOTAL POSTPETITION DELINQUENCY:                          $

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                      Page 9                          F 4001-1.RFS.PP.MOTION

g. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. The plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (*attach LBR form F 4001-1.DEC.AGENT.TRUSTEE*).

16. ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

17. ☐ The bankruptcy case was filed in bad faith:

a. ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c. ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d. ☐ Other (*specify*):


18. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

b. ☐ Multiple bankruptcy cases affecting the Property.

(1) Case name: _____
    Chapter: _____    Case number: _____
    Date filed: _____    Date discharged: _____    Date dismissed: _____
    Relief from stay regarding the Property ☐ was ☐ was not granted.

(2) Case name: _____
    Chapter: _____    Case number: _____
    Date filed: _____    Date discharged: _____    Date dismissed: _____
    Relief from stay regarding the Property ☐ was ☐ was not granted.

(3) Case name: _____
    Chapter: _____    Case number: _____
    Date filed: _____    Date discharged: _____    Date dismissed: _____
    Relief from stay regarding the Property ☐ was ☐ was not granted.

☐ See attached continuation page for more information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b.  ☐  Although Movant knew the bankruptcy case was filed, Movant previously obtained relief from stay to proceed
with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c.  ☐  For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____     _____     _____
*Date*                              *Printed Name*                                      *Signature*

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                             Page 11                                  **F 4001-1.RFS.PP.MOTION**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

950 Bannock St. Ste. 1100 Boise, ID 83702

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY) (AND TERMINATE AGREEMENT)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __8/14/2024__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) __8/14/2024__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| __8/14/2024__ | Holly Roark | *Holly Roark* (signature) |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## ATTACHMENT TO PROOF OF SERVICE

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- Ron Bender rb@lnbyg.com for Debtor Synapse Financial Technologies, Inc.
- Monica Y Kim myk@lnbyg.com for Debtor Synapse Financial Technologies, Inc.
- Krikor J Meshefejian kjm@lnbyg.com for Debtor Synapse Financial Technologies, Inc.
- Beth Ann R. Young bry@lnbyg.com for Debtor Synapse Financial Technologies, Inc.
- Jelena McWilliams jmcwilliams@cravath.com Chapter 11 Trustee
- Jane Kim jkim@kellerbenvenutti.com for Chapter 11 Trustee
- Jeremy V Richards jrichards@kbkllp.com for Chapter 11 Trustee
- Thomas B Rupp trupp@kbkllp.com for Chapter 11 Trustee
- Russell Clementson russell.clementson@usdoj.gov for United States Trustee
- Zev Shechtman Saul Ewing LLP Zev.Shechtman@saul.com for Official Committee of Unsecured Creditors of Synapse Financial Technologies, Inc.
- Joshua D. Morse joshua.morse@pillsburylaw.com for AMG National Trust Bank
- Claire K Wu claire.wu@pillsburylaw.com for AMG National Trust Bank
- Lance N Jurich ljurich@loeb.com for AMG National Trust Bank
- Ralph P Guenther rguenther@guentherlawgroup.com for Capital J Inc. d/b/a Juno
- Andrew Michael Cummings andrew.cummings@hklaw.com for Cigna Health and Life Insurance Company
- Jeffrey C Wisler jwisler@connollygallagher.com for Cigna Health and Life Insurance Company
- Sara Chenetz schenetz@perkinscoie.com Courtesy NEF
- Michael I. Gottfried mgottfried@elkinskalt.com Courtesy NEF
- Steven T Gubner sgubner@bg.law Courtesy NEF
- Valerie Bantner Peo vbantnerpeo@buchalter.com Courtesy NEF
- David M Poitras dpoitras@bg.law Courtesy NEF
- J Scott Bovitz bovitz@bovitz-spitzer.com for EarnUp inc. and EarnUp, LLC
- David M Poitras dpoitras@bg.law for Evolve Bank & Trust
- William J Levant wlevant@kaplaw.com for William Levant
- Paul R. Glassman pglassman@stradlinglaw.com for Lineage Bank
- Nicholas Christian Glenos cglenos@bradley.com for Lineage Bank
- Fred Neufeld fneufeld@stradlinglaw.com for Lineage Bank
- Michael G. Farag mfarag@gibsondunn.com for Mercury Technologies, Inc.
- Jeffrey C Krause jkrause@gibsondunn.com for Mercury Technologies, Inc.
- David A Berkley david.berkley@wbd-us.com for MongoDB, Inc.

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                    **F 9013-3.1.PROOF.SERVICE**
Page 13 of 60

- Zev Shechtman Zev.Shechtman@saul.com for Official Committee of Unsecured Creditors of Synapse Financial Technologies, Inc.
- Adam A Lewis alewis@mofo.com for Silicon Valley Bank
- Rudy J Cerone rcerone@mcglinchey.com for SoLo Funds, Inc.
- Raymond O Aghaian raghaian@kilpatricktownsend.com for TClub Inc.
- Paul M Rosenblatt prosenblatt@kilpatricktownsend.com for TClub Inc.
- Robert T. Honeywell robert.honeywell@klgates.com for TabaPay Holdings LLC
- Brandy A Sargent  brandy.sargent@klgates.com for TabaPay Holdings LLC
- Callan C Searcy bk-csearcy@texasattorneygeneral.gov for Texas Comptroller of Public Accounts, Revenue Accounting Division and Texas Workforce Commission
- Darren Azman dazman@mwe.com for TriplePoint Capital, LLC
- Jason D Strabo jstrabo@mwe.com for TriplePoint Capital, LLC
- Michael H Goldstein mgoldstein@goodwinprocter.com for YieldStreet Inc
- Michael I. Gottfried mgottfried@elkinskalt.com for Yotta Technologies, Inc.

## 2. SERVED BY UNITED STATES MAIL:

DEBTOR
Synapse Financial Technologies, Inc.
21255 Burbank Boulevard Suite 120
Woodland Hills, CA 91367-0000

AGENT FOR SERVICE OF PROCESS FOR DEBTOR
1505 Corporation National Registered Agents, Inc.
Amanda Garcia
330 N Brand Blvd
Glendale, CA 91203

COUNSEL FOR DEBTOR
Levene, Neale, Bender, Yoo & Golubchik LLP
2818 La Cienega Avenue
Los Angeles, CA 90034

CHAPTER 11 TRUSTEE
Jelena McWilliams (TR)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001

COUNSEL FOR CHAPTER 11 TRUSTEE
Alexander Gerten
Cravath, Swaine & Moore LLP
Two Manhattan West
375 9th Avenue
New York, NY 10001

COUNSEL FOR CHAPTER 11 TRUSTEE
Benjamin Gruenstein
Cravath, Swaine & Moore LLP
2 Manhattan West
375 9th Avenue
New York, NY 10001

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                    **F 9013-3.1.PROOF.SERVICE**
Page 14 of 60

COUNSEL FOR CHAPTER 11 TRUSTEE
Paul H Zumbro
Cravath, Swaine & Moore LLP
2 Manhattan West
375 9th Avenue
New York, NY 10001

COUNSEL FOR CHAPTER 11 TRUSTEE
John D Buretta
Cravath, Swaine & Moore LLP
2 Manhattan West
375 9th Avenue
New York, NY 10001

COUNSEL FOR OFFICIAL UNSECURED
CREDITORS' COMMITTEE OF SYNAPSE
FINANCIAL TECHNOLOGIES, INC.
Zev Schechtman
Carol Chow
Saul Ewing LLP
1888 Century Park East Ste 1500
Los Angeles, CA 90067

COUNSEL FOR OFFICIAL UNSECURED
CREDITORS' COMMITTEE OF SYNAPSE
FINANCIAL TECHNOLOGIES, INC.
Benjamin Waisbren
John Kucera
Boies Schiller Flexner LLP
1401 New York Avenue, N.W.
Washington, DC 2005

COUNSEL FOR TRIPLEPOINT CAPITAL,
LLC
Jake Jumbeck
McDermott Will & Emery LLP
444 W. Lake Street, Suite 4000
Chicago, CA 60606-0029

Darren Azman
One Vanderbilt Avenue
New York, NY 10017-3852

Robert J Labate
400 South Hope Street, 8th Floor
Los Angeles, CA 90071

Neda Shapourian
Unit21, Inc.
49 Geary St. Ste 200
San Francisco, CA 94108

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                    **F 9013-3.1.PROOF.SERVICE**
Page 15 of 60

Holly Roark (SBN 234638)
ROARK LAW OFFICES
950 Bannock St. Ste. 1100
Boise, ID 83702
T (310) 553-2600
F (310) 553-2601
holly@roarklawoffices.com

Attorney for Synoptek, LLC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

|  |  |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.<br><br>        Debtor and Debtor in Possession. | Case No. 1:24-bk-10646-MB<br>Chapter 11<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362**<br><br>**[Declaration of Tonia Danford and Request for Judicial Notice filed concurrently herewith]**<br><br>Date:   September 10, 2024<br>Time:  10:00 a.m.<br>Place:  Courtroom 303<br>        21041 Burbank Boulevard<br>        Woodland Hills, CA 91367 |

MOTION FOR RELIEF FROM THE AUTOMATIC STAY

TO THE DEBTOR, DEBTOR IN POSSESSION, CHAPTER 11 TRUSTEE, UNSECURED CREDITORS COMMITTEE, RESPONDING PARTIES, THEIR COUNSEL OF RECORD, AND TO ALL INTERESTED PARTIES:

Movant, Synoptek, LLC, hereby submits its Memorandum of Points and Authorities in Support of its Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 and represents as follows:

MEMORANDUM OF POINTS AND AUTHORITIES

## I.  BACKGROUND

1.  Movant, Synoptek, LLC ("**Movant**" or "**Synoptek**") provides technology consulting and managed IT services, including the sale of hardware and software to clients, including the Debtor (defined below), pursuant to an executory contract. <u>See</u> Declaration of **Tonia Danford** attached hereto ("Decl."), ¶ 3.

2.  On or about January 9, 2019, Synoptek and Synapse Financial Technologies, Inc. (the "**Debtor**" or "**Customer**") entered into the Master Service Agreement (the "**MSA**") for the purchase of contracted hardware and software (collectively, the "**Product**"), various professional services, and/or managed services (collectively, the "**Services**") including client advisory, security event and information management, dedicated cloud, and threat intelligent reporting. Pursuant to Article 1.4 of the MSA, the Service Orders define what specific Services Synoptek provides to the Debtor (the "**Service Orders**"). Decl., ¶ 4, Ex. A.

3.  Payments under the MSA come due and payable 30 days after the invoice date. Decl., ¶ 5, Ex. A, Article 2.3.

4.  On December 1, 2023, the Debtor defaulted under the MSA for its failure to timely pay invoices for pre-petition Services provided by Synoptek to the Debtor. There remains a pre-petition sum due and owing by the Debtor to Synoptek in the amount of $15,302.18. The pre-petition amount is calculated by taking the sum of Invoice 1238585, plus the first twenty-one (21) days of Invoice 1245438 which is billing in advance for services rendered from April 1, 2023, to April 30, 2023. Decl., ¶ 6. Ex. B.

2

MOTION FOR RELIEF FROM THE AUTOMATIC STAY

5.      Pursuant to Article 10.3, Movant has the right to terminate the MSA due to the failure of Debtor to timely pay its invoices.  Decl., ¶ 7, Ex. A, Article 10.3.

6.      On April 22, 2024, Debtor, Synapse Financial Technologies, Inc. filed its Chapter 11 bankruptcy case, Case number 1:24-bk-10646-MB.  Decl., ¶ 8.

7.      Pursuant to Article 10.4 of the MSA, it shall be deemed a material breach if the Customer becomes insolvent or bankrupt, and the MSA may be terminated as a result of said breach. Decl., ¶ 9, Ex. A, Article 10.4.

8.      On May 8, 2024, the Official Committee of Unsecured Creditors was appointed. Dkt. No. 128.

9.      On May 24, 2024, the Court entered its Order approving the appointment of Jelena McWilliams as Chapter 11 Trustee.  Dkt. No. 199.

10.     On April 29, 2024, Debtor filed its First Omnibus Motion for Entry of an Order Authorizing Rejection of Executory Contracts and Unexpired Leases as Docket No. 76.  Movant is listed as Number 282 on page 16 of 33 as a "Services Agreement" to be rejected, effective as of April 29, 2024, if not assumed in the sale of Debtor's assets to be held on May 9, 2024. *See* accompanying Request for Judicial Notice ("**RJN**"), Ex. E. The sale did not close.  On May 24, 2024, the Court entered its Order granting the Motion, entered as Docket No. 195, with an effective rejection date of May 9, 2024. RJN, Ex. F.

11.     Movant has continued to provide post-petition Services to the Debtor and has not been paid for such Services. As of August 14, 2024, $39,855.70 is due and owing by the Debtor to Synoptek for post-petition Services, which continues to accrue. Decl., ¶ 10, Ex. C.

12.     Debtor has continued to use two pieces of hardware identified as edge collectors, at each of its locations in Los Angeles, and San Francisco, California (the "**hardware**"). The edge device in Los Angeles is a Gen3 rack mount. The edge collector in San Francisco is a Gen4 rack mount. Both devices are custom builds utilizing SUPERMICRO 5019D-FTN4 chassis. Both edge collectors cost $1,500 each, and both are Synoptek owned equipment that were provided to Debtor as part of the ITaaS Site service, and should be returned to Synoptek. Decl. ¶ 11, Ex. D.

