CRAVATH, SWAINE & MOORE LLP
PAUL H. ZUMBRO (*pro hac vice*)
pzumbro@cravath.com
GEORGE E. ZOBITZ (*pro hac vice*)
jzobitz@cravath.com
ALEXANDER GERTEN (*pro hac vice*)
agerten@cravath.com
2 Manhattan West
375 9th Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

KELLER BENVENUTTI KIM LLP
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
JEREMY V. RICHARDS (Cal. Bar No. 102300)
(jrichards@kbkllp.com)
THOMAS B. RUPP (Cal. Bar. No. 278041)
(trupp@kbkllp.com)
101 Montgomery Street, Suite 1950
San Francisco, CA 94104
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Counsel for Jelena McWilliams,
in her capacity as Chapter 11 Trustee for
Synapse Financial Technologies, Inc.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>Debtor. | Case No. 1:24-bk-10646-MB<br><br>Chapter 11<br><br>**MOTION OF THE CHAPTER 11 TRUSTEE TO ALLOW AND PAY ADMINISTRATIVE EXPENSES**<br><br>Date:  TBD<br>Time:  TBD<br>Place: Courtroom 303<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

1

[[DMS:6790296v5:6/6/2025 1:54:54 PM

1    Jelena McWilliams, the duly appointed Chapter 11 Trustee (the "Trustee") for the bankruptcy estate of Synapse Financial Technologies, Inc. (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby submits this Motion (the "Motion") for an order in substantially the form attached hereto as **Exhibit A** (the "Proposed Order") allowing and authorizing the payment of certain administrative expenses of vendors that provided post-petition services to the estate, pursuant to section 105, 363, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code").

In further support of this Motion, the Trustee respectfully represents as follows:

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order No. 13-05* (C.D. Cal. Jul. 1, 2013), and Rule 5011-1(a) of the Local Bankruptcy Rules. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    Chapter 11 Filing

The Debtor's proprietary technology, software and data enabled the provision of banking and payment solutions by insured depository institutions ("IDIs") to non-bank financial technology businesses not affiliated with the Debtor ("Fintechs"). The Debtor partnered with certain IDIs ("Partner Financial Institutions") to enable the provision of their banking services to Fintechs, who in turn offered various financial products to companies and individuals ("End Users"). The Debtor's technology and software formed a network among Fintechs, Partner Financial Institutions and End Users that ultimately allowed for financial transactions for End Users to take place. The Debtor's technology included, as a prime example, ledger services to record transactions on behalf of the Partner Financial Institutions.

The Debtor wholly owns two (2) subsidiaries: (i) Synapse Credit LLC ("S Credit") and (ii) Synapse Brokerage LLC ("S Brokerage"). S Brokerage is a registered broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").

2

The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 22, 2024 (the "Petition Date") with the goal of selling substantially all of its assets (the "Purchased Assets") to the highest and best bidder. [Dkt. No. 1]. That same day, the Debtor filed an emergency motion for an order approving the sale of all its assets for $9.7 million to TabaPay Holdings, LLC. [Dkt. No. 2]. The Debtor also filed a motion to approve a settlement reached with Evolve Bank & Trust ("Evolve") with respect to a dispute between the two parties regarding amounts of End User funds held by Evolve, as well as Evolve's handling of certain funds held in Debtor-related accounts. [Dkt. No. 9]. At the hearing to approve the sale of the Purchased Assets on May 9, 2024, the Debtor reported that it failed to reach a settlement with Evolve. The buyer reported that it was unwilling to proceed with the sale without the Evolve settlement, so the bidding procedures and the sale process were halted. [Dkt. No. 146].

Disputes between the Debtor, Evolve and other Partner Financial Institutions (regarding the fact that balances reported on the Debtor's ledger and systems did not reconcile with actual funds held at Partner Financial Institutions, among other issues) escalated. The conflict between the parties eventually resulted in accounts being frozen and End Users losing access to their funds.

On May 14, 2024, the Court conducted a status conference regarding End Users' access to their funds and parties continued to report that End Users did not have access to funds and were experiencing personal hardships.

