STEVEN T. GUBNER – Bar No. 156593
DAVID M. POITRAS – Bar No. 141309
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:       sgubner@bg.law
             dpoitras@bg.law

JEFFREY NAIMON – DC Bar No. 429409 (*Admitted Pro Hac Vice*)
ARAVIND SWAMINATHAN – WA Bar No. 33883 (*Admitted Pro Hac Vice*)
EDWARD SOMERS – IL Bar No. 6300920 (*Admitted Pro Hac Vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2001 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 339-8400
Email:       jnaimon@orrick.com
             aswaminathan@orrick.com
             esomers@orrick.com

Attorneys for Evolve Bank & Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:24-bk-10646-MB |
| SYNAPSE FINANCIAL TECHNOLOGIES, INC., | Chapter 11 |
| Debtor. | **EVOLVE BANK & TRUST'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA AND/OR FOR A PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF EDWARD SOMERS IN SUPPORT THEREOF** |
| | *Application for Order Shortening Time Filed Concurrently Herewith* |
| | **Hearing:** |
| | Date:  [To Be Set]<br>Time: [To Be Set]<br>Place: Via ZoomGov or in Person Per Judge Barash's Hearing Procedures |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORTIES ...................................................3

I.    INTRODUCTION & BACKGROUND ...........................................................3

II.    ARGUMENT.............................................................................................9

    A.    Mr. Newbern is No Longer Entitled to 2004 Relief Because Another
        Action is Pending...........................................................................9

    B.    If the Court Does Not Quash the Subpoena as Served, the Court Should
        Enter a Protective Order for Evolve...................................................13

III.    CONCLUSION.........................................................................................14

DECLARATION OF EDWARD SOMERS ...........................................................16

# TABLE OF AUTHORITIES

Page

## CASES

*Diamond State Ins. Co. v. Rebel Oil, Inc.*,
    157 F.R.D. 691, 695 (D. Nev. 1994)..................................................................13

*In re 2435 Plainfield Ave., Inc.*,
    223 B.R. 440 (Bankr. D. N.J. 1998) ...............................................................10

*In re Art & Architecture Books of 21st Century*,
    2019 WL 9243053, at *6 (Bankr. C.D. Cal. Dec. 6, 2019) ...........................9, 10

*In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*,
    258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001)...................................................10

*In re Bennett Funding Grp., Inc.*,
    203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ......................................................11

*In re Bibhu LLC*,
    2019 WL 171550, at *2 (Bankr. S.D.N.Y. Jan. 10, 2019) (citing *Snyder v. Soc'y Bank*,
    181 B.R. 40, 42 (S.D. Tex. 1994), *aff'd sub nom. In re Snyder*, 52 F.3d 1067 (5th Cir.
    1995) ...........................................................................................................11

*In re Brooke Corp.*,
    No. 08-22786, 2013 WL 3948866, at *3 (Bankr. D. Kan. July 29, 2013) (citing *In re
    Washington Mutual, Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009)) ..................12

*In re Combs*,
    668 B.R. 896, 906 (Bankr. M.D. Fla. 2025) ..................................................10

*In re Dinubilo*,
    177 B.R. 932, 940 (Bankr. E.D. Cal. 1993) ...............................................11, 12

*In re Enron Corp.*,
    281 B.R. 836, 840 (Bankr. S.D. N.Y. 2002) .................................................10

*In re GHR Energy Corp.*,
    35 B.R. 534, 537 (Bankr. D. Mass. 1983) ....................................................11

*In re Mathews*,
    2018 WL 5024167, at *3 (D. Del. Oct. 17, 2018) .........................................11

*In re REMEC, Inc. Sec. Litig.*,
    2008 WL 2282647, at *1 (S.D. Cal. May 30, 2008).......................................14

*In re Szadkowski*,
    198 B.R. 140, 141 (Bankr. D. Md. 1996) .....................................................10

*In re Washington Mutual, Inc.*,
    408 B.R. 45, 50 (Bankr. D. Del. 2009) ....................................................10, 12

*Little v. City of Seattle,*
    863 F.2d 681, 685 (9th Cir. 1988) ...................................................................13

*Matter of Wilcher,*
    56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) ........................................................12

*Scalia v. Unforgettable Coatings, Inc.,*
    2020 WL 8881373, at *2 (D. Nev. Nov. 24, 2020) (quoting *G.K. Las Vegas Ltd.*
    *Partnership*, 2007 WL 119148, at *4 (D. Nev. Apr. 30, 2012).........................14

*Wheel Group Holdings, LLC v. Cub Elecparts, Inc.,*
    2018 WL 6264980, at *3, fn. 3 (C.D. Cal. Sept. 4, 2018) (citing *In re REMEC*
    affirmatively) ..................................................................................................14

**RULES**

Fed. R. Civ. P. 26(b)(1)..........................................................................................13

Fed. R. Civ. P. 26(c)(1)...........................................................................................14

Fed. R. Civ. P. 45(c)(1)...........................................................................................13

Fed. R. Civ. P. 45(c)(3)(A)(iv) ...............................................................................13

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, JUSTIN NEWBERN, AND INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that on _____, __, 2025 at _____ .m.[1] in the above-entitled court located at 21041 Burbank Boulevard, Courtroom 303, Woodland Hills, California 91367, Evolve Bank & Trust ("Evolve" or "Movant"), a creditor and party-in-interest in the above-referenced chapter 11 case, will and does hereby move to quash the Subpoena for 2004 Examination served by Justin Newbern and for a protective order regarding improperly served, overbroad, burdensome, irrelevant and abusive discovery (the "Motion").

Movant in the above-captioned matter will move the Court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith.  Said Motion is based upon the grounds set forth in the attached Motion and accompanying supporting documents.

Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one.  (If you do not have an attorney, you may wish to consult one.)

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule ("LBR") 9013-1(f), and unless otherwise ordered by the Court in connection with the concurrently filed application for order shortening time, if you wish to oppose this Motion you shall, not later than fourteen (14) calendar days prior to the hearing on the Motion, serve your response or opposition to the Motion on Evolve's counsel of record (noted in the upper left-hand corner of this notice), and file such response or opposition with the Clerk of the Bankruptcy Court.  If you fail to file a written response to the Motion within such time period, the Court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

**PLEASE TAKE FURTHER NOTICE** that the following additional ZoomGov procedures shall govern at this hearing:

1. In addition to appearing in person, parties in interest (and their counsel) may appear remotely using ZoomGov audio and video.  Information on how to appear using ZoomGov is provided on the following page of this notice.

---

[1]  See concurrently filed application for order shortening time, in which the moving party requests a hearing on shortened notice for this motion.

2. Parties in interest (and their counsel) may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet).

3. The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet.  Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below.

**4. Members of the public and the press may only connect to the zoom audio feed, and only by telephone.  Access to the video feed by these individuals is prohibited.  In the case of a trial or evidentiary hearing, no audio access will be provided.  However, members of the public and the press may observe all proceedings in person.**

5. Neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.  The use of ZoomGov is free of charge to participants.

6. The audio portion of the hearing will be recorded electronically by the Court and constitute its official record.

**7. All persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or otherwise. Violation of this prohibition may result in the imposition of monetary and non-monetary sanctions.**

8. Any party in interest or counsel that elects to appear remotely by ZoomGov bears the risk of malfunction or disconnection from the hearing.

More information on using ZoomGov to participate in this hearing is available on the Court's website at the following web address:   https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-and-training-participants.

**WHEREFORE**, Evolve respectfully requests that the Court enter an order granting this Motion, quashing the Subpoena as improper and/or issuing a protective order so that the Subpoena for documents may not be had, and for such other and further relief as the Court may deem just and proper under the circumstances.

DATED:  August 8, 2025

Respectfully submitted,

BG LAW LLP

By:  /s/ David M. Poitras
     Steven T. Gubner
     David M. Poitras

ORRICK, HERRINGTON & SUTCLIFFE LLP
Jeffrey Naimon *(Admitted Pro Hac Vice)*
Aravind Swaminathan *(Admitted Pro Hac Vice)*
Edward Somers *(Admitted Pro Hac Vice)*

Attorneys for Evolve Bank & Trust

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION & BACKGROUND

Synapse Financial Technologies, Inc., the chapter 11 debtor in the above-captioned chapter 11 bankruptcy case (the "Debtor"), filed a voluntary petition under Chapter 11 of Title 11, 11 U.S.C. Sections 101 *et seq.* (the "Bankruptcy Code") on April 22, 2024 (the "Petition Date").

On May 24, 2024, an order was entered appointing a chapter 11 trustee and Jelena McWilliams was appointed by the U.S. Trustee as the chapter 11 trustee in this case (the "Trustee"). [Docket No. 196]. Ms. McWilliams has served as the Trustee in this case since that date.

On June 13, 2025, Justin Newbern ("Mr. Newbern") (in his individual capacity and *pro per*) filed a Motion for Rule 2004 examination of Evolve (the "2004 Exam Motion") [Docket No. 547]. Mr. Newbern is a customer of Juno (CapitalJ Inc.) whose relationship with Evolve is governed by the Consumer Interest Checking Account Agreement that was accepted by him when he opened his account with Juno (the "Deposit Agreement") and the terms of which are available on Juno's website at https://cdn.juno.finance/legal/OnJuno_Consumer_IC_Agreement.pdf (last visited Aug. 8, 2025). The Deposit Agreement is also attached to this Motion as **Exhibit 1.** In his 2004 Exam Motion, Mr. Newbern stated that he was "not currently a named plaintiff in any class action or legal proceeding related to the Synapse bankruptcy, nor is he a plaintiff in any individual lawsuit against Evolve Bank & Trust or any other party" [Docket No. 547 at p. 3.]. The Court entered an *Order Granting Motion of Justin Newbern for Order Authorizing 2004 Examination of Evolve Bank & Trust* on June 24, 2025 (the "2004 Order") [Docket No. 562]. The 2004 Order limited the production of documents for inspection and copying to the requests identified at ECF pages 7:9 through 8:15 of the 2004 Exam Motion and the oral examination of person(s) most knowledgeable about the matters identified at ECF page 6:25 through 7:5 of the 2004 Exam Motion. On July 7, 2025, Mr. Newbern served a *Subpoena for Rule 2004 Examination* (the "Subpoena") on Evolve's registered agent for service of process. A copy of the Subpoena is attached to this Motion as **Exhibit 2.** As set forth below, the Subpoena includes numerous categories of documents that well exceed the scope of the 2004 Order, and consistent therewith, the proposed oral examination also exceeds the scope of the 2004 Order. The Subpoena requests the production of a voluminous

amount of substantially unauthorized documents and corresponding oral examination within eight business days or eleven days after service, by July 18, 2025. The time for compliance is therefore facially unreasonable. For the reasons set forth herein, the Subpoena can and should be quashed.

In addition, Mr. Newbern's motion to compel compliance with the Subpoena, further described below, should also be denied. On July 15, 2025, Mr. Newbern filed a *Notice of Motion and Motion to Compel Compliance with Rule 2004 Subpoena Issued to Evolve Bank & Trust* (the "Motion to Compel") [Docket No. 594]. By the Motion to Compel, Mr. Newbern sought an order of the Bankruptcy Court (without a hearing or an application for an order shortening time) to compel Evolve to appear for examination and produce documents well beyond what the Court ordered on June 24, 2025. Importantly, Movant filed his Motion to Compel (a) *prior* to the date for compliance (July 18th); (b) without following this Court's Local Rules to meet and confer prior to seeking such relief; (c) and prior to the preparation of a joint stipulation per LBR 7026-1(c). Counsel for Evolve wrote to Mr. Newbern on July 15, 2025, providing its objections to his Subpoena, informing Mr. Newbern that it would not be producing a witness on July 18, and offering to meet and confer pursuant LBRs 2004-1(g) and 7026-1(c) to discuss compliance with a substantially narrowed Subpoena consistent with the 2004 Order, and preparation of a joint stipulation, if necessary. Declaration of Edward Somers ("Somers Decl."), ¶ 7.[2]  On July 17, 2025, Evolve filed its *Opposition to Motion to Compel Compliance with Rule 2004 Subpoena Issued to Evolve Bank & Trust; Declaration of Edward Somers in Support Thereof* (the "Opposition to Motion to Compel") [Docket No. 597]. On August 4, 2025, Mr. Newbern filed his *Response to Evolve Bank & Trust's Opposition to Motion to Compel Compliance with Rule 2004 Subpoena; Request for Clarification and Leave to Seek Supplemental Relief* [Docket No. 608]. As of the date of this Motion, the Motion to Compel has not been set for hearing or otherwise ruled upon by the Court.

The 2004 Order ordered the following documents to be produced, all of which relate specifically to Movant's account:

---

[2] As of the date of this Motion, the parties have not completed a joint stipulation. Notwithstanding, Movant feels compelled to file this Motion at this time based upon Mr. Newbern's unwillingness to resolve the pending disputes informally, the pending Motion to Compel, and the served Subpoena.

- Internal records and communications relating to the October 12, 2023 transfer of $153,679.14, in which **Mr. Newbern's account** was migrated from a demand deposit account to a cash management or brokerage structure, including any approvals, oversight processes, or third-party communications regarding that transaction;

- Internal records and communications relating to the February 21, 2024 transaction reflecting a ledgered credit of $137,516.69 to **Mr. Newbern's account** that was not supported by custodial funds;

- All ACH, wire, or internal transfers involving **Mr. Newbern's account** from August 19, 2021 (account opening) through May 31, 2024, including metadata, authorization records, and reconciliation status;

- Evolve's daily reconciliation reports, exception reports, custodial account records, or internal audits that mention or concern **Mr. Newbern's account**, or explain any failure to reconcile funds purportedly transferred to Movant;

- All communications that reference **Mr. Newbern's account**, including communications between Evolve and Synapse Financial Technologies; The Chapter 11 Trustee; Other financial institutions, to the extent they relate to transfers into or out of Movant's account; Juno (or its parent), including any discussions of Movant or account migration;

- Documents or communications reflecting Evolve's role in authorizing or overseeing the use of its brand, name, or logo in connection with **Mr. Newbern's account** or the Juno platform;

- Any planning, approval, or implementation documentation related to the migration of **Mr. Newbern's account** from a demand deposit structure to a brokerage or cash management model;

- All documents or communications reflecting any fees, revenue, or compensation Evolve received from Synapse in connection with its oversight, compliance monitoring, reconciliation, custodial responsibilities relating to **Mr. Newbern's account**, including internal billing records, statements of work, invoices, or service-level expectations that reference consumer funds or reconciliation duties.

5

[Docket No. 562 (emphasis added)].