3

MOTION FOR RELIEF FROM THE AUTOMATIC STAY

13.     Synoptek is the owner of the hardware referenced above. Decl. ¶ 11. The Debtor has possession of the hardware and has not relinquished possession of the same to Movant.

14.     The Debtor has no equity in the hardware, as the Debtor has no ownership interest. The Debtor is in default of the MSA and has not cured the default and assumed the MSA in accordance with the Bankruptcy Code. Despite repeated requests, the Debtor has also failed to pay post-petition invoices for the services rendered under the MSA, in the ordinary course of business, since the bankruptcy filing.

15.     As of August 14, 2024, the total amount owed for pre-petition and post-petition Services is $55,157.88, plus attorney's fees, costs, and late payment service charges. Decl., ¶ 13, Ex. A, Article 6.5. The Termination Fees total $62,072.15 calculated by multiplying the monthly recurring fee of $8,867.45 by the remaining seven (7) months of the MSA.  Decl., ¶ 13, Ex. A, Article 10.2.

## II.    ARGUMENT

16.     Although the Debtor has rejected the MSA, the Automatic Stay is not terminated, and Movant is still obligated to perform under the MSA absent the Court granting relief from the Automatic Stay to terminate the MSA. *Computer Communications, Inc. v. Codex Corporation*, 824 F.2d 725, 731 (9th Cir. 1987).

17.     11 U.S.C. § 362(d)(1) allows the automatic stay to be terminated "for cause, including lack of adequate protection of an interest in property of such party in interest." Cause exists to grant Movant the requested relief from stay as follows: (1) The MSA has been rejected by Order of the Court, effective as of May 9, 2024. (RJN Exs. E, F.) (2) Debtor has failed to make ongoing post-petition payments for services rendered to Debtor by Movant. (Decl., ¶¶10, 13.)

18.     11 U.S.C. § 362(d)(2) allows the automatic stay to be terminated when (A) "the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."  Movant is the owner of the hardware in Debtor's possession. The Debtor has no interest or equity in the hardware. The hardware is not being sold to Debtor but was provided as part of the MSA so long as that agreement is in effect. Since Debtor rejected the

MOTION FOR RELIEF FROM THE AUTOMATIC STAY

1   MSA, in can be inferred that Movant's hardware and Services are not necessary to an effective

2   reorganization.

3       19.      Absent the filing of the Chapter 11 proceeding, Movant would have terminated its

4   services, obtained possession of its hardware, and sought damages thereof. Unless this Court

5   permits Movant to proceed with immediate termination of the MSA, then Movant will suffer great

6   and irreparable damage and injury by reason of the fact that it is not receiving any monthly

7   payments for the ongoing services and its hardware is being retained by the Debtor without

8   postpetition payment of Movant's invoices.

9       20.      Thus, due to the foregoing breaches of the MSA and the rejection of the MSA

10   under 11 U.S.C. §365(a), Movant is entitled to relief from automatic stay pursuant to 11 U.S.C.

11   § 362(d)(1) and § 362(d)(2), to terminate its services under the MSA and recover its hardware.

12   **III.    CONCLUSION**

13       WHEREFORE, Movant Synoptek, LLC respectfully requests that the Court enter an

14   Order:

15       1.      Granting the Motion in its entirety;

16       2.      Terminating the Automatic Stay so that Movant can terminate its Services under

17   the Master Services Agreement and recover its hardware;

18       3.      Waiving the 14-day stay prescribed by Fed. R. Bankr. P. 4001(a)(3); and

19       4.      Granting such further relief as is just and proper.

20

21   DATED: August 14, 2024                    ROARK LAW OFFICES

22

23

24                                           Holly Roark, Attorney for
                                             Synoptek, LLC
25

26

27

28

5

MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Holly Roark (SBN 234638)
ROARK LAW OFFICES
950 Bannock St. Ste. 1100
Boise, ID 83702
T (310) 553-2600
F (310) 553-2601
holly@roarklawoffices.com

Attorney for Synoptek, LLC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

|  |  |
|---|---|
| In re<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.<br><br>       Debtor and Debtor in Possession. | Case No. 1:24-bk-10646-MB<br>Chapter 11<br><br>**DECLARATION OF TONIA DANFORD IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362**<br><br>Date:  September 10, 2024<br>Time:  10:00 a.m.<br>Place:  Courtroom 303<br>       21041 Burbank Boulevard<br>       Woodland Hills, CA 91367 |

6

DECLARATION

# DECLARATION OF TONIA DANFORD

I, TONIA DANFORD, declare as follows:

1.      I am the Director of Strategic Finance of Movant, Synoptek, LLC ("**Movant**" or "**Synoptek**") . I am over the age of 18.  I have personal knowledge of the facts set forth herein and if called as a witness to testify, I could and would testify thereto competently and truthfully.

2.      I am one of the custodians of the books, records and files of Movant that pertain to the hardware, software, and various professional services and/or managed services given to Debtor in connection with the Master Services Agreement entered into between Debtor and Movant on January 9, 2019. I have gained knowledge of the books, records, and files from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate.  Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

3.      Movant provides technology consulting and managed IT services, including the sale of hardware and software to clients, including the Debtor (defined below), pursuant to an executory contract.

4.      On or about January 9, 2019, Synoptek and Synapse Financial Technologies, Inc. (the "**Debtor**" and "**Customer**") entered into a Master Service Agreement ("**MSA**") for the purchase of contracted hardware and software (collectively, the "**Product**"), various professional services, and/or managed services (together, the "**Services**"), including client advisory, security event and information management, dedicated cloud, and threat intelligent reporting.  Pursuant to Article 1.4 of the MSA, the Service Orders defines what specific Services Synoptek provides to the Debtor (the "**Service Orders**"). Attached hereto as **<u>Exhibit A</u>** are true and correct copies of the MSA, and Service Orders, and are incorporated herein by this reference.

5.      Payments under the MSA come due and payable 30 days after the invoice date. *See* Exhibit A, Article 2.3.

6.      On December 1, 2023, the Debtor defaulted under the MSA for its failure to timely pay invoices for pre-petition Services provided by Synoptek to the Debtor.  There remains a pre-petition sum due and owing by the Debtor to Synoptek in the amount of $15,302.18.  The pre-petition amount is calculated by taking the sum of Invoice 1238585, plus the first twenty-one (21) days of Invoice 1245438 which is billing in advance for services rendered from April 1, 2023, to April 30, 2023.  Attached hereto as **Exhibit B** are true and correct copies of the unpaid pre-petition invoices, and are incorporated herein by reference

7.      Pursuant to Article 10.3, Movant has the right to terminate the MSA due to the failure of Debtor to timely pay its invoices.  *See* Exhibit A, Article 10.3.

8.      On April 22, 2024, Debtor, Synapse Financial Technologies, Inc. filed its Chapter 11 bankruptcy case, Case number 1:24-bk-10646-MB (the "**Bankruptcy Case**").

9.      Pursuant to Article 10.4 of the MSA, it shall be deemed a material breach if the Customer becomes insolvent or bankrupt, and the MSA may be terminated as a result of said breach. *See* Exhibit A, Article 10.4.

10.     Movant has continued to provide post-petition Services to the Debtor in the ordinary course of business in the same manner and under the same terms as had been the parties' pre-petition ordinary course dealing, and has not been paid for such services.  As of August 14, 2024, $39,855.70 is due and owing by Debtor to Synoptek for post-petition Services, which continues to accrue. Despite repeated requests, the Debtor has also failed to pay post-petition invoices for the services rendered under the MSA, in the ordinary course of business, since the bankruptcy filing. Attached hereto as **Exhibit C** are true and correct copies of the unpaid post-petition invoices, and are incorporated herein by reference.

11.     Debtor has continued to use two pieces of hardware identified as edge collectors, at each of its locations in Los Angeles, and San Francisco, California. The edge device in Los Angeles is a Gen3 rack mount. The edge collector in San Francisco is a Gen4 rack mount. Both devices are custom builds utilizing SUPERMICRO 5019D-FTN4 chassis. Both edge collectors

8

DECLARATION

1     cost $1,500 each, and both are Synoptek owned equipment that were provided to Debtor as part

2     of the ITaaS Site service, and should be returned to Synoptek. Attached hereto as **Exhibit D** is a

3     true and correct copy of the "New Logo" Dual Hybrid Cloud Hubs Service Order #006468

4     document, evidencing the ITaaS Site service on page 5, incorporated herein by reference.

5        12.     Synoptek is the owner of the hardware referenced above. The Debtor has

6     possession of the hardware and has not relinquished possession of the same to Movant.

7        13.     As of August 14, 2024, the total amount owed for pre-petition and post-petition

8     Services is $55,157.88, plus attorney's fees, costs, and late payment service charges. The

9     Termination Fee totals $62,072.15, calculated by multiplying the monthly recurring fee of

10     $8,867.45 by the remaining seven (7) months of the MSA. *See* Exhibit A, Article 10.2.

11        I declare under penalty of perjury under the laws of the United States of America, that

12     the foregoing is true and correct and that this declaration was executed on August 14, 2024, at

13     Chambers County, Alabama.

14

    TONIA DANFORD

9
DECLARATION

# EXHIBIT A



19520 Jamboree Rd
#110
Irvine, CA 92612
(888) 796-6727

## Master Services Agreement

This Master Services Agreement including this agreement and any exhibits or attachments attached hereto (together "Agreement") is by and between Synoptek, LLC ("Synoptek" or "Company") and the individual and/or entity reflected on the signature line below ("Customer") for the purchase of contracted hardware and software (collectively, the "Product"), various professional services, and/or managed services (together, "Services") and governs the business relationship between Company and Customer and all transactions between such parties.  This MSA is effective as of 01/09/2019_____, 20__ (the "Effective Date") and shall remain in effect until terminated in accordance with Article 10 below. Company and Customer shall sometimes be referred to herein as a "Party" and together as the "Parties." In consideration of the mutual promises of the Parties and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the following:

### ARTICLE ONE:  DEFINITIONS

**1.1** **Change Order.** A Change Order is a document which modifies a previously executed Service Order. A Change Order is required when material changes or additional work are requested by Customer which may cause an NRC to be incurred or an increase or decrease in the current MRC being charged to Customer. Company will detail the changes on the Change Order using the same or similar methods to those used in the preparation of the original Service Order. Once executed by both Parties, a Change Order will become part of the Service Order to which it relates.  The Company may determine, in its reasonable discretion whether the requested changes require a new Service Order as opposed to a Change Order.

**1.2** **Effective Date.** The "Effective Date" as set forth in the preamble to this MSA and as used herein, shall refer to the date upon which this MSA becomes binding on the Parties.  The "Term" shall be determined as set forth in Article 10 below.

**1.3** **Managed Services ("MS").** Managed Services includes ongoing monitoring, maintenance, remediation (problem resolution), administration, support or consulting work performed by Company for Customer for a fixed contract period with a defined scope. The specific terms of MS to be provided are contained in an MS Service Order as described below.

**1.4** **Service Order.** A Service Order is a document that defines the MS or PS to be performed by Company for Customer and includes: the Service Order term ("Term" usually specified in months), a list of the Services to be provided, a detailed description of the Services, the NRC, the MRC, and any special terms or conditions associated with the Service. The Parties may enter into an unlimited number of Service Orders under the terms of this MSA, each of which will be subject to the terms of this MSA once executed by both Parties and shall reference this MSA as the governing terms and conditions.

**1.5** **Monthly-Recurring Charge ("MRC").** A monthly-recurring fee for continual services rendered under the terms of a Service Order.

**1.6** **Non-Recurring Charge ("NRC").** A one-time, non-recurring fee to (i) initiate a Service Order, also referred to as a "Setup Fee" or "Transition Fee" or (ii) perform other non-recurring Services.

**1.7** **Professional Services ("PS").** Professional Services are project-based services provided to Customer including: consulting, staff augmentation, application development, integration, design, installation, configuration, support, project management and other services performed by Company's employees, agents, subcontractors, consultants and representatives, as detailed in a Service Order.

**1.8** **SOW.** A "SOW" is a document that details the professional services to be performed for Customer, or key assumptions related to a MS.  A SOW is issued as part of a Service Order.

### ARTICLE TWO:  PROFESSIONAL SERVICES

**2.1** **Services.** Under the terms of this MSA, Customer may choose to purchase PS where each project is initiated by a separate SOW in a Service Order.

**2.2** **Personnel.** Company shall provide the necessary skilled personnel to perform the PS described in the applicable Service Order. Customer reserves the right to request a change in the assigned personnel as required by its business needs or as otherwise required to complete the PS.  If such a change is requested by Customer, the Company shall use commercially reasonable efforts to accommodate such request and the Parties shall enter into a Change Order if, in the Company's reasonable discretion, such change constitutes a change in the nature of the skill level or skillset being provided.

**2.3** **Invoicing and Payment for PS.** Notwithstanding the payment terms in Article 6 below, PS fees typically involve either a Fixed-Price fee or "Time and Materials" fee ("T&M") or a combination of both, as defined in the applicable Service Order. For Fixed-Price fees, Company shall invoice Customer upon completion of billable milestones as defined in the applicable Service Order or at the end of each month based on the percentage of work performed. For T&M Service Orders, Company shall invoice Customer at the end of each month based on work performed, or as otherwise outlined in the individual Service Order.  All such invoices shall be payable thirty (30) days from the date of invoice.