On May 15, 2024, the United States Trustee for the Central District of California (the "U.S. Trustee") filed a motion on an emergency basis requesting that the Court enter an order converting the chapter 11 case to chapter 7 for cause, or, in the alternative, for the appointment of a chapter 11 trustee. [Dkt. No. 146].

On May 24, 2024, the Debtor reported that it would run out of all available cash, terminate the balance of its employees and cease any remaining operations by the end of the day on May 24, 2024. The Debtor further noted that without additional funding, which did not appear to be available, there was no chance of a reorganization or sale of the Debtor's business as a going concern.

[[DMS:6790296v5:6/6/2025 1:54:54 PM

On May 24, 2024, following a hearing, the Court entered an order appointing a chapter 11 trustee (the "Appointment Order") and Jelena McWilliams was appointed by the U.S. Trustee as the chapter 11 trustee (the "Trustee") in this chapter 11 case (the "Case"). [Dkt. No. 196.]

### B.    End User Funds

After significant reconciliation work over several months, Partner Financial Institutions reported that they held approximately $219 million in total cash in accounts associated with End Users as of Synapse's closure in May 2024. [Dkt. No. 485.] Throughout reconciliation, there has been an apparent shortfall ranging from $65 million to $95 million between actual funds held by Partner Financial Institutions and funds needed to be held by the Partner Financial Institutions to cover all amounts due to End Users as recorded in the Debtor's ledger. [Dkt. No. 474]. Due to the lack of resources in the Debtor's estate and certain Partner Financial Institutions refusal to provide reconciliation and distribution data on a voluntary basis, the Trustee has been unable to independently ascertain the exact amounts of a potential shortfall. [Dkt. No. 485].

Since her appointment, the Trustee and her advisors have focused their efforts on restoring End Users' access to their funds given the large impact of the frozen accounts on the lives of End Users. Although all operations of the Debtor have ceased and all employees have been terminated, this Court and End Users have communicated to the Trustee the urgency and the importance of reconciling accounts and returning funds to End Users. The Trustee and her counsel worked around the clock to investigate the events that led to the reconciliation issues and the freezing of End User accounts and to identify a path to unfreezing customer accounts as soon as possible.

The Trustee and her professionals have also facilitated data and information sharing not only among Partner Financial Institutions, but also with other interested parties seeking to find other answers and resolutions to the various issues and disputes in connection with Synapse and the Partner Financial Institutions.

The Trustee and her advisors have also worked to push forward a resolution process involving all Partner Financial Institutions in order to reconcile all parties' records and amounts of funds held. All Partner Financial Institutions have now successfully completed the reconciliation work necessary to distribute funds back to End Users. At the time of filing this Motion, the vast

4

majority of the $219 million End User funds held by Partner Financial Institutions as of May 2024 have been distributed and the Court's directive to reconcile End User accounts by and between Partner Financial Institutions has been achieved. Partner Financial Institutions are continuing to return small amounts of funds held for End Users in accordance with the results of the reconciliation process, payment instructions and returned payment reprocessing. No further work related to the reconciliation process remains in which the Debtor's estate can meaningfully participate.

### C. The Debtor's Secured Loans

The Debtor is a party to two (2) pre-petition financing arrangements with (i) Silicon Valley Bank ("SVB"), acquired by First Citizens Bank & Trust Company ("First Citizens") after SVB entered receivership, and (ii) TriplePoint Capital LLC ("TriplePoint").

First Citizens is owed approximately $1.5 million, and the underlying agreements grant to SVB a security interest and lien upon all personal property of the Debtor, other than intellectual property[1], to secure its obligations, and SVB recorded a UCC financing statement on February 19, 2021, with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

TriplePoint is owed approximately $7.2 million and the underlying agreements grant to TriplePoint a security interest and lien upon all personal property of the Debtor to secure its obligations, and TriplePoint recorded a UCC financing statement on July 29, 2022, with the Delaware Secretary's Office to perfect such security interest and liens upon such assets.