Notwithstanding the clear limitations outlined above, the Subpoena includes significantly expanded categories of documents, ***the vast majority of which do not concern Mr. Newbern's account***. Indeed, the documents sought in Request Nos. 5 through 15 of the Subpoena fall well beyond the bounds of the Court's 2004 Order and are inconsistent with the ordered relief, primarily because they do not relate specifically to Mr. Newbern's account. For example:

- Request No. 5 seeks broad information concerning "Synapse Reserve and Risk Mitigation Accounts," including information "related to any reserve, escrow, or risk mitigation account established or maintained by Synapse…at Evolve";

- Request No. 6 seeks information concerning "Alleged Direct Debits from Custodial Accounts (Fee Deductions)," including information related to public statements made by former Synapse CEO Sankaet Pathak and documents concerning "Evolve's internal justifications, accounting treatment, and risk oversight practices," including "transaction records related to any debits, withdrawals, or transfer of funds initiated by Evolve…from any omnibus, custodial, or FBO ("For Benefit Of") account titled in any variation of "FBO Synapse End User Funds – Program Funding Account";

- Request No. 7 seeks confidential, commercially sensitive, and proprietary information concerning "Inter-Party Agreements and Communications" with Synapse and CapitalJ, Inc. ("Juno") relating to "custodial services, deposit accounts, compliance responsibilities, and fund flows applicable to Synapse-supported platforms (including Juno";

- Request No. 8 broadly seeks information concerning "Disclosures, Marketing Materials, and Compliance Oversight," including "consumer-facing disclosures and marketing materials made by Synapse, Juno, and other platforms" (none of which are controlled by Evolve), as well as compensation arrangements between such entities, which again do not concern Mr. Newbern's account;

- Request No. 9 seeks information concerning "Reconciliation and Forensic Engagements," including broad details regarding Evolve's engagement of its forensic

expert, Ankura Consulting Group, LLC, to include work product and summaries, which is protected from disclosure by the attorney-client privilege, the work product doctrine, and applicable protections and/or privileges;

- Request No. 10 seeks information concerning "Mercury-Associated Reconciliation Discrepancies" related to a third party fintech platform, Mercury Technologies, Inc. ("Mercury") notwithstanding the fact that Movant does not purport to have an account with Mercury;

- Request No. 11 seeks information concerning "Technical Logs and Transaction-Level Diagnostics" relating to "Synapse accounts" generally and documentation to policies, procedures, or internal guidelines related to Evolve's reconciliation processes with internal or third-party records;

- Request No. 12 seeks information concerning the "Migration of Custodial Accounts to Brokerage Structures" of "any…customer funds—including Juno platform users," including "[i]nternal discussions assessing the legal, operational, and custodial implications of such migration;"

- Request No. 13 seeks information concerning "Periodic Account Statements" delivered to "Synapse platform users (including Juno)" and "[a]ny objections raised, approval granted, or changes proposed by Evolve regarding period statements or account interfaces reflecting Evolve's custodial role";

- Request No. 14 seeks information concerning "Account Identifiers Post-Migration" regarding "the preservation of user-facing account numbers, routing numbers, debit card numbers, or other account identifiers following the migration of funds to brokerage structures"; and

- Request No. 15 seeks information concerning "FDIC Part 363 Audit Reports" related to Evolve's annual independent audit and management reports from August 2021 through present.

[Docket No. 608 at 5-7]. Each of these enumerated categories is not specifically outlined or reflected in the 2004 Exam Motion and therefore was not authorized by the 2004 Order.

Notwithstanding the facial deficiencies and procedural improprieties of the Subpoena,[3] counsel for Evolve met and conferred with Mr. Newbern on July 18, 2025 and July 23, 2025 to discuss the Subpoena's scope and the timing of compliance, as required by Local Bankruptcy Rule 7026-1(c)(2).  Somers Decl. ¶¶ 8–9.  On July 25, 2025, Evolve filed an arbitration demand with the American Arbitration Association (the "AAA") against Mr. Newbern, relating to the claims referenced in Mr. Newbern's 2004 Exam Motion, as required by the terms of the Deposit Agreement governing the relationship between Mr. Newbern and Evolve (the "Arbitration Action").  Somers Decl. ¶ 10.  A copy of the Deposit Agreement is attached to this Motion as **Exhibit 1**.  Section 7.11 of the Deposit Agreement mandates arbitration of disputes related to Mr. Newbern's account, and states in relevant part:

> **Agreement to Arbitrate.** Any claim, dispute, or controversy ("Claim") arising out of or relating in any way to: i) this Agreement; ii) the Account or Services; iii) your use of the Account or Services; iv) the amount of funds Account; v) advertisements, promotions or oral or written statements relating to the Account or Services; vi) the benefits and services related to the Account or Servies; or vii) transactions made using Account or Services, no matter how described, pleaded or styled, shall be FINALLY AND EXCLUSIVELY resolved by binding individual arbitration conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act (9. U.S.C. 1-16). The arbitration shall occur in Shelby County, Tennessee.

Notwithstanding the pendency of the Arbitration Action, on July 25, 2025, Evolve made its first production in response to the Subpoena, consisting of seven documents totaling forty-seven pages.  Somers Decl. ¶ 12.  On July 29, 2025, Evolve made its second production in response to the Subpoena, consisting of forty-three documents totaling three hundred and twenty-three pages.  *Id.* ¶ 13.

---

[3] As more fully set forth in the Opposition to Motion to Compel, the Subpoena fails to comply with Federal Rule of Civil Procedure 45 because the Subpoena fails to provide a reasonable time to comply, seeks to compel the production of documents not authorized by the 2004 Order, and it does not provide a location for the examination within 100 miles of Evolve's principal place of business, which is Memphis, Tennessee.

As of the date of this Motion, Mr. Newbern is a party to pending arbitration proceedings related to the claims referenced in his 2004 Exam Motion.  The Arbitration Action provides a separate forum for the discovery requested through the 2004 proceedings before this Court.

## II.    ARGUMENT

First and foremost, the Subpoena should be quashed because of the pending Arbitration Action.  The general rule in Bankruptcy Courts is to deny parties the ability to take Rule 2004 examinations when another action is pending, related to the dispute at issue, for which the other pending proceeding allows the parties to take discovery in connection with such claims.  *See, In re Art & Architecture Books of 21st Century*, 2019 WL 9243053, at *6 (Bankr. C.D. Cal. Dec. 6, 2019) ("If an adversary proceeding or a contested matter is pending and related to the dispute at issue, then the parties to that proceeding or matter may no longer utilize the liberal provisions of Federal Rule of Bankruptcy Procedure 2004.").  The Arbitration Action relates to the issues in the 2004 Exam Motion and Mr. Newbern may conduct the discovery he seeks in that forum.  Accordingly, the Court should quash the Subpoena because of the pending Arbitration Action between the parties.

Alternatively, in the event that the Court does not quash the Subpoena, the Court should enter a protective order for Evolve.  The 2004 Order authorized limited discovery relating only to Mr. Newbern's account.  However, the Subpoena seeks to substantially broaden the discovery allowed by the 2004 Order and includes information that is privileged, commercially sensitive, proprietary, and or includes private personal information to which Mr. Newbern is not entitled.  Thus, a protective order under Federal Rules of Civil Procedure 26(c) and 45(c) is appropriate to protect Evolve from producing confidential information to which Mr. Newbern is not entitled.

### A.    **Mr. Newbern is No Longer Entitled to 2004 Relief Because Another Action is Pending**.

As set forth above, and as required by the Deposit Agreement between Evolve and Mr. Newbern, Evolve has initiated the Arbitration Action against Mr. Newbern in an effort to resolve the claims referenced by Mr. Newbern in the 2004 Exam Motion and the Motion to Compel.  Accordingly, because Mr. Newbern may conduct the discovery sought here in the Arbitration Action and in that forum—which provides the parties with appropriate procedural safeguards in contrast to a

2004 examination—the Subpoena should be quashed and/or a protective order entered in favor of Evolve.

Bankruptcy courts recognize that a party is not entitled to Rule 2004 discovery when another action is pending and related to the dispute at issue and discovery is available in that proceeding. *See In re Art & Architecture Books of 21st Century*, 2019 WL 9243053, at *6 (Bankr. C.D. Cal. Dec. 6, 2019); *see also, e.g.*, *In re 2435 Plainfield Ave., Inc.,* 223 B.R. 440 (Bankr. D. N.J. 1998) ("The majority of courts that have addressed this issue have prohibited a Rule 2004 exam of parties involved in or affected by an adversary proceeding while it is pending."); *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D. N.Y. 2002); *In re Szadkowski,* 198 B.R. 140, 141 (Bankr. D. Md. 1996) ("Once an adversary proceeding has commenced . . . discovery may be had only pursuant to the discovery provisions of the Federal Rules of Civil Procedure").

This body of bankruptcy law is generally referred to as the "pending proceeding rule." In *In re Washington Mutual, Inc.,* 408 B.R. 45, 50 (Bankr. D. Del. 2009), the Bankruptcy Court explained that "[t]he 'pending proceeding' rule provides 'that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to Federal Rules of Bankruptcy Procedure 7026 *et seq*., rather than by a 2004 examination'." Although most cases dealing with the pending proceeding rule involve adversary proceedings and contested matters, their reasoning is applicable to a case where the separate proceeding is an arbitration. *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) (denying motion for 2004 examination on the ground that, among other things, Rule 2004 disclosure should not be used as a substitute for disclosure that may be available in the pending foreign arbitration proceedings).

"Under the pending proceeding rule, Rule 2004 examinations are limited after an adversary proceeding or other litigation is filed because a litigant might receive an unfair advantage in litigation because requests for production and examinations under Rule 2004 lack some of the procedural safeguards that exist for discovery conducted in pending litigation." *In re Combs*, 668 B.R. 896, 906 (Bankr. M.D. Fla. 2025) (internal quotations omitted). "The use of a Rule 2004 examination to further litigation of a case in state court has been characterized as an 'abuse' of the rule." *In re Bibhu LLC*, 2019 WL 171550, at *2 (Bankr. S.D.N.Y. Jan. 10, 2019) (citing *Snyder v.*

10

*Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), *aff'd sub nom. In re Snyder*, 52 F.3d 1067 (5th Cir. 1995) (characterizing the use of Rule 2004 to further a state court action as an abuse of Rule 2004 and stating that the bankruptcy court did not abuse its discretion by denying production under a subpoena issued under Rule 2004, where appellant's primary motivation was to use those materials in a state court action against the examinee). This is exactly what Newbern would be doing if the Subpoena is not quashed. Anything that is produced by Evolve pursuant to the Subpoena would be available for use in the Arbitration Action and Mr. Newbern will receive an unfair advantage in the Arbitration Action because Rule 2004 does not contain the same safeguards that exist for the production of documents and examinations in arbitration proceedings.

"Two limiting principles on Rule 2004's application can be gleaned from case law: 1) a Rule 2004 examination is utilized for the purpose of identifying the assets and transactions involving a debtor's estate; and 2) it is generally used as a prelitigation device, during the short time period before a matter becomes contested." *In re Dinubilo,* 177 B.R. 932, 940 (Bankr. E.D. Cal. 1993). There is no dispute that Mr. Newbern's Subpoena does not seek discovery in accordance with the first principle. As to the second, a Rule 2004 examination is "properly used as a pre-litigation device to determine whether there are grounds to bring an action to determine a debtor's right to discharge or the dischargeability of a particular debt." *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996). A Rule 2004 exam is not the proper device or forum for a ***non-debtor third party*** to seek discovery of another ***non-debtor third party*** regarding non-estate claims, which is precisely what the Subpoena seeks to accomplish.[4] "[A]lthough Rule 2004 permits examinations of 'third parties' the language of the rule makes it 'evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs so far as it relates to a debtor's proceeding in bankruptcy.' *In re GHR Energy Corp.,* 35 B.R. 534, 537 (Bankr. D. Mass. 1983). To be sure, it is improper to use Rule 2004 to investigate a non-debtor's private business affairs. *E.g.*, *In re Mathews*, 2018 WL 5024167, at *3 (D. Del. Oct. 17, 2018) (quashing subpoenas that sought disclosure of private third-party personal and financial information not related

---

[4]  Evolve notes that Mr. Newbern has not filed a proof of claim in the bankruptcy case.

to the bankruptcy case); *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("There are ... limits to the use of Rule 2004 examinations" and "[i]t may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry.") (internal quotation marks omitted); *Matter of Wilcher,* 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) ("It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs.").

"Once a motion to quash has been filed, the examiner bears the burden of proving that good cause exists for taking the requested discovery." *In re Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993) (internal citations omitted). "Generally, good cause is shown if the examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *Id.* Here, Mr. Newbern has not and cannot make a showing of good cause. Mr. Newbern did not bring the 2004 Exam Motion to determine the Debtor's right to a discharge or the dischargeability of his debt or any estate-related claims. Rather, Mr. Newbern brought the 2004 Exam Motion to seek discovery related to his alleged claims against Evolve, a non-debtor third party. Mr. Newbern has threatened litigation against Evolve and while no such adversarial proceeding was pending at the time of his 2004 Exam Motion, the Arbitration Action is now pending, in accordance with the contractual obligations of the parties set forth in the Deposit Agreement. Mr. Newbern may conduct the discovery he seeks in the pending proceeding in the AAA. In the context of Rule 2004 examinations, courts generally identify the relevant inquiry when faced with a contested matter as "whether the Rule 2004 examination will lead to the discovery of evidence relating to the pending proceeding or whether the requested examination seeks to discover evidence unrelated to the pending proceeding." *In re Brooke Corp.,* No. 08-22786, 2013 WL 3948866, at *3 (Bankr. D. Kan. July 29, 2013) (citing *In re Washington Mutual, Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009)). The discovery sought by Mr. Newbern through is 2004 Exam Motion regarding his purported claims against Evolve is precisely the same discovery that will be at issue in the Arbitration Action and is not related to the bankruptcy case.

Accordingly, the Court should quash the Subpoena on the ground that Rule 2004 discovery should not be used as a substitute for discovery that is available in the pending Arbitration Action, and unrelated to the bankruptcy case.

**B.**     **If the Court Does Not Quash the Subpoena as Served, the Court Should Enter a Protective Order for Evolve.**

If the court does not quash the Subpoena as served on Evolve, it should enter a protective order in Evolve's favor. Any protective order should, *inter alia*: (a) limit Mr. Newbern to the production of documents and the examination of witness(es) authorized by the 2004 Order, (b) exclude the production (and examination) concerning any privileged documents/information and any personally identifiable information of third parties, and (c) limit any disclosure of commercially sensitive or proprietary information concerning Evolve. Federal Rule of Civil Procedure 26(b)(1) makes clear that Mr. Newbern has the initial burden to demonstrate that his Subpoena is consistent with the discovery allowed by the 2004 Order, that it is relevant and, further, that it is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

Further, Federal Rule of Civil Procedure 45(a)(1) requires a party issuing a subpoena to take reasonable steps to avoid imposing undue burden or expense upon a person subject to a subpoena. Fed. R. Civ. P. 45(c)(1). A subpoena is sufficiently limited and specific in its directive where compliance to its terms would not be unreasonably burdensome. *Diamond State Ins. Co. v. Rebel Oil, Inc.,* 157 F.R.D. 691, 695 (D. Nev. 1994). In the present case, the Subpoena seeks vast categories of documents not authorized by the 2004 Order. Accordingly, Evolve submits that on its face, the Subpoena at issue is not sufficiently limited in its directive and is wholly improper. Federal Rule of Civil Procedure 45(c)(3)(A)(iv) empowers courts to quash or modify a subpoena that subjects a person to undue burden. Fed. R. Civ. P. 45(c)(3)(A)(iv). A court has broad discretion in determining whether discovery is burdensome or oppressive. *Id.* at 685 (citing *Little v. City of Seattle,* 863 F.2d 681, 685 (9th Cir. 1988)).