Master Services Agreement
Page 1 of 18
April 20, 2018
Synoptek, LLC

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

 **Services Agreement**

**ARTICLE THREE: MANAGED SERVICES**

**3.1     Services.** Under the terms of this MSA, Customer may choose to purchase MS, where each MS engagement is initiated by a separate Service Order, as defined above.

**3.2     General Service Level Agreement ("GSLA").** If purchasing MS, Customer acknowledges and hereby agrees to be bound by Company's General Service Level Agreement ("GSLA") attached hereto as *Exhibit B* and incorporated herein by reference.

**3.3     Services in General.** The terms of this Article 3 shall apply to all Services unless otherwise specified in this MSA.

**3.4     Order Acceptance.** A Service Order or Change Order is considered accepted by Company when the Service Order or Change Order, as is applicable, is returned to Customer via email, fax or mail countersigned by an Authorized Executive (as defined herein) of Company.

**3.5     Initial Term and Renewal.** The Term of any individual Service Order shall be set forth in such document. A Term shall automatically renew for additional twelve (12) month periods (which shall become the new Term) unless written notice by either Party is provided to the other Party at least thirty (30) days in advance of the expiration of a Term. Unless otherwise specified in the applicable Service Order or a related Change Order, when Customer and Company agree to a Change Order, the term for such Change Order, if longer than the then current Term of the applicable Service Order, shall automatically replace the then current Term of that Service Order.

**3.6     Price Increases.** At any twelve-month interval (month 12, 24, 36, etc.), all fees shall be subject to a price adjustment to account for increased cost of performance over time. Any such adjustment shall not exceed the CPI per year based from the original pricing date and shall be at the sole discretion of Company.

**3.7     Scheduled Start Date.** Any scheduled start for a Service Order, whether provided by Company in writing or orally, are estimates as to when the Services contemplated by that Service Order will be fully deployed and available for Customer use. Company cannot guarantee a date for full deployment and shall therefore not be subject to any liability for its failure to meet any scheduled start date.

**3.8     Cancellation.** Subject to the specific terms of this MSA, no Service Order may be cancelled before the end of the existing Term.

**3.9     Changes.** Changes to any Service Order may be made only upon the mutual written agreement of the Parties. No changes or additions shall be implemented or acted upon until both Parties execute the Change Order.

**3.10     Customer Responsibilities.** Customer shall support the Services of Company in all reasonable technical, administrative, and commercial ways and shall provide Company with all documentation, statements, and credentials reasonably requested for Company to perform the Services. Customer shall also be responsible to satisfy certain prerequisites before work by Company can begin as set forth in the applicable Service Order. Company shall not be responsible for delays caused by Customer. In order to ensure an effective partnership, Customer agrees to complete a quarterly Net Promoter Score survey upon Company request.

**3.11     Related Hardware and Software.** Customer understands and acknowledges that the fees for Services provided under this MSA are independent of any Product purchased or leased by Customer whether or not such Products are purchased or leased in conjunction with Company's provision of Services. If Customer purchases or leases any Product, it shall be subject the associated terms and conditions set forth in this MSA.

**3.12     Existing Network.** The terms of all Service Orders are based on the Services being provided to Customer's network and operating environment as such environment exists on the date when the Service Order is executed unless otherwise agreed to in the Service Order. Any updates to quantities of services by the Customer will automatically be reflected in the quantities invoiced by Company, once those changes are detected by Company. Customer will provide advance written notice of any new systems deployed by Customer in order to ensure support coverage from Company. Any Customer requests made of Company for new services or to make upgrades for Customer will require a Change Order or, in the Company's reasonable discretion, a new Service Order, and may impose additional NRC's and/or MRC's. Upgrades, unless stated in the Service Order are not included in the scope of Service. Requests outside of an executed Service Order may be handled as a Change Order, new Service Order or in another manner if deemed appropriate by Company. Any equipment necessary for Company's performance of the Services that is owned by Customer shall be the sole responsibility of Customer. Any damages or delay caused by the non-provision, failure or malfunction of Customer-owned equipment shall be the responsibility of Customer.

**3.13     Change in Delivery of Services.** With thirty (30) day notice to Customer, Company reserves the right to change the systems used to deliver, view, access and utilize the Services as described herein that materially affect Customer's systems. Those that do not materially affect Customer's systems may change at any time, without notice, at Company's sole discretion. In addition, Company retains the right to change the specific functions offered by a Service or the Service itself.

**3.14     Acceptable Use Policy.** If purchasing Services, Customer agrees to abide by Company's "Acceptable Use

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

 Services Agreement

Policy" ("AUP") attached hereto as *Exhibit A* and incorporated herein by reference.

**3.15    Security.**  The internet is not a secure network. Company does not assume responsibility for loss or theft of information transmitted over the Internet. As qualified by the foregoing, Company shall make commercially reasonable efforts to comply with the internal controls required to meet or exceed any applicable industry standards, including but not limited to: (i) building and maintaining a reasonably secure network, systems, and applications, and (ii) tracking access.

**3.16    IP Address Numbers and Domain Name.**  All network IP Address numbers that may be required for the Services, shall be provided solely by Company. If Customer leaves or terminates Company's Services, all network IP address numbers shall be returned to Company and will not be available for continued use by Customer.  Company will route Customer's domain name into its network. In the event Customer elects to have Company register a domain name on behalf of Customer, Company will do so with the Customer's understanding that Company is not responsible for the ownership, renewal, control and use of the domain name. In addition to any and all fees that Company requires from Customer to perform such registration services, Customer will be responsible for any and all other fees due and payable to a third party for such domain name services.

**3.17    Critical Risk Assessment Change Order.**  After Services have been fully deployed, if in Company's expert opinion Customer's systems being supported by Company become at risk with regard to Customer owned infrastructure that may be out of line with Company best practices in the area of environment (including HVAC, power, bandwidth, operating systems, servers, etc.), security or data availability (backup and recovery), Company shall submit a Critical Risk Assessment Change Order that outlines the area of concern and suggest implementation measures to remediate the risk. Customer shall have the option to 1) accept the Change Order in its entirety, 2) accept part of the Change Order or 3) reject the changes requested.  In the event that the Critical Risk Assessment Change Order is partially accepted or rejected, Company may be alleviated from certain contract requirements as outlined in the Critical Risk Assessment Change Order or be allowed to charge fees as outlined therein to meet the Agreement requirements or both.

**3.18    Decommission/Transition Services and Fees.**  Unless specifically called out in a Service Order no Services include any decommission or transition services at the end of any Term.  If, at the end of any Term, decommission or transition services are desired by Customer, Customer shall work with Company to determine what services if any are needed and Company shall propose decommission and/or transition services as part of a new Service Order which shall include all associated fees at then current rates if required.

**ARTICLE FOUR:  HARDWARE AND SOFTWARE**

**4.1    Acceptance.**  A written sales proposal provided by Company for sale of Product shall be considered only an offer for the sale of Products and shall be accepted by Customer when Customer does any of the following, whichever occurs first: (i) signs a Service Order that includes the sales proposal or; (ii) accepts the Products at the location where they were shipped; Products are deemed risk of loss transfers to Customer once product leaves the dock of the manufacturer, distributor, or any other third-party warehouse. Maintenance services provided pursuant to a binding Service Order are delivered electronically and Customer's acceptance occurs once services are sent. Where software cannot be delivered electronically (such as bundled hardware and software, disks, tapes, etc.), it is the responsibility of Customer to notify Company prior to acceptance.

**4.2    Shipment.**  Products will ship directly from the warehouse of the manufacturer of the Products, an authorized distributor of Company, or from Company's integration center (in any such case, "Shipping Point").  All Products are shipped F.O.B. Shipping Point, and all title, risk of loss, damage, or destruction to the Products shall pass to Customer as soon as the Products leave the Shipping Point. Company reserves the right, in its sole discretion, to select the means of shipment, Shipping Point, and routing.

**4.3    Returns.**  Returns are only granted for Products procured through Company, for the reasons listed below, and require compliance with the manufacturer's requirements. Acceptance of a return is in the sole discretion of Company and subject to acceptance of the return by the manufacturer, where applicable. Neither physical acceptance of returned Product, nor Company's assistance with attempts to return Product to the manufacturer shall be deemed Company's acceptance of a return.  No software may be returned.  Company may impose a twenty-five (25%) restocking fee on all returns for any reason other than those listed in (i) – (iv) below.  Refunds will not be given, but credits will be applied on accepted returns. All returns require the filing of a Return Merchandise Authorization ("RMA") which is available on Company's website (as amended from time to time).

(i)    Damaged Products. RMA must be filed within five (5) days from date of the Company's receipt of the damaged Products.

(ii)    Breach of Warranty.  RMA must be filed within five (5) days of the breach of all applicable warranties, if any. MANUFACTURER'S RETURN POLICY IS NOT A WARRANTY.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

 **Services Agreement**

(iii) Errant Products. If Customer receives shipment of Products over the quantity ordered, or Products that were not ordered, Customer shall notify Company and return such Products with manufacturer's external seal intact within five (5) days of Customer's receipt thereof.
(iv) Upgrades. If, pursuant to any Service Order, the Products purchased by Customer constitute an upgrade, Customer may return the original Product in accordance with the manufacturer's requirements for return of the same. If Customer fails to return the original Product within thirty (30) days of the date of receipt of the upgrade Product, then Customer will not be eligible to receive a credit for the original Product and shall pay the full purchase price for the upgrade.

**4.4    Cancellations.** Company has the right to cancel any orders placed for any Products listed at an incorrect price or shown with incorrect information, whether due to typographical error or otherwise, whether or not such errors were made by Customer or Company, and whether or not Customer's order was accepted. Upon any such cancellation, if the Products have not shipped, the Company will credit Customer for any fees owed. Upon any cancellation of Products that shipped, Customer shall return all Products unopened or, if opened, undamaged, within five (5) business days of the Company's written notification to Customer of such cancellation, and upon such return Company will issue a credit to Customer's account.

**ARTICLE FIVE:  WARRANTIES; LIABILITY**

**5.1    PS and MS Warranty.** Company represents and warrants that: (i) the Services delivered to Customer pursuant to each applicable Service Order shall conform and perform in all material respects to the specifications described in such Service Order; (ii) Company shall perform all Services hereunder consistent with or exceeding customary industry standards; and (iii) in providing the Services, Company shall not knowingly infringe upon the intellectual property rights of Customer or any third party. In order to receive any warranty remedies, Customer must report deficiencies in the Services within thirty (30) days of completion of those Services. For any breach of the above warranties, Customer's exclusive remedy, and Company's entire liability, shall be the re-performance of the Services. If Company is unable to perform the Services as warranted, Customer shall be entitled to a credit for the fees paid to Company for the deficient Services; refunds will not be given.

**5.2    Hardware and Software Warranty**. Warranty and warranty information, if applicable, are provided by the manufacturer of the Products, which shall pass to the Customer upon acceptance of the Products. While the Company tries to ensure the accuracy and completeness of its Products, the Company is not responsible for manufacturer's errors.

**5.3    Limitation of Liability.** UNDER NO CIRCUMSTANCES SHALL COMPANY, OR ITS OWNERS, DIRECTORS, OFFICERS, EMPLOYEES OR ANY OTHER AGENTS OR REPRESENTATIVES, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF BUSINESS, REVENUE, PROFITS, USE, DATA OR OTHER ECONOMIC ADVANTAGE (EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE (INCLUDING NEGLIGENCE ON THE PART OF THE COMPANY, ITS AFFILIATES, SUBSIDIARIES, OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS), OR ANY OTHER BASIS, AND EVEN IF SUCH DAMAGES WERE FORESEEABLE, ARISING FROM THE USE OF OR INABILITY TO USE CUSTOMER'S SYSTEMS, COMPONENTS, OR BOTH; OR THAT RESULT FROM MISTAKES, OMISSIONS, INTERRUPTIONS, DELETION OF FILES, ERRORS, DEFECTS, DELAYS IN OPERATION, TRANSMISSION, OR ANY FAILURE OF PERFORMANCE OR ANY BREACH OF THIS AGREEMENT BY THE COMPANY. IN NO EVENT SHALL COMPANY'S LIABILITY FOR BREACH, DEFAULT OR ANY FAILURE TO PERFORM EXCEED THE TOTAL AMOUNT PAID BY CUSTOMER UNDER THE APPLICABLE SERVICE ORDER DURING THE TWENTY FOUR (24) MONTHS PRECEDING THE CLAIM.