Pursuant to the interim, second interim and final cash collateral orders, the Debtor was authorized to use cash collateral in its estate to operate its business and honor certain pre-petition

---

[1] The collateral of SVB does not include intellectual property. However, all accounts and proceeds of intellectual property are purported to be included. The SVB loan documents' definition of "Collateral" states that, "[i]f a judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property." The Trustee understands that the Debtor's sole intellectual property asset is a registered trademark and the Debtor does not have any copyright or patent-related assets.

5

obligations (collectively, the "Cash Collateral Orders"). [Dkt. Nos. 60, 90 and 201.] Pursuant to the Cash Collateral Orders and § 361 of the Bankruptcy Code, in addition to all the existing security interests and liens previously granted to SVB and TriplePoint, as adequate protection for, and to secure the payment of, an amount equal to the diminution of the value of the pre-petition collateral, SVB and TriplePoint were granted (i) continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens on (collectively, the "Adequate Protection Liens") all prepetition and post-petition tangible and intangible property and assets, whether real or personal, of the Debtor and (ii) allowed superpriority administrative expense claims in the Case and any successor cases (the "Adequate Protection Superpriority Claims") with priority over all other administrative expense claims and unsecured claims against the Debtor or its estate. The amount of diminution of the value of First Citizens' and TriplePoint's pre-petition collateral and, therefore, the value of the Adequate Protection Liens is uncertain at this time.

### D. State of Remaining Assets

Despite fully ceasing operations, terminating all employees and having no access to funds, the Trustee has ensured that the necessary data systems are operational, diligently facilitated the reconciliation and distribution process and pursued a sale of assets remaining in the Debtor's estate. The Trustee and her advisors, after many weeks of concerted effort and communications with representatives of major platform vendors that were required to gain access to secure key Debtor system components, became able to provide access to system components to facilitate potential bidders' due diligence of the Debtor's platform.

The Debtor's primary assets are its proprietary technology platform and related data ("Technology Assets").[2] However, the value of the proprietary technology without the related

---

[2] The Debtor did have some supplies, computers and other equipment that the employees were free to take after their termination, and the other remaining equipment is limited to payment processing equipment attached to servers that could have value to any new business without an existing payment processing infrastructure. According to the Declaration of Sankaet Pathak filed on May 6, 2024, regarding the assets and liabilities of the Debtor, the net book value of office equipment was stated as $9,931. [Dkt, No.108]. Other assets of the Debtor, such as its customer lists and intellectual property-related goodwill, no longer have any value.

6

operations, customers and employees is significantly diminished and difficult to estimate.[3] Additionally, certain key technology assets are maintained in disperse repositories by trade vendors with substantial administrative claims.

Nonetheless, with an end to the reconciliation process in sight and access to the key Debtor system components, the Trustee hoped to pursue a sale process to receive the highest and best bid for some, all or substantially all assets of the Debtor's estate.

On October 17, 2024, the Court approved the bidding procedures for a sale of the Debtor's assets proposed by the Trustee. [Dkt. No. 410.] With the initial deadline for buyer indications of interest nearing and no viable buyers having come forward, the Trustee filed a notice to extend the initial indications of interest and the initial bid deadlines. The extended deadline for initial indications of interest expired on November 4, 2024, and the initial bid deadline expired on November 11, 2024. [Dkt. No. 425.] The Trustee determined, in her business judgment, that she received no qualified bids by the bid deadline, and therefore also filed a notice on November 11, 2024, to adjourn the auction, to be rescheduled at a later date if the Trustee determined such a rescheduling to be in the best interests of the estate. [Dkt. No. 457.]

The sale process has not led to any actionable bids, and the estate has no funds to pay expenses already incurred in relation to the sale process or to take on additional expenses to further meaningfully pursue a sale process. Significant expense is expected in order to continue pursuing and closing a sale of the Technology Assets (e.g., engagement of advisors to negotiate price and a purchase agreement, facilitate due diligence processes, maintain vendors for the continued maintenance of the assets, set up processes for the transfer of and access to purchased assets and ensure proper processing of personally identifiable information and other data subject to privacy laws). All assets of the Debtor are subject to substantial secured debt, and the bids received on Technology Assets have not exceeded the value of such liens or justified the costs necessary to complete a sale process.