Here, the 2004 Order was limited to the information requested in the 2004 Exam Motion concerning ***Mr. Newbern's account***. In contrast, the Subpoena substantially broadens the information sought by 2004 Exam Motion by seeking documents concerning Synapse-related

reserves, escrows, or mitigation accounts, information generally concerning Synapse-related accounts or end users, Mercury, third-party agreements, migration-related details, FDIC audit reports, and the like. Not only do such requests exceed the bounds of the 2004 Order, but they are also entirely disproportional to Mr. Newbern's alleged claims. In addition, the information sought is commercially sensitive, proprietary, and or includes private personal information to which Mr. Newbern is not entitled. Moreover, documents related to Mr. Newbern's prelitigation demands to Evolve are subject to the attorney-client privilege, the work product doctrine, and other applicable privileges and protections.

"A party can, however, move for a protective order in regard to a subpoena issued to a non-party if it believes its own interest is jeopardized by discovery sought from a third party and has standing under Rule 26(c) to seek a protective order regarding subpoenas issued to non-parties which seek irrelevant information." *Scalia v. Unforgettable Coatings, Inc.*, 2020 WL 8881373, at *2 (D. Nev. Nov. 24, 2020) (quoting *G.K. Las Vegas Ltd. Partnership*, 2007 WL 119148, at *4 (D. Nev. Apr. 30, 2012) and citing Fed. R. Civ. P. 26(c)(1)); *see also In re REMEC, Inc. Sec. Litig.*, 2008 WL 2282647, at *1 (S.D. Cal. May 30, 2008) (party can move for a Rule 26 protective order "if it believes its own interests are jeopardized by discovery sought from a third party ... regarding subpoenas issued to non-parties which seek irrelevant information"); *Wheel Group Holdings, LLC v. Cub Elecparts, Inc.*, 2018 WL 6264980, at *3, fn. 3 (C.D. Cal. Sept. 4, 2018) (citing *In re REMEC* affirmatively). As described above, because Mr. Newbern is now in an adversarial posture in the Arbitration Action, such information, to the extent it is even discoverable and proportional, is more appropriately produced in that forum.

## III. CONCLUSION

Based upon the foregoing, Evolve respectfully requests that the Court enter an order granting this Motion, quashing the Subpoena and issuing a protective order to the effect that the documents set forth in the Subpoena need not be further responded to or produced in this proceeding, and further discovery may not be had by way of a 2004 examination, but that such discovery can and should proceed in the normal course in the Arbitration Action. Alternatively, Evolve requests that the Court modify the Subpoena to limit the production of documents to the documents authorized

only by the 2004 Order, and enter a protective order concerning the production of and Mr.

Newbern's use of such documents.  Evolve prays for relief in accordance with the foregoing, and for

such other and further relief that the court may deem just and proper.

DATED:  August 8, 2025                              Respectfully submitted,

                                                   BG LAW LLP


                                                   By:  /s/ David M. Poitras
                                                        Steven T. Gubner
                                                        David M. Poitras


                                                   ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                   Jeffrey Naimon *(Admitted Pro Hac Vice)*
                                                   Aravind Swaminathan *(Admitted Pro Hac Vice)*
                                                   Edward Somers *(Admitted Pro Hac Vice)*

                                                   Attorneys for Evolve Bank & Trust

## <u>DECLARATION OF EDWARD SOMERS</u>

I, Edward Somers, declare as follows:

I am an attorney at Orrick, Herrington & Sutcliffe LLP, counsel to Evolve Bank & Trust ("Evolve") in this bankruptcy case, and other matters.  I have been admitted to appear before this court in this bankruptcy case *pro hac vice.*

1.      I have personal knowledge of the matters stated herein.  If called as a witness, I could and would competently testify to the truth of the facts set forth herein.

2.      I submit this declaration in support of Evolve's *Motion to Quash Subpoena and for a Protective Order* (the "Motion").  Capitalized terms used in this declaration and not specifically defined herein shall have the meaning ascribed to such terms in the Motion.

3.      Mr. Newbern filed a Motion for Rule 2004 examination on June 13, 2025 [Docket No. 547] (the "2004 Exam Motion").  The Court entered an *Order Granting Motion of Justin Newbern for Order Authorizing 2004 Examination of Evolve Bank & Trust* on June 24, 2025 (the "2004 Order") [Docket No. 562].

4.      On July 7, 2025, Mr. Newbern served a subpoena on Evolve's registered agent for service of process (the "Subpoena").  The Subpoena included a compliance date for production and examination of July 18, 2025, eleven days after service.  A copy of the Subpoena is attached hereto as **<u>Exhibit 2</u>.**

5.      Thereafter, on July 15, 2025, Mr. Newbern filed a *Notice of Motion and Motion to Compel Compliance with Rule 2004 Subpoena Issued to Evolve Bank & Trust* (the "Motion to Compel") [Docket No. 594], three days before the Subpoena's noticed date for compliance.

6.      On July 17, 2025, Evolve filed its *Opposition to Motion to Compel Compliance with Rule 2004 Subpoena Issued to Evolve Bank & Trust* [Docket No. 597] and my declaration in support thereof. As set forth in detail therein, the Subpoena includes numerous categories of documents that exceed the scope of the 2004 Order, and consistent therewith, the proposed oral examination also exceeds the scope of the 2004 Order.

7.      I wrote to Mr. Newbern on July 15, 2025, providing Evolve's objections to the Subpoena, which otherwise would have been due on July 21, 2025 (or fourteen days after service),

which is after the Subpoena's stated compliance date of July 18, 2025.  In my July 15 correspondence, I offered to meet and confer with Mr. Newbern pursuant LBRs 2004-1(g) and 7026-1(c) to discuss compliance with a substantially narrowed Subpoena that is consistent with this Court's prior order, and preparation of a joint stipulation, if necessary.

8.      On July 18, 2025, I met and conferred with Mr. Newbern regarding the Subpoena and provided additional context regarding Evolve's objections to the Subpoena, as outlined in my July 15, 2025 letter and Evolve's July 17, 2025 Opposition to the Motion to Compel.

9.      On July 23, 2025, I further met and conferred with Mr. Newbern and requested that Mr. Newbern narrow his Subpoena consistent with the Court's 2004 Order and withdraw his Motion to Compel.

10.      On July 25, 2025, Evolve filed an arbitration demand with the American Arbitration Association (the "AAA") against Mr. Newbern, related to the claims referenced in Mr. Newbern's 2004 Exam Motion, consistent with the terms of the Consumer Interest Checking Account Agreement governing his relationship with Evolve (the "Deposit Agreement") and the terms of which are available on Juno's website at https://cdn.juno.finance/legal/OnJuno_Consumer_IC_Agreement.pdf (last visited Aug. 8, 2025).  A copy of the Deposit Agreement is attached hereto as **Exhibit 1.**

11.      Section 7.11 of the Deposit Agreement includes a mandatory arbitration provision that states, in relevant part:

> **Agreement to Arbitrate.** Any claim, dispute, or controversy ("Claim") arising out of or relating in any way to: i) this Agreement; ii) the Account or Services; iii) your use of the Account or Services; iv) the amount of funds Account; v) advertisements, promotions or oral or written statements relating to the Account or Services; vi) the benefits and services related to the Account or Servies; or vii) transactions made using Account or Services, no matter how described, pleaded or styled, shall be FINALLY AND EXCLUSIVELY resolved by binding individual arbitration conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act (9. U.S.C. 1-16). The arbitration shall occur in Shelby County, Tennessee.

17

12.    On July 25, 2025, notwithstanding the pendency of the Arbitration Action and in a good faith effort to comply with Mr. Newbern's 2004 Subpoena, I caused Evolve's first production of documents to be sent to Mr. Newbern. The production consisted of five documents totaling forty-seven pages and was Bates-stamped EBT-NEWBERN-000001 through EBT-NEWBERN-000047.

13.    On July 29, 2025, I further caused Evolve's second production of documents to be sent to Mr. Newbern. It consisted of forty-three documents totaling three hundred and twenty-three pages and was Bates-stamped EBT-NEWBERN-000047 through EBT-NEWBERN-000370.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is being executed this 8th day of August, 2025 in Chicago, Illinois.

---

EDWARD SOMERS

# EXHIBIT 1

## Synapse

Synapse Financial Technologies, Inc.

Consumer Interest Checking Account Agreement

Effective Date: July 21, 2022

***Synapse Financial Technologies, Inc. ("Synapse") is providing this Agreement to you on behalf of Bank. Synapse is an agent of Bank for some purposes and will be responsible for carrying out some of our responsibilities under this Agreement as our agent, including receiving notices from you, responding to any notices relating to questions or complaints concerning your Account, and carrying out other responsibilities described in this Agreement. Accordingly, where we are responsible for matters under this Agreement, those matters may be handled either by Synapse or by us directly.***

This Consumer Interest Checking Account Agreement (this "Agreement") governs the interest-bearing consumer demand account (the "Account" or "Interest Checking Account") made available to you by Synapse, as a technology service provider of Evolve Bank & Trust ("Bank"), a member of the Federal Deposit Insurance Corporation (the "FDIC"). Access to your Account and the services under this Agreement is available only through the website and/or phone application (the "App") of the OnJuno ("Platform") that is responsible for making the services available to you and as a result, some services under this Agreement may not be available to you. You should review your agreement with Platform for a complete list of services available. As used in this document the words "we", "our", and "us" refer to Bank and Synapse, our successors, affiliates, or assignees, and the words "you", and "your" refer to the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the Account.

This Agreement, along with any other documents we give you pertaining to your Account(s), is a contract that establishes the rules that govern your Account(s) with us. This Agreement covers any account opened through Platform that you may have with us now, or in the future, and that is used primarily for consumer purposes. This Account is not designed for business use, and we may close the account if we determine it is being used for business purposes. If you sign a written or electronic signature card or open an Account with us, you agree to the most recent version of this Agreement, which is available to you at or by calling us at the number listed on the last page of this Agreement. This Agreement may be changed by us from time to time, as described in Section 7.8 below. This Agreement also includes Bank's Privacy Policy, as referred to in Section 2.10 below, any other agreement you enter into with us, and any other terms and conditions made available to you by us on Platform's website or the Mobile App (collectively the website and Mobile App are the "Platform Website").

Access to your Account and the services offered under this Agreement is limited to your use of the Platform Website and/or the Mobile App unless we notify you otherwise. **YOU UNDERSTAND THAT BY OPENING AN ACCOUNT THROUGH THE PLATFORM WEBSITE, YOU AUTHORIZE BANK TO ACCEPT ALL INSTRUCTIONS PROVIDED TO BANK BY PLATFORM OR SYNAPSE ON YOUR BEHALF.**

### Truth in Savings Disclosures

| | |
|---|---|
| Initial Deposit and Balance | There is no initial deposit or minimum balance required to open this Account. |
| Interest Rate | 0.010% |
| Annual Percentage Yield | 0.01% |

| Fees to Bank | There are no fees charged by us and applicable for this Account. You may be responsible for paying fees to the Platform. |
| --- | --- |
| Transaction Limitations | The Transaction Limitations for your Account are set forth in Section 4. |
| Additional Fee Disclosure | As noted above, you are not responsible for paying any fees to Bank for holding this Account. You may be responsible for paying fees to the Platform as provided in your agreement with Platform. You should refer to your agreement with Platform to understand how fees are charged. |

This is an interest-bearing account. There is no initial deposit required to open an Account. You may deposit any amount after you open the Account. The interest rate and Annual Percentage Yield is correct as of today's date.

1. **Consent to Use Electronic Signatures, Communications and Statements.**

    1.1. **Your Consent to Electronic Signatures. By accepting this Agreement, you understand that: (i)** electronically signing and submitting any document(s) to Synapse legally binds you in the same manner as if you had signed in a non-electronic form, and (ii) the electronically stored copy of your signature, any written instruction or authorization and any other document provided to you by Synapse is considered to be a true, accurate and complete record, legally enforceable in any proceeding to the same extent as if such documents were originally generated and maintained in printed form. You agree not to contest the admissibility or enforceability of Synapse's electronically stored copy of this Agreement and any other documents.

    1.2. **Your Consent to Electronic Communications**. To the fullest extent permitted by law, this Agreement, account statements, notices, legal and rate disclosures for your Account, updates and changes to this Agreement, or other service agreements and other communications (collectively, "Communications") from us to you regarding your Account(s) and related services with us may be provided to you electronically, and you consent and agree to receive all those communications in an electronic form. Electronic Communications may be posted on the pages within the Platform Website and/or delivered to your email address. You may print a paper copy of or download any electronic communication and retain it for your records. All Communications in electronic format will be considered to be "in writing," and to have been received on the day of posting, whether or not you have received or retrieved the Communication. We reserve the right to provide Communications in paper format.

    Your consent to receive Communications electronically is valid until you revoke your consent by notifying us of your decision to do so. If you revoke your consent to receive Communications electronically, Platform will terminate your right to use the Platform Website, including the Mobile App, or to obtain or maintain Account(s) and related services, and you accept sole liability for any losses, liabilities, cost, damages and expenses resulting from such an involuntary termination of your Account(s) and related services, to the extent permitted by law.

    1.3. **Your Review of Communications.** Please review promptly all Communications we deliver or make available to you. If Communications are mailed to you, they will be delivered to you at the postal address shown in our records. If Communications are sent to you electronically, they will be delivered to you at the email address shown in our records or made available to you on the Platform Website and/or Mobile App. We will retain printable versions of your Account statements for seven (7) years or longer periods as may be required by applicable law. You agree to give Platform notice of any change of your postal or email address.

**22**

1.4.  **Reporting to You (Statements).** Statements will be made available to you to view and/or print on the Platform Website and/or Mobile App (if available). Platform will send an email notification when the statements are available online on a periodic basis at approximately monthly intervals. The Account Statement will describe each item, date of credit or debit, and the respective amount. Electronically delivered Statements will provide all information available in paper statements.

    1.4.1.  Account statements will be considered to be correct unless you notify us, through Synapse, of any errors within sixty (60) days of becoming available. Carefully review your statement each statement cycle and notify us of any errors within sixty (60) days of your statement becoming available. Bank will not be liable to you for any error that you do not report to Bank within that period of sixty (60) days.

2.  **Account Basics.**

2.1.  **Eligibility.** The Account is available to consumers who are citizens, permanent residents or non-permanent resident alien in the United States on a valid long-term visa, at least 18 years of age, and with a valid Social Security Number or a Tax Identification Number. All deposits and withdrawals must be in U.S. dollars only. **You must agree to accept electronic, rather than paper statements, as provided above. This means; (i) you must keep us supplied with your valid email address; and (ii) you must agree to accept electronic delivery of all account communications (such as end-of-year tax forms and electronic statements). If you do not do so, you may not open an Account. If you withdraw your consent, we may close your Account.**

    2.1.1.  You authorize us or Synapse to verify your credit and employment history and/or have a credit reporting agency prepare a credit report on you, as an individual.

2.2.  **The Interest Checking Account.** This Account consists of the interest-bearing account used to hold your deposits and make online transactions, as provided herein.

2.3.  **Important information about procedures for opening a new Account.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an Account. What this means for you: When you open an Account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see a copy of your driver's license or other identifying documents.

2.4.  **Account.** You will access your Account via the Platform Website. If made available by Platform, the Account may include the use of a Debit Card to make payments and transfers to third parties. Use of a Debit Card will be subject to additional terms and conditions contained in a Cardholder Agreement. The Cardholder Agreement will be considered part of this Agreement.