**5.4    Customer Equipment and Network Security.** All wiring, networking, physical security and environmental controls within Customer's facilities shall be the responsibility of Customer unless otherwise specified in this MSA. Any equipment necessary for Company's performance of Services or installation of Product, which is owned by Customer, shall be the sole responsibility of Customer.  Company will perform Services and install software on Customer equipment approved by Company. Non-approved equipment will be handled on a case-by-case basis as specified by Company. Company provides no user access security with respect to any of Customer's facilities or facilities of others. Customer shall be responsible for user access, security and network access on Customer facilities. Company will reasonably assist in network security breach detection or identification, but shall not be liable for any inability, failure or mistake in doing so. Customer agrees to indemnify, defend and hold Company harmless for any claim arising out of any breach of user or network access security and/or the security of Customer or third-party facilities, caused by Customer or Customer's third parties. Any software owned by Customer shall be the responsibility of Customer. Customer shall be responsible for any software licensing required by the software licensing agreement set by the software manufacturer. Any damage or delay caused by the non-provision or failure or malfunction of Customer owned hardware, software or other equipment, shall be the responsibility of Customer.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

**Services Agreement**

**5.5** **Connection Costs and Responsibilities.** Unless specified in a written document executed by Company and Customer, the Customer is responsible for the cost of the telecommunications line(s) and routing hardware that connects a Customer's office or user to the Company's network. All such costs and associated terms and conditions required by the telecommunications carrier to perform such services are in addition to the Services and shall be directly between the Customer and telecommunications provider.

**ARTICLE SIX: GENERAL PAYMENT TERMS**

**6.1** **General Terms.** Except for any shorter duration specifically set forth in this MSA or any Service Order all invoices are due and payable by Customer net thirty (30) days after the invoice date (the "Due Date").

**6.2** **Payment.** Any Setup Fee is invoiced when the applicable Service Order or Change Order has been executed by both Parties. Payment of the NRC is due and payable upon receipt of the invoice as set forth in such invoice. In the event that the scheduled start date for a Service Order that involves MRC does not fall on the first calendar day of a month, Company will calculate the pro-rated MRC for the partial first-month's service. Such prorated portion of the first month's MRC will be included in the Customer's first MRC invoice. Thereafter, Company will deliver invoices for MRC on a monthly basis in advance. If any government authority requires Customer to withhold part of any fees payable to Company hereunder, those fees will first be increased so that after diversion of that withholding to the relevant authority Customer remits to Company the full amount which would have been payable in the absence of such withholding.

**6.3** **Payment for Incidental Expenses.** For any Services where Company incurs travel, lodging, meals and other similar costs and expenses, including, without limitation, auto mileage charges, and such costs and expenses are either (i) referenced in the applicable Service Order, or (ii) requested by Customer, Customer shall reimburse Company for such costs expenses incurred by the Company (in any such case, "Regular Travel Costs"). Travel costs other than Regular Travel Costs shall be reimbursed by Customer provided that Customer has preapproved them, in writing, including without limitation, via email. Travel and other related expenses shall be billed to Customer once incurred and in no event more than once per month.

**6.4** **Taxes.** All prices are based on U.S. Dollars and all payments shall be made in U.S. Dollars. Customer shall be solely responsible for the payment of all taxes, including any interest and penalties, in connection with any payments made pursuant to this Agreement, including but not limited to any sales, use, excise, value-added taxes ("VAT"), consumption, and other taxes and duties assessed on the services. All Services under this Agreement are deemed taxable unless Customer provides Company with a tax exemption certification acceptable to all relevant taxing authorities prior to delivery.

**6.5** **Late Payments/Disputes.** A service charge equal to the lesser of 1.5% per month (accruing monthly), or the maximum rate allowed under applicable law (whichever is less), will be assessed on all amounts not paid or Disputed (as described below) on or before the Due Date until the same are paid. If within thirty (30) days after the Due Date, Customer fails to pay or Dispute any invoice, Company may, do any or all of the following: (i) refuse to accept any additional orders for Services or Product; (ii) restrict physical access or access per GSLA (as defined below); or (iii) suspend performing Services or further shipment of Product until the Customer has paid all undisputed past due amounts and charges related thereto.    During any period of suspension, no Service Interruption (as defined in the GSLA) shall be deemed to have occurred and, more generally, the Company will have no liability to Customer for delays or damages incurred by Customer or any third party because of such suspension. In addition, the Customer is responsible to pay all reasonable collection costs incurred by Company in its efforts to collect overdue invoices. In the event Customer desires to dispute any charge on an invoice, Customer must provide written notice of such disputed amount prior to the date that is thirty (30) days after the Due Date of the applicable invoice (a "Dispute"). In the event of a Dispute, only the disputed portion of the invoice may be withheld from payment and the undisputed portion must be paid on or before the Due Date. Customer will exercise reasonableness in initiating any Dispute. No interest will accrue on the invoiced amount specifically related to the Dispute until the Parties reach a mutually acceptable resolution, provided, however, if the Parties have reached such a resolution and Customer has not made the agreed upon payment per such resolution within sixty (60) days after the Due Date, the Customer shall be deemed in default hereunder.

**6.6** **Invoice Pricing.**

(i). Volume. Any volume pricing discounts specified in any Service Order or Sales Proposal are subject to Customer's continued purchase of Service or Product, as is applicable, at the levels and pursuant to the terms set forth in the applicable Service Order. In the event that Customer falls below the levels mentioned in the immediately prior sentence, Company's list pricing shall apply to all Products and Services.

(ii). Third Party Price Increases. If, during the then current Term, a third party provider used by Company to deliver the MS increases their pricing by 5% or more to Company, Company may immediately increase

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

 **Services Agreement**

Customer price(s) to account for that cost increase, dollar for dollar, with no fee.

## ARTICLE SEVEN: EXPORT COMPLIANCE

**7.1    Compliance.**    Customer understands and acknowledges that United States law and, in particular, the United States Export Administration Regulations ("EAR") govern the sale, export or other disposition of the Products and related technical data that are the subject of this Agreement. Customer therefore agrees to adhere to all provisions of the EAR and the terms, conditions, required procedures, and documentation of any export licenses or other approvals issued for the Products and related technical data. Specifically, Customer agrees that it will not participate in the transfer by any means of any Product or technical data acquired from Company: (i) in violation of the EAR or any order or license issued under its provisions, or (ii) with the knowledge or with reason to know that a violation of the EAR, an order or a license has occurred, is about to occur, or is intended to occur with respect to any such Product or technical data. In the event that any license or approval is required in order for Company to perform its obligations under this Agreement Company agrees to use its best efforts in obtaining such license or approval.  Customer agrees to fully cooperate with and support Company in obtaining any required license or approval and in maintaining Company's strict compliance with the EAR, including, but not limited to, executing any required documents or providing any required information.

**7.2    Violations.**    Company shall be relieved of all obligations to Customer if Customer violates the EAR or the provisions of any export license or approval, or if such export licenses or approvals are not issued, are suspended or revoked by the United States Government, or if Customer fails to comply with the other requirements of Article 7.1 or this Article 7.2.

## ARTICLE EIGHT:    CONFIDENTIALITY;    NON-SOLICITATION

**8.1    Duty to Protect.** By virtue of this Agreement the Parties may have access to information that is confidential or proprietary to the other Party ("Confidential Information"). Company and Customer agree to use reasonable commercial care (the same being not less than that employed to protect such Party's own proprietary and confidential information) to safeguard each other's proprietary and confidential information and to prevent the unauthorized use or disclosure thereof. Company considers this Agreement and other documents related hereto (and the contents in all of the foregoing, including without limitation, pricing and service descriptions) to be proprietary and confidential, and these shall not be disclosed to anyone by Customer without the prior written consent of Company except to those employees of Customer who need this information in connection with their job. Each Party may disclose proprietary and confidential information of the other

Party to any regulatory, law enforcement agency or other Government third party if it is requested to do so in writing, provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.

**8.2    Exclusions.** Confidential Information shall not include any information that: (i) prior to the effective date, has been disclosed in publicly available sources of information, (ii) is, through no fault of either Party, hereafter disclosed in publicly available sources of information, (iii) prior the effective date was in the possession of the disclosing Party without any obligation of confidentiality, or (iv) has been or is hereafter rightfully acquired from a third party who itself was not in breach of confidentiality restrictions and the disclosure is authorized by the third party.

**8.3    Remedies.** Each Party acknowledges that any breach of the provisions of Article 8.1 shall result in serious and irreparable harm to the non-breaching Party for which the non-breaching Party cannot be adequately compensated. Each Party agrees, therefore, that in addition to any other remedy that the non-breaching Party may have in law or equity, the non-breaching Party shall be entitled to seek specific performance of the obligations in Article 8.1 by the breaching Party by way of an injunction.

**8.4    Non-Solicitation of Personnel.** During the Effective Date of this MSA, and for a period of one (1) year thereafter, neither Party shall, either directly or indirectly, employ or solicit for employment any employee of the other Party or any of its affiliates with whom the hiring Party had contact or became aware of during the business relationship governed by this Agreement; provided, however, that this prohibition will not apply to advertisements of open positions that are made public by either Party in a manner which does not specifically target the employees of the other Party and the hiring of candidates who respond to such advertisements. If a Party breaches this Article 8.4, the breaching Party shall pay to the non-breaching Party a "hire-away fee" of ninety percent (90%) of the first year's total compensation package offered by the breaching Party to the employee. Payment to the non-breaching Party will be made on date of hire. If a Party's employee voluntarily resigns and begins working for the other Party within one hundred and eighty (180) days of the resignation, the hiring Party agrees to pay the other Party a fee of ninety percent (90%) of the first year total compensation package offered by the hiring Party to the employee.

## ARTICLE NINE: OWNERSHIP RIGHTS AND LICENSES

Unless otherwise provided in the applicable Service Order, all specifications, documentation, ideas, know-how, technique, processes, developments, inventions, software, script, code, tool, and other intellectual property and work product created for the Services (collectively, "Company IP")

Master Services Agreement
Page 6 of 18
April 20, 2018
Synoptek, LLC

Confidentia

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

Page 31 of 60                                                                                    EXHIBIT A

 **Services Agreement**

shall remain the property of Company; however, Company hereby grants Customer an irrevocable (during the Term in which the Services are being provided or as otherwise specifically set forth in a specific Service Order), worldwide, royalty-free, non-exclusive, nontransferable right and license to use such Company IP in support of Customer's use of the Services. Company IP does not include any Customer owned intellectual property. The rights granted with respect to the Company IP in this Article 9 do not extend to any parent, subsidiary or affiliate of Customer or to any other individual or entity except for Customer's employees with the need to use the Company IP for performance of the work for Customer. Except to the extent reasonably necessary for archiving, back-up, and disaster-recovery purposes, Customer shall not make copies of Company IP without Company's prior written consent. Upon termination of this MSA for any reason or in any manner, or upon the request of Company, Customer agrees to deliver promptly to Company all such documents, whether in written, graphical, electromagnetic or any other form, together with any other of Company's property then in Customer's possession, except as Customer may be required to retain, and only to such extent, based on applicable law or regulation by prior written approval, and in its sole and absolute discretion, Company may allow Customer to retain. Customer grants to Company an irrevocable, worldwide, royalty-free, non-exclusive, nontransferable right and license to use any data or software supplied by Customer and not otherwise covered by this Article 9 for the purpose of performing the Services. Nothing in this Article 9 shall be construed to grant Company additional rights in such data or software. Without limiting the generality of other terms of this Article 9, Customer will not modify, create derivative works from or reverse-engineer Company IP.

## ARTICLE TEN: TERM AND TERMINATION

**10.1    Term.** The Term of any Service Order shall be stated in the individual Service Order. The MSA term shall continue in full force and effect starting on the Effective Date and continuing until the earlier of (i) the date that all obligations of the Parties under all Service Orders have been completed or (ii) either Party terminates pursuant to the terms and conditions herein. In order to protect the continuity of Services for Customer, if for any reason any Term ends and services are needed to continue as agreed to between the Parties, the Term shall automatically become month-to-month and all pricing shall be subject to a 20% surcharge.

**10.2    Termination for Convenience.** Except as otherwise provided in this Agreement, Customer shall not terminate any Service Order until the expiration of the applicable Term except upon payment of a "Termination Fee." Subject to this Article 10.2, the Termination Fee shall comprise all amounts accrued prior to such termination, plus the value of the unpaid balance of the aggregate NRC, MRC and all other fees, and costs incurred, for the duration as if

such Service Order had not terminated. If Company is providing T&M Services (or other hourly services), with respect to such Services, the Termination Fee will be the reasonable value of Company's services performed up to the date of termination, which is presumed to be the hours worked at the rate specified, up to the last completed milestone per the applicable Service Order. The Termination Fee recognizes that Company has invested substantial resources in order to provide Services to Customer during the Term. If Customer chooses to terminate for convenience, Company will make commercially reasonable efforts to provide Customer its data and messaging at a reasonable charge.

**10.3    Termination for Breach and Remedies.** Upon material breach of this MSA, any Service Order, or Service, this MSA, applicable Service Order or Service may be terminated by either Party immediately and upon written notice provided that the violation is not remedied within thirty (30) days of delivery of the notice. Customer has the right to only terminate the breached Service, rather than all Services associated with this Agreement or any Service Order. Upon termination of any Service Order except as otherwise provided for in this MSA, the obligations of either Party to the other under all existing Service Orders or non-breached Services on a Service Order that has a breached Service, shall continue in effect as though this MSA had not been terminated until such Services are completed and all Products delivered and paid for a specific Service Order or Service within a Service Order. With respect to an asserted breach by Company for its failure to achieve promised Service standards, Customer may terminate the applicable Service only if Company fails to achieve Service standards for two (2) consecutive months, provided, however, that Customer provides Company with written notice detailing the manner in which such Services have failed to meet the established standards and Company fails to commence performance of the Services up to such standards prior to the end of the second month.