---

[3] According to the Declaration of Sankaet Pathak filed on May 6, 2024, regarding the assets and liabilities of the Debtor, the net book value of all intellectual property of the Debtor was stated as $408,544. [Dkt. No.108].

7

In addition to Technology Assets, the Debtor may hold valuable causes of action against third parties that may potentially involve the recovery of substantial value. While the Trustee has explored the possibility of pursuing certain causes of action on behalf of the estate, the estate has no available funds to investigate the viability of those claims in earnest or to finance any litigation efforts in connection therewith. The Trustee and her professionals have also sought alternative financing options for the pursuit of any causes of action, including potentially engaging contingency counsel and selling the causes of action to interested parties. However, in light of the significant investigative work required and the currently speculative nature of the potential value of any causes of action, the Trustee and her professionals have been unable to find suitable arrangements with respect to the causes of action that will return meaningful value back to the estate.

### E. Preservation of Debtor's Data and Records

Among the remaining assets are records and data contained in the Debtor's ledger systems, as well as other data and information contained in the Debtor's books and records ("Remaining Records and Data"). The ledger systems are maintained in data repositories operated by third-party vendors, primarily MongoDB and Amazon Web Services ("AWS"), and other records are dispersed across various vendors and platforms. While the third-party vendors have thus far been generously receptive to the request of the Trustee to continue maintaining the Remaining Records and Data, the estate has no funds to pay for such maintenance and the vendors have significant existing administrative claims related to such maintenance.

The Trustee is aware that the Remaining Records and Data, especially records related to the financial ledger stored in the Debtor's accounts with MongoDB and AWS, may be important to certain parties in interest and has taken several steps to preserve, share and analyze this data.

During the course of reconciliation efforts, the Trustee's professionals produced copies of the Debtor's ledger (from MongoDB) and two sets of financial reports (from AWS), which were shared to the Partner Financial Institutions who continue to be in possession of these data copies. The Trustee's professionals have also produced a cold storage copy of the MongoDB ledger which is stored on a hard drive in the Trustee's possession.

8

The Trustee has also proposed data custody arrangements to various federal and state government agencies, the secured creditors and certain qualified private parties, including any and all public and private entities that have requested data or information from the Trustee in connection with their respective litigation, investigation or otherwise. In these discussions, the Trustee has proposed to transfer certain of the Remaining Records and Data to the custody of one or more third parties who would assume the responsibility for remaining data preservation work, storage expenses and processing the data in accordance with applicable privacy laws. To date, no party qualified to handle the data in light of the associated expenses and applicable privacy laws has agreed to take custody of the Remaining Records and Data.

### F.    The Evolve Payment to the Estate and the Vendors' Services

As aforementioned, the Trustee's priority has been to facilitate reconciliation among the Partner Financial Institutions, including by sharing relevant estate data and information. In July 2024, the Trustee's professionals at B. Riley worked with the Partner Financial Institutions to generate, upload to shared access environment and validate a copy of the Synapse financial ledger from the Debtor's MongoDB environment, which was intended for all four Partner Financial Institution's use in their reconciliation work. [Dkt. No. 320.] This process took multiple weeks, including 24/7 monitoring and troubleshooting by technology professionals due to the size and complexity of the data set. Id. In parallel, Evolve requested that the Trustee assist with the production of a second copy of the MongoDB ledger for that bank's sole use; Evolve reported to the Trustee that its reconciliation work would be expedited by having a copy of the ledger stored internally at the bank and accessed by fewer professionals at one time. [Dkt. No. 331.] This effort required additional significant time and work from the Trustee's professionals and delayed the Trustee's efforts to downgrade non-essential MongoDB computing services to capture cost-savings for that vendor's monthly fees. Therefore, the Trustee and Evolve agreed that Evolve would pay to the estate approximately $100,000 to cover (i) the estate's MongoDB invoice for the month of July 2024 and (ii) approximately 45 hours of professional time from B. Riley and a cloud computing specialist company engaged by B. Riley, Klouddata (together, with B. Riley and MongoDB, the "Vendors") to facilitate Evolve's request. This agreement (the "Evolve Data

Procedures Plan") is attached hereto as **Exhibit B**. Ultimately, the MongoDB invoice for July 2024 amounted to $70,500.35; that invoice is attached hereto as **Exhibit C**. Klouddata's fees for this work amounted to a total of $18,612.50; Klouddata's invoice is attached hereto as **Exhibit D**.