2.5.  **Password Security.** You are responsible for maintaining adequate security and control of any and all User IDs, Passwords, hints, personal identification numbers (PINs), or any other codes that you use to access the Account. Do not discuss, compare, or share information about your account number or password unless you are willing to give them full use of your money. Any loss or compromise of the foregoing information and/or your personal information may result in unauthorized access to your Account by third-parties and the loss or theft of any funds held in your Account and any associated accounts, including your Account. Checks and electronic withdrawals are processed by automated methods, and anyone who obtains your account number or access device could use it to withdraw money from your account, with or without your permission. You are responsible for keeping your email address and telephone number up to date in order to receive any notices or alerts that we may send you. We assume no responsibility for any loss that you may sustain due to compromise of your account login credentials due to no fault of ours and/or your failure to follow or act on any notices or alerts that we may send to you. If you believe your Account information has been compromised, or that someone has transferred or may transfer money from your account without your permission, contact us immediately, through Synapse, at help@synapsefi.com or call at +1(415) 688-2943. You agree to promptly review all Account and transaction records and other Communications that we make available to you and to promptly report any discrepancy to us.

**23**

2.6. **Titling and Ownership**. The Account may be owned and titled only in the name of one (1) person who shall solely retain the right to direct the deposit or transfer of funds. The Account cannot be owned or titled jointly, by an organization, as Payable on Death ("POD") or "In Trust For" ("ITF").

    2.6.1. **Joint Accounts**. An Account may be opened as a joint account ("Joint Account") to be held jointly by you and others. All Joint Accounts are held with right of survivorship and in the name of two or more persons; each of the persons listed on the account intends that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s) even if the decedent had a will directing disposition to someone else. If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

    2.6.2. **Exception for Uniform Transfer to Minor Accounts. An Account may be opened as a custodial account (a "Custodial Account") for the benefit of a minor pursuant to the Tennessee Uniform Transfers to Minors Act, Tenn. Code Ann. 35-7-101 *et seq*.** As the custodian for such an Account, you agree, acknowledge and assume all responsibilities as custodian under applicable laws and regulations. You agree you will not access the Custodial Account, transfer funds into or out of the Account or use the Account for any reason other than for the benefit of the person over whom you have custody pursuant to your responsibilities as custodian. You release and hold us harmless from any liability for any use or transactions made on the Account that are in violation of these terms, this Agreement or applicable law.

    2.6.3. **Death or Incapacitation**. You or your appointed party, designee, or appointed individual agree to notify us promptly if you become legally incapacitated, are deemed incompetent, or die. We may continue to accept deposits and process transaction instructions into and from your Account until we are: (a) notified of your death or adjudication of incompetency and (b) have a reasonable opportunity to act on that knowledge. You agree that, even if we have knowledge of your death, we may pay or process transactions on your Account executed on or before the date of death for up to ten (10) days after that date unless ordered to stop payment by someone claiming interest in the Account. We may require additional documentation to confirm any claims made on the Account.

2.7. **Power of Attorney**. You may wish to appoint an agent to conduct transactions on your behalf. We have no duty or agreement whatsoever to monitor or insure that the acts of the agent are for your benefit. We will not be required to follow the instructions of your designated attorney-in-fact (your "Agent") unless you have furnished us a power of attorney in a form or under circumstances acceptable to us. Unless you revoke it, a power of attorney continues until your death or the death of the person given the power. If the power of attorney is not "durable," it is also revoked when you become incompetent. We may require your Agent to sign an affidavit stating that the power of attorney presented to us is a true copy and that, to the best of the Agent's knowledge, you are alive and competent and that the relevant powers delegated to the Agent have not been amended or terminated. We may continue to honor the transactions of your Agent until: (1) we have received written notice of the termination of the authority or notice of your death, and (2) we have a reasonable opportunity to act on that notice. You agree not to hold us responsible for any loss or damage you may incur as a result of our following instructions given by an Agent acting under a valid power of attorney.

**24**

2.8. **Our Relationship with You**. The relationship between you and the Bank is that of debtor and creditor, and the Bank owes no fiduciary duty to you. **YOU UNDERSTAND AND AGREE THAT THE PRODUCTS AND SERVICES OFFERED BY PLATFORM ARE NOT ENDORSED OR GUARANTEED BY BANK AND BANK ASSUMES NO LIABILITY FOR PRODUCTS OR SERVICES PURCHASED OR OFFERED BY PLATFORM OR PLATFORM USERS OTHER THAN THE SERVICES PROVIDED IN THIS AGREEMENT.** You understand that Platform and Bank are not partners, affiliates or joint venturers with each other. Nothing in this Agreement is intended to be read or understood as making Platform and Bank partners, affiliates or joint venturers or impose any liability as such on either of them. Unless otherwise expressly stated in this Agreement, Platform has no authority to act or represent Bank in any way. Bank provides the services under this Agreement in part through one or more service providers that Bank has engaged to render some or all of such services to you on Bank's behalf, including Synapse. You agree that Synapse and any other such service providers are third-party beneficiaries of this Agreement, which means they can enforce the Agreement against you. You understand and agree that Bank is exculpated from any and all liability arising with respect to any of the Bank services or other aspects of this Agreement to the fullest extent permitted by law.

2.8.1. **Fee Disclosure**. You are not required to pay Bank any fees in connection with this Account. Synapse will pay fees to Bank for processing your payments and checks at least enough to cover the costs associated with such processing. Platform may charge additional transaction fees and other fees associated with the services provided to you as provided in your agreement with Platform. You should refer to your agreement with platform to understand how fees are charged.

2.9. **Location of the Account**. Your Account is established in Memphis, Tennessee.

2.10. **Privacy Policy**. Bank's privacy policy is available at https://synapsefi.com/evolve-privacy and is considered part of this Agreement. By executing this agreement, you acknowledge that you have read and accepted Bank's privacy policy.

2.11. **Internet Gambling; Illegal Transactions**. We may, but are not required to, deny authorization for any internet gambling transactions. You agree not to use your Account or our services for online gambling or any illegal activity. We may refuse to process any transaction that we believe may violate the terms of this Agreement or applicable law. You acknowledge and agree that we have no obligation to monitor, review or evaluate the legality of your transactions and Account activity. You agree that using Bank services or your Account for illegal activity will be deemed an action of default and/or breach of contract and, in such event, our services and/or any of your Accounts may be terminated at our discretion. You further agree that should illegal use occur, you waive any right to sue us for such illegal use or any activity directly or indirectly related to it, and you agree to indemnify and hold us harmless from any suits, legal action, or liability directly resulting from such illegal use. To the fullest extent permitted by law, you agree to pay for any transaction that you authorized, even if that transaction is determined to be illegal.

2.12. **Freezes, Blocking or Closing Accounts Due to Irregular or Unlawful Activities**. You agree that if Bank suspects that any irregular, unauthorized, or unlawful activity may be occurring in connection with your Account, Bank may "freeze" or place a hold on the balance in such Account pending an investigation of such activities. If Bank freezes your Account, it will give any notice required under the circumstances by the laws governing the Account. If investigation confirms Bank's suspicions of irregular, unauthorized, or unlawful activity then, notwithstanding anything to the contrary in this Agreement, Bank may immediately close your Account, and may also close any or all other Accounts, if necessary, to comply with applicable law. You agree that Bank may also freeze, block, or close your Account as necessary in order to comply with regulations issued by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC").

3. **Interest Information.**

3.1. **Which Accounts Bear Interest**. Your Account will bear interest as described in this Section 3.

3.2.  **Rate Information**. The current interest rate and Annual Percentage Yield ("APY") for the Account appear in the Truth in Savings Disclosures. This is a variable rate account. We may, at our discretion, change the interest rate and APY for your Account at any time; this may be changed daily. Additionally, the interestrate is dependent on factors such as the current Federal Funds Rate and will be adjusted commensurately with changes to the relevant factors.

3.3.  **Accrual of Interest**. Interest begins to accrue no later than the business day the deposit is applied to your Account. Interest will be compounded daily and credited to your Account on a monthly basis. Account interest is calculated using the daily balance calculation method. This method applies a daily periodic rate to the principal balance in the Account each day. There are no minimum or maximum balance restrictions on your Account.

3.4.  **Forfeit of Uncredited Interest**. If you withdraw funds from your Account after interest has accrued but before it is credited to your Account, you will forfeit that interest, and it will not be credited to your Account.

4.  **Funding and Withdrawing from your Account.**

4.1.  **Deposits to the Account**. You can make deposits into your Account using any of these methods:

| Transaction Type | Frequency and Dollar Amounts/Per Day* |
|---|---|
| Direct deposits or ACH Transfers initiated from an outside financial institution | No limit to the number of times per calendar day ░░░░░░░░░░ |
| Wires initiated from an outside financial institution | No limit to the number of times per calendar day ░░░░░░░░░░ |
| ACH Transfers (debit) initiated from Us or a Linked Bank Account | No limit to the number of times per calender day ░░░░░░░ |
| Deposits using an external debit or credit card from an outside financial institution | No limit to the number of times per calender day ░░░░░░░ |

\* The limits included here are the lowest limits allowed for transactions. However, we reserve the right to allow you to transact higher volume than the limits defined herein at any time without prior notice. In certain cases, for security reasons, we may lower your limits upon notice to you at the time you attempt to initiate a transaction.

4.1.1. **Linking Bank Accounts**. If enabled by Platform for your Account, you may link an account with us or an external account at a third-party financial institution for online transfers between your linked account(s) and your Account. If enabled by Platform, you may link your external account(s) with your Account by (i) logging into your financial institution on Platform's Website or Mobile App, or (ii) by providing the account and routing details for the external account and verifying the two (2) micro deposits we send to your external account the next business day. We may also verify your control of the external account by requiring you to submit proof of ownership of the external account(s). All linked accounts must be with financial institutions in the United States. We may decline the use of any external account that we believe may present a risk to you and/or us. By linking your external account to your Account, and by subsequently logging into your linked account(s) through the Platform Website or Mobile App, you authorize us to view your account history and profile, including, but not limited to, your account and routing details, authentication details, balance, transaction history, contact information, and other related information made available by such external financial institution; and you understand this information may be used to transact on your behalf and perform other services subject to our Privacy Policy. When adding an external account, you represent and warrant that you are owner of and have the right to access, use and authorize us to use the account for information and funds transfer purposes. If any of your linked accounts has a joint account holder, you represent and warrant that the joint account holder has consented for you to represent both you and them, and to use the external account with the Platform service. If you do not have such consent, you should not use that external account and we will terminate your use of the linking service if we are notified of such a situation. If you close any of your external accounts, you are responsible for removing it as an account eligible for the linking service to avoid any transaction failure and possible charges related to a failed transaction. We are not responsible for any acts or omissions by the external financial institution or other provider of any linked external bank account, including, without limitation, any modification, interruption, or discontinuance of any linked external bank account by such financial institution, service provider or Platform.

4.1.2. **Direct Deposits**. If enabled by Platform for your Account, your Account number and bank routing number may be used for the purpose of initiating direct deposits to your Account. The recipient's name on any direct deposit(s) we receive must match your name. Any direct deposits received in a name other than the name registered to the Account will be returned to the originator. If your Account number changes you must immediately notify your employer or any other payors. You must provide them with the new Account number to ensure that your direct deposit activity continues uninterrupted.

4.1.3. **Account Funding with Cards**. If enabled by Platform for your Account, you may fund your Account with your debit or credit card. To fund your Account using a credit or debit card you must have either (i) a credit card issued by a U.S.-based bank or financial institution bearing the trademark of MasterCard International Inc. ("MasterCard"), Visa Inc. ("Visa"), or DFS Services, LLC ("Discover"), or (ii) a valid debit card issued by a U.S.-based bank or financial institution bearing the Visa, MasterCard or Discover logo. You may not use prepaid cards or gift cards with your Account. Please keep your card account information current. If your card account number changes or your card expiration date changes, we may acquire that information from our financial services partner and update your account accordingly. You may dispute a payment made with your card issuer if you used a debit or credit card to fund your payment. Your rights with the card issuer may be broader than those available under this Agreement.

**27**

4.1.4. **Remote Deposit Capture ("RDC")**. If enabled by Platform for your Account, you may make deposits into your Account by using the Mobile App to take a legible picture of the front and back of a negotiable check and transmitting such images. The RDC service is for non-business, personal use in accordance with this Agreement. We will attempt to collect the item by presenting the image or converting the image into a digital representation of the original check (a "Substitute Check"). Unlike traditional check deposits, you retain the original paper check when you use Remote Deposit Capture. We request you to retain the original check until final settlement of the check. There is currently no charge for using RDC; should there be charges in the future, you will be given appropriate notice. Your wireless telecommunications provider for your wireless device or other third parties that you may utilize may impose fees to make that device data-capable, to exchange data between the device and the Platform, or based on the location of your use. By using the RDC service, you agree that you will be bound by the terms of this Agreement and will follow any and all other procedures and instructions for use of RDC that we may establish from time to time.

4.1.4.1. **Eligible Items**. You agree to scan and deposit only checks, as that term is defined in Federal Reserve Regulation CC ("Reg. CC"). You agree that the image of the check transmitted to us shall be deemed an "item" within the meaning of Article 4 of the Uniform Commercial Code as adopted in Tennessee. You agree that you will not use RDC to scan and deposit any of the following checks or other items:

(1) Checks or items payable to any person or entity other than you, including a check payable to "Cash".
(2) Checks or items containing obvious alteration to any of the fields on the front of the check or item, or which you know or suspect, or should know or suspect, are fraudulent or otherwise not authorized by the owner of the account on which the check or item is drawn.
(3) Checks or items previously converted to a substitute check, as defined in Reg. CC.
(4) Checks or items drawn on a foreign bank or payable in a foreign currency.
(5) Checks or items that are demand drafts or remotely created checks (checks lacking the original signature of the drawer).
(6) Checks that have been previously returned stop payment or account closed.
(7) Checks or items dated more than six months prior to the date of deposit.

4.1.4.2. **Image Quality**. The image of a check or item transmitted to us using RDC must be legible. The image quality of the items must comply with the requirements established from time to time by ANSI, the Board of Governors of the Federal Reserve Board, or any other regulatory agency, or other clearinghouses.

4.1.4.3. **Necessary Endorsement**. The checks to be deposited via RDC shall be properly endorsed in the same manner in which it is made payable to you and with the restrictive endorsement: "For mobile deposit only."

4.1.4.4. **Cut-off Time**. Receipt of your check image must be received by 4:00 p.m. Pacific Time, for us to consider that day to be the day of your deposit. Any check image received by us after 4:00 p.m. Pacific Time is considered as a deposit made on the next business day we are open.

4.1.4.5. **Receipt of Items**. We reserve the right to reject any item transmitted through RDC, at our discretion, without liability to you. We are not responsible for items we do not receive or for images that are dropped during transmission. You agree to receive notices electronically relating to RDC, whether or not you have previously agreed to accept electronic disclosures for any of your Accounts. An image of an item shall be deemed received when you receive an electronic confirmation from us that we have received the image. Receipt of such confirmation does not mean that the transmission was error free or complete.

**28**

4.1.4.6. **Representations and Warranties; Indemnification**. As to all items transmitted to us, you represent and warrant that: (i) you will comply with the terms and conditions set forth in this Agreement; (ii) you will only transmit eligible items; (iii) you have good title to each check and item and no defense of any party to the check is good against you; (iv) the original check, or a paper or electronic representation, has not previously been deposited for collection with us or any other financial institution, and no depositary bank, drawee, or drawer will be asked to pay a check that it already has paid; and (v) you have no knowledge or notice of information to indicate that the transaction is fraudulent. You agree to indemnify and hold us, our affiliates, directors, officers, employees, and agents harmless from and against all losses, liabilities, cost, damages and expenses (including reasonable attorneys' fees and cost of litigation) to which we may be subject or that we may incur in connection with any claims that might arise from or out of your use of RDC.