**10.4    Terminations for other Causes.** It shall be deemed a material breach by Customer if it becomes insolvent or bankrupt, admits in writing its inability to pay its debts as they become due or makes an assignment for the benefit of creditors; or the applies for or consents to the appointment of any receiver, trustee or similar officer for it or for all or any substantial part of its property; or the institutes any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction, or any such proceeding is instituted against it and is not dismissed within sixty (60) days; or any judgment, writ, warrant or attachment or execution of similar process is issued or levied against a substantial part of its property and remains unsatisfied for sixty (60) days; or Dissolves, liquidates or otherwise terminates its existence as an entity, or consolidates with or merges with or into any entity which is a direct competitor of Company or sells, leases or otherwise disposes of all or substantially all of its assets to a

Master Services Agreement
Page 7 of 18
April 20, 2018
Synoptek, LLC

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

 **Services Agreement**

direct competitor of Company or incurs a substantial amount of indebtedness other than in the ordinary course of its business except for transactions which do not result in the acquisition of an entity or business which is a competitor of Company, in each case whether in a single transaction or in a series of related transactions Customer or the person or persons in control of Customer shall (or shall threaten or propose to) sell, assign, part with or cease to carry on its business or that of its business relating to computing services.

**ARTICLE ELEVEN: MISCELLANEOUS**

**11.1    Relationship of Parties.** Company's relationship with Customer is that of an independent contractor and nothing in this Agreement will be construed to create a joint partnership, joint venture, or employer-employee relationship.

**11.2    Customer's Representations.** Customer represents and warrants to Company that: (i) Customer will assure that all persons accepting the Products on behalf of Customer, will be duly authorized by all necessary corporate procedures or other action of Customer; (ii) Customer's execution of the MSA will not violate any provision or law of its governing, organizational documents, or result in the breach of any agreement to which the Customer is a party; (iii) Customer will assure that all persons executing a Service Order or Change Order will be duly authorized by all necessary corporate procedures or other action by Customer; and (iv) Customer is the end-user of the Products and Services.  Customer acknowledges and agrees that Company's performance is dependent on Customer's timely and effective satisfaction of all of Customer's responsibilities hereunder and timely approvals by Customer. Company is entitled to rely on all approvals of Customer in connection with the products provided hereunder. Customer further acknowledges and agrees that Customer may have to comply with other terms and conditions apart from those hereunder which may be required by third parties with whom Company conducts business.

**11.3    Notices.** All notices required or permitted to be given hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the Party to be notified; (ii) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after deposit with a nationally recognized overnight courier. All communications shall be addressed to the parties at their respective addresses set forth on the signature page of this MSA. Either Party may change the address to which notices or other communications shall be sent or delivered by giving advance written notice to the other party.

**11.4    Arbitration.** Any controversy, or claim arising out of, or related to this Agreement, or breach thereof, shall be

settled by mandatory arbitration, to be held in Orange County, California, in accordance with the rules of the American Arbitration Association and the decision of the arbitrator(s) shall be binding on the parties thereto.  The Parties sharing equally the costs of arbitration; provided, however, the prevailing Party in any arbitration shall be entitled to recover its reasonable legal fees and costs. Nothing in this Article 11.4 shall prohibit either Party from bringing provisional or ancillary actions to obtain remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration, including, without limitation to enforce a Party's rights under Article 8 of this MSA, and the exercise of any such remedy does not waive either Party's right to arbitration.

**11.5    Waiver.** The waiver by either Party of any default or breach of this Agreement shall not constitute a waiver of any other provision of this Agreement.

**11.6    Assignment.** Customer shall not assign or transfer this MSA or any Service Order or other rights or obligations related to this MSA, or any of the rights Customer obtains in the Products, without in any such case, prior written consent of Company. Consent will not be unreasonably delayed or denied if assignment, transfer, or sublicense of the rights is to a reputable (as determined in the Company's sole discretion) individual or entity that Company should not, in its reasonable discretion, expect to enter into a separate MSA and purchase its own Products and Services. To the extent that an approved assignment by Customer occurs, the terms and conditions of this MSA and all related documents shall be binding upon the successors and assigns of the Parties hereto.

**11.7    Governing Law.** This Agreement shall be construed under and governed by the laws of California excluding any conflict of laws principles that would require the application of the law of another jurisdiction.

**11.8    Severability.** If any part of this Agreement shall be held invalid or unenforceable, the remaining provisions of this Agreement will remain in full force and effect.

**11.9    Entire Agreement and Amendment.** This Agreement shall constitute the complete and exclusive agreement between the Parties respecting the subject matter. Except as set forth herein, this MSA may not be amended, terminated or superseded except by an agreement in writing executed by the Parties. This MSA supersedes all previous agreements between the Parties, whether oral or written, regarding the Services to be provided and Products to be sold hereunder. Notwithstanding 11.14, the terms of any Service Order can take precedence over this MSA with respect to that particular Service Order, if and only if, such Service Order specifically acknowledges the conflicting provision and contains an express provision over-ruling it.  The Company expressly rejects all terms and conditions set forth on any Customer's PO or other documentation which are contrary to, or in

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

## Master Services Agreement

addition to, or which in any way modify any of the terms and conditions contained in this MSA or in any Service Order. Company, at its sole discretion, may elect to accept changes or requests related to Services or Product from representative(s) of the Customer via oral or emailed direction from Customer's employees, representatives and agents who have acted on behalf of Customer with respect to this MSA or a particular Service Order. Customer agrees to be responsible for fees and costs incurred by Company as a result of these Customer request(s). In the event that Company accepts oral changes, Customer and Company agree to memorialize these changes with a signed written agreement or an acknowledgement email or fax between Company and an Authorized Executive of the Customer within seven (7) days of Company's request for such a written agreement or acknowledgement; provided, however, if Company has started any work or begun the process of ordering any Product, Customer shall be bound. Any such agreements or acknowledgements will be a Change Order or new Service Order.

**11.10   Force Majeure.** Neither Party shall be liable for any loss or damage, for any failure or delay in delivery due to causes beyond its control, including, but not limited to, fire, acts of God or the public enemy, terrorist act, or acts of governmental bodies or agencies.

**11.11   Contacts and Authorized Executive.** On each Service Order the Customer and Company shall designate one or more Authorized Contact Person(s) and one or more "Authorized Executives." The Authorized Contact Person(s) shall be the primary points of contact for administration of the project addressed in such Service Order.   The Authorized Executive shall be, subject to the Company's rights in Article 11.9, the only person authorized to bind the Company or the Customer, as the case may be, with respect to such Service Order. If during the Term of such Service Order, prior to when all obligations thereunder a complete, a Party wishes to change the Authorized Contact Person(s) or an Authorized Executive, that Party shall notify the other Party in writing of the name, address, email and telephone numbers of the new Authorized Contact Person(s) Authorized Executive.

**11.12   Access by Company.**   Where access to Customer's premises is necessary due to the nature of Services to be performed or Product delivered, Customer will coordinate with Company to provide ingress and egress over Customer's real property and further grants Company a license to provide the Services set forth in any Service Order issued hereunder, within the premises described therein. With respect to Services to be performed for Customer on a Product delivered to property not owned by Customer, the Customer will secure, at its own cost, prior to the commencement of any Services or delivery of Product, any necessary rights of entry, licenses, permits or other permission necessary for Company to provide Services. Company shall not be liable for delay in performance or nonperformance of any term or condition of this Agreement, directly or indirectly, resulting from denial to Company of the required access to Customer's systems and components thereof, or denial to Company of the required access to Customer's personnel or premises pursuant to this Agreement essential for completion of the Services.

**11.13   Public Release of Information.**   Company shall not have the right to use Customer's name and the general nature of the services provided in any listing of Company's clients for external communications and business development purposes without prior written consent. Company will not use Customer's logo without prior written consent from Customer.

**11.14   Headings.**   This MSA and all documents related thereto are subject to and have been negotiated by the Parties and no provisions shall be construed strictly against either Party.  The captions, headings, articles and sections are for convenience only and do not in any way limit or amplify any term or provision hereof.

**11.15   Order of Precedence.** Any inconsistency in this Agreement or any documents associated with this Agreement shall be resolved by giving precedence in the following order:

- Terms of this Agreement
- Terms of a Service Order or Change Order (excluding terms incorporated by this Agreement)
- Terms of a Statement of Work (if any) associated with a Service Order or Change Order
- Other terms incorporated specifically into a Service Order or Change Order

### ACKNOWLEDGMENT

The Parties have signed below to indicate their acceptance of the terms and conditions of this Agreement.

| Synoptek, LLC: | Customer: Synapse Financial Technologies, Inc. |
|---|---|
| Name: Eric Westrom | Name: Sankaet Pathak |
| Title: CTO | Title: CEO |

Master Services Agreement
Page 9 of 18
April 20, 2018
Synoptek, LLC

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

 **Master Services Agreement**

| Date: *1/9/2019* | Date: 01 / 09 / 2019 |
|---|---|
| Signature: | Signature: *sankaet pathak* |
| Address for Notices:<br>Attn: Accounting Department<br>412 E. Parkcenter Blvd, Suite 300<br>Boise, ID 83706<br>Phone: 208.422.9125<br>Fax:    949.241.8690 | Address for Notices:<br>101 2nd St, Suite 1500, San Francisco, CA 94105<br><br>CC: legal@synapsefi.com |



Master Services Agreement
Page 10 of 18
April 20, 2018
Synoptek, LLC

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

**Master Services Agreement**

**Exhibit A**
**Acceptable Use Policy ("AUP")**

**1. Introduction.** This Acceptable Use Policy ("AUP") is designed to help protect customers and the internet community from fraud, abuse of resources, and irresponsible or illegal activities. The Company makes no guarantee regarding, and assumes no liability for the security and integrity of, any data or information the Customer or its users transmits via the service or over the Internet, including any data information transmitted via any server designated as "secure." As a service provider, it is not practical for the Company to monitor the content of information passing through its network. The Company exercises no control whatsoever over the content of any information passing through our network and is not responsible for damages customers may suffer for any reason from such data. Any persons or organizations, including the Company's customers, who publish material or information made accessible through the Company's networks are solely responsible for the content of such material and information, and are solely responsible to know and comply with the laws applicable to the publication of such materials and information. The Company will cooperate with legal authorities in the investigation of any suspected criminal or civil infringements. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms as are set forth in the Master Services Agreement to which with AUP is attached.

**2. Customer Responsibilities.** Services provided by the Company are intended solely for the use of the Customer, its affiliates and/or subsidiaries that are connected by LAN, WAN or remote access applications; services may not be re-sold to or used by any outside entity without prior written consent from the Company. Customer is responsible for the activities of its end-users and agrees to inform its customers and/or end-users of this AUP or its own Acceptable Use Policy, which must not be inconsistent with the terms herein.

**3. Prohibited Conduct.** The Services may not be used in violation of any community standards, accepted Internet policy, laws or regulations of local, State or Federal governments or Agencies thereof, or international treaty. Customer agrees indemnify, defend and hold the Company harmless for any claims arising out of the misuse of Services by Customer. Illegal actions such as, but not limited to, misuse of copyrighted, patented or protected materials, use of the Services for defamatory, threatening or obscene purposes, and the mass distribution of any message on an intrusive basis to users of the Internet, is prohibited. This prohibition extends to the sending of unsolicited mass mailings from another service, which in any way implicates the use of the Services, Company equipment or any of Company email or IP address(es). Any such violations may be grounds for termination of the Services, in addition to triggering any and all other rights of the Company. Without limiting the generality of the foregoing provisions of this paragraph 3, the following activities illustrate some, but not all, prohibited uses under this AUP:

- Copyright or Trademark Infringement. Transmitting, uploading or posting any material that infringes any copyright, trademark, patent, trade secret, or any other proprietary right of a third party, including, but not limited to, the unauthorized copying of copyrighted material, incorporating a third party's trademark within an email address without the prior authorization of the trademark owner, the digitization and distribution of photographs from magazines, books, or other copyrighted sources, and the unauthorized transmittal of copyrighted software.

- Denial of Service: Engaging in any activity that will interfere or attempt to interfere with the service of any other user, host or network on the internet.

- Distribution of Viruses, Worms, Trojan Horses or Other Destructive Activity that Compromises Security: Intentional distribution of software that attempts to and/or causes damage or annoyance to persons, data, and/or computer systems, service or equipment, including, without limitation, using or distributing, Internet viruses, worms, Trojan Horse programs, password guessing programs, decoders, keystroke loggers, cracking tools, packet sniffers, flooding a network, encryption circumvention devices or unauthorized port scanning.

- Forging Headers: Forging or misrepresenting any message header, in part or whole, of any electronic transmission, originating or passing through the Synoptek network.

- Email Spamming or Mail Bombing: The transmitting of unsolicited email to multiple recipients, sending large amounts of email repeatedly to a person to harass or threaten, or any attempt to use Synoptek servers as a mail drop or name server for SPAM. Sending unsolicited bulk email from another Internet service provider's network advertising or implicating any service hosted or provided by Synoptek, including without limitation email, web, FTP and DNS services.

- Fraudulent Activities: Any intentional misrepresentation or misleading statement, writing, or activity made with the intent that the person receiving it will act upon, obtaining or attempting to obtain service by any means or device with intent to avoid payment.