### G.    Secured Creditor's Consent to Use Cash Collateral

Each of the Debtor's secured creditors, SVB and TriplePoint, has informed the Trustee that it does not intend to object to the use of $100,000 of their cash collateral to pay the above described administrative claims of MongoDB and Klouddata.

## RELIEF REQUESTED

The Trustee requests, pursuant to section 503 of the Bankruptcy Code, that the Court allow and authorize the payment of $70,500.35 to MongoDB and $18,612.50 to Klouddata (the "Vendor Claims").

## BASIS FOR RELIEF REQUESTED

**The Vendor Claims are Administrative Claims**

The Bankruptcy Code provides that claims for "the actual, necessary costs and expenses of preserving the estate" shall be allowed as administrative expenses, 11 U.S.C. §503(b)(1)(A), and "the administrative expenses of the [chapter 11 trustee] receive highest priority in corporate bankruptcy proceedings." *Supplee v. Bethlehem Steel Corporation (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007); *see* 11 U.S.C. § 507(a)(1).

To be allowed an administrative expense, "[t]he claimant must show that the debt asserted to be an administrative expense (1) arose from a transaction with the [chapter 11 trustee] as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the [chapter 11 trustee]); and (2) directly and substantially benefitted the estate." *In re Abercrombie*, 139 F.3d 755, 756 (9th Cir. 1998) (citing *In re DAK Indus.*, 66 F.3d 1091, 1094 (9th Cir. 1995)).

These requirements are met here. The Trustee and Evolve entered into an agreement for the work the Vendors would do to preserve the estate assets. The Vendors have been critical to preserving the information required for the Trustee to administer the estate.

**The Secured Lenders Have Consented to the Payment of the Administrative Claims**

[[DMS:6790296v5:6/6/2025 1:54:54 PM

1    "Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposits or other cash equivalents in which the estate and an entity other than the estate have an interest..." 11 U.S.C. § 363(a). Here, the Trustee seeks to use cash collateral of the estate to pay the Vendor Claims, specifically the $100,000 cash that was paid by Evolve to the estate in July 2024 for the purpose of paying the Vendor Claims.

The Trustee's use of cash collateral is governed by section 363(c)(2) of the Bankruptcy Code which establishes a special requirement for the use of cash collateral if:

>    (A)    each entity that has an interest in such cash collateral consents; or
>
>    (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2)(A) and (B). The Trustee believes that the only entities which have a valid interest in the cash collateral are the Debtor's secured creditors, SVB and TriplePoint, which are collectively owed approximately $8.7 million and hold liens on substantially all the Debtor's assets. Pursuant to section 363(c)(2), the Court may authorize a trustee to use cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Here, each of SVB and TriplePoint have consented to the use of $100,000 cash collateral to pay the Vendor Claims.

## NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 16 (Attn: Peter C. Anderson, Eryk R. Escobar, and Russell Clementson); (ii) the secured creditors and their respective counsel and (iii) any persons who have formally appeared in this Chapter 11 Case and requested service pursuant to Bankruptcy Rule 2002. No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Trustee respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

11

[[DMS:6790296v5:6/6/2025 1:54:54 PM

Dated: June 6, 2025

CRAVATH, SWAINE & MOORE LLP

By: _____
PAUL H. ZUMBRO (*pro hac vice*)
GEORGE E. ZOBITZ (*pro hac vice*)
ALEXANDER GERTEN (*pro hac vice*)
Two Manhattan West
375 9th Avenue
New York, NY 10001

KELLER BENVENUTTI KIM LLP

Dated: June 6, 2025

By: /s/ Thomas B. Rupp
JANE KIM
JEREMY V. RICHARDS
THOMAS B. RUPP
425 Market Street, 26th Floor
San Francisco, CA 94105

Counsel for Jelena McWilliams,
in her capacity as Chapter 11 Trustee for
Synapse Financial Technologies, Inc.

[[DMS:6790296v5:6/6/2025 1:54:54 PM