4.1.4.7. **Deposit Errors**. You agree to notify us, through Synapse, of any suspected errors regarding items deposited through RDC right away, and in no event later than 40 days after the applicable account statement is sent or made available to you. Unless you notify us within 40 days, such Statement regarding all deposits made through RDC shall be deemed correct, and you are prohibited from bringing a claim against us for such alleged error.

4.1.5. **No Deposits in Cash, Paper Checks or Foreign Currency**. Bank will only accept funds deposited electronically through Platform. We are not liable for any deposits, including cash, lost in the mail, lost in transit, or not received by us. We do not accept deposits in cash, personal checks, cashier's checks, money orders or in foreign currency. If we receive any of those instruments by mail, we will return it to the address we have for you on file. Only deposits made in accordance with the terms of this Agreement will be accepted.

4.1.6. **Our Right to Charge Back Deposited Checks or Electronic Transfers**. If you deposit a check or receive an electronic transfer as provided in this Agreement and (i) the paying bank returns it to us unpaid; (ii) the paying bank or the issuer of a check demands that we repay them because the check was altered, forged or unauthorized, is missing a signature or endorsement, or has a forged endorsement; or (iii) the sending bank or the originator of an item demands that we return the item because it was unauthorized, sent to the wrong account number or procured by fraud, we may pay the return or demand, and subtract the funds from your Account. If we have reason to believe that any of the events in the previous sentence have occurred or may occur or that the check or other item should not have been paid or may not be paid for any other reason, we may place a hold on the funds or move them to a non-customer account until we determine who is entitled to them.

4.1.7. **Right to Reject Any Deposit**. We may refuse any check for deposit, with or without cause, or may elect to take a check on a collection basis only. We are under no obligation to accept any item, wire, electronic funds transfer, or other transaction for deposit to your Account or for collection, and we may refuse to cash or give value for any such item. We may restrict access to any deposit credited to your account that violates any laws of the United States, including those giving rise to OFAC sanctions. Unless Bank specifically permits you to do so, you may not deposit any substitute check that has not been previously handled by a bank in the collection process. This means you cannot deposit a substitute check you create, or one that is created by another person, unless we enter into an agreement to do so. Nevertheless, if a substitute check is received for deposit, you will be responsible for any losses you or another person suffers relating to that substitute check.

4.2. **Withdrawals from the Account**. You can make withdrawals from your Account using any of these methods:

| Transaction Type | Frequency and Dollar Amounts/ Per Day* |
|---|---|

| ACH Transfers (credit) to an external financial institution or Linked Bank Account tht is initiated by Us | No limit to the number of times per calendar day ██████████ |
| Wires (if enabled by Platform to your Account) | No limit to the number of times per calendar day ██████████ |
| Bill Pay Checks | 0 times per calendar day<br><br>Not Enabled |
| Debit Card Payments | No limit to the number of times per calendar day<br><br>POS daily limit: $10,000.00<br><br>ATM daily limit: $2,500.00 |

\* The limits included here are the lowest limits allowed for transactions. However, we reserve the right to allow you to transact higher volume than the limits defined herein at any time without prior notice. In certain cases, for security reasons, we may lower your limits upon notice to you at the time you attempt to initiate a transaction.

4.2.1. **Bill Pay via Check**. If enabled by Platform to your Account, you will be able to authorize us to make bill payments via check on your behalf to third parties. You may not have access to this feature until your Account has been open for a minimum of thirty (30) days. To initiate a bill payment using Bill Pay via Check, you must provide the name and mailing address of each individual or company you wish to pay. You must provide such information about each payee as we may request from time to time, and in any event sufficient to properly direct a payment to that payee and permit the payee to identify the correct account to credit with your payment. You may not make a payment of alimony, child-support, taxes, or other governmental fees or court-directed payments via Bill Pay via Check. We do not recommend using online bill payment services to fund brokerage or investment services. We may impose a dollar amount limit on bill payment transactions and will notify you in the event such a limit is put in place. Loan payments made via Bill Pay via Check, other than the amounts due, cannot be designated as principal, interest or payoff. Once a payment is authorized, the payment amount will be immediately deducted from your Account balance. Payments made using Bill Pay via Check take the form of a paper check and are sent to the payee using standard U.S. Postal Service mail. Please allow three to nine (3-9) business days for delivery of the check. Payments can only be sent to addresses located within the fifty (50) states of the U.S. Bill Pay via Check payments are processed daily by 9 a.m. Pacific Time. Check payments initiated after this time will be processed the next business day. Bank reserves the right to refuse to process payments to any individual or company. If the decision is made to refuse a payment, Bank will notify you on or before the next business day.

4.2.1.1. **Returned or Refused Checks**. Checks may be refused or returned by the individual or company to whom the payment was issued. The determination to accept this method of payment is at the discretion of the recipient. The U.S. Postal Service may also return payments in cases of expired or invalid addresses. If the check payment is returned for any reason, the payment will be voided and the full amount credited to your Account the next business day.

    4.2.1.2. **Uncashed checks.** If we remit your payment to a payee by mailing your payee a check drawn on your account and the check has not been presented for payment within our payment cut-off period, we will investigate the status of the check. If the Payee cannot be reached, or the payment is to an individual and the check has not been presented for payment by ninety (90) days after the date the funds are withdrawn from your account, we will place a stop payment order on the check and refund your Account.

    4.2.1.3. **Cancelling a Check Payment. You may cancel a single check payment as long as it has not been presented for payment by logging into Platform App or by emailing Synapse at help@synapsefi.com. Funds from any cancelled check will be credited to your Account on the next available business day. Same-day payments (***i.e.***,** payments entered and initiated on the same date) cannot be modified or deleted.

    4.2.1.4. **Liability for failure to stop payment**. If you request cancellation of a Bill Pay via Check payment three (3) three business days or more before it is scheduled to be initiated, and we do not cancel it in time, we will be liable for your losses or damages.

4.2.2. **Checks Issued by a Third-Party**. We do not support the issuance of personal checks to access funds in this Account. We reserve the right to refuse to make payments initiated via a check printed by a third-party service provider and not via the Bill Pay via Checks services provided herein.

4.2.3. **No Overdrafts**. You are not permitted to overdraw your Account. If the available balance in your Account is not sufficient to cover any payment or withdrawal you have authorized, we may refuse to process the payment or withdrawal. If your Account balance becomes negative for any reason, you must make a deposit immediately to cover the negative balance. If your Account has a negative balance and you have another account with us, we reserve the right to exercise our right to set off. See Section 4.2.4 below for details. If your Account has a negative balance for sixty (60) calendar days or more it will be closed. If you fail to pay the amount of any overdraft, we reserve the right to refer your overdrawn account to an attorney for collection, and you agree to pay all reasonable expenses, including, but not limited to, reasonable attorney's fees and court costs incurred by us as a result of your account being overdrawn.

4.2.4. **Right to Set Off**. If your Account balance becomes and remains negative, we can use the funds in any of your accounts with us to repay the negative balance in your Account without any further notice to or demand on you. Moreover, we have the right to set-off any liability, direct or contingent, past, present or future that you owe against any account you have with us. Further, you grant us a lien on and security interest in the funds on deposit in each of your account(s) as security for all of your liabilities and obligations to us, now or in the future.

5. **General Funds Availability.**

5.1. **Availability**. We make funds available according to the type of deposit and when the funds are applied or credited to your Account. Some types of deposits may not be available for immediate use. When we delay the availability of funds or place a hold on a deposit made to your Account, you may not withdraw those funds, and we will not use them to pay any debits, such as ACH transfers or payments, check payments or, if available, transactions using your debit card during the hold period. We have the right to refuse any deposit. If final payment is not received on any item you have deposited into your Account, or if any direct deposit or ACH transfer is returned to us for any reason, you agree to pay us the amount of the returned item. The length of the delay in the availability of funds will vary depending on the type of deposit.

5.2. **Business Days.** The length of the delay in the availability of funds is counted in business days from the day your deposit is applied to your Account. For purposes of these disclosures, our business days are Monday through Friday. Federal holidays are not included. Deposits received after the cut-off times provided in this Agreement or on a day Bank is not open will be processed the following business day that Bank is open.

**31**

5.3. **Same Day Availability**. Funds received from preauthorized electronic payments such as payroll direct deposits, or other preauthorized electronic payments will be available on the day the deposit is applied to your Account. ACH Credits received from an external bank account will be applied to the Account when we have verified the external account and received payment on collected funds. Once the funds are applied to the Account, they will have same day availability.

5.4. **Longer Availability**. Electronic transfers depositing into the Account initiated through the Platform may take up to five (5) business days from the date of the initial request but will post on the payment date of the deposit once the money has reached us.

5.5. **Availability of Mobile Deposits.** Checks deposited through the RDC service are not subject to the funds availability requirements of Regulation CC. Checks deposited using the RDC service will generally be made available in your Account no later than six (6) business days after the day you made the deposit. In some cases, we may not make the funds available in accordance with the general policy for other reasons, including, but not limited to, if we have reasonable cause to doubt collectability of the check. The length of the delay will be counted in business days from the day of your deposit. We reserve the right to change the limits on the amount(s) and/or number of deposits that you transmit using RDC and may modify these limits from time to time.

5.6. **Longer Delays for Check Deposits**. In some circumstances, a longer hold period may apply before funds deposited by check are available in your Account. For example, a longer delay may apply in the following cases: (i) we believe a deposited check will not be paid; (ii) you deposit one or more checks totaling $5,000 or more in one day; (iii) you redeposit a check that has been previously returned unpaid; (iv) your Account had a negative balance anytime in the previous six (6) months; or (v) we experience an emergency, such as failure of communication or computer delays. We will notify you if we delay your availability to withdraw funds and we will tell you when the funds will be available for withdrawal no later than the seventh business day after the day of your deposit.

6. **Electronic Funds Transfer Disclosures.**

6.1. **Electronic Transfers via ACH**. You may originate transfers to and from your Account via ACH as provided in Section 4 of this Agreement. These requests must be made via the Platform. In the case of electronic transfer requests from an external bank account to your Account, we will complete such requests only if the funds are being transferred from your linked external account.

    6.1.1. <u>**Next Day ACH. Cut-off Time**</u>. The cut-off time for scheduling a next day ACH transfer is 4:00 p.m. Pacific Time. Any next day ACH transfer scheduled after the cut-off time will be treated as if it were scheduled on the next business day. In some circumstances, transactions may be delayed for risk or compliance reasons.

    6.1.2. <u>**Same Day ACH. Cut-off Time.**</u> The cut-off time for scheduling same day ACH transfers (if enabled on your Account) is 9:00 a.m. Pacific Time. If enabled by Platform, the Same Day ACH means that the transfer will be performed within one (1) business day. Any same day ACH transfer scheduled after the cut-off time will be treated as if it were scheduled as next day ACH transfer. In some circumstances, transactions may be delayed for risk or compliance reasons.

6.2. **Electronic Transfers Using Your Account Number**. If enabled by Platform, you may authorize a third-party to transfer funds to and from your Account by providing your account number and your routing number to such third-party. Your account information should only be provided to trusted third-parties authorized to initiate the electronic funds transfers.

6.3. **Debit Cards and ATM Services**. If enabled by Platform, you may obtain a debit card that can be used for purchases on points of sales and/or withdrawals at ATMs. The use of your debit card to initiate electronic transfers is subject to the term and conditions of your Cardholder Agreement.

6.4. **Types of Electronic Transfers Available.**

    6.4.1. You may arrange with another party, such as your employer or a government agency, to electronically deposit funds on a one-time or recurring basis directly to your Account.

    6.4.2. You may arrange with another party to make one-time or recurring charges to your Account to a make a utility payment or to pay other bills.

**32**

6.5.  **Limitations on Transfers, Amounts and Frequency**. Your right to make electronic funds transfers is subject to the limits established in Section 4 of this Agreement.

6.6.  **Right to Receive Documentation of Electronic Funds Transfers**. Your electronic funds transfers will be reflected on the statements that will be delivered to you through the Platform Website and/or Mobile App, as described in Section 1.4. You can also contact Synapse, at +1(415) 688-2943 or email at help@synapsefi.com, to obtain information about any particular direct deposit or transfer.

6.7.  **Right to Stop Payment of Preauthorized Transfers and Procedures.** If you have scheduled a one-time or a recurring ACH transfer via the Platform, you may stop or cancel that transfer by following the procedures defined here.

6.7.1.  To stop a preauthorized ACH transfer you initiated via the Platform Website or Mobile App, either one-time or recurring, use the Platform Website or Mobile App to cancel such payment. If you are unable to cancel or stop the payment via the Platform Website or Mobile App, please contact Synapse, at +1(415) 688-2943 or email at help@synapsefi.com, to request cancellation of the transfer.

6.7.2.  To stop a recurring transfer that you have authorized a third-party to debit, please contact that third-party to request the cancellation of the recurring payment. If the third-party is unable or unwilling to stop the transfer, please contact Synapse, at +1 (415) 688-2943 or email at help@synapsefi.com, to request a stop on the payment.

6.7.3.  If you wish to stop a recurring transfer, your request to stop the transfer must be received at least three (3) business days before the transfer is scheduled to occur. You should specify whether you wish to stop one recurring payment or all recurring payments. You must specify the name of the payee, the dollar amount of the payment and the date of the payment. We will be liable for your losses or damages if you requested the stop payment at least three (3) business days before the transfer was scheduled to occur and we did not stop the payment.

6.7.4.  In the case of an authorized third-party debit transfer, if the written stop payment notification is not received at least fourteen (14) days before the transfer was scheduled to occur, the payment in question will be honored as originally authorized and future payments will not be permanently stopped. In such cases, we will not be liable if we do not refuse payment.

6.8.  **Your Liability for Unauthorized Transfers. You must contact Synapse, by calling at +1(415) 688-2943 or emailing** **help@synapsefi.com** if you believe your Account number was stolen or if you believe someone has transferred or may transfer money from your Account without permission. If your account number was stolen or if you believe someone has transferred or may transfer money from your Account without permission contact us immediately through Synapse, at the number specified above.

6.8.1.  If you notify us within two (2) business days after you learn of any unauthorized transaction, you can lose no more than $50.00 if someone used your Account without your permission. If you do not notify us within two (2) business days after you learn of the loss or theft of your Account number and we can prove that we could have stopped someone from using your Account without your permission if you had promptly notified us, you could lose as much as $500.00.

6.8.2.  If you become aware of and/or your statement shows transactions that you did not make, notify us at once following the procedures stated in the section below "Errors and Disputes." If you do not notify us within sixty (60) days after (i) you become aware of the transaction(s) and/or (ii) the statement was made available to you, you may not get back any of the value you lost after the sixty (60) days if we can prove that we could have stopped someone from taking value if you had notified us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods. After receiving notice from you of such an event, we will close Account to keep losses down and issue you a new Account number.

6.8.3.  If your Account number changes, you must immediately notify your employer or any other payors or merchants. You must provide them with your new Account number to ensure that your direct deposit and/or payments activity continues uninterrupted.