- Harm to Minors. Harming, attempting to harm, or exploiting minors in any way, including, but not limited to, the use of the Services (i) to receive, distribute, solicit, present, or store illegal images or URLs containing child pornography, or (ii) to post or disclose personal identifiable information or private information of individuals under the age of 13 or in connection with materials directed towards children under the age of 13 without verifiable parental consent.

- Illegal or Unauthorized Access to Information, other Computers, Accounts or Networks: Accessing, or attempting to access, any computer resource belonging to another party, or attempting to penetrate security measures of other systems, whether or not the intrusion results in corruption or loss of data. This includes Collecting, or attempting to collect, personal information about third parties without their knowledge or consent or under false pretenses.

- Network Sabotage: Any use of Synoptek's services to interfere with the use of the internet resources or the Synoptek network by other customers or end-users.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

## M͟S͟G͟ Services Agreement

- <u>Phishing</u>. Attempting to impersonate any person or entity, engaging in sender address or network header falsification, or forging anyone else's digital or manual signature.
- <u>Unlawful Acts</u>: Any use of Synoptek's services to violate the law or aid of any unlawful act.
- <u>Usenet Spamming</u>: Posting of messages to newsgroups, and the posting of harassing and/or threatening messages.
- <u>Telemarketing/Unsolicited FAX</u>: Use of the network for telemarketing via IP based telephony in violation of the Telephone Consumer Protection Act, Telemarketing and Consumer Fraud Abuse Prevention Act as well as other applicable laws, including both voice and facsimile transmissions.
- <u>Facilitating a Violation of this AUP</u>: Advertising, transmitting, or otherwise making available any software, program, or product, or service that is designed to violate this AUP which includes, but is not limited to, the facilitation of the means to spam, initiation of pinging, flooding, mail bombing, denial of service attacks, and privacy software.

**4. Responsibilities of Sellers and Downstream Service Providers.** Some users may be customers of Internet Service Providers (ISPs) that receive Internet connectivity through Synoptek. Such ISPs (also known as resellers or downstream service providers) are responsible for informing their customers of this AUP and for enforcing its restrictions. Complaints about customers of any such reseller or downstream service provider will be forwarded to the reseller or downstream service provider for resolution. If Synoptek determines that a reseller or downstream service provider is not taking appropriate action in accordance with this AUP, Synoptek will work with the reseller or downstream service provider to review their policies and enforcement procedures. If the reseller or downstream service provider continues to fail to take appropriate action, Synoptek will take such action as it deems appropriate, up to and including termination of the Services.

**5. Violations and Enforcement.** Synoptek will enforce this AUP according to the severity of the offense and the Customer's history of prior AUP infringements. At Synoptek's sole discretion, violations of any element of this AUP may result; 1) in a written warning to the Customer followed by suspension or termination of services if the Customer does not cease the violation; or 2) Synoptek may immediately suspend or terminate services, and/or terminate any associated agreement for default. Repeat offenses will result in immediate termination of services and any associated agreement for default. Synoptek is not liable for any damages of any nature suffered by any Customer, user, or third party resulting in whole or in part from Synoptek exercising its rights under this AUP and waives any liability related to any violation.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

**MSA** Services Agreement

### Exhibit B
### General Service Level Agreement ("GSLA")

1. Definitions

   All capitalized terms used but not defined in this Exhibit shall have the meanings given them in the MSA to which this an Exhibit or the Work Order based on the order of precedence set forth in the MSA.  For purposes of this GSLA, the following terms shall have the following meanings:

   a. "Available" shall mean the System or Network is up, running and responsive to ping requests.
   b. "Databases" are the gathering of associated files or tables containing related data.
   c. "Data Management" are devices or Software that serves the purpose of backing up, replicating or storing data.
   d. "Excusable Downtime" shall mean, during planned Scheduled Uptime, the aggregate amount of time in any calendar month during which the System or Network is not Available for use by Customer due to action or inaction by Customer, anyone acting by, through or under Customer, or for any other reason aside from the acts or omissions of Company, or anyone acting by, through or under Company, which in any such case constitutes a breach of the MSA.
   e. "Hardware" is infrastructure or devices which work together to accept, process and show data and information.
   f. "Highly Available" services are those based on a redundant, N+1 fault-tolerant infrastructure whereby the failure of any single component should not result in loss of service for the Customer.
   g. "Incident" is defined as an unplanned interruption to a service or reduction in the quality of a service.
   h. "Mean Time to Restore Service (MTRS)" includes the elapsed time to repair the cause of an Incident plus the elapsed recovery time to restore normal service operation for all impacted systems and networks.
   i. "Network" means the voice and data related circuits and circuit termination equipment located at Company and Customer locations pursuant to which Company will provide the Services.
   j. "Scheduled Downtime" shall mean, during planned Scheduled Uptime, the aggregate number of hours in any calendar month during which the System or Network is scheduled to be not Available for use by Customer due to such things as preventive maintenance, System upgrades, etc.
   k. "Scheduled Uptime" shall mean the days of the week and hours per day that Company or Network is scheduled by Customer to be Available for use by Customer subject to mutually agreed upon Scheduled Downtime.
   l. "Service Availability" shall be calculated using the formula below for the purpose of determining whether Company's performance meets the agreed performance standard for Customer subscribed services.    The following is 'Service Availability' expressed as a mathematical formula:

   $$A = (SU - UD)/SU$$
   where:
   - $A$ = Availability
   - $SU$ = Scheduled Uptime
   - $UD$ = Unplanned Downtime

   The following is an example, determined on a monthly basis, using the above formula:

   $SU$ = 720 hours
   $UD$ = 6.25 hours
   $[(720 - 6.25)/720] = 99.13\%$.

   m. "Service Interruption" is a situation during Scheduled Uptime that the service is not Available.
   n. "Service Request" is a user request for information or advice, or for a standard change (a pre-approved change that is low risk, relatively common and follows a procedure) or for access to an IT service.
   o. "Service Level Guarantee (SLG)" describes the minimum level of service that Company has committed to provide and Company's failure to meet an SLG has financial penalties as described in this GSLA and the elsewhere in this Agreement.
   p. "Service Level Objectives (SLO)" describes a target objective for a level of service that Company has committed to provide. Company's failure to meet any SLO has no financial penalty.
   q. "Software" are programs that allow the Hardware to process the data.
   r. "System" is the computer technology specifically designed to carry out a planned task which include, without limitation, Hardware, Software, Databases, Networks and Data Management.
   s. "Transitional Support Plan" defines service level targets and support model details for support provided by Company while new services are deployed in the Customer environment.
   t. "Unplanned Downtime" shall mean, during planned Scheduled Uptime, the aggregate number of hours in any calendar month during which the System or Network is not Available.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

**Master Services Agreement**

2.   Exclusions to Services - Assumptions and Adjustments

*   *Exclusions to Services*
    Only Services explicitly described in a Service Order or Change Order will be provided.  All other services are excluded.  The following items are explicitly excluded unless specifically called out in any Change Order or Service Order as being included.  This list is descriptive only and not intended to limit those items which are excluded:
    o   Products, parts and materials required to repair Customer systems are not included.
    o   Major system upgrades or changes such as but not limited to: operating system upgrade, relocation of equipment, installation of new applications, or any projects that are not considered "routine maintenance, administration, or support" are not included.
    o   Adds, moves or change projects that exceed two hours of work time are not included.
    o   Application programming, modification and design work are not included.
    o   Services required that are a direct result of the Customer or an agent of the Customer modifying or changing the configuration of covered equipment without explicit, prior Company consent is not included.

*   *Excluded Events*
    The events listed below in this Section will have a material adverse impact on Company's ability to meet the SLO or SLG and in the event of an occurrence of any such event or combination of events, Company shall be excused from complying with any SLG or SLO until the cessation of any such events.

    All claims with respect to SLGs are excluded when one or more of the following conditions exist ("Excluded Events"):

    i.     The outage occurs during a Regular Maintenance Window or Emergency Maintenance Action as defined in Section 3 of this Appendix.
    ii.    The outage is caused in full or in part by acts or omissions on the part of the Customer, anyone acting by, through or under Customer, or anyone else except to the extent of any act or omission by Company or anyone acting by, through or under Company.
    iii.   The outage is caused in full or in part by equipment, business operations, software or facilities owned by or under the control of the Customer, including any third party equipment, except as a result of the acts or omissions of Company, or anyone acting by, through or under Company.
    iv.    The outage is caused in full or in part as a result of Company or its agents not being given access to the Customer's premises (if applicable) where related communications lines or equipment are located, after Company has requested such access.
    v.     The Customer fails to provide Company with accurate, up-to-date contact information for the "Escalation Plan" which will be created for Customer as part of the applicable Service Order, or when, after repeated attempts over a period of one hour or more, Company support staff is unable to reach at least one of the Customer's contacts on file when the event in question occurs.
    vi.    The failure or malfunction of equipment, applications or Systems not owned or controlled by Company.
    vii.   Force Majeure events.
    viii.  Any suspension of Service pursuant to a Service Order.
    ix.    Problems associated with Customer applications that cause the System or any portion thereof to be not Available.
    x.     A material increase in processing and the approval necessary for additional resources is partially or completely withheld by Customer.
    xi.    A publicly reported vendor-announced issue that affects Company's compliance with any SLO or SLG for a commercially reasonable period until a fix can be reasonably implemented.
    xii.   Periods of Excusable Downtime including but not limited to planned outages, change management, or Customer requested reboots.

3.   Service Level Agreement
    The terms of this GSLA apply to all current or future relevant Services offered under the Agreement.  Optional GSLA Addendums, if attached, include special provisions not covered by this GSLA.  These Addendums are created by Company to address special customer requirements not covered in the GSLA or to address exceptions.  All new Service Orders may require provisioning resources including, but not limited to documentation, altering of systems and processes

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

## M**⟲** Services Agreement

to achieve desired performance, and/or possible support enhancements to reach ideal standards. Service Levels may be reduced or suspended upon service commencement as defined in a Transitional Support Plan.

Maintenance Actions

i. Regular Maintenance Window

Company performs ongoing, proactive maintenance on the systems, networks and communications circuits that provide services to our Customers.  When performing any maintenance with the potential of causing a Service Interruption, Company will schedule this activity to take place during a pre-planned maintenance window.

Company will notify the Customer at least five (5) business days ahead of when such a maintenance window is scheduled to occur and how long it is expected to last. This notification will be made by email sent to the contacts listed in the Escalation Plan on file with Company.  Another email will be sent to the same contacts at the close of the maintenance window.

Company makes every attempt to perform such maintenance without disruption of service, including the integration of redundancy features in our network infrastructure, but depending on the type of work being performed, interruptions can occur.

ii. Emergency Maintenance Actions

In rare instances, Company may determine that some emergency, unscheduled maintenance action is required due to circumstances outside of our immediate control that could pose a serious threat to the operational integrity of our systems, networks, or facilities.

Company reserves the right to remove from service any equipment, which term shall include, without limitation, Hardware and Software, presenting a threat to life and/or property (e.g. fire) when a significant risk of additional damage exists should the equipment not be removed from service.

Company reserves the right to temporarily remove from our Network any equipment which Company determines poses a threat to the operational integrity of our Network. This action may be required for Incidents including, but not limited to, the Customer's equipment having been compromised in such a way that it can be used by an auto-replicating virus or denial of service attack.

In these circumstances in which Company determines to take emergency action, Company will contact the Customer in accordance with the Escalation Plan.

### Service Level Performance

**Service Level Guarantee (SLG):** Company will make commercially reasonable efforts to provide the following SLGs where services are managed by the Company and specifically associated within a Service Order or Change Order.  SLGs will be applied independently for each covered service item. Penalties may be accrued on individual covered service items if the service level performance in a given month fail to meet the stated guarantee.

Company will provide compensation to the Customer for affected services represented by associated Service Order or Change Order for SLGs that are not met. Any Discount must be requested in writing within thirty (30) days of the date the trouble ticket associated with the Unscheduled Downtime is closed. Customer waives any right to Discounts not requested within the thirty (30) day period. Discounts will be issued once validated by Company and then applied to Customer's next invoice.  No refunds will be given. This SLG Penalties Section provides Customer its sole and exclusive remedy for any Service Interruptions, deficiencies, or failures of any kind. The Discount will not apply and Customer will not be entitled to receive any Discount in the event the Incident involves an Excluded Event. Customer acknowledges that the Discounts are not cumulative.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

## Master Services Agreement

     **Network HA**: All managed Network Services that are categorized as Highly Availability will be fully operational 99.99% average uptime per month (no more than 5m of downtime).

### Service Availability (99.99% Services)

| Measure | Actual Monthly Performance | Performance Credit |
|---|---|---|
| Service Availability % by Service Item (T) | T >= 99.99% | No Credit |
| Service Availability % by Service Item (T) | 99.95% <= T < 99.99% | 4 Days Prorated credit for individual service item based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | 99.9% <= T < 99.95% | 8 Days Prorated credit for individual service item based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | T < 99.9% | See NOTE1 |

NOTE1:  Performance Credits where Service Availability % is below 99.9% is calculated as follows:

- 8 Days Prorated credit, PLUS
- 2 Additional Days Prorated credit for every 0.1% below 99.9%
- Total penalty may not exceed 15 days credit for a covered service item in a single month.