6.8.4. If you furnish your access code and grant actual authority to make transfers to someone who then exceeds that authority, you will be liable for the transfers the person makes unless we have been notified that transfers by that person are no longer authorized. If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your Account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for any special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources. Concerning each item you deposit with us, or which we cash for you or give other consideration, you make the following warranties to us whether Bank is the payor bank or depository bank: all necessary signatures and endorsements have been placed on the time and are genuine, the item has not been materially altered and you have good title to it, and no defense of any party to the item is good against you. If any such warranty is breached, we may deduct the amount of the item from any of your accounts or otherwise collect from you this amount plus expenses.

6.9. **Errors and Disputes**. If you think your statement is wrong or if you need more information about a transaction listed on it, please contact Synapse, at +1(415) 688-2943 or email at help@synapsefi.com. You must report any errors within sixty (60) days from the earlier of (i) the date the statement was made available to you on the Platform Website and/or the Mobile App or (ii) the date you access your Account and would have been able to see the error. You must provide the appropriate information for us to investigate the error or unauthorized transaction, including at least the date of the transaction and its amount. If you call us, we may request that you send your complaint or question in writing within ten (10) business days.

6.9.1. We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to use this additional time, we will credit your Account for the amount you think is in error within ten (10) business days, so that you will have use of the money during the time it takes to complete the investigation.

6.9.2. If your Account was opened less than thirty (30) days before the date of the suspected error, we may extend the ten (10) business day period to twenty (20) business days before crediting your Account.

6.9.3. If your Account was opened less than thirty (30) days before the date of the suspected error, the error resulted from a point-of-sale debit card transaction or was initiated in a foreign country, we may extend the ten (10) business day period to ninety (90) days before crediting your Account.

6.9.4. If we ask you to put your complaint or question in writing and you do not provide it within ten (10) business days, we will not credit your Account.

**34**

6.9.5. You will be informed of the results of the investigation within three (3) business days after our completion of the investigation. If we determine that there was no error, we will send you an explanation by email or by making it available via the Platform Website or the Mobile App. Copies of the investigation documentation can be obtained by calling us at +1(415) 688-2943 or emailing at help@synapsefi.com.

6.10. **Our Liability for Failure to Complete Transactions**. If we do not complete a transaction from your Account on time or in the correct amount, we will be liable for your losses or damages. However, we are not liable for any failed transaction if you do not have enough money in your balance to cover a transaction, if the ATM or device does not have enough cash or is not working properly, if circumstances beyond our control prevent the transaction, if the merchant requests authorization for an amount greater than the purchase amount, if access to your Account or linked account has been blocked after you reported your Account number or linked account number lost or stolen, if there is a hold or your funds are subject to legal or administrative process or other encumbrance restricting their use, if we have reason to believe the requested transaction is unauthorized, if we have received incomplete or inaccurate information from the third-party payor or payee or if there are other exceptions stated in this agreement or as provided by law. We are not liable for the failure to complete a transaction on a business account if we send you notice that the transaction was not completed.

7. **General Rules Governing the Account.**

7.1. **Assignment. Transfer. Non-Waiver. Applicable law**. The Account and your obligations under this Agreement may not be assigned. We may transfer our rights under this Agreement. Use of the Account is subject to applicable Federal laws and the laws of the State of Tennessee, and all applicable rules and customs of any clearinghouse or other association governing your Account or any transactions. If you or we excuse each other from complying with any part of this Agreement, this will not waive compliance by the excused party on any other occasion, notwithstanding the number of previous excusals or their duration. A party may not rely justifiably upon another's past forbearance to vary present or future rights, obligations or performance under this Agreement. If any provision of this Agreement is determined to be invalid, illegal or unenforceable for any reason, that provision shall not invalidate or render unenforceable any other provision of this Agreement.

7.2. **Sub-Deposit Accounts.** We will, from time to time, place your funds provided to us in a Sub-Deposit Account. You hereby direct Bank, as agent for you and at your written direction (as set forth herein), to open and maintain in Bank's Trust Department and/or with other financial institutions ( each, an "Insured Depository Institution" and collectively, "Insured Depository Institutions'') a deposit account or omnibus custody account (individually and collectively, "Sub-Deposit Account") in the name of Bank (for your benefit), and to deposit in the Sub-Deposit Account from time to time (at Bank's discretion) all or some moneys you may deliver to Bank from time to time for credit to the Account. The owner of the Sub-Deposit Account is Bank as agent and custodian for you and ownership will be evidenced by a book entry in records maintained by us. You authorize us to act as your agent with respect to establishing, maintaining and administering the Sub-Deposit Account, and you authorize us to take any action necessary to establish, maintain and administer the Sub-Deposit Account and to initiate transfers to and from your Sub-Deposit Account and Account as we may determine in our sole discretion. Bank, in its sole discretion, may divide the funds deposited into the Account into one or more separate Sub-Deposit Account to be managed by Bank. As your agent, the Bank will determine the amount of funds to deposit in and withdraw from each Sub-Deposit Account, subject to the terms herein. You consent to the assets deposited in the Sub-Deposit Account with the Bank's Trust Department being considered trust assets of the Trust Department. No evidence of ownership related to the Sub-Account will be issued to you, and you will not receive any written confirmation of the establishment of the Sub-Deposit Account or transfer of funds to or from the Sub-Deposit Account. All deposits to your Sub-Deposit Account and withdrawals from the Sub-Deposit Account necessary to satisfy any debits to or withdrawals from your Account will be made by us, as your agent. The depositing of your funds into the Sub-Deposit Account will not increase your FDIC deposit insurance coverage.You authorize us to execute and deliver or file on your behalf all appropriate receipts, agreements, releases and other instruments, including whatever agreements may be required to establish and maintain the Sub-Deposit Account or to establish your ownership interest in the Sub-Deposit Account. Notwithstanding anything to the contrary, you acknowledge and agree that the funds deposited in your Account and transferred to the Sub-Deposit Account may be used by us and/or each Insured Depository Institution as a source of funding and for investment; provided, however, we will only invest such funds in certain securities, equities and debt (e.g., U.S. Treasury Bills, U.S. or state issued or guaranteed securities, corporate bonds, mutual funds, exchange traded funds, etc.) or any other investments or assets permitted by applicable law. For the avoidance of doubt and notwithstanding any other provision herein, Bank and each Insured Depository Institution intend to (and you authorize each such party to) use deposits in the Account and/or Sub-Deposit Account each such party holds to fund current and new businesses, including lending activities and investments, without benefit to you (and for their respective benefit). You acknowledge and agree that the Sub-Deposit Account and any investments made by us in connection with the Sub-Deposit Account will earn no interest or fees for you, and that we may collect any interest, investment returns and/or fees in connection with a Sub-Deposit Account or any investment contemplated herein for the exclusive benefit and account of Bank and/or Insured Depository Institutions (if applicable). However, the funds you deposit with us in your Account will be made available to you in accordance with this Agreement (and regardless of the performance of any of our loans or investments, subject to FDIC insurance limitations). You further acknowledge and agree the income that we and/or an Insured Depository Institution earn through our respective lending and investing activities may be greater than the interest earned by you pursuant to the Account Agreement (if any), that we and Insured Depository Institutions may also receive other financial benefits in connection with the funds in your Sub-Deposit Account. Our placement of funds in the Sub-Deposit Account may reflect considerations of federal and state law, our funding needs and funding needs of Insured Depository Institutions, general economic conditions or other factors determined by us in our sole discretion. We may place funds to enhance our business objectives and for balance sheet management purposes without any benefit to you. We are under no obligation to place your funds with an Insured Depository Institution. Subject to applicable law, your only rights with respect to the Sub-Deposit Account are to demand we repay you all amounts in your Account that were deposited with us, including those transferred to the Sub-Deposit Account from your Account. The Sub-Deposit Account may not be transferred to another institution, except by us or the Insured Depository Institution. You may terminate our role as your agent here under by providing us with thirty (30) days' prior written notice, such notice to be sent to help@synapsefi.com. Any termination will result in a return of funds in accordance with law and closing of your Account and any Sub-Deposit Account opened specifically for you. Each Sub-Deposit Account at each Insured Depository Institution constitutes an obligation of the Insured Depository Institution and is not directly or indirectly an obligation of the Bank. You can obtain publicly available financial information concerning each Insured Depository Institution at Search Instituions or by contacting the FDIC Public Information Center by mail at 3501 North Fairfax Drive, Arlington, VA 22226, or by phone at 1-877-275-3342. We do not guarantee in any way the financial condition of an Insured Depository Institution or the accuracy of any publicly available financial information concerning an Insured Depository Institution. We may provide your name, tax identification number and other pertinent identifying information to the Insured Depository Institution, and other parties providing services in connection with the placement of your funds and the establishing and holding the Sub-Deposit Account. Although there are two or more accounts associated with your funds (the Account and the Sub-Deposit Account), your Account is treated as a single account for reporting deposits and withdrawals, as well as for tax reporting, balance requirement, service charge, and monthly statement (which will reflect the total balance in your Account and each Sub-Deposit Account, excluding any interest or amounts owed or belonging to us or any Insured Depository Institution). The existence of the Sub-Deposit Account will not change the manner in which you use, obtain information about or earn interest (if any) on your Account. Transfers to and from the Sub-Deposit Account will not appear on your monthly statement. We are responsible for the accuracy of your Account statements, not the Insured Depository Institutions.

7.3.  **Legal Processes Affecting Accounts**. If we are served with a subpoena, government agency request for information, restraining order, writ of attachment or execution, levy, garnishment, search warrant, forfeiture or similar order or legal process relating to your Account (termed "legal action" in this section), regardless of the jurisdiction of the issuing authority, we may rely on the representations made in the legal action and comply with the legal action, regardless of the jurisdiction of the issuing authority or the location of the Bank at which the legal action is received. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your Account or in any way restricted access to your funds in accordance with the legal action. If you believe your funds are exempt from legal action, or otherwise should not be subject to legal action (for example, if you own funds and the legal action applies to another joint owner, you believe the court, garnishor, or levying authority lacks jurisdiction over you or the property, or you believe the garnishment or levy names the wrong party as garnishee), you agree that it is your responsibility to raise any defense to the legal action against the party who originated the legal action, and you agree that we have no obligation to do so. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your Account. Unless expressly prohibited by law, we will charge your account a fee for each legal action received, regardless of whether the action is subsequently revoked, vacated or released.

7.4.  **Abandoned or Inactive Accounts**. Tennessee has unclaimed property laws that govern when accounts are considered abandoned. Your account is usually considered abandoned if you have not made a deposit or withdrawal, or signed in to your online Account, for a specified period of time. We are required by the unclaimed property laws to turn over accounts considered abandoned to the applicable state. Before we turn over an abandoned account, we may send a notice to you by e-mail or the address we show for the account statement. Unless prohibited by law, we may charge to your Account our costs and expenses of any notice, payment and turnover of the remaining balance of your Account to the applicable state. Tennessee laws will apply on unclaimed or abandoned property related to this Account.

7.5.  **FDIC Insurance.** For any deposit accounts you open, the FDIC requires Bank to disclose, and you hereby acknowledge, that deposits held by Evolve Bank & Trust are insured up to $250,000 federal deposit insurance limit, per depositor for each ownership category.

7.6.  **Standard of Care. Limitation of Liability**. Our liability for losses you incur in connection with your Account is limited to actual damages proved that are proximately caused by our failure to exercise ordinary care. Nevertheless, if we make an error in your favor by excessively crediting or insufficiently debiting your account for any reason, including, without limitation, to the giving of cash or credit in excess of a corresponding account debit, you agree that you immediately owe us the amount in error, whether you relied on the error or not. You agree to waive your rights to a jury and to punitive and exemplary damages and further agree to be subject to all parts of the arbitration provision in Section 6.10. Damages for any breach of this Agreement are limited to those that are direct and lie in contract, and will exclude indirect and consequential damages. Also excluded are damages in tort, including but not limited to those for emotional distress, unless caused by a willful and malicious act, which in the case of the unauthorized disclosure of private or confidential information must also be defamatory. In return, we also waive our same rights in any such action, cross-action or claims in arbitration we may file against you. We will have no liability for acting on instructions from you accepted or interpreted by us in good faith according to the terms of this Agreement, declining to act on instructions whose authenticity or accuracy cannot be verified to our satisfaction, or not acting on instructions not actually received.

7.6.1.  Except as required by applicable law, we will have no liability to you if we are unable to complete a transaction for any reason beyond our control. Except as otherwise expressly provided in this Agreement or as otherwise required by applicable law, we, any affiliates, and the parties with whom we and our affiliates contract in order to offer your Account and related services are neither responsible nor liable for any indirect, incidental, consequential, special, exemplary, or punitive damages arising out of or relating in any way to your Account, any products or services purchased using the Account, or this Agreement (as well as any related or prior agreement you may have had with us).

**37**

7.6.2.  By accepting this Agreement, you acknowledge that Bank will not be liable for taking action for the purpose of compliance with any applicable law or regulation.

7.7.  **Indemnification**. You shall indemnify and defend us and our officers, directors, employees, agents, and representatives, and hold each of them harmless, against suit, judgment, asserted claim, demand, excise taxes, claims, liabilities or losses, including fees of counsel, interest and other expenses, arising directly or indirectly from your breach of your obligations under this Agreement or those arising from the instructions or actions of you or of third parties whom you have permitted to direct, manage, view or otherwise act or omit to act in connection with your Account. If we and our officers, directors, employees, agents or representatives are entitled to indemnification against a claim under this Agreement, we shall give you prompt notice of the claim and any further pleadings, communication or other information connected with it. You shall defend us, and our officers, directors, employees, agents, and representatives, or pay for the cost of its defense, as we or our officers, directors, employees, agents or representatives shall elect. The parties shall cooperate for the cost-effective defense of the claim, and us and our officers, directors, employees, agents and representatives shall not settle any claim for which indemnification is demanded without your consent.

7.8.  **No Warranty of Availability or Uninterrupted Use.** From time to time, services related to the Platform Website, the Mobile App or the Account may be inoperative. When this happens, you may be unable to access the Platform, and you may be unable to use the Account or obtain information about the Account. Please notify us if you have any problems using the Account or Platform Website and/or Mobile App. You agree that we will not be responsible for temporary interruptions in service due to maintenance, website changes, or failures, nor shall we be liable for extended interruptions due to failures beyond our control, including but not limited to the failure of interconnecting and operating systems, computer viruses, forces of nature, labor disputes and armed conflicts.

7.9.  **Amendment and Cancellation**. Except as otherwise required by applicable law, we may amend or change the terms and conditions of this Agreement at any time by posting the amended Agreement on the Platform Website, and any such amendment will be effective upon such posting to the website. You will be notified of any amendment(s) in the manner provided by applicable law prior to the effective date of the amendment(s). However, if the amendment(s) is made for security purposes or your benefit, we may implement it without prior notice.

7.9.1.  We may cancel or suspend your Account or this Agreement at any time. You may cancel this Agreement by emailing help@synapsefi.com to close your Account. Your cancellation of this Agreement will not affect any of our rights or your obligations arising under this Agreement prior to cancellation.

7.9.2.  If your Account is canceled, closed or terminated for any reason, you may request the balance to be returned to an external account that you have maintained, including any linked external account. Allow at least fourteen (14) days for processing of such balance return. If Platform's offering is canceled, closed, or terminated, Platform will be responsible for sending you prior notice, in accordance with applicable law. Specific information and instructions, including how to convert and receive any remaining Account balance, will be included in the notice.