     **Servers & Storage HA**: All managed servers, physical or logical (VMs) that are categorized as Highly Availability will be fully operational 99.95% average uptime per month (no more than 22m of downtime).

### Service Availability (99.95% Services)

| Measure | Actual Monthly Performance | Performance Credit |
|---|---|---|
| Service Availability % by Service Item (T) | T >= 99.95% | No Credit |
| Service Availability % by Service Item (T) | 99.75% <= T < 99.95% | 4 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | 99.5% <= T < 99.75% | 8 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | T < 99.5% | See NOTE2 |

NOTE2:  Performance Credits where Service Availability % is below 99.5% is calculated as follows:

- 8 Days Prorated credit, PLUS
- 2 Additional Days Prorated credit for every 0.5% below 99.5%
- Total penalty may not exceed 15 days credit for a covered service item in a single month.

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

## Master Services Agreement

☐ **Network Non-HA:** All managed Network Services will be fully operational 99.9% average uptime per month (no more than 44m of downtime).

### Service Availability (99.9% Services)

| Measure | Actual Monthly Performance | Performance Credit |
|---|---|---|
| Service Availability % by Service Item (T) | T >= 99.9% | No Credit |
| Service Availability % by Service Item (T) | 99.5% <= T < 99.9% | 4 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | 99.0% <= T < 99.5% | 8 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | T < 99.0% | See NOTE 3 |

NOTE 3: Performance Credits where Service Availability % is below 99.0% is calculated as follows:

- 8 Days Prorated credit, PLUS
- 2 Additional Days Prorated credit for every 1% below 99%
- Total penalty may not exceed 15 days credit for a covered service item in a single month.

☐ **Servers & Storage Non-HA:** All managed servers, physical or logical, will be fully operational 99.5% average uptime per month (no more than 3.6hrs of downtime).

### Service Availability (99.5% Services)

| Measure | Actual Monthly Performance | Performance Credit |
|---|---|---|
| Service Availability % by Service Item (T) | T >= 99.5% | No Credit |
| Service Availability % by Service Item (T) | 97.5% <= T < 99.5% | 4 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | 95.0% <= T < 97.5% | 8 Days Prorated credit for impacted service items based on monthly charge for the month in which the outage occurred. |
| Service Availability % by Service Item (T) | T < 95% | See NOTE 4 |

NOTE 4: Performance Credits where Service Availability % is below 95% is calculated as follows:

- 8 Days Prorated credit, PLUS
- 2 Additional Days Prorated credit for every 2% below 95%
- Total penalty may not exceed 15 days credit for a covered service item in a single month.

*Confidential*

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

 **Services Agreement**

**Service Level Objectives (SLO):** Company will make commercially reasonable efforts to achieve the SLOs indicated in the charts appearing below for any service represented by associated Service Order or Change Order:

| Service Level Objective | Monthly Target |
|---|---|
| Time to Answer (Phone) | 90 Second Average Speed of Answer |
| Response to Email | 15 minutes or less |
| Call Abandonment Rate* | Less than or equal to 5% |
| Customer Satisfaction | 95% Satisfied |

*Calls <= 10 seconds and calls abandoned before the prompt are excluded

| | Synoptek Service Level Definitions & Targets | | Service Level Objectives | | | | |
|---|---|---|---|---|---|---|---|
| Priority | Type | Associated Service Now Priority Tag | First Response (Email Acknowledgement) (SLO Target > 95%) | First Activity (Live Acknowledgement) (SLO Target > 95%) | MTRS Target (SLO Target > 95%) | Continued after Updates | Explanation |
| P0 | Incident - Critical Event (Multiple Customer Outage) | P0 - Critical | 10 mins | 15 mins | 4 Hrs | Every 30 mins | Multiple Customer Critical Infrastructure Event – Service interruption of critical infrastructure, processes, systems, facilities, technologies, networks, assets and services essential to the customer's daily operations where Synoptek is responsible for service availability. Examples include, but not limited to: Cloud managed services, Hosted business applications, Exchange, VOIP, and network services. Incident is worked until service is restored. |
| P1 | Incident - Major Event (Single Customer Outage) | P1 - Major | 10 mins | 15 Min | 4 Hrs | Every 30 mins | Single Customer Critical Infrastructure Event – Service interruption of critical infrastructure, processes, systems, facilities, technologies, networks, assets and services essential to the customer's daily operations where Synoptek is responsible for service availability. Examples include, but not limited to: Cloud managed services, Hosted business applications, Exchange, VOIP, and network services. Incident is worked until service is restored. |
| P2 | Incident - Service Impairment | P2 - Impaired | 10 mins | 60 mins | 8 Hrs | Every 60 Mins | Multiple or Single Customer Infrastructure Impairment Event – significant degradation of service impacting daily operations of multiple users or business critical functions. Loss of N+1 redundancy is treated as an impairment event as well. Incident worked till degradation resolved |
| P3 | Incident - Single User (Critical Business Impact) | P3 - User Expedite | 15 mins | 60 mins | 8 Hrs | N/A | Single user with critical operations impacted or single critical function unavailable |
| P4 | Incident - Moderate | P3 - Moderate | 15 mins | 8 Business Hrs | 1 Business Day (12 Hrs) | N/A | Single user outage and/or limited degradation of functions affected. Business process can continue, or non-mission critical applications or hardware, like Development environments |
| P5 | Incident - Low | P4 - Functional | 15 mins | 32 Business Hrs | 3 Business Days (36 Hrs) | N/A | Single user functionality problems. Work around in place |
| Scheduled | Customer/End User Driven | Scheduled | 15 mins | N/A Scheduled Event | N/A Scheduled Event | N/A | Timeline at corrective action driven by customer |
| SA | Service Request - Expedited | P2 - User Expedite | 15 mins | 60 mins | 1 Business Day | Tbd | Expedited Service Request (must be explicitly requested by customer) |
| SR | Service Request - Standard | P5 - Service Request | 15 mins | 1 Business Day | 3 Business Days | N/A | Standard Service Request |

Business Day = Monday through Friday, excluding Company Holidays 06:00 - 18:00 Pacific Time

Master Services Agreement
Page 18 of 18
April 20, 2018
Synoptek, LLC

Confidential

Doc ID: 278eb6afd2812c63468417d9bef3843f048b1be2

EXHIBIT A

# EXHIBIT B



# Invoice

| | |
|---|---|
| **Date** | 4/1/2024 |
| **Invoice #** | 1245438 |
| **Acct. No.** | 802472 |
| **Invoice Total** | 9,002.46 |
| **Total Acct Balance** | 27,005.38 |
| **Overdue Balance** | 18,002.92 |

| **Bill To** | **Primary Service Location** |
|---|---|
| Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States | Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States |

| Terms | Due Date | PO # | Project |
|---|---|---|---|
| Net 30 | 5/1/2024 | | |

| Qty | Description | Rate | Amount |
|---|---|---|---|
| 2 | IFS-SNTMGT-ITaaS Site [04/01/2024 - 04/30/2024] | 603.889 | 1,207.78 |
| 4 | ITL-ITA-IT Advisory [04/01/2024 - 04/30/2024] | 247.0455 | 988.18 |
| 2 | IFS-SYNDED-Synoptek Dedicated Cloud (IaaS) [04/01/2024 - 04/30/2024] | 2,387.00... | 4,774.02 |
| 8 | SEC-IFPROT-SIEM Compliance Basic [04/01/2024 - 04/30/2024] | 87.8384 | 702.70 |
| 1 | SEC-IFPROT-SIEM Threat Intelligence Reporting [04/01/2024 - 04/30/2024] | 525.00 | 525.00 |
| 2 | SEC-VCISO-VCISO (BISG) [04/01/2024 - 04/30/2024] | 334.8839 | 669.77 |
| 1 | Finance Charges of $135.01 for open balance of $9000.46 | 1.50% | 135.01 |

| Remit Address | ACH / Wire Information | General | | |
|---|---|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY 10172<br>Routing Number:<br>Account Number:<br>Please send remittance advice to: AR@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 | **Subtotal** | 9,002.46 |
| | | | **Tax Total** | 0.00 |
| | | | **Total** | 9,002.46 USD |

EXHIBIT B

# EXHIBIT C

# Invoice



| Date | 5/1/2024 |
|---|---|
| Invoice # | 1246711 |
| Acct. No. | 802472 |
| Invoice Total | 9,002.46 |
| Total Acct Balance | 27,005.38 |
| Overdue Balance | 9,000.46 |

| Bill To | Primary Service Location |
|---|---|
| Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States | Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States |

| Terms | Due Date | PO # | Project |
|---|---|---|---|
| Net 30 | 5/31/2024 | | |

| Qty | Description | Rate | Amount |
|---|---|---|---|
| 2 | IFS-SNTMGT-ITaaS Site [05/01/2024 - 05/31/2024] | 603.889 | 1,207.78 |
| 4 | ITL-ITA-IT Advisory [05/01/2024 - 05/31/2024] | 247.0455 | 988.18 |
| 2 | IFS-SYNDED-Synoptek Dedicated Cloud (IaaS) [05/01/2024 - 05/31/2024] | 2,387.00... | 4,774.02 |
| 8 | SEC-IFPROT-SIEM Compliance Basic [05/01/2024 - 05/31/2024] | 87.8384 | 702.70 |
| 1 | SEC-IFPROT-SIEM Threat Intelligence Reporting [05/01/2024 - 05/31/2024] | 525.00 | 525.00 |
| 2 | SEC-VCISO-VCISO (BISG) [05/01/2024 - 05/31/2024] | 334.8839 | 669.77 |
| 1 | Finance Charges of $135.01 for open balance of $9000.46 | 1.50% | 135.01 |

| Remit Address | ACH / Wire Information | General | | |
|---|---|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for<br>International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY<br>10172<br>Routing Number:<br>Account Number:<br>Please send remittance advice to:<br>AR@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 | Subtotal | 9,002.46 |
| | | | Tax Total | 0.00 |
| | | | Total | 9,002.46 USD |

EXHIBIT C

# Invoice



| Date | 6/30/2024 |
|---|---|
| Invoice # | 1249820 |
| Acct. No. | 802472 |
| Invoice Total | 9,272.50 |
| Total Acct Balance | 36,277.88 |
| Overdue Balance | 27,005.38 |

| Bill To | Primary Service Location |
|---|---|
| Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States | Synapse Financial Services<br>101 2nd St Ste 1500<br>Suite 1500<br>San Francisco CA 94105-3656<br>United States |

| Terms | Due Date | PO # | Project |
|---|---|---|---|
| Net 30 | 7/30/2024 | | |

| Qty | Description | Rate | Amount |
|---|---|---|---|
| 2 | IFS-SNTMGT-ITaaS Site [06/01/2024 - 06/30/2024] | 603.889 | 1,207.78 |
| 4 | ITL-ITA-IT Advisory [06/01/2024 - 06/30/2024] | 247.0455 | 988.18 |
| 2 | IFS-SYNDED-Synoptek Dedicated Cloud (IaaS) [06/01/2024 - 06/30/2024] | 2,387.00... | 4,774.02 |
| 8 | SEC-IFPROT-SIEM Compliance Basic [06/01/2024 - 06/30/2024] | 87.8384 | 702.70 |
| 1 | SEC-IFPROT-SIEM Threat Intelligence Reporting [06/01/2024 - 06/30/2024] | 525.00 | 525.00 |
| 2 | SEC-VCISO-VCISO (BISG) [06/01/2024 - 06/30/2024] | 334.8839 | 669.77 |
| 1 | Finance Charges of $135.01 for open balance of $9000.46 | 1.50% | 135.01 |
| 1 | Finance Charges of $270.04 for open balance of $18002.92 | 1.50% | 270.04 |

| Remit Address | ACH / Wire Information | General | | |
|---|---|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for<br>International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY<br>10172<br>Routing Number:<br>Account Number:<br>Please send remittance advice to:<br>AR@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 | Subtotal | 9,272.50 |
| | | | Tax Total | 0.00 |
| | | | Total | 9,272.50 USD |



# Invoice

| Date | 7/1/2024 |
|---|---|
| Invoice # | 1249821 |
| Acct. No. | 802472 |
| Invoice Total | 9,202.36 |
| Total Acct Balance | 45,480.24 |
| Overdue Balance | 27,005.38 |

| Bill To |
|---|
| Synapse Financial Services |
| 101 2nd St Ste 1500 |
| Suite 1500 |
| San Francisco CA 94105-3656 |
| United States |

| Primary Service Location |
|---|
| Synapse Financial Services |
| 101 2nd St Ste 1500 |
| Suite 1500 |
| San Francisco CA 94105-3656 |
| United States |

| Terms | Due Date | PO # | Project |
|---|---|---|---|
| Net 30 | 7/31/2024 | | |

| Qty | Description | Rate | Amount |
|---|---|---|---|
| 2 | IFS-SNTMGT-ITaaS Site<br>[07/01/2024 - 07/31/2024] | 603.89 | 1,207.78 |
| 4 | SEC-IFPROT-SIEM Compliance Basic<br>[07/01/2024 - 07/31/2024] | 87.84 | 351.36 |
| 2 | IFS-SYNDED-Synoptek Dedicated Cloud (IaaS)<br>[07/01/2024 - 07/31/2024] | 2,387.01 | 4,774.02 |
| 1 | SEC-VCISO-VCISO (BISG)<br>[07/01/2024 - 07/31/2024] | 334.88 | 334.88 |
| 4 | ITL-ITA-IT Advisory<br>[07/01/2024 - 07/31/2024] | 247.05 | 988.20 |
| 1 | SEC-IFPROT-SIEM Threat Intelligence Reporting<br>[07/01/2024 - 07/31/2024] | 525.00 | 525.00 |
| 4 | SEC-IFPROT-SIEM Compliance Basic<br>[07/01/2024 - 07/31/2024]<br>SIEM - Compliance Basic - LA | 87.84 | 351.36 |

| Remit Address | ACH / Wire Information | General | | |
|---|---|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for<br>International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY<br>10172<br>Routing Number: ▮▮▮<br>Account Number: ▮▮▮<br>Please send remittance advice to:<br>AR@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 | Subtotal | 9,202.36 |
| | | | Tax Total | 0.00 |
| | | | Total | 9,202.36 USD |