7.10.  **Customer Service.** For customer service or additional information regarding your Account and any financial services, please contact Synapse at:

7.10.1.  **Phone:** +1(415) 688-2943

7.10.2.  **Email: [help@synapsefi.com](mailto:help@synapsefi.com)**

7.10.3.  **Hours**. Customer Service agents are available to answer your calls:

7.10.3.1.  Eastern Time: Monday through Friday: 10:00 AM – 5:00 PM.

7.10.3.2.  Central Time: Monday through Friday: 10:00 AM – 5:00 PM.

**38**

7.10.3.3.   Pacific Time, Monday through Friday, 10:00 AM – 5:00 PM.

**7.11.   Arbitration. PLEASE READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY. IT PROVIDES FOR MANDATORY ARBITRATION OF CONSUMER CLAIMS (SUBJECT TO SOME EXCEPTIONS), INSTEAD OF COURT PROCEEDINGS. IF YOU OR WE ELECT ARBITRATION OF A CLAIM, NEITHER WILL HAVE THE RIGHT TO PURSUE THAT CLAIM BEFORE A JUDGE OR JURY IN COURT OR TO PARTICIPATE IN A CLASS ACTION PROCEEDING. RIGHTS YOU WOULD HAVE IN COURT THAT MAY BE LIMITED OR UNAVAILABLE IN ARBITRATION INCLUDE THE RIGHT TO CONDUCT DISCOVERY OR TO APPEAL. FEES AND EXPENSES OF ARBITRATION MAY BE HIGHER THAN THOSE ASSOCIATED WITH COURT PROCEEDINGS. THE ARBITRATOR'S DECISION WILL BE BINDING, EXCEPT AS PROVIDED BELOW.**

7.11.1.   **Agreement to Arbitrate**. Any claim, dispute, or controversy ("Claim") arising out of or relating in any way to: i) this Agreement; ii) the Account or Services; iii) your use of the Account or Services; iv) the amount of funds Account; v) advertisements, promotions or oral or written statements related to the Account or Services; vi) the benefits and services related to the Account or Services; or vii) transactions made using Account or Services, no matter how described, pleaded or styled, shall be FINALLY and EXCLUSIVELY resolved by binding individual arbitration conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act (9 U.S.C. 1-16).  The arbitration shall occur in Shelby County, Tennessee.

7.11.2.   ARBITRATION OF YOUR CLAIM IS MANDATORY AND BINDING. NEITHER PARTY WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM THROUGH A COURT. IN ARBITRATION, NEITHER PARTY WILL HAVE THE RIGHT TO A JURY TRIAL OR TO ENGAGE IN DISCOVERY, EXCEPT AS PROVIDED FOR IN THE AAA CODE OF PROCEDURE

7.11.3.   For a copy of the procedures, to file a Claim or for other information about this organization, contact it at: AAA, 335 Madison Avenue, New York, NY 10017, or at www.adr.org.

7.11.4.   All determinations as to the scope, interpretation, enforceability and validity of this Agreement shall be made final exclusively by the arbitrator, which award shall be binding and final. Judgment on the arbitration award may be entered in any court having jurisdiction.

7.11.5.   NO CLASS ACTION, OR OTHER REPRESENTATIVE ACTION OR PRIVATE ATTORNEY GENERAL ACTION OR JOINDER OR CONSOLIDATION OF ANY CLAIM WITH A CLAIM OF ANOTHER PERSON OR CLASS OF CLAIMANTS SHALL BE ALLOWABLE.

7.11.6.   This arbitration provision shall survive: i) the termination of the Agreement; ii) the bankruptcy of any party; iii) any transfer, sale or assignment of your Account, or any amounts owed on your Account, to any other person or entity; or iv) closing of the Account. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall remain in force.

7.11.7.   **IF YOU DO NOT AGREE TO THE TERMS OF THIS ARBITRATION AGREEMENT, EMAIL US AT [HELP@SYNAPSEFI.COM](mailto:HELP@SYNAPSEFI.COM) TO CLOSE THE ACCOUNT AND REQUEST A REFUND, IF APPLICABLE.**

7.11.8.   **Costs of Arbitration**. You and we will be responsible for paying the fees of the arbitrator and any administrative fees charged by the Administrator according to the rules and procedures of the Administrator. We will also pay or reimburse you for all or part of other arbitration fees, if the arbitrator determines there is good reason to do so, and we will pay any fees and costs, which we are required to pay by law or by the rules and procedures of the Administrator. In addition, in the event that you receive an arbitration award that is greater than our last written settlement offer, the arbitrator shall have the discretion to require us to pay your attorneys' fees and costs. Otherwise, each party will bear its own attorneys' fees and costs, regardless of who prevails.

7.11.9.  The arbitrator's decision is final and binding on the parties, except for any right of appeal provided by the Federal Arbitration Act. Costs will be allocated in the same way as costs are allocated in arbitration by a single arbitrator. A final and binding award is subject to judicial review only as provided by the Federal Arbitration Act. An arbitration award will be enforceable under the Federal Arbitration Act by any court having jurisdiction.

7.12.  **Governing Law.** This Agreement shall be governed by the laws of the State of Tennessee.

7.13.  **Termination.** We and you may each terminate this relationship unilaterally at any time upon notice. To close your Account and terminate this Agreement, please contact us through Synapse as provided in Section 7.9.

7.13.1.  You understand and acknowledge that even after executing this Agreement and opening an Account, Bank has the right to close your account and terminate this relationship, and you will have no right to compel Bank to grant access to Bank services, either initially or after an Account is opened.

7.13.2.  IMPORTANT: If you terminate your relationship with Platform, the Account will automatically be closed. Upon closure, any remaining funds in the Account will be converted and returned to you in accordance with this Section.

7.13.3.  IMPORTANT: If the agreement between Synapse and Platform is terminated, this Account may be terminated. In this case, Synapse shall send you a notice with the applicable procedures.

7.13.4.  Unless you are notified otherwise, upon termination, Synapse will instruct Bank to return any remaining funds in the Account in a check mailed to the address on file associated with the Account. Bank's obligations to you will be fully satisfied by mailing a check in the appropriate amount to the address specified by Synapse.

| DIGITAL SIGNATURE | |
|---|---|
| FINGERPRINT | ██████████ |
| IP | █████ |
| TIMESTAMP | July 21, 2022 (07/21/22) - 06:56:47 UTC |

# EXHIBIT 2

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

CENTRAL _____ District of _____CALIFORNIA_____

In re ___SYNAPSE FINANCIAL TECHNOLOGIES, INC.___   Case No. ___1:24-BK-10646-MB___
                      Debtor

                                        Chapter __11_____


## SUBPOENA FOR RULE 2004 EXAMINATION

To: _____EVOLVE BANK & TRUST_____

                        *(Name of person to whom the subpoena is directed)*


☐ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| **VIRTUAL- LINK TO BE PROVIDED (GOOGLE MEET)** **or physical location to be mutually agreed upon** | **JULY 18TH, 2025** **8:00AM EST- 12:00PM EST** |


The examination will be recorded by this method:   **AUDIO**


☒ *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

  **SEE 'EXHIBIT A'**


        The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _7/1/2025_

        CLERK OF COURT

                                    OR

        *Signature of Clerk or Deputy Clerk*          *Attorney's signature*


The name, address, email address, and telephone number of the attorney representing *(name of party)*
**SELF - PRO SE** _____ , who issues or requests this subpoena, are:

  **JUSTIN NEWBERN, PRO SE, 360.870.9488, JAY@JAYNEWBERN.COM**
  **3701 WESLEY DR NW, OLYMPIA, WA 98502**
                    **Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**42**

**EXHIBIT A**

**REQUEST FOR PRODUCTION OF DOCUMENTS AND ORAL EXAMINATION**

**PURSUANT TO RULE 2004 EXAMINATION**

**To:** Evolve Bank & Trust

**From:** Justin Newbern

**Re:** Rule 2004 Document Subpoena Relating to Custodial Account Activity and Related Matters

Pursuant to the United States Bankruptcy Court's Order entered on June 24, 2025 (Dkt. 562), authorizing a Rule 2004 examination of Evolve Bank & Trust, the following requests are issued. In addition to producing the document described below, Evolve is required to designate and produce one or more person(s) most knowledgeable to testify regarding the subjects and matters identified herein, including but not limited to custodial account structures, reconciliation activities, account migration, oversight responsibilities, and any transactions or processes involving Justin Newbern.

The deposition is scheduled for **July 18, 2025, at 8:00 AM Eastern Time**, to be conducted remotely or at a mutually agreeable location, unless otherwise agreed upon by the parties. This date is proposed in good faith based on the discovery window authorized by the Court. Evolve Bank & Trust is expected to either confirm its availability for the noticed date and time or promptly propose an alternative, in keeping with its obligation to cooperate with the examination as ordered. Failure to engage in timely scheduling discussions may result in the matter being brought back to the Court for further relief.

1

**43**

**Definitions and Scope**

- Evolve Bank & Trust / Evolve:

  include agents, officers, contractors, and related third parties.

- Synapse / Synapse Financial Technologies:

  Shall include Synapse Financial Technologies, Inc., its affiliates, agents, and any
  contractors acting on its behalf, including but not limited to Synapse Brokerage
  LLC.

- Juno:

  Shall include CapitalJ Inc., doing business as Juno, as well as any affiliated
  entities, officers, employees, or agents acting on its behalf.

- Custodial Account(s):

  Shall include any account—individual, omnibus, FBO ("for benefit of") structure,
  or sub-ledger—in which funds associated with or attributable to Justin Newbern
  were held, pooled, or otherwise administered.

- Disclosures:

  Shall mean any written, verbal, or digital representations made to end users or
  regulators regarding account structure, FDIC insurance, custodianship, fund
  access, or terms of service.

- Marketing Materials:

  Shall include consumer-facing advertisements, emails, pitch decks, promotional
  content, social media, and onboarding communications.

- Communications:

  Shall mean emails, instant messages (e.g., Slack), memoranda, meeting notes,
  documents shared via collaboration platforms (e.g., Google Drive, Dropbox), and
  internal or external correspondence in any form.

- Reconciliation:

**44**

Shall include any process of verifying, matching, or tracing customer account balances, internal ledgers, or platform funds; including error investigations, adjustment reports, and balances reviewed for audit or operational purposes.

- Ankura:

    Shall refer to Ankura Consulting Group, LLC and any employees, subcontractors, or consultants engaged by Evolve for reconciliation, forensic analysis, or internal investigation related to Synapse-supported accounts.

**I. Account-Specific Records**

1. a. All records, internal or external, reflecting the opening, maintenance, and activity of any deposit account, custodial account, or brokerage account associated with or held on behalf of Justin Newbern, beginning at account opening in August 2021 through the present, including but not limited to:

    - Account agreements, terms and conditions, and onboarding materials;
    - Periodic statements, transaction logs, and account ledgers;
    - All records of internal reconciliation related to the subject account(s).
    - All internal customer service records, case logs, call notes, call recordings, CRM entries, or internal communications documenting or referring to any contact made by Justin Newbern to Evolve Bank & Trust staff, support channels, or compliance representatives, from August 2021 to present.

    This request includes any internal identifier, alias, reference number, or ledger designation used by Evolve or Synapse to represent or segregate Justin Newbern's funds, regardless of whether the account is formally titled in his name.

**45**

## II. Regulation E Dispute and Internal Investigation Materials

**2.**    a. All records, internal notes, communications, and investigatory materials generated or reviewed by Evolve Bank & Trust in connection with Regulation E Dispute Ticket #1136382, including but not limited to:

- The consumer's initial dispute submission and any supporting documents;
- Internal investigation notes, assessments, and findings;
- Communications with Synapse, Juno, or any third party relating to the disputed transaction or the authorization of the October 2023 transfer;
- Any documents purporting to show customer authorization for the transaction in question;
- System logs, access records, or audit trails reviewed during the investigation;
- Non-privileged communications with legal or compliance staff concerning the handling, classification, or resolution of this dispute;
- Any documents or communications reflecting the final determination issued to the consumer.

For clarity, this request includes any documents Evolve relied on to determine that the transaction was authorized, as well as any documentation that supports or disputes that conclusion.

## III. Internal Communications Concerning Justin Newbern

**3.**    a. All internal communications, including emails, memoranda, or meeting notes, between or among officers, executives, or employees of Evolve Bank & Trust concerning:

- Justin Newbern;
- His custodial or deposit accounts;
- His disputes, inquiries, or requests;
- The Rule 2004 motion or any legal filings by or involving Justin Newbern;

4

**46**

- Communications concerning internal handling, response coordination, or administrative consideration of Mr. Newbern's correspondence, complaints, or other submitted materials.

## IV. Custodial and Omnibus Account Documentation

**4.**   a. All documents or communications reflecting:

- The flow of funds into, within, or out of any omnibus or custodial account in which Justin Newbern's funds were held;
- The structure, reconciliation process, and operational oversight of such accounts;
- The identities of any sub-accounts or ledger identifiers associated with Justin Newbern.

## V. Synapse Reserve and Risk Mitigation Accounts

**5.**   a. All documents and communications relating to any reserve, escrow, or risk mitigation account established or maintained by Synapse Financial Technologies, Inc. at Evolve Bank & Trust, including but not limited to:

- Documents sufficient to identify the name, account number (including accounts ending in 0018), and terms of any such account;
- Statements or transaction records from August 2021 to the present;
- Policies or agreements governing the establishment, maintenance, or authorized use of the account(s);
- Communications between Evolve, Synapse, and/or any third party regarding:
- The purpose, balance, or sufficiency of the reserve;
- Use or access to such funds (including any withdrawals, offsets, or reallocations by Evolve);
- Disputes or anticipated disputes concerning the reserve;

5

**47**

- Internal analyses or reports discussing the reserve's role in risk mitigation or reconciliation related to Synapse-supported end-user accounts.

This request includes communications authored by or addressed to (but not limited to) Scot Lenoir, Jeff Theiler, Hank Word, the bank's legal department, and any personnel in compliance, risk, operations, or executive leadership. This request is intended to determine whether funds held in any reserve, escrow, or offset accounts related to Synapse-supported platforms—including any "Program Funding Accounts" or other aggregated fund vehicles—were funded by or served to offset consumer balances held on behalf of end users such as Mr. Newbern.

## VI. Alleged Direct Debits from Custodial Accounts (Fee Deductions)

6.  Public statements by Sankaet Pathak, former CEO of Synapse Financial Technologies, have alleged that Evolve Bank & Trust directly debited substantial fees—amounting to millions of dollars—from custodial accounts titled "FBO Synapse End Users Funds." These accounts, including but not limited to one ending in 0018, were purportedly used to hold aggregated customer funds. One such debit was reportedly executed on or around May 8, 2024, in the amount of $5,912,154.

This request seeks documents sufficient to assess Evolve's internal justifications, accounting treatment, and risk oversight practices related to any such debits from pooled custodial accounts or program funding accounts. It includes:

a. All documents, communications, and transaction records related to any debits, withdrawals, or transfers of funds initiated by Evolve Bank & Trust from any omnibus, custodial, or FBO ("For Benefit Of") account titled in any variation of "FBO Synapse End User Funds – Program Funding Account" or similar, including but not limited to the account ending in "0018."

This includes but is not limited to:

6

**48**

- Authorizations, internal approvals, or rationale for such transactions;
- Communications between Evolve, Synapse, or any platform (including Juno) discussing the purpose, legitimacy, or basis of such transfers;
- Accounting or ledger entries showing the disposition of the debited funds;
- Any reconciliation or clawback efforts involving these funds;
- Records of any fees, service charges, penalties, or amounts deducted from such FBO accounts from August 2021 through present.

## VII. Inter-Party Agreements and Communications

7.   a. All agreements and amendments between Evolve and Synapse Financial Technologies, Inc. relating to custodial services, deposit accounts, compliance responsibilities, and fund flows applicable to Synapse-supported platforms (including Juno).

b. All communications between Evolve and Synapse or Juno relating to:

- Platform disclosures or user-facing representations concerning account structures, FDIC insurance, or fund custody;
- Disputed transactions or account errors involving Justin Newbern;
- Requests for, or approvals of, transaction reversals, adjustments, or reconciliations.

## VIII. Disclosures, Marketing Materials, and Compliance Oversight

8.   a. All communications from August 2021 to present — including emails, shared drive access logs, and approval records — reflecting Evolve's review, approval, or commentary on consumer-facing disclosures, marketing materials, or representations made by Synapse, Juno, or other platforms concerning:

- Custodial arrangements;
- Use of Evolve's name or logo;
- Representations of FDIC insurance coverage;

**49**

b. All communications in which Evolve Bank & Trust provided feedback on, consulted on, or otherwise influenced any customer-facing document or communication prepared by Synapse, Juno, or any related platform—regardless of whether it referenced Evolve's name, logo, or FDIC status.

c. All documents sufficient to show any payments, transfers, or compensation of any kind made to Evolve Bank & Trust by Synapse, Juno, or any affiliated platform, whether direct or indirect, including:

- Payments specifically designated, described, or understood internally as relating to custodial services;

- Payments associated with or attributed to oversight responsibilities, compliance monitoring, audit support, risk assessments, regulatory review, or any related function;

- Fees, charges, or compensation for review, approval, or clearance of platform disclosures, marketing materials, or public-facing representations;

- Compensation or consideration for the use of Evolve's name, charter, or FDIC-insured status, whether explicitly invoiced or bundled with other service categories.

## IX. Reconciliation and Forensic Engagements

9. a. All correspondence, contracts, and non-privileged deliverables associated with Ankura Consulting Group's engagement by Evolve Bank & Trust for reconciliation or forensic accounting related to Synapse-supported accounts, including:

- Work product or summaries provided to Evolve;

- Reports or documentation related to the reconciliation of customer balances, including balances attributed to Justin Newbern;

- Internal or third-party communications referencing Ankura's reconciliation findings.

8

**50**

- Any final reconciliation reports or determinations made by Ankura or Evolve regarding Justin Newbern's balances, allocations, or account status

b. Documents sufficient to show the dates and scope of Ankura's engagement, including:

- Statements of work;
- Task orders or amendments;
- Any reports summarizing findings on missing or misallocated funds.
- Reports or communications purporting to rebut or disprove the accuracy of transaction data as reported within Synapse's systems.

## X. Mercury-Associated Reconciliation Discrepancies

**10.**  a. All communications and documents relating to custodial fund flows and reconciliation activities involving Mercury accounts supported by Synapse:

- All documents, communications, and reconciliation records concerning fund transfers, account migrations, or ledger discrepancies in any custodial or FBO account(s) associated with Mercury platform users, including those managed or processed via Synapse Financial Technologies.
- Any reports, audits, or internal reviews prepared by or provided to Evolve Bank & Trust concerning the reconciliation status or accuracy of Mercury-related funds, including but not limited to any migration or allocation issues occurring in or around September through December 2023.
- Communications with Synapse, Mercury, or relevant third parties concerning any differences between ledger balances and actual funds held in custodial or omnibus accounts serving Mercury users.
- Any documentation related to Evolve's assessment of claims made publicly (e.g., blog posts, news reports, or regulatory inquiries) regarding reconciliation concerns involving Mercury platform users.

1    This request does not assume the accuracy of any third-party statements, but seeks

2    documentation sufficient to assess Evolve's own understanding, internal analysis,

3    and response to fund reconciliation issues involving Mercury-related accounts.

4    Given the interconnected nature of Synapse's pooled custodial structures and the

5    shared reconciliation systems across platforms, understanding whether systemic

6    reconciliation errors—including those potentially involving Mercury—impacted

7    the accuracy or integrity of account balances across the ecosystem, including my

8    own, is directly relevant to the examination authorized by the Court. Notably, a

9    shortfall between custodial records and available funds estimated at $65 to $95

10   million remains uncontested in the case record, further underscoring the need to

11   evaluate the scope and origin of reconciliation discrepancies across platforms,

12   especially where they may have distorted end-user balances or contributed to the

13   now-documented shortfall.

14

15   **XI. Technical Logs and Transaction-Level Diagnostics**

16   **11.**    a. All technical logs, including but not limited to access logs, server activity

17   reports, transaction processing records, reconciliation batch logs, error reports,

18   internal status updates, or outage alerts from any system used by Evolve or its

19   agents for reconciliation or transaction processing related to Synapse accounts.

20   This request specifically encompasses activity surrounding the following disputed

21   transactions, which were first brought to Movant's attention via account

22   statements shared by Scott Lenoir in or around August 2024:

23       • February 21, 2024 — Transaction ID 65d7bc2aa6ed060b6a52ab91

24   "Transfer from Brokerage": $137,516.69

25   Approx. timestamp of database entry: 2024-02-22 21:27:06 UTC

26       • April 30, 2024 — Transaction ID 6632b5db52c033d777c3a511

27   "Transfer from Brokerage": $22,004.48

28   Approx. timestamp of database entry: 2024-05-01 21:36:27 UTC

**52**

Note: The previous timestamps are approximated based on the hexadecimal structure of the listed MongoDB ObjectIDs, which embed a Unix epoch timestamp in their first four bytes. These values correspond to the moment each transaction was recorded in Synapse's ledger database. Movant expects the production of any error reports, downtime logs, access records, or reconciliation anomalies occurring at or around the listed transaction dates as well as the inferred database entry times, to fully account for any system events that may have impacted performance, reconciliation, or transaction integrity.

b. Please include any documentation, monitoring reports, or internal communications reflecting:

- System uptime or outage status;
- Processing delays;
- Reconciliation anomalies;
- Flags or escalations involving these transactions.

c. All documentation related to policies, procedures, or internal guidelines in effect at any time from August 2021 to present governing how Evolve identifies, flags, escalates, or otherwise handles ledger entries or transaction records that fail to reconcile with internal or third-party records

## XII. Migration of Custodial Accounts to Brokerage Structures

12.    All documents, communications, or internal records reflecting Evolve Bank & Trust's awareness, review, or approval of any migration of customer funds— including Juno platform users—from Evolve-held custodial deposit accounts to brokerage sweep structures. This includes, but is not limited to:

- Communications or notices received from Synapse or its partners regarding changes to account structure, terms, or disclosures;
- Internal discussions assessing the legal, operational, or custodial implications of such migration;

- Communications or analyses reflecting whether Evolve considered the method of user notice (e.g., browsewrap, amended terms of service) to be adequate or problematic;
- Any documentation reflecting Evolve's position on whether user consent was obtained or required for this migration.

**XIII. Periodic Account Statements**

13. All documents, communications, or internal records reflecting Evolve Bank & Trust's role in the review, approval, or awareness of periodic account statements or balances delivered to Synapse platform users (including Juno), including:

- Communications discussing the content, format, or branding of statements (e.g., continued use of Evolve's name/logo or FDIC-insured indicators post-migration);
- Any objections raised, approvals granted, or changes proposed by Evolve regarding periodic statements or account interfaces reflecting Evolve's custodial role.

**XIV. Account Identifiers Post-Migration**

14. All documents and communications reflecting Evolve Bank & Trust's knowledge of, participation in, or decisions regarding the preservation of user-facing account numbers, routing numbers, debit card numbers, or other account identifiers following the migration of funds to brokerage structures, including:

- Any discussion of operational, strategic, legal, or reputational reasons for maintaining these identifiers;
- Communications between Evolve and Synapse, Juno, or any platform partner regarding the display or use of Evolve-issued account numbers and branding post-migration;

1    • Internal risk assessments, compliance reviews, or customer experience

2    analyses related to the decision to retain or display such account information.

3

4    **XV. FDIC Part 363 Audit Reports**

5    **15.**   a. All Annual Independent Auditors' Reports and Management Reports

6    submitted by Evolve Bank & Trust under 12 CFR Part 363 from August 2021

7    through the present, including for each year:

8    • The annual audited financial statements;

9    • The management assessment of internal controls over financial reporting;

10   • The independent public accountant's attestation;

11   • Any accompanying communication to regulators or the FDIC;

12   • All documents or correspondence reflecting the Bank's determination not to

13   provide these materials by mail or electronically in response to previous requests.

14

15   This request follows prior correspondence with Evolve in which in-person

16   inspection was the only inspection method offered, imposing an undue burden

17   inconsistent with 12 CFR Part 363's intent and guidance from FDIC staff.

18

19   If no such report exists for any requested year, please affirmatively state so and

20   identify the reason (e.g., institution below reporting threshold for that year).

21

22   **Privilege and Withholding Instructions**

23   To the extent that any document responsive to these requests is withheld or

24   redacted on the basis of attorney–client privilege, the work product doctrine, or

25   any other claim of privilege, Evolve Bank & Trust shall provide a privilege log

26   identifying:

27   (i) the type of document,

28   (ii) its date,

1    (iii) a general description of its subject matter,

2    (iv) the identity of all authors and recipients, and

3    (v) the specific privilege asserted.

4    These requests are not intended to seek privileged legal advice. They are limited

5    to operational, contractual, compliance, and reconciliation-related documents

6    pertaining to custodial accounts and Synapse-supported platforms.

7

8    **Production Format and Accessibility**

9    Production shall be made in native digital format where applicable and practical.

10    If any responsive documents are produced in a proprietary or non-standard file

11    format that requires specialized software or licensing to be accessed or

12    understood, Evolve Bank & Trust must either:

13    (a) provide the necessary viewer or access credentials; or

14    (b) convert the document to a reasonably accessible format (e.g., PDF or CSV),

15    along with a description of any data fields or functionality not preserved in the

16    conversion.

17

18    Production should be made in native digital format where available and include

19    associated metadata, including but not limited to email headers, file creation and

20    modification dates, and authorship or custodial identifiers. Documents should be

21    transmitted to Justin Newbern at an address or secure location to be mutually

22    agreed upon.

23

24    If complete compliance by the deadline is not feasible, please propose a

25    reasonable format and schedule for rolling production. However, the

26    unavailability, dispute, or privilege review of certain items should not delay

27    production of other responsive materials. Fulfillment of all non-disputed, readily

14

**56**

1 | accessible, or partially available materials is expected to proceed concurrently.

2 | Failure to comply may result in further relief being sought from the Court.

3 | Movant remains open to reasonable meet-and-confer communications regarding

4 | scope, formatting, or production logistics, provided they are made in good faith

5 | and without delay.

6 |

7 |

8 | Justin Newbern

9 | Dated: July 2, 2025

15

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the foregoing document entitled: **EVOLVE BANK & TRUST'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA AND/OR FOR A PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF EDWARD SOMERS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 8, 2025,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **August 8, 2025,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**\*\*PURSUANT TO PROCEDURES, JUDGE MARTIN R. BARASH WAIVES SERVICE OF JUDGE'S COPY.**

Justin Newbern
3701 Wesley Dr. NW
Olympia, WA 98502

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 8, 2025,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**<u>BY EMAIL</u>**

Justin Newbern – <u>jay@jaynewbern.com</u>

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 8, 2025 | Mela Galvan | /s/ Mela Galvan |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **Ron Bender**    rb@lnbyg.com
- **David A Berkley**    david.berkley@wbd-us.com, mary.koo@wbd-us.com;Sul.Lee@wbd-us.com
- **J Scott Bovitz**    bovitz@bovitz-spitzer.com
- **Rudy J Cerone**    rcerone@mcglinchey.com, lgraff@mcglinchey.com;jingargiola@mcglinchey.com
- **Sara Chenetz**    schenetz@perkinscoie.com,
  docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-
  8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Andrew Michael Cummings**    andrew.cummings@hklaw.com,
  philip.dobbs@hklaw.com;hapi@hklaw.com;sandy.olalde@hklaw.com
- **Michael G. Farag**    mfarag@gibsondunn.com
- **M Douglas Flahaut**    df@echoparklegal.com
- **Jacqueline Foroutan**    jacqueline.foroutan@akerman.com, akermanlas@akerman.com
- **Maria L Garcia**    Maria.L.Garcia@lewisbrisbois.com
- **Paul R. Glassman**    pglassman@stradlinglaw.com
- **Nicholas Christian Glenos**    cglenos@bradley.com
- **Michael H Goldstein**    mgoldstein@goodwinprocter.com, ASchaefer@goodwinlaw.com
- **Michael I. Gottfried**    mgottfried@elkinskalt.com,
  lwageman@elkinskalt.com,docketing@elkinskalt.com,lmasse@elkinskalt.com
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **Ralph P Guenther**    rguenther@guentherlawgroup.com
- **Robert T. Honeywell**    robert.honeywell@klgates.com
- **Lance N Jurich**    ljurich@loeb.com,
  pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com;fmckeown@loeb.com
- **Jane Kim**    jkim@kellerbenvenutti.com
- **Monica Y Kim**    myk@lnbyg.com, myk@ecf.inforuptcy.com
- **Jeffrey C Krause**    jkrause@gibsondunn.com, dtrujillo@gibsondunn.com;jstern@gibsondunn.com
- **Sabita Krishnan**    sabita.krishnan@cfpb.gov
- **Joseph Lake**    joseph.lake@cfpb.gov
- **William J Levant**    wlevant@kaplaw.com, wlevant@gmail.com
- **Adam A Lewis**    alewis@mofo.com, adam-lewis-3473@ecf.pacerpro.com
- **Norman Norman Lueck**    dennis.lueck@akerman.com, katie.solem@akerman.com
- **Jelena McWilliams (TR)**    jmcwilliams@cravath.com, mao@cravath.com
- **Krikor J Meshefejian**    kjm@lnbyg.com
- **Fred Neufeld**    fneufeld@stradlinglaw.com, tingman@sycr.com
- **Berj Parseghian**    bparseghian@lippes.com
- **Valerie Bantner Peo**    vbantnerpeo@buchalter.com
- **David M Poitras**    dpoitras@bg.law
- **Jeremy V Richards**    jrichards@kbkllp.com, bdassa@pszjlaw.com;imorris@pszjlaw.com
- **Holly Roark**    holly@roarklawboise.com, RoarkLawOffices@jubileebk.net
- **Paul M Rosenblatt**    prosenblatt@kilpatricktownsend.com, moroberts@ktslaw.com
- **Thomas B Rupp**    trupp@kbkllp.com
- **Brandy A Sargent**    brandy.sargent@klgates.com, litigation.docketing@klgates.com;janna.leasy@klgates.com
- **Callan C Searcy**    bk-csearcy@texasattorneygeneral.gov
- **Zev Shechtman**    Zev.Shechtman@saul.com,
  zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul.com
- **Jason D Strabo**    jstrabo@mwe.com, jbishopjones@mwe.com;dnorthrop@mwe.com
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Jeffrey C Wisler**    jwisler@connollygallagher.com, dperkins@connollygallagher.com
- **Claire K Wu**    claire.wu@pillsburylaw.com, renee.evans@pillsburylaw.com;docket@pillsburylaw.com
- **Beth Ann R. Young**    bry@lnbyg.com, bry@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                      **F 9013-3.1.PROOF.SERVICE**