EXHIBIT C

# Invoice



| Date | 7/1/2024 |
|---|---|
| Invoice # | 1249821 |
| Acct. No. | 802472 |
| Invoice Total | 9,202.36 |
| Total Acct Balance | 45,480.24 |
| Overdue Balance | 27,005.38 |

| Qty | Description | Rate | Amount |
|---|---|---|---|
| 1 | SEC-VCISO-VCISO (BISG)<br>[07/01/2024 - 07/31/2024] | 334.88 | 669.76 |

| Remit Address | ACH / Wire Information | General |
|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for<br>International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY 10172<br>Routing Number: ▇▇▇<br>Account Number: ▇▇▇<br>Please send remittance advice to:<br>AR@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 |

EXHIBIT C



| Date | 8/13/2024 |
|---|---|
| PO # | |
| Invoice Number | 1251694 |
| Payment Terms | Net 30 |
| Payment Due | 9/12/2024 |
| Total Acct Balance | $39,855.70 |
| Overdue Balance | $30,178.06 |

Synoptek
412 E. Parkcenter Blvd STE 300
Boise, ID 83706
Billing support: ar@synoptek.com

**Bill To**

Synapse Financial Services
101 2nd St Ste 1500
Suite 1500
San Francisco CA 94105-3656
United States

**Primary Service Location**

Synapse Financial Services
101 2nd St Ste 1500
Suite 1500
San Francisco CA 94105-3656
United States

| Item Description | Quantity | Rate/Cost | Amount |
|---|---|---|---|
| SEC-VCISO-VCISO (BISG)<br>[08/01/2024 - 08/31/2024] | 2 | $334.88 | $669.76 |
| IFS-SNTMGT-ITaaS Site<br>[08/01/2024 - 08/31/2024] | 2 | $603.89 | $1,207.78 |
| SEC-IFPROT-SIEM Compliance Basic<br>[08/01/2024 - 08/31/2024] | 4 | $87.84 | $351.36 |
| IFS-SYNDED-Synoptek Dedicated Cloud (IaaS)<br>[08/01/2024 - 08/31/2024] | 2 | $2,387.01 | $4,774.02 |
| ITL-ITA-IT Advisory<br>[08/01/2024 - 08/31/2024] | 4 | $247.05 | $988.20 |
| SEC-IFPROT-SIEM Threat Intelligence Reporting<br>[08/01/2024 - 08/31/2024] | 1 | $525.00 | $525.00 |
| SEC-IFPROT-SIEM Compliance Basic<br>[08/01/2024 - 08/31/2024]<br>SIEM - Compliance Basic - LA | 4 | $87.84 | $351.36 |
| Finance Charges of $405.08 for open balance of $27005.38 | 1 | $NaN | $405.08 |
| Finance Charges of $405.08 for open balance of $27005.38 | 1 | $NaN | $405.08 |

EXHIBIT C

| Remit Address | ACH / Wire Information | Contact Information |
|---|---|---|
| Make checks payable to:<br>Synoptek, LLC<br>P.O. Box 737625<br>Dallas, TX 75373-7625<br><br>** Please contact us for International Wire Instructions. | JPMorgan Chase Bank, N.A.<br>270 Park Avenue, New York, NY 10172<br>Routing Number: ▆▆▆<br>Account Number: ▆▆▆<br>Please send remittance advice to:<br>ar@Synoptek.com | 1-888-SYNOPTEK<br>D: 800-957-4872 x 1<br>F: 949-241-8690<br>ar@Synoptek.com<br><br>www.Synoptek.com<br>Tax ID: 46-3291703 |

**Total Amount Billable**    $9,677.64

**Total Taxes**    $0.00

**Grand Total**    **$9,677.64**

EXHIBIT C

# EXHIBIT D



# SIMPLIFIED TECHNOLOGY. SUPERIOR RESULTS.™

## Dual Hybrid Cloud Hubs

Service Order # 006468 | Version 1

Prepared for:                    Prepared by:

Synapse Financial Services        Ryan Ribary

process. technology. results.

# ⊃Synoptek

**Dual Hybrid Cloud Hubs**
Service Order # 006468 | Version 1

**Wednesday, January 09, 2019**

Synapse Financial Services
Sankael Pathak
101 2nd st Suite 1500
san francisco, ca 94105
sankael@synapsepay.com

Dear  Sankael Pathak,

Synoptek is pleased to submit this proposal as a response to your request for quote. Synoptek represents its capabilities and strengths with the best interest of our clients. The proposed services contained in this response will be delivered from Synoptek employees, inside of Synoptek managed facilities.

**The following core services are proposed:**

- 24x7x 365 Core Infrastructure Management
- 24x7 Infrastructure Monitoring, Response and Remediation
- Managed Security
- IT Advisory Services

**Our proposal outlines the following:**

- Executive Summary
- Scope
- Approach
- Transition Plan
- Assumptions & Risks
- Pricing & Terms
- Synoptek at a Glance
- Overview of Service Offering

On behalf of all of our teams at Synoptek, we look forward to the opportunity to serve you. We are absolutely confident that our history of performance, expertise, company culture, and high attention to the end user's experience will differentiate Synoptek from others in the market.

Synoptek is committed to providing the necessary professionals and resources to ensure the successful delivery of services contained in this proposal and will meet the requirements contained herein. We sincerely believe that our understanding of your current IT environment, combined with our ability to deliver these services will result in the best value for your organization.

This proposal will remain valid for 30 days from submittal and is binding based on the material shared between both parties, as well as the assumptions enclosed.

Thank you for your consideration. If you have any questions or need additional information, please contact me directly, 503.998.2177.

Sincerely,

Ryan Ribary
Sr Solutions Architect
Synoptek, LLC



**Dual Hybrid Cloud Hubs**
Service Order # 006468 | Version 1

## Terms and Conditions



Synoptek has deep experience providing managed IT support services for organizations that are driven to provide their staff with high service levels, outstanding customer service, and superb end user experience. We understand that pricing needs to be flexible and scalable with the organization. To achieve this Synoptek proposes a pricing methodology that simplifies cost calculation and provides complete IT support for Services enclosed in the pricing table, detailed below.

The Term of this Service Order shall be 36 months. The Term shall automatically renew in accordance with the terms set forth in the Master Services Agreement between the parties.

At no point will Customer allow Synoptek access to Client Data. Synoptek has no system to access data if it were to exist. This contract is a network management solution without data storage enablement.

If Customer is not notified 90 days prior to end of term of contract renewal, Contract will convert to month to month at the same rate.

In case of any conflict, the Terms in this Service Order shall prevail over the terms of the Master Services Agreement.



## General Assumptions



Recurring billing will be effective as of service turn up.

Non-recurring billing will be invoiced when this Service Order or Change Order has been executed by both Parties.

In no event will the then-current Monthly Recurring Charges (MRC) be reduced by more than five percent (5%) during the Term of this Service Order as result of any reduction in scope of Services.



Dual Hybrid Cloud Hubs
Service Order # 006468 | Version 1

## Dual Hybrid Cloud Hubs

**Prepared for:**

**Synapse Financial Services**
101 2nd st Suite 1500
san francisco, ca 94105
Sankaet Pathak
sankaet@synapsepay.com
(901) 942-8167

**Prepared by:**



**Synoptek, LLC**
Ryan Ribary
503.998.2177
Fax
rribary@synoptek.com

**Service Order Information:**
**Service Order #: 006468**
Version: 1
Delivery Date: 01/09/2019
Expiration Date: 02/07/2019

## Service Order Summary

| Description | NRC | MRC |
|---|---|---|
| IT Management | | $1,510.00 |
| Core Infrastructure Management | $3,000.00 | $5,448.00 |
| Security Management | $400.00 | $1,140.00 |
| Labor & Assessments | $11,250.00 | |
| **Subtotal(s)** | **$14,650.00** | **$8,098.00** |
| **Total(s)** | **$14,650.00** | **$8,098.00** |

This Managed Services Order is issued under the agreed terms and conditions of the Master Service Agreement on file. If these services are subject to taxation, the Client agrees that it will pay any such taxes invoiced by Synoptek. Both parties represent and warrant that they have full corporate power and authority to execute and deliver this Service Order and to perform their obligation hereunder, and that the person whose signature appears below is duly authorized to enter into this Service Order on behalf of the party and subject to all terms and conditions stated herein.

IN WITNESS WHEREOF, the parties have agreed to the terms and conditions of this Service Order as of the date of the last signature.

Synapse Financial Services

*sankaet pathak*
_____
Signature

01/09/2019
_____
Date

Synoptek, LLC

_____
Signature

01/09/2019
_____
Date

*1/9/19*

# ⑤Synoptek

## Service Order Details

### IT Management

| Short Description | Description | MRC | Qty | Ext. MRC |
|---|---|---|---|---|
| IT Advisory | IT Advisory services includes developing and managing a plan to enhance customer's IT systems and advance them along the capability maturity model. | $225.00 | 4 | $900.00 |
| vCISO | Virtual Chief Information Security Officer provides advisory services includes developing and managing a security plan, creation and/or development of policy to enhance customer's security posture. | $305.00 | 2 | $610.00 |
| | **Recurring Subtotal** | | | **$1,510.00** |

### Core Infrastructure Management

| Short Description | Description | NRC | MRC | Qty | Ext. NRC | Ext. MRC |
|---|---|---|---|---|---|---|
| ITaaS - Per Site | Monitoring, remediation and reporting for up to 4 network devices (router, switch, firewall, WAP, circuit) located in a single client site. Additional devices may increase pricing. Minimum of 5 users. LA and Silicon Valley | $500.00 | $550.00 | 2 | $1,000.00 | $1,100.00 |
| Performance Hub - client core - Device | Rental of customer solution based equipment. Sold with Client Performance Hub Hardware: HA Cisco Nexus 3048 1Gb switchs HA Fortinet Routing Firewall with IPS (1Gb Throughput), includes 4 virtual firewalls. | $1,000.00 | $2,174.00 | 2 | $2,000.00 | $4,348.00 |
| | **Subtotal** | | | | **$3,000.00** | **$5,448.00** |

### Security Management

| Short Description | Description | NRC | MRC | Qty | Ext. NRC | Ext. MRC |
|---|---|---|---|---|---|---|
| SIEM - Compliance Basic | SIEM-as-a-Service solution, fully hosted in our secure and compliant cloud to monitor critical systems. This includes manual daily log review required for regulatory compliance. Priced per device. | $50.00 | $80.00 | 8 | $400.00 | $640.00 |
| SIEM - Threat Intelligence Reporting | Monthly report highlighting incidents and resolutions. SIEMaaS Basic or Complete required. | $0.00 | $500.00 | 1 | $0.00 | $500.00 |
| | **Subtotal** | | | | **$400.00** | **$1,140.00** |

EXHIBIT D

# SSynoptek

**Dual Hybrid Cloud Hubs**
Service Order # 006468 | Version 1

## Labor & Assessments

| Short Description | Description | Price | Qty | Ext. Price |
|---|---|---|---|---|
| **Engineer for Networks** | A professional services engineer providing remote consulting and support services for customers and includes setup of PCI network coming from Master Card hardware onsite, and peering with AWS HA direct connect | $225.00 | 50 | $11,250.00 |
| | **One Time Subtotal** | | | $11,250.00 |

# ▽ HELLOSIGN

## Audit Trail

| | |
|---|---|
| **TITLE** | Synoptek |
| **FILE NAME** | Synoptek MSA  042018.docx and 1 other |
| **DOCUMENT ID** | 278eb6afd2812c63468417d9bef3843f048b1be2 |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ⟋ **SIGNED** | **01/09/2019** 18:54:58 UTC | Signed by Mariana Chapei (mariana@synapsefi.com) IP: 38.88.175.154 |
| ⟳ **SENT** | **01/09/2019** 18:55:11 UTC | Sent for signature to Sankaet Pathak (s@synapsefi.com) from mariana@synapsefi.com IP: 38.88.175.154 |
| 👁 **VIEWED** | **01/09/2019** 18:55:28 UTC | Viewed by Sankaet Pathak (s@synapsefi.com) IP: 38.88.175.154 |
| ⟋ **SIGNED** | **01/09/2019** 18:55:41 UTC | Signed by Sankaet Pathak (s@synapsefi.com) IP: 38.88.175.154 |
| ⊘ **COMPLETED** | **01/09/2019** 18:55:41 UTC | The document has been completed